Misc. Docket No. _____

# United States Court of Appeals for the Federal Circuit

IN RE SK HYNIX INC., SK HYNIX AMERICA INC.,

*Petitioner.*

On Petition for a Writ of Mandamus to the
U.S. District Court for the Western District of Texas in
Case No. 6:20-cv-194-ADA, District Judge Alan Albright

## PETITION FOR A WRIT OF MANDAMUS WITH APPENDIX IN SUPPORT

KENNETH L. NISSLY
LAW OFFICES OF KENNETH L.
  NISSLY
P.O Box 3462
Saratoga, CA 95070-1462
Telephone: (408) 398-7043

CARTER G. PHILLIPS
RYAN C. MORRIS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

*Counsel for SK hynix Inc., SK hynix America Inc.*

February 5, 2021

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | |
| **Short Case Caption** | In re: SK hynix Inc. |
| **Filing Party/Entity** | SK hynix Inc. and SK hynix America Inc. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/05/2021

Signature:    */s/ Carter G. Phillips*

Name:    Carter G. Phillips

FORM 9. Certificate of Interest

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| SK hynix Inc. | | SK Telecom Co., Ltd. |
| SK hynix America Inc. | | SK hynix Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| David C. Giardina, Sidley Austin LLP, Chicago, IL | Theodore W. Chandler, formerly of Sidley Austin LLP, Los Angeles, CA | Michael D. Hatcher, Sidley Austin LLP, Dallas, TX |
| Brian R. Nester, Joseph A. Micallef,  Michael R. Franzinger, Sidley Austin LLP, Washington, DC | Christopher S. Ross, Alice A. Wang, Sidley Austin LLP, Washington, DC | Wonjoo Suh, formerly of Sidley Austin LLP, Washington, DC |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Netlist, Inc. v. SK hynix Inc., Case No. 8:16-CV-01605 (C.D. Cal.) | Netlist, Inc. v. SK hynix Inc., Case No. 8:17-CV-01030 (C.D. Cal.) | Netlist, Inc. v. SK hynix Inc., Civil Action No. 6:20-cv-00525 (W.D. Tex.) |
| In re SK Hynix Inc., Case No. 21-113, (Fed. Cir.) | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

INTRODUCTION ...........................................................................1

RELIEF SOUGHT ..........................................................................3

ISSUES PRESENTED ......................................................................3

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF FACTS ................................................................3

    A.    Background on Parties and Patent Family ...........................3

    B.    Background of Related Litigation ...................................6

    C.    Background of This Litigation ....................................11

    D.    The District Court's Transfer Decision.......................13

REASONS WHY THE WRIT SHOULD ISSUE ..................................13

I.    The District Court's Numerous Errors in Applying the First-to-File Rule Warrants Issuance of the Writ. .....................................15

    A.    The WDTX and CDCA cases involve substantially similar issues. ......................................................................15

    B.    The district court grossly abused its discretion in assessing the facts and applying the relevant factors. ..............................19

        1.    Extent of Overlap. ..................................................21

        2.    Likelihood of conflict. ............................................24

        3.    Comparative advantage and the interest of each forum in resolving the dispute.............................................25

II.    Transfer Is Also Warranted Under Section 1404(a). .....................28

    A.    The Private Interest Factors Overwhelmingly Favor Transfer.....................................................................30

        1.    "Access to sources of evidence" strongly weighs in favor of transfer. ...............................................................30

2.    The "availability of compulsory process" strongly favors transfer. ..................................................................32

3.    "Witness convenience" overwhelmingly favors transfer. .....34

4.    No "practical problems" weigh against transfer, and judicial economy favors transfer. ..........................................36

B.    The Public Interest Factors Also Favor Transfer. ...................38

1.    The "local interest" factor favors transfer..............................38

2.    "Court congestion" is neutral as to transfer. ........................40

3.    The "familiarity of the forum with the governing law" favors transfer. ......................................................................40

CONCLUSION ........................................................................................41

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acer Am. Corp.*,
  626 F.3d 1252 (Fed. Cir. 2010) ...................................................... 31, 39

*In re Adobe Inc.*,
  823 F. App'x 929 (Fed. Cir. 2020) ........................................................ 40

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*,
  No. 6:13-CV-364, 2014 WL 12570501 (W.D. Tex. June 11,
  2014) ...................................................................................... 36, 38

*In re Amerijet Int'l, Inc.*,
  785 F.3d 967 (5th Cir. 2015) ............................................................. 19

*In re Apple Inc.*,
  979 F.3d 1332 (Fed. Cir. 2020) ................................................... *passim*

*Cadle Co. v. Whataburger of Alice, Inc.*,
  174 F.3d 599 (5th Cir. 1999) ........................................................ 16, 19

*Cameron Int'l Corp. v. Nitro Fluids LLC*,
  No. 6:20-CV-00125-ADA, 2020 WL 3259809 (W.D. Tex.
  June 16, 2020) .............................................................................. 17

*Dataquill, Ltd. v. Apple Inc.*,
  Case No. 13-CA-706, 2014 WL 2722201 (W.D. Tex. June
  13, 2014) ..................................................................................... 39

*In re Echostar Corp.*,
  388 F. App'x. 994 (Fed. Cir. 2010) ...................................................... 14

*In re EMC Corp.*,
  501 F. App'x 973 (Fed. Cir. 2013)
  ................................................................................... 18, 23, 25

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) .......................................................... 19

*In re Genentech, Inc.*,
  566 F.3d 1338 (Fed. Cir. 2009) .................................................... 30, 34

*In re Hoffmann-LaRoche Inc.*,
  587 F.3d 1333 (Fed. Cir. 2009) ...................................................... 38

*In re HP Inc.*,
  No. 2018-149, 2018 WL 4692486 (Fed. Cir. Sept. 25, 2018) ........ 33, 34

*In re HTC Corp.*,
  889 F.3d 1349 (Fed. Cir. 2018) ...................................................... 27

*Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*,
  665 F.3d 671 (5th Cir. 2011) .................................................... 16, 19, 21

*Leach v. Day To Day Imports, Inc.*,
  No. 2:17-07351, ECF No. 50 (C.D. Cal. Nov. 14, 2017) ...................... 29

*In re Morgan Stanley*,
  417 F. App'x 947 (Fed. Cir. 2011) ........................................................ 36

*In re Nintendo Co.*,
  589 F.3d 1194 (Fed. Cir. 2009) .................................................... *passim*

*In re Nitro Fluids*,
  978 F.3d 1308 (Fed. Cir. 2020) .................................................... *passim*

*Save Power Ltd. v. Syntek Fin. Corp.*,
  121 F.3d 947 (5th Cir. 1997) ............................................. 15, 17, 19, 21

*TC Heartland LLC v. Kraft Food Grp. Brands, LLC*,
  137 S. Ct. 1514 (2017) ................................................................ *passim*

*In re TOA Tech.*,
  543 F. App'x 1006 (Fed. Cir. 2013) .................................................... 36

*In re TS Tech. United States Corp.*,
  551 F.3d 1315 (Fed. Cir. 2008) ........................................... 3, 13, 35, 36

*In re Vistaprint Ltd.*,
  628 F.3d 1342 (Fed. Cir. 2010) .......................................................... 37

*In re Volkswagen AG,*
    371 F.3d 201 (5th Cir. 2004) .................................................... 14, 15, 34

*In re Volkswagen of Am., Inc.,*
    545 F.3d 304 (5th Cir. 2008) (en banc) .......................................... 13, 14

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,*
    751 F.2d 721 (5th Cir. 1985) ............................................................... 16

*XY, LLC v. Trans Ova Genetics, LC,*
    No. W-16-CA-00447-RP, 2017 WL 5505340 (W.D. Tex.
    Apr. 5, 2017) ........................................................................................ 28

## Statutes

28 U.S.C. § 1295 ........................................................................................ 3

28 U.S.C. § 1400(b) .................................................................................. 26

28 U.S.C. § 1404 ...................................................................................... 13

28 U.S.C. § 1404(a) ...................................................................... 2, 12, 28

## Other Authorities

Fed. R. Civ. P. 45(c) ............................................................................... 33

# INTRODUCTION

Petitioners SK hynix Inc. and SK hynix America Inc. (together "SK hynix") respectfully petition this Court for a writ of mandamus to compel the United States District Court for the Western District of Texas ("WDTX") to transfer this case to the Central District of California ("CDCA").

As this Court recently recognized, the district court allowed SK hynix's transfer motion to "linger[] unnecessarily on the docket" and "required the parties to proceed ahead with the merits." APPX0645. Because that contravened this Court's precedent, the Court ordered the district court to stay proceedings and decide the motion. Instead of staying the proceedings, however, the district court quickly ordered a hearing on the transfer motion and denied it that same day, while also inexplicably shortening SK hynix's time to file its Markman brief and moving up the Markman hearing by three weeks and by rescheduling trial date five months earlier. That decision is replete with errors. Among other things, the court failed to assess transfer as of the time SK hynix filed its motion, and it either completely ignored or misstated

critical facts. The court's various errors demonstrate a clear abuse of discretion that warrants mandamus.

The district court's abuse of discretion is particularly egregious because this is a prototypical case for transfer. SK hynix sought to transfer this case to CDCA where two related cases between the same parties are currently pending. Those cases involve the same family of patents, the same accused products, and even the same accused functionality as this case. Plaintiff Netlist has declared that each of the patents involved in CDCA and the patents asserted here are essential to the same industry standards for computer memory modules. And in each case, SK hynix has asserted counterclaims against Netlist for its failure to license these supposedly standard-essential patents on reasonable and non-discriminatory ("RAND") terms and conditions. These counterclaims cover the very patents Netlist has asserted here. Thus, transfer is warranted under both the first-to-file rule and 28 U.S.C. § 1404(a). Because the basis for transfer is clear, the Court should compel the district court to transfer this case to CDCA.

## RELIEF SOUGHT

SK hynix respectfully requests a writ of mandamus compelling the district court to transfer this case to CDCA.

## ISSUES PRESENTED

Whether this case should be transferred to CDCA, because substantially similar cases were filed there first, and because the private and public factors compel transfer to that court.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this petition because the underlying case is a patent case. *See* 28 U.S.C. § 1295; *id.* §§ 1331, 1338(a). Mandamus is available "to correct a clear abuse of discretion or usurpation of judicial power." *See In re TS Tech. United States Corp.*, 551 F.3d 1315, 1318 (Fed. Cir. 2008).

## STATEMENT OF FACTS

### A.    Background on Parties and Patent Family

In the case below, Netlist accuses SK hynix's memory module products of infringing U.S. Patent Nos. 9,858,218 ("the '218 patent") and 10,474,595 ("the '595 patent"), which Netlist contends are essential to certain Joint Electron Device Engineering Council ("JEDEC")

standards for memory modules, where JEDEC is the established standards-setting organization for the industry.

SK hynix Inc. is a Korean company with its principal place of business in Korea. APPX0095. SK hynix America Inc. is a California corporation headquartered in San Jose, California. APPX0095-0096. SK hynix America Inc. is a subsidiary of SK hynix Inc. in the United States, providing support for customer or client relationship operations. *Id.* California has been the base of SK hynix's U.S. operations for over 30 years, with over 200 employees in that State. APPX0096. The documents related to the research and development, operation, and function of the accused products, as well as related marketing, sales, and licensing information, are maintained in Korea. APPX0097. SK hynix America does have a small office in Austin, Texas, but the nine employees working in that office have never been relevant to this case. APPX0097-0098. Nor are they involved in the research, design, development, or manufacture of any accused products. APPX0098.

"Netlist is headquartered and has its principal place of business in [CDCA], sells products in [CDCA], and has been harmed by Defendants' conduct, business transactions and sales in [CDCA]." APPX0198-0199,

APPX0300-0301. Netlist has also asserted that "Netlist engineers working in Irvine, California, invented the technology of the asserted patents and worked to implement the patented inventions into Netlist's … products …." APPX0223, APPX0354. "Since 2007, substantially all of the research and development, design, engineering and testing of [the products] was done by Netlist engineers working in Irvine, California." APPX0225, APPX0356. Netlist does not allege it has a presence in Texas.

Netlist has declared that many of its patents are essential to JEDEC industry standards for memory modules. APPX0199-0200, APPX0218, APPX0301-0302, APPX0313. These allegedly standard-essential patents include U.S. Patent Nos. 8,489,837 ("the '837 patent") and 9,535,623 ("the '623 patent"), as well as the '218 and '595 patents. APPX0109-0120 ('837 patent), APPX0122-0135 ('623 patent), APPX0137-0150 ('218 patent), APPX0152-0168 ('595 patent). The '623, '218, and '595 patents all claim to be continuations, through intervening applications, of the '837 patent. APPX0122, APPX0138, APPX0153.

## B.   Background of Related Litigation

Netlist has filed seven prior cases accusing SK hynix's memory modules of infringing Netlist's allegedly standard-essential patents—two in district court, two in the ITC, and three before foreign tribunals. Across these proceedings, Netlist and SK hynix have taken dozens of depositions, conducted two trials in the ITC, and engaged in litigation in two CDCA cases. None of these cases was brought in Texas, and no fact witnesses reside in Texas.

In the two California cases—as here—Netlist has accused SK hynix's standard-compliant DDR4 LRDIMM and RDIMM memory modules of infringing standard-essential patents. *Compare* APPX0035, APPX0039 *with* APPX0212, APPX0306-0307. Specifically, Netlist asserts, both in California and in Texas, that SK hynix's products infringe based on their incorporation of "Clock-to-CA training mode" functionality called for by JEDEC standards. APPX0045-0051, APPX0054-0060, APPX0219, APPX0319-0323.

In 2016, Netlist sued SK hynix in CDCA (No. 8:16-CV-01605) ("*California I*") and the U.S. International Trade Commission (No. 337-TA-1023) ("*ITC I*"). APPX0196, APPX0218, APPX0222. Netlist asserted

that SK hynix infringed standard-essential patents, including the '837

patent. SK hynix filed counterclaims in *California I* asserting that

Netlist had violated contractual obligations to license its standard-

essential patents to SK hynix on reasonable and non-discriminatory

("RAND") terms. APPX0244-0245. The counterclaims seek a

determination of the RAND terms to license those patents that Netlist

asserts to be standard-essential, as well as an order barring Netlist

from enforcing any injunctive relief based on infringement of any

standard-essential patent. APPX0246, APPX0248.

SK hynix's counterclaims encompass both the '218 patent and '595

patent that Netlist asserts in the underlying case here. APPX0079-

0080. Indeed, Netlist acknowledged before the court below that it has

"committed" to offer to license the asserted patents on RAND terms

under the JEDEC Patent Policy. APPX0032-0033.

The parties advanced both the claims and the counterclaims in

*California I*, including through negotiations over discovery and

protective orders, APPX0261-0275, APPX0277-0292, exchange of

discovery including infringement and invalidity contentions,

APPX0100, and full briefing of all claim construction issues. *Id*. Judge

Staton also held a hearing and granted a motion to disqualify Netlist's

initial counsel, APPX0252, and struck portions of expert claim-

construction declarations Netlist had filed improperly, APPX0294.

Judge Staton eventually stayed Netlist's claims—though not SK hynix's

counterclaims—pending the resolution of *inter partes* review

proceedings on all claims of the relevant patents. APPX0340-0342. The

counterclaims were not stayed because *ITC I* proceeded apace, putting

SK hynix at risk of an exclusion order that the counterclaims alleged

would be a violation of Netlist's RAND licensing obligations. APPX0341.

As a result, discovery continued in *California I* as to SK hynix's RAND

counterclaims.

In January 2018, the ITC issued a Final Determination of non-

infringement of all six asserted patents in *ITC I*, including the '837

patent. APPX0376. Shortly thereafter, the Patent Trial and Appeal

Board ("PTAB") issued final written decisions finding invalid each of the

asserted claims of the patents at issue in both *California I* and *ITC I*,

including those of the '837 patent. APPX0383. Judge Staton then stayed

SK hynix's RAND counterclaims in *California I* based on the parties'

agreement and consistent with her previous ruling that patent claims

and RAND counterclaims should not be bifurcated. APPX0380. Judge

Staton continues to manage the case and requires regular joint reports.

*Id.* The parties have agreed to update Judge Staton once the transfer

motion is resolved, and provide their proposals for how *California I*

should proceed. APPX0550. During the course of that case, Netlist has

maintained, and the CDCA ordered, that the infringement and RAND

claims should be litigated together rather than bifurcated. APPX0256.

And, under a cross-use discovery agreement for *California I* and *ITC I*,

the parties have served and responded to hundreds of interrogatories,

requests for admission, and requests for production; exchanged over 2.4

million pages of document production; served over 11,000 pages of

expert reports; and taken over 25 days of depositions of fact and expert

witnesses. APPX0330-0331, APPX0100.

Prior to the ITC's determination in *ITC I* (and the ensuing district

court stay), in June 2017, Netlist filed a second case against SK hynix

in CDCA (No. 8:17-CV-01030) ("*California II*"), and then a second case

in the ITC in October 2017 (No. 337-TA-1089) ("*ITC II*").[1] APPX0298,

---

[1] Netlist also sued SK hynix twice in China and once in Germany, based
on patents from the same family as those asserted in U.S. litigation.

APPX0313, APPX0353. In these cases, Netlist asserted claims of the '623 patent, a continuation of the '837 patent. APPX0301-0302. In *California II*, SK hynix reiterated the RAND counterclaims it asserted in *California I*. APPX0345-0346, APPX0348-0349. Judge Staton ultimately consolidated and stayed both CDCA cases. APPX0367.

*ITC II* resulted in a determination that *ITC I*'s non-infringement finding with respect to the '837 patent collaterally estopped Netlist from asserting the '623 patent. APPX0394-0399. The ITC separately concluded that the accused products do not infringe the '623 patent. APPX0399-0419. These findings became final after Netlist declined to seek review. APPX0437.

Finally, while *California II* and *ITC II* were pending, SK hynix filed an IPR against the '623 patent, which resulted in a final written decision invalidating all asserted claims. APPX0388-0389. Netlist initially appealed that decision, and that appeal was pending at the time Netlist filed the underlying case; Netlist has abandoned that appeal. APPX0434.

---

These cases resulted in the patents being found not infringed, invalid, or both. APPX0424-0425.

## C.     Background of This Litigation

Netlist filed the underlying action on March 17, 2020. APPX0027.
Its complaint alleges that the same SK hynix products at issue in the
California cases infringe the '218 and '595 patents based on their
incorporation of the same "Clock-to-CA training mode" functionality
accused in California. APPX0035, APPX0045-0051, APPX0039,
APPX0054-0060.

As noted, both the '218 and '595 patents, and the '623 patent, are
continuations of the '837 patent asserted in *California I*. All four
patents share the same specification, inventor, and claimed priority
dates. APPX0109-0120, APPX0122-0135, APPX0137-0150, APPX0152-
0168. Indeed, the examiner for the '218 and '595 patents initially
rejected all of the then-pending claims "on the ground of nonstatutory
double patenting as being unpatentable over claims 1-18" of the '837
patent, finding that "they are not patentably distinct from each other."
APPX0173; APPX0185. Netlist overcame this rejection only by filing
terminal disclaimers tying the expiration of the '218 and '595 patents to
the '837 patent's expiration. APPX0183, APPX0189, APPX0192.

11

Because this case substantially overlaps with *California I* and *California II*, SK hynix moved to transfer it to CDCA on May 4, 2020, under the first-to-file rule and 28 U.S.C. § 1404(a). *See* APPX0074-0094.[2] After the transfer motion languished for eight months, SK hynix petitioned this Court for a writ of mandamus to compel the court to transfer Case No. 6:20-cv-194-ADA to CDCA, or, alternatively, to decide SK hynix's motion to transfer. *See* Case No. 21-113 (Fed. Cir. filed Jan. 22, 2021); APPX0572-0618. The Court ordered Netlist Inc. to respond. *See* APPX0619; APPX0621. Shortly thereafter, the district court scheduled a hearing for February 2, 2021, on the motion to transfer. *See* APPX0016. On February 1, 2021, this Court granted SK hynix's petition, directing the district court to stay proceedings and rule on the transfer motion. APPX0643-0646.

---

[2] Shortly after briefing on the transfer motion concluded, Netlist filed another action asserting U.S. Patent No. 10,217,523 ("the '523 patent") on June 15, 2020. *See Netlist, Inc. v. SK hynix Inc.*, Civil Action No. 6:20-cv-00525 (W.D. Tex.) ("525 action"). APPX0061. The parties stipulated that a ruling on the transfer motion in this case "shall be binding upon and have the same effect" in the 525 action. APPX00565.

### D.    The District Court's Transfer Decision

The day after this Court's mandamus order, the district court held a hearing on the transfer motion. It did not enter a stay as directed, but, instead, denied transfer through an opinion later that day. *See* APPX0647. The court concluded that (1) the first-to-file rule does not apply, APPX0650-0654; (2) SK hynix has not established a "threshold requirement" that Netlist could have filed the action in CDCA under *TC Heartland LLC v. Kraft Food Grp. Brands, LLC*, 137 S. Ct. 1514 (2017), APPX0656-0657; and (3) the public and private factors relevant to transfer under 28 U.S.C. § 1404 do not warrant transfer, APPX0657-0661. Specifically, the court rejected transfer under the first-to-file rule on the grounds that the WDTX "case involves different asserted claims from different patents" and did not present any significant overlap with the CDCA cases. APPX0651. And it concluded that four of the *Volkswagen* public and private interest factors weighed against transfer, while the other four were simply neutral. APPX0655-0656.

## REASONS WHY THE WRIT SHOULD ISSUE

The Court should grant mandamus to correct the district court's clear abuse of discretion. *See In re TS Tech. United States Corp.*, 551

F.3d 1315, 1318 (Fed. Cir. 2008). A court clearly abuses its discretion if it "(1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts," and if "such error[] produce[s] a patently erroneous result." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc) ("*Volkswagen II*") (citations and internal quotation marks omitted).

Separately, under Fifth Circuit precedent, a district court should grant a transfer motion if the movant shows that the transferee venue is clearly more convenient than the transferor venue. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc).[3] In the Fifth Circuit, district courts evaluate a number of private and public interest factors in making this determination. The private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004).

---

[3] This Court applies regional circuit law when considering transfer motions. *See, e.g.*, *In re Echostar Corp.*, 388 F. App'x. 994, 995 (Fed. Cir. 2010).

The public factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.*

Mandamus is appropriate here in light of SK hynix's showing that the case should be transferred and the district court's failure to properly apply the "governing legal standards." *In re Nitro Fluids*, 978 F.3d 1308, 1311 (Fed. Cir. 2020). SK hynix's transfer motion indisputably demonstrated that this case should be heard in CDCA—not WDTX—because of the "stark contrast in relevance, convenience, and fairness between the two venues." *In re Nintendo Co.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009). The district court abused its discretion in reaching a contrary conclusion.

## I.   The District Court's Numerous Errors in Applying the First-to-File Rule Warrants Issuance of the Writ.

### A.   The WDTX and CDCA cases involve substantially similar issues.

As a "general rule," "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd.*

*v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). Even where

overlapping cases arise different districts, "[t]he concern manifestly is to

avoid the waste of duplication, to avoid rulings which may trench upon

the authority of sister courts, and to avoid piecemeal resolution of

issues that call for a uniform result." *West Gulf Maritime Ass'n v. ILA*

*Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985). Indeed, "the focus

of the first-to-file rule is to avoid potential interference in the affairs of

another court." *In re Nitro Fluids*, 978 F.3d at 1312.

   The Fifth Circuit evaluates substantial overlap by looking to such

factors as whether "the core issue … was the same" or whether "much of

the proof adduced … would likely be identical." *Int'l Fid. Ins. Co. v.*

*Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011).[4] As the

district court recognized in its own recent orders on transfer, "[i]n

patent cases, courts determining whether cases were substantially

similar have examined whether they involved the same parties, the

---

[4] "[O]nce the district court [finds] that the issues *might* substantially overlap, the proper course of action [is] for the court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999) (emphasis added).

same technology, the same inventors, overlapping remedies, the same

witnesses, or overlapping issues in claim construction." *Cameron Int'l*

*Corp. v. Nitro Fluids LLC*, No. 6:20-CV-00125-ADA, 2020 WL 3259809,

at *2 (W.D. Tex. June 16, 2020), *mandamus granted sub nom. In re*

*Nitro Fluids LLC*, 978 F.3d 1308 (Fed. Cir. 2020) (citation omitted).

Critically, the first-to-file rule "does not … require that cases be

identical." *Save Power*, 121 F.3d at 950; *cf. In re Nitro Fluids, Inc.*, 978

F.3d 1308,1309-10 (Fed. Cir. 2020) (granting mandamus where second-

filed suit "alleg[ed] that the same accused products infringe two …

other related patents").

The overlap between the WDTX and CDCA cases is obvious and

substantial. The '218 and '595 patents descend directly from the '837

patent asserted in California. Indeed, the '218 and '595 patents share

an identical specification with the earlier-asserted patents and include

claims that the Patent Office found to be "not patentably distinct from"

those of the earlier-asserted patents. *See supra*, 11. The accused

products are the same. And Netlist's infringement theories are the

same. Hence, the claim construction, infringement, and validity

analyses and discovery will be nearly identical across all three cases.

That the PTO has found the claims invalid or that Netlist has abandoned its appeals of those decisions is irrelevant. Transfer motions are "decided based on 'the situation which existed when suit was instituted.'" *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013) (quoting *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)). When Netlist filed this case, it was still appealing the PTAB decisions invalidating the claims being asserted in CDCA. Nor has Netlist denied the substantial overlap of the RAND counterclaims.

Indeed, the RAND counterclaim issues over the '218 and '595 patents do not merely overlap with the RAND issues pending in *California I* and *II*; they are the same issues. As in the *California* cases, SK hynix asserted a counterclaim here seeking a remedy for Netlist's breach of its RAND obligations on all allegedly standard-essential patents. APPX0479. But the CDCA counterclaims seek a determination of the RAND terms for a license to *any* alleged Netlist standard-essential patent (which SK hynix has committed to accept), and therefore *already include* the '218 and '595 patents asserted here. Furthermore, any damages award arising from the patent claims in WDTX must take into account Netlist's RAND licensing obligations, *see,*

18

*e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1235 (Fed. Cir. 2014), so proceedings in WDTX risk inconsistent determinations and a significant waste of judicial resources when the same issues are proceeding in California, where substantial discovery has already taken place. *See supra*, 9. This is precisely when transfer is compelled. *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 976-77 (5th Cir. 2015), as revised (May 15, 2015).

## B.    The district court grossly abused its discretion in assessing the facts and applying the relevant factors.

The district court spent precisely two sentences on whether the overlap between this case and the CDCA cases compels transfer under the first-to-file rule. APPX0651. This was error because the district court turned immediately to the discretionary factors and elided the fact that, under Fifth Circuit precedent, once a second-filed court finds a substantial overlap, it must allow the first-filed court to determine how the second-filed action should proceed. *See Cadle Co.*, 174 F.3d at 606; *Save Power*, 121 F.3d at 950. In giving this question short shrift, the court ignored the factors the Fifth Circuit has held demonstrate substantial overlap, *see Sweet Little Mexico*, 665 F.3d at 678, which it

19

has cited in recent cases. These factors all point firmly toward transfer. *See supra*, 15-19. Ignoring them was an abuse of discretion.

In addition, the district court made a critical error in the second part of its two-sentence analysis, an error it repeated throughout its opinion. The court stated that "the -525 action … involves a patent that is unrelated to any of those asserted in the California cases." APPX0651. But the 525 action is irrelevant because the motion to transfer addressed the patents asserted in the 194 action. The parties stipulated that the transfer decision "shall be binding upon and have the same effect in the [525 action] as if filed and decided herein," APPX0565, but the 525 action was not otherwise part of the transfer motion. Indeed, the 525 action had not been filed when SK hynix moved for transfer. Accordingly, the '523 patent's relationship to *California I* and *II* is inconsequential to the transfer motion before the court. APPX0651, APPX0652, APPX0653.

In any event, the '523 patent at issue in the 525 action is a continuation of three patents asserted in *California I* and *ITC I*.[5] The PTAB may have invalidated the asserted claims of those three patents,

---

[5] These patents are U.S. Patent Nos. 8,756,364, 8,516,185, 8,001,434.

and the ITC may have found the asserted claims of those patents not infringed, APPX0559. But, Netlist has not dismissed these claims in *California I*, so they remain pending there. The assertion that the '523 patent is not related to the CDCA cases is flatly wrong.

The district court also erred in analyzing substantial overlap. It stated that "[t]he overlap … is far from 'complete or nearly complete,'" but that is not the standard. *See supra*, 16-17. And the court nevertheless abused its discretion in assessing the relevant factors. It cited the correct discretionary factors: "the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute," *Int'l Fid. Ins.*, 665 F.3d at 678. APPX0650. But its application of these factors relied on "clearly erroneous assessment[s] of the evidence." *In re Nitro Fluids*, 978 F.3d at 1310 (citation omitted).

### 1. Extent of Overlap.

As described above, the issues in this case substantially overlap with the ones raised in the CDCA. Without acknowledging the weight of precedent stating that overlap does not require identical claims, *e.g.*, *Save Power*, 121 F.3d at 950, the district court simply stated that

21

"[t]ransfer under the first-to-file rule requires far more than patents from the same family, same parties, and same accused products." APPX0652. But this assertion ignores the similarities between the theories of infringement, the accused products, the evidence, and numerous other issues. *See supra*, 17-18. The court's assertion also ignores SK hynix's RAND counterclaims, which include all the patents Netlist has asserted here. The district court's failure to weigh the relevant facts was an abuse of discretion. *See In re Nitro Fluids*, 978 F.3d at 1310 ("Errors of judgment in weighing relevant factors" constitute "an abuse of discretion.").

Indeed, the district court's cursory rejection of SK hynix's arguments about the RAND counterclaims rests on an inaccurate portrayal of the relevant facts. The district court concluded "there are no viable RAND claims pending in the California cases" and so (presumably) there can be no overlap. APPX0652. But that is not so. As a preliminary matter, it is not the province of one district court to say whether claims pending before a different district court are "viable."[6]

---

[6] Netlist has never disputed (a) that the CDCA counterclaims cover the patents at issue in the WDTX, (b) that the CDCA counterclaims overlap

The district court's role in a transfer decision is to resolve the issues based on the circumstances as they existed when transfer was sought. *In re EMC Corp.*, 501 F. App'x at 976. When Netlist filed the WDTX action and again when SK hynix filed its transfer motion, Netlist's claims based on the '623 patent were alive on appeal, and even today Netlist has not sought to dismiss them from *California I.*

Apart from that, SK hynix's RAND counterclaims were and remain pending in CDCA and stand on their own, extending to any patent Netlist contends is standard essential, including the patents asserted in the WDTX action. Even if Netlist withdrew its patent claims in CDCA, SK hynix's counterclaims would remain pending there. Further, those counterclaims—which (1) allege a claim for breach of contract based on Netlist's litigation and negotiation conduct and its failure to offer SK hynix a RAND license to its portfolio of allegedly essential patents, (2) seek equitable relief barring Netlist from further breaching its RAND licensing obligations, and (3) seek a declaration of the RAND terms and conditions for a license encompassing the patents

---

with the WDTX counterclaims, and (c) that the CDCA counterclaims could moot the 525 and 194 actions in WDTX.

Netlist claims to be essential—would moot the WDTX action as the
result would be a RAND license including the WDTX patents assuming
Netlist proves them to be essential. For this reason, the district court's
aside that SK hynix "suggests that it is willing to take licenses for
invalided patents" is simply incorrect. APPX0652. Even if subsequent
actions have invalidated some claims of the patents Netlist has asserted
against SK hynix, not all claims of those patents have been invalidated
and Netlist claims to have dozens more standard-essential patents that
it has not yet asserted in litigation against SK hynix. Against this
background, the district court's comment that SK hynix "keeps its
RAND claims in the California cases solely to gain certain tactical
advantages" is baseless. APPX0652. The CDCA has long been SK
hynix's chosen forum for its RAND counterclaims, which remain live.
These counterclaims—along with other key issues in this case—
substantially overlap with the issues in CDCA, and this case should be
transferred to that court.

### 2. Likelihood of conflict.

The district court similarly erred analyzing the potential for
conflicting decisions from CDCA and WDTX. First, it found no such

potential based on the PTAB's invalidation of the '837 and '623 patents. But the '623 patent appeal was pending when this case was filed, so the district court failed to conduct its analysis within the proper time frame. *See In re EMC Corp.*, 501 F. App'x at 976.  Second, Netlist has not dismissed any of the patents from its CDCA actions, so the risk of conflicting decisions still exists. Third, the district court ignored that there are additional claims in the patents asserted in the CDCA actions that the PTAB has not invalidated. Each of these factual mistakes reflects a clearly erroneous view of the evidence, constituting an abuse of discretion. *See In re Nitro Fluids*, 978 F.3d at 1310.

### 3. Comparative advantage and the interest of each forum in resolving the dispute.

The district court's analysis of the comparative-advantage factor rests on two facts: (1) CDCA stayed proceedings in order to try the RAND and patent claims together and (2) WDTX required the parties to make substantive progress on the case. APPX0653-0654. But the district court draws deeply flawed conclusions from these facts. The WDTX action proceeded substantively only because the district court ignored SK hynix's motion for more than eight months, requiring this Court to intercede. APPX0572. By contrast, CDCA has elected to

manage its docket more conservatively, at Netlist's and SK hynix's joint request, to try the RAND and patent claims together once the relevant ITC, PTAB, and other proceedings have concluded. As noted, Netlist has also refused to bifurcate the RAND claims from the infringement claims in CDCA. APPX0256. The district court's disregard of precedent in allowing this case to proceed despite a pending transfer motion is an insufficient basis for claiming "comparative advantage" over CDCA. *See In re Nitro Fluids*, 978 F.3d at 1312 ("the court was wrong to replace [the first-to-file] preference with its own views on the importance of speed of resolution.").

*    *    *

Finally, the district court concluded in a footnote that SK hynix's first-to-file argument sought to "trump[] the venue requirements described in [28 U.S.C. § 1400(b)] and *TC Heartland*." APPX0651. It criticized SK hynix for not "provid[ing] any legal authority for that proposition." *Id.* But SK hynix has never contended that the first-to-file rule somehow "trumps" the rule from *TC Heartland*. The first-to-file rule deals with situations where a preexisting lawsuit between the parties is currently pending. Given that the parties are already before a

26

district court, questions of venue simply do not arise. Netlist has filed

two similar infringement actions against SK hynix in CDCA,

constructively agreeing that CDCA is a suitable venue for its litany of

claims. And CDCA is indisputably a proper venue for the claims against

SK hynix Inc., which is a foreign corporation not subject to venue rules.

*See In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018); *see also TC*

*Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520

n.2 (2017). SK hynix America Inc. has actively participated in those

actions and has continued to do so after *TC Heartland*.

Tellingly, neither the district court nor Netlist could muster any

case or persuasive reason to conclude that the *TC Heartland* analysis is

at all relevant to the first-to-file analysis. And the fact that the district

court relegated this point to a footnote shows that it is not a holding

relevant to its conclusion; this Court need not decide a question of first

impression. But, even if the Court concludes that a transferee venue

under the first-to-file rule takes stock of the *TC Heartland* rule, CDCA,

as shown above, is such a viable venue on the facts of this case.

## II.    Transfer Is Also Warranted Under Section 1404(a).

This case has no meaningful connection to WDTX. The events allegedly giving rise to this lawsuit did not occur in Texas. In the four years that the California and ITC cases have been litigated, not a single document has been identified in Texas, nor has a single fact witness been identified or deposed in Texas. The appropriate forum for this case is CDCA, where Netlist is located, where the events allegedly giving rise to this lawsuit occurred, and where the parties are litigating two closely related cases. The private and public factors thus overwhelmingly favor transfer. *See Nintendo Co.*, 589 F.3d at 1198. The district court reached its patently erroneous result by making clearly erroneous legal determinations and misapplying the facts to the governing standards.

As an initial matter, the district court evaded the weight of the private and public factors by erroneously concluding that this case could not have been brought in CDCA after *TC Heartland*. As SK hynix demonstrated below, *California I* and *II* establish that this case "might have been brought" in CDCA, where all parties have consented to venue—and have been litigating for four years. *See XY, LLC v. Trans*

*Ova Genetics, LC*, No. W-16-CA-00447-RP, 2017 WL 5505340, at *11

(W.D. Tex. Apr. 5, 2017) (finding forum appropriate where parties have

already "extensively litigat[ed]" in that jurisdiction). Having sued SK

hynix twice in CDCA on closely related patents, Netlist "waived [its]

right to contest venue" when it brought its "initial action in that

[venue]." Order Transferring Action, *Leach v. Day To Day Imports, Inc.*,

No. 2:17-07351, ECF No. 50 at 4 & n.1 (C.D. Cal. Nov. 14, 2017).

 The district court erroneously dismissed SK hynix's waiver point

on an incorrect factual determination that the *California I* and *II* cases

were filed before the *TC Heartland* decision. In fact, Netlist filed

*California II* shortly after *TC Heartland* was decided. APPX0297. The

district court thus erred in concluding "there is no evidence showing

that both parties have consented to the CDCA venue in the -194 and -

525 actions," and in summarily dismissing SK hynix's argument

without addressing contrary precedent. APPX0656. The district court

also ignored SK hynix's argument that the claims "might have been

brought" in CDCA if Netlist sought leave to amend its complaint in

CDCA to add the patents asserted here.

## A.    The Private Interest Factors Overwhelmingly Favor Transfer.

### 1. "Access to sources of evidence" strongly weighs in favor of transfer.

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer," so "the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). Thus, the district court recognized, SK hynix's documents will be the primary sources of evidence. APPX0657. Those documents are in California or South Korea, where SK hynix America and SK hynix are based. Moreover, given that Netlist's claims here mirror those in the prior actions, those sources of proof have been produced in California. APPX0100. Thus, access to sources of evidence strongly favors transfer.

The district court concluded that this factor "weighs slightly against transfer" because in addition to South Korea, evidence "could also be in this District" or in California. APPX0657-0658. To reach this determination, however, the court disregarded SK hynix's showing that its nine-person office in Austin is not involved in the research, design, development, or manufacture of the accused products, and thus would not house evidence relevant to the claims here. APPX0105.

30

The district court thus failed to "meaningfully compare [the sources of proof in California] to proof in or nearer to WDTX." *In re Apple Inc.*, 979 F.3d 1332, 1340 (Fed. Cir. 2020). After erroneously assuming evidence might be in Austin, the district court illogically assumed that the sources of proof in South Korea, California, and Austin were equal. *See In re Nintendo Co., Ltd.*, 589 F.3d at 1199-200 (error to assume "relevant documents were equally spread between" locations). The failure to "meaningfully consider" the vastly different volumes of evidence that would be found in SK hynix's California headquarters versus its nine-person Austin office was clear error. *In re Apple Inc.*, 979 F.3d at 1340.

The district court also incorrectly stated that SK hynix "does not contend that any sources of proof [are] located in CDCA." APPX0657. This statement ignores that Netlist's principal place of business is in CDCA. APPX0089-0090. The court also ignored that SK hynix's American headquarters are in California and thus closer to CDCA than WDTX. *See In re Acer Am. Corp.*, 626 F.3d 1252, 1256 (Fed. Cir. 2010). The district court clearly erred in concluding that access to sources of evidence slightly weighed against transfer. *See id.* at 1254-55 ("the

combination of multiple parties being headquartered in or near the

transferee venue and no party or witness in the plaintiffs chosen forum

is an important consideration.").

## 2. The "availability of compulsory process" strongly favors transfer.

Given that CDCA has subpoena power over several key third-

party witnesses, while none would be subject to WDTX's, the

availability of compulsory process strongly favors transfer. The record

shows that Dr. Hyun Lee, the sole inventor of the '837, '623, '218 and

'595 patents, is no longer employed by Netlist, yet still lives near

Netlist's headquarters in CDCA. APPX0104-0105. Another key witness

located near Netlist's headquarters in CDCA is Noel Whitney, Netlist's

former chief licensing officer who led Netlist's efforts to license its

alleged standard-essential patent portfolio, and whose testimony is

highly relevant to the RAND issues here. APPX0103-0104. Additionally,

the patent prosecutor for all four patents, and witnesses for the

suppliers of the chips containing the accused functionality used in the

accused products, are all located in California. APPX0103-0104.

By contrast, it was undisputed that *no* witnesses were subject to

WDTX's subpoena power. *See* APPX0458. Netlist's complaint does not

identify or implicate any third parties located in WDTX, and in years of litigation involving the same products, no third-party witnesses have been identified or deposed in Texas. APPX0104-0105. Going forward, more witnesses are likely to be within the 100-mile subpoena radius of CDCA given that both Netlist and SK hynix America are headquartered in California. *See* Fed. R. Civ. P. 45(c).

Although this factor clearly weighs in favor of transfer, the district court concluded that it is simply "neutral." This flies in the face of this Court's decisions, which makes clear that where some third-party witnesses are subject to the subpoena power of the transferee court, and *no* witness is subject to that of the transferor court, this factor weighs in favor of transfer. *In re HP Inc.*, No. 2018-149, 2018 WL 4692486, at *3 (Fed. Cir. Sept. 25, 2018).

The proffered reason for disregarding witnesses subject to CDCA's subpoena power was clear error. The court said there was no "show[ing] that … potential witness[es] … are unwilling to testify," citing only to its own prior case, which in turn cited only an out-of-circuit case. APPX0658 (citing *CloudofChange, LLC v. NCR Corp.*, No. 6-19-cv-00513 (W.D. Tex. Mar. 17, 2020) (citing *Duha v. Agrium, Inc.*, 448 F.3d

867, 877 (6th Cir. 2006))). However, "when there is no indication that a non-party witness is willing, the witness is presumed to be unwilling and considered under the compulsory process factor." *In re HP Inc.*, 2018 WL 4692486, at *3 n.1 (5th Cir.). Here, the witnesses' participation in the prior ITC proceeding occurred *before* they left Netlist and became third-party witnesses, and only Mr. Whitley actually traveled to attend the ITC trial. APPX0458, APPX0471. Because speculation about whether witnesses are willing to voluntarily participate is unnecessary in CDCA, that district is clearly more convenient, and the district court clearly erred. *See In re Genentech, Inc.*, 566 F.3d at 1345.

### 3. "Witness convenience" overwhelmingly favors transfer.

Convenience to witnesses is "'the single most important factor in transfer analysis,'" *Genentech*, 566 F.3d at 1343. The Fifth Circuit applies a "100-mile rule." If the transferor and transferee courts are more than 100 miles apart, "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen AG*, 371 F.3d at 204-05; *see In re Apple Inc.*, 979 F.3d at 1341.

Here, many witnesses reside in California, no identified witnesses are in Texas, and other witnesses reside in locations such as South Korea for which California is significantly more convenient. None of SK hynix's potential witnesses resides in WDTX, and in the prior related litigation, Netlist has never identified or deposed any SK hynix employees in WDTX. APPX0102. CDCA is on average closer to SK hynix's potential witnesses, including those in California and Korea. APPX0096. Travel to WDTX by witnesses from California would require repeated, costly, indirect flights. *Id.*

The district court found this factor neutral. It reasoned, without support, that it would not be more costly for witnesses to travel to WDTX instead of CDCA because, "the hotels in Waco are cheaper than average." APPX0659. The district clearly erred by failing to recognize or apply the 100-mile rule. *In re TS Tech USA Corp.*, 551 F.3d at 1320.

Moreover, the conclusion that travel to CDCA and WDTX are equivalent defies reality. Longer-distance travel always incurs greater expenses. *See id.* The district court's unsupported speculation regarding travel costs is an insufficient basis for its conclusion about convenience. *See In re Nintendo Co., Ltd.*, 589 F.3d at 1199 (accounting for the

35

burden where witnesses would need to travel "approximately 700 miles more" to Texas); *In re TS Tech USA Corp.*, 551 F.3d at 1320.

In sum, the most important factor in the analysis strongly favors transfer, and the district court's disregard of precedent was clear error. *See In re Morgan Stanley*, 417 F. App'x 947, 948-49 (Fed. Cir. 2011); *In re Nintendo Co., Ltd.*, 589 F.3d at 1199 (district court erred in finding the factor "only 'slightly favors transfer'" under similar circumstances where "no witnesses live in Texas"); *In re TOA Tech.*, 543 F. App'x 1006, 1009 (Fed. Cir. 2013) ("none of those witnesses reside[d] within 100 miles of the Eastern District of Texas and the majority of witnesses would find the [transferee district] less inconvenient and costly to travel for trial").

### 4. No "practical problems" weigh against transfer, and judicial economy favors transfer.

No practical problems weigh against transfer. In fact, transfer to CDCA where the related cases are pending will make trial expeditious and inexpensive compared with allowing these cases to proceed in parallel in WDTX and CDCA. "'[J]udicial economy plays a paramount role in trying to maintain an orderly, effective, administration of justice.'" *Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*, No. 6:13-

CV-364, 2014 WL 12570501, at *7 (W.D. Tex. June 11, 2014) (quoting *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010)). Here, where "there are pending cases in [CD]CA with 'some overlapping issues,'" this Court has recognized that the "judicial economy benefits" weigh in favor of transfer. *In re Apple Inc.*, 979 F.3d at 1344.

The district court clearly erred in finding that this factor "weighs against transfer" because to transfer the case "would largely obviate all the resources expended by the parties and the Court to prepare this case." APPX0660. As explained above, given that CDCA has already expended significant resources and become familiar with the parties, this patent family, and the RAND issues here, transfer to CDCA is the only way to avoid wasteful duplication. *See In re Vistaprint Ltd.*, 628 F.3d at 1346 ("co-pending litigation … involving the same patent and underlying technology" provides "substantial justification" for a venue). Moreover, it is inappropriate for the district court to refuse to transfer the case based on time it spent proceeding to the merits while allowing the transfer motion to languish. *See In re Nitro Fluids*, 978 F.3d at 1312.

**B.    The Public Interest Factors Also Favor Transfer.**

   **1. The "local interest" factor favors transfer.**

Under the public factors, CDCA has a substantial local interest in

this case given that Netlist is headquartered there, and individuals who

are involved in this case live and work in CDCA. *In re Hoffmann-

LaRoche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009); *Affinity Labs*, 2014

WL 12570501, at *3 ("The district where a party has its principal place

of business typically has a stronger local interest ….").

The district court concluded that the local interest of WDTX

"weighs against transfer" because SK hynix has an Austin office and

because SK hynix's alternative request to transfer the case from the

Waco Division to the Austin Division "indicates that Hynix is aware of

the localized interest of litigating the present actions in this District."

APPX0660-0661. This was clear error. The local interest factor concerns

the events that gave rise to the litigation and the individuals involved.

*In re Apple Inc.*, 979 F.3d at 1345 (district court erred by "failing to

g[i]ve weight to the 'significant connections between [NDCA] and *the

events that gave rise to a suit*.' (emphasis in original)). The district court

discusses none of these factors. While it recognizes that "Netlist's

headquarter is located in C.D. Cal.," APPX0660, the court did not

grapple with CDCA's interest on that basis, nor the fact that key witnesses, including inventor Dr. Lee, also reside in CDCA. *See In re Acer Am. Corp.*, 626 F.3d at 1256 (local interest where "the inventor and patent prosecuting attorney whose work may be questioned" are residents of the district).

Instead, the district court gave undue weight to the fact that SK hynix's Austin office "provides support to one of its largest American customers in this District," APPX0660, which is irrelevant to the patent claims at issue here. *See In re Apple Inc.*, 979 F.3d at 1345 (district court erred "by so heavily weighing Apple's general contacts with the forum that are untethered to the lawsuit"). That sales and other customer-facing activities take place in Austin, or that a customer is in Austin do not constitute a meaningful local interest. *Dataquill, Ltd. v. Apple Inc.*, Case No. 13-CA-706, 2014 WL 2722201, at 4 (W.D. Tex. June 13, 2014).

The district court's reliance on SK hynix's division transfer request also constituted clear error. That SK hynix would find it more convenient to litigate in Austin rather than Waco, both within WDTX, says nothing about the localized interest of WDTX in this case. The

39

district court clearly erred in finding the local interest factor weighs against transfer.

## 2. "Court congestion" is neutral as to transfer.

The parties agreed that the relative congestion of the courts is about the same and thus this factor is neutral. *See* APPX0460. The district court, however, concluded *sua sponte* that the factor "weighs against transfer" because it set this case for trial on a fast timeline of "around 10 months from now." APPX0660. This was clear error, because this factor "concerns whether there is an appreciable difference in docket congestion between the two forums." *In re Adobe Inc.*, 823 F. App'x 929, 932 (Fed. Cir. 2020). The district court's boot-strapping reliance on its own "suggestion that it could more quickly resolve this case based on its scheduling order" was erroneous. *Id.*; *In re Nitro Fluids*, 978 F.3d at 1312.

## 3. The "familiarity of the forum with the governing law" favors transfer.

Given the two pending cases in California, CDCA and Judge Staton have greater familiarity with the technology relevant to this patent family and the RAND counterclaims that will be relevant here, which counsels toward transfer. The district court's finding that this factor

40

was neutral, APPX0661, without engaging with SK hynix's argument, was clear error.

## CONCLUSION

For the foregoing reasons, the Court should issue a writ of mandamus compelling the district court to transfer this case to the CDCA.

Date: February 5, 2021              Respectfully submitted,

                                   /s/ Carter G. Phillips

KENNETH L. NISSLY                  CARTER G. PHILLIPS
LAW OFFICES OF KENNETH L.          RYAN C. MORRIS
    NISSLY                         SIDLEY AUSTIN LLP
P.O Box 3462                       1501 K Street, N.W.
Saratoga, CA 95070-1462            Washington, D.C. 20005
Telephone: (408) 398-7043          Telephone: (202) 736-8000

*Counsel for SK hynix Inc., SK hynix America Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2021, a true and correct copy of the foregoing Petition for a Writ of Mandamus with Appendix in Support was timely filed with the Clerk of the Court using the appellate CM/ECF system.

I further certify that on February 5, 2021, a true and correct copy of the foregoing Petition for a Writ of Mandamus with Appendix in Support was served on the following counsel for Netlist, Inc., through a Sharefile electronic transfer:

> Andrew H. DeVoogd
> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
> One Financial Center
> Boston, MA 02111
> Email: AHDeVoogd@mintz.com

Counsel for Netlist, Inc., consented to receive service electronically via email on February 5, 2021. A copy of the petition will also be sent to the Honorable Alan Albright, United States District Judge, via First Class Mail.

/s/ Carter G. Phillips
Carter G. Phillips

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 7,781 words (as determined by the Microsoft Word word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in 14-point Century Schoolbook font.

/s/ Carter G. Phillips
Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, D.C. 20005
(202) 736-8000

*Counsel for SK hynix Inc.,*
*SK hynix America Inc.*

# APPENDIX

# Appendix Table of Contents

| Document | Docket No.[1] | Appx. No. |
|---|---|---|
| Docket Sheet, Case No. 6:20-cv-00194-ADA (W.D. Tex.) | --- | APPX0001 |
| Docket Sheet, Case No. 6:20-cv-00525-ADA (W.D. Tex.) | --- | APPX0018 |
| Complaint for Patent Infringement, *Netlist, Inc. v. SK hynix Inc.*, 6:20-cv-00194-ADA (W.D. Tex.) | 1 | APPX0027 |
| Exhibit 5, Infringement Claim Chart, '218 patent | 1-5 | APPX0043 |
| Exhibit 10, Infringement Claim Chart, '595 patent | 1-10 | APPX0052 |
| Complaint for Patent Infringement, *Netlist, Inc. v. SK hynix Inc.*, 6:20-cv-00194-ADA (W.D. Tex.) | 1 (525 action) | APPX0061 |
| Defendants' Opposed Motion to Transfer Venue Pursuant to the First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a) | 26 | APPX0074 |
| Declaration of Ki-Tae Kim in Support of Defendants' Motion to Transfer Venue | 26-2 | APPX0095 |
| Declaration of Michael D. Hatcher in Support of Defendants' Motion to Transfer Venue | 26-3 | APPX0099 |
| Exhibit 1, U.S. Patent No. 8,489,837 | 26-4 | APPX0108 |
| Exhibit 2, U.S. Patent No. 9,535,623 | 26-5 | APPX0121 |

---

[1] All docket numbers refer to the docket in Case No. 6:20-cv-00194-ADA (W.D. Tex.), unless specified.

| | | |
|---|---|---|
| Exhibit 3, U.S. Patent No. 9,858,218 | 26-6 | APPX0136 |
| Exhibit 4, U.S. Patent No. 10,474,595 | 26-7 | APPX0151 |
| Exhibit 5, U.S. Patent & Trademark Office, Non-Final Office Action Summary, '218 patent (May 16, 2016) | 26-8 | APPX0169 |
| Exhibit 6, U.S. Patent & Trademark Office, Netlist Terminal Disclaimer, '218 patent (Apr. 1, 2016) | 26-9 | APPX0179 |
| Exhibit 7, U.S. Patent & Trademark Office, Non-Final Office Action Summary, '595 patent (Aug. 22, 2018) | 26-10 | APPX0182 |
| Exhibit 8, U.S. Patent & Trademark Office, Netlist Terminal Disclaimer, '595 patent (Nov. 28, 2018) | 26-11 | APPX0188 |
| Exhibit 9, U.S. Patent & Trademark Office, Netlist Terminal Disclaimer, '623 patent (Aug. 3, 2016) | 26-12 | APPX0191 |
| Exhibit 10, Complaint for Patent Infringement, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605 (C.D. Cal. Aug. 31, 2016) ("*California I*") | 26-13 | APPX0195 |
| Exhibit 11, Infringement Claim Chart for '837 patent (*California I*) | 26-14 | APPX0216 |
| Exhibit 12, Complaint in the International Trade Commission, In re Certain Memory Modules and Components Thereof, and Products Containing Same (Dec. 1, 2016) ("*ITC I*") | 26-15 | APPX0220 |

| | | |
|---|---|---|
| Exhibit 14, Defendant SK hynix Inc.'s Counterclaims, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605 (C.D. Cal. Nov. 7, 2011) | 26-17 | APPX0228 |
| Exhibit 16, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, (In Chambers) Order Granting Defendants' Motion to Disqualify (Doc. 29) (Dec. 5, 2016) | 26-19 | APPX0250 |
| Exhibit 17, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Joint Rule 26(f) Report (Dec. 23, 2016) | 26-20 | APPX0253 |
| Exhibit 19, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Protective Order (Jan. 12, 2017) | 26-22 | APPX0260 |
| Exhibit 20, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Discovery Order (Jan. 12, 2017) | 26-23 | APPX0276 |
| Exhibit 21, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, (In Chambers) Order (1) Granting in Part Ex Parte Motion to Strike Netlist's Expert Declarations, (2) Continuing the Deadline to Submit Responsive Claim Construction Briefs to June 30, 2017, and (3) Continuing the Markman Hearing to July 27, 2017 (Jun. 13, 2017) | 26-24 | APPX0293 |
| Exhibit 22, Complaint for Patent Infringement, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:17-cv-1030 (C.D. Cal. Jun. 14, 2017) ("*California II*") | 26-25 | APPX0297 |

| | | |
|---|---|---|
| Exhibit 23, Infringement Claim Chart for '623 patent (*California II*) | 26-26 | APPX0311 |
| Exhibit 24, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Netlist Opposition to Defendants' Ex Parte Application for an Order Staying Only Netlist's Infringement Claims Pending Completion of *Inter Partes* Review (Jul. 12, 2017) | 26-27 | APPX0324 |
| Exhibit 25, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, (In Chambers) Order Granting in Part Defendants' Application for an Order Staying Netlist's Infringement Claims Pending Completion of Inter Partes Review (Doc. 150) (Jul. 17, 2017) | 26-28 | APPX0333 |
| Exhibit 26, Defendants' Answer, Affirmative Defenses, and SK hynix Inc.'s Counterclaims, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:17-cv-1030 (C.D. Cal. Oct. 19, 2017) | 26-29 | APPX0343 |
| Exhibit 27, Complaint in the International Trade Commission, In re Certain Memory Modules and Components Thereof (Oct. 31, 2017) ("*ITC II*") | 26-30 | APPX0352 |
| Exhibit 28, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:17-cv-1030, Joint Stipulation for Automatic Stay of Plaintiff's Claims; Consolidation of Counterclaims with no. 8:16-cv-01605; And Request to Vacate Scheduling Conference on December 8, 2017 (C.D. Cal. Nov. 30, 2017) | 26-31 | APPX0360 |

| | | |
|---|---|---|
| Exhibit 29, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:17-cv-1030, Order Staying Plaintiff's Claims; Order Consolidating Counterclaims with No. 8:16-cv-01605; Order Vacating Scheduling Conference on December 8, 2017 (Dec. 6, 2017) | 26-32 | APPX0365 |
| Exhibit 30, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Defendant SK hynix's Notice of Consolidation (Dec. 7, 2017) | 26-33 | APPX0368 |
| Exhibit 32, U.S. Int'l Trade Comm'n, *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing the Same*, Notice of a Commission Determination to Review-in-Part an Initial Determination Finding no Violation of Section 337; On Review, To Take No Position on One Issue; Affirmation of the Finding of No Violation And Termination of the Investigation, Investigation No. 337-TA-1023 (Jan. 16, 2018) | 26-35 | APPX0374 |
| Exhibit 33, *Netlist Inc. v. SK hynix Inc.*, Case Nos. 8:16-cv-01605, 8:17-cv-1030, Order Staying SK hynix's RAND Counterclaims (Feb. 2, 2018) | 26-36 | APPX0378 |
| Exhibit 35, Patent Trial & Appeal Board, *SK hynix Inc. v. Netlist, Inc.*, Case IPR2017-00548, Final Written Decision (May 3, 2018) | 26-38 | APPX0381 |
| Exhibit 36, Patent Trial & Appeal Board, *SK hynix Inc. v. Netlist, Inc.*, Case IPR2018-00303, Final Written Decision (Mar. 21, 2019) | 26-39 | APPX0386 |

| | | |
|---|---|---|
| Exhibit 37, U.S. Int'l Trade Comm'n, *In the Matter of Certain Memory Modules and Components Thereof*, Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, Investigation No. 337-TA-1089 (Oct. 21, 2019) | 26-40 | APPX0392 |
| Exhibit 38, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Seventh Joint Report Per Feb. 2, 2018 Order [ECF No. 172] Regarding Status of All Litigation and Request to Continue Stay of SK hynix's RAND Counterclaims (Nov. 1, 2019) | 26-41 | APPX0421 |
| Exhibit 39, Brief for Appellant Netlist, Inc., *Netlist Inc. v. SK hynix Inc.*, Case No. 19-1920 (Fed. Cir. Jan. 3, 2020) | 26-42 | APPX0429 |
| Exhibit 40, U.S. Int'l Trade Comm'n, *In the Matter of Certain Memory Modules and Components Thereof*, Notice of Commission Determination to Review in Part a Final Initial Determination Finding a Violation of Section 337; Schedule for Filing Written Submissions on the Issues Under Review and on Remedy, the Public Interest, and Bonding; Extension of the Target Date, Investigation No. 337-TA-1089 (Jan. 31, 2020) | 26-43 | APPX0435 |
| Plaintiff Netlist, Inc.'s Opposition to Defendants' Motion to Transfer Venue (without exhibits) | 27 | APPX0442 |
| Defendants' Reply in Support of Opposed Motion to Transfer Venue Pursuant to the | 31 | APPX0464 |

| | | |
|---|---|---|
| First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a) | | |
| Email Submission in *Netlist, Inc. v. SK hynix Inc.* (6:20-cv-194-ADA) in Response to Oral Order During June 11 Teleconference, Exhibit 42, to SK hynix's Contingent Response to Netlist's Supplemental Submission [ECF No. 40] on Defendants' Motion to Transfer | 42-1 | APPX0475 |
| Defendant SK hynix's Answer, Affirmative Defenses, & Counterclaims | 47 | APPX0478 |
| Transcript of Telephone Scheduling Conference (Jun. 19, 2020) | 52-1 | APPX0502 |
| Amended Scheduling Order Governing the '525 and '194 Cases (Nov. 18, 2020) | 73 | APPX0510 |
| Defendants' Opposed Motion to Stay Pending Transfer (Dec. 15, 2020) | 76 | APPX0515 |
| Plaintiff Netlist Inc.'s Opposition to Defendants' Motion to Stay Pending Transfer (Dec. 22, 2020) | 78 | APPX0526 |
| Defendants' Reply in Support of Their Proposed Motion to Stay Pending Transfer (Dec. 29, 2020) | 79 | APPX0537 |
| Exhibit 1 to SK hynix's Stay Motion Reply, *Netlist Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605, Ninth Joint Report Per Feb. 2, 2018 Order [ECF No. 172] Regarding Status of All Litigation and Request to Continue Stay of SK hynix's RAND Counterclaims (Nov. 9, 2020) | 79-1 | APPX0548 |

| Minute Entry for proceedings held before Judge Alan D. Albright (Oct. 16, 2020) | 23 (525 action) | APPX0563 |
|---|---|---|
| Joint Stipulation on Motion to Transfer Venue  (Oct. 21, 2020) | 24 (525 action) | APPX0565 |
| Email from Hannah Santasawatku to Barry Shelton (Jan 6, 2021) | --- | APPX0570 |
| Petition for Writ of Mandamus, *In re SK hynix Inc.*, (Fed. Cir. Case No. 21-113) (without exhibits) | 2 (Fed. Cir.) | APPX0572 |
| Order directing Netlist Inc. to Respond | 3 (Fed. Cir.) | APPX0619 |
| Response Brief of Netlist Inc., *In re SK hynix Inc.*, (Fed. Cir. Case No. 21-113) | 9-1 (Fed. Cir.) | APPX0621 |
| Order Granting Mandamus, *In re SK hynix Inc.*, (Fed. Cir. Case No. 21-113) | 10 (Fed. Cir.) | APPX0643 |
| Memorandum Opinion & Order Denying Transfer (Feb. 2, 2021) | 87 | APPX0647 |

PATENT

**U.S. District Court [LIVE]**
**Western District of Texas (Waco)**
**CIVIL DOCKET FOR CASE #: 6:20-cv-00194-ADA**

Netlist, Inc. v. SK hynix Inc. et al
Assigned to: Judge Alan D Albright
Case in other court: USCA for the Federal Circuit, 21-00113
Cause: 35:271 Patent Infringement

Date Filed: 03/17/2020
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Netlist, Inc.**                represented by    **Eric S. Hansen**
McKool Smith P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
214-978-4204
Fax: 214-978-4044
Email: ehansen@mckoolsmith.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Stephen Ravel**
Kelly Hart & Hallman LLP
303 Colorado Street
Suite 2000
Austin, TX 78701
(512)495-6429
Fax: 512/495-6610
Email: steve.ravel@khh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M. Wodarski**
Mint Levin Cohn Ferris Glovsky & Popeo,
P.C.
One Financial Center
Boston, MA 02111
617-348-1855
Fax: 617-542-2241
Email: jwodarski@mintz.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Galica**
Mintz Levin Cohn Ferris Glovsky & Popeo,
P.C.
One Financial Center
Boston, MA 02111
617-348-4859
Fax: 617-542-2241
Email: msgalica@mintz.com
*LEAD ATTORNEY*
*PRO HAC VICE*

APPX0001

*ATTORNEY TO BE NOTICED*

**John Franklin Garvish , II**
McKool Smith, PC
300 W. 6th Street
Suite 1700
Austin, TX 78701
(512) 692-8731
Fax: (512) 692-8744
Email: jgarvish@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Scott L. Cole**
5209 Spanish Oaks Club Blvd.
Austin, TX 78738
512-348-2206
Email: scottcole@quinnemanuel.com
*TERMINATED: 01/28/2021*
*ATTORNEY TO BE NOTICED*

**Andrew H. DeVoogd**
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, P.C.
One Financial Center
Boston, MA 02111
617-348-1611
Fax: 617-542-2241
Email: AHDeVoogd@mintz.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**SK hynix Inc.**                    represented by    **Barry K. Shelton**
Shelton Coburn LLP
311 RR 620 S
Suite 205
Austin, TX 78734-4775
512-263-2165
Fax: 512-263-2166
Email: bshelton@sheltoncoburn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ralph Nester**
Sidley Austin - Washington
1501 K St NW
Washington, DC 20005
202-736-8000
Fax: 202-736-8711
Email: bnester@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
Sidley Austin LLP
One South Dearborn

APPX0002

Chicago, IL 60603
312-853-7000
Fax: 312-853-7036
Email: dgiardina@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
Law Offices of Kenneth L. Nissly
P.O. Box 3462
Saratoga, CA 95070-1462
408-398-7043
Email: knissly@nisslylaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
Sildey Austin LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8000
Fax: 202-736-8711
Email: mfranzinger@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
214-981-3300
Fax: 214-981-3400
Email: mhatcher@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
Baker Botts L.L.P.
1801 Century Park East
Suite 2400
Los Angeles, CA 90067
213-202-5702
Fax: 415-291-6359
Email: ted.chandler@bakerbotts.com
*TERMINATED: 01/28/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wonjoo Suh**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8000

APPX0003

|  | Fax: 202-736-8711<br>Email: wsuh@sidley.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
|--|--|

**Joseph A. Micallef**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
Fax: (202) 736-8711
Email: jmicallef@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SK hynix America Inc.**                    represented by  **Barry K. Shelton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 01/28/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wonjoo Suh**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**SK hynix America Inc.**                    represented by   **Barry K. Shelton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 01/28/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wonjoo Suh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**SK hynix Inc.**                                  represented by **Barry K. Shelton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 01/28/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wonjoo Suh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Netlist, Inc.**                                  represented by **Eric S. Hansen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Stephen Ravel**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M. Wodarski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Galica**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Franklin Garvish , II**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott L. Cole**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew H. DeVoogd**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2020 | 1 | COMPLAINT ( Filing fee $ 400 receipt number 0542-13354631), filed by Netlist, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Civil Cover Sheet)(DeVoogd, Andrew) (Entered: 03/17/2020) |
| 03/17/2020 | 2 | REQUEST FOR ISSUANCE OF SUMMONS by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 03/17/2020) |
| 03/17/2020 | 3 | REQUEST FOR ISSUANCE OF SUMMONS by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 03/17/2020) |
| 03/17/2020 | 4 | RULE 7 DISCLOSURE STATEMENT filed by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 03/17/2020) |
| 03/17/2020 | 5 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 forwarded to the Director of the U.S. Patent and Trademark Office. (DeVoogd, Andrew) (Entered: 03/17/2020) |
| 03/17/2020 | | Case assigned to Judge Alan D Albright. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (bw) (Entered: 03/18/2020) |
| 03/17/2020 | 7 | Summons Issued as to SK hynix Inc.. (bw) (Entered: 03/18/2020) |
| 03/18/2020 | 6 | Summons Issued as to SK hynix America Inc.. (bw) (Entered: 03/18/2020) |
| 03/24/2020 | 8 | STANDING ORDER from U.S. District Judge Alan D. Albright regarding scheduled civil hearings. (tada) (Entered: 03/25/2020) |
| 04/07/2020 | 9 | NOTICE of Attorney Appearance by Barry K. Shelton on behalf of SK hynix America Inc., SK hynix Inc.. Attorney Barry K. Shelton added to party SK hynix America Inc.(pty:dft), Attorney Barry K. Shelton added to party SK hynix Inc.(pty:dft) (Shelton, Barry) (Entered: 04/07/2020) |
| 04/07/2020 | 10 | WAIVER OF SERVICE Returned Executed by SK hynix America Inc., SK hynix Inc. as to All |

|  |  |  |
|---|---|---|
|  |  | Defendants. (Shelton, Barry) (Entered: 04/07/2020) |
| 04/07/2020 | 11 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Proposed Order)(Shelton, Barry) (Entered: 04/07/2020) |
| 04/07/2020 | 12 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Brian R. Nester* ( Filing fee $ 100 receipt number 0542-13433662) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 04/07/2020) |
| 04/07/2020 | 13 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Kenneth L. Nissly* ( Filing fee $ 100 receipt number 0542-13433731) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 04/07/2020) |
| 04/07/2020 | 14 | Pro Hac Vice Letter to SK hynix America Inc., SK hynix Inc. for Theodore W. Chandler. (am) (Entered: 04/07/2020) |
| 04/07/2020 | 15 | Pro Hac Vice Letter to SK hynix America Inc., SK hynix Inc. for Michael Hatcher. (am) (Entered: 04/07/2020) |
| 04/07/2020 | 16 | Pro Hac Vice Letter to SK hynix America Inc., SK hynix Inc. for David C. Giardina. (am) (Entered: 04/07/2020) |
| 04/07/2020 | 17 | Pro Hac Vice Letter to SK hynix America Inc., SK hynix Inc. for Michael R. Franzinger and Wonjoo Suh. (am) (Entered: 04/07/2020) |
| 04/08/2020 | 18 | MOTION to Appear Pro Hac Vice for Wonjoo Suh by SK hynix America Inc., SK hynix Inc.. (mc5) (Additional attachment(s) added on 4/17/2020: # 1 Pro Hac Vice Fee Receipt) (am). (Entered: 04/08/2020) |
| 04/08/2020 | 19 | MOTION to Appear Pro Hac Vice for Michael R. Franzinger by SK hynix America Inc., SK hynix Inc.. (mc5) (Additional attachment(s) added on 4/17/2020: # 1 Pro Hac Vice Fee Receipt) (am). (Entered: 04/08/2020) |
| 04/08/2020 | 20 | MOTION to Appear Pro Hac Vice for Michael D. Hatcher by SK hynix America Inc., SK hynix Inc.. (mc5) (Additional attachment(s) added on 4/17/2020: # 1 Pro Hac Vice Fee Receipt) (am). (Entered: 04/08/2020) |
| 04/08/2020 | 21 | MOTION to Appear Pro Hac Vice for Theodore W. Chandler by SK hynix America Inc., SK hynix Inc.. (mc5) (Additional attachment(s) added on 4/17/2020: # 1 Pro Hac Vice Fee Receipt) (am). (Entered: 04/08/2020) |
| 04/08/2020 | 22 | MOTION to Appear Pro Hac Vice for David C. Giardina by SK hynix America Inc., SK hynix Inc.. (mc5) (Additional attachment(s) added on 4/17/2020: # 1 Pro Hac Vice Fee Receipt) (am). (Entered: 04/08/2020) |
| 04/09/2020 |  | Text Order GRANTING 11 Motion for Extension of Time to Answer entered by Judge Alan D Albright. Came on for consideration is Defendants' Motion. Noting that it is unopposed, the Court GRANTS the Motion. Defendants shall have up to and including July 21, 2020 to answer or otherwise respond to Plaintiff's Complaint. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 |  | Text Order GRANTING 12 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
|  |  |  |

| 04/09/2020 | Text Order GRANTING 13 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
|---|---|
| 04/09/2020 | Text Order GRANTING 18 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 | Text Order GRANTING 19 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 | Text Order GRANTING 20 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 | Text Order GRANTING 21 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 | Text Order GRANTING 22 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall |

| | | |
|---|---|---|
| | | immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/09/2020) |
| 04/09/2020 | | Reset Deadlines: All Defendants. (am) (Entered: 04/09/2020) |
| 04/17/2020 | 23 | MOTION to Appear Pro Hac Vice by Andrew H. DeVoogd *on behalf of James M. Wodarski* ( Filing fee $ 100 receipt number 0542-13471467) by on behalf of Netlist, Inc.. (DeVoogd, Andrew) (Entered: 04/17/2020) |
| 04/17/2020 | 24 | MOTION to Appear Pro Hac Vice by Andrew H. DeVoogd *on behalf of Matthew Galica* ( Filing fee $ 100 receipt number 0542-13471690) by on behalf of Netlist, Inc.. (DeVoogd, Andrew) (Entered: 04/17/2020) |
| 04/18/2020 | | Text Order GRANTING 23 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/18/2020) |
| 04/18/2020 | | Text Order GRANTING 24 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 04/18/2020) |
| 04/27/2020 | 25 | NOTICE of Attorney Appearance by J. Stephen Ravel on behalf of Netlist, Inc.. Attorney J. Stephen Ravel added to party Netlist, Inc.(pty:pla) (Ravel, J.) (Entered: 04/27/2020) |
| 05/04/2020 | 26 | Opposed MOTION to Transfer Case *THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)* by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Proposed Order, # 2 Declaration of Ki-Tae Kim, # 3 Declaration of Michael D. Hatcher, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30, # 34 Exhibit 31, # 35 Exhibit 32, # 36 Exhibit 33, # 37 Exhibit 34, # 38 Exhibit 35, # 39 Exhibit 36, # 40 Exhibit 37, # 41 Exhibit 38, # 42 Exhibit 39, # 43 Exhibit 40, # 44 Exhibit 41)(Nester, Brian) (Entered: 05/04/2020) |
| 05/18/2020 | 27 | Response in Opposition to Motion, filed by Netlist, Inc., re 26 Opposed MOTION to Transfer Case *THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)* filed by Defendant SK hynix Inc., Defendant SK hynix America Inc. (Attachments: # 1 Declaration of Gail Sasaki, # 2 Exhibit to Declaration of Gail Sasaki, # 3 Declaration of Andrew H. DeVoogd, # 4 Exhibit 1 to Declaration of A. DeVoogd, # 5 Exhibit 2 to Declaration of A. DeVoogd, # 6 Exhibit 3 to Declaration of A. DeVoogd, # 7 Exhibit 4 to Declaration of A. DeVoogd, # 8 Exhibit 5 to |

| | | |
|---|---|---|
| | | Declaration of A. DeVoogd, # 9 Exhibit 6 to Declaration of A. DeVoogd, # 10 Exhibit 7 to Declaration of A. DeVoogd, # 11 Exhibit 8 to Declaration of A. DeVoogd, # 12 Exhibit 9 to Declaration of A. DeVoogd, # 13 Exhibit 10 to Declaration of A. DeVoogd, # 14 Exhibit 11 to Declaration of A. DeVoogd, # 15 Exhibit 12 to Declaration of A. DeVoogd, # 16 Proposed Order) (DeVoogd, Andrew) (Entered: 05/18/2020) |
| 05/18/2020 | 28 | Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document Declaration of Gail Sasaki, # 2 Proposed Order) (DeVoogd, Andrew) (Entered: 05/18/2020) |
| 05/19/2020 | | Text Order GRANTING 28 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. Before the Court is Plaintiff Netlist, Inc.'s Motion for Leave to File Under Seal the Declaration of Gail Sasaki in Support of Plaintiff Netlist, Inc.'s Opposition to Defendants' Motion to Transfer. The Court GRANTS the motion. The Clerk's Office is directed to file the Declaration of Gail Sasaki, which is attached as an exhibit to Plaintiff Netlist, Inc.'s Opposition to Defendants Motion to Transfer Venue under seal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 05/19/2020) |
| 05/19/2020 | 29 | Sealed Document filed (mc5) (Entered: 05/19/2020) |
| 05/22/2020 | 30 | NOTICE of Readiness by Netlist, Inc. (DeVoogd, Andrew) (Entered: 05/22/2020) |
| 05/26/2020 | 31 | REPLY to Response to Motion, filed by SK hynix America Inc., SK hynix Inc., re 26 Opposed MOTION to Transfer Case *THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)* filed by Defendant SK hynix Inc., Defendant SK hynix America Inc. (Nester, Brian) (Entered: 05/26/2020) |
| 05/27/2020 | 32 | ORDER GOVERNING PROCEEDINGS PATENT CASE, Telephone Conference set for 6/19/2020 02:00 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 05/27/2020) |
| 06/09/2020 | 33 | AMENDED COMPLAINT against All Defendants amending, filed by Netlist, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(DeVoogd, Andrew) (Entered: 06/09/2020) |
| 06/11/2020 | 34 | ORDER SETTING TELEPHONIC SCHEDULING CONFERENCE, Telephone Conference set for 6/15/2020 03:00 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 06/11/2020) |
| 06/11/2020 | 35 | ORDER CORRECTING DATE AND TIME OF TELEPHONIC HEARING, Telephone Conference set for 6/11/2020 03:00 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 06/11/2020) |
| 06/11/2020 | 36 | Minute Entry for proceedings held before Judge Alan D Albright: Telephone Conference held on 6/11/2020. Case called for telephonic scheduling hearing. Two IPR's have been filed on the pending patents. The Court asks that by 5:00 tomorrow both parties submit a Revised Scheduling Order that they can live with. The Court also needs to speak to the Motion to Transfer. If the Court retains the case in TXWD then the Court will probably set a Trial date due to the IPR's being filed. Court asks if the plaintiff wishes to bifurcate the case with the new patent being separate. Plaintiff will have to speak with his client regarding this. Defendant can file a supplemental brief of no more than 10 pages by Monday and plaintiff may have until the next Monday to file a response of no more than 10 pages. (Minute entry documents are not available electronically.). (Court Reporter Lily Reznik.)(am) (Entered: 06/11/2020) |
| 06/15/2020 | 37 | NOTICE of Rule 42(a)(1)(A)(i) Withdrawal of Allegations Regarding U.S. Patent No. 10,217,523 Only by Netlist, Inc. (DeVoogd, Andrew) (Entered: 06/15/2020) |
| 06/19/2020 | 38 | ORDER RESETTING TELEPHONIC HEARING TIME. Telephone Conference reset for 6/19/2020 03:45 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (bw) (Entered: 06/19/2020) |
| 06/19/2020 | 39 | Minute Entry for proceedings held before Judge Alan D Albright: Telephone Conference held on |

| | | |
|---|---|---|
| | | 6/19/2020. Case called for telephonic scheduling conference. The plaintiff is in agreement to the 11/19 suggested Markman Hearing date - the defendant is going to be in trial and would like a Markman Hearing in January. The Court is going to set the Markman Hearing 12/10 and the Jury Selection and trial date will be in October, 2021. An Order will be coming out with the trial date. The Court will rule on the motion to California by the end of July at the latest. A zoom or telephonic hearing will be set on the motion before the Court's ruling. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(am) (Entered: 06/19/2020) |
| 06/26/2020 | 40 | AFFIDAVIT in Support of 27 Response in Opposition to Motion,,, by Netlist, Inc.. (Attachments: # 1 Exhibit 1)(DeVoogd, Andrew) (Entered: 06/26/2020) |
| 06/26/2020 | 41 | Order Setting Markman Hearing for 12/8/2020 09:00 AM before Judge Alan D Albright. Signed by Judge Alan D Albright. (bot4) (Entered: 06/26/2020) |
| 06/30/2020 | 42 | RESPONSE *(Contingent)* to 40 Affidavit in Support by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Exhibit 42 - June 12th Email to Court, # 2 Exhibit 43 - June 15th Email re: Appeal Dismissal, # 3 Exhibit 44 - Unopposed Motion to Dismiss Appeal, # 4 Exhibit 45 - Email re: California cases, # 5 Exhibit 46 - CACD Complaint)(Nester, Brian) (Entered: 06/30/2020) |
| 06/30/2020 | 43 | Pro Hac Vice Letter to SK hynix America Inc. and SK hynix Inc.. (am) (Entered: 06/30/2020) |
| 07/01/2020 | 44 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Joseph A. Micallef* ( Filing fee $ 100 receipt number 0542-13718277) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 07/01/2020) |
| 07/02/2020 | | Text Order GRANTING 44 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 07/02/2020) |
| 07/06/2020 | 45 | Proposed Scheduling Order by Netlist, Inc.. (Attachments: # 1 Exhibit A - Jointly Proposed Scheduling Order)(DeVoogd, Andrew) (Entered: 07/06/2020) |
| 07/08/2020 | 46 | SCHEDULING ORDER: Joinder of Parties due by 1/15/2021. Amended Pleadings due by 2/26/2021. Motions due by 8/13/2021. Pretrial Conference set for 10/11/2021 before Judge Alan D Albright. Jury Selection and Jury Trial set for 10/26/2021 before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 07/08/2020) |
| 07/21/2020 | 47 | ANSWER to 33 Amended Complaint, with Jury Demand , COUNTERCLAIM against Netlist, Inc. by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Errata 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68)(Shelton, Barry) (Entered: 07/21/2020) |
| 08/11/2020 | 48 | *Plaintiff/Counter-Defendant's* ANSWER to 47 Answer to Amended Complaint,,,,,, Counterclaim,,,,, by Netlist, Inc..(DeVoogd, Andrew) (Entered: 08/11/2020) |

| 08/18/2020 | 49 | NOTICE of Attorney Appearance by Scott L. Cole on behalf of Netlist, Inc.. Attorney Scott L. Cole added to party Netlist, Inc.(pty:pla), Attorney Scott L. Cole added to party Netlist, Inc. (pty:cd) (Cole, Scott) (Entered: 08/18/2020) |
|---|---|---|
| 08/18/2020 | 50 | MOTION to Appear Pro Hac Vice by Scott L. Cole *on behalf of Eric S. Hansen* ( Filing fee $ 100 receipt number 0542-13874922) by on behalf of Netlist, Inc.. (Attachments: # 1 Proposed Order) (Cole, Scott) (Entered: 08/18/2020) |
| 08/19/2020 | | Text Order GRANTING 50 Motion to Appear Pro Hac Vice for Attorney Eric S. Hansen for Netlist, Inc. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sm3) (Entered: 08/19/2020) |
| 08/20/2020 | 51 | NOTICE of Attorney Appearance by John Franklin Garvish, II on behalf of Netlist, Inc.. Attorney John Franklin Garvish, II added to party Netlist, Inc.(pty:pla), Attorney John Franklin Garvish, II added to party Netlist, Inc.(pty:cd) (Garvish, John) (Entered: 08/20/2020) |
| 08/26/2020 | 52 | Transcript filed of Proceedings held on 6-19-20, Proceedings Transcribed: Telephonic Scheduling Conference. Court Reporter/Transcriber: Kristie Davis, Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 9/16/2020, Redacted Transcript Deadline set for 9/28/2020, Release of Transcript Restriction set for 11/24/2020, (kd) (Entered: 08/26/2020) |
| 09/25/2020 | 53 | BRIEF by Netlist, Inc.. (Attachments: # 1 Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief, # 2 Exhibit 1 to Declaration, # 3 Exhibit 2 to Declaration, # 4 Exhibit 3 to Declaration, # 5 Exhibit 4 to Declaration, # 6 Exhibit 5 to Declaration, # 7 Exhibit 6 to Declaration, # 8 Exhibit 7 to Declaration, # 9 Exhibit 8 to Declaration, # 10 Exhibit 9 to Declaration, # 11 Exhibit 10 to Declaration, # 12 Exhibit 11 to Declaration, # 13 Exhibit 12 to Declaration, # 14 Exhibit 13 to Declaration, # 15 Exhibit 14 to Declaration, # 16 Exhibit 15 to Declaration, # 17 Exhibit 16 to Declaration, # 18 Exhibit 17 to Declaration, # 19 Exhibit 18 to Declaration, # 20 Exhibit 19 to Declaration)(DeVoogd, Andrew) (Entered: 09/25/2020) |
| 09/25/2020 | 54 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Exhibit 13 to Declaration of A. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief, # 3 Sealed Document Exhibit 15 to Declaration of A. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief, # 4 Sealed Document Exhibit 18 to Declaration of A. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief, # 5 Sealed Document Exhibit 19 to Declaration of A. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief) (DeVoogd, Andrew) (Entered: 09/25/2020) |
| 09/25/2020 | 55 | Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Brief, # 3 Sealed Document Declaration, # 4 Sealed Document Exhibit 1, # 5 Sealed Document Exhibit 2, # 6 Sealed Document Exhibit 3, # 7 Sealed Document Exhibit 4, # 8 Sealed Document Exhibit 5, # 9 Sealed Document Exhibit 6, # 10 Sealed Document Exhibit 7, # 11 Sealed Document Exhibit 8, # 12 Sealed Document Exhibit 9, # 13 Sealed Document Exhibit 10, # 14 Sealed Document Exhibit 11, # 15 Sealed Document Exhibit 12, # 16 Sealed Document Exhibit 13, # 17 Sealed Document Exhibit 14, # 18 Sealed Document Exhibit 15, # 19 Sealed Document Exhibit 16, # 20 Sealed Document Exhibit 17, # 21 Sealed Document Exhibit 18, # 22 Sealed Document Exhibit 19, # 23 Sealed Document Exhibit 20, # 24 Sealed Document Exhibit |

| | | |
|---|---|---|
| | | 21, # 25 Sealed Document Exhibit 22, # 26 Sealed Document Exhibit 23, # 27 Sealed Document Exhibit 24, # 28 Sealed Document Exhibit 25, # 29 Sealed Document Exhibit 26, # 30 Sealed Document Exhibit 27, # 31 Sealed Document Exhibit 28, # 32 Sealed Document Exhibit 29, # 33 Sealed Document Exhibit 30, # 34 Sealed Document Exhibit 31, # 35 Sealed Document Exhibit 32, # 36 Sealed Document Exhibit 33, # 37 Sealed Document Exhibit 34, # 38 Sealed Document Exhibit 35, # 39 Sealed Document Exhibit 36, # 40 Sealed Document Exhibit 37, # 41 Sealed Document Exhibit 38, # 42 Sealed Document Exhibit 39, # 43 Sealed Document Exhibit 40, # 44 Sealed Document Exhibit 41, # 45 Sealed Document Exhibit 42, # 46 Sealed Document Exhibit 43, # 47 Sealed Document Exhibit 44 - Part 1, # 48 Sealed Document Exhibit 44 - Part 2, # 49 Sealed Document Exhibit 44 - Part 3, # 50 Sealed Document Exhibit 45 - Part 1, # 51 Sealed Document Exhibit 45 - Part 2, # 52 Sealed Document Exhibit 45 - Part 3, # 53 Sealed Document Exhibit 46 - Part 1, # 54 Sealed Document Exhibit 46 - Part 2, # 55 Sealed Document Exhibit 47, # 56 Sealed Document Exhibit 48, # 57 Sealed Document Exhibit 49) (Hatcher, Michael) (Entered: 09/25/2020) |
| 09/29/2020 | 56 | ***Stricken pursuant to Order dated 10/1/2020***Unopposed MOTION for Leave to File Answer to Counterclaim *Out of Time* by Netlist, Inc.. (Attachments: # 1 Exhibit A - Proposed Answer to Counterclaim, # 2 Proposed Order)(DeVoogd, Andrew) Modified on 10/1/2020 (am). (Entered: 09/29/2020) |
| 09/30/2020 | | Text Order GRANTING 54 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. The Motion is GRANTED, and the Clerk 's Office is directed to file the attached documents under seal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 09/30/2020) |
| 09/30/2020 | | Text Order GRANTING 55 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. The Motion is GRANTED, and the Clerk 's Office is directed to file the attached documents under seal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 09/30/2020) |
| 09/30/2020 | | Text Order GRANTING 56 Motion for Leave to File entered by Judge Alan D Albright. Came on for consideration is Plaintiff's Motion. Noting that it is unopposed, the Court GRANTS the Motion. Plaintiff shall have up to and including October 7, 2020 to answer or otherwise respond to Defendants' Counterclaim.(This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 09/30/2020) |
| 09/30/2020 | 57 | Sealed Exhibits to Declaration of A. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief. EXHIBIT 13 (Attachments: # 1 EXHIBIT 15, # 2 EXHIBIT 18, # 3 EXHIBIT 19) (am) (Entered: 09/30/2020) |
| 09/30/2020 | 58 | SK HYNIX'S Opening Claim Construction Brief (Attachments: # 1 Exhibit Declaration of Michael D. Hatcher in Support of SK Hynix's Opening Claim Construction Brief, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44 Part 1, # 45 Exhibit 44 Part 2, # 46 Exhibit 44 Part 3, # 47 Exhibit 45 Part 1, # 48 Exhibit 45 Part 2, # 49 Exhibit 45 Part 3, # 50 Exhibit 46 Part 1, # 51 Exhibit 46 Part 2, # 52 Exhibit 47, # 53 Exhibit 48, # 54 Exhibit 49) (am) (Entered: 09/30/2020) |
| 09/30/2020 | 59 | *** Stricken pursuant to Order dated 10/1/2020***NETLIST INC.S ANSWERTO SK HYNIX DEFENDANTS COUNTERCLAIMS(am) Modified on 10/1/2020 (am). (Entered: 09/30/2020) |
| 09/30/2020 | 60 | MOTION to Withdraw *Motion for Leave (Dkt. Nos. 56 & 59)* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(DeVoogd, Andrew) (Entered: 09/30/2020) |
| 10/01/2020 | | Text Order GRANTING 60 Motion to Withdraw entered by Judge Alan D Albright. The Court GRANTS the Motion. ECF 56 and ECF 59 are withdrawn. (This is a text-only entry generated by |

| | | |
|---|---|---|
| | | the court. There is no document associated with this entry.) (hs) (Entered: 10/01/2020) |
| 10/16/2020 | 61 | RESPONSE *Claim Construction Brief* to 58 Sealed Document,,,, by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 10/16/2020) |
| 10/16/2020 | 62 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Responsive Claim Construction Brief, # 3 Sealed Document Declaration in Support, # 4 Sealed Document Exhibit 50, # 5 Sealed Document Exhibit 51, # 6 Sealed Document Exhibit 52, # 7 Sealed Document Exhibit 53, # 8 Sealed Document Exhibit 54, # 9 Sealed Document Exhibit 55, # 10 Sealed Document Exhibit 56, # 11 Sealed Document Exhibit 57, # 12 Sealed Document Exhibit 58, # 13 Sealed Document Exhibit 59, # 14 Sealed Document Exhibit 60) (Hatcher, Michael) (Entered: 10/16/2020) |
| 10/19/2020 | | Text Order GRANTING 62 Motion for leave to File Sealed Document entered by Judge Alan D Albright. The Motion is GRANTED, and the Clerk 's Office is directed to file the attached documents under seal.(This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 10/19/2020) |
| 10/19/2020 | 63 | SK HYNIX'S Responsive Claim Construction Brief (Attachments: # 1 Exhibit Declaration of Michael D. Hatcher, # 2 Exhibit 50, # 3 Exhibit 51, # 4 Exhibit 52, # 5 Exhibit 53, # 6 Exhibit 54, # 7 Exhibit 55, # 8 Exhibit 56, # 9 Exhibit 57, # 10 Exhibit 58, # 11 Exhibit 59, # 12 Exhibit 60) (am) (Entered: 10/19/2020) |
| 10/29/2020 | 64 | Joint MOTION *for Entry of Scheduling Order Governing the '525 and '194 Cases* by Netlist, Inc.. (Attachments: # 1 Proposed Order Exhibit A - Proposed Scheduling Order)(DeVoogd, Andrew) (Entered: 10/29/2020) |
| 11/04/2020 | 65 | SCHEDULING ORDER: Markman Hearing set for 3/19/2021 01:30 PM before Judge Alan D Albright. Joinder of Parties due by 4/9/2021. Amended Pleadings due by 6/11/2021. Motions due by 10/1/2021. Pretrial Conference set for 11/29/2021 before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 11/05/2020) |
| 11/06/2020 | 66 | RESPONSE *REPLY CLAIM CONSTRUCTION BRIEF* to 63 Sealed Document, by Netlist, Inc.. (Attachments: # 1 Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Reply Claim Construction Brief, # 2 Exhibit 20 to the Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Reply Claim Construction Brief)(DeVoogd, Andrew) (Entered: 11/06/2020) |
| 11/06/2020 | 67 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document Exhibit 20 to the Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Reply Claim Construction Brief, # 2 Proposed Order) (DeVoogd, Andrew) (Entered: 11/06/2020) |
| 11/06/2020 | 68 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Proposed Order, # 2 Sealed Document Reply Claim Construction Brief, # 3 Sealed Document Declaration in Support, # 4 Sealed Document Exhibit 61, # 5 Sealed Document Exhibit 62) (Hatcher, Michael) (Entered: 11/06/2020) |
| 11/09/2020 | 69 | Updated Standing Order Governing Proceedings Patent Cases. Signed by Judge Alan D Albright. (jkda) (Entered: 11/10/2020) |
| 11/12/2020 | | Text Order GRANTING 67 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. The Motion is GRANTED, and the Clerk 's Office is directed to file the attached documents under seal.(This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 11/12/2020) |
| 11/12/2020 | | Text Order GRANTING 68 Motion for Leave to File Sealed Document entered by Judge Alan D Albright. The Motion is GRANTED, and the Clerk 's Office is directed to file the attached documents under seal. (This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 11/12/2020) |
| 11/12/2020 | 70 | Sealed Document Exhibit 20 to the Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Reply Claim Construction Brief to Doc. 66 . (am) (Entered: 11/12/2020) |
| 11/12/2020 | 71 | SK HYNIXS Reply Claim Construction Brief (Attachments: # 1 Declaration of Michael D. |

| | | |
|---|---|---|
| | | Hatcher in Support of SK Hynix's Reply Claim Construction Brief, # 2 Exhibit 61, # 3 Exhibit 62) (am) (Entered: 11/12/2020) |
| 11/16/2020 | 72 | Joint MOTION *for Entry of Amended Scheduling Order Pursuant to Order Dated November 9, 2020 ('194 Docket No. 69)* by Netlist, Inc.. (Attachments: # 1 Proposed Order Exhibit A - Proposed Scheduling Order)(DeVoogd, Andrew) (Entered: 11/16/2020) |
| 11/18/2020 | 73 | SCHEDULING ORDER:Joinder of Parties due by 4/9/2021. Amended Pleadings due by 6/11/2021. Markman Hearing set for 3/19/2021 01:30 PM before Judge Alan D Albright. Motions due by 10/1/2021. Pretrial Conference set for 11/29/2021 before Judge Alan D Albright. Jury Selection and Jury Trial set for 12/6/2021 before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 11/18/2020) |
| 12/02/2020 | 74 | STIPULATION *(JOINT) REGARDING DISCOVERY* by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 12/02/2020) |
| 12/11/2020 | 75 | Unopposed MOTION to Withdraw as Attorney by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Proposed Order)(Chandler, Theodore) (Entered: 12/11/2020) |
| 12/14/2020 | | Text Order GRANTING 75 Motion to Withdraw as Attorney. entered by Judge Alan D Albright. Came on for consideration is Defendants' Motion to Allow Theodore W. Chandler (Mr. Chandler) to Withdraw As Counsel. Noting that it is unopposed, the Court GRANTS the motion. It is therefore ORDERED that Mr. Chandler is hereby withdrawn as counsel of record for Defendants. It is further ORDERED that the docket be amended to reflect that Mr. Chandler has withdrawn as counsel for Defendants and that he no longer needs to be noticed of any pleadings, motions, or other documents filed or served in this case. (This is a text-only entry generated by the court. There is no document associated with this entry.) (hs) (Entered: 12/14/2020) |
| 12/15/2020 | 76 | Opposed MOTION to Stay Case by SK hynix America Inc., SK hynix Inc.. (Nester, Brian) (Entered: 12/15/2020) |
| 12/18/2020 | 77 | Unopposed MOTION to Withdraw as Attorney *of Scott L. Cole* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Cole, Scott) (Entered: 12/18/2020) |
| 12/22/2020 | 78 | Response in Opposition to Motion, filed by Netlist, Inc.., re 76 Opposed MOTION to Stay Case filed by Defendant SK hynix Inc., Defendant SK hynix America Inc. (Attachments: # 1 Proposed Order)(DeVoogd, Andrew) (Entered: 12/22/2020) |
| 12/29/2020 | 79 | REPLY to Response to Motion, filed by SK hynix America Inc., SK hynix Inc.., re 76 Opposed MOTION to Stay Case filed by Defendant SK hynix Inc., Defendant SK hynix America Inc. (Attachments: # 1 Exhibit 1)(Nester, Brian) (Entered: 12/29/2020) |
| 01/20/2021 | 80 | BRIEF by Netlist, Inc.. (Attachments: # 1 Declaration of Andrew H. DeVoogd in Support of Netlist, Inc.'s Opening Claim Construction Brief, # 2 Exhibit 21, # 3 Exhibit 22, # 4 Exhibit 23, # 5 Exhibit 24, # 6 Exhibit 25, # 7 Exhibit 26, # 8 Exhibit 27, # 9 Exhibit 28, # 10 Exhibit 29) (DeVoogd, Andrew) (Entered: 01/20/2021) |
| 01/20/2021 | 81 | Unopposed Motion for leave to File Sealed Document (Attachments: # 1 Sealed Document Exhibit 22, # 2 Sealed Document Exhibit 27, # 3 Sealed Document Exhibit 28, # 4 Proposed Order) (DeVoogd, Andrew) (Entered: 01/20/2021) |
| 01/28/2021 | | Text Order GRANTING 77 Unopposed Motion to Withdraw as Attorney. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JZ) (Entered: 01/28/2021) |
| 01/28/2021 | | Text Order GRANTING 81 Motion for Leave to File Sealed Document, entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (JZ) (Entered: 01/28/2021) |
| 01/28/2021 | 82 | Sealed Exhibits to 80 BRIEF by Netlist, Inc.. (Attachments: # 1 Exhibit 27, # 2 Exhibit 28) (am) (Entered: 01/28/2021) |
| 01/28/2021 | 83 | ORDER Setting Zoom Motion Hearing for 2/2/2021 09:30 AM before Judge Alan D Albright. |

| | | Signed by Judge Alan D Albright. (bot1) (Entered: 01/28/2021) |
|---|---|---|
| 02/01/2021 | 84 | ORDER. IT IS ORDERED THAT: The petition is granted to the extent that the district court must stay all proceedings concerning the substantive issues in the case until such time that it has issued a ruling on the transfer motion capable of providing meaningful appellate review of the reasons for its decision. The parties shall inform the court when the district court has issued such an opinion. Issued by United States Court of Appeals for the Federal Circuit. (am) (Entered: 02/01/2021) |
| 02/02/2021 | 85 | Transcript filed of Proceedings held on 2-2-21, Proceedings Transcribed: Motion Hearing. Court Reporter/Transcriber: Kristie Davis, Telephone number: 254-340-6114. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 2/23/2021, Redacted Transcript Deadline set for 3/5/2021, Release of Transcript Restriction set for 5/3/2021, (kd) (Entered: 02/02/2021) |
| 02/02/2021 | 86 | Minute Entry for proceedings held before Judge Alan D Albright: Motion Hearing held on 2/2/2021. Case called for motion hearing by zoom. At issue is the defendant's motion to transfer the case to California. The Court heard argument from both sides and he will issue an order in the near future ruling on the motion. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(am) (Entered: 02/02/2021) |
| 02/02/2021 | 87 | ORDER DENYING 26 Motion to Transfer Case. The Court finds that Hynix has failed to meet its burden to demonstrate that litigating this case in the Central District of California, or in the Austin Division of this District would be clearly more convenient than in Waco. Accordingly, the Hynixs Motion to Transfer is DENIED. Signed by Judge Alan D Albright. (bw) (Entered: 02/02/2021) |
| 02/02/2021 | | Markman Hearing set for 3/1/2021 before Judge Alan D Albright. Jury Selection and Trial set for 7/6/2021 before Judge Alan D Albright. (bw) (Entered: 02/02/2021) |

PATENT

**U.S. District Court [LIVE]**
**Western District of Texas (Waco)**
**CIVIL DOCKET FOR CASE #: 6:20-cv-00525-ADA**

Netlist, Inc. v. SK hynix America Inc. et al                Date Filed: 06/15/2020
Assigned to: Judge Alan D Albright                          Jury Demand: Both
Cause: 35:271 Patent Infringement                           Nature of Suit: 830 Patent
                                                            Jurisdiction: Federal Question

**Plaintiff**

**Netlist, Inc.**                          represented by   **J. Stephen Ravel**
                                                            Kelly Hart & Hallman LLP
                                                            303 Colorado Street
                                                            Suite 2000
                                                            Austin, TX 78701
                                                            (512)495-6429
                                                            Fax: 512/495-6610
                                                            Email: steve.ravel@khh.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Andrew H. DeVoogd**
                                                            Mintz, Levin, Cohn, Ferris, Glovsky and
                                                            Popeo, P.C.
                                                            One Financial Center
                                                            Boston, MA 02111
                                                            617-348-1611
                                                            Fax: 617-542-2241
                                                            Email: AHDeVoogd@mintz.com
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SK hynix America Inc.**                  represented by   **Brian Ralph Nester**
                                                            Sidley Austin **-** Washington
                                                            1501 K St NW
                                                            Washington, DC 20005
                                                            202-736-8000
                                                            Fax: 202-736-8711
                                                            Email: bnester@sidley.com
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **David C. Giardina**
                                                            Sidley Austin LLP
                                                            One South Dearborn
                                                            Chicago, IL 60603
                                                            312-853-7000
                                                            Fax: 312-853-7036
                                                            Email: dgiardina@sidley.com
                                                            *LEAD ATTORNEY*

APPX0018

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
Fax: (202) 736-8711
Email: jmicallef@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
Law Offices of Kenneth L. Nissly
P.O. Box 3462
Saratoga, CA 95070-1462
408-398-7043
Email: knissly@nisslylaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
Sildey Austin LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8000
Fax: 202-736-8711
Email: mfranzinger@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
214-981-3300
Fax: 214-981-3400
Email: mhatcher@sidley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
Baker Botts L.L.P.
1801 Century Park East
Suite 2400
Los Angeles, CA 90067
213-202-5702
Fax: 415-291-6359
Email: ted.chandler@bakerbotts.com
*TERMINATED: 12/14/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry K. Shelton**
Shelton Coburn LLP
311 RR 620 S
Suite 205
Austin, TX 78734-4775
512-263-2165
Fax: 512-263-2166
Email: bshelton@sheltoncoburn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**SK hynix Inc.**                    represented by   **Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 12/14/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry K. Shelton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**SK hynix Inc.**                              represented by  **Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 12/14/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry K. Shelton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Plaintiff**

**SK hynix America Inc.**                      represented by  **Brian Ralph Nester**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Giardina**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Micallef**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth L. Nissly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael R. Franzinger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael D. Hatcher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theodore W. Chandler**
(See above for address)
*TERMINATED: 12/14/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry K. Shelton**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Netlist, Inc.**                              represented by **J. Stephen Ravel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew H. DeVoogd**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2020 | 7 | STANDING ORDER from U.S. District Judge Alan D. Albright regarding scheduled civil hearings. Signed by Judge Alan D Albright. (Attachments: # 1 Supplemental Standing Order from Chief Judge Garcia re COVID19)(mc5) (Entered: 06/16/2020) |
| 06/15/2020 | 1 | COMPLAINT ( Filing fee $ 400 receipt number 0542-13667320), filed by Netlist, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Civil Cover Sheet) (DeVoogd, Andrew) (Entered: 06/15/2020) |
| 06/15/2020 | 2 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 forwarded to the Director of the U.S. Patent and Trademark Office. (DeVoogd, Andrew) (Entered: 06/15/2020) |
| 06/15/2020 | 3 | REQUEST FOR ISSUANCE OF SUMMONS by Netlist, Inc.. *to SK hynix America Inc. and SK hynix Inc.* (DeVoogd, Andrew) (Entered: 06/15/2020) |
| 06/15/2020 | 4 | RULE 7 DISCLOSURE STATEMENT filed by Netlist, Inc.. (DeVoogd, Andrew) (Entered: 06/15/2020) |
| 06/15/2020 |   | Case assigned to Judge Alan D Albright. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE |

APPX0022

| | | |
|---|---|---|
| | | CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (bw) (Entered: 06/16/2020) |
| 06/16/2020 | 5 | Summons Issued as to SK hynix America Inc.. (bw) (Entered: 06/16/2020) |
| 06/16/2020 | 6 | Summons Issued as to SK hynix Inc.. (bw) (Entered: 06/16/2020) |
| 06/17/2020 | 8 | NOTICE of Attorney Appearance by Barry K. Shelton on behalf of SK hynix America Inc., SK hynix Inc.. Attorney Barry K. Shelton added to party SK hynix America Inc.(pty:dft), Attorney Barry K. Shelton added to party SK hynix Inc.(pty:dft) (Shelton, Barry) (Main Document 8 replaced on 6/18/2020 per requirement to flatten document before e-filing) (Entered: 06/17/2020) |
| 06/22/2020 | 9 | WAIVER OF SERVICE Returned Executed by SK hynix Inc., SK hynix America Inc. as to All Defendants. (Shelton, Barry) (Entered: 06/22/2020) |
| 06/23/2020 | 10 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Brian Nester* ( Filing fee $ 100 receipt number 0542-13690074) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/23/2020 | 11 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Michael Hatcher* ( Filing fee $ 100 receipt number 0542-13690161) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/23/2020 | 12 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Kenneth L. Nissly* ( Filing fee $ 100 receipt number 0542-13690182) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/23/2020 | 13 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Theodore W. Chandler* ( Filing fee $ 100 receipt number 0542-13690197) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/23/2020 | 14 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Michael R. Franzinger* ( Filing fee $ 100 receipt number 0542-13690207) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/23/2020 | 15 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for David C. Giardina* ( Filing fee $ 100 receipt number 0542-13690215) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 06/23/2020) |
| 06/25/2020 | | Text Order GRANTING 10 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
| 06/25/2020 | | Text Order GRANTING 11 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
| 06/25/2020 | | Text Order GRANTING 12 Motion to Appear Pro Hac Vice. Before the Court is the Motion for |

|  | | Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
|---|---|---|
| 06/25/2020 | | Text Order GRANTING 13 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
| 06/25/2020 | | Text Order GRANTING 14 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
| 06/25/2020 | | Text Order GRANTING 15 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 06/25/2020) |
| 07/01/2020 | 16 | MOTION to Appear Pro Hac Vice by Barry K. Shelton *for Joseph A. Micallef* ( Filing fee $ 100 receipt number 0542-13718313) by on behalf of SK hynix America Inc., SK hynix Inc.. (Shelton, Barry) (Entered: 07/01/2020) |
| 07/03/2020 | | Text Order GRANTING 16 Motion to Appear Pro Hac Vice. Before the Court is the Motion for Admission Pro Hac Vice. The Court, having reviewed the Motion, finds it should be GRANTED and therefore orders as follows: IT IS ORDERED the Motion for Admission Pro Hac Vice is GRANTED. IT IS FURTHER ORDERED that Applicant, if he/she has not already done so, shall immediately tender the amount of $100.00, made payable to: Clerk, U.S. District Court, in compliance with Local Rule AT-I (f)(2). Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Alan D Albright. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jy) (Entered: 07/03/2020) |
| 08/21/2020 | 17 | ANSWER to 1 Complaint with Jury Demand , COUNTERCLAIM against Netlist, Inc. by SK hynix Inc., SK hynix America Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 |

| | | |
|---|---|---|
| | | Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Errata 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62)(Shelton, Barry) (Entered: 08/21/2020) |
| 08/26/2020 | 18 | NOTICE of Readiness by Netlist, Inc. (DeVoogd, Andrew) (Entered: 08/26/2020) |
| 09/30/2020 | 19 | Unopposed MOTION for Leave to File Answer to Counterclaim Out of Time by Netlist, Inc.. (Attachments: # 1 Exhibit A - Proposed Answer to Counterclaim, # 2 Proposed Order)(DeVoogd, Andrew) (Entered: 09/30/2020) |
| 10/05/2020 | 20 | ORDER GOVERNING PROCEEDINGS PATENT CASE. This case is SET for a telephonic Rule 16 Case Management Conference on Friday, October 16, 2020 at 1:30 p.m. before Judge Alan D Albright. Signed by Judge Alan D Albright. (bw) (Entered: 10/05/2020) |
| 10/08/2020 | 21 | NOTICE of Co-Pending Inter Partes Review by Netlist, Inc. (DeVoogd, Andrew) (Entered: 10/08/2020) |
| 10/16/2020 | 22 | ORDER RESETTING TIME OF TELEPHONIC SCHEDULING CONFERENCE, Telephone Conference set for 10/16/2020 01:00 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (am) (Entered: 10/16/2020) |
| 10/16/2020 | 23 | Minute Entry for proceedings held before Judge Alan D Albright. Telephone Conference held on 10/16/2020. Case called for telephonic scheduling conference. At issue is whether the two cases will proceed at the same time for hearings or be separated. Plaintiff would like to combine both cases together while the defendant prefers that have 1 Markman Hearing on the track with the second case which is later. There is also a pending motion to transfer case to California. The Court decided that set the Markman Hearings in March and set all trials in both matter in December 2021. Discovery is open immediately, The Court will work on the motion to transfer and it is done by the end of the year well before the Markmans. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis.)(bw) (Entered: 10/16/2020) |
| 10/21/2020 | 24 | STIPULATION on Motion to Transfer (Joint) by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Proposed Order)(Shelton, Barry) (Entered: 10/21/2020) |
| 10/26/2020 | 25 | ORDER Setting Markman Hearing for 3/19/2021 01:30 PM before Judge Alan D Albright. Signed by Judge Alan D Albright. (bot4) (Entered: 10/27/2020) |
| 10/29/2020 | 26 | Joint MOTION for Entry of Scheduling Order Governing the '525 and '194 Cases by Netlist, Inc.. (Attachments: # 1 Proposed Order Exhibit A - Proposed Scheduling Order)(DeVoogd, Andrew) (Entered: 10/29/2020) |
| 11/09/2020 | 27 | Updated Standing Order Governing Proceedings Patent Cases. Signed by Judge Alan D Albright. (jkda) (Entered: 11/10/2020) |
| 11/18/2020 | 28 | SCHEDULING ORDER: Markman Hearing set for 3/19/2021 01:30 PM before Judge Alan D Albright. Joinder of Parties due by 4/9/2021. Amended Pleadings due by 6/11/2021. Dispositive Motions due by 11/1/2021. Pretrial Conference set for 11/29/2021 before Judge Alan D Albright. Jury Selection and Trial set for 12/6/2021 before Judge Alan D Albright. Signed by Judge Alan D Albright. (bw) (Entered: 11/18/2020) |
| 12/11/2020 | 29 | Unopposed MOTION to Withdraw as Attorney by SK hynix America Inc., SK hynix Inc.. (Attachments: # 1 Proposed Order)(Chandler, Theodore) (Entered: 12/11/2020) |
| 12/15/2020 | | Text Order GRANTING 29 Motion to Withdraw as Attorney entered by Judge Alan D Albright. |

|  |  | IT IS HEREBY ORDERED that Theodore W. Chandler be permitted to withdraw as counsel of record for Defendants in these actions. (This is a text-only entry generated by the court. There is no document associated with this entry.) (re) (Entered: 12/15/2020) |
|---|---|---|
| 02/02/2021 | 30 | MEMORANDUM OPINION AND ORDER: DENYING 24 Motion to Transfer Case and Re-setying the Markman hearings for the consolidated -194 and -525 actions to take place on March 1, 2021, and the case is set for jury trial for July 6, 2021. Signed by Judge Alan D Albright. (lad) (Entered: 02/02/2021) |
| 02/02/2021 |  | Reset Hearings: Markman Hearing set for 3/1/2021 before Judge Alan D Albright, Jury Trial set for 7/6/2021 before Judge Alan D Albright. (lad) (Entered: 02/02/2021) |

APPX0026

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| NETLIST, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 6:20-cv-00194 |
| v. ) | |
| ) | |
| SK HYNIX INC. and SK HYNIX ) | **JURY TRIAL DEMANDED** |
| AMERICA INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

### NETLIST, INC.'S
### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") brings this Complaint for patent infringement ("Complaint") and for jury trial against Defendants SK hynix, Inc. and SK hynix America Inc. (collectively "SK hynix" or "Defendants"). Netlist alleges as follows:

### THE PARTIES

1.    Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

2.    Netlist is the owner by assignment of U.S. Patent No. 9,858,218 ("the '218 patent") (attached as Exhibit 1) and U.S. Patent No. 10,474,595 ("the '595 patent") (attached as Exhibit 2) (together, the "Asserted Patents"). Both of these patents are essential to certain DDR4 memory module standards promulgated by the Joint Electron Device Engineering Council, or "JEDEC," the standard-setting body for the microelectronics industry. The Asserted Patents are therefore "standard essential."

1

3.      On information and belief, Defendant SK hynix Inc. is a corporation organized and existing under the laws of the Republic of Korea ("Korea"), having a principal place of business at 2091, Gyeongchung-daero, Bubal-eup, Icheon-si, Gyeonggi-do, 17336, Korea. On information and belief, SK hynix Inc. is the worldwide parent corporation for Defendant SK hynix America Inc., and is responsible, either directly or indirectly through subsidiaries, for its infringing activities. References herein to the acts of SK hynix America Inc. should be understood to encompass such acts by SK hynix Inc.

4.      On information and belief, Defendant SK hynix America Inc. is a corporation organized and existing under the laws of California, having a principal place of business at 3101 North 1st Street, San Jose, CA 95134, United States. On information and belief, Defendant SK hynix America Inc. is a wholly owned subsidiary of SK hynix Inc. and is a United States operating company for SK hynix Inc. On information and belief, Defendant SK hynix America Inc. provides support for sales, technical, and customer/client relationship operations, including the testing, certification, and qualification of the accused LRDIMM and RDIMM memory modules for use in customer server products.

5.      SK hynix America Inc. is registered to do business in Texas.

6.      On information and belief, SK hynix America Inc. maintains a registered agent for service of process within this District, The Prentice-Hall Corporation System, 211 E. 7th Street, Suite 620, Austin, TX 78701.

7.      On information and belief, SK hynix America Inc. maintains one or more physical fixed places of business in Texas, including offices at 4201 West Parmer Lane Bldg. B, Suite 245, Austin, TX 78727, at which, as alleged below, personnel perform certain activities directly related to the products accused of infringement in this case.

8.      Defendants place, have placed, or contributed to placing infringing products like Load Reduced Dual In-line Memory Modules ("LRDIMMs")[1] and Registered Dual In-line Memory Modules ("RDIMMs")[2] into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Western District of Texas.  On information and belief, Defendants have also derived substantial revenues from infringing acts in this District including from the sale and use of infringing LRDIMM and RDIMM products.

## JURISDICTION AND VENUE

9.      This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code § 1, et seq. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.      This Court has specific personal jurisdiction over Defendants at least in part because Defendants conduct business in this Judicial District.  Netlist's causes of action arise, at least in part, from Defendants' contacts with and activities in the State of Texas and this District. On information and belief, Defendants have committed acts of infringement within the State of Texas and this District by, among other things, directly and/or indirectly using, selling, offering to sell, or importing products that infringe one or more claims of the '218 patent and/or the '595 patent.

11.      On information and belief, Defendants conduct business in this District and maintain regular and established places of business within this District. For example, SK hynix America Inc. has maintained regular and established places of business with offices and/or other facilities in this District, including at least such offices and/or facilities at 4201 West Parmer Lane

---

[1] The SK hynix HMA84GL7AMR4N-UH is an exemplary infringing LRDIMM product.
[2] The SK hynix HMA42GR7AFR4N-UH is an exemplary infringing RDIMM product.

Bldg. B, Suite 245, Austin, TX 78727. On information and belief, personnel working at this facility in Austin engage in activities directly related to the LRDIMM and RDIMM products at issue in this case.

12.     For example, on information and belief, personnel employed by SK hynix America Inc. working at this location are semiconductor professionals, including field application engineers, senior technical marketing managers, and senior quality managers. On information and belief, these personnel have expertise in, among other aspects of the accused products, semiconductors, application specific integrated circuits, embedded systems, and testing and qualification of computer memory modules. On information and belief, one of the Defendants' largest customers within the United States, Dell Technologies, is based in the Austin area, and many of the personnel working at the SK hynix America Inc. location in Austin direct their efforts to providing Dell with the accused products. These efforts include, on information and belief, extensive testing, certification, and qualification of the accused LRDIMM and RDIMM memory modules for specific use in Dell server products.

13.     On information and belief, Defendants have placed or contributed to placing infringing products including, but not limited to, SK hynix LRDIMM and RDIMM products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District. For example, apart from SK hynix America Inc.'s own activities within this District described above, SK hynix America Inc. also has a distributor—N.F. Smith & Associates, LP—with a location in this District. On information and belief, this distributor also sells SK hynix LRDIMM and RDIMM products into the stream of commerce within this District.[3]

---

[3] *See* https://www.skhynix.com/eng/support/distributor.jsp; *see also* https://www.smithweb.com/global-locations/.

14.    On information and belief, SK hynix America Inc. has also derived substantial revenues from infringing acts in this District, including from the sale and use of infringing products including, but not limited to, SK hynix's LRDIMM and RDIMM products.

15.    Defendants have committed acts within this District giving rise to this action, and have established sufficient minimum contacts with the State of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

16.    Venue in this District is proper as to SK hynix Inc. under 28 U.S.C. § 1391(c)(3) because it is a foreign corporation. *In re HTC Corp.,* 889 F.3d 1349, 1354 (Fed. Cir. 2018).

17.    Venue is proper in this District as to SK hynix America Inc. pursuant to 28 U.S.C. § 1391(b), (c), and 1400(b) because SK hynix America Inc. (1) has committed and continue to commit acts of patent infringement in this District by, among other things, directly and/or indirectly using, selling, offering to sell, or importing products that infringe one or more claims of the '218 patent and/or the '595 patent, and (2) has done and continue to do business in this District by maintaining regular and established places of business, including at least at 4201 West Parmer Lane Bldg. B, Suite 245, Austin, TX 78727. *In re Cray Inc.,* 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

## **FACTUAL BACKGROUND**

18.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies. Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets. Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

APPX0031

19.     The technologies disclosed and claimed in the asserted patents relate generally to memory modules. Generally speaking, a memory module is a printed circuit board that contains, among other important components, DRAM integrated circuits. A memory module is typically installed into a memory slot on a computer motherboard and serves as memory for that computer system. The '218 patent relates to memory modules that operate in two distinct modes, where the module performs memory read or write operations in one mode, and one or more training sequences in the other. Similarly, the '595 patent relates to memory modules that operate in two distinct modes, where the module performs memory read or write operations in one mode, and operations related to one or more training sequences in the other.

20.     The accused SK hynix DDR4 RDIMM and LRDIMM memory modules are designed for use in servers, such as those supporting cloud-based computing and other data-intensive applications. The structure, function, and operation of server memory modules like the accused devices is defined, specified, and standardized by JEDEC (Joint Electron Device Engineering Council), the standard-setting body for the microelectronics industry. The accused RDIMMs are JEDEC-standard compliant memory modules. LRDIMM is a different type of memory module that is JEDEC-standard compliant, albeit to other JEDEC standards. JEDEC released the second version of the standard for one of the important memory module components of both RDIMMs and LRDIMMs, the DDR4[4] register control device, or RCD, in August of 2019.

21.     Netlist "committed" both of the Asserted Patents to the relevant JEDEC standards pursuant to the JEDEC Patent Policy, which sets certain obligations for owners of patents (like the Asserted Patents) that are essential to one or more JEDEC standards. Netlist has in all respects and at all times acted in a manner consistent with the JEDEC Patent Policy, as set forth in the JEDEC

---

[4] DDR4 refers to the latest generation of DRAM memory. Older, slower generations of memory modules used DDR3 DRAM; even older memory modules used DDR2 DRAM.

Manual of Organization and Procedure, which states in relevant part that "[a] license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination . . . ." Netlist contacted SK hynix in 2015 regarding its need for a license to Netlist's essential patent portfolio and has since been negotiating in good faith to reach a resolution—but SK hynix still refuses to take a license to Netlist's patents.

22.     In the course of these negotiations, and years before bringing this action, Netlist offered to license to SK hynix, among other patents in its standard-essential portfolio, the direct parents of the currently-asserted patents under reasonable terms and conditions that are free of any unfair discrimination. Unfortunately, SK hynix has not acted as a willing licensee. From the beginning, SK hynix has taken unreasonable positions and refused to attribute any meaningful value to Netlist's fundamental patents. Faced with an intransigent infringer of its standard-essential patents, Netlist turned to litigation in order to obtain fair compensation for SK hynix's unauthorized use of its intellectual property, including in federal district court and at the International Trade Commission. In turn, SK hynix launched extensive collateral attacks on Netlist and its intellectual property, including filing multiple post-grant challenges to over a dozen of Netlist's standard-essential patents. As a result, the parties have made no progress towards resolution, despite multiple substantive exchanges, over many years of negotiation, and Netlist's multiple, reasonable offers to license.

23.     In June 2016, consistent with its obligations under the JEDEC Patent Policy, Netlist sent SK hynix a formal letter outlining Netlist's offer to license Netlist's patent portfolio related to RDIMM and LRDIMM technology on reasonable terms and conditions that are free of any discrimination. Netlist again identified the direct parents of the asserted patents, and informed SK

hynix that their DDR4 RDIMMs and LRDIMMs practice these patents and additional of Netlist's standard essential patent ("SEP") assets without authorization. Despite this, SK hynix has continued to hold out, and has refused to accept any of Netlist's reasonable and non-discriminatory offers for a license to its SEPs. Notably, the Chief Administrative Law Judge of the International Trade Commission has twice rejected SK hynix's allegations that Netlist violated its obligations under the JEDEC patent policy, and also concluded in the fall of 2019 that Defendants infringed the claims of another of Netlist's standard essential patents.

24.    In parallel with its two International Trade Commission complaints, Netlist filed two federal district court complaints in the Central District of California,[5] one in the fall of 2016 and the second a year later. After consolidation, those cases were stayed based on the co-pending action before the International Trade Commission. Those complaints asserted different patents from those asserted in this case and, prior to being stayed, no patent claims were construed by the court, and no meaningful discovery had been exchanged among the parties.

25.    Each of the Defendants has been aware of the parents of the asserted patents since at least January 2016 when Netlist presented to the Defendants detailed claim charts related to the parent of the asserted patents. Further, each of the Defendants has been aware of the '218 patent since at least January 2018 when Netlist provided Defendants with detailed claim charts describing how Defendants' RDIMM and LRDIMM products infringed claims of the '218 patent. As to the '595 patent, Netlist informed Defendants in late 2019 that the '595 patent had issued, and that Defendants' LRDIMM and RDIMM products infringed this patent too.

//

---

[5] Defendants do not appear to have any employees or physical presence in the Central District of California.

## COUNT I

## DEFENDANTS' INFRINGEMENT OF U.S. PATENT NO. 9,858,218

26.     Netlist restates and incorporates by reference all of the allegations made in the preceding paragraphs as though fully set forth herein.

27.     The '218 patent, entitled "Memory module and methods for handshaking with a memory controller," issued to inventor Dr. Hyun Lee on January 2, 2018. The '218 patent issued from Application No. 15/088,115, filed on April 1, 2016. The '218 Patent is the child of U.S. Patent No. 8,489,837 ("the '837 patent"). Netlist owns by assignment the entire right, title and interest in and to the '218 patent. The '218 patent is essential to the JEDEC DDR4 RDIMM standard, and to the JEDEC DDR4 LRDIMM standard. Netlist committed the '218 patent to these standards pursuant to the JEDEC Patent Policy and has, at all times, observed and adhered to its obligations under this policy.

28.     On information and belief, Defendants directly infringed and are currently infringing at least the independent and dependent claims of the '218 patent identified in the chart below ("the '218 Asserted Claims") by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, SK hynix DDR4 LRDIMMS (Load-Reduced Dual In-Line Memory Modules) (the "accused LRDIMM Products") and SK hynix DDR4 RDIMMs (Registered Dual In-Line Memory Modules) (the "accused RDIMM Products"). These infringing products include, without limitation, the exemplary SK hynix DDR4 LRDIMM and RDIMM modules identified in the SK hynix Q1 2017 Databook or Module Product List, attached as Exhibits 3 and 4 respectively (collectively, the "accused products" or the "accused LRDIMM and RDIMM products").

| '218 Independent Claims | '218 Dependent Claims |
|---|---|
| 1 | 2, 3, 4, 5, 6, 7, 8 |
| 15 | 16, 17, 18, 19, 20, 21, 22 |

29.     An exemplary claim chart comparing the asserted independent claims of the '218 patent to an exemplary accused LRDIMM product (part number HMA84GL7AMR4N-UH) is attached as Exhibit 5. An exemplary claim chart comparing the asserted independent claims of the '218 patent to an exemplary accused RDIMM product (part number HMA42GR7AFR4N-UH) is attached as Exhibit 6.[6]

30.     On information and belief, each of Defendants has been aware of the '837 patent, the parent of the '218 patent, and the patents' disclosures, since at least January 2016. Defendants have been specifically aware of the '218 patent claims since at least January of 2018.

31.     Defendants also indirectly infringed, and are currently infringing, the '218 Asserted Claims.

32.     In particular, on information and belief, users making routine use of the accused LRDIMM and RDIMM products infringe at least the '218 Asserted Claims. On information and belief, each of the Defendants has induced, and currently induces, the infringement of the '218 patent. For example, each of Defendants was aware that the accused LRDIMM and RDIMM

---

[6] These claim charts are exemplary, and are based on relevant information presently within Netlist's possession, custody, or control. Netlist expressly reserves the right to amend, modify and/or supplement these exemplary disclosures as new information, documents, source code, testimony, or knowledge come to light, whether received from Defendants or non-parties.  Further, Netlist expressly reserves the right to amend, modify and/or supplement these exemplary disclosures by identifying, charting, and relying on additional information that describes the disclosures and information already contained within these exemplary disclosures. Further, Netlist reserves the right to supplement these exemplary disclosures as this case proceeds, including, but not limited, following any *Markman* order in this case.  The Asserted Claims have not been construed, and nothing contained in these exemplary disclosures is an express or implied admission with respect to the proper construction of the Asserted Claims, or any issue relating to any alleged invalidity of such claims.

products infringe at least the '218 Asserted Claims, and was aware that users making routine use of the accused LRDIMM and RDIMM products infringe those claims. On information and belief, each of Defendants specifically intended that users of the accused LRDIMM and RDIMM products infringe at least the '218 Asserted Claims, and acted with the intent of causing the infringing acts, including the infringing routine use of the accused LRDIMM and RDIMM products by users. For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM and RDIMM products by users with the intent of inducing infringement. *See, e.g.*, Exhibits 7, 8, and 9.

33. On information and belief, each of Defendants has contributed, and currently contributes to, the infringement of at least the '218 Asserted Claims, including the infringing routine use of the accused LRDIMM and RDIMM products by users. On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM and RDIMM products for use in an infringing manner. On information and belief, the accused LRDIMM and RDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Defendants are aware that the product or process that includes the accused LRDIMM and RDIMM products may be covered by one or more of the '218 Asserted Claims or may satisfy one or more of the '218 Asserted Claims under the doctrine of equivalents. On information and belief, the use of the product or process that includes the accused LRDIMM and RDIMM products infringes at least the '218 Asserted Claims.

34. Defendants have committed these acts of direct and indirect infringement with knowledge of the '218 Asserted Claims and thus have acted with willful, egregious, wanton, deliberate, and flagrant disregard for Netlist's rights in the '218 patent.

35.    As a result of Defendants' direct, indirect, and willful infringement of the '218

Asserted Claims, Netlist has suffered and is continuing to suffer monetary damages and is entitled

to a monetary judgment in an amount adequate to compensate for Defendants' past infringement.

Netlist is also entitled to enhanced damages, attorneys' fees, interest, and costs due to Defendants'

willful, egregious, wanton, deliberate, and flagrant conduct with regard to Netlist's patent rights.

For example, despite claiming for over four years that they are willing licensees to Netlist's

standard essential patents, Defendants have continued their extensive and intentional infringement

with callous disregard for Netlist's intellectual property rights. In fact, even after the Chief

Administrative Law Judge of the International Trade Commission twice concluded on review of

an extensive evidentiary record that Netlist did not violate whatever RAND obligations it owed to

Defendants, they continue to refuse to pay a reasonable royalty for their ongoing unauthorized use

of Netlist's patented technology.

## COUNT II

## DEFENDANTS' INFRINGEMENT OF U.S. PATENT NO. 10,474,595

36.    Netlist restates and incorporates by reference all of the allegations made in the

preceding paragraphs as though fully set forth herein.

37.    The '595 patent, entitled "Memory module having an open-drain output pin for

parity error in a first mode and for training sequences in a second mode," issued to inventor Dr.

Hyun Lee on November 12, 2019. The 595 patent issued from Application No. 15/857,553, filed

on December 28, 2017. The '595 Patent is the child of the '837 patent". Netlist owns by assignment

the entire right, title and interest in and to the '595 patent. The '595 patent is essential to the JEDEC

DDR4 RDIMM standard, and to the JEDEC DDR4 LRDIMM standard. Netlist committed the

APPX0038

'595 patent to these standards pursuant to the JEDEC Patent Policy and has, at all times, observed and adhered to its obligations under this policy.

38.     On information and belief, Defendants directly infringed and are currently infringing at least the independent and dependent claims of the '595 patent identified in the chart below ("the '595 Asserted Claims") by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused LRDIMM and RDIMM products.

| '595 Independent Claims | '595 Dependent Claims |
| --- | --- |
| 1 | 2, 3, 4, 5, 6, 7, 8, 9 |
| 10 | 11, 12, 13, 14, 15, 16 |

39.     An exemplary claim chart comparing the asserted independent claims of the '595 patent to an exemplary accused LRDIMM product (part number HMA84GL7AMR4N-UH) is attached as Exhibit 10. An exemplary claim chart comparing the asserted independent claims of the '595 patent to an exemplary accused RDIMM product (part number HMA42GR7AFR4N-UH) is attached as Exhibit 11.[7]

---

[7] These claim charts are exemplary, and are based on relevant information presently within Netlist's possession, custody, or control. Netlist expressly reserves the right to amend, modify and/or supplement these exemplary disclosures as new information, documents, source code, testimony, or knowledge come to light, whether received from Defendants or non-parties.  Further, Netlist expressly reserves the right to amend, modify and/or supplement these exemplary disclosures by identifying, charting, and relying on additional information that describes the disclosures and information already contained within these exemplary disclosures. Further, Netlist reserves the right to supplement these exemplary disclosures as this case proceeds, including, but not limited, following any *Markman* order in this case.  The Asserted Claims have not been construed, and nothing contained in these exemplary disclosures is an express or implied admission with respect to the proper construction of the Asserted Claims, or any issue relating to any alleged invalidity of such claims.

40.     On information and belief, each of Defendants has been aware of the '837 patent, the parent of the '595 patent, and the patents' disclosures, since at least January 2016. Defendants have been aware of the '595 patent claims since at least late 2019.

41.     In particular, on information and belief, users making routine use of the accused LRDIMM and RDIMM products infringe at least the '595 Asserted Claims. On information and belief, each of the Defendants has induced, and currently induces, the infringement of the '595 patent. For example, each of Defendants was aware that the accused LRDIMM and RDIMM products infringe at least the '595 Asserted Claims, and was aware that users making routine use of the accused LRDIMM and RDIMM products infringe those claims. On information and belief, each of Defendants specifically intended that users of the accused LRDIMM and RDIMM products infringe at least the '595 Asserted Claims, and acted with the intent of causing the infringing acts, including the infringing routine use of the accused LRDIMM and RDIMM products by users. For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM and RDIMM products by users with the intent of inducing infringement. *See, e.g.*, Exhibits 6, 7, and 8.

42.     On information and belief, each of Defendants has contributed, and currently contributes to, the infringement of at least the '595 Asserted Claims, including the infringing routine use of the accused LRDIMM and RDIMM products by users. On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM and RDIMM products for use in an infringing manner. On information and belief, the accused LRDIMM and RDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Defendants are aware that the

product or process that includes the accused LRDIMM and RDIMM products may be covered by one or more of the '595 Asserted Claims or may satisfy one or more of the '595 Asserted Claims under the doctrine of equivalents. On information and belief, the use of the product or process that includes the accused LRDIMM and RDIMM products infringes at least the '595 Asserted Claims.

43.     Defendants have committed these acts of direct and indirect infringement with knowledge of at least the '595 Asserted Claims and thus have acted with willful, egregious, wanton, deliberate, and flagrant disregard for Netlist's rights in the '595 patent.

44.     As a result of Defendants' direct, indirect, and willful infringement of at least the '595 Asserted Claims, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement. Netlist is also entitled to enhanced damages, attorneys' fees, interest, and costs due to Defendants' willful, egregious, wanton, deliberate and flagrant conduct with regard to Netlist's patent rights. For example, despite claiming for over four years that they are willing licensees to Netlist's standard essential patents, Defendants have continued their extensive and intentional infringement with callous disregard for Netlist's intellectual property rights. In fact, even after the Chief Administrative Law Judge of the International Trade Commission twice concluded on review of an extensive evidentiary record that Netlist did not violate whatever RAND obligations it owed to Defendants, they continue to refuse to pay a reasonable royalty for their ongoing unauthorized use of Netlist's patented technology.

**PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that judgment be entered:

A.     Declaring that Defendants have infringed and are infringing, directly and indirectly, the claims of the asserted patents;

APPX0041

B.    Compensating Netlist for all damages caused by Defendants' infringement of the asserted patents;

C.    Ordering Defendants to account for and pay damages caused to Netlist by Defendants' unlawful acts of patent infringement;

D.    Entering judgment that Defendants' acts of patent infringement are willful, egregious, wanton, deliberate, and flagrant conduct and enhancing Netlist's damages up to three times their amount under 35 U.S.C. § 284;

E.    Granting Netlist pre- and post-judgment interests, together with all costs and expenses;

F.    Granting Netlist its reasonable attorneys' fees under 35 U.S.C. § 285;

G.    Awarding such other relief as this Court may deem just and proper.


**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all issues deemed to be triable by a jury.


Dated:  March 17, 2020

/s/ *Andrew H. DeVoogd*
Andrew H. DeVoogd
  (Admitted to practice in WDTX)
  Massachusetts BBO No. 670203
  E-mail: AHDeVoogd@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
  POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

*Attorneys for Plaintiff Netlist Inc.*


16

# EXHIBIT 5

APPX0043

Case 6:20-cv-00194　Document 1-5　Filed 03/17/20　Page 2 of 165

U.S. Patent No. 9,858,218

SK hynix HMA84GL7AMR4N-UHTE

APPX0044

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."

| wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode. | The module controller of the SK hynix Products is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode.<br><br>For example, the SK hynix products are configure to drive the Alert_n signal to the error edge connection via the open drain output while the memory module is in Clock-to-CA training mode, e.g., the first mode. |

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."

### 2.12    CA Bus Training Modes

The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word") in order to assist the memory controller in aligning the incoming command/address and control signals optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero latency adder has been selected.

In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle together and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their previous values and parity checking is disabled.

The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all '0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three cycles after the last command. This position indicates the end position of a cumulative CA bus "eye opening". The memory controller can now position either the clock phase or the Dn input timing so that the clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative to the clock edge.

Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions at the LOW time, the transition time or the HIGH time of the inputs, respectively.

The memory controller can use the DCS0_n, DCS1_n, DCKE0, DCKE1, DODT0 and DODT0 loop back modes in similar fashion. In each of these modes a single input signal is looped back to the ALERT_n output and the memory controller can determine the optimal clock position for each of the control signals that are used for a particular DIMM. Once the optimal clock position for all CMD/ADDR and control inputs has been established, the memory controller can determine the best clock position for the whole set of input signals or potentially move the timing of individual control signals around to increase either setup or hold margins relative to the clock edge.

*See* JEDEC RCD01 Specification at 54 (annotations added).

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."

<table>
<tr><td></td><td></td><td>

Output driver characteristics are separately controlled for outputs that are often loaded with twice as many DRAMs as the other outputs. Outputs are grouped as follows:

- CA Signals = QxA0..QxA17, QxBA0..QxBA1, QxBG0..QxBG1, QxACT_n, QxC2, QxPAR
- Control Signals = QxCKE0/1, QxODT0/1, QxC2, QxCS[1:0]_n for Dual CS mode, QxCS[3:0]
- CK = Yn_t - Yn_c



**Figure 72 — Voltage waveforms, tALERT_HL Measurement**

</td></tr>
<tr><td></td><td>*See* JEDEC RCD01 Specification at 144.</td></tr>
</table>

Case: 21-114    Document: 2    Page: 108    Filed: 02/08/2021

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."

**Table 16 — Terminal functions**

| Signal Group | Signal Name | Type | Description |
|---|---|---|---|
| Output Address and Command bus | QAA0..QAA13, QAA17, QBA0..QBA13, QBA17, QABA0..QABA1, QBBA0..QBBA1, QAG0..QAG1, QBG0..QBG1 | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. |
| | QAA14..QAA16, QBA14..QBA16 <br><br> or <br><br> QAWE_n, QACAS_n, QARAS_n, QBWE_n, QBCAS_n, QBRAS_n | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. <br> In case of an ACT command some of these terminals have an alternative function: <br> Register output command signals. <br> • QxA14 <=> QxWE_n <br> • QxA15 <=> QxCAS_n <br> • QxA16 <=> QxRAS_n |
| | QAACT_n, QBACT_n | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. |
| Vref output | QVrefCA | $V_{DD}$/2 | Output reference voltage for DRAM receivers |
| Clock outputs | Y0_t..Y3_t, Y0_c..Y3_c | CMOS[2] differential | Redriven clock |
| Reset output | QRST_n | CMOS[2] | Redriven reset. This is an asynchronous output. It is the responsibility of the DDR4RCD01 QRST_n to reset the DDR4 SDRAM on all DIMM topologies. |
| Parity outputs | QAPAR QBPAR | CMOS[2] | Redriven parity[3] |
| Error out | ALERT_n | Open drain | When LOW, this output indicates that a parity error was identified associated with the address and/or command inputs when parity checking is enabled or that the ERROR_IN_n input was asserted, regardless of whether parity checking is enabled or not. |
| I2C bus | SDA | Open drain I/O | I2C Data |

*See* JEDEC RCD01 Specification at 60 (annotation added).

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."



Figure 12 — **Example Wiring of the ALERT_n Function**

JEDEC LRDIMM Specification at 30 (annotations added).

The Alert_n signal is a notification signal associated with the one or more training sequences. For example, while in Clock-to-CA training mode, the IDT 4RCD0124KC0 RCD ORs all enabled Dn inputs from the memory controller and then outputs the result of that OR operation to the memory controller via the Alert_n pin.

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."

### 2.12    CA Bus Training Modes

The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word") in order to assist the memory controller in aligning the incoming command/address and control signals optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero latency adder has been selected.

In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle together and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their previous values and parity checking is disabled.

The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all '0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three cycles after the last command. This position indicates the end position of a cumulative CA bus "eye opening". The memory controller can now position either the clock phase or the Dn input timing so that the clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative to the clock edge.

Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions at the LOW time, the transition time or the HIGH time of the inputs, respectively.

The memory controller can use the DCS0_n, DCS1_n, DCKE0, DCKE1, DODT0 and DODT0 loop back modes in similar fashion. In each of these modes a single input signal is looped back to the ALERT_n output and the memory controller can determine the optimal clock position for each of the control signals that are used for a particular DIMM. Once the optimal clock position for all CMD/ADDR and control inputs has been established, the memory controller can determine the best clock position for the whole set of input signals or potentially move the timing of individual control signals around to increase either setup or hold margins relative to the clock edge.

*See* JEDEC RCD01 Specification at 54 (annotations added).

U.S. Patent No. 9,858,218: Claim 1

"wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode."



**Figure 22 — Clock-to-CA Training Mode Examples**

*See* JEDEC RCD01 Specification at 55.

# EXHIBIT 10

APPX0052

Case 6:20-cv-00194   Document 1-10   Filed 03/17/20   Page 2 of 186

U.S. Patent No. 10,474,595
SK hynix HMA84GL7AMR4N-UHTE

APPX0053

U.S. Patent No. 10,474,595: Claim 10

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."

| | |
|---|---|
| wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state. | The module controller of the SK hynix Products in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state. |
| | For example, the SK hynix products are configured to drive the Alert_n signal, in either a HIGH or LOW state, to the error edge connection via the open drain output while the memory module is in Clock-to-CA training mode, e.g., the second mode. The Alert_n signal constitutes information related to the Clock-to-CA training sequences. |

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."

| | |
|---|---|
| | **2.12    CA Bus Training Modes**<br><br>The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word") in order to assist the memory controller in aligning the incoming command/address and control signals optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero latency adder has been selected.<br><br>In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle together and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their previous values and parity checking is disabled.<br><br>The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all '0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three cycles after the last command. This position indicates the end position of a cumulative CA bus "eye opening". The memory controller can now position either the clock phase or the Dn input timing so that the clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative to the clock edge.<br><br>Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions at the LOW time, the transition time or the HIGH time of the inputs, respectively.<br><br>The memory controller can use the DCS0_n, DCS1_n, DCKE0, DCKE1, DODT0 and DODT0 loop back modes in similar fashion. In each of these modes a single input signal is looped back to the ALERT_n output and the memory controller can determine the optimal clock position for each of the control signals that are used for a particular DIMM. Once the optimal clock position for all CMD/ADDR and control inputs has been established, the memory controller can determine the best clock position for the whole set of input signals or potentially move the timing of individual control signals around to increase either setup or hold margins relative to the clock edge. |
| | *See* JEDEC RCD01 Specification (annotations added). |

U.S. Patent No. 10,474,595: Claim 1

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."

Output driver characteristics are separately controlled for outputs that are often loaded with twice as many DRAMs as the other outputs. Outputs are grouped as follows:

- CA Signals = QxA0..QxA17, QxBA0..QxBA1, QxBG0..QxBG1, QxACT_n, QxC2, QxPAR
- Control Signals = QxCKE0/1, QxODT0/1, QxC2, QxCS[1:0]_n for Dual CS mode, QxCS[3:0]
- CK = Yn_t - Yn_c



**Figure 72 — Voltage waveforms, tALERT_HL Measurement**

*See* JEDEC RCD01 Specification.

U.S. Patent No. 10,474,595: Claim 1

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."

Case: 21-114     Document: 2     Page: 118     Filed: 02/08/2021

**Table 16 — Terminal functions**

| Signal Group | Signal Name | Type | Description |
|---|---|---|---|
| Output Address and Command bus | QAA0..QAA13, QAA17, QBA0..QBA13, QBA17, QABA0..QABA1, QBBA0..QBBA1, QAG0..QAG1, QBG0..QBG1 | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. |
| | QAA14..QAA16, QBA14..QBA16 or QAWE_n, QACAS_n, QARAS_n, QBWE_n, QBCAS_n, QBRAS_n | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. In case of an ACT command some of these terminals have an alternative function: Register output command signals.<br>• QxA14 <=> QxWE_n<br>• QxA15 <=> QxCAS_n<br>• QxA16 <=> QxRAS_n |
| | QAACT_n, QBACT_n | CMOS[2] | Outputs of the register, valid after the specified clock count and immediately following a rising edge of the clock. |
| Vref output | QVrefCA | $V_{DD}/2$ | Output reference voltage for DRAM receivers |
| Clock outputs | Y0_t..Y3_t, Y0_c..Y3_c | CMOS[2] differential | Redriven clock |
| Reset output | QRST_n | CMOS[2] | Redriven reset. This is an asynchronous output. It is the responsibility of the DDR4RCD01 QRST_n to reset the DDR4 SDRAM on all DIMM topologies. |
| Parity outputs | QAPAR QBPAR | CMOS[2] | Redriven parity[3] |
| Error out | ALERT_n | Open drain | When LOW, this output indicates that a parity error was identified associated with the address and/or command inputs when parity checking is enabled or that the ERROR_IN_n input was asserted, regardless of whether parity checking is enabled or not. |
| I2c_n | SDA | Open drain I/O | I2C Bus Data |

*See* JEDEC RCD01 Specification (annotation added).

Page **85** of **185**

U.S. Patent No. 10,474,595: Claim 1

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."



**Figure 12 — Example Wiring of the ALERT_n Function**

JEDEC LRDIMM Specification (annotations added).

The Alert_n signal provides information related to the one or more training sequences. For example, while in Clock-to-CA training mode, the IDT 4RCD0124KC0 RCD ORs all enabled Dn inputs from the memory controller and then outputs the result of that OR operation to the memory controller via the Alert_n pin. The module controller of the SK hynix Products drives the open drain output and the error edge connection to one of two states.

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."

| | |
|---|---|
| | **2.12    CA Bus Training Modes**<br><br>The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word") in order to assist the memory controller in aligning the incoming command/address and control signals optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero latency adder has been selected.<br><br>In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle together and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their previous values and parity checking is disabled.<br><br>The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all '0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three cycles after the last command. This position indicates the end position of a cumulative CA bus "eye opening". The memory controller can now position either the clock phase or the Dn input timing so that the clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative to the clock edge.<br><br>Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions at the LOW time, the transition time or the HIGH time of the inputs, respectively.<br><br>The memory controller can use the DCS0_n, DCS1_n, DCKE0, DCKE1, DODT0 and DODT0 loop back modes in similar fashion. In each of these modes a single input signal is looped back to the ALERT_n output and the memory controller can determine the optimal clock position for each of the control signals that are used for a particular DIMM. Once the optimal clock position for all CMD/ADDR and control inputs has been established, the memory controller can determine the best clock position for the whole set of input signals or potentially move the timing of individual control signals around to increase either setup or hold margins relative to the clock edge. |
| | *See* JEDEC RCD01 Specification (annotations added). |

U.S. Patent No. 10,474,595: Claim 1

"wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state."



**2.12 CA Bus Training Modes (cont'd)**

Figure 22 — Clock-to-CA Training Mode Examples

*See* JEDEC RCD01 Specification.

Case: 21-114    Document: 2    Page: 121    Filed: 02/08/2021

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| NETLIST, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 6:20-cv-00525 |
| ) | |
| v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| SK HYNIX INC. and SK HYNIX ) | |
| AMERICA INC. ) | |
| ) | |
| Defendants. ) | |
| ) | |

## NETLIST, INC.'S COMPLAINT FOR PATENT INFRINGEMENT

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") files this complaint for patent infringement ("Complaint") and for jury trial against Defendants SK hynix, Inc. and SK hynix America Inc. (collectively "SK hynix" or "Defendants"). Netlist alleges as follows:

## THE PARTIES

1.     Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

2.     Netlist is the owner by assignment of U.S. Patent No. 10,217,523 ("the '523 patent") (attached as Exhibit 1) (the "Asserted Patent"). This patent is essential to certain DDR4 memory module standards promulgated by the Joint Electron Device Engineering Council, or "JEDEC," the standard-setting body for the microelectronics industry. The Asserted Patent is therefore "standard essential."

3.      On information and belief, Defendant SK hynix Inc. is a corporation organized and existing under the laws of the Republic of Korea ("Korea"), having a principal place of business at 2091, Gyeongchung-daero, Bubal-eup, Icheon-si, Gyeonggi-do, 17336, Korea. On information and belief, SK hynix Inc. is the worldwide parent corporation for Defendant SK hynix America Inc., and is responsible, either directly or indirectly through subsidiaries, for its infringing activities. References herein to the acts of SK hynix America Inc. should be understood to encompass such acts by SK hynix Inc.

4.      On information and belief, Defendant SK hynix America Inc. is a corporation organized and existing under the laws of California, having a principal place of business at 3101 North 1st Street, San Jose, CA 95134, United States. On information and belief, Defendant SK hynix America Inc. is a wholly owned subsidiary of SK hynix Inc. and is a United States operating company for SK hynix Inc. On information and belief, Defendant SK hynix America Inc. provides support for sales, technical, and customer/client relationship operations, including the testing, certification, and qualification of the accused LRDIMM memory modules for use in customer server products.

5.      SK hynix America Inc. is registered to do business in Texas.

6.      On information and belief, SK hynix America Inc. maintains a registered agent for service of process within this District, The Prentice-Hall Corporation System, 211 E. 7th Street, Suite 620, Austin, TX 78701.

7.      On information and belief, SK hynix America Inc. maintains one or more physical fixed places of business in Texas, including offices at 4201 West Parmer Lane Bldg. B, Suite 245, Austin, TX 78727, at which, as alleged below, personnel perform certain activities directly related to the products accused of infringement in this case.

APPX0062

8.      Defendants place, have placed, or contributed to placing infringing products like Load Reduced Dual In-line Memory Modules ("LRDIMMs")[1] into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in the Western District of Texas.  On information and belief, Defendants have also derived substantial revenues from infringing acts in this District including from the sale and use of infringing LRDIMM products.

## JURISDICTION AND VENUE

9.      This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code § 1, et seq. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.      This Court has specific personal jurisdiction over Defendants at least in part because Defendants conduct business in this Judicial District.  Netlist's causes of action arise, at least in part, from Defendants' contacts with and activities in the State of Texas and this District. On information and belief, Defendants have committed acts of infringement within the State of Texas and this District by, among other things, directly and/or indirectly using, selling, offering to sell, or importing products that infringe one or more claims of the '523 patent.

11.      On information and belief, Defendants conduct business in this District and maintain regular and established places of business within this District. For example, SK hynix America Inc. has maintained regular and established places of business with offices and/or other facilities in this District, including at least such offices and/or facilities at 4201 West Parmer Lane Bldg. B, Suite 245, Austin, TX 78727. On information and belief, personnel working at this facility in Austin engage in activities directly related to the LRDIMM products at issue in this case.

---

[1] The SK hynix HMA84GL7AMR4N-UHTE is an exemplary infringing LRDIMM product.

12.     For example, on information and belief, personnel employed by SK hynix America Inc. working at this location are semiconductor professionals, including field application engineers, senior technical marketing managers, and senior quality managers. On information and belief, these personnel have expertise in, among other aspects of the accused products, semiconductors, application specific integrated circuits, embedded systems, and testing and qualification of computer memory modules. On information and belief, one of the Defendants' largest customers within the United States, Dell Technologies, is based in the Austin area, and many of the personnel working at the SK hynix America Inc. location in Austin direct their efforts to providing Dell with the accused products. These efforts include, on information and belief, extensive testing, certification, and qualification of the accused LRDIMM memory modules for specific use in Dell server products.

13.     On information and belief, Defendants have placed or contributed to placing infringing products including, but not limited to, SK hynix LRDIMM products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District. For example, apart from SK hynix America Inc.'s own activities within this District described above, SK hynix America Inc. also has a distributor—N.F. Smith & Associates, LP—with a location in this District. On information and belief, this distributor also sells SK hynix LRDIMM products into the stream of commerce within this District.[2]

14.     On information and belief, SK hynix America Inc. has also derived substantial revenues from infringing acts in this District, including from the sale and use of infringing products including, but not limited to, SK hynix's LRDIMM products.

---

[2] *See* https://www.skhynix.com/eng/support/distributor.jsp; *see also* https://www.smithweb.com/global-locations/.

15.     Defendants have committed acts within this District giving rise to this action, and have established sufficient minimum contacts with the State of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

16.     Venue in this District is proper as to SK hynix Inc. under 28 U.S.C. § 1391(c)(3) because it is a foreign corporation. *In re HTC Corp.,* 889 F.3d 1349, 1354 (Fed. Cir. 2018).

17.     Venue is proper in this District as to SK hynix America Inc. pursuant to 28 U.S.C. § 1391(b), (c), and 1400(b) because SK hynix America Inc. (1) has committed and continue to commit acts of patent infringement in this District by, among other things, directly and/or indirectly using, selling, offering to sell, or importing products that infringe one or more claims of the '523 patent, and (2) has done and continue to do business in this District by maintaining regular and established places of business, including at least at 4201 West Parmer Lane Bldg. B, Suite 245, Austin, TX 78727. *In re Cray Inc.,* 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

## FACTUAL BACKGROUND

18.     Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies. Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets. Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

19.     The technologies disclosed and claimed in the asserted patent relate generally to memory modules. Generally speaking, a memory module is a printed circuit board that contains, among other important components, DRAM integrated circuits. A memory module is typically installed into a memory slot on a computer motherboard and serves as memory for that computer

system. The '523 patent relates to memory subsystems and, more specifically, a self-testing architecture for memory modules.

20.    The accused SK hynix DDR4 LRDIMM memory modules are designed for use in servers, such as those supporting cloud-based computing and other data-intensive applications. The structure, function, and operation of server memory modules like the accused devices is defined, specified, and standardized by JEDEC (Joint Electron Device Engineering Council), the standard-setting body for the microelectronics industry. The accused LRDIMMs are a type of memory module that is JEDEC-standard compliant. JEDEC released the second version of the standard for one of the important memory module components of LRDIMMs, the DDR4[3] register control device, or RCD, in August of 2019.

21.    Netlist "committed" the Asserted Patent to the relevant JEDEC standards pursuant to the JEDEC Patent Policy, which sets certain obligations for owners of patents (like the Asserted Patents) that are essential to one or more JEDEC standards. Netlist has in all respects and at all times acted in a manner consistent with the JEDEC Patent Policy, as set forth in the JEDEC Manual of Organization and Procedure, which states in relevant part that "[a] license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination . . . ." Netlist contacted SK hynix in 2015 regarding its need for a license to Netlist's essential patent portfolio and has since been negotiating in good faith to reach a resolution—but SK hynix still refuses to take a license to Netlist's patents.

---

[3] DDR4 refers to the latest generation of DRAM memory. Older, slower generations of memory modules used DDR3 DRAM; even older memory modules used DDR2 DRAM.

22.     In the course of these negotiations, and years before bringing this action, Netlist offered to license to SK hynix, among other patents in its standard-essential portfolio, the direct parents of the currently-asserted patent under reasonable terms and conditions that are free of any unfair discrimination. Unfortunately, SK hynix has not acted as a willing licensee. From the beginning, SK hynix has taken unreasonable positions and refused to attribute any meaningful value to Netlist's fundamental patents. Faced with an intransigent infringer of its standard-essential patents, Netlist turned to litigation in order to obtain fair compensation for SK hynix's unauthorized use of its intellectual property, including in federal district court and at the International Trade Commission. In turn, SK hynix launched extensive collateral attacks on Netlist and its intellectual property, including filing multiple post-grant challenges to over a dozen of Netlist's standard-essential patents. As a result, the parties have made no progress towards resolution, despite multiple substantive exchanges, over many years of negotiation, and Netlist's multiple, reasonable offers to license.

23.     In June 2016, consistent with its obligations under the JEDEC Patent Policy, Netlist sent SK hynix a formal letter outlining Netlist's offer to license Netlist's patent portfolio related to, among other technology, its LRDIMM technology on reasonable terms and conditions that are free of any discrimination. Netlist again identified the direct parents of the asserted patent, and informed SK hynix that their DDR4 LRDIMMs, among other relevant products, practice these patents (and additional of Netlist's standard essential patent ("SEP") assets) without authorization. Despite this, SK hynix has continued to hold out, and has refused to accept any of Netlist's reasonable and non-discriminatory offers for a license to its SEPs. Notably, the Chief Administrative Law Judge of the International Trade Commission has twice rejected SK hynix's allegations that Netlist violated its obligations under the JEDEC patent policy.

24.     In parallel with its two International Trade Commission complaints, Netlist filed

two federal district court complaints in the Central District of California,[4] one in the fall of 2016

and the second a year later. After consolidation, those cases were stayed based on the co-pending

action before the International Trade Commission. Those complaints asserted different patents

from those asserted in this case and, prior to being stayed, no patent claims were construed by the

court, and no meaningful discovery had been exchanged among the parties.

25.     Each of the Defendants has been aware of the parents of the asserted patents since

at least January 2016 when Netlist presented to the Defendants detailed claim charts related to

the parent of the asserted patents. Further, each of the Defendants has been aware of the '523

patent since at least June 9, 2020, when Netlist provided Defendants with detailed claim charts

describing how Defendants' LRDIMM products infringed claims of the '523 patent.

## COUNT I

## DEFENDANTS' INFRINGEMENT OF U.S. PATENT NO. 10,217,523

26.     Netlist restates and incorporates by reference all of the allegations made in the

preceding paragraphs as though fully set forth herein.

27.     The '523 patent, entitled "Multi-mode memory module with data handlers," issued

to inventors Dr. Hyun Lee, Jayesh R. Bhakta, and Soonju Choi on February 26, 2019. The '523

patent is a continuation of U.S. patent application Ser. No. 13/745,790, filed Jan. 19, 2013, now

U.S. Pat. No. 8,689,064 ("the '064 patent"), which is a continuation of U.S. patent application Ser.

No. 13/183,253, filed Jul. 14, 2011, now U.S. Pat. No. 8,359,501 ("the '501 patent"), which is a

continuation of U.S. patent application Ser. No. 12/422,925, filed Apr. 13, 2009, now U.S. Pat.

---

[4] Defendants do not appear to have any employees or physical presence in the Central District of California.

No. 8,001,434 ("the '434 patent"). Netlist owns by assignment the entire right, title and interest in and to the '523 patent. The '523 patent is essential to the JEDEC DDR4 LRDIMM standard. Netlist committed the '523 patent to these standards pursuant to the JEDEC Patent Policy and has, at all times, observed and adhered to its obligations under this policy.

28.    On information and belief, Defendants directly infringed and are currently infringing at least the independent and dependent claims of the '523 patent identified in the chart below ("the '523 Asserted Claims") by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused LRDIMM products.

| '523 Independent Claims | '523 Dependent Claims |
|---|---|
| 1 | 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18 |
| 19 | 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34 |

29.    An exemplary claim chart comparing the asserted independent claims of the '523 patent to an exemplary accused LRDIMM product (part number HMA84GL7AMR4N-UHTE) is attached as Exhibit 2.[5]

---

[5] This claim chart is exemplary, and is based on relevant information presently within Netlist's possession, custody, or control. Netlist expressly reserves the right to amend, modify and/or supplement this exemplary disclosure as new information, documents, source code, testimony, or knowledge come to light, whether received from Defendants or non-parties. Further, Netlist expressly reserves the right to amend, modify and/or supplement this exemplary disclosure by identifying, charting, and relying on additional information that describes the disclosures and information already contained within these exemplary disclosures. Further, Netlist reserves the right to supplement this exemplary disclosure as this case proceeds, including, but not limited, following any *Markman* order in this case. The Asserted Claims have not been construed, and nothing contained in this exemplary disclosure is an express or implied admission with respect to the proper construction of the Asserted Claims, or any issue relating to any alleged invalidity of such claims.

30.     On information and belief, each of Defendants has been aware of the '064, '501, and '434 patents, the parent patents of the '523 patent, and the patents' disclosures, since at least January 2016. Defendants have been specifically aware of the '523 patent since at least as early as June 9, 2020.

31.     As a result of Defendants' infringement of at least the '523 Asserted Claims, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement. Netlist is also entitled to enhanced damages, attorneys' fees, interest, and costs due to Defendants' willful, egregious, wanton, deliberate and flagrant conduct with regard to Netlist's patent rights.

32.     Defendants also indirectly infringed, and are currently infringing, the '523 Asserted Claims. In particular, on information and belief, users making routine use of the accused LRDIMM products infringe at least the '523 Asserted Claims. On information and belief, each of the Defendants has induced, and currently induces, the infringement of the '523 patent. For example, each of Defendants was aware that the accused LRDIMM products infringe at least the '523 Asserted Claims, and was aware that users making routine use of the accused LRDIMM products infringe those claims. On information and belief, each of Defendants specifically intended that users of the accused LRDIMM products infringe at least the '523 Asserted Claims, and acted with the intent of causing the infringing acts, including the infringing routine use of the accused LRDIMM products by users. For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM products by users with the intent of inducing infringement. *See, e.g.*, Exhibits 3 and 4.

33.     On information and belief, each of Defendants has contributed, and currently contributes to, the infringement of at least the '523 Asserted Claims, including the infringing routine use of the accused LRDIMM products by users. On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM products for use in an infringing manner. On information and belief, the accused LRDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, Defendants are aware that the product or process that includes the accused LRDIMM products may be covered by one or more of the '523 Asserted Claims or may satisfy one or more of the '523 Asserted Claims under the doctrine of equivalents. On information and belief, the use of the product or process that includes the accused LRDIMM products infringes at least the '523 Asserted Claims.

34.     Defendants have committed these acts of direct and indirect infringement with knowledge of the '523 Asserted Claims and thus have acted with willful, egregious, wanton, deliberate, and flagrant disregard for Netlist's rights in the '523 patent.

35.     As a result of Defendants' direct, indirect, and willful infringement of the '523 Asserted Claims, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement. Netlist is also entitled to enhanced damages, attorneys' fees, interest, and costs due to Defendants' willful, egregious, wanton, deliberate, and flagrant conduct with regard to Netlist's patent rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that judgment be entered:

A.     Declaring that Defendants have infringed and are infringing, directly and indirectly, the claims of the asserted patent;

B.  Compensating Netlist for all damages caused by Defendants' infringement of the asserted patent;

C.  Ordering Defendants to account for and pay damages caused to Netlist by Defendants' unlawful acts of patent infringement;

D.  Entering judgment that Defendants' acts of patent infringement are willful, egregious, wanton, deliberate, and flagrant conduct and enhancing Netlist's damages up to three times their amount under 35 U.S.C. § 284;

E.  Granting Netlist pre- and post-judgment interests, together with all costs and expenses;

F.  Granting Netlist its reasonable attorneys' fees under 35 U.S.C. § 285;

G.  Awarding such other relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues deemed to be triable by a jury.

Dated: June 15, 2020

/s/ *Andrew H. DeVoogd*
Andrew H. DeVoogd
  E-mail: AHDeVoogd@mintz.com
James M. Wodarski  (*pro hac vice to be submitted*)
  E-mail: JWodarski@mintz.com
Matthew S. Galica  (*pro hac vice to be submitted*)
  E-mail: MSGalica@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
  POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

J. Stephen Ravel
  Email: steve.ravel@kellyhart.com
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

*Attorneys for Plaintiff Netlist Inc.*

APPX0073

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **NETLIST, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 6:20-cv-00194-ADA** |
| **SK HYNIX INC. and SK HYNIX AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)

## TABLE OF CONTENTS

I.  Factual Background ....................................................................................................... 2

    A.    Round One:  The '837 Patent (and Others) in *California I* ........................... 2

    B.    Round Two:  The '623 Patent (and Another) in *California II* ..................................... 4

    C.    Round Three:  The Present Action ................................................................. 5

        1.    The Issues Here Substantially Overlap with *California I* and *II* ......................... 5

        2.    Neither the Parties Nor the Evidence Are Connected to This District ................. 6

II. Argument ...................................................................................................................... 7

    A.    The "First-to-File" Rule Requires Transfer to California. ............................. 7

    B.    Transfer is Also Warranted Under Section 1404(a) ................................... 11

        1.    Judicial Economy & Practical Considerations ..................................... 11

        2.    The Relevant Sources of Proof Are in California or Korea ................ 12

        3.    Compulsory Process on Non-Party Witnesses is Available in the Central District of California, Not Here ......................................................................... 13

        4.    The Cost of Attendance at Trial is Lower in California ..................... 13

        5.    The Central District of California Has a Localized Interest ............... 14

    C.    In the Alternative, SK hynix Requests an Intra-District Transfer ............. 15

III. Conclusion .................................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*,
  No. 6:13-cv-364, 2014 WL 12570501 (W.D. Tex. June 10, 2014)............................11, 12, 15

*Ah Ha Publ'g, LLC v. Herer*,
  No. A-12-CA-844-5S, 2013 WL 8182656 (W.D. Tex. Jan. 7, 2013)....................................10

*In re Amerijet Int'l, Inc.*,
  785 F.3d 967 (5th Cir. 2015), *as revised* (May 15, 2015) ......................................................10

*Cadle Co. v. Whataburger of Alice, Inc.*,
  174 F.3d 599 (5th Cir. 1999) ......................................................................................................8

*Chartis Specialty Ins. Co. v. Tesoro Corp.*,
  No. SA-11-CA-927-OG, 2012 WL 12864341 (W.D. Tex. Apr. 11, 2012)..............................9

*Cirk Tek, LLC v. Ong Invs., LC*,
  212 F. Supp. 3d 709 (W.D. Tex. 2016).......................................................................................8

*Dataquill, Ltd. v. Apple Inc.*
  Case No. 13-CA-706, 2014 WL 2722201 (W.D. Tex. June 13, 2014)....................................14

*In re Echostar Corp.*,
  388 Fed. App'x. 994 (Fed. Cir. 2010).........................................................................................7

*Ericsson Inc. v. Samsung Elecs. Co.*,
  No. 06-cv-00063, 2007 WL 1202728 (E.D. Tex. Apr. 20, 2007)............................................10

*Ericsson, Inc .v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)................................................................................................10

*In re Genentech, Inc.*,
  566 F.3d 1338 (Fed. Cir. 2009)................................................................................................12

*Granado v. Quality Energy Servs., Inc.*,
  No. SA-15-CV-1061-XR, 2016 WL 705228 (W.D. Tex. Feb. 18, 2016) .................................8

*Heritage All. v. Am. Policy Roundtable*,
  No. 1:18-CV-939-RP, 2019 WL 3305609 (W.D. Tex. July 23, 2019)......................................9

*Hlavaty v. Integrated Prod. Servs., Inc.*,
  No. 5:16-CV-949-DAE, 2017 WL 10699610 (W.D. Tex. Jan. 27, 2017)................................7

*Hunter Douglas, Inc. v. Nien Made Enter. Co.*
  No. CV 16-01308-SJO (KX), 2016 WL 6822310 (C.D. Cal. May 23, 2016) ........................9

*In re Hoffman-La Roche Inc.*,
  587 F.3d 1333 (Fed. Cir. 2009) ........................................................................................11, 15

*In re Hubbell*,
  709 F.3d 1140 (Fed. Cir. 2013) ................................................................................................5

*Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp*.,
  665 F.3d 671 (5th Cir. 2011) ....................................................................................................8

*Integra Techs. Int'l, Inc. v. Durst Image Tech. US LLC*,
  No. A-09-CA-143-SS, 2009 WL 10669338 (W.D. Tex. Aug. 20, 2009) .................................9

*Save Power Ltd. v. Syntek Fin. Corp.*,
  121 F.3d 947 (5th Cir. 1997) ....................................................................................................7

*Sutter Corp. v. P & P Indus., Inc.*,
  125 F.3d 914 (5th Cir. 1997) ....................................................................................................8

*TMI Prod., Inc. v. Audiovox Corp.*,
  No. CV 09-1437-JFW (JCX), 2009 WL 10675633 (C.D. Cal. Apr. 29, 2009) ........................9

*In re Volkswagen AG*,
  371 F.3d 201 (5th Cir. 2004) ..................................................................................................11

*In re Volkswagen of America*,
  545 F.3d 304 (5th Cir. 2008) (en banc) .................................................................................14

*In re Vistaprint Ltd.*,
  628 F.3d 1342 (Fed. Cir. 2010)). .......................................................................................11

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
  751 F.2d 721 (5th Cir. 1985) ....................................................................................................8

*XY, LLC v. Trans Ova Genetics, LC*
  No. W-16-CA-00447-RP, 2017 WL 5505340 (W.D. Tex. Apr. 5, 2017) ..............................12

**Regulations**

28 U.S.C. § 1404(a) ..................................................................................................... *passim*

Local Rule CV-5(b) ......................................................................................................................1

Defendants SK hynix Inc. and SK hynix America Inc. ("SK hynix") respectfully seek an order transferring this case under the "first-to-file" rule to the Central District of California ("C.D. Cal."), where the plaintiff Netlist, Inc. is headquartered and already has *two* pending lawsuits against SK hynix, accusing the same products of infringing two patents in the same family as the patents asserted here. In both California cases, as here, Netlist asserts patents it has declared essential to the industry standards for computer memory modules, and in both cases SK hynix is asserting counterclaims directed to Netlist's failure to honor its obligation to license its essential patents on reasonable and non-discriminatory ("RAND") terms and conditions. SK hynix's counterclaims in C.D. Cal. encompass the patents Netlist asserts here. In C.D. Cal., the court will decide the essentiality of Netlist's patents (*i.e.*, whether practice of the standard necessitates infringement) and the scope of Netlist's RAND obligations. This Court will be forced to duplicate that analysis, at least in part, in this case, if the case is not transferred. The substantial factual overlap between this case and the pending California cases thus presents an undue risk of inconsistent determinations and wasteful expenditure of judicial and party resources, should these actions proceed in parallel. In these circumstances, the long-established "first-to-file" rule dictates that this case — which was filed long after Netlist's California actions — should either be transferred to C.D. Cal., or it should be stayed or dismissed.

Apart from the "first-to-file" rule, the traditional convenience factors under 28 U.S.C. § 1404(a) and judicial economy independently and clearly justify transfer to C.D. Cal., given that the parties have already conducted substantial discovery and claim construction briefing directly relevant to the patents asserted here, and many party and third-party witnesses live in California (where Netlist and SK hynix America, Inc. are headquartered), while none lives here.

Finally, should this Court retain this case, it should be transferred from the Waco Division to the Austin Division, and SK hynix respectfully requests that intra-district transfer in the alternative, but only if the Court does not transfer the case to C.D. Cal.

SK hynix has conferred with Netlist and Netlist opposes any transfer, including an intra-district transfer to Austin.

1

## I.    Factual Background

This is the third district court case (in addition to two ITC cases and three foreign cases) in which Netlist has accused the same SK hynix memory modules of infringing Netlist's allegedly standard essential patents.  As explained below, in those prior cases the parties have engaged in extensive litigation involving the same accused products and the same patent family that is asserted here, with Netlist taking over 20 depositions and SK hynix taking over 26 depositions, resulting in two separate trials in the ITC and extensive litigation in the California actions.  None of the prior cases were brought in Texas, and to SK hynix's knowledge, none of the fact witnesses deposed or appearing at the various hearings and trials reside in Texas.

### A.    Round One:  The '837 Patent (and Others) in *California I*

Netlist first sued SK hynix in C.D. Cal. (No. 8:16-CV-01605) ("*California I*") and the U.S. International Trade Commission (No. 337-TA-1023) ("*ITC I*") in 2016, asserting six patents declared essential to the JEDEC industry standards for memory modules.  Exs. 10, ¶¶ 10-11 and 11 at 1 (*California I* Complaint and accompanying Claim Chart); Ex. 12 at 1 (*ITC I* Complaint).[1] Among the asserted patents was U.S. Patent No. 8,489,837 ("the '837 patent"), Ex. 1 at 1, which is the grandparent to the patents asserted here.  *California I* was not stayed in light of *ITC I*, *see* Ex. 18 (scheduling order); both proceeded in parallel.

In *California I*, SK hynix filed counterclaims asserting that Netlist had violated its contractual obligations to offer to license its essential patents to SK hynix on RAND terms.  Ex. 14, ¶¶ 52-58.  The counterclaims seek a judicial determination of the RAND terms for a portfolio license to all patents that Netlist asserts to be essential and an order barring Netlist from enforcing any injunctive relief it might receive in court or the ITC on the basis of infringement of any essential patents.  *Id.* ¶¶ 65-66, 76.  The relief sought under SK hynix's counterclaims encompasses the patents asserted here, which Netlist now alleges to be essential and which it

---

[1] Unless stated otherwise, all exhibits cited in this brief are attached to the Declaration of Michael D. Hatcher In Support of Defendants' Opposed Motion to Transfer Venue Pursuant to the First-to-File Rule, or Alternatively, 28 U.S.C. § 1404(a) ("Hatcher Decl."), submitted herewith.

acknowledges it "committed" to offer to license on RAND terms under the JEDEC Patent Policy. Ex. 14, ¶¶ 52-54, 65-66, 69-70 (alleging failure to offer license to standard-essential patents on RAND terms); <u>Dkt No. 1</u>, ¶ 21 (alleging essentiality).[2] Both Netlist's claims and SK hynix's counterclaims were heavily litigated in *California I*: the parties negotiated discovery and protective orders, Exs. 19–20, engaged in substantial discovery including the exchange of infringement and invalidity contentions, *see* Hatcher Decl. ¶¶ 3-4, and fully briefed all claim construction issues, *id.* ¶ 3. Judge Staton held a hearing and granted a motion to disqualify Netlist's initial counsel, Ex. 16 at 14, and granted SK hynix's motion to strike portions of two untimely expert declarations that Netlist had attempted to submit with its opening claim construction brief, Ex. 21 at 1. After almost a year of litigation, Judge Staton stayed Netlist's infringement claims — but not SK hynix's RAND counterclaims — pending the resolution of *inter partes* review proceedings instituted against all asserted claims of all asserted patents, including the '837 patent. Ex. 25 at 7-9. SK hynix's RAND counterclaims were not stayed because *ITC I* continued to proceed in parallel, thereby subjecting SK hynix to the threat of an exclusion order in what SK hynix alleges was a violation of Netlist's RAND obligations. *Id.* at 7–9. Thus discovery in *California I* continued as to SK hynix's RAND counterclaims.

In January 2018, *ITC I* resulted in a Final Determination of non-infringement of all six asserted patents, including the '837 patent. Ex. 32 at 2. A few months later, the PTAB issued final written decisions ("FWDs") finding invalid all asserted claims of all patents asserted in both *California I* and *ITC I*, including the '837 patent. Ex. 35 at 2. Following the conclusion of *ITC I*, Judge Staton stayed SK hynix's RAND counterclaims in *California I* with the agreement of the parties. Ex. 33 at 2. Judge Staton, however, continues to actively manage the case, requiring regular joint reports that include the parties' views on whether the stay should be lifted. *Id.*; Ex.

---

[2] SK hynix included as an exhibit to its counterclaims in *California I* a copy of the License Assurance/Declaration Form that Netlist submitted to JEDEC and pursuant to which it committed to offer to license the '837 patent on RAND terms, which, under the JEDEC rules, is deemed to cover all patents claiming the same priority date, including the two patents specifically asserted in this litigation. Ex. 15 at 1.

3

38 at 2 (joint status report).  Netlist has never tried to lift the stay in *California I*, and previously urged that the patent and RAND claims be litigated together, rather than bifurcated.  Ex. 17 at 9:8–11 (joint Fed. R. Civ. P. 26(f) report).

Curiously, Netlist's complaint in this case asserts "no meaningful discovery had been exchanged among the parties" in *California I*.  Dkt No. 1, ¶ 24.  In July 2017, Netlist represented the opposite to Judge Staton when opposing a stay in *California I*, stating that the "sweeping discovery cross-use agreement" between *California I* and *ITC I* meant that:

> [F]or purposes of this case, the parties have already served and responded to over 200 combined interrogatories and over 220 combined document requests, the parties have already exchanged over 2,400,000 pages of document production, the parties have already served over 11,400 pages of expert reports, and the parties have already taken and defended 25 days of fact and expert depositions.

Ex. 24 at 2:25–3:2.  And in addition to the *ITC I* discovery, the parties responded to scores of additional requests for admission (194 of them), requests for production (245 of them), and interrogatories (23 of them), and had begun taking depositions, in *California I*.  *See* Hatcher Decl. ¶ 3.  Thus, although there is more to be done, substantial discovery has already occurred in the *California I* litigation.

**B.     Round Two:  The '623 Patent (and Another) in *California II***

Netlist sued SK hynix a second time in C.D. Cal. in June 2017 (No. 8:17-CV-01030) ("*California II*"), and then a second time in the ITC in October 2017 (No. 337-TA-1089) ("*ITC II*").[3]  Exs. 22–23 (*California II* Complaint and accompanying Claim Chart), 27 (*ITC II* Complaint).  In those cases, Netlist asserted two more allegedly essential patents, including U.S. Patent No. 9,535,623 ("the '623 patent"), which is a continuation of the '837 patent and the parent to the patents asserted here.  Exs. 22, ¶¶ 10-11, 14; 23 at 1; 27 at 1.  SK hynix again

---

[3] Netlist also brought three foreign suits, two in China and one in Germany, alleging that SK hynix infringed Netlist's allegedly essential patents, which were members of the same patent families Netlist was asserting in the U.S. litigation.  Netlist lost all three suits, with its patents found not infringed, invalid, or both, in decisions that are now final.  Ex. 38 at 7:7–8:17.

reiterated its RAND counterclaims in C.D. Cal.  Ex. 26 ¶¶ 57-63, 70-71, 81 (*California II* counterclaims).  *California I* and *II* were ultimately consolidated, and eventually stayed by Judge Staton.  Exs. 28 at 2-3 (joint stipulation to stay *California II* and consolidate with *California I*), 29 at 2 (Order granting same), 30 at 1 (notice of consolidation), 31 (consolidated counterclaims), 33 (Order staying RAND counterclaims); *see also* Ex. 26 (*California II* counterclaims).

In *ITC II*, the ALJ found that *ITC I*'s non-infringement findings with respect to the '837 patent collaterally estopped Netlist's assertion of the '623 patent, Ex. 37 at 27–40, and that, regardless, the accused products did not infringe the '623 patent.  *Id.* at 40–60.  Netlist did not seek review of these findings, which are now final.  Ex. 40 at 2.  Additionally, while *California II* and *ITC II* were pending, SK hynix filed an IPR against the '623 patent, which resulted in a FWD invalidating all asserted claims, a decision Netlist is appealing.  Exs. 36 at 2, 39 at iv.

      **C.**     **Round Three:  The Present Action**

          **1.**     **The Issues Here Substantially Overlap with *California I* and *II***

Netlist now brings this suit asserting two more allegedly essential patents against SK hynix, U.S. Patent No. 9,858,218 ("the '218 patent") and U.S. Patent No. 10,474,595 ("the '595 patent").  Exs. 3–4.  Both patents, like the '623 patent, Ex. 2, are continuations of the '837 patent asserted in *California I*, Ex. 1.  All four patents share the same specification, inventor, and priority dates.  *See* Exs. 1–4.  Indeed, the examiner for the '218 and '595 patents explicitly rejected all of the pending claims "on the ground of nonstatutory double patenting as being unpatentable over claims 1-18" of the '837 patent, finding that:

> Although the claims at issue are not identical, they are not patentably distinct from each other because the pending claims make obvious the claims of the issued patents and vice versa.[4]

Netlist overcame this rejection only by filing terminal disclaimers tying the expiration of the

---

[4] Ex. 7, '595 patent File History, Non-Final Rejection at 3 (Aug. 28, 2018); Ex. 5, '218 patent File History, Non-Final Rejection at 3 (May 20, 2016) (substantively similar statement); *see also In re Hubbell*, 709 F.3d 1140, 1148 (Fed. Cir. 2013) (terminal disclaimer required when child's claims lack patentable distinction compared to the claims of parent patent).

'218 and '595 patents to the life of the '837 patent.[5]

Netlist accuses the same products here that are accused in *California I* and *II*—SK hynix's standard-compliant DDR4 LRDIMM and RDIMM memory modules[6]—and Netlist points to the same allegedly infringing functionality—the "Clock-to-CA training mode" called for by JEDEC standards.[7]  Accordingly, should this case proceed in this District, Netlist will assert the same infringement theories as in *California I* and *II*, and SK hynix will be forced to assert RAND counterclaims and defenses nearly identical to those currently pending in *California I* and *II*.

**2.    Neither the Parties Nor the Evidence Are Connected to This District**

According to Netlist's complaints in *California I* and *II*, "Netlist is headquartered and has its principal place of business in [C.D. Cal.], sells products in [C.D. Cal.], and has been harmed by Defendants' conduct, business transactions and sales in [C.D. Cal.]."  Ex. 10, ¶ 8; Ex. 22, ¶ 8. Per Netlist's complaints in the ITC, "Netlist engineers working in Irvine, California, invented the technology of the asserted patents, [including the '837 and '623 patents,] and worked to implement the patented inventions into Netlist's HyperCloud and HybriDIMM products …." Ex. 12, ¶ 115; Ex. 27, ¶ 79.  "Since 2007, substantially all of the research and development, design, engineering and testing of HyperCloud and HybriDIMM was done by Netlist engineers working in Irvine, California."  Ex. 12, ¶ 120; Ex. 27, ¶ 84.  Netlist does not allege in this case that it has a presence in Texas, and, as far as SK hynix is aware, it does not:  no facilities, no employees, no connections whatsoever.

SK hynix Inc. is a Korean corporation having a principal place of business in Korea.

---

[5] Ex. 6, '218 patent File History, Terminal Disclaimer at 1 (Aug. 10, 2016); Ex. 8, '595 patent File History, Terminal Disclaimer at 1 (Nov. 28, 2018); *see also* Ex. 9, '623 patent File History, Terminal Disclaimer at 1 (Aug. 3, 2016) (disclaiming over application that issued as '218 patent, which disclaims over the '837 patent).

[6] *Compare* Dkt No. 1, Complaint, ¶¶ 28, 38, *with* Ex. 10, ¶ 63, *and* Ex. 22, ¶ 30.

[7] *Compare* Dkt No. 1-5 at 77–83 ('218 Claim Chart ), *and* Dkt No. 1-10 at 82–88 ('595 Claim Chart), *with* Ex. 11 at 13 ('837 Claim Chart attached to *California I* Complaint), *and* Ex. 23 at 19–23 ('623 Claim Chart attached to *California II* Complaint).

Kim Decl. ¶ 2[8].  SK hynix America Inc. is a California corporation headquartered in San Jose, California.  *Id*. ¶ 3.  SK hynix America Inc. is the United States operating arm of SK hynix Inc., providing support for sales, technical, and customer/client relationship operations.  *Id*.  For over 30 years, SK hynix's United States operations have been based out of California, where it has over 200 employees.  *Id*. ¶ 4.  The documents related to the research and development, operation, and function (i.e., design documents) of the accused products, as well as marketing, sales and licensing information related thereto, are maintained in Korea.  *Id*. ¶ 9.  Although SK hynix America has a small office in Austin with nine employees, *id*. ¶ 11, there is no reason to believe that any of those employees will be relevant to this case, given that in over three years of litigation involving the same family of patents and the same accused products at issue here, no employees or third-party witnesses from Texas were ever disclosed, deposed, or testified at trial. That is no doubt because those Austin-based employees are not involved in the research, design, development, or manufacture of any accused products.  *Id*.  Rather, those employees provide commercial sales and high-level technical assistance to customers in the area, referring more detailed technical questions from the customers to engineers in Korea.  *Id.*

## II.    Argument

As explained below, in these circumstances both the "first-to-file" rule and § 1404(a) warrant transfer of this action to Judge Staton in the Central District of California.

### A.    The "First-to-File" Rule Requires Transfer to California.

"The Fifth Circuit adheres to the general rule that the court in which an action is first filed is the appropriate court to determine whether substantially similar issues should proceed."[9]  *Hlavaty v. Integrated Prod. Servs., Inc.*, No. 5:16-CV-949-DAE, 2017 WL 10699610, at *3–4 (W.D. Tex. Jan. 27, 2017) (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121

---

[8] Declaration of Ki-Tae Kim In Support of Defendants' Opposed Motion to Transfer Pursuant to the First-to-File Rule, or Alternatively, 28 U.S.C. § 1404(a) ("Kim Decl.").

[9] The Federal Circuit applies regional circuit law in reviewing motions to transfer under the "first-to-file" rule.  *See, e.g.*, *In re Echostar Corp.*, 388 Fed. App'x. 994, 995 (Fed. Cir. 2010).

F.3d 947, 950 (5th Cir. 1997)).  The "first-to-file" rule "not only determines which court may decide the merits of substantially similar issues, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999) (quoting *Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997)).  In other words, "once the district court [finds] that the issues might substantially overlap, the proper course of action [is] for the court to transfer the case to the [first filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed."  *Id.*; *see also Granado v. Quality Energy Servs., Inc.*, No. SA-15-CV-1061-XR, 2016 WL 705228, at *1 (W.D. Tex. Feb. 18, 2016) ("[T]he Court sees no reason to depart from the Fifth Circuit's proscribed course of action, which is for the second-filed court to transfer the case to the first-filed court.").  In the alternative, a district court "may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district court" or "stay it."  *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 & n.1 (5th Cir. 1985).

"In deciding if a substantial overlap exists, [the Fifth Circuit looks] at factors such as whether 'the core issue . . . was the same' or if 'much of the proof adduced . . . would likely be identical.'"  *Cirk Tek, LLC v. Ong Invs., LC*, 212 F. Supp. 3d 709, 712 (W.D. Tex. 2016) (quoting *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011)).  "Where the overlap between two suits is less than complete, the judgment is made . . . based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute."  *Sweet Little Mexico*, 665 F.3d at 678.

Consideration of these factors shows the "substantial overlap" between this action and the earlier filed *California* actions, and, therefore, strongly supports transfer of this action to Judge Staton.  As explained above, the patents asserted here are direct descendants of those asserted in the *California* actions, sharing an identical specification and claims the Patent Office has found are "not patentably distinct from" those asserted in *California I* and *II*.  *See supra* § I.C.1.  The accused products are the same.  *Id*.  Netlist's infringement theories are also the same.  *Id*.  As a

result, the claim construction, infringement, and validity analysis (and pertinent discovery related thereto) across all three actions are likely to be nearly identical, easily satisfying the "substantial overlap" standard. *See, e.g.*, *Integra Techs. Int'l, Inc. v. Durst Image Tech. US LLC*, No. A-09-CA-143-SS, 2009 WL 10669338, at *1 (W.D. Tex. Aug. 20, 2009) (invoking first-to-file rule where, even though claims at issue did not arise out of same "transaction or occurrence" they "substantially overlap[ped]" because the cases involved the same parties, the same product, the same general questions, and discovery would "largely involve similar question and depositions of the same witnesses"); *Heritage All. v. Am. Policy Roundtable,* No. 1:18-CV-939-RP, 2019 WL 3305609, at *3 (W.D. Tex. July 23, 2019) (finding competing trademark infringement claims substantially overlapped where the parties were the same, "much of the evidence will be the same, and the core issues—which party's mark has priority, and whether the marks are confusingly similar—[were] the same").

In the Ninth Circuit—which applies a similar "first-to-file" analysis[10]—courts have applied the rule in cases where (as here) the patent holder filed serial litigations involving patents from the same family. For example, in *Hunter Douglas, Inc. v. Nien Made Enter. Co.*, the court found substantially similar issues where, although "the patents asserted in the two actions [were] not the same, it [was] also true that the patents [were] both within the same family and list the same inventor, with the Asserted Patents being continuations-in-part of the [earlier asserted patents]," therefore likely leading to "duplicative fact and expert discovery." No. CV 16-01308-SJO (KX), 2016 WL 6822310, at *9 (C.D. Cal. May 23, 2016); *see also TMI Prod., Inc. v. Audiovox Corp.*, No. CV 09-1437-JFW (JCX), 2009 WL 10675633, at *2 (C.D. Cal. Apr. 29, 2009) (finding "similarity of issues" under the "first-to-file" rule where the parties had asserted patents against one another, and (i) both parties were sellers of accused entertainment systems, (ii) the patents covered similar subject matter, (iii) the patents likely shared similar prior art, (iv)

---

[10] *Chartis Specialty Ins. Co. v. Tesoro Corp.*, No. SA-11-CA-927-OG, 2012 WL 12864341, at *7 (W.D. Tex. Apr. 11, 2012), *report and recommendation adopted in part, rejected in part*, No. SA-11-CA-927-OG, 2012 WL 12864342 (W.D. Tex. May 21, 2012) (noting "[b]oth the Fifth Circuit and courts in the Ninth Circuit follow" the first-to-file rule).

9

there would be "substantial overlap with respect to evidentiary and discovery issues" including "the same witnesses and documents," and (v) the "risk of inconsistent rulings [would] be substantial if these two actions are allowed to proceed separately in separate courts").

Further, the RAND royalty issues here would also "substantially overlap" with the RAND royalty issues pending in *California I* and *II*. Because Netlist is asserting here allegedly standard essential patents subject to a RAND obligation, SK hynix will plead here the same RAND counterclaims it has raised in *California I* and *II*. Any damages award must take into account Netlist's RAND licensing obligations, *see, e.g.*, *Ericsson, Inc .v. D-Link Sys., Inc.*, 773 F.3d 1201, 1235 (Fed. Cir. 2014), thus risking inconsistent determinations and significant waste of judicial resources should this case proceed in parallel to the ones in California (where substantial discovery has already been taken, *see supra* § I.A). In such circumstances, the Fifth Circuit has held that transfer is warranted. *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 976–77 (5th Cir. 2015), *as revised* (May 15, 2015) (finding "substantial overlap" where there was "a substantial risk that rulings in Florida—or Texas—'would trench upon the authority' of the other court and lead to 'piecemeal resolution of issues that call for a uniform result'").

Still further, SK hynix's RAND counterclaims pending in California—which seek a determination of the RAND terms for a license to any Netlist essential patent (which SK hynix has committed to take)—include the '218 and '595 patents asserted here, and thus are likely to effectively moot Netlist's infringement claims on those patents. *Ericsson Inc. v. Samsung Elecs. Co.*, No. 06-cv-00063, 2007 WL 1202728, at *2-3 (E.D. Tex. Apr. 20, 2007) (bifurcating FRAND claims and staying standard essential patent infringement claims where "the parties' primary dispute [was] over the appropriate terms of a FRAND license"). In a similar fact pattern, this District has found transfer warranted. *Ah Ha Publ'g, LLC v. Herer*, No. A-12-CA-844-5S, 2013 WL 8182656, at *8 (W.D. Tex. Jan. 7, 2013) ("[E]ither Ah Ha Publishing has a contract with Jack under which it may publish his works, or it does not, and it is infringing [his Copyright]. It therefore makes little sense to engage in separate lawsuits in separate courts.").

**B.    Transfer is Also Warranted Under Section 1404(a)**

In addition to the "first-to-file" rule, transfer is independently warranted under 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  The previous complaints and answers in *California I* and *II* establish that this case "might have been brought" by Netlist in C.D. Cal., like it did twice before and where all parties have consented to venue.  Ex. 10, ¶ 8; Ex. 13, ¶ 8; Ex. 22, ¶ 8; Ex. 26, ¶ 8.  Thus this Court need only consider the public and private factors identified by the Fifth Circuit, *see, e.g.*, *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004), which are discussed below and clearly favor transfer.[11]

**1.    Judicial Economy & Practical Considerations**

Judicial economy is a "paramount" consideration in the § 1404(a) analysis.  *Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*, No. 6:13-cv-364, 2014 WL 12570501, at *3 (W.D. Tex. June 10, 2014) (citing *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010)).  Here, judicial economy strongly favors transfer to C.D. Cal., where the same accused functionality of the same accused products is at issue, where the asserted patents are "not patentably distinct" from those here, and where significant discovery has already occurred and the court has already expended resources on the case, as explained above, *see supra* § I.A.

*Affinity Labs* is particularly relevant here.  There, the patent holder (headquartered in this District) alleged infringement by Samsung (headquartered in Korea) and Samsung's U.S. affiliate (headquartered in Richardson, Texas).  2014 WL 12570501, at *1.  As here, years earlier the patent holder had filed a similar suit against Samsung on "patents from the same family" that "share[d] the same specification and inventors, claim[ed] priority to the same application, and involve[d] the same subject matter," which was pending in the Northern District of California. *Id.* at *2.  Citing the "potential efficiencies gained by the Northern District of California based on

---

[11] The Federal Circuit applies regional circuit law in reviewing decisions on motions to transfer under § 1404(a).  *See, e.g.*, *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009).

its familiarity with similar technologies and patents through its oversight of" the earlier filed case, the court granted Samsung's motion to transfer the case, even though some of the other 1404(a) factors favored retaining the case. *Id.* at *3. Likewise, in *XY, LLC v. Trans Ova Genetics, LC,* the court held that, where an earlier lawsuit had already proceeded through trial involving the same parties, accused products, and patent family, the convenience factors— including "[t]he efforts expended by the District of Colorado to become familiar with the technology at issue"—warranted transferring the case to avoid "wasteful duplication of efforts." Case No. W-16-CA-00447-RP, 2017 WL 5505340, at *14-16 (W.D. Tex. Apr. 5, 2017)

As in *Affinity Labs* and *XY*, Judge Staton has experience with the parties, this patent family, and the RAND issues. Judicial economy thus "weigh[s] extensively in favor of transfer" here. *XY LLC*, 2017 WL 5505340 at *15-16. SK hynix can only surmise that Netlist's goal in filing its third nearly identical lawsuit against SK hynix in *this* District is to create a wasteful duplication of efforts in hopes of circumventing adverse rulings it received from Judge Staton, such as her ruling striking Netlist's untimely claim construction evidence for the '837 patent, the grandparent to the patents asserted here. Ex. 21 at 3 (Order).

### 2.    The Relevant Sources of Proof Are in California or Korea

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). In this case, SK hynix's documents and specifications will be the primary sources of evidence relevant to Netlist's infringement claims. Given that Netlist's infringement claims here mirror those in the *California* and *ITC* actions, these sources of proof have already been produced in the *California* and the *ITC* actions. Hatcher Decl. ¶ 4. The same is true for information related to SK hynix's general operations, marketing, financials of the accused products, and sales and marketing information that could be relevant to the RAND issues. *Id*. ¶ 4. Moreover, there is no reason to believe that any evidence relevant to this litigation is located in Texas. As discussed above, Netlist's principal place of business is within C.D. Cal. Netlist has no footprint

whatsoever within this District.  Thus, this factor weights in favor of transfer to C.D. Cal.

> **3.    Compulsory Process on Non-Party Witnesses is Available in the Central District of California, Not Here**

Netlist's complaint does not identify or implicate any third parties located in this District that are likely to be deposed or testify, and tellingly, in over three years of litigation involving the same products, no third-party witnesses were deposed in Texas.  Hatcher Decl. ¶¶9-11.

California, on the other hand, is home to several important third-party witnesses outside this Court's subpoena power.  For example, the lone inventor of the '837, '623, '218 and '595 patents is Dr. Hyun Lee.  *See* Exs. 1–4 (patents).  He is no longer employed by Netlist and thus is a third-party witness.  Hatcher Decl. ¶ 10.  SK hynix understands that Dr. Lee still lives near Netlist's headquarters in Irvine, California (in C.D. Cal.).  In this case, SK hynix expects to take and submit Dr. Lee's testimony regarding any alleged invention claimed in the '218 and '595 patents.  *Id*.  Similarly, Mr. Noel Whitley is Netlist's former chief licensing officer, and since at least 2015 was tasked with leading Netlist's efforts to license SK hynix under Netlist's standard essential patent portfolio.  SK hynix understands that Mr. Whitley recently left Netlist, but still resides near Netlist's headquarters in C.D. Cal.  Mr. Whitley's testimony is highly relevant to the RAND issues applicable to the patents in *California I* and *II* as well as here.  *Id.*  Finally, California is where the patent prosecutor for all four patents and witnesses for the suppliers of components of the accused products are located and were deposed.  *Id*. ¶ 9.

> **4.    The Cost of Attendance at Trial is Lower in California**

Undoubtedly, the cost of attendance at trial would be lower for all parties in California.  As previously noted, Netlist is headquartered within C.D. Cal., and its employees and engineers live in that area.  Netlist has not identified any employees in this District.

The cost of trial attendance in California would also be significantly lower for SK hynix.  None of SK hynix's potential witnesses reside in this District, and in over three years of litigation Netlist never deposed any SK hynix employees in this District.  Hatcher Decl. ¶ 7-8.  The court in C.D. Cal. is a much shorter average travel distance for SK hynix's potential

witnesses, including those in California and Korea. Kim Decl. ¶ 6. Travel to Waco by witnesses at SK hynix's U.S. headquarters in California would require repeated, costly, indirect flights, along with substantial loss of work time. *Id.* By contrast, travel from SK hynix's California headquarters to C.D. Cal. where Judge Staton sits takes approximately an hour and fifteen minutes by air. *Id*. Likewise, travel between Korea and Waco would take three to four hours of additional time each way. *Id*. Accordingly, it would be significantly more convenient and less costly for SK hynix (and Netlist) to have this dispute litigated in California.

**5.    The Central District of California Has a Localized Interest**

This District has no material connection to the events at issue in this litigation. Netlist has no presence in or relevant connection to this District, and the only specific connections to this District alleged in Netlist's complaint are that "personnel working at [SK hynix's] facility in Austin engage in activities directly related to the LRDIMM and RDIMM products at issue" and "one of the Defendants' largest customers within the United States, Dell Technologies, is based in the Austin area." Dkt No. 1, ¶¶ 11–12. However, the existence of some allegedly infringing products within this District is not a meaningful local interest. *Dataquill, Ltd. v. Apple Inc.*, Case No. 13-CA-706, 2014 WL 2722201 (W.D. Tex. June 13, 2014) ("The fact [accused products] are sold to Austin residents is largely irrelevant, as the mere presence of accused products in a district does not create a local interest"); *In re Volkswagen of America*, 545 F.3d 304, 317–18 (5th Cir. 2008) (en banc) (holding such a rationale would eviscerate the localized interest analysis).[12] Netlist's allegation regarding limited personnel at SK hynix's Austin office is of little significance given that neither Netlist nor SK hynix deposed or identified any of these employees as witnesses in three years of prior litigation involving the same products, patent family, and RAND issues. *Dataquill*, 2014 WL 2722201, at *1 (granting transfer despite 3,500 employees in W.D. Texas given that critical activities occurred in California).

---

[12] Dell submitted public interest statements in *ITC I* and *II* urging against issuance of an exclusion order barring importation of the accused SK hynix memory modules. Because Netlist is not seeking similar injunctive relief in this action, *see* Dkt No. 1 at Prayer for Relief, Dell's public interest statements are irrelevant to this case.

14

By contrast, C.D. Cal. has substantial local interest in this action. *In re Hoffmann-La Roche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009) (local interests are strong where a "cause of action calls into question the work and reputation of several individuals residing in or near that district and who presumably conduct business in that community."). Netlist is headquartered in C.D. Cal., its engineers work there, and the purported inventions of the '218 and '595 patent family were allegedly developed there. *Affinity Labs*, 2014 WL 12570501, at *3 ("The district where a party has its principal place of business typically has a stronger local interest in the adjudication of the case."). Moreover, negotiations and communications central to Netlist's RAND obligations occurred in or originated from Netlist's corporate headquarters.[13]

**C.      In the Alternative, SK hynix Requests an Intra-District Transfer**

Should this Court retain this case, which for the reasons above SK hynix respectfully suggests it should not, SK hynix requests it be transferred from the Waco Division to the Austin Division, with Your Honor continuing to preside over the case. As SK hynix's only presence in the District is in Austin, and Netlist has none, the case should be in the Austin Division, if anywhere in the District, based on consideration of the § 1404(a) factors.

**III.    Conclusion**

For the reasons discussed herein, both the "first-to-file" rule and traditional § 1404(a) convenience factors clearly favor transfer of this case to the C.D. of California, where virtually identical claims and issues have been pending for years before Judge Staton. Thus, SK hynix respectfully requests that the Court transfer this case to the C.D. of California.

---

[13] The relative congestion of the courts and familiarity with governing law are also relevant considerations under § 1404(a). This Court's docket aims for trials to occur 18 months after the CMC, which typically occurs one month after the answer is due, which means that, given the March 17, 2020 complaint filing date and the July 21, 2020 answer date agreed to by the parties, it will take approximately 23 months to reach trial in this case. That compares to 22.3 months in the C.D. of California. Federal Court Management Statistics, December 2019, at 37, 68, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf. And as discussed above, Judge Staton has greater familiarity with the technology relevant to this patent family and RAND counterclaims by virtue of the advanced stage of *California I*. Hence, these factors are either neutral or further warrant transfer.

Date:  May 4, 2020                      Respectfully submitted,

                                        By:  */s/ Brian R. Nester*                    

David C. Giardina                       Michael D. Hatcher (*pro hac vice*)
Illinois Bar No. 6225008 (*pro hac vice*)   Texas Bar No. 24027067
SIDLEY AUSTIN LLP                       SIDLEY AUSTIN LLP
One South Dearborn                      2021 McKinney Avenue, Suite 2000
Chicago, IL 60603                       Dallas, TX 75201
Telephone:  (312) 853-7000             Telephone:  (214) 981-3300
Facsimile:  (312) 853-7036             Facsimile:  (214) 981-3400
dgiardina@sidley.com                    mhatcher@sidley.com

Theodore W. Chandler                    Barry K. Shelton
California Bar No. 219456 (*pro hac     Texas State Bar No. 24055029
vice*)                                  SHELTON COBURN LLP
SIDLEY AUSTIN LLP                       311 RR 620, Suite 205
555 West Fifth Street                   Austin, TX 78734-4775
Los Angeles, CA 90013                   Telephone: (512) 263-2165
Telephone:  (213) 896-6000             Facsimile: (512) 263-2166
Facsimile:  (213) 896-6600             bshelton@sheltoncoburn.com
tchandler@sidley.com
                                        COUNSEL FOR DEFENDANTS
Brian R. Nester                         SK HYNIX INC. AND SK HYNIX AMERICA INC.
DC Bar No. 460225 (*pro hac vice*)
Joseph A. Micallef
DC Bar No. 443679 (*pro hac vice
pending*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 4, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Brian R.Nester*
Brian R. Nester

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

NETLIST, INC.,

     Plaintiff,

v.                                                        Civil Action No. 6:20-cv-00194

SK HYNIX INC. and SK HYNIX                    JURY TRIAL DEMANDED
AMERICA INC.,

     Defendants.

---

**DECLARATION OF KI-TAE KIM IN SUPPORT OF DEFENDANTS'
MOTION TO TRANSFER VENUE PURSUANT TO THE FIRST-TO-FILE RULE OR,
ALTERNATIVELY, 28 U.S.C. § 1404(A)**

I, Ki-Tae Kim, declare as follows:

1.     I am Head of Sales Operations & Planning at SK hynix American Inc.  As Head of Sales Operations & Planning, I oversee the sales teams providing commercial support for customers from the SK hynix America Inc. offices in San Jose, California.  I submit this declaration on behalf of SK hynix Inc. and SK hynix America Inc. (collectively, "SK hynix"), in support of SK hynix's Motion to Transfer Venue Pursuant to the First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a).  I have personal knowledge of the facts set forth in this declaration, and, if called upon as a witness, I could and would testify to such facts under oath.

2.     SK hynix Inc. is a Korean corporation, with its principal place of business in the Republic of Korea.

3.     SK hynix America Inc. is a California corporation and a substantially owned subsidiary of SK hynix Inc.  SK hynix America Inc.'s headquarters are located at 3101 North

1

First Street, San Jose, California. SK hynix America Inc. is the United States operating arm of

SK hynix Inc., providing support for sales, technical sales support, and operations.

4.    SK hynix's United States operations have been based in San Jose, California for

over 30 years, where it now has 234 employees.

5.    One of the reasons that SK hynix's United States operations are based in

California is that many of SK hynix's major customers are located in California, particularly in

or near San Jose. Another reason is that it is more convenient to travel to and from Korea to

California as there are several non-stop flights each day.

6.    Litigating in Waco, Texas is very inconvenient for SK hynix, especially when

compared to the convenience of litigating in California where SK hynix's United States

operations are headquartered. For SK hynix's employees, travel to and from Waco would likely

require connecting flights in Dallas, Texas or driving approximately 1.5 hours between Dallas

and Waco after flying to Dallas. Flights to Dallas from San Jose and Seoul take around 3.25

hours and 12.5 hours, respectively. By contrast, flights to the Los Angeles area from San Jose

and Seoul only take approximately 1.25 hours and 10.75 hours, respectively. Returning, flights

from Dallas to San Jose and Seoul last approximately 3.5 hours and 15 hours, respectively,

whereas flights from Los Angeles to San Jose and Seoul take only 1.25 hours and 13 hours,

respectively.

7.    SK hynix's witnesses related to the research, design, development and operation

of the accused memory module products are based in Korea where SK hynix's products are

designed and developed. SK hynix memory module products are researched, designed, and

developed in Korea, manufactured in Korea and China, and either imported by third parties or by

SK hynix America Inc. SK hynix does not research, design, develop or manufacture any

2

products in Texas. SK hynix America Inc. does not research, design, develop or manufacture the accused memory modules, all of which is done outside the United States by entities other than SK hynix America Inc.

8.    Witnesses relating to sales and marketing in the United States, such as myself, are located in California.

9.    The documents related to the research, design and development, operation, and manufacture of the accused products, as well as marketing, sales and licensing information related thereto and produced in the prior litigations with Netlist are maintained in Korea. The same is true for nearly all of the information related to SK hynix's general operations, marketing, and financials of the accused products.

10.    I understand that the SK hynix witnesses identified in the table below were deposed in one or both of the International Trade Commission Investigations between SK hynix and Netlist, Inc., Inv. No. 337-TA-1023 and Inv. No. 337-TA-1089. I understand that each of these witnesses lives and works in California or Korea.

| Witness | Location |
|---|---|
| Paul Fahey | California |
| Jongbum Park | South Korea (No longer with SK hynix) |
| Chunseok Jeong | South Korea |
| Kyung Hyun Min | South Korea |
| Jin Ho Lee | South Korea |
| Jaehan Park | South Korea |
| Donghyun Kim | South Korea |
| Hyungjoong Kim | South Korea |

11.    SK hynix America Inc. operates a single facility in the Western District of Texas, located at 4201 West Parmer Lane Bldg. B, Suite 245/250, Austin, TX 78727. The Austin

3

facility consists of only 10 rooms and a warehouse, and houses only 9 employees. Seven of the employees in Austin are involved in sales of memory products, a category that includes DDR4 LRDIMM and RDIMM products among others. The Austin facility serves two primary functions. First, the Austin facility provides commercial support for local customers including sales procurement and operations. Second, the Austin facility provides high-level technical support to customers, including providing sample products and coordinating with SK hynix Inc. employees in Korea who are able to provide more detailed technical solutions for customers in the event of product qualification problems. No research, design, development, or manufacture of any accused products occurs in Austin.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on May 1, 2020 in San Jose, California.

Ki-Tae Kim

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **NETLIST, INC.,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. **6:20-cv-00194** |
| **SK HYNIX INC. and SK HYNIX** **AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**DECLARATION OF MICHAEL D. HATCHER IN SUPPORT OF DEFENDANTS'**
**OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO THE FIRST-TO-FILE**
**RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(A)**

I, Michael D. Hatcher, declare as follows:

1.        I am a citizen of the United States over 18 years of age. I am a partner at Sidley Austin LLP, counsel for Defendants and anticipated Counter Claimants SK hynix Inc. and SK hynix American Inc. ("SK hynix").  I submit this declaration pursuant to Civil Local Rule 79-5, on behalf of SK hynix, in support of its Opposed Motion to Transfer Venue Pursuant to the First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a).  I have personal knowledge of the facts set forth in this declaration, and, if called upon as a witness, I could and would testify to such facts under oath.

2.        Plaintiff Netlist, Inc. ("Netlist") has sued SK hynix twice in the Central District of California, Case No. 8:16-CV-01605 ("*California I*") and Case No. 8:17-CV-01030 ("*California II*"), and twice before the United States International Trade Commission, USITC Inv. No. 337-TA-1023 ("*ITC I*") and USITC Inv. No. 337-TA-1089 ("*ITC II*").

3.      In the *California I* litigation, the parties have engaged in substantial discovery and expended substantial resources litigating the parties' claims.  Before the *California I* case was stayed, the parties exchanged infringement and invalidity contentions; responded to 194 requests for admission, 245 requests for production, and 23 interrogatories; had begun taking fact depositions; and fully briefed all claim construction issues.

4.      The infringement claims in this case accuse the same standard-compliant functionality (the "Clock-to-CA training mode" and "Alert_n signal") of the same standard-compliant DDR4 LRDIMM and RDIMM memory modules of infringing continuations of two patents asserted in the *California I* and *II* and *ITC I* and *II* litigations.  Technical documents, such as specifications and data sheets, related to the "Clock-to-CA training mode" and "Alert_n signal" functionality of the accused DDR4 LRDIMM and RDIMM memory modules were already produced in the *California I* and *II* and *ITC I* and *II* litigations.  Likewise, information related to SK hynix's general operations, marketing, financials of the accused DDR4 LRDIMM and RDIMM products, and sales and marketing information that could be relevant to the RAND issues were already produced in the *California I* and *II* and *ITC I* and *II* litigations.

5.      Collectively, between the *California I* and *II* and *ITC I* and *II* litigations, SK hynix and Netlist have deposed 46 different fact and expert witnesses, some on multiple occasions.  Of those witnesses, 25 were deposed in California.  Not a single witness was deposed by SK hynix or Netlist in Texas.  Below I address first the party fact witnesses deposed, then the third-party fact witnesses, and finally the expert witnesses.

**Party Fact Witnesses**

6.      SK hynix has deposed 11 different party fact witnesses[1], some on multiple

occasions.  Of those witnesses, 10 were deposed in California and 2 were deposed in Korea.

Below is a table identifying the party fact witnesses, when they were deposed, where they were

deposed and for which litigation they were formally noticed.  Of note, SK hynix and Netlist

entered into a cross-use agreement in *California I* (since consolidated with *California II*) that

allows the use of all discovery obtained in *ITC I*.  That cross-use agreement is reflected on page

19 of the Joint Rule 26(f) Report the parties submitted in *California I*, and is included as Exhibit

17 in the table of exhibits in paragraph 15 below.  Likewise, the parties have agreed to cross-use

of discovery from *ITC II* in *California I* and *II*.  Exhibit 34, Private Parties' Initial Discovery

Stipulations at 6 (Section 10).

| Party Fact Witness Deposed by SK hynix | Location | Date | Noticed Litigations |
|---|---|---|---|
| Soonju Choi | Los Angeles, CA; Costa Mesa, CA | 1/26/2017, 8/9/2018 | *ITC I*, *ITC II* |
| C.K. Hong (30(b)(6) and Individual) | Los Angeles, CA; Costa Mesa, CA | 2/1/2017, 4/4/2017, 8/13/2018 | *ITC I*, *ITC II* |
| Harrison Jin | Seoul, South Korea | 2/19/2017 | *ITC I* |
| JiBum Kim | Seoul, South Korea; Costa Mesa, CA | 2/18/2017, 8/15/2018 | *ITC I*, *ITC II* |
| Mario Martinez (30(b)(6) and Individual) | Irvine, CA; Costa Mesa, CA | 2/22/2017, 8/14/2018 | *ITC I*, *ITC II* |
| Gail Sasaki (30(b)(6) and Individual) | Los Angeles, CA; Costa Mesa, CA | 2/2/2017, 4/4/2017, 8/16/2018 | *ITC I*, *ITC II* |
| Jordan Horwich | Costa Mesa, CA | 7/11/2018 | *ITC II* |
| Hao Hsu (30(b)(6)) | Los Angeles, CA | 1/17/2018 | *California I*, *ITC II* |

---

[1] Not including current third-party witnesses Hyun Lee, Noel Whitley and Vahid Ordoubadian, who were previously deposed while still employees of Netlist.

| | | | |
|---|---|---|---|
| Scott Milton (30(b)(6) and Individual) | Costa Mesa, CA | 8/15/2018 | *ITC II* |
| Joshua Park (30(b)(6) and Individual) | Los Angeles, CA | 1/17/2018 | *California I, ITC II* |
| Junkil Ryu | Costa Mesa, CA | 8/9/2018 | *ITC II* |

7.    Netlist has deposed 8 different party fact witnesses, some on multiple occasions. Of those witnesses, 6 were deposed in California and 3 were deposed in Korea.  Below is a table identifying the party fact witnesses, when they were deposed, where they were deposed and for which litigation they were formally noticed.

| Party Fact Witness Deposed By Netlist | Location | Date | Noticed Litigations |
|---|---|---|---|
| Donghyun Kim (30(b)(6) and Individual) | Palo Alto, CA | 2/8/2017 | *ITC I* |
| Hyungjoong Kim (30(b)(6) and Individual) | Palo Alto, CA; Seoul, South Korea | 2/9/2017, 2/6/2018 | *California I, ITC I, ITC II* |
| Jin Ho Lee | Palo Alto, CA | 2/23/2017 | *ITC I* |
| Kyung Hyun Min (30(b)(6) and Individual) | Palo Alto, CA | 2/24/2017 | *ITC I* |
| Jaehan Park (30(b)(6) and Individual) | Seoul, South Korea | 2/17/2017, 2/2/2018 | *California I, ITC I, ITC II* |
| Jongbum Park | Seoul, South Korea | 2/16/2017 | *ITC I* |
| Paul Fahey (30(b)(6)) | Palo Alto, CA | 8/2/2018 | *ITC II* |
| Chunseok Jeong (30(b)(6)) | Palo Alto, CA | 8/2/2018 | *ITC II* |

8.    Not a single party fact witness was deposed by SK hynix or Netlist in Texas, and I am not aware of any party fact witness that has been deposed who resides in Texas.  Rather, my understanding is that all the party fact witnesses that have been deposed to date live and work either in California or Korea, with Netlist's witnesses who live and work in California generally located within the Central District of California and SK hynix's witnesses who live and work in California generally located within the Northern District of California.

APPX0102

**Third-Party Fact Witnesses**

9.      Setting aside for now former Netlist employees who were deposed when they were employees, 9 third-party fact witnesses have been deposed, some on multiple occasions. Of those third-party fact witnesses, 6 were deposed in California.  Below is a table identifying the third-party fact witnesses, their affiliations to the litigations, when they were deposed, where they were deposed and for which litigation they were formally subpoenaed.

| Third Party Fact Witness | Affiliation | Location | Date | Noticed Litigations |
|---|---|---|---|---|
| Rambus, Inc. (Srinivas Bamdhamravuri) | Designs and makes components of the accused products | Westlake Village, CA; Agoura Hills, CA | 3/2/2017, 8/24/2018 | *ITC I, ITC II* |
| William Gervasi | Former Netlist technology consultant and JEDEC Chairman | Irvine, CA | 2/17/2017 | *ITC I* |
| Montage Technology, Inc. (Robert Jin) | Designs and makes components of the accused products | Menlo Park, CA | 2/24/2017 | *ITC I* |
| Joint Electron Device Engineering Council (John Kelly) | Standard-setting organization promulgating standards relevant to SK hynix's RAND defenses and counterclaims | Washington, D.C. | 3/2/2017 | *ITC I* |
| Integrated Device Technology, Inc. (Roland Knaack) | Designs and makes components of the accused products | Atlanta, GA; Johns Creek, GA | 2/21/2017, 8/21/2018 | *ITC I, ITC II* |
| Jeffrey Solomon | Former engineer for Netlist | Los Angeles, CA | 1/27/2017 | *ITC I* |
| Brian Napper | Employee of FTI Consulting, retained by Netlist regarding financial consulting with respect to RAND analysis | San Francisco, CA | 1/17/2018 | *California I, California II, ITC II* |

| TR Global Funding V, LLC (Michael Rozen) | Investor of Netlist contributing to litigation related to at least *California I* and *ITC I* | New York, NY | 4/11/2018 | *ITC II* |
|---|---|---|---|---|
| Jamie Zheng | Prosecuting attorney for U.S. Patent Nos. 8,489,837; 9,535,623; 9,858,218; and 10,474,595[2] | Palo Alto, CA | 7/12/2018 | *ITC II* |

10.    In addition, current third-party fact witnesses Hyun Lee, Noel Whitley and Vahid Ordoubadian were deposed on seven total occasions in California by SK hynix while employees of Netlist, and Mr. Ordoubadian once more after leaving Netlist.  Dr. Hyun Lee is likely to be a critical witness in this litigation.  Dr. Lee is the lone named inventor of the '837, '623, '218, and '595 Patents.  SK hynix expects to take and submit Dr. Lee's testimony regarding any alleged invention claimed in the '218 and '595 Patents.  Mr. Whitley is Netlist's former chief licensing officer, and since at least 2015 was tasked with leading Netlist's efforts to license SK hynix under Netlist's standard essential patent portfolio.  His testimony is therefore relevant to the RAND issues applicable to the patents in this case, as well as the *California I* and *II* cases.  Below is a table identifying when these three individuals were deposed, where they were deposed and for which litigation they were formally noticed

| Former Netlist Fact Witness | Location | Date | Noticed Litigations |
|---|---|---|---|
| Hyun Lee (30(b)(6) and Individual) | Irvine, CA | 1/31/2017, 2/1/2017, 3/1/2017 | *ITC I* |
| Noel Whitley (30(b)(6) and Individual) | Los Angeles, CA; Costa Mesa, CA | 2/3/2017, 1/16/2018, 8/17/2018 | *California I, California II, ITC I, ITC II* |

---

[2] The "'837," "'623," "'218" and "'595 Patents," respectively.

| Vahid Ordoubadian (30(b)(6) and Individual) | Costa Mesa, CA | 2/24/2017, 7/12/2018 | *ITC I, ITC II* |
|---|---|---|---|

11.     Not a single third-party witness has been deposed by SK hynix or Netlist in

Texas.

**Expert Witnesses**

12.     SK hynix has deposed 6 different expert witnesses, some on multiple occasions.

Below is a table identifying the expert witnesses, when they were deposed, where they were

deposed and for which litigation they were formally noticed.

| Expert Witness Deposed by SK hynix | Location | Date | Noticed Litigations |
|---|---|---|---|
| Jacob Baker | Washington, D.C. | 3/25/2017, 10/26/2018 | *ITC I, ITC II* |
| Michael C. Brogioli | Washington, D.C. | 3/27/2017 | *ITC I* |
| William Mangione-Smith | Washington, D.C. | 4/2/2017, 10/22/2018 | *ITC I, ITC II* |
| Robert Murphy | Washington, D.C. | 3/26/2017, 10/19/2018 | *ITC I, ITC II* |
| Gregory J. Sidak | Washington, D.C. | 4/1/2017, 10/30/2018 | *ITC I, ITC II* |
| Marc Levitt | Washington, D.C. | 10/17/2018 | *ITC II* |

13.     Netlist has deposed 9 different expert witnesses, some on multiple occasions.

Below is a table identifying the expert witnesses, when they were deposed, where they were

deposed and for which litigation they were formally noticed.

| Expert Witness Deposed By Netlist | Location | Date | Noticed Litigations |
|---|---|---|---|
| Michael Davies | Washington, D.C. | 3/23/2017, 10/30/2018 | *ITC I, ITC II* |
| William Hoffman | Washington, D.C. | 3/28/2017 | *ITC I* |
| Michael Lasinski | Washington, D.C. | 3/31/2017, 10/23/2018 | *ITC I, ITC II* |

| Fiona Scott Morton | New York, NY | 4/4/2017 | *ITC I* |
| Vivek Subramanian | Washington, D.C. | 3/29/2017, 10/15/2018 | *ITC I, ITC II* |
| Robert Wedig | Washington, D.C. | 3/30/2017, 10/16/2018 | *ITC I, ITC II* |
| Thomas VanderVeen | Washington, D.C. | 3/19/2017, 10/23/2018 | *ITC I, ITC II* |
| John B. Halbert | Washington, D.C. | 10/26/2018 | *ITC II* |
| Kevin Murphy | Chicago, IL | 10/29/2018 | *ITC II* |

14.    Not a single expert witness has been deposed by SK hynix or Netlist in Texas.

**Exhibits**

15.    The following table identifies the list of exhibits attached hereto.  Each of the

attached exhibits is a true and correct copy of the corresponding document identified.

| Exhibit No. | Document Description | Document Date |
|---|---|---|
| 1 | '837 Patent | -- |
| 2 | '623 Patent | -- |
| 3 | '218 Patent | -- |
| 4 | '595 Patent | -- |
| 5 | Non-Final Rejection - '218 Patent File History | 5/20/2016 |
| 6 | Terminal Disclaimer - '218 Patent File History | 8/10/2016 |
| 7 | Non-Final Rejection - '595 Patent File History | 8/28/2018 |
| 8 | Terminal Disclaimer - '595 Patent File History | 11/11/2018 |
| 9 | Terminal Disclaimer - '623 Patent File History | 8/3/2016 |
| 10 | *California I* - Complaint | 8/31/2016 |
| 11 | *California I* - Complaint Ex. 13 - Claim Chart of '837 Patent | 8/31/2016 |
| 12 | *ITC I* - Complaint | 9/1/2016 |
| 13 | *California I* - Defendants' Answer and Affirmative Defenses | 11/7/2016 |
| 14 | *California I* - Defendant SK hynix Inc.'s Counterclaims – Redacted Public Version | 11/7/2016 |
| 15 | *California I* – Ex. 41 to Defendant SK hynix Inc.'s Counterclaims – Redacted Public Version, License Assurance/Disclosure Form | 4/7/2016 |
| 16 | *California I* - Order Granting Defendants' Motion to Disqualify | 12/5/2016 |
| 17 | *California I* - Joint Rule 26(F) Report | 12/23/2016 |
| 18 | *California I* - Scheduling Order | 1/4/2017 |
| 19 | *California I* - Protective Order | 1/12/2017 |
| 20 | *California I* - Discovery Order | 1/12/2017 |

APPX0106

| 21 | *California I* - Order Granting In Part Ex Parte Motion to Strike Netlist's Expert Declarations | 6/13/2017 |
| 22 | *California II* - Complaint | 6/14/2017 |
| 23 | *California II* - Complaint Ex. 5 - Claim Chart of '623 Patent | 6/14/2017 |
| 24 | *California I* - Netlist's Opp. to Defendants' Ex Parte Application for an Order Staying Only Netlist's Infringement Claims Pending Completion of IPR | 7/12/2017 |
| 25 | *California I* - Order Granting In Part Defendants' Application for an Order Staying Netlist's Infringement Claims Pending Completion of IPR | 7/17/2017 |
| 26 | *California II* - Answer, Affirmative Defenses, and SK hynix Inc.'s Counterclaims – Redacted Public Version | 10/9/2017 |
| 27 | *ITC II* - Complaint | 10/31/2017 |
| 28 | *California II* - Joint Stipulation for Automatic Stay of Plaintiff's Claims | 11/30/2017 |
| 29 | *California II* - Order Staying Plaintiff's Claims | 12/6/2017 |
| 30 | *California I* - Defendant SK hynix Inc.'s Notice of Consolidation | 12/7/2017 |
| 31 | *California I* – SK hynix's Consolidated Counterclaims – Redacted Public Version | 12/13/2017 |
| 32 | *ITC I* - Notice of Commission Determination to Review-in-Part an Initial Determination | 1/16/2018 |
| 33 | *California I* - Order Staying SK hynix's RAND Counterclaims | 2/2/2018 |
| 34 | *ITC II* – Private Parties' Initial Discovery Stipulations | 3/5/2018 |
| 35 | IPR2017-00548 - Final Written Decision ('837 Patent) | 5/3/2018 |
| 36 | IPR2018-00303 - Final Written Decision ('623 Patent) | 9/3/2018 |
| 37 | *ITC II* - Initial Determination (Excerpted) – Redacted Public Version | 10/21/2019 |
| 38 | *California I* - Seventh Joint Status Report | 11/1/2019 |
| 39 | Brief for Appellant Netlist, Inc., *Netlist, Inc. v. SK hynix, Inc.*, App. No. 19-1920 (Fed. Cir. Jan. 3, 2020) | 1/3/2020 |
| 40 | *ITC II* - Notice of Commission Determination to Review in Part a Final Determination | 1/31/2020 |
| 41 | *ITC II* – Notice of Commission's Final Determination Finding No Violation | 4/7/2020 |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on May 1, 2020 in Southlake, Texas.

Michael D. Hatcher

9

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 1

US008489837B1

(12) **United States Patent**     (10) **Patent No.:**     **US 8,489,837 B1**
Lee     (45) **Date of Patent:**     **Jul. 16, 2013**

(54) **SYSTEMS AND METHODS FOR HANDSHAKING WITH A MEMORY MODULE**

(75) Inventor: **Hyun Lee**, Ladera Ranch, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 367 days.

(21) Appl. No.: **12/815,339**

(22) Filed: **Jun. 14, 2010**

**Related U.S. Application Data**

(60) Provisional application No. 61/186,799, filed on Jun. 12, 2009.

(51) **Int. Cl.**
    *G06F 9/00*     (2006.01)
(52) **U.S. Cl.**
    USPC ............................................. **711/166**; 713/1
(58) **Field of Classification Search**
    USPC ........................................... 711/116; 713/1
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,586,350 | B2 * | 9/2009 | Chung et al. ................. | 327/198 |
| 2003/0115427 | A1 * | 6/2003 | Roohparvar ................. | 711/154 |
| 2007/0091702 | A1 * | 4/2007 | Nikitin et al. ............... | 365/210 |
| 2008/0256281 | A1 * | 10/2008 | Fahr et al. .................... | 710/305 |
| 2010/0042778 | A1 * | 2/2010 | Tanguay et al. .............. | 711/105 |
| 2010/0202240 | A1 * | 8/2010 | Moshayedi et al. .......... | 365/229 |
| 2011/0027789 | A1 * | 1/2011 | Fujimoto ...................... | 711/103 |

* cited by examiner

*Primary Examiner* — Jared Rutz
(74) *Attorney, Agent, or Firm* — Jamie J. Zheng, Esq.

(57) **ABSTRACT**

According to certain aspects, a memory module is provided having at least one output configured to be operatively coupled to a memory controller of a host computer system. The memory module can be configured to operate in at least two modes comprising an initialization mode during which the memory module executes at least one initialization sequence and an operational mode. The memory module may include a controller circuit configured to cause the memory module to enter the initialization mode. The memory module may also include a notification circuit configured to drive the at least one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller indicating at least one status of the at least one initialization sequence.

**18 Claims, 3 Drawing Sheets**

100



102
Provide first memory module

104
Cause the first memory module to enter initialization mode

106
Drive the at least one first output to a first state while the memory module executes initialization sequence

108
Upon completion of initialization sequence, drive the at least one first output to a second state

**U.S. Patent**    Jul. 16, 2013    Sheet 1 of 3    **US 8,489,837 B1**



Figure 1

Figure 2

Figure 3



Figure 4



Figure 5

US 8,489,837 B1

**1**

# SYSTEMS AND METHODS FOR HANDSHAKING WITH A MEMORY MODULE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of priority from U.S. Provisional Application No. 61/186,799, filed Jun. 12, 2009, which is incorporated in its entirety by reference herein.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the operation of memory modules. Specifically, the present disclosure relates to systems and methods for handshaking with a memory module during or upon completion of initialization.

## BACKGROUND OF THE DISCLOSURE

Memory subsystems such as memory modules are generally involved in the initialization procedure for computer systems, including servers, personal computers, and the like. For example, during system-wide initialization, the memory subsystems may undergo internal initialization procedures, or the system memory controller may otherwise interact with the memory subsystems during the initialization procedure. As part of this interaction, the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization.

## SUMMARY

According to certain aspects, a memory module comprises at least one output configured to be operatively coupled to a memory controller of a host computer system. The memory module can be configured to operate in at least two modes comprising an initialization mode during which the memory module executes at least one initialization sequence and an operational mode. In certain embodiments, the memory module comprises a controller circuit configured to cause the memory module to enter the initialization mode. The memory module can also comprise a notification circuit configured to drive the at least one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller indicating at least one status of the at least one initialization sequence.

In another aspect, a method of using at least one memory module comprises providing a first memory module comprising at least one first output operatively coupled to a memory controller of a host computer system. The first memory module can be configured to operate in at least two modes comprising an initialization mode during which the first memory module executes at least one initialization sequence and an operational mode. The method can further comprise causing the first memory module to enter the initialization mode. In certain embodiments, the method comprises driving the at least one first output to a first state while the memory module executes the at least one initialization sequence. In certain embodiments, the method further comprises, upon completion of the at least one initialization sequence, driving the at least one first output to a second state different than the first state.

According to additional aspects, a method of using at least one memory module comprises providing a memory module comprising at least one output operatively coupled to a memory controller of a host computer system. In certain

**2**

embodiments, the memory module is configured to operate in at least two modes comprising an initialization mode during which the memory module executes at least one initialization sequence and an operational mode. The method may comprise causing the memory module to enter the initialization mode. In some embodiments, the method comprises receiving a notification signal from the at least one output of the memory module, the notification signal indicating that the memory module has completed the at least one initialization sequence.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example host computer system including an example memory module configured to perform handshaking with a memory controller of the host computer system according to certain embodiments described herein.

FIG. **2** shows an example host computer system including example first and second memory modules configured to perform handshaking with a system memory controller of the host computer system according to certain embodiments described herein.

FIG. **3** shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system, where the notification circuits of the first and second memory modules have another example configuration according to certain embodiments described herein.

FIG. **4** and FIG. **5** show example methods of using at least one memory module according to certain embodiments described herein.

## DETAILED DESCRIPTION

Existing initialization schemes have certain inefficiencies which lead to wasted time and expense. Thus, there is a need to reduce the time and complexity involved in system memory controller interactions with memory subsystems during initialization. Certain embodiments described herein advantageously satisfy at least a portion of this need by providing a system and method which utilizes a feedback path from a memory subsystem such as a memory module to a system memory controller, such as a Memory Controller Hub (MCH) of a computer system during initialization.

In general, there is no existing method of handshaking between the MCH (e.g., system memory controller) and a memory subsystem (e.g., memory module) during initialization. For example, in conventional systems, the system memory controller does not monitor the error-out signal from the memory subsystem. This causes the MCH to perform blind execution. In a typical server (e.g., an Intel or AMD or other chipset based server), the lack of any handshaking between the MCH and the memory subsystem during the server initialization period has not been a serious issue since the MCH generally has complete control over the initialization procedure. However, one possible configuration for LR-DIMM (Load Reduced DIMM) includes the MCH handing over one or more parts of the initialization operation sequence to the memory subsystem. This raises an unprecedented issue not addressed in conventional systems because, in such proposed configurations, the system can benefit from the MCH handshaking with the memory subsystem controller, as described more fully below.

Such an LR-DIMM configuration may have the MCH inserting a waiting period of predetermined length during which the MCH is idle and the memory subsystem controller undergoes initialization. However, one shortcoming of this

US 8,489,837 B1

**3**

LR-DIMM configuration would be that it requires the MCH to be in standby (idle, or wait) while the memory subsystem controller completes its task. Under such an arrangement, since the time to complete a task can be dependent on the density, speed and configuration of the memory subsystem, and these parameters may be unknown to the MCH, the MCH may have to insert a single, predetermined standby period. In addition, if there are multiple occasions that the MCH needs to hand off control to the memory subsystem controller, the required MCH wait periods can be different from one occasion to another, and it complicates the correlation between the MCH and the memory subsystem controller. For example, the MCH according to such a scheme may give control to the local memory controller of a memory subsystem (e.g., memory module) for execution of a training sequence. The MCH may wait for a pre-determined period of time and then assume that the local memory controller has completed the training sequence. However, depending on the memory subsystem parameters (e.g., memory capacity, speed, number of ranks, etc.), the time for actually completing the training sequence may vary and may be longer or shorter than predetermined period of time.

In general, handshaking can be implemented in at least two ways; polling and notifying. In the polling method, the MCH reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation. For example, a status register may be read out through a serial interface such as System Management Bus (SMBus). However, a register polling method is generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation. Thus, the system memory controller may wait longer than necessary to poll the memory subsystem, thereby delaying the overall initialization process. Additionally, the problem may be compounded because multiple training sequences or other initialization sequences may be run on the memory subsystem during a particular initialization period, resulting in accumulation of such unnecessary delays. Moreover, polling generally involves scheduling polling intervals during which the system memory controller is not performing other operations, resulting in further inefficiency.

Alternatively, the notifying method is an advantageous handshaking method between the MCH and the memory subsystem controller. According to a notifying method, the memory subsystem controller sends a signal to the MCH when the memory subsystem controller completes the required or requested operation. This method allows the MCH to execute one or more independent commands while it is waiting for a notification signal from the memory subsystem controller.

Certain embodiments described herein provide a method of establishing a handshake mechanism based on notification signaling. In certain embodiments, this mechanism can be implemented by adding a new interface (notifying) signal between the MCH and the memory subsystem controller, or by adding an additional functionality to an existing, non-timing critical signal without altering the memory subsystem hardware. In either case, the interface between the MCH and the memory subsystem controller of certain embodiments can be an open drain signaling from the memory subsystem controller to the MCH, although a variety of other configurations are possible. As will be appreciated by persons skilled in the art, the terms MCH, system memory controller, and memory subsystem are used generally interchangeable throughout this disclosure, and the terms memory module, memory sub-

**4**

system controller, and local memory controller are used generally interchangeably throughout this disclosure.

FIG. **1** illustrates an example host computer system **16** including an example memory module **10** according to certain embodiments described herein. The memory module **10** can comprise at least one output **12** configured to be operatively coupled to a system memory controller **14** of the host computer system **16**. In certain embodiments, the memory module **10** is configured to operate in at least two modes comprising an initialization mode during which the memory module **10** executes at least one initialization sequence, and an operational mode. The memory module **10** may further include a controller circuit **18**. In some embodiments, the controller circuit **18** is configured to cause the memory module **10** to enter the initialization mode. The memory module **10** can further include a notification circuit **20** configured to drive the at least one output **12** while the memory module **10** is in the initialization mode to provide at least one notification signal to the memory controller **14** indicating at least one status of the at least one initialization sequence.

The memory module **10** may comprise a printed-circuit board (PCB) **22**. In certain embodiments, the memory module **10** has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or higher. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules **10** having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. The PCB **22** can have an industry-standard form factor. For example, the PCB **22** can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB **20** has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB **22** has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. In other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain embodiments, the memory module **10** is operatively coupled to (e.g., in electrical communication with) the host computer system **16**. In certain other embodiments, the memory module **10** may communicate with the host computer system **16** using some other type of communication, such as, for example, optical communication. Examples of host computer systems **16** include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The PCB **22** can comprise an interface (not shown) that is configured to be in electrical communication with the host computer system **16**. For example, the interface can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system **16**. The interface of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory module **10** and the host system **16**. For example, the interface can comprise a standard 240-pin DDR2 edge connector. The at least one output **12** may be routed over the interface, for example.

The memory module **10** may also comprise one or more memory elements (not shown), such as dynamic random-

US 8,489,837 B1

5

access memory (DRAM) elements, for example. Types of DRAM elements compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, DDR4, and synchronous DRAM (SDRAM). In addition, memory elements having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory elements compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). In certain embodiments, the memory module 10 may also include one or more non-volatile memory elements, such as one or more flash memory elements. Types of flash memory elements compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC).

The controller circuit 18 of certain embodiments generally controls the operation of the memory module 10. For example, the controller circuit 18 may control the memory elements of the memory module 10 and/or communicate with the system memory controller 14. For example, the controller circuit 18 may receive and process address and command signals (e.g., read, write commands) from the system memory controller 14 and transmit appropriate address and commands to the memory elements in response. See, e.g., U.S. Pat. Appl. Publ. Nos. 2006/0062047 A1 and 2006/0262586 A1, each of which is incorporated in its entirety by reference herein. In certain embodiments, the controller circuit 18 comprises a local memory controller. Additionally, depending on the architecture of the memory module 10, such as for an FB-DIMM, the controller circuit 18 may comprise an advanced memory buffer (AMB). The controller circuit 18 can comprise one or more of a field-programmable gate array (FPGA), a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, and a complex programmable logic device (CPLD), for example. In certain embodiments, the controller circuit 18 comprises various discrete electrical elements, while in certain other embodiments, the controller circuit 18 comprises one or more integrated circuits.

As discussed, the memory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode. In one embodiment, for example, the at least one initialization sequence may comprise one or more training sequences. The initialization sequence (e.g., comprising one or more training sequences) may be initiated by the system memory controller 14. In some embodiments, the controller circuit 18 is configured to cause the memory module 10 to enter the initialization mode. For example, the controller circuit 18 may be configured to execute a routine implementing the at least one initialization sequence when the appropriate signal or command is received from the memory controller 14 or is otherwise received from the host computer system 16 (e.g., upon receipt of a reset signal).

In certain embodiments, for example, the computer system 16 is coupled to a plurality of memory modules 10, 26 including the memory module 10 and at least a second memory module 26, and the memory controller 14 (e.g., MCH) trains each module 10, 26 separately, in series. In one example scenario, the memory controller 14 issues a first command to the memory module 10, and, in response, the memory module 10 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization

6

sequence, the first memory module 10 advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, the memory controller 14 issues a second command, this time to the memory module 26, and, in response, the memory module 26 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the second memory module 26, similar to the first memory module 10, advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, where there are more than two memory modules 10, 26, the memory controller 14 issues a third command to a third memory module (not shown), and so forth. One example computer system 16 capable of implementing such a scenario is configured to execute an Intel Basic Input/Output System (BIOS), and comprises a plurality of memory modules 10, 26 having an LRDIMM configuration. In such an example system, the Intel BIOS causes the system memory controller 14 to initialize the LRDIMM memory modules 10, 26 serially.

The operational mode is the normal mode of the memory module 10. For example, during the operational mode, the memory module 10 is generally accessed by the system memory controller 14 of the host computer 16 during standard computer operation not associated with initialization. For example, the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode, although it will be appreciated that one or more of these operations can also be performed by the memory module 10 while in initialization mode in certain embodiments.

The notification circuit 20 can be configured to drive the at least one output 12, while the memory module 10 is in the initialization mode or after the memory module 10 completes one or more initialization sequences, to provide the at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence. While shown in FIGS. 1-3 as forming a part of the controller circuit 18, the notification circuit 20 may be a physically and/or logically separate circuit in certain embodiments. While a variety of configurations are possible, the notification circuit 20 may comprise one or more transistors, one or more logic elements (e.g., AND, OR, NOR, NAND, XOR gates, and the like), or a combination thereof. In some embodiments, the notification circuit 20 may additionally or alternatively comprise one or more of an FPGA, PLD, CPLD, ASIC, custom-designed semiconductor device, discrete electrical elements, and an integrated circuit.

The at least one status of certain embodiments comprises completion of the at least one initialization sequence, such that the at least one notification signal is indicative of the completion of the at least one initialization sequence. The at least one status of certain embodiments comprises execution of the at least one initialization sequence. For example, the at least one status may indicate that the at least one initialization sequence is currently being executed. In some embodiments, the at least one status may provide an indication that a certain task has been completed by the memory module 10, such as a training task requested by the system memory controller 14. In certain embodiments, the notification circuit 20 can be configured to drive the at least one output 12 to a first state indicative of execution of the at least one initialization sequence or to a second state indicative of completion of the at least one initialization sequence. As one example, the first state may be a high or low logic level, and the second state

US 8,489,837 B1

7

may be a high impedance state. In another case, the first state is a high or low logic level, and the second state is the inverse logic level of the first state.

The at least one output 12 of certain embodiments is configured to be operatively coupled to at least one interrupt of the system memory controller 14, and the system memory controller 14 is responsive to the at least one notification signal indicating completion of the at least one initialization sequence. For example, the system memory controller 14 may trigger execution of an interrupt routine upon receipt of the notification signal on the output 12. The interrupt routine generally executes the appropriate operations for the at least one status indicated by the at least one notification signal. For example, if the at least one status indicates that the at least one initialization sequence is complete, execution of the interrupt routine may cause the system memory controller 14 to notify the host computer system 16 that the system initialization, or a portion thereof, is completed. In one embodiment, for example, the execution of the interrupt routine causes the system memory controller 14 to initiate a subsequent initialization sequence for the memory module 10 or on another memory module connected to the host system 16. For example, in one embodiment, a central processing unit (CPU) of the host system 16 (not shown) enters a "Wait" state after issuing a command to the memory module 10 to enter the initialization mode. Receipt of the at least one notification signal on the output 12 triggers execution of the interrupt routine, which interrupts the CPU, causing the "Wait" state to be aborted and allowing the host system 16 to continue operation. In this manner, generation of the interrupt on the at least one output 12 can allow completion of the at least one initialization sequence to receive generally immediate attention from the CPU and/or memory controller 14 of the host system 16. As will be appreciated, the CPU and memory controller 14 of the host system 16 may comprise separate modules, or may alternatively comprise a single integrated module, depending on the architecture of the host system 16 chip-set.

In certain embodiments, execution of the interrupt routine causes the system memory controller 14 to cause the memory module 10 to exit the initialization mode and to enter the operational mode. In another embodiment, the memory module 10 automatically enters the operational mode upon completion of the at least one initialization sequence without intervention from the memory controller 14.

In some embodiments, the at least one output 12 is operated in conformance with a standard (e.g., an industry standard) when the memory module 10 is in the operational mode, but is not operated in conformance with the standard when the memory module 10 is in the initialization mode. An example of a standard in accordance with certain embodiments described herein is one or more of the industry standard promulgated by the Joint Electronic Devices Engineering Counsel (JEDEC). For example, the operation and behavior of the at least one output 12 may conform to an industry standard when the memory module 10 is in the operational mode, but the operation and behavior of the at least one output 12 may not conform to the industry standard when the memory module 10 is in the initialization mode. Because the at least one output 12 does not conform to the standard during initialization mode, an existing (e.g., JEDEC-specified) pin may be utilized to provide the at least one notification signal to the system memory controller 14 from the memory module 10 during the initialization mode. In one embodiment, for example, the at least one output 12 comprises an error-out pin of the memory module 10. In conventional systems, the operation of the error-out pin is undefined by the standard during initialization. However, in certain embodiments

8

described herein, during the operational mode, the error-out pin may be used according a conventional industry standard (e.g., a JEDEC standard) to indicate a parity error has occurred in the memory module 10. During the initialization mode, the error-out pin can be used to transmit the at least one notification signal to the system memory controller 14.

It is advantageous to use the error-out pin for initialization status notification according to certain embodiments because the error-out pin can be asserted by the memory module 10 independent from system memory controller 14 requests or commands. Also, because the error-out pin is a JEDEC-specified pin, design cost and complexity are reduced because additional pin-outs and interrupt design changes can be avoided (e.g., in cases where such changes in hardware or chipset may not be feasible to provide the at least one status to the system memory controller 14). However, in certain other embodiments, providing the at least one status may be implemented by adding one or more pins to the system memory controller 14 (e.g., MCH) and to the controller circuit 18 (e.g., local memory controller), thereby utilizing changes in hardware or the chipset.

Moreover, the error-out pin may be coupled to an interrupt of the system memory controller 14 (e.g., according to the JEDEC standard). Thus, where the error-out pin is used, from the system point of view in accordance with certain embodiments, the notification of completion of the required or requested task from the memory module 10 (e.g., by the local memory controller) generates an interrupt communicated to the system during the initialization period and indicative of completion of the required or requested task. Assertion of the same pin during normal (non-initialization) operation upon an error occurring, on the other hand, generates an interrupt communicated to the system during the normal operation indicative of the occurrence of the error condition. Thus, in certain embodiments, the error-out pin and corresponding signal memory module 10 can be used to support the notifying function and to provide the at least one status generally without changing hardware. Certain other such embodiments involve modifying the basic input/output system (BIOS) or other programming change. For example, the BIOS may be modified to indicate to the system memory controller 14 how to respond to the notification signal (e.g., to the error_out signal or the interrupt corresponding thereto).

In certain other embodiments, the at least one output 12 may include other existing (e.g., JEDEC specified) pins instead of, or in addition to, the error-out pin. In yet other configurations, at least one additional (e.g., non-JEDEC specified) pin may be employed. In general, any pin not otherwise active during the initialization mode may be used (e.g., high-order address pins, read/write pins, data pins, etc.).

The at least one output 12 can further be configured to be operatively coupled to at least one second output 24 of a second memory module 26 in some embodiments, as schematically illustrated in FIGS. 1-3. The second memory module 26 may be generally similar in structure and function to the memory module 10, and may comprise a controller circuit 28 and a notification circuit 30, for example. The second memory module 26 may be generally identical to the first memory module 10, or may have a different memory capacity, form factor, etc., than the first memory module 10. More than two such memory modules may be present in certain embodiments. As described above, the second memory module 26 can be configured to operate in at least two modes comprising an initialization mode during which the second memory module 26 executes at least one initialization sequence, and an operational mode. For example, the initial-

APPX0116

US 8,489,837 B1

9

ization and operational modes may be similar to those describe above in relation to the first memory module **10**.

The second memory module **26** can also be configured to drive the at least one second output **24** to a third state indicative of execution of at least one initialization sequence of the second memory module **26** or to a fourth state indicative of completion of the at least one initialization sequence of the second memory module **26**. Additionally, in some embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the system memory controller **14**. In other embodiments (not shown), the at least one first output **12** and the at least one second output **24** are not coupled together, and are coupled to two separate inputs of the system memory controller **14**.

FIG. **2** shows an example host computer system **16** including example first and second memory modules **10**, **26**. As shown, the notification circuits **20**, **30** of the first and second memory modules **10**, **26** each comprise at least one transistor **36**, **38**. The at least one transistor **36**, **38** can be in an open-drain configuration, as shown, although other configurations are possible. In certain such embodiments, the first state of the at least one first output **12** is a first logic level, the second state of the at least one first output **12** is a high-impedance state, the third state of the at least one second output **24** is the first logic level, and the fourth state of the at least one second output **24** is the high-impedance state. In the illustrated example, while the at least one initialization sequence is in progress, the first and second memory modules **10**, **26** drive the gates of the respective transistors **36**, **38** high. Thus, the transistors **36**, **38** are respectively low impedance while the memory modules **10**, **26** are executing each section of the initialization sequence, thereby pulling the first and second outputs **12**, **24** low. Thus, the first state and the third state are low logic levels (ground) in the example configuration. Also, because the first and second outputs **12**, **24** are coupled together by the bus **32**, if the at least one initialization sequence of either one of the first and second memory modules **10**, **26** are in progress, the bus **32** will be pulled to a low logic level.

As each of the two memory modules **10**, **26** completes its at least one initialization sequence, it can drive the corresponding at least one first and second outputs **12**, **24** respectively to a high impedance state, For example, once the at least one initialization sequence on each of the first and second memory modules **10**, **26** is completed, the first and second memory modules **10**, **26** can drive the gates of the respective transistors **36**, **38** low, resulting in a high-impedance state on the at least one first and second outputs **12**, **24** causing the bus **32** to be pulled high by the system memory controller **14**. Accordingly, only once the at least one initialization sequence of both the first and second memory modules **10**, **26** are complete, the bus **32** will be pulled high by the internal pull-up configuration **40** of the system memory controller **14**. The second state and the fourth state are therefore high-impedance values in the example embodiment. Thus, the system memory controller **14** can monitor the value on the bus **32** via the first input **34** to determine when both of the memory modules **10**, **26** have completed the at least one initialization sequence. As discussed, in other configurations the at least one first and second outputs **12**, **24** may be received on separate inputs of the system memory controller **14**, and the status of the at least one initialization sequence of each memory module **10**, **26** may be monitored independently.

As discussed above, in certain embodiments in which more than one memory module **10**, **26** is connected to the system memory controller **14**, each memory module **10**, **26** or asso-

10

ciated controller circuit **18** (e.g., local memory controller) causes the corresponding notification circuit **20**, **30** to drive the at least one output **12**, **24** to the high impedance state from the low impedance state when it completes the requested or required operation. Thus, in certain such embodiments, the system memory controller **14** (e.g., MCH) can only pull the notifying signal high when all memory modules **10**, **26** or associated controller circuits (e.g., local memory controllers) have completed the required or requested operation (e.g., initialization sequence). This configuration allows the system memory controller **14** (e.g., MCH) to work with a non-homogenous memory subsystem. For example, the system memory controller **14** may be able to monitor the progress of multiple memory modules **10**, **26** including a mix of DIMMs or other memory modules having differing characteristics, such as DIMM density, rank configurations, DRAM density, speed, DRAM configuration, etc.

Additionally, the at least one output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are configured to be operatively coupled to at least one interrupt of the system memory controller **14** in certain embodiments. In certain such embodiments, the system memory controller **14** can be responsive to the second state of the first memory module **10** and the fourth state of the second memory module **26** by triggering execution of an interrupt routine by a processor of the system memory controller **14**. For example, in the example system of FIG. **2**, when the bus **32** is pulled high by the pull-up configuration **40** indicating the second state of the first memory module **10** and the fourth state of the second memory module **26**, the system memory controller **14** triggers execution of the interrupt routine.

In some embodiments, in which the at least one first output **12** and the at least one second output **24** are operatively coupled to separate inputs of the system memory controller **14**, the at least one first output **12** and the at least out second output **24** may be operatively coupled to two separate interrupts. For example, the system memory controller **14** may be responsive to the second state of the first memory module **10** by triggering execution of a first interrupt routine associated with a first interrupt, and may be responsive to the fourth state of the second memory module **26** by triggering execution of a second interrupt routine associated with the second interrupt. In yet other embodiments, the separate inputs of the memory controller **14** are internally operatively coupled to the same interrupt, or are operatively coupled to separate interrupts which trigger the same interrupt routine.

FIG. **3** shows a host computer system **16** including an example memory module **10** where the notification circuit **20** of the memory module **10** has another example configuration in accordance with certain embodiments described herein. In the example configuration of FIG. **3**, the at least one first output **12** is operatively coupled to an error-out pin of the memory module **10**, and a multiplexor **42** drives the transistor **36** with either of a task_in_progress signal **44** or an error signal **46** (e.g., parity error signal). In one embodiment, for example, the multiplexor **42** may be configured to drive the transistor **36** with the task_in_progress signal **44** when the memory module **10** is in the initialization mode or is executing the at least one initialization sequence, and with the error signal **46** when the memory module **10** is in the operational mode. Thus, the memory module **10** can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode, as described herein. As shown in FIG. **3**, a second memory module **26**

US 8,489,837 B1

**11**

including a similar configuration can also be operatively coupled to the host computer system **16**. In certain embodiments, the at least one second output **24** of the second memory module **26** can be operatively coupled to the at least one first output **12** by the bus **32**, as described above (e.g., with respect to FIG. **2**).

FIG. **4** shows an example method **100** of using the at least one memory module **10** in accordance with certain embodiments described herein. While the description below of the method **100** refers to structure shown in FIGS. **1**–**3**, other structures may also be used in accordance with certain embodiments described herein. At block **102**, the method **100** of certain embodiments comprises providing a first memory module **10** comprising at least one first output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The first memory module **10** can be configured to operate in at least two modes comprising an initialization mode during which the first memory module **10** executes at least one initialization sequence, and an operational mode. For example, the at least one initialization sequence may comprise one or more steps of a series of steps associated with an initialization procedure of the host computer system **16**.

At block **104**, the method **100** in some embodiments comprises causing the first memory module **10** to enter the initialization mode. At block **106**, the method **100** of certain embodiments comprises driving the at least one first output **12** to a first state while the memory module **10** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method of certain embodiments comprises driving the at least one first output **12** to a second state different than the first state. In certain embodiments, the first state is a first logic level and the second state is a high impedance state. Additionally, in certain embodiments, the at least one first output **12** is operatively coupled to at least one interrupt of the memory controller **14** such that driving the at least one output **12** to the second state triggers the memory controller to execute an interrupt routine.

In certain embodiments, the at least one output **12** is operated in conformance with JEDEC standard when the first memory module **10** is in the operational mode, but is not operated in conformance with the JEDEC standard when the first memory module **10** is in the initialization mode. The at least one first output **12** of certain embodiments include an error-out pin of the first memory module, for example.

The method **100** can further include providing a second memory module **26** comprising at least one second output **24** operatively coupled to the memory controller **14**. The second memory module **26** can be configured to operate in one of at least two modes comprising an initialization mode, during which the second memory module **26** executes at least one initialization sequence, and an operational mode. The method **100** can further include causing the second memory module **26** to enter the initialization mode. In certain embodiments, the method **100** also includes driving the at least one second output **24** of the second memory module **26** to a third state while the second memory module **26** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method **100** can further include driving the at least one second output **24** of the second memory module **26** to a fourth state different from the third state.

In certain embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the memory controller **14**. In certain other embodiments, the at least one first output **12** of the first

**12**

memory module **10** is operatively coupled to a first input **34** of the memory controller **14** and the at least one second output **24** of the second memory module **26** is operatively coupled to a second input (not shown) of the memory controller **14**.

FIG. **5** shows another example method **200** of using at least one memory module **10** in accordance with certain embodiments described herein. At block **202**, the method **200** may include providing a memory module **10** comprising at least one output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The memory module **10** may be configured to operate in at least two modes comprising an initialization mode, during which the memory module **10** executes at least one initialization sequence, and an operational mode.

The method **200** can further include causing the memory module **10** to enter the initialization mode at block **204**. At block **206**, the method **200** can include receiving a notification signal from the at least one output **12** of the memory module **10**. The notification signal may indicate that the memory module **10** has completed the initialization sequence, for example. In certain embodiments, the method **200** further comprises executing an interrupt routine by the memory controller **14** in response to the notification signal.

TERMINOLOGY/ALTERNATIVE
EMBODIMENTS

Embodiments have been described in connection with the accompanying drawings. However, it should be understood that the figures are not drawn to scale. Distances, angles, etc. are merely illustrative and do not necessarily bear an exact relationship to actual dimensions and layout of the devices illustrated. In addition, the foregoing embodiments have been described at a level of detail to allow one of ordinary skill in the art to make and use the devices, systems, etc. described herein. A wide variety of variation is possible. Components, elements, and/or steps can be altered, added, removed, or rearranged. While certain embodiments have been explicitly described, other embodiments will become apparent to those of ordinary skill in the art based on this disclosure.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

Depending on the embodiment, certain acts, events, or functions of any of the methods described herein can be performed in a different sequence, can be added, merged, or left out all together (e.g., not all described acts or events are necessary for the practice of the method). Moreover, in certain embodiments, acts or events can be performed concurrently, e.g., through multi-threaded processing, interrupt processing, or multiple processors or processor cores, rather than sequentially.

The various illustrative logical blocks, modules, circuits, and algorithm steps described in connection with the embodiments disclosed herein can be implemented as electronic hardware, computer software, or combinations of both. To clearly illustrate this interchangeability of hardware and soft-

US 8,489,837 B1

13

ware, various illustrative components, blocks, modules, circuits, and steps have been described above generally in terms of their functionality. Whether such functionality is implemented as hardware or software depends upon the particular application and design constraints imposed on the overall system. The described functionality can be implemented in varying ways for each particular application, but such implementation decisions should not be interpreted as causing a departure from the scope of the disclosure.

The various illustrative logical blocks, modules, and circuits described in connection with the embodiments disclosed herein can be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic device, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general purpose processor can be a microprocessor, but in the alternative, the processor can be any conventional processor, controller, microcontroller, or state machine. A processor can also be implemented as a combination of computing devices, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

The blocks of the methods and algorithms described in connection with the embodiments disclosed herein can be embodied directly in hardware, in a software module executed by a processor, or in a combination of the two. A software module can reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, a hard disk, a removable disk, a CD-ROM, or any other form of computer-readable storage medium known in the art. An exemplary storage medium is coupled to a processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium can be integral to the processor. The processor and the storage medium can reside in an ASIC. The ASIC can reside in a user terminal. In the alternative, the processor and the storage medium can reside as discrete components in a user terminal.

Certain embodiments described herein are compatible with a memory system including memory devices with various attributes (see, e.g., FIGS. 2 and 3). For example, the memory system of certain embodiments may include various data slice sizes (e.g., two, four, eight, or 16 bit data slices) and corresponding memories (e.g., memories having two, four, eight, or 16 bit data widths).

Although certain embodiments and examples are discussed above, it is understood that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. It is intended that the scope of the inventions disclosed herein should not be limited by the particular disclosed embodiments. Thus, for example, in any method or process disclosed herein, the acts or operations making up the method/process may be performed in any suitable sequence and are not necessarily limited to any particular disclosed sequence.

Various aspects and advantages of the embodiments have been described where appropriate. It is to be understood that not necessarily all such aspects or advantages may be achieved in accordance with any particular embodiment. Thus, for example, it should be recognized that the various embodiments may be carried out in a manner that achieves or optimizes one advantage or group of advantages as taught

14

herein without necessarily achieving other aspects or advantages as may be taught or suggested herein.

What is claimed is:

**1**. A memory module comprising:

at least one output configured to be operatively coupled to a memory controller of a host computer system, the memory module configured to operate in at least two modes comprising an initialization mode during which the memory module executes at least one initialization sequence and an operational mode;

a controller circuit configured to cause the memory module to enter the initialization mode; and

a notification circuit configured to drive the at least one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller indicating at least one status of the at least one initialization sequence; and

wherein the at least one notification signal triggers the memory controller to execute an interrupt routine.

**2**. The memory module of claim **1**, wherein the at least one status comprises completion of the at least one initialization sequence.

**3**. The memory module of claim **1**, wherein the at least one status comprises execution of the at least one initialization sequence.

**4**. The memory module of claim **1**, wherein the at least one output is configured to be operatively coupled to at least one interrupt of the memory controller.

**5**. The memory module of claim **1**, wherein the at least one output comprises an error-out pin of the memory module.

**6**. The memory module of claim **1**, wherein the notification circuit is configured to drive the at least one output to a first state indicative of execution of the at least one initialization sequence or to a second state indicative of completion of the at least one initialization sequence.

**7**. The memory module of claim **6**, wherein the at least one output is configured to be operatively coupled to at least one second output of a second memory module, the second memory module configured to operate in at least two modes comprising an initialization mode during which the second memory module executes at least one initialization sequence and an operational mode, the second memory module configured to drive the at least one second output of the second memory module to a third state indicative of execution of the at least one initialization sequence of the second memory module or to a fourth state indicative of completion of the at least one initialization sequence of the second memory module.

**8**. The memory module of claim **7**, wherein the at least one output of the first memory module and the at least one second output of the second memory module are configured to be operatively coupled to at least one interrupt of the memory controller and the memory controller is responsive to the second state of the first memory module and the fourth state of the second memory module by triggering execution of an interrupt routine by a processor of the memory controller.

**9**. The memory module of claim **7**, wherein the first state is a first logic level, the second state is a high-impedance state, the third state is the first logic level, and the fourth state is the high-impedance state.

**10**. A method of using at least one memory module, comprising:

providing a first memory module comprising at least one first output operatively coupled to a memory controller of a host computer system, the first memory module configured to operate in at least two modes comprising

US 8,489,837 B1

15

an initialization mode during which the first memory module executes at least one initialization sequence and an operational mode;

causing the first memory module to enter the initialization mode; driving the at least one first output to a first state while the memory module executes the at least one initialization sequence; and

upon completion of the at least one initialization sequence, driving the at least one first output to a second state different than the first state so as to trigger the memory controller to execute an interrupt routine.

**11**. The method of claim **10**, wherein the first state is a first logic level and the second state is a high impedance state.

**12**. The method of claim **10**, wherein the at least one first output is operatively coupled to at least one interrupt of the memory controller such that driving the at least one output to the second state triggers the memory controller to execute an interrupt routine.

**13**. The method of claim **10**, wherein the at least one first output is a error-out pin of the first memory module.

**14**. The method of claim **10**, further comprising:

providing a second memory module comprising at least one second output operatively coupled to the memory controller, the second memory module configured to operate in one of at least two modes comprising an initialization mode during which the second memory module executes at least one initialization sequence and an operational mode;

causing the second memory module to enter the initialization mode;

driving the at least one second output of the second memory module to a third state while the second memory module executes the at least one initialization sequence; and

16

upon completion of the at least one initialization sequence, driving the at least one second output of the second memory module to a fourth state different from the third state.

**15**. The method of claim **14**, wherein the at least one first output of the first memory module and the at least one second output of the second memory module are operatively coupled together by a bus which is also operatively coupled to at least one input of the memory controller.

**16**. The method of claim **14**, wherein the at least one first output of the first memory module is operatively coupled to a first input of the memory controller and the at least one second output of the second memory module is operatively coupled to a second input of the memory controller.

**17**. A method of using at least one memory module, comprising:

providing a memory module comprising at least one output operatively coupled to a memory controller of a host computer system, the memory module configured to operate in at least two modes comprising an initialization mode during which the memory module executes at least one initialization sequence and an operational mode;

causing the memory module to enter the initialization mode; and

outputting a notification signal from the at least one output of the memory module, the notification signal indicating that the memory module has completed the at least one initialization sequence and triggering the memory controller to execute an interrupt routine.

**18**. The method of claim **17**, wherein the notification signal is output via an error-out pin of the memory module.

\*   \*   \*   \*   \*

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 2

US009535623B1

(12) **United States Patent**     (10) **Patent No.:**     **US 9,535,623 B1**

Lee     (45) **Date of Patent:**     ***Jan. 3, 2017**

(54) **MEMORY MODULE CAPABLE OF HANDSHAKING WITH A MEMORY CONTROLLER OF A HOST SYSTEM**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventor: **Hyun Lee**, Ladera Ranch, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/169,745**

(22) Filed: **Jun. 1, 2016**

**Related U.S. Application Data**

(63) Continuation of application No. 15/088,115, filed on Apr. 1, 2016, which is a continuation of application No. 13/942,721, filed on Jul. 16, 2013, now Pat. No. 9,311,116, which is a continuation of application No. 12/815,339, filed on Jun. 14, 2010, now Pat. No. 8,489,837.

(60) Provisional application No. 61/186,799, filed on Jun. 12, 2009.

(51) **Int. Cl.**

| G06F 12/00 | (2006.01) |
| G06F 3/06 | (2006.01) |
| G06F 11/10 | (2006.01) |
| G11C 29/52 | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *G06F 3/0632* (2013.01); *G06F 3/0619* (2013.01); *G06F 3/0659* (2013.01); *G06F 3/0673* (2013.01); *G06F 11/1068* (2013.01); *G11C 29/52* (2013.01)

(58) **Field of Classification Search**

USPC ....................................................... 711/170

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,672,570 A | 6/1987 | Benken |
| 5,450,576 A | 9/1995 | Kennedy |
| 5,511,152 A | 4/1996 | Lai et al. |
| 5,684,979 A | 11/1997 | Grimes |
| 6,763,437 B1 | 7/2004 | Nguyen et al. |
| 6,886,109 B2 | 4/2005 | Olarig et al. |
| 7,024,518 B2 | 4/2006 | Halbert et al. |
| 7,065,688 B1 | 6/2006 | Moyes et al. |
| 7,093,115 B2 | 8/2006 | Poisner et al. |

(Continued)

*Primary Examiner* — Mardochee Chery

(74) *Attorney, Agent, or Firm* — Jamie J. Zheng, Esq.

(57)     **ABSTRACT**

A memory module is operable with a memory controller of a host computer system. The memory module includes a module controller having an open drain output. The module controller generates a parity error signal and drives the parity error signal to the memory controller of the host system via the open drain output while the memory module operates in a first mode, the parity error signal indicating a parity error having occurred in the memory module while the memory module operates in the first mode. The module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system. The module controller generates a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode and outputs the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode.

**29 Claims, 3 Drawing Sheets**



**US 9,535,623 B1**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,266,633 B2 | 9/2007 | James |
| 7,489,163 B2 | 2/2009 | Goodnow et al. |
| 7,539,909 B2 | 5/2009 | LeClerg et al. |
| 7,586,350 B2 | 9/2009 | Chung et al. |
| 8,429,493 B2 | 4/2013 | Sokolov et al. |
| 2001/0034246 A1 * | 10/2001 | Hutchison, IV ....... H04M 11/06 |
| | | 455/557 |
| 2003/0115427 A1 | 6/2003 | Roohparvar |
| 2005/0071580 A1 | 3/2005 | LeClerg et al. |
| 2007/0091702 A1 | 4/2007 | Nikitin |
| 2007/0214347 A1 | 9/2007 | Rothman et al. |
| 2008/0256281 A1 | 10/2008 | Fahr et al. |
| 2009/0119464 A1 | 5/2009 | Grundy |
| 2010/0005218 A1 | 1/2010 | Gower et al. |
| 2010/0042778 A1 | 2/2010 | Grundy et al. |
| 2010/0202240 A1 | 8/2010 | Moshayedi et al. |
| 2011/0022789 A1 | 1/2011 | Fujimoto |

* cited by examiner

**U.S. Patent**        Jan. 3, 2017        Sheet 1 of 3        **US 9,535,623 B1**



Figure 1

Figure 2

Figure 3



Figure 4

**U.S. Patent**        Jan. 3, 2017        Sheet 3 of 3        US 9,535,623 B1



Figure 5

US 9,535,623 B1

**1**

# MEMORY MODULE CAPABLE OF HANDSHAKING WITH A MEMORY CONTROLLER OF A HOST SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/088,115, filed Apr. 1, 2016, entitled "SYSTEMS AND METHODS FOR HANDSHAKING WITH A MEMORY MODULE," which is a continuation of U.S. application Ser. No. 13/942,721, filed Jul. 16, 2013, now U.S. Pat. No. 9,311,116 on Apr. 12, 2016, which is a continuation of U.S. application Ser. No. 12/815,339, filed Jun. 14, 2010, now U.S. Pat. No. 8,489,837, which claims the benefit of priority from U.S. Provisional App. No. 61/186,799, filed Jun. 12, 2009. Each of the above applications/patents is incorporated in its entirety by reference herein.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the operation of memory modules. Specifically, the present disclosure relates to a memory module capable of handshaking with a memory controller of a host system.

## BACKGROUND OF THE DISCLOSURE

Memory subsystems such as memory modules are generally involved in the initialization procedure for computer systems, including servers, personal computers, and the like. For example, during system-wide initialization, the memory subsystems may undergo internal initialization procedures, or the system memory controller may otherwise interact with the memory subsystems during the initialization procedure. As part of this interaction, the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization.

## SUMMARY

According to certain aspects, a memory module is operable with a memory controller of a host computer system. The memory module includes a module controller having an open drain output. The module controller generates a parity error signal and drives the parity error signal to the memory controller of the host system via the open drain output while the memory module operates in a first mode, the parity error signal indicating a parity error having occurred in the memory module while the memory module operates in the first mode. The module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system. The module controller generates a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode and outputs the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode.

The memory module further includes a printed circuit board (PCB) having a first set of edge connections for communicating address and control signals from the memory controller of the host system, a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in the first mode,

**2**

and an error edge connection coupled to the open drain output of the module controller. The memory module communicates to the memory controller of the host system via the error edge connection the parity error signal while the memory module operates in the first mode and the notification signal while the memory module is in the second mode.

In another aspect, a memory module includes a plurality of synchronous dynamic random access memory elements, a printed circuit board (PCB), a module circuit, and a notification circuit. The PCB has a first set of edge connections for communicating address and control signals from the memory controller of the host system, and a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in a first mode. The PCB further includes an error edge connection in addition to the first set of edge connections and the second set of edge connections.

In certain embodiments, the module circuit controls the plurality of dynamic random access memory elements in response to read and write commands received from the memory controller of the host system via the first set of edge connections while the memory module operates in the first mode. The module circuit generates a parity error signal indicative of a parity error having occurred in the memory module while the memory module operates in the first mode. The module circuit can cause the memory module to enter a second mode in response to a command from the memory controller of the host system. The module circuit then generates a notification signal in response to one or more training sequences while the memory module is in the second mode, the notification signal indicating a status of the one or more training sequences.

In certain embodiments, the notification circuit has an open drain output coupled to the error edge connection of the PCB. The notification circuit drives the parity error signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module operates in the first mode. The notification circuit drives the notification signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the second mode.

According to additional aspects, a memory module is operable with a memory controller of a host system in at least a first mode and a second mode. The memory module includes a plurality of synchronous dynamic random access memory elements, a PCB, and a module controller. The PCB has a first set of edge connections for communicating address and control signals from the memory controller of the host system, and a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in the first mode. The PCB further includes an error edge connection in addition to the first set of edge connections and the second set of edge connections. The PCB is configured to fit in a corresponding slot connector of the host system.

In certain embodiments, the module controller has an open drain output coupled to the error edge connection. The module controller is configured to transmit address and control signals to the plurality of synchronous dynamic random access memory elements in response to read or write commands received from the memory controller of the host system via the first set of edge connections while the memory module operates in the first mode, to generate a parity error signal indicating a parity error having occurred

US 9,535,623 B1

**3**

in the memory module while the memory module is in the first mode, and to transmit the parity error signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the first mode. The module controller is further configured to cause the memory module to enter the second mode in response to a command from the memory controller of the host system, to generate a notification signal indicating a status of one or more training sequences while the memory module is in the second mode, and to transmit the notification signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the second mode.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows an example host computer system including an example memory module configured to perform handshaking with a memory controller of the host computer system according to certain embodiments described herein.

FIG. **2** shows an example host computer system including example first and second memory modules configured to perform handshaking with a system memory controller of the host computer system according to certain embodiments described herein.

FIG. **3** shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system, where the notification circuits of the first and second memory modules have another example configuration according to certain embodiments described herein.

FIG. **4** and FIG. **5** show example methods of using at least one memory module according to certain embodiments described herein.

DETAILED DESCRIPTION

Existing initialization schemes have certain inefficiencies which lead to wasted time and expense. Thus, there is a need to reduce the time and complexity involved in system memory controller interactions with memory subsystems during initialization. Certain embodiments described herein advantageously satisfy at least a portion of this need by providing a system and method which utilizes a feedback path from a memory subsystem such as a memory module to a system memory controller, such as a Memory Controller Hub (MCH) of a computer system during initialization.

In general, there is no existing method of handshaking between the MCH (e.g., system memory controller) and a memory subsystem (e.g., memory module) during initialization. For example, in conventional systems, the system memory controller does not monitor the error-out signal from the memory subsystem. This causes the MCH to perform blind execution. In a typical server (e.g., an Intel or AMD or other chipset based server), the lack of any handshaking between the MCH and the memory subsystem during the server initialization period has not been a serious issue since the MCH generally has complete control over the initialization procedure. However, one possible configuration for LR-DIMM (Load Reduced DIMM) includes the MCH handing over one or more parts of the initialization operation sequence to the memory subsystem. This raises an unprecedented issue not addressed in conventional systems because, in such proposed configurations, the system can benefit from the MCH handshaking with the memory subsystem controller, as described more fully below.

**4**

Such an LR-DIMM configuration may have the MCH inserting a waiting period of predetermined length during which the MCH is idle and the memory subsystem controller undergoes initialization. However, one shortcoming of this LR-DIMM configuration would be that it requires the MCH to be in standby (idle, or wait) while the memory subsystem controller completes its task. Under such an arrangement, since the time to complete a task can be dependent on the density, speed and configuration of the memory subsystem, and these parameters may be unknown to the MCH, the MCH may have to insert a single, predetermined standby period. In addition, if there are multiple occasions that the MCH needs to hand off control to the memory subsystem controller, the required MCH wait periods can be different from one occasion to another, and it complicates the correlation between the MCH and the memory subsystem controller. For example, the MCH according to such a scheme may give control to the local memory controller of a memory subsystem (e.g., memory module) for execution of a training sequence. The MCH may wait for a pre-determined period of time and then assume that the local memory controller has completed the training sequence. However, depending on the memory subsystem parameters (e.g., memory capacity, speed, number of ranks, etc.), the time for actually completing the training sequence may vary and may be longer or shorter than predetermined period of time.

In general, handshaking can be implemented in at least two ways; polling and notifying. In the polling method, the MCH reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation. For example, a status register may be read out through a serial interface such as System Management Bus (SMBus). However, a register polling method is generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation. Thus, the system memory controller may wait longer than necessary to poll the memory subsystem, thereby delaying the overall initialization process. Additionally, the problem may be compounded because multiple training sequences or other initialization sequences may be run on the memory subsystem during a particular initialization period, resulting in accumulation of such unnecessary delays. Moreover, polling generally involves scheduling polling intervals during which the system memory controller is not performing other operations, resulting in further inefficiency.

Alternatively, the notifying method is an advantageous handshaking method between the MCH and the memory subsystem controller. According to a notifying method, the memory subsystem controller sends a signal to the MCH when the memory subsystem controller completes the required or requested operation. This method allows the MCH to execute one or more independent commands while it is waiting for a notification signal from the memory subsystem controller.

Certain embodiments described herein provide a method of establishing a handshake mechanism based on notification signaling. In certain embodiments, this mechanism can be implemented by adding a new interface (notifying) signal between the MCH and the memory subsystem controller, or by adding an additional functionality to an existing, non-timing critical signal without altering the memory subsystem hardware. In either case, the interface between the MCH and the memory subsystem controller of certain embodiments can be an open drain signaling from the memory subsystem controller to the MCH, although a variety of other configu-

US 9,535,623 B1

5

rations are possible. As will be appreciated by persons skilled in the art, the terms MCH, system memory controller, and memory subsystem are used generally interchangeable throughout this disclosure, and the terms memory module, memory subsystem controller, and local memory controller are used generally interchangeably throughout this disclosure.

FIG. **1** illustrates an example host computer system **16** including an example memory module **10** according to certain embodiments described herein. The memory module **10** can comprise at least one output **12** configured to be operatively coupled to a system memory controller **14** of the host computer system **16**. In certain embodiments, the memory module **10** is configured to operate in at least two modes comprising an initialization mode during which the memory module **10** executes at least one initialization sequence, and an operational mode. The memory module **10** may further include a controller circuit **18**. In some embodiments, the controller circuit **18** is configured to cause the memory module **10** to enter the initialization mode. The memory module **10** can further include a notification circuit **20** configured to drive the at least one output **12** while the memory module **10** is in the initialization mode to provide at least one notification signal to the memory controller **14** indicating at least one status of the at least one initialization sequence.

The memory module **10** may comprise a printed-circuit board (PCB) **22**. In certain embodiments, the memory module **10** has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or higher. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules **10** having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. The PCB **22** can have an industry-standard form factor. For example, the PCB **22** can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB **20** has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB **22** has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. In other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain embodiments, the memory module **10** is operatively coupled to (e.g., in electrical communication with) the host computer system **16**. In certain other embodiments, the memory module **10** may communicate with the host computer system **16** using some other type of communication, such as, for example, optical communication. Examples of host computer systems **16** include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The PCB **22** can comprise an interface (not shown) that is configured to be in electrical communication with the host computer system **16**. For example, the interface can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system **16**. The interface of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the

6

memory module **10** and the host system **16**. For example, the interface can comprise a standard 240-pin DDR2 edge connector. The at least one output **12** may be routed over the interface, for example.

The memory module **10** may also comprise one or more memory elements (not shown), such as dynamic random-access memory (DRAM) elements, for example. Types of DRAM elements compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, DDR4, and synchronous DRAM (SDRAM). In addition, memory elements having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory elements compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). In certain embodiments, the memory module **10** may also include one or more non-volatile memory elements, such as one or more flash memory elements. Types of flash memory elements compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC).

The controller circuit **18** of certain embodiments generally controls the operation of the memory module **10**. For example, the controller circuit **18** may control the memory elements of the memory module **10** and/or communicate with the system memory controller **14**. For example, the controller circuit **18** may receive and process address and command signals (e.g., read, write commands) from the system memory controller **14** and transmit appropriate address and commands to the memory elements in response. See, e.g., U.S. Pat. Appl. Publ. Nos. 2006/0062047 A1 and 2006/0262586 A1, each of which is incorporated in its entirety by reference herein. In certain embodiments, the controller circuit **18** comprises a local memory controller. Additionally, depending on the architecture of the memory module **10**, such as for an FB-DIMM, the controller circuit **18** may comprise an advanced memory buffer (AMB). The controller circuit **18** can comprise one or more of a field-programmable gate array (FPGA), a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, and a complex programmable logic device (CPLD), for example. In certain embodiments, the controller circuit **18** comprises various discrete electrical elements, while in certain other embodiments, the controller circuit **18** comprises one or more integrated circuits.

As discussed, the memory module **10** is configured to operate in at least two modes comprising an initialization mode during which the memory module **10** executes at least one initialization sequence, and an operational mode. In one embodiment, for example, the at least one initialization sequence may comprise one or more training sequences. The initialization sequence (e.g., comprising one or more training sequences) may be initiated by the system memory controller **14**. In some embodiments, the controller circuit **18** is configured to cause the memory module **10** to enter the initialization mode. For example, the controller circuit **18** may be configured to execute a routine implementing the at least one initialization sequence when the appropriate signal or command is received from the memory controller **14** or is otherwise received from the host computer system **16** (e.g., upon receipt of a reset signal).

In certain embodiments, for example, the computer system **16** is coupled to a plurality of memory modules **10**, **26**

US 9,535,623 B1

7

including the memory module 10 and at least a second memory module 26, and the memory controller 14 (e.g., MCH) trains each module 10, 26 separately, in series. In one example scenario, the memory controller 14 issues a first command to the memory module 10, and, in response, the memory module 10 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the first memory module 10 advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, the memory controller 14 issues a second command, this time to the memory module 26, and, in response, the memory module 26 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the second memory module 26, similar to the first memory module 10, advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, where there are more than two memory modules 10, 26, the memory controller 14 issues a third command to a third memory module (not shown), and so forth. One example computer system 16 capable of implementing such a scenario is configured to execute an Intel Basic Input/Output System (BIOS), and comprises a plurality of memory modules 10, 26 having an LRDIMM configuration. In such an example system, the Intel BIOS causes the system memory controller 14 to initialize the LRDIMM memory modules 10, 26 serially.

The operational mode is the normal mode of the memory module 10. For example, during the operational mode, the memory module 10 is generally accessed by the system memory controller 14 of the host computer 16 during standard computer operation not associated with initialization. For example, the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode, although it will be appreciated that one or more of these operations can also be performed by the memory module 10 while in initialization mode in certain embodiments.

The notification circuit 20 can be configured to drive the at least one output 12, while the memory module 10 is in the initialization mode or after the memory module 10 completes one or more initialization sequences, to provide the at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence. While shown in FIGS. 1-3 as forming a part of the controller circuit 18, the notification circuit 20 may be a physically and/or logically separate circuit in certain embodiments. While a variety of configurations are possible, the notification circuit 20 may comprise one or more transistors, one or more logic elements (e.g., AND, OR, NOR, NAND, XOR gates, and the like), or a combination thereof. In some embodiments, the notification circuit 20 may additionally or alternatively comprise one or more of an FPGA, PLD, CPLD, ASIC, custom-designed semiconductor device, discrete electrical elements, and an integrated circuit.

The at least one status of certain embodiments comprises completion of the at least one initialization sequence, such that the at least one notification signal is indicative of the completion of the at least one initialization sequence. The at least one status of certain embodiments comprises execution of the at least one initialization sequence. For example, the at least one status may indicate that the at least one initialization sequence is currently being executed. In some embodiments, the at least one status may provide an indication that a certain task has been completed by the memory

8

module 10, such as a training task requested by the system memory controller 14. In certain embodiments, the notification circuit 20 can be configured to drive the at least one output 12 to a first state indicative of execution of the at least one initialization sequence or to a second state indicative of completion of the at least one initialization sequence. As one example, the first state may be a high or low logic level, and the second state may be a high impedance state. In another case, the first state is a high or low logic level, and the second state is the inverse logic level of the first state.

The at least one output 12 of certain embodiments is configured to be operatively coupled to at least one interrupt of the system memory controller 14, and the system memory controller 14 is responsive to the at least one notification signal indicating completion of the at least one initialization sequence. For example, the system memory controller 14 may trigger execution of an interrupt routine upon receipt of the notification signal on the output 12. The interrupt routine generally executes the appropriate operations for the at least one status indicated by the at least one notification signal. For example, if the at least one status indicates that the at least one initialization sequence is complete, execution of the interrupt routine may cause the system memory controller 14 to notify the host computer system 16 that the system initialization, or a portion thereof, is completed. In one embodiment, for example, the execution of the interrupt routine causes the system memory controller 14 to initiate a subsequent training sequence for the memory module 10 or on another memory module connected to the host system 16. For example, in one embodiment, a central processing unit (CPU) of the host system 16 (not shown) enters a "Wait" state after issuing a command to the memory module 10 to enter the initialization mode. Receipt of the at least one notification signal on the output 12 triggers execution of the interrupt routine, which interrupts the CPU, causing the "Wait" state to be aborted and allowing the host system 16 to continue operation. In this manner, generation of the interrupt on the at least one output 12 can allow completion of the at least one initialization sequence to receive generally immediate attention from the CPU and/or memory controller 14 of the host system 16. As will be appreciated, the CPU and memory controller 14 of the host system 16 may comprise separate modules, or may alternatively comprise a single integrated module, depending on the architecture of the host system 16 chip-set.

In certain embodiments, execution of the interrupt routine causes the system memory controller 14 to cause the memory module 10 to exit the initialization mode and to enter the operational mode. In another embodiment, the memory module 10 automatically enters the operational mode upon completion of the at least one initialization sequence without intervention from the memory controller 14.

In some embodiments, the at least one output 12 is operated in conformance with a standard (e.g., an industry standard) when the memory module 10 is in the operational mode, but is not operated in conformance with the standard when the memory module 10 is in the initialization mode. An example of a standard in accordance with certain embodiments described herein is one or more of the industry standard promulgated by the Joint Electronic Devices Engineering Counsel (JEDEC). For example, the operation and behavior of the at least one output 12 may conform to an industry standard when the memory module 10 is in the operational mode, but the operation and behavior of the at least one output 12 may not conform to the industry standard when the memory module 10 is in the initialization mode.

US 9,535,623 B1

9

Because the at least one output **12** does not conform to the standard during initialization mode, an existing (e.g., JEDEC-specified) pin may be utilized to provide the at least one notification signal to the system memory controller **14** from the memory module **10** during the initialization mode. In one embodiment, for example, the at least one output **12** comprises an error-out pin of the memory module **10**. In conventional systems, the operation of the error-out pin is undefined by the standard during initialization. However, in certain embodiments described herein, during the operational mode, the error-out pin may be used according to a conventional industry standard (e.g., a JEDEC standard) to indicate a parity error has occurred in the memory module **10**. During the initialization mode, the error-out pin can be used to transmit the at least one notification signal to the system memory controller **14**.

It is advantageous to use the error-out pin for initialization status notification according to certain embodiments because the error-out pin can be asserted by the memory module **10** independent from system memory controller **14** requests or commands. Also, because the error-out pin is a JEDEC-specified pin, design cost and complexity are reduced because additional pin-outs and interrupt design changes can be avoided (e.g., in cases where such changes in hardware or chipset may not be feasible to provide the at least one status to the system memory controller **14**). However, in certain other embodiments, providing the at least one status may be implemented by adding one or more pins to the system memory controller **14** (e.g., MCH) and to the controller circuit **18** (e.g., local memory controller), thereby utilizing changes in hardware or the chipset.

Moreover, the error-out pin may be coupled to an interrupt of the system memory controller **14** (e.g., according to the JEDEC standard). Thus, where the error-out pin is used, from the system point of view in accordance with certain embodiments, the notification of completion of the required or requested task from the memory module **10** (e.g., by the local memory controller) generates an interrupt communicated to the system during the initialization period and indicative of completion of the required or requested task. Assertion of the same pin during normal (non-initialization) operation upon an error occurring, on the other hand, generates an interrupt communicated to the system during the normal operation indicative of the occurrence of the error condition. Thus, in certain embodiments, the error-out pin and corresponding signal memory module **10** can be used to support the notifying function and to provide the at least one status generally without changing hardware. Certain other such embodiments involve modifying the basic input/output system (BIOS) or other programming change. For example, the BIOS may be modified to indicate to the system memory controller **14** how to respond to the notification signal (e.g., to the error_out signal or the interrupt corresponding thereto).

In certain other embodiments, the at least one output **12** may include other existing (e.g., JEDEC specified) pins instead of, or in addition to, the error-out pin. In yet other configurations, at least one additional (e.g., non-JEDEC specified) pin may be employed. In general, any pin not otherwise active during the initialization mode may be used (e.g., high-order address pins, read/write pins, data pins, etc.).

The at least one output **12** can further be configured to be operatively coupled to at least one second output **24** of a second memory module **26** in some embodiments, as schematically illustrated in FIGS. **1-3**. The second memory module **26** may be generally similar in structure and func-

10

tion to the memory module **10**, and may comprise a controller circuit **28** and a notification circuit **30**, for example. The second memory module **26** may be generally identical to the first memory module **10**, or may have a different memory capacity, form factor, etc., than the first memory module **10**. More than two such memory modules may be present in certain embodiments. As described above, the second memory module **26** can be configured to operate in at least two modes comprising an initialization mode during which the second memory module **26** executes at least one initialization sequence, and an operational mode. For example, the initialization and operational modes may be similar to those describe above in relation to the first memory module **10**.

The second memory module **26** can also be configured to drive the at least one second output **24** to a third state indicative of execution of at least one initialization sequence of the second memory module **26** or to a fourth state indicative of completion of the at least one initialization sequence of the second memory module **26**. Additionally, in some embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the system memory controller **14**. In other embodiments (not shown), the at least one first output **12** and the at least one second output **24** are not coupled together, and are coupled to two separate inputs of the system memory controller **14**.

FIG. **2** shows an example host computer system **16** including example first and second memory modules **10**, **26**. As shown, the notification circuits **20**, **30** of the first and second memory modules **10**, **26** each comprise at least one transistor **36**, **38**. The at least one transistor **36**, **38** can be in an open-drain configuration, as shown, although other configurations are possible. In certain such embodiments, the first state of the at least one first output **12** is a first logic level, the second state of the at least one first output **12** is a high-impedance state, the third state of the at least one second output **24** is the first logic level, and the fourth state of the at least one second output **24** is the high-impedance state. In the illustrated example, while the at least one initialization sequence is in progress, the first and second memory modules **10**, **26** drive the gates of the respective transistors **36**, **38** high. Thus, the transistors **36**, **38** are respectively low impedance while the memory modules **10**, **26** are executing each section of the initialization sequence, thereby pulling the first and second outputs **12**, **24** low. Thus, the first state and the third state are low logic levels (ground) in the example configuration. Also, because the first and second outputs **12**, **24** are coupled together by the bus **32**, if the at least one initialization sequence of either one of the first and second memory modules **10**, **26** are in progress, the bus **32** will be pulled to a low logic level.

As each of the two memory modules **10**, **26** completes its at least one initialization sequence, it can drive the corresponding output to at least one first and second outputs **12**, **24** respectively to a high impedance state, For example, once the at least one initialization sequence on each of the first and second memory modules **10**, **26** is completed, the first and second memory modules **10**, **26** can drive the gates of the respective transistors **36**, **38** low, resulting in a high-impedance state on the at least one first and second outputs **12**, **24** causing the bus **32** to be pulled high by the system memory controller **14**. Accordingly, only once the at least one initialization sequence of both the first and second memory modules **10**, **26** are complete, the bus **32** will be

US 9,535,623 B1

11                                                                12

pulled high by the internal pull-up configuration **40** of the system memory controller **14**. The second state and the fourth state are therefore high-impedance values in the example embodiment. Thus, the system memory controller **14** can monitor the value on the bus **32** via the first input **34** to determine when both of the memory modules **10**, **26** have completed the at least one initialization sequence. As discussed, in other configurations the at least one first and second outputs **12**, **24** may be received on separate inputs of the system memory controller **14**, and the status of the at least one initialization sequence of each memory module **10**, **26** may be monitored independently.

As discussed above, in certain embodiments in which more than one memory module **10**, **26** is connected to the system memory controller **14**, each memory module **10**, **26** or associated controller circuit **18** (e.g., local memory controller) causes the corresponding notification circuit **20**, **30** to drive the at least one output **12**, **24** to the high impedance state from the low impedance state when it completes the requested or required operation. Thus, in certain such embodiments, the system memory controller **14** (e.g., MCH) can only pull the notifying signal high when all memory modules **10**, **26** or associated controller circuits (e.g., local memory controllers) have completed the required or requested operation (e.g., initialization sequence). This configuration allows the system memory controller **14** (e.g., MCH) to work with a non-homogeneous memory subsystem. For example, the system memory controller **14** may be able to monitor the progress of multiple memory modules **10**, **26** including a mix of DIMMs or other memory modules having differing characteristics, such as DIMM density, rank configurations, DRAM density, speed, DRAM configuration, etc.

Additionally, the at least one output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are configured to be operatively coupled to at least one interrupt of the system memory controller **14** in certain embodiments. In certain such embodiments, the system memory controller **14** can be responsive to the second state of the first memory module **10** and the fourth state of the second memory module **26** by triggering execution of an interrupt routine by a processor of the system memory controller **14**. For example, in the example system of FIG. **2**, when the bus **32** is pulled high by the pull-up configuration **40** indicating the second state of the first memory module **10** and the fourth state of the second memory module **26**, the system memory controller **14** triggers execution of the interrupt routine.

In some embodiments, in which the at least one first output **12** and the at least one second output **24** are operatively coupled to separate inputs of the system memory controller **14**, the at least one first output **12** and the at least out second output **24** may be operatively coupled to two separate interrupts. For example, the system memory controller **14** may be responsive to the second state of the first memory module **10** by triggering execution of a first interrupt routine associated with a first interrupt, and may be responsive to the fourth state of the second memory module **26** by triggering execution of a second interrupt routine associated with the second interrupt. In yet other embodiments, the separate inputs of the memory controller **14** are internally operatively coupled to the same interrupt, or are operatively coupled to separate interrupts which trigger the same interrupt routine.

FIG. **3** shows a host computer system **16** including an example memory module **10** where the notification circuit **20** of the memory module **10** has another example configu-

ration in accordance with certain embodiments described herein. In the example configuration of FIG. **3**, the at least one first output **12** is operatively coupled to an error-out pin of the memory module **10**, and a multiplexor **42** drives the transistor **36** with either of a task_in_progress signal **44** or an error signal **46** (e.g., parity error signal). In one embodiment, for example, the multiplexor **42** may be configured to drive the transistor **36** with the task_in_progress signal **44** when the memory module **10** is in the initialization mode or is executing the at least one initialization sequence, and with the error signal **46** when the memory module **10** is in the operational mode. Thus, the memory module **10** can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode, as described herein. As shown in FIG. **3**, a second memory module **26** including a similar configuration can also be operatively coupled to the host computer system **16**. In certain embodiments, the at least one second output **24** of the second memory module **26** can be operatively coupled to the at least one first output **12** by the bus **32**, as described above (e.g., with respect to FIG. **2**).

FIG. **4** shows an example method **100** of using the at least one memory module **10** in accordance with certain embodiments described herein. While the description below of the method **100** refers to structure shown in FIGS. **1-3**, other structures may also be used in accordance with certain embodiments described herein. At block **102**, the method **100** of certain embodiments comprises providing a first memory module **10** comprising at least one first output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The first memory module **10** can be configured to operate in at least two modes comprising an initialization mode during which the first memory module **10** executes at least one initialization sequence, and an operational mode. For example, the at least one initialization sequence may comprise one or more steps of a series of steps associated with an initialization procedure of the host computer system **16**.

At block **104**, the method **100** in some embodiments comprises causing the first memory module **10** to enter the initialization mode. At block **106**, the method **100** of certain embodiments comprises driving the at least one first output **12** to a first state while the memory module **10** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method of certain embodiments comprises driving the at least one first output **12** to a second state different than the first state. In certain embodiments, the first state is a first logic level and the second state is a high impedance state. Additionally, in certain embodiments, the at least one first output **12** is operatively coupled to at least one interrupt of the memory controller **14** such that driving the at least one output **12** to the second state triggers the memory controller to execute an interrupt routine.

In certain embodiments, the at least one output **12** is operated in conformance with JEDEC standard when the first memory module **10** is in the operational mode, but is not operated in conformance with the JEDEC standard when the first memory module **10** is in the initialization mode. The at least one first output **12** of certain embodiments include an error-out pin of the first memory module, for example.

The method **100** can further include providing a second memory module **26** comprising at least one second output **24** operatively coupled to the memory controller **14**. The second memory module **26** can be configured to operate in one

US 9,535,623 B1

**13**

of at least two modes comprising an initialization mode, during which the second memory module **26** executes at least one initialization sequence, and an operational mode. The method **100** can further include causing the second memory module **26** to enter the initialization mode. In certain embodiments, the method **100** also includes driving the at least one second output **24** of the second memory module **26** to a third state while the second memory module **26** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method **100** can further include driving the at least one second output **24** of the second memory module **26** to a fourth state different from the third state.

In certain embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the memory controller **14**. In certain other embodiments, the at least one first output **12** of the first memory module **10** is operatively coupled to a first input **34** of the memory controller **14** and the at least one second output **24** of the second memory module **26** is operatively coupled to a second input (not shown) of the memory controller **14**.

FIG. **5** shows another example method **200** of using at least one memory module **10** in accordance with certain embodiments described herein. At block **202**, the method **200** may include providing a memory module **10** comprising at least one output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The memory module **10** may be configured to operate in at least two modes comprising an initialization mode, during which the memory module **10** executes at least one initialization sequence, and an operational mode.

The method **200** can further include causing the memory module **10** to enter the initialization mode at block **204**. At block **206**, the method **200** can include receiving a notification signal from the at least one output **12** of the memory module **10**. The notification signal may indicate that the memory module **10** has completed the initialization sequence, for example. In certain embodiments, the method **200** further comprises executing an interrupt routine by the memory controller **14** in response to the notification signal.

Terminology/Alternative Embodiments

Embodiments have been described in connection with the accompanying drawings. However, it should be understood that the figures are not drawn to scale. Distances, angles, etc. are merely illustrative and do not necessarily bear an exact relationship to actual dimensions and layout of the devices illustrated. In addition, the foregoing embodiments have been described at a level of detail to allow one of ordinary skill in the art to make and use the devices, systems, etc. described herein. A wide variety of variation is possible. Components, elements, and/or steps can be altered, added, removed, or rearranged. While certain embodiments have been explicitly described, other embodiments will become apparent to those of ordinary skill in the art based on this disclosure.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply

**14**

that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

Depending on the embodiment, certain acts, events, or functions of any of the methods described herein can be performed in a different sequence, can be added, merged, or left out all together (e.g., not all described acts or events are necessary for the practice of the method). Moreover, in certain embodiments, acts or events can be performed concurrently, e.g., through multi-threaded processing, interrupt processing, or multiple processors or processor cores, rather than sequentially.

The various illustrative logical blocks, modules, circuits, and algorithm steps described in connection with the embodiments disclosed herein can be implemented as electronic hardware, computer software, or combinations of both. To clearly illustrate this interchangeability of hardware and software, various illustrative components, blocks, modules, circuits, and steps have been described above generally in terms of their functionality. Whether such functionality is implemented as hardware or software depends upon the particular application and design constraints imposed on the overall system. The described functionality can be implemented in varying ways for each particular application, but such implementation decisions should not be interpreted as causing a departure from the scope of the disclosure.

The various illustrative logical blocks, modules, and circuits described in connection with the embodiments disclosed herein can be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic device, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general purpose processor can be a microprocessor, but in the alternative, the processor can be any conventional processor, controller, microcontroller, or state machine. A processor can also be implemented as a combination of computing devices, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

The blocks of the methods and algorithms described in connection with the embodiments disclosed herein can be embodied directly in hardware, in a software module executed by a processor, or in a combination of the two. A software module can reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, a hard disk, a removable disk, a CD-ROM, or any other form of computer-readable storage medium known in the art. An exemplary storage medium is coupled to a processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium can be integral to the processor. The processor and the storage medium can reside in an ASIC. The ASIC can reside in a user terminal. In the alternative, the processor and the storage medium can reside as discrete components in a user terminal.

Certain embodiments described herein are compatible with a memory system including memory devices with various attributes (see, e.g., FIGS. **2** and **3**). For example, the memory system of certain embodiments may include various data slice sizes (e.g., two, four, eight, or 16 bit data

US 9,535,623 B1

15

slices) and corresponding memories (e.g., memories having two, four, eight, or 16 bit data widths).

Although certain embodiments and examples are discussed above, it is understood that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. It is intended that the scope of the inventions disclosed herein should not be limited by the particular disclosed embodiments. Thus, for example, in any method or process disclosed herein, the acts or operations making up the method/process may be performed in any suitable sequence and are not necessarily limited to any particular disclosed sequence.

Various aspects and advantages of the embodiments have been described where appropriate. It is to be understood that not necessarily all such aspects or advantages may be achieved in accordance with any particular embodiment. Thus, for example, it should be recognized that the various embodiments may be carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other aspects or advantages as may be taught or suggested herein.

What is claimed is:

1. A memory module configured to fit into a corresponding slot of a host system to operate with a memory controller of the host system, the memory module comprising:
   a module controller having an open drain output, the module controller generating a parity error signal and driving the parity error signal to the memory controller of the host system via the open drain output while the memory module operates in a first mode, the parity error signal indicating a parity error having occurred in the memory module while the memory module operates in the first mode, wherein the module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system, the module controller generating a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode and outputting the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode; and
   a printed circuit board having a first set of edge connections for communicating address and control signals from the memory controller of the host system, a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in the first mode, and an error edge connection coupled to the open drain output of the module controller, the memory module communicating to the memory controller of the host system via the error edge connection the parity error signal while the memory module operates in the first mode and the notification signal while the memory module is in the second mode.

2. The memory module of claim 1, further comprising:
   a plurality of synchronous dynamic random access memory elements, wherein, while the memory module is in the first mode, the module controller receives and processes address and control signals corresponding to read or write commands from the memory controller of the host system and transmits processed address and control signals to the plurality of synchronous dynamic random access memory elements.

16

3. The memory module of claim 1, wherein, while the memory module is in the second mode, the module controller drives the notification signal to a logic low level via the open drain output to indicate a status of the one or more training sequences.

4. The memory module of claim 1, wherein the first mode is an operational mode of the memory module, and the second mode is a training mode of the memory module.

5. The memory module of claim 1, wherein the one or more training sequences are executed by the module controller in response to a command or a signal received from the memory controller of the host system.

6. The memory module of claim 1, wherein the module controller comprises one or more integrated circuit.

7. The memory module of claim 1, wherein the module controller includes a notification circuit comprising one or more transistors each having an open drain coupled to the open drain output.

8. The memory module of claim 7, wherein the notification circuit generates the notification signal by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

9. The memory module of claim 7, wherein the notification circuit generates the parity error signal by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

10. The memory module of claim 7, wherein the notification circuit generates the notification signal using one or more OR logic elements.

11. The memory module of claim 1, wherein the module controller implements the one or more training sequences in response to a signal or a command received from the memory controller of the host system.

12. A memory module to be coupled to a memory controller of a host system, the memory module comprising:
   a plurality of synchronous dynamic random access memory elements;
   a printed circuit board (PCB) having a first set of edge connections for communicating address and control signals from the memory controller of the host system, and a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in a first mode, the PCB further including an error edge connection in addition to the first set of edge connections and the second set of edge connections;
   a module circuit controlling the plurality of synchronous dynamic random access memory elements in response to read and write commands received from the memory controller of the host system via the first set of edge connections while the memory module operates in the first mode, the module circuit generating a parity error signal indicative of a parity error having occurred in the memory module while the memory module operates in the first mode, the module circuit causing the memory module to enter a second mode in response to a command from the memory controller of the host system, the module circuit generating a notification signal in response to one or more training sequences while the memory module is in the second mode, the notification signal indicating a status of the one or more training sequences; and
   a notification circuit having an open drain output coupled to the error edge connection of the PCB, the notification

US 9,535,623 B1

17

circuit driving the parity error signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module operates in the first mode, the notification circuit driving the notification signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the second mode.

**13**. The memory module of claim **12**, wherein the memory module executes the one or more training sequences in response to a signal or a command from the memory controller of the host system.

**14**. The memory module of claim **12**, wherein the first mode is an operational mode of the memory module, and the second mode is a training mode of the memory module.

**15**. The memory module of claim **12**, wherein the notification circuit generates the notification signal using one or more OR logic elements.

**16**. The memory module of claim **12**, wherein the notification circuit is a physically separate circuit from the module circuit.

**17**. The memory module of claim **12**, wherein the module circuit includes the notification circuit.

**18**. The memory module of claim **12**, wherein the notification circuit includes one or more transistors each having an open drain coupled to the open drain output.

**19**. The memory module of claim **18**, wherein the notification circuit generates the notification signal by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

**20**. The memory module of claim **18**, wherein the notification circuit generates the parity error signal by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

**21**. A memory module operable in at least a first mode and a second mode, the memory module comprising:

   a plurality of synchronous dynamic random access memory elements;

   a printed circuit board (PCB) having a first set of edge connections for communicating address and control signals from the memory controller of the host system, and a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in the first mode, the PCB further including an error edge connection in addition to the first set of edge connections and the second set of edge connections, wherein the PCB is configured to fit into a corresponding slot connector of the host system; and

   a module controller having an open drain output coupled to the error edge connection, the module controller being configured to transmit address and control signals

18

to the plurality of synchronous dynamic random access memory elements in response to read or write commands received from the memory controller of the host system via the first set of edge connections while the memory module operates in the first mode, to generate a parity error signal indicating a parity error having occurred in the memory module while the memory module is in the first mode, and to transmit the parity error signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the first mode, the module controller being further configured to cause the memory module to enter the second mode in response to a command from the memory controller of the host system, to generate a notification signal indicating a status of one or more training sequences while the memory module is in the second mode, and to transmit the notification signal to the memory controller of the host system via the open drain output and the error edge connection while the memory module is in the second mode.

**22**. The memory module of claim **21**, wherein the first mode is an operational mode of the memory module, and second mode is a training mode of the memory module.

**23**. The memory module of claim **21**, wherein the memory module executes the one or more training sequences in response to a command or a signal received from the memory controller of the host system.

**24**. The memory module of claim **21**, wherein the module controller includes a notification circuit comprising one or more transistors, each of the one or more transistors having an open drain coupled to the open drain output.

**25**. The memory module of claim **24**, wherein the notification circuit is configured to generate the notification signal by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

**26**. The memory module of claim **24**, wherein the notification circuit is configured to generate the parity error signal by by driving a gate of each of the one or more transistors to a logic high level such that the open drain of each of the one or more transistors provides a low impedance path to ground.

**27**. The memory module of claim **24**, wherein the notification circuit is configured to generate the notification signal using one or more OR logic elements.

**28**. The memory module of claim **24**, wherein the module controller comprises one or more integrated circuits.

**29**. The memory module of claim **21**, wherein the module controller is further configured to implement the one or more training sequences in response to a signal or a command received from the memory controller of the host system.

*   *   *   *   *

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 3

US009858218B1

(12) **United States Patent**          (10) **Patent No.:**    **US 9,858,218 B1**
Lee                                     (45) **Date of Patent:**    ***Jan. 2, 2018***

(54) **MEMORY MODULE AND METHODS FOR HANDSHAKING WITH A MEMORY CONTROLLER**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventor: **Hyun Lee**, Ladera Ranch, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/088,115**

(22) Filed: **Apr. 1, 2016**

**Related U.S. Application Data**

(63) Continuation of application No. 13/942,721, filed on Jul. 16, 2013, now Pat. No. 9,311,116, which is a
(Continued)

(51) **Int. Cl.**
    *G06F 12/00*        (2006.01)
    *G06F 13/16*        (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC .......... *G06F 13/1694* (2013.01); *G06F 9/445* (2013.01); *G06F 12/0646* (2013.01);
    (Continued)

(58) **Field of Classification Search**
    CPC ... G11C 5/00; G11C 16/26; G11C 2029/4402; G11C 29/78; G11C 7/1066
    (Continued)

(56)                **References Cited**

                U.S. PATENT DOCUMENTS

    3,560,935  A    2/1971  Beers
    4,672,570  A    6/1987  Benken
                    (Continued)

                OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2001—Declaration of Robert J. Murphy, filed Sep. 6, 2017.
                    (Continued)

*Primary Examiner* — Mardochee Chery
(74) *Attorney, Agent, or Firm* — Maschoff Brennan

(57)                **ABSTRACT**

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The interface includes data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module receives a first command from the memory controller via the address and control signal pins, and enters a first mode in response to the first command. The memory module in the first mode responds to at least one initialization sequence, and sends a first output signal via the output pin to indicate a status of the at least one initialization sequence to the memory controller. The memory module enters a second mode in which the memory module performs memory operations including memory read/write operations according to an industry standard. During the read/write operations, the memory module communicates data with the memory controller via the data signal pins in response to second memory commands received via the address and control signal pins. The memory module may output a second output signal related to the read/write operations via the output pin.

**22 Claims, 3 Drawing Sheets**



## US 9,858,218 B1

Page 2

### Related U.S. Application Data

continuation of application No. 12/815,339, filed on Jun. 14, 2010, now Pat. No. 8,489,837.

(60) Provisional application No. 61/186,799, filed on Jun. 12, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 13/24* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G06F 9/445* | (2006.01) |
| *G11C 16/26* | (2006.01) |
| *G11C 5/00* | (2006.01) |
| *G11C 29/44* | (2006.01) |
| *G11C 29/00* | (2006.01) |
| *G11C 7/10* | (2006.01) |

(52) **U.S. Cl.**
CPC ................ *G06F 13/24* (2013.01); *G11C 5/00* (2013.01); *G11C 7/1066* (2013.01); *G11C 16/26* (2013.01); *G11C 29/78* (2013.01); *G11C 2029/4402* (2013.01)

(58) **Field of Classification Search**
USPC ............................................... 711/116; 713/1
See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,388,074 A | 2/1995 | Buckenmaier |
| 5,438,536 A | 8/1995 | Salzman |
| 5,450,576 A | 9/1995 | Kennedy |
| 5,511,152 A | 4/1996 | Lai et al. |
| 5,684,979 A | 11/1997 | Grimes |
| 5,835,733 A | 11/1998 | Walsh et al. |
| 6,693,840 B2 | 2/2004 | Shimada et al. |
| 6,754,787 B2 | 6/2004 | Miller et al. |
| 6,763,437 B1 | 7/2004 | Nguyen et al. |
| 6,886,109 B2 | 4/2005 | Olarig et al. |
| 7,024,518 B2 | 4/2006 | Halbert et al. |
| 7,065,688 B1 | 6/2006 | Moyes et al. |
| 7,093,115 B2 | 8/2006 | Poisner et al. |
| 7,155,579 B1 | 12/2006 | Neils et al. |
| 7,266,633 B2 | 9/2007 | James |
| 7,489,163 B2 | 2/2009 | Goodnow et al. |
| 7,539,909 B2 | 5/2009 | LeClerg et al. |
| 7,586,350 B2 | 9/2009 | Chung et al. |
| 7,757,101 B2 | 7/2010 | Nonaka et al. |
| 8,074,034 B2 | 12/2011 | Sartore |
| 8,359,521 B2 | 1/2013 | Kim et al. |
| 8,429,493 B2 | 4/2013 | Sokolov et al. |
| 2003/0115427 A1* | 6/2003 | Roohparvar ............. G11C 7/02 711/154 |
| 2005/0071580 A1 | 3/2005 | LeClerg et al. |
| 2005/0193161 A1 | 9/2005 | Lee et al. |
| 2006/0062047 A1 | 3/2006 | Bhakta et al. |
| 2006/0262586 A1 | 11/2006 | Solomon et al. |
| 2007/0091702 A1 | 4/2007 | Nikitin |

| | | |
|---|---|---|
| 2007/0136523 A1 | 6/2007 | Bonella et al. |
| 2007/0214347 A1 | 9/2007 | Rothman et al. |
| 2008/0256281 A1 | 10/2008 | Fahr et al. |
| 2009/0119464 A1 | 5/2009 | Grundy |
| 2010/0005218 A1 | 1/2010 | Gower et al. |
| 2010/0042778 A1* | 2/2010 | Tanguay ............. G06F 13/1694 711/105 |
| 2010/0142383 A1* | 6/2010 | Goishi ................... H04L 43/50 370/250 |
| 2010/0202240 A1 | 8/2010 | Moshayedi et al. |
| 2011/0022789 A1 | 1/2011 | Fujimoto |

#### OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2002—Deposition of Donald Alpert, Ph.D. filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2003—Defendants' Opening Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2004—Plaintiff Netlist, Inc.'s Opening Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2005—Plaintiff Netlist, Inc.'s Amended Opening Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2006—Defendants' Reply Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2007—Plaintiff Netlist, Inc.'s Responsive Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2008—United States International Trade Commission Open Sessions filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2009—Computer Desktop Encyclopedia Sep. 6, 2017.

Inter partes review Case No. IPR2017-00548, Petition for Inter Partes Review of U.S. Pat. No. 8,489,837, filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1003 "Declaration of Donald Alpert", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1010 "5400 MCH Datasheet", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1011 "Microsoft Computer Dictionary (5th Ed. 2002)", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Patent Owner's Preliminary Response filed Apr. 9, 2017.

Inter partes review Case No. IPR2017-00548, Trial Instituted document dated May 15, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Petitioner's Objections to Evidence, filed Sep. 13, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Notice of Deposition of Robert J. Murphy, filed Sep. 25, 2017.

* cited by examiner

Case 6:20-cv-00194-ADA   Document 26-6   Filed 05/04/20   Page 4 of 15

**U.S. Patent**     Jan. 2, 2018     Sheet 1 of 3     **US 9,858,218 B1**



Figure 1

Figure 2

Figure 3

**U.S. Patent**     Jan. 2, 2018     Sheet 2 of 3     **US 9,858,218 B1**



100

102

Provide first memory module

104

Cause the first memory
module to enter initialization mode

106

Drive the at least one first output to a first state
while the memory module executes initialization
sequence

108

Upon completion of initialization sequence, drive
the at least one first output to a second state

Figure 4

**U.S. Patent**        **Jan. 2, 2018**        **Sheet 3 of 3**        **US 9,858,218 B1**



Figure 5

US 9,858,218 B1

1

# MEMORY MODULE AND METHODS FOR HANDSHAKING WITH A MEMORY CONTROLLER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 13/942,721, filed Jul. 16, 2013, now U.S. Pat. No. 9,311,116, which is a continuation of U.S. application Ser. No. 12/815,339, filed Jun. 14, 2010, now U.S. Pat. No. 8,489,837, which claims the benefit of priority from U.S. Provisional App. No. 61/186,799, filed Jun. 12, 2009, each of which is incorporated in its entirety by reference herein.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the operation of memory modules. Specifically, the present disclosure relates to systems and methods for handshaking with a memory controller during or upon completion of initialization.

## BACKGROUND OF THE DISCLOSURE

Memory subsystems such as memory modules are generally involved in the initialization procedure for computer systems, including servers, personal computers, and the like. For example, during system-wide initialization, the memory subsystems may undergo internal initialization procedures, or the system memory controller may otherwise interact with the memory subsystems during the initialization procedure. As part of this interaction, the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization.

## SUMMARY

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The interface includes data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module receives a first command from the memory controller via the address and control signal pins, and enters a first mode in response to the first command. The memory module in the first mode responds to at least one initialization sequence, and sends a first output signal via the output pin to indicate a status of the at least one initialization sequence to the memory controller. The memory module enters a second mode in which the memory module performs memory operations including memory read/write operations according to an industry standard. During the read/write operations, the memory module communicates data with the memory controller via the data signal pins in response to second memory commands received via the address and control signal pins. The memory module may output a second output signal related to the read/write operations via the output pin.

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The interface includes data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module performs an internal procedure in a first mode in response to a first command from the memory controller whereby the memory controller hands off control of the internal procedure to the first memory module. The memory module sends

2

a first output signal via the output pin to indicate a status of the internal procedure to the memory controller. The memory module enters a second mode in which the memory module performs standard operations including one or more of memory read/write, pre-charge, refresh operations according to an industry standard. The memory module may output a second output signal related to the standard operations via the output pin.

In another aspect, a memory module is operable in a first mode and in a second mode. The memory module operates according to an industry standard in the second mode by performing standard operations including memory read/write operations in response to address and control signals from a memory controller of a host computer system. The memory module comprises a standard interface including data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module enters the first mode in response to a first command from the memory controller, in which the memory module responds to at least one initialization sequence. The memory module further comprises a notification circuit to output a notification signal indicating a status of the at least one initialization sequence to the memory controller via the output pin.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an example host computer system including an example memory module configured to perform handshaking with a memory controller of the host computer system according to certain embodiments described herein.

FIG. 2 shows an example host computer system including example first and second memory modules configured to perform handshaking with a system memory controller of the host computer system according to certain embodiments described herein.

FIG. 3 shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system, where the notification circuits of the first and second memory modules have another example configuration according to certain embodiments described herein.

FIG. 4 and FIG. 5 show example methods of using at least one memory module according to certain embodiments described herein.

## DETAILED DESCRIPTION

Existing initialization schemes have certain inefficiencies which lead to wasted time and expense. Thus, there is a need to reduce the time and complexity involved in system memory controller interactions with memory subsystems during initialization. Certain embodiments described herein advantageously satisfy at least a portion of this need by providing a system and method which utilizes a feedback path from a memory subsystem such as a memory module to a system memory controller, such as a Memory Controller Hub (MCH) of a computer system during initialization.

In general, there is no existing method of handshaking between the MCH (e.g., system memory controller) and a memory subsystem (e.g., memory module) during initialization. For example, in conventional systems, the system memory controller does not monitor the error-out signal from the memory subsystem. This causes the MCH to perform blind execution. In a typical server (e.g., an Intel or AMD or other chipset based server), the lack of any handshaking between the MCH and the memory subsystem

3

during the server initialization period has not been a serious issue since the MCH generally has complete control over the initialization procedure. However, one possible configuration for LR-DIMM (Load Reduced DIMM) includes the MCH handing over one or more parts of the initialization operation sequence to the memory subsystem. This raises an unprecedented issue not addressed in conventional systems because, in such proposed configurations, the system can benefit from the MCH handshaking with the memory subsystem controller, as described more fully below.

Such an LR-DIMM configuration may have the MCH inserting a waiting period of predetermined length during which the MCH is idle and the memory subsystem controller undergoes initialization. However, one shortcoming of this LR-DIMM configuration would be that it requires the MCH to be in standby (idle, or wait) while the memory subsystem controller completes its task. Under such an arrangement, since the time to complete a task can be dependent on the density, speed and configuration of the memory subsystem, and these parameters may be unknown to the MCH, the MCH may have to insert a single, predetermined standby period. In addition, if there are multiple occasions that the MCH needs to hand off control to the memory subsystem controller, the required MCH wait periods can be different from one occasion to another, and it complicates the correlation between the MCH and the memory subsystem controller. For example, the MCH according to such a scheme may give control to the local memory controller of a memory subsystem (e.g., memory module) for execution of a training sequence. The MCH may wait for a pre-determined period of time and then assume that the local memory controller has completed the training sequence. However, depending on the memory subsystem parameters (e.g., memory capacity, speed, number of ranks, etc.), the time for actually completing the training sequence may vary and may be longer or shorter than predetermined period of time.

In general, handshaking can be implemented in at least two ways; polling and notifying. In the polling method, the MCH reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation. For example, a status register may be read out through a serial interface such as System Management Bus (SMBus). However, a register polling method is generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation. Thus, the system memory controller may wait longer than necessary to poll the memory subsystem, thereby delaying the overall initialization process. Additionally, the problem may be compounded because multiple training sequences or other initialization sequences may be run on the memory subsystem during a particular initialization period, resulting in accumulation of such unnecessary delays. Moreover, polling generally involves scheduling polling intervals during which the system memory controller is not performing other operations, resulting in further inefficiency.

Alternatively, the notifying method is an advantageous handshaking method between the MCH and the memory subsystem controller. According to a notifying method, the memory subsystem controller sends a signal to the MCH when the memory subsystem controller completes the required or requested operation. This method allows the MCH to execute one or more independent commands while it is waiting for a notification signal from the memory subsystem controller.

4

Certain embodiments described herein provide a method of establishing a handshake mechanism based on notification signaling. In certain embodiments, this mechanism can be implemented by adding a new interface (notifying) signal between the MCH and the memory subsystem controller, or by adding an additional functionality to an existing, non-timing critical signal without altering the memory subsystem hardware. In either case, the interface between the MCH and the memory subsystem controller of certain embodiments can be an open drain signaling from the memory subsystem controller to the MCH, although a variety of other configurations are possible. As will be appreciated by persons skilled in the art, the terms MCH, system memory controller, and memory subsystem controller are used generally interchangeable throughout this disclosure, and the terms memory module, memory subsystem controller, and local memory controller are used generally interchangeably throughout this disclosure.

FIG. 1 illustrates an example host computer system 16 including an example memory module 10 according to certain embodiments described herein. The memory module 10 can comprise at least one output 12 configured to be operatively coupled to a system memory controller 14 of the host computer system 16. In certain embodiments, the memory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode. The memory module 10 may further include a controller circuit 18. In some embodiments, the controller circuit 18 is configured to cause the memory module 10 to enter the initialization mode. The memory module 10 can further include a notification circuit 20 configured to drive the at least one output 12 while the memory module 10 is in the initialization mode to provide at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence.

The memory module 10 may comprise a printed-circuit board (PCB) 22. In certain embodiments, the memory module 10 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or higher. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules 10 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. The PCB 22 can have an industry-standard form factor. For example, the PCB 22 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 20 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 22 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. In other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain embodiments, the memory module 10 is operatively coupled to (e.g., in electrical communication with) the host computer system 16. In certain other embodiments, the memory module 10 may communicate with the host computer system 16 using some other type of communication,

US 9,858,218 B1

5

such as, for example, optical communication. Examples of host computer systems **16** include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The PCB **22** can comprise an interface (not shown) that is configured to be in electrical communication with the host computer system **16**. For example, the interface can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system **16**. The interface of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory module **10** and the host system **16**. For example, the interface can comprise a standard 240-pin DDR2 edge connector. The at least one output **12** may be routed over the interface, for example.

The memory module **10** may also comprise one or more memory elements (not shown), such as dynamic random-access memory (DRAM) elements, for example. Types of DRAM elements compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, DDR4, and synchronous DRAM (SDRAM). In addition, memory elements having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory elements compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (µBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). In certain embodiments, the memory module **10** may also include one or more non-volatile memory elements, such as one or more flash memory elements. Types of flash memory elements compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC).

The controller circuit **18** of certain embodiments generally controls the operation of the memory module **10**. For example, the controller circuit **18** may control the memory elements of the memory module **10** and/or communicate with the system memory controller **14**. For example, the controller circuit **18** may receive and process address and command signals (e.g., read, write commands) from the system memory controller **14** and transmit appropriate address and commands to the memory elements in response. See, e.g., U.S. Pat. Appl. Publ. Nos. 2006/0062047 A1 and 2006/0262586 A1, each of which is incorporated in its entirety by reference herein. In certain embodiments, the controller circuit **18** comprises a local memory controller. Additionally, depending on the architecture of the memory module **10**, such as for an FB-DIMM, the controller circuit **18** may comprise an advanced memory buffer (AMB). The controller circuit **18** can comprise one or more of a field-programmable gate array (FPGA), a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, and a complex programmable logic device (CPLD), for example. In certain embodiments, the controller circuit **18** comprises various discrete electrical elements, while in certain other embodiments, the controller circuit **18** comprises one or more integrated circuits.

As discussed, the memory module **10** is configured to operate in at least two modes comprising an initialization mode during which the memory module **10** executes at least one initialization sequence, and an operational mode. In one embodiment, for example, the at least one initialization sequence may comprise one or more training sequences. The initialization sequence (e.g., comprising one or more train-

6

ing sequences) may be initiated by the system memory controller **14**. In some embodiments, the controller circuit **18** is configured to cause the memory module **10** to enter the initialization mode. For example, the controller circuit **18** may be configured to execute a routine implementing the at least one initialization sequence when the appropriate signal or command is received from the memory controller **14** or is otherwise received from the host computer system **16** (e.g., upon receipt of a reset signal).

In certain embodiments, for example, the computer system **16** is coupled to a plurality of memory modules **10**, **26** including the memory module **10** and at least a second memory module **26**, and the memory controller **14** (e.g., MCH) trains each module **10**, **26** separately, in series. In one example scenario, the memory controller **14** issues a first command to the memory module **10**, and, in response, the memory module **10** executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the first memory module **10** advantageously issues a notification to the memory controller **14** in accordance with embodiments described herein. In response, the memory controller **14** issues a second command, this time to the memory module **26**, and, in response, the memory module **26** executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the second memory module **26**, similar to the first memory module **10**, advantageously issues a notification to the memory controller **14** in accordance with embodiments described herein. In response, where there are more than two memory modules **10**, **26**, the memory controller **14** issues a third command to a third memory module (not shown), and so forth. One example computer system **16** capable of implementing such a scenario is configured to execute an Intel Basic Input/Output System (BIOS), and comprises a plurality of memory modules **10**, **26** having an LRDIMM configuration. In such an example system, the Intel BIOS causes the system memory controller **14** to initialize the LRDIMM memory modules **10**, **26** serially.

The operational mode is the normal mode of the memory module **10**. For example, during the operational mode, the memory module **10** is generally accessed by the system memory controller **14** of the host computer **16** during standard computer operation not associated with initialization. For example, the system memory controller **14** may cause the memory module **10** to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode, although it will be appreciated that one or more of these operations can also be performed by the memory module **10** while in initialization mode in certain embodiments.

The notification circuit **20** can be configured to drive the at least one output **12**, while the memory module **10** is in the initialization mode or after the memory module **10** completes one or more initialization sequences, to provide the at least one notification signal to the memory controller **14** indicating at least one status of the at least one initialization sequence. While shown in FIGS. **1-3** as forming a part of the controller circuit **18**, the notification circuit **20** may be a physically and/or logically separate circuit in certain embodiments. While a variety of configurations are possible, the notification circuit **20** may comprise one or more transistors, one or more logic elements (e.g., AND, OR, NOR, NAND, XOR gates, and the like), or a combination thereof. In some embodiments, the notification circuit **20** may additionally or alternatively comprise one or more of an FPGA,

US 9,858,218 B1

7

PLD, CPLD, ASIC, custom-designed semiconductor device, discrete electrical elements, and an integrated circuit.

The at least one status of certain embodiments comprises completion of the at least one initialization sequence, such that the at least one notification signal is indicative of the completion of the at least one initialization sequence. The at least one status of certain embodiments comprises execution of the at least one initialization sequence. For example, the at least one status may indicate that the at least one initialization sequence is currently being executed. In some embodiments, the at least one status may provide an indication that a certain task has been completed by the memory module **10**, such as a training task requested by the system memory controller **14**. In certain embodiments, the notification circuit **20** can be configured to drive the at least one output **12** to a first state indicative of execution of the at least one initialization sequence or to a second state indicative of completion of the at least one initialization sequence. As one example, the first state may be a high or low logic level, and the second state may be a high impedance state. In another case, the first state is a high or low logic level, and the second state is the inverse logic level of the first state.

The at least one output **12** of certain embodiments is configured to be operatively coupled to at least one interrupt of the system memory controller **14**, and the system memory controller **14** is responsive to the at least one notification signal indicating completion of the at least one initialization sequence. For example, the system memory controller **14** may trigger execution of an interrupt routine upon receipt of the notification signal on the output **12**. The interrupt routine generally executes the appropriate operations for the at least one status indicated by the at least one notification signal. For example, if the at least one status indicates that the at least one initialization sequence is complete, execution of the interrupt routine may cause the system memory controller **14** to notify the host computer system **16** that the system initialization, or a portion thereof, is completed. In one embodiment, for example, the execution of the interrupt routine causes the system memory controller **14** to initiate a subsequent training sequence for the memory module **10** or on another memory module connected to the host system **16**. For example, in one embodiment, a central processing unit (CPU) of the host system **16** (not shown) enters a "Wait" state after issuing a command to the memory module **10** to enter the initialization mode. Receipt of the at least one notification signal on the output **12** triggers execution of the interrupt routine, which interrupts the CPU, causing the "Wait" state to be aborted and allowing the host system **16** to continue operation. In this manner, generation of the interrupt on the at least one output **12** can allow completion of the at least one initialization sequence to receive generally immediate attention from the CPU and/or memory controller **14** of the host system **16**. As will be appreciated, the CPU and memory controller **14** of the host system **16** may comprise separate modules, or may alternatively comprise a single integrated module, depending on the architecture of the host system **16** chip-set.

In certain embodiments, execution of the interrupt routine causes the system memory controller **14** to cause the memory module **10** to exit the initialization mode and to enter the operational mode. In another embodiment, the memory module **10** automatically enters the operational mode upon completion of the at least one initialization sequence without intervention from the memory controller **14**.

In some embodiments, the at least one output **12** is operated in conformance with a standard (e.g., an industry

8

standard) when the memory module **10** is in the operational mode, but is not operated in conformance with the standard when the memory module **10** is in the initialization mode. An example of a standard in accordance with certain embodiments described herein is one or more of the industry standard promulgated by the Joint Electronic Devices Engineering Counsel (JEDEC). For example, the operation and behavior of the at least one output **12** may conform to an industry standard when the memory module **10** is in the operational mode, but the operation and behavior of the at least one output **12** may not conform to the industry standard when the memory module **10** is in the initialization mode. Because the at least one output **12** does not conform to the standard during initialization mode, an existing (e.g., JEDEC-specified) pin may be utilized to provide the at least one notification signal to the system memory controller **14** from the memory module **10** during the initialization mode. In one embodiment, for example, the at least one output **12** comprises an error-out pin of the memory module **10**. In conventional systems, the operation of the error-out pin is undefined by the standard during initialization. However, in certain embodiments described herein, during the operational mode, the error-out pin may be used according to a conventional industry standard (e.g., a JEDEC standard) to indicate a parity error has occurred in the memory module **10**. During the initialization mode, the error-out pin can be used to transmit the at least one notification signal to the system memory controller **14**.

It is advantageous to use the error-out pin for initialization status notification according to certain embodiments because the error-out pin can be asserted by the memory module **10** independent from system memory controller **14** requests or commands. Also, because the error-out pin is a JEDEC-specified pin, design cost and complexity are reduced because additional pin-outs and interrupt design changes can be avoided (e.g., in cases where such changes in hardware or chipset may not be feasible to provide the at least one status to the system memory controller **14**). However, in certain other embodiments, providing the at least one status may be implemented by adding one or more pins to the system memory controller **14** (e.g., MCH) and to the controller circuit **18** (e.g., local memory controller), thereby utilizing changes in hardware or the chipset.

Moreover, the error-out pin may be coupled to an interrupt of the system memory controller **14** (e.g., according to the JEDEC standard). Thus, where the error-out pin is used, from the system point of view in accordance with certain embodiments, the notification of completion of the required or requested task from the memory module **10** (e.g., by the local memory controller) generates an interrupt communicated to the system during the initialization period and indicative of completion of the required or requested task. Assertion of the same pin during normal (non-initialization) operation upon an error occurring, on the other hand, generates an interrupt communicated to the system during the normal operation indicative of the occurrence of the error condition. Thus, in certain embodiments, the error-out pin and corresponding signal memory module **10** can be used to support the notifying function and to provide the at least one status generally without changing hardware. Certain other such embodiments involve modifying the basic input/output system (BIOS) or other programming change. For example, the BIOS may be modified to indicate to the system memory controller **14** how to respond to the notification signal (e.g., to the error_out signal or the interrupt corresponding thereto).

US 9,858,218 B1

9

In certain other embodiments, the at least one output 12 may include other existing (e.g., JEDEC specified) pins instead of, or in addition to, the error-out pin. In yet other configurations, at least one additional (e.g., non-JEDEC specified) pin may be employed. In general, any pin not otherwise active during the initialization mode may be used (e.g., high-order address pins, read/write pins, data pins, etc.).

The at least one output 12 can further be configured to be operatively coupled to at least one second output 24 of a second memory module 26 in some embodiments, as schematically illustrated in FIGS. 1-3. The second memory module 26 may be generally similar in structure and function to the memory module 10, and may comprise a controller circuit 28 and a notification circuit 30, for example. The second memory module 26 may be generally identical to the first memory module 10, or may have a different memory capacity, form factor, etc., than the first memory module 10. More than two such memory modules may be present in certain embodiments. As described above, the second memory module 26 can be configured to operate in at least two modes comprising an initialization mode during which the second memory module 26 executes at least one initialization sequence, and an operational mode. For example, the initialization and operational modes may be similar to those describe above in relation to the first memory module 10.

The second memory module 26 can also be configured to drive the at least one second output 24 to a third state indicative of execution of at least one initialization sequence of the second memory module 26 or to a fourth state indicative of completion of the at least one initialization sequence of the second memory module 26. Additionally, in some embodiments, the at least one first output 12 of the first memory module 10 and the at least one second output 24 of the second memory module 26 are operatively coupled together by a bus 32 which is also operatively coupled to at least one input 34 of the system memory controller 14. In other embodiments (not shown), the at least one first output 12 and the at least one second output 24 are not coupled together, and are coupled to two separate inputs of the system memory controller 14.

FIG. 2 shows an example host computer system 16 including example first and second memory modules 10, 26. As shown, the notification circuits 20, 30 of the first and second memory modules 10, 26 each comprise at least one transistor 36, 38. The at least one transistor 36, 38 can be in an open-drain configuration, as shown, although other configurations are possible. In certain such embodiments, the first state of the at least one first output 12 is a first logic level, the second state of the at least one first output 12 is a high-impedance state, the third state of the at least one second output 24 is the first logic level, and the fourth state of the at least one second output 24 is the high-impedance state. In the illustrated example, while the at least one initialization sequence is in progress, the first and second memory modules 10, 26 drive the gates of the respective transistors 36, 38 high. Thus, the transistors 36, 38 are respectively low impedance while the memory modules 10, 26 are executing each section of the initialization sequence, thereby pulling the first and second outputs 12, 24 low. Thus, the first state and the third state are low logic levels (ground) in the example configuration. Also, because the first and second outputs 12, 24 are coupled together by the bus 32, if the at least one initialization sequence of either one of the first and second memory modules 10, 26 are in progress, the bus 32 will be pulled to a low logic level.

10

As each of the two memory modules 10, 26 completes its at least one initialization sequence, it can drive the corresponding at least one first and second outputs 12, 24 respectively to a high impedance state, For example, once the at least one initialization sequence on each of the first and second memory modules 10, 26 is completed, the first and second memory modules 10, 26 can drive the gates of the respective transistors 36, 38 low, resulting in a high-impedance state on the at least one first and second outputs 12, 24 causing the bus 32 to be pulled high by the system memory controller 14. Accordingly, only once the at least one initialization sequence of both the first and second memory modules 10, 26 are complete, the bus 32 will be pulled high by the internal pull-up configuration 40 of the system memory controller 14. The second state and the fourth state are therefore high-impedance values in the example embodiment. Thus, the system memory controller 14 can monitor the value on the bus 32 via the first input 34 to determine when both of the memory modules 10, 26 have completed the at least one initialization sequence. As discussed, in other configurations the at least one first and second outputs 12, 24 may be received on separate inputs of the system memory controller 14, and the status of the at least one initialization sequence of each memory module 10, 26 may be monitored independently.

As discussed above, in certain embodiments in which more than one memory module 10, 26 is connected to the system memory controller 14, each memory module 10, 26 or associated controller circuit 18 (e.g., local memory controller) causes the corresponding notification circuit 20, 30 to drive the at least one output 12, 24 to the high impedance state from the low impedance state when it completes the requested or required operation. Thus, in certain such embodiments, the system memory controller 14 (e.g., MCH) can only pull the notifying signal high when all memory modules 10, 26 or associated controller circuits (e.g., local memory controllers) have completed the required or requested operation (e.g., initialization sequence). This configuration allows the system memory controller 14 (e.g., MCH) to work with a non-homogenous memory subsystem. For example, the system memory controller 14 may be able to monitor the progress of multiple memory modules 10, 26 including a mix of DIMMs or other memory modules having differing characteristics, such as DIMM density, rank configurations, DRAM density, speed, DRAM configuration, etc.

Additionally, the at least one output 12 of the first memory module 10 and the at least one second output 24 of the second memory module 26 are configured to be operatively coupled to at least one interrupt of the system memory controller 14 in certain embodiments. In certain such embodiments, the system memory controller 14 can be responsive to the second state of the first memory module 10 and the fourth state of the second memory module 26 by triggering execution of an interrupt routine by a processor of the system memory controller 14. For example, in the example system of FIG. 2, when the bus 32 is pulled high by the pull-up configuration 40 indicating the second state of the first memory module 10 and the fourth state of the second memory module 26, the system memory controller 14 triggers execution of the interrupt routine.

In some embodiments, in which the at least one first output 12 and the at least one second output 24 are operatively coupled to separate inputs of the system memory controller 14, the at least one first output 12 and the at least out second output 24 may be operatively coupled to two separate interrupts. For example, the system memory con-

US 9,858,218 B1

11

troller **14** may be responsive to the second state of the first memory module **10** by triggering execution of a first interrupt routine associated with a first interrupt, and may be responsive to the fourth state of the second memory module **26** by triggering execution of a second interrupt routine associated with the second interrupt. In yet other embodiments, the separate inputs of the memory controller **14** are internally operatively coupled to the same interrupt, or are operatively coupled to separate interrupts which trigger the same interrupt routine.

FIG. **3** shows a host computer system **16** including an example memory module **10** where the notification circuit **20** of the memory module **10** has another example configuration in accordance with certain embodiments described herein. In the example configuration of FIG. **3**, the at least one first output **12** is operatively coupled to an error-out pin of the memory module **10**, and a multiplexor **42** drives the transistor **36** with either of a task_in_progress signal **44** or an error signal **46** (e.g., parity error signal). In one embodiment, for example, the multiplexor **42** may be configured to drive the transistor **36** with the task_in_progress signal **44** when the memory module **10** is in the initialization mode or is executing the at least one initialization sequence, and with the error signal **46** when the memory module **10** is in the operational mode. Thus, the memory module **10** can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode, as described herein. As shown in FIG. **3**, a second memory module **26** including a similar configuration can also be operatively coupled to the host computer system **16**. In certain embodiments, the at least one second output **24** of the second memory module **26** can be operatively coupled to the at least one first output **12** by the bus **32**, as described above (e.g., with respect to FIG. **2**).

FIG. **4** shows an example method **100** of using the at least one memory module **10** in accordance with certain embodiments described herein. While the description below of the method **100** refers to structure shown in FIGS. **1**–**3**, other structures may also be used in accordance with certain embodiments described herein. At block **102**, the method **100** of certain embodiments comprises providing a first memory module **10** comprising at least one first output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The first memory module **10** can be configured to operate in at least two modes comprising an initialization mode during which the first memory module **10** executes at least one initialization sequence, and an operational mode. For example, the at least one initialization sequence may comprise one or more steps of a series of steps associated with an initialization procedure of the host computer system **16**.

At block **104**, the method **100** in some embodiments comprises causing the first memory module **10** to enter the initialization mode. At block **106**, the method **100** of certain embodiments comprises driving the at least one first output **12** to a first state while the memory module **10** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method of certain embodiments comprises driving the at least one first output **12** to a second state different than the first state. In certain embodiments, the first state is a first logic level and the second state is a high impedance state. Additionally, in certain embodiments, the at least one first output **12** is operatively coupled to at least one interrupt of the memory

12

controller **14** such that driving the at least one output **12** to the second state triggers the memory controller to execute an interrupt routine.

In certain embodiments, the at least one output **12** is operated in conformance with JEDEC standard when the first memory module **10** is in the operational mode, but is not operated in conformance with the JEDEC standard when the first memory module **10** is in the initialization mode. The at least one first output **12** of certain embodiments include an error-out pin of the first memory module, for example.

The method **100** can further include providing a second memory module **26** comprising at least one second output **24** operatively coupled to the memory controller **14**. The second memory module **26** can be configured to operate in one of at least two modes comprising an initialization mode, during which the second memory module **26** executes at least one initialization sequence, and an operational mode. The method **100** can further include causing the second memory module **26** to enter the initialization mode. In certain embodiments, the method **100** also includes driving the at least one second output **24** of the second memory module **26** to a third state while the second memory module **26** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method **100** can further include driving the at least one second output **24** of the second memory module **26** to a fourth state different from the third state.

In certain embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the memory controller **14**. In certain other embodiments, the at least one first output **12** of the first memory module **10** is operatively coupled to a first input **34** of the memory controller **14** and the at least one second output **24** of the second memory module **26** is operatively coupled to a second input (not shown) of the memory controller **14**.

FIG. **5** shows another example method **200** of using at least one memory module **10** in accordance with certain embodiments described herein. At block **202**, the method **200** may include providing a memory module **10** comprising at least one output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The memory module **10** may be configured to operate in at least two modes comprising an initialization mode, during which the memory module **10** executes at least one initialization sequence, and an operational mode.

The method **200** can further include causing the memory module **10** to enter the initialization mode at block **204**. At block **206**, the method **200** can include receiving a notification signal from the at least one output **12** of the memory module **10**. The notification signal may indicate that the memory module **10** has completed the initialization sequence, for example. In certain embodiments, the method **200** further comprises executing an interrupt routine by the memory controller **14** in response to the notification signal.

Terminology/Alternative Embodiments

Embodiments have been described in connection with the accompanying drawings. However, it should be understood that the figures are not drawn to scale. Distances, angles, etc. are merely illustrative and do not necessarily bear an exact relationship to actual dimensions and layout of the devices illustrated. In addition, the foregoing embodiments have been described at a level of detail to allow one of ordinary

US 9,858,218 B1

**13**

skill in the art to make and use the devices, systems, etc. described herein. A wide variety of variation is possible. Components, elements, and/or steps can be altered, added, removed, or rearranged. While certain embodiments have been explicitly described, other embodiments will become apparent to those of ordinary skill in the art based on this disclosure.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

Depending on the embodiment, certain acts, events, or functions of any of the methods described herein can be performed in a different sequence, can be added, merged, or left out all together (e.g., not all described acts or events are necessary for the practice of the method). Moreover, in certain embodiments, acts or events can be performed concurrently, e.g., through multi-threaded processing, interrupt processing, or multiple processors or processor cores, rather than sequentially.

The various illustrative logical blocks, modules, circuits, and algorithm steps described in connection with the embodiments disclosed herein can be implemented as electronic hardware, computer software, or combinations of both. To clearly illustrate this interchangeability of hardware and software, various illustrative components, blocks, modules, circuits, and steps have been described above generally in terms of their functionality. Whether such functionality is implemented as hardware or software depends upon the particular application and design constraints imposed on the overall system. The described functionality can be implemented in varying ways for each particular application, but such implementation decisions should not be interpreted as causing a departure from the scope of the disclosure.

The various illustrative logical blocks, modules, and circuits described in connection with the embodiments disclosed herein can be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic device, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general purpose processor can be a microprocessor, but in the alternative, the processor can be any conventional processor, controller, microcontroller, or state machine. A processor can also be implemented as a combination of computing devices, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

The blocks of the methods and algorithms described in connection with the embodiments disclosed herein can be embodied directly in hardware, in a software module executed by a processor, or in a combination of the two. A software module can reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, a hard disk, a removable disk, a CD-ROM, or any other form of computer-readable storage medium known in

**14**

the art. An exemplary storage medium is coupled to a processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium can be integral to the processor. The processor and the storage medium can reside in an ASIC. The ASIC can reside in a user terminal. In the alternative, the processor and the storage medium can reside as discrete components in a user terminal.

Certain embodiments described herein are compatible with a memory system including memory devices with various attributes (see, e.g., FIGS. 2 and 3). For example, the memory system of certain embodiments may include various data slice sizes (e.g., two, four, eight, or 16 bit data slices) and corresponding memories (e.g., memories having two, four, eight, or 16 bit data widths).

Although certain embodiments and examples are discussed above, it is understood that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. It is intended that the scope of the inventions disclosed herein should not be limited by the particular disclosed embodiments. Thus, for example, in any method or process disclosed herein, the acts or operations making up the method/process may be performed in any suitable sequence and are not necessarily limited to any particular disclosed sequence.

Various aspects and advantages of the embodiments have been described where appropriate. It is to be understood that not necessarily all such aspects or advantages may be achieved in accordance with any particular embodiment. Thus, for example, it should be recognized that the various embodiments may be carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other aspects or advantages as may be taught or suggested herein.

What is claimed is:

1. A memory module operable with a memory controller of a host system, comprising:

a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections;

dynamic random access memory elements on the printed circuit board;

a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection; and

wherein the memory module is operable in at least a first mode and a second mode, wherein the memory module in the first mode is configured to be trained with one or more training sequences; wherein the memory module in the second mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals via the first edge connections in response to address and command signals received via the second edge connections;

wherein the module controller is configured to receive via the second edge connections the address and command signals associated with the one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the

US 9,858,218 B1

**15**

address and command signals, and wherein the module controller is further configured to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the second mode;

wherein the module controller is further configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output while the memory module is in the first mode.

**2**. The memory module of claim **1**, wherein the module controller comprises an integrated circuit.

**3**. The memory module of claim **1**, wherein the module controller includes a notification circuit comprising one or more transistors each having an open drain coupled to the open drain output.

**4**. The memory module of claim **3**, wherein the notification circuit is configured to drive the notification signal by driving a gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground.

**5**. The memory module of claim **4**, wherein the notification circuit is configured to drive the parity error signal by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground.

**6**. The memory module of claim **4**, wherein the notification circuit is configured to drive the notification signal using one or more OR logic elements.

**7**. The memory module of claim **1**, wherein the first edge connections are not active when the memory module is in the first mode and configured to be trained with the one or more training sequences.

**8**. The memory module of claim **1**, wherein the module controller is configured to drive the notification signal to indicate a status of the one or more training sequences.

**9**. A method performed by a memory module operating with a memory controller of the host system, the memory module including dynamic random access memory elements on a printed circuit board, the printed circuit board having edge connections that fit into a corresponding slot of a host system, the edge connections including first edge connections via which the dynamic random access memory devices communicate data with the memory controller, second edge connections via which the memory module receives address and command signals from the memory controller, and an error edge connection in addition to the first edge connections and the second edge connections, the method comprising:

receiving from the memory controller address and command signals associated with one or more memory read or write operations;

controlling the dynamic random access memory elements in accordance with the address and command signals;

outputting to the memory controller via an open-drain output coupled to the error edge connection a signal indicating a parity error having occurred in the memory module; and

training with one or more training sequences while the first edge connections are not active, and driving a notification signal associated with the one or more training sequences to the memory controller via the open drain output and the error edge connection.

**10**. The method of claim **9**, wherein driving the notification signal comprises driving a gate of each of one or more transistors to a logic high level to provide a low impedance

**16**

path from the open drain output to ground, the one or more transistors each having an open drain coupled to the open drain output.

**11**. The method of claim **10**, wherein driving the signal indicating the parity error comprises driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path from the open drain output to ground.

**12**. The method of claim **10**, wherein driving the notification signal comprises using one or more OR logic elements.

**13**. The method of claim **9**, wherein the memory module is configured to be trained with the one or more training sequences in response to a request by the memory controller.

**14**. The method of claim **9**, wherein the notification signal indicates a status of the one or more training sequences.

**15**. A memory module operable with a memory controller of a host system, comprising:

a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and command signals, and an error edge connection in addition to the first edge connections and the second edge connections;

dynamic random access memory elements on the printed circuit board and configurable to communicate data signals with the memory controller via the first edge connections; and

a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection;

wherein the memory module is configurable to perform at least a first operation and a second operation;

wherein the module controller in the first operation is configured to receive via the second edge connections address and command signals associated with one or more memory read or write operations and to control the dynamic random access memory elements in accordance with the address and command signals, wherein the module controller in the first operation is further configured to output to the memory controller a signal indicating a parity error having occurred in the memory module; and

wherein the memory module in the second operation is configured to be trained with one or more training sequences while the first edge connections are not active, and wherein the module controller in the second operation is configured to drive a notification signal associated with the one or more training sequences to the error edge connection via the open drain output of the module controller.

**16**. The memory module of claim **15**, wherein the module controller comprises an integrated circuit.

**17**. The memory module of claim **15**, wherein the module controller includes a notification circuit comprising one or more transistors each having an open drain coupled to the open drain output.

**18**. The memory module of claim **17**, wherein the notification circuit is configured to generate the notification signal by driving a gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground.

**19**. The memory module of claim **18**, wherein the notification circuit is configured to drive the signal indicating the

US 9,858,218 B1

17

18

parity error by driving the gate of each of the one or more transistors to a logic high level to provide a low impedance path between the open drain output to ground.

**20**. The memory module of claim **18**, wherein the notification circuit is configured to drive the notification signal using one or more OR logic elements.

**21**. The memory module of claim **15**, wherein the memory module is configured to perform the second operation in response to a command from the memory controller.

**22**. The memory module of claim **15**, wherein the module controller is configured to drive the notification signal to indicate a status of the one or more training sequences.

\*  \*  \*  \*  \*

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 4

US010474595B2

(12) **United States Patent**     (10) **Patent No.:**     **US 10,474,595 B2**

Lee     (45) **Date of Patent:**     ***Nov. 12, 2019**

(54) **MEMORY MODULE HAVING AN OPEN-DRAIN OUTPUT PIN FOR PARITY ERROR IN A FIRST MODE AND FOR TRAINING SEQUENCES IN A SECOND MODE**

(71) Applicant: **Netlist, Inc.**, Irvine, CA (US)

(72) Inventor: **Hyun Lee**, Ladera Ranch, CA (US)

(73) Assignee: **NETLIST, INC.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/857,553**

(22) Filed: **Dec. 28, 2017**

(65) **Prior Publication Data**

US 2018/0293193 A1     Oct. 11, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/088,115, filed on Apr. 1, 2016, now Pat. No. 9,858,218, which is a
(Continued)

(51) **Int. Cl.**
*G06F 13/16*     (2006.01)
*G11C 5/04*     (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *G06F 13/1694* (2013.01); *G06F 3/0619* (2013.01); *G06F 3/0632* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ... G11C 5/00; G11C 16/26; G11C 2029/4402; G11C 29/78; G11C 7/1066; G11C 29/52;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,414,781 A     12/1968 Dill
3,560,935 A     2/1971 Beers
(Continued)

OTHER PUBLICATIONS

Inter partes review Case No. IPR2017-00548, Petition for Inter Partes Review of U.S. Pat. No. 8,489,837, filed Dec. 30, 2016.
(Continued)

*Primary Examiner* — Mardochee Chery
(74) *Attorney, Agent, or Firm* — Morgan, Lewis & Bockius LLP

(57)     **ABSTRACT**

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The memory module is operable in at least a second mode and a first mode. The memory module in the second mode is configured to perform training related to one or more training sequences initiated by the memory controller while the memory module is not accessed by the memory controller for memory read or write operations. The memory module in the first mode is configured to perform one or more memory read or write operations not associated with the one or more training sequences by communicating data signals with the memory module. The memory module has an open-drain output pin via which the memory module output a signal indicating a parity error having occurred while the memory module is performing a normal memory read or write operation, and via which the memory module output a signal related to the one or more training sequences.

**24 Claims, 3 Drawing Sheets**



US 10,474,595 B2

Page 2

**Related U.S. Application Data**

continuation of application No. 13/942,721, filed on Jul. 16, 2013, now Pat. No. 9,311,116, which is a continuation of application No. 12/815,339, filed on Jun. 14, 2010, now Pat. No. 8,489,837.

(60) Provisional application No. 61/186,799, filed on Jun. 12, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| *G11C 7/10* | (2006.01) |
| *G06F 9/445* | (2018.01) |
| *G06F 13/24* | (2006.01) |
| *G06F 3/06* | (2006.01) |
| *G06F 11/10* | (2006.01) |
| *G11C 29/52* | (2006.01) |
| *G06F 12/06* | (2006.01) |
| *G11C 5/00* | (2006.01) |
| *G11C 16/26* | (2006.01) |
| *G11C 29/00* | (2006.01) |
| *G11C 29/44* | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *G06F 3/0659* (2013.01); *G06F 3/0673* (2013.01); *G06F 9/445* (2013.01); *G06F 11/1068* (2013.01); *G06F 12/0646* (2013.01); *G06F 13/1668* (2013.01); *G06F 13/24* (2013.01); *G11C 5/04* (2013.01); *G11C 7/1063* (2013.01); *G11C 29/52* (2013.01); *G11C 5/00* (2013.01); *G11C 7/1066* (2013.01); *G11C 16/26* (2013.01); *G11C 29/78* (2013.01); *G11C 2029/4402* (2013.01); *G11C 2207/2254* (2013.01)

(58) **Field of Classification Search**

CPC . G11C 7/1063; G11C 5/04; G11C 2207/2254; G06F 13/1694; G06F 12/0646; G06F 3/0619; G06F 11/1068; G06F 3/0673; G06F 3/0659; G06F 3/0632; G06F 13/24; G06F 9/445; G06F 13/1668

USPC ........................................................ 711/154

See application file for complete search history.

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,672,570 | A | 6/1987 | Benken |
| 5,388,074 | A | 2/1995 | Buckenmaier |
| 5,438,536 | A | 8/1995 | Salzman |
| 5,450,576 | A | 9/1995 | Kennedy |
| 5,511,152 | A | 4/1996 | Lai et al. |
| 5,606,662 | A | 2/1997 | Wisor |
| 5,684,979 | A | 11/1997 | Grimes |
| 5,835,733 | A | 11/1998 | Walsh et al. |
| 6,693,840 | B2 | 2/2004 | Shimada et al. |
| 6,754,787 | B2 | 6/2004 | Miller et al. |
| 6,763,437 | B1 | 7/2004 | Nguyen et al. |
| 6,886,109 | B2 | 4/2005 | Olarig et al. |
| 7,024,518 | B2 | 4/2006 | Halbert et al. |
| 7,065,688 | B1 | 6/2006 | Moyes et al. |
| 7,093,115 | B2 | 8/2006 | Poisner et al. |
| 7,155,579 | B1 | 12/2006 | Neils et al. |
| 7,221,699 | B1 | 5/2007 | Lindskog |
| 7,266,633 | B2 | 9/2007 | James |
| 7,489,163 | B2 | 2/2009 | Goodnow et al. |
| 7,525,860 | B2 | 4/2009 | Hokenmaier |
| 7,539,909 | B2 | 5/2009 | LeClerg et al. |
| 7,568,130 | B2 | 7/2009 | Smith et al. |
| 7,586,350 | B2 | 9/2009 | Chung et al. |
| 7,647,467 | B1 | 1/2010 | Hutsell et al. |
| 7,757,101 | B2 | 1/2010 | Nonaka et al. |

| | | | |
|---|---|---|---|
| 8,074,034 | B2 | 12/2011 | Sartore |
| 8,139,430 | B2 | 3/2012 | Buchmann et al. |
| 8,359,521 | B2 | 1/2013 | Kim et al. |
| 8,429,493 | B2 | 4/2013 | Sokolov et al. |
| 2003/0115427 | A1 | 6/2003 | Roohparvar |
| 2005/0071580 | A1 | 3/2005 | LeClerg et al. |
| 2005/0193161 | A1 | 9/2005 | Lee et al. |
| 2006/0062047 | A1 | 3/2006 | Bhakta et al. |
| 2006/0262586 | A1 | 11/2006 | Solomon et al. |
| 2007/0091702 | A1 | 4/2007 | Nikitin et al. |
| 2007/0136523 | A1 | 6/2007 | Bonella et al. |
| 2007/0214347 | A1 | 9/2007 | Rothman et al. |
| 2008/0098277 | A1 | 4/2008 | Hazelzet |
| 2008/0147897 | A1 | 6/2008 | Talbot |
| 2008/0155378 | A1 | 6/2008 | Amidi |
| 2008/0256281 | A1 | 10/2008 | Fahr et al. |
| 2009/0119464 | A1 | 5/2009 | Grundy et al. |
| 2010/0005218 | A1 | 1/2010 | Gower et al. |
| 2010/0042778 | A1 | 2/2010 | Tanguay et al. |
| 2010/0142383 | A1 | 6/2010 | Goishi et al. |
| 2010/0202240 | A1 | 8/2010 | Moshayedi et al. |
| 2011/0022789 | A1 | 1/2011 | Fujimoto |

OTHER PUBLICATIONS

Inter partes review Case No. IPR2017-00548, Power of Attorney of Petitioners, filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1002 "File History", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1003 "Declaration of Donald Alpert", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1004 "Camelback Computer Architecture", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1006 "U.S. Appl. No. 61/186,799", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1010 "5400 MCH Datasheet", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Exhibit 1011 "Microsoft Computer Dictionary (5th Ed. 2002)", filed Dec. 30, 2016.

Inter partes review Case No. IPR2017-00548, Notice of Filing Date Accorded to Petition, Mailing date Jan. 9, 2017.

Inter partes review Case No. IPR2017-00548, Patent Owner's Mandatory Notices, filed Jan. 20, 2017.

Inter partes review Case No. IPR2017-00548, Patent Owner's Power of Attorney, filed Jan. 20, 2017.

Inter partes review Case No. IPR2017-00548, Patent Owner's Preliminary Response filed Apr. 9, 2017.

Inter partes review Case No. IPR2017-00548, Trial Instituted document dated May 15, 2017.

Inter partes review Case No. IPR2017-00548, Decision, entered May 15, 2017.

Inter partes review Case No. IPR2017-00548, Scheduling Order, entered May 15, 2017.

Inter partes review Case No. IPR2017-00548, Notice of Deposition of Dr. Donald Alpert, filed Jul. 31, 2017.

Inter partes review Case No. IPR2017-00548, Joint Notice of Stipulation to Adjust Schedule, filed Aug. 7, 2017.

Inter partes review Case No. IPR2017-00548, Patent Owner's Response, filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2001—Declaration of Robert J. Murphy, filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2002—Deposition of Donald Alpert, Ph.D. filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2003—Defendants' Opening Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2004—Plaintiff Netlist, NC.'s Opening Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2005—Plaintiff Netlist, NC.'s Amended Opening Claim Construction Brief filed Sep. 6, 2017.

**US 10,474,595 B2**

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2006—Defendants' Reply Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2007—Plaintiff Netlist, NC.'s Responsive Claim Construction Brief filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2008—United States International Trade Commission Open Sessions filed Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2009—Computer Desktop Encyclopedia Sep. 6, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Petitioner's Objections to Evidence, filed Sep. 13, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Notice of Deposition of Robert J. Murphy, filed Sep. 25, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Deposition of Robert J. Murphy, filed Dec. 11, 2017.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Petitioner's Reply to Patent Owner's Response, filed Dec. 13, 2017.

Inter partes review Case No. IPR2017-00548, Patent Owner's Updated Mandatory Notices, filed Jan. 3, 2018.

Inter partes review Case No. IPR2017-00548, Patent Owner's Request for Oral Argument, filed Jan. 9, 2018.

Inter partes review Case No. IPR2017-00548, Petitioner's Request for Oral Argument, filed Jan. 9, 2018.

Inter partes review Case No. IPR2017-00548, Petitioner's Motion to Exclude, filed Jan. 9, 2018.

Inter partes review Case No. IPR2017-00548, Patent Owner's Opposition to Petitioner's Motion to Exclude, filed Jan. 23, 2018.

Inter partes review Case No. IPR2017-00548, Order, Trial Hearing, entered Jan. 25, 2018.

Inter partes review Case No. IPR2017-00548, Petitioner's Reply in Support of Its Motion to Exclude, filed Jan. 30, 2018.

Inter partes review Case No. IPR2017-00548, Petitioner's Updated Exhibit List, filed Feb. 9, 2018.

Inter partes review Case No. IPR2017-00548, Patent Owner's Updated Exhibit List, filed Feb. 9, 2018.

Inter partes review Case No. IPR2017-00548, Petitioner's Demonstratives, filed Feb. 9, 2018.

Inter Partes Review of U.S. Pat. No. 8,489,837, Case No. IPR2017-00548, Exhibit 2012—Demonstratives of Patent Owner Netlist, Inc., filed Feb. 9, 2018.

Inter partes review Case No. IPR2017-00548, Record of Oral Hearing, held Feb. 14, 2018.

Inter partes review Case No. IPR2017-00548, Final Written Decision, entered May 3, 2018.

Lee, Office Action, U.S. Appl. No. 15/088,115, dated May 20, 2016, 10 pgs.

Lee, Office Action, U.S. Appl. No. 15/088,115, dated Jun. 16, 2017, 9 pgs.

Lee, Notice of Allowance, U.S. Appl. No. 15/088,115, dated Oct. 12, 2017, 5 pgs.

Lee, Office Action, U.S. Appl. No. 13/942,721, dated May 22, 2015, 6 pgs.

Lee, Final Office Action, U.S. Appl. No. 13/942,721, dated Nov. 16, 2015, 6 pgs.

Lee, Notice of Allowance, U.S. Appl. No. 13/942,721, dated Feb. 24, 2016, 5 pgs.

Lee, Office Action, U.S. Appl. No. 12/815,339, dated Sep. 14, 2012, 14 pgs.

Lee, Notice of Allowance, U.S. Appl. No. 12/815,339, dated Mar. 20, 2013, 6 pgs.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petition for Inter Partes Review of U.S. Pat. No. 9,535,623, filed Dec. 14, 2017.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, PO Preliminary Response, filed Mar. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner's Objections to Petition Evidence, filed Jun. 8, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners' Objections to Evidence, filed Jun. 8, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner's Response, filed Aug. 10, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioner's Objection to Evidence, filed Aug. 21, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners' Reply to Patent Owner's Response, filed Nov. 9, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner's Objections to Reply Evidence, filed Nov. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners Motion to Exclude, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners' Request for Oral Argument, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner Request for Oral Argument, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner Submission of ITC Claim Construction Order, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner Motion to Exclude, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners Opposition to Patent Owner's Motion to Exclude, filed Dec. 14, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence, filed Dec. 14, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners' Reply in Support of its Motion to Exclude, filed Dec. 21, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner Reply to Petitioner Opposition to Motion to Exclude, filed Dec. 21, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Patent Owner Demonstratives, filed Feb. 4, 2019.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Petitioners' Demonstratives, filed Feb. 4, 2019.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Notice of Accord Filing Date—Defective Petition, filed Dec. 19, 2017.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Notice of Accepting Corrected Petition, filed Dec. 19, 2017.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Trial Instituted Document, filed May 24, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Conduct of the Proceeding 37 C.F.R. § 42.5, filed Nov. 30, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Order—Trial Hearing—37 CFR 42.70, filed Jan. 16, 2019.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Hearing Transcript, filed Feb. 26, 2019.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2001, 'Exhibit 2001,' filed Mar. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2002, 'Exhibit 2002,' filed Mar. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2003, 'Exhibit 2003,' filed Mar. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2004, 'Exhibit 2004,' filed Mar. 19, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2005, 'Exhibit 2005,' filed Aug. 10, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2006, 'Exhibit 2006,' filed Aug. 10, 2018.

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2007, 'Exhibit 2007,' filed Aug. 10, 2018.

**US 10,474,595 B2**

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2008, 'Exhibit 2008,' filed Aug. 10, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2009, 'Exhibit 2009,' filed Aug. 10, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 2010, 'Exhibit 2010,' filed Nov. 30, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1025, '337-TA-1023, Initial Determination (Excerpts),' filed Dec. 14, 2017.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1026, 'Murphy Deposition Transcript in IPR2017-00548 (837 Patent),' filed Dec. 14, 2017.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1028, 'Patent Owner's Dictionary (Exhibit 2009 in IPR2017-00548),' filed Dec. 14, 2017.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1003, 'Declaration of Donald Alpert,' filed Dec. 4, 2017.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1003, 'Corrected Declaration of Donald Alpert,' filed Dec. 19, 2017.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1030, 'Declaration of Brian Nester PHV,' filed Oct. 18, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1032, 'Annotated p. 37 of Ex. 2005,' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1034, 'ITC Expert Report of Robert Mr. Murphy Regarding 623 Patent (Public Version),' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1033, 'Annotated p. 18 of Ex. 2005,' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1035, 'Mr. Murphy 623 IPR Deposition Transcript (Oct. 25, 2018),' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1036, 'Mr. Murphy 623 ITC Deposition Transcript (Oct. 19, 2018),' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Exhibits 1037, 'JEDEC Standard (JESD79-3),' filed Nov. 9, 2018.
Inter Partes Review of U.S. Pat. No. 9,535,623, Case No. IPR2018-00303, Final Written Decision, filed Mar. 21, 2019.

Case 6:20-cv-00194-ADA   Document 26-7   Filed 05/04/20   Page 6 of 18



Figure 1

Figure 2

Figure 3



Figure 4



Figure 5

US 10,474,595 B2

1

# MEMORY MODULE HAVING AN OPEN-DRAIN OUTPUT PIN FOR PARITY ERROR IN A FIRST MODE AND FOR TRAINING SEQUENCES IN A SECOND MODE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/088,115, filed Apr. 1, 2016, to be issued as U.S. Pat. No. 9,858,218, on Jan. 2, 2018, which is a continuation of U.S. application Ser. No. 13/942,721, filed Jul. 16, 2013, now U.S. Pat. No. 9,311,116, which is a continuation of U.S. application Ser. No. 12/815,339, filed Jun. 14, 2010, now U.S. Pat. No. 8,489,837, which claims the benefit of priority from U.S. Provisional App. No. 61/186,799, filed Jun. 12, 2009, each of which is incorporated in its entirety by reference herein.

## FIELD OF THE DISCLOSURE

The present disclosure relates to the operation of memory modules. Specifically, the present disclosure relates to systems and methods for handshaking with a memory module during or upon completion of initialization.

## BACKGROUND OF THE DISCLOSURE

Memory subsystems such as memory modules are generally involved in the initialization procedure for computer systems, including servers, personal computers, and the like. For example, during system-wide initialization, the memory subsystems may undergo internal initialization procedures, or the system memory controller may otherwise interact with the memory subsystems during the initialization procedure. As part of this interaction, the system memory controller may request that the memory subsystem perform one or more requested tasks during system initialization.

## SUMMARY

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The interface includes data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module receives a first command from the memory controller via the address and control signal pins, and enters a first mode in response to the first command. The memory module in the first mode responds to at least one initialization sequence, and sends a first output signal via the output pin to indicate a status of the at least one initialization sequence to the memory controller. The memory module enters a second mode in which the memory module performs memory operations including memory read/write operations according to an industry standard. During the read/write operations, the memory module communicates data with the memory controller via the data signal pins in response to second memory commands received via the address and control signal pins. The memory module may output a second output signal related to the read/write operations via the output pin.

According to certain aspects, a memory module is coupled to a memory controller of a host computer system via an interface. The interface includes data, address and control signal pins and an output pin in addition to the data,

2

address and control signal pins. The memory module performs an internal procedure in a first mode in response to a first command from the memory controller whereby the memory controller hands off control of the internal procedure to the first memory module. The memory module sends a first output signal via the output pin to indicate a status of the internal procedure to the memory controller. The memory module enters a second mode in which the memory module performs standard operations including one or more of memory read/write, pre-charge, refresh operations according to an industry standard. The memory module may output a second output signal related to the standard operations via the output pin.

In another aspect, a memory module is operable in a first mode and in a second mode. The memory module operates according to an industry standard in the second mode by performing standard operations including memory read/write operations in response to address and control signals from a memory controller of a host computer system. The memory module comprises a standard interface including data, address and control signal pins and an output pin in addition to the data, address and control signal pins. The memory module enters the first mode in response to a first command from the memory controller, in which the memory module responds to at least one initialization sequence. The memory module further comprises a notification circuit to output a notification signal indicating a status of the at least one initialization sequence to the memory controller via the output pin.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an example host computer system including an example memory module configured to perform handshaking with a memory controller of the host computer system according to certain embodiments described herein.

FIG. 2 shows an example host computer system including example first and second memory modules configured to perform handshaking with a system memory controller of the host computer system according to certain embodiments described herein.

FIG. 3 shows a host computer system including example first and second memory modules configured to perform handshaking with a memory controller of the host system, where the notification circuits of the first and second memory modules have another example configuration according to certain embodiments described herein.

FIG. 4 and FIG. 5 show example methods of using at least one memory module according to certain embodiments described herein.

## DETAILED DESCRIPTION

Existing initialization schemes have certain inefficiencies which lead to wasted time and expense. Thus, there is a need to reduce the time and complexity involved in system memory controller interactions with memory subsystems during initialization. Certain embodiments described herein advantageously satisfy at least a portion of this need by providing a system and method which utilizes a feedback path from a memory subsystem such as a memory module to a system memory controller, such as a Memory Controller Hub (MCH) of a computer system during initialization.

In general, there is no existing method of handshaking between the MCH (e.g., system memory controller) and a memory subsystem (e.g., memory module) during initialization. For example, in conventional systems, the system

US 10,474,595 B2

3

memory controller does not monitor the error-out signal from the memory subsystem. This causes the MCH to perform blind execution. In a typical server (e.g., an Intel or AMD or other chipset based server), the lack of any handshaking between the MCH and the memory subsystem during the server initialization period has not been a serious issue since the MCH generally has complete control over the initialization procedure. However, one possible configuration for LR-DIMM (Load Reduced DIMM) includes the MCH handing over one or more parts of the initialization operation sequence to the memory subsystem. This raises an unprecedented issue not addressed in conventional systems because, in such proposed configurations, the system can benefit from the MCH handshaking with the memory subsystem controller, as described more fully below.

Such an LR-DIMM configuration may have the MCH inserting a waiting period of predetermined length during which the MCH is idle and the memory subsystem controller undergoes initialization. However, one shortcoming of this LR-DIMM configuration would be that it requires the MCH to be in standby (idle, or wait) while the memory subsystem controller completes its task. Under such an arrangement, since the time to complete a task can be dependent on the density, speed and configuration of the memory subsystem, and these parameters may be unknown to the MCH, the MCH may have to insert a single, predetermined standby period. In addition, if there are multiple occasions that the MCH needs to hand off control to the memory subsystem controller, the required MCH wait periods can be different from one occasion to another, and it complicates the correlation between the MCH and the memory subsystem controller. For example, the MCH according to such a scheme may give control to the local memory controller of a memory subsystem (e.g., memory module) for execution of a training sequence. The MCH may wait for a pre-determined period of time and then assume that the local memory controller has completed the training sequence. However, depending on the memory subsystem parameters (e.g., memory capacity, speed, number of ranks, etc.), the time for actually completing the training sequence may vary and may be longer or shorter than predetermined period of time.

In general, handshaking can be implemented in at least two ways; polling and notifying. In the polling method, the MCH reads a status register in the memory subsystem controller to find out if the memory subsystem controller has completed the required or requested operation. For example, a status register may be read out through a serial interface such as System Management Bus (SMBus). However, a register polling method is generally inefficient because the system memory controller does not know exactly when the memory subsystem will have completed the required or requested operation. Thus, the system memory controller may wait longer than necessary to poll the memory subsystem, thereby delaying the overall initialization process. Additionally, the problem may be compounded because multiple training sequences or other initialization sequences may be run on the memory subsystem during a particular initialization period, resulting in accumulation of such unnecessary delays. Moreover, polling generally involves scheduling polling intervals during which the system memory controller is not performing other operations, resulting in further inefficiency.

Alternatively, the notifying method is an advantageous handshaking method between the MCH and the memory subsystem controller. According to a notifying method, the memory subsystem controller sends a signal to the MCH when the memory subsystem controller completes the

4

required or requested operation. This method allows the MCH to execute one or more independent commands while it is waiting for a notification signal from the memory subsystem controller.

Certain embodiments described herein provide a method of establishing a handshake mechanism based on notification signaling. In certain embodiments, this mechanism can be implemented by adding a new interface (notifying) signal between the MCH and the memory subsystem controller, or by adding an additional functionality to an existing, non-timing critical signal without altering the memory subsystem hardware. In either case, the interface between the MCH and the memory subsystem controller of certain embodiments can be an open drain signaling from the memory subsystem controller to the MCH, although a variety of other configurations are possible. As will be appreciated by persons skilled in the art, the terms MCH, system memory controller, and memory subsystem are used generally interchangeable throughout this disclosure, and the terms memory module, memory subsystem controller, and local memory controller are used generally interchangeably throughout this disclosure.

FIG. 1 illustrates an example host computer system 16 including an example memory module 10 according to certain embodiments described herein. The memory module 10 can comprise at least one output 12 configured to be operatively coupled to a system memory controller 14 of the host computer system 16. In certain embodiments, the memory module 10 is configured to operate in at least two modes comprising an initialization mode during which the memory module 10 executes at least one initialization sequence, and an operational mode. The memory module 10 may further include a controller circuit 18. In some embodiments, the controller circuit 18 is configured to cause the memory module 10 to enter the initialization mode. The memory module 10 can further include a notification circuit 20 configured to drive the at least one output 12 while the memory module 10 is in the initialization mode to provide at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence.

The memory module 10 may comprise a printed-circuit board (PCB) 22. In certain embodiments, the memory module 10 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or higher. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules 10 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. The PCB 22 can have an industry-standard form factor. For example, the PCB 22 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 20 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 22 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. In other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

US 10,474,595 B2

5

In certain embodiments, the memory module 10 is operatively coupled to (e.g., in electrical communication with) the host computer system 16. In certain other embodiments, the memory module 10 may communicate with the host computer system 16 using some other type of communication, such as, for example, optical communication. Examples of host computer systems 16 include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The PCB 22 can comprise an interface (not shown) that is configured to be in electrical communication with the host computer system 16. For example, the interface can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system 16. The interface of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory module 10 and the host system 16. For example, the interface can comprise a standard 240-pin DDR2 edge connector. The at least one output 12 may be routed over the interface, for example.

The memory module 10 may also comprise one or more memory elements (not shown), such as dynamic random-access memory (DRAM) elements, for example. Types of DRAM elements compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, DDR4, and synchronous DRAM (SDRAM). In addition, memory elements having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory elements compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). In certain embodiments, the memory module 10 may also include one or more non-volatile memory elements, such as one or more flash memory elements. Types of flash memory elements compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC).

The controller circuit 18 of certain embodiments generally controls the operation of the memory module 10. For example, the controller circuit 18 may control the memory elements of the memory module 10 and/or communicate with the system memory controller 14. For example, the controller circuit 18 may receive and process address and command signals (e.g., read, write commands) from the system memory controller 14 and transmit appropriate address and commands to the memory elements in response. See, e.g., U.S. Pat. Appl. Publ. Nos. 2006/0062047 A1 and 2006/0262586 A1, each of which is incorporated in its entirety by reference herein. In certain embodiments, the controller circuit 18 comprises a local memory controller. Additionally, depending on the architecture of the memory module 10, such as for an FB-DIMM, the controller circuit 18 may comprise an advanced memory buffer (AMB). The controller circuit 18 can comprise one or more of a field-programmable gate array (FPGA), a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, and a complex programmable logic device (CPLD), for example. In certain embodiments, the controller circuit 18 comprises various discrete electrical elements, while in certain other embodiments, the controller circuit 18 comprises one or more integrated circuits.

As discussed, the memory module 10 is configured to operate in at least two modes comprising an initialization

6

mode during which the memory module 10 executes at least one initialization sequence, and an operational mode. In one embodiment, for example, the at least one initialization sequence may comprise one or more training sequences. The initialization sequence (e.g., comprising one or more training sequences) may be initiated by the system memory controller 14. In some embodiments, the controller circuit 18 is configured to cause the memory module 10 to enter the initialization mode. For example, the controller circuit 18 may be configured to execute a routine implementing the at least one initialization sequence when the appropriate signal or command is received from the memory controller 14 or is otherwise received from the host computer system 16 (e.g., upon receipt of a reset signal).

In certain embodiments, for example, the computer system 16 is coupled to a plurality of memory modules 10, 26 including the memory module 10 and at least a second memory module 26, and the memory controller 14 (e.g., MCH) trains each module 10, 26 separately, in series. In one example scenario, the memory controller 14 issues a first command to the memory module 10, and, in response, the memory module 10 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the first memory module 10 advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, the memory controller 14 issues a second command, this time to the memory module 26, and, in response, the memory module 26 executes an initialization sequence (e.g., one or more training sequences). Upon completion of the initialization sequence, the second memory module 26, similar to the first memory module 10, advantageously issues a notification to the memory controller 14 in accordance with embodiments described herein. In response, where there are more than two memory modules 10, 26, the memory controller 14 issues a third command to a third memory module (not shown), and so forth. One example computer system 16 capable of implementing such a scenario is configured to execute an Intel Basic Input/Output System (BIOS), and comprises a plurality of memory modules 10, 26 having an LRDIMM configuration. In such an example system, the Intel BIOS causes the system memory controller 14 to initialize the LRDIMM memory modules 10, 26 serially.

The operational mode is the normal mode of the memory module 10. For example, during the operational mode, the memory module 10 is generally accessed by the system memory controller 14 of the host computer 16 during standard computer operation not associated with initialization. For example, the system memory controller 14 may cause the memory module 10 to perform standard operations such as memory read/write, pre-charge, refresh, etc., while in operational mode, although it will be appreciated that one or more of these operations can also be performed by the memory module 10 while in initialization mode in certain embodiments.

The notification circuit 20 can be configured to drive the at least one output 12, while the memory module 10 is in the initialization mode or after the memory module 10 completes one or more initialization sequences, to provide the at least one notification signal to the memory controller 14 indicating at least one status of the at least one initialization sequence. While shown in FIGS. 1-3 as forming a part of the controller circuit 18, the notification circuit 20 may be a physically and/or logically separate circuit in certain embodiments. While a variety of configurations are possible, the notification circuit 20 may comprise one or more tran-

US 10,474,595 B2

7                                                                          8

sistors, one or more logic elements (e.g., AND, OR, NOR, NAND, XOR gates, and the like), or a combination thereof. In some embodiments, the notification circuit **20** may additionally or alternatively comprise one or more of an FPGA, PLD, CPLD, ASIC, custom-designed semiconductor device, discrete electrical elements, and an integrated circuit.

The at least one status of certain embodiments comprises completion of the at least one initialization sequence, such that the at least one notification signal is indicative of the completion of the at least one initialization sequence. The at least one status of certain embodiments comprises execution of the at least one initialization sequence. For example, the at least one status may indicate that the at least one initialization sequence is currently being executed. In some embodiments, the at least one status may provide an indication that a certain task has been completed by the memory module **10**, such as a training task requested by the system memory controller **14**. In certain embodiments, the notification circuit **20** can be configured to drive the at least one output **12** to a first state indicative of execution of the at least one initialization sequence or to a second state indicative of completion of the at least one initialization sequence. As one example, the first state may be a high or low logic level, and the second state may be a high impedance state. In another case, the first state is a high or low logic level, and the second state is the inverse logic level of the first state.

The at least one output **12** of certain embodiments is configured to be operatively coupled to at least one interrupt of the system memory controller **14**, and the system memory controller **14** is responsive to the at least one notification signal indicating completion of the at least one initialization sequence. For example, the system memory controller **14** may trigger execution of an interrupt routine upon receipt of the notification signal on the output **12**. The interrupt routine generally executes the appropriate operations for the at least one status indicated by the at least one notification signal. For example, if the at least one status indicates that the at least one initialization sequence is complete, execution of the interrupt routine may cause the system memory controller **14** to notify the host computer system **16** that the system initialization, or a portion thereof, is completed. In one embodiment, for example, the execution of the interrupt routine causes the system memory controller **14** to initiate a subsequent training sequence for the memory module **10** or on another memory module connected to the host system **16**. For example, in one embodiment, a central processing unit (CPU) of the host system **16** (not shown) enters a "Wait" state after issuing a command to the memory module **10** to enter the initialization mode. Receipt of the at least one notification signal on the output **12** triggers execution of the interrupt routine, which interrupts the CPU, causing the "Wait" state to be aborted and allowing the host system **16** to continue operation. In this manner, generation of the interrupt on the at least one output **12** can allow completion of the at least one initialization sequence to receive prompt immediate attention from the CPU and/or memory controller **14** of the host system **16**. As will be appreciated, the CPU and memory controller **14** of the host system **16** may comprise separate modules, or may alternatively comprise a single integrated module, depending on the architecture of the host system **16** chip-set.

In certain embodiments, execution of the interrupt routine causes the system memory controller **14** to cause the memory module **10** to exit the initialization mode and to enter the operational mode. In another embodiment, the memory module **10** automatically enters the operational mode upon completion of the at least one initialization sequence without intervention from the memory controller **14**.

In some embodiments, the at least one output **12** is operated in conformance with a standard (e.g., an industry standard) when the memory module **10** is in the operational mode, but is not operated in conformance with the standard when the memory module **10** is in the initialization mode. An example of a standard in accordance with certain embodiments described herein is one or more of the industry standard promulgated by the Joint Electronic Devices Engineering Counsel (JEDEC). For example, the operation and behavior of the at least one output **12** may conform to an industry standard when the memory module **10** is in the operational mode, but the operation and behavior of the at least one output **12** may not conform to the industry standard when the memory module **10** is in the initialization mode. Because the at least one output **12** does not conform to the standard during initialization mode, an existing (e.g., JEDEC-specified) pin may be utilized to provide the at least one notification signal to the system memory controller **14** from the memory module **10** during the initialization mode. In one embodiment, for example, the at least one output **12** comprises an error-out pin of the memory module **10**. In conventional systems, the operation of the error-out pin is undefined by the standard during initialization. However, in certain embodiments described herein, during the operational mode, the error-out pin may be used according to a conventional industry standard (e.g., a JEDEC standard) to indicate a parity error has occurred in the memory module **10**. During the initialization mode, the error-out pin can be used to transmit the at least one notification signal to the system memory controller **14**.

It is advantageous to use the error-out pin for initialization status notification according to certain embodiments because the error-out pin can be asserted by the memory module **10** independent from system memory controller **14** requests or commands. Also, because the error-out pin is a JEDEC-specified pin, design cost and complexity are reduced because additional pin-outs and interrupt design changes can be avoided (e.g., in cases where such changes in hardware or chipset may not be feasible to provide the at least one status to the system memory controller **14**). However, in certain other embodiments, providing the at least one status may be implemented by adding one or more pins to the system memory controller **14** (e.g., MCH) and to the controller circuit **18** (e.g., local memory controller), thereby utilizing changes in hardware or the chipset.

Moreover, the error-out pin may be coupled to an interrupt of the system memory controller **14** (e.g., according to the JEDEC standard). Thus, where the error-out pin is used, from the system point of view in accordance with certain embodiments, the notification of completion of the required or requested task from the memory module **10** (e.g., by the local memory controller) generates an interrupt communicated to the system during the initialization period and indicative of completion of the required or requested task. Assertion of the same pin during normal (non-initialization) operation upon an error occurring, on the other hand, generates an interrupt communicated to the system during the normal operation indicative of the occurrence of the error condition. Thus, in certain embodiments, the error-out pin and corresponding signal memory module **10** can be used to support the notifying function and to provide the at least one status generally without changing hardware. Certain other such embodiments involve modifying the basic input/output system (BIOS) or other programming change.

US 10,474,595 B2

9

For example, the BIOS may be modified to indicate to the system memory controller **14** how to respond to the notification signal (e.g., to the error_out signal or the interrupt corresponding thereto).

In certain other embodiments, the at least one output **12** may include other existing (e.g., JEDEC specified) pins instead of, or in addition to, the error-out pin. In yet other configurations, at least one additional (e.g., non-JEDEC specified) pin may be employed. In general, any pin not otherwise active during the initialization mode may be used (e.g., high-order address pins, read/write pins, data pins, etc.).

The at least one output **12** can further be configured to be operatively coupled to at least one second output **24** of a second memory module **26** in some embodiments, as schematically illustrated in FIGS. **1-3**. The second memory module **26** may be generally similar in structure and function to the memory module **10**, and may comprise a controller circuit **28** and a notification circuit **30**, for example. The second memory module **26** may be generally identical to the first memory module **10**, or may have a different memory capacity, form factor, etc., than the first memory module **10**. More than two such memory modules may be present in certain embodiments. As described above, the second memory module **26** can be configured to operate in at least two modes comprising an initialization mode during which the second memory module **26** executes at least one initialization sequence, and an operational mode. For example, the initialization and operational modes may be similar to those describe above in relation to the first memory module **10**.

The second memory module **26** can also be configured to drive the at least one second output **24** to a third state indicative of execution of at least one initialization sequence of the second memory module **26** or to a fourth state indicative of completion of the at least one initialization sequence of the second memory module **26**. Additionally, in some embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the system memory controller **14**. In other embodiments (not shown), the at least one first output **12** and the at least one second output **24** are not coupled together, and are coupled to two separate inputs of the system memory controller **14**.

FIG. **2** shows an example host computer system **16** including example first and second memory modules **10**, **26**. As shown, the notification circuits **20**, **30** of the first and second memory modules **10**, **26** each comprise at least one transistor **36**, **38**. The at least one transistor **36**, **38** can be in an open-drain configuration, although other configurations are possible. In certain such embodiments, the first state of the at least one first output **12** is a first logic level, the second state of the at least one first output **12** is a high-impedance state, the third state of the at least one second output **24** is the first logic level, and the fourth state of the at least one second output **24** is the high-impedance state. In the illustrated example, while the at least one initialization sequence is in progress, the first and second memory modules **10**, **26** drive the gates of the respective transistors **36**, **38** high. Thus, the transistors **36**, **38** are respectively low impedance while the memory modules **10**, **26** are executing each section of the initialization sequence, thereby pulling the first and second outputs **12**, **24** low. Thus, the first state and the third state are low logic levels (ground) in the example configuration. Also, because the first and

10

second outputs **12**, **24** are coupled together by the bus **32**, if the at least one initialization sequence of either one of the first and second memory modules **10**, **26** are in progress, the bus **32** will be pulled to a low logic level.

As each of the two memory modules **10**, **26** completes its at least one initialization sequence, it can drive the corresponding at least one first and second outputs **12**, **24** respectively to a high impedance state. For example, once the at least one initialization sequence on each of the first and second memory modules **10**, **26** is completed, the first and second memory modules **10**, **26** can drive the gates of the respective transistors **36**, **38** low, resulting in a high-impedance state on the at least one first and second outputs **12**, **24** causing the bus **32** to be pulled high by the system memory controller **14**. Accordingly, only once the at least one initialization sequence of both the first and second memory modules **10**, **26** are complete, the bus **32** will be pulled high by the internal pull-up configuration **40** of the system memory controller **14**. The second state and the fourth state are therefore high-impedance values in the example embodiment. Thus, the system memory controller **14** can monitor the value on the bus **32** via the first input **34** to determine when both of the memory modules **10**, **26** have completed the at least one initialization sequence. As discussed, in other configurations the at least one first and second outputs **12**, **24** may be received on separate inputs of the system memory controller **14**, and the status of the at least one initialization sequence of each memory module **10**, **26** may be monitored independently.

As discussed above, in certain embodiments in which more than one memory module **10**, **26** is connected to the system memory controller **14**, each memory module **10**, **26** or associated controller circuit **18** (e.g., local memory controller) causes the corresponding notification circuit **20**, **30** to drive the at least one output **12**, **24** to the high impedance state from the low impedance state when it completes the requested or required operation. Thus, in certain such embodiments, the system memory controller **14** (e.g., MCH) can only pull the notifying signal high when all memory modules **10**, **26** or associated controller circuits (e.g., local memory controllers) have completed the required or requested operation (e.g., initialization sequence). This configuration allows the system memory controller **14** (e.g., MCH) to work with a non-homogenous memory subsystem. For example, the system memory controller **14** may be able to monitor the progress of multiple memory modules **10**, **26** including a mix of DIMMs or other memory modules having differing characteristics, such as DIMM density, rank configurations, DRAM density, speed, DRAM configuration, etc.

Additionally, the at least one output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are configured to be operatively coupled to at least one interrupt of the system memory controller **14** in certain embodiments. In certain such embodiments, the system memory controller **14** can be responsive to the second state of the first memory module **10** and the fourth state of the second memory module **26** by triggering execution of an interrupt routine by a processor of the system memory controller **14**. For example, in the example system of FIG. **2**, when the bus **32** is pulled high by the pull-up configuration **40** indicating the second state of the first memory module **10** and the fourth state of the second memory module **26**, the system memory controller **14** triggers execution of the interrupt routine.

In some embodiments, in which the at least one first output **12** and the at least one second output **24** are opera-

US 10,474,595 B2

11

tively coupled to separate inputs of the system memory controller **14**, the at least one first output **12** and the at least out second output **24** may be operatively coupled to two separate interrupts. For example, the system memory controller **14** may be responsive to the second state of the first memory module **10** by triggering execution of a first interrupt routine associated with a first interrupt, and may be responsive to the fourth state of the second memory module **26** by triggering execution of a second interrupt routine associated with the second interrupt. In yet other embodiments, the separate inputs of the memory controller **14** are internally operatively coupled to the same interrupt, or are operatively coupled to separate interrupts which trigger the same interrupt routine.

FIG. **3** shows a host computer system **16** including an example memory module **10** where the notification circuit **20** of the memory module **10** has another example configuration in accordance with certain embodiments described herein. In the example configuration of FIG. **3**, the at least one first output **12** is operatively coupled to an error-out pin of the memory module **10**, and a multiplexor **42** drives the transistor **36** with either of a task_in_progress signal **44** or an error signal **46** (e.g., parity error signal). In one embodiment, for example, the multiplexor **42** may be configured to drive the transistor **36** with the task_in_progress signal **44** when the memory module **10** is in the initialization mode or is executing the at least one initialization sequence, and with the error signal **46** when the memory module **10** is in the operational mode. Thus, the memory module **10** can be advantageously configured to both perform the standard (e.g., JEDEC-specified) error reporting functionality via the error-out pin during the operational mode and provide the status notification functionality during the system initialization mode, as described herein. As shown in FIG. **3**, a second memory module **26** including a similar configuration can also be operatively coupled to the host computer system **16**. In certain embodiments, the at least one second output **24** of the second memory module **26** can be operatively coupled to the at least one first output **12** by the bus **32**, as described above (e.g., with respect to FIG. **2**).

FIG. **4** shows an example method **100** of using the at least one memory module **10** in accordance with certain embodiments described herein. While the description below of the method **100** refers to structure shown in FIGS. **1**-**3**, other structures may also be used in accordance with certain embodiments described herein. At block **102**, the method **100** of certain embodiments comprises providing a first memory module **10** comprising at least one first output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The first memory module **10** can be configured to operate in at least two modes comprising an initialization mode during which the first memory module **10** executes at least one initialization sequence, and an operational mode. For example, the at least one initialization sequence may comprise one or more steps of a series of steps associated with an initialization procedure of the host computer system **16**.

At block **104**, the method **100** in some embodiments comprises causing the first memory module **10** to enter the initialization mode. At block **106**, the method **100** of certain embodiments comprises driving the at least one first output **12** to a first state while the memory module **10** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method of certain embodiments comprises driving the at least one first output **12** to a second state different than the first state. In certain embodiments, the first state is a first logic level and the

12

second state is a high impedance state. Additionally, in certain embodiments, the at least one first output **12** is operatively coupled to at least one interrupt of the memory controller **14** such that driving the at least one output **12** to the second state triggers the memory controller to execute an interrupt routine.

In certain embodiments, the at least one output **12** is operated in conformance with JEDEC standard when the first memory module **10** is in the operational mode, but is not operated in conformance with the JEDEC standard when the first memory module **10** is in the initialization mode. The at least one first output **12** of certain embodiments include an error-out pin of the first memory module, for example.

The method **100** can further include providing a second memory module **26** comprising at least one second output **24** operatively coupled to the memory controller **14**. The second memory module **26** can be configured to operate in one of at least two modes comprising an initialization mode, during which the second memory module **26** executes at least one initialization sequence, and an operational mode. The method **100** can further include causing the second memory module **26** to enter the initialization mode. In certain embodiments, the method **100** also includes driving the at least one second output **24** of the second memory module **26** to a third state while the second memory module **26** executes the at least one initialization sequence. Upon completion of the at least one initialization sequence, the method **100** can further include driving the at least one second output **24** of the second memory **26** to a fourth state different from the third state.

In certain embodiments, the at least one first output **12** of the first memory module **10** and the at least one second output **24** of the second memory module **26** are operatively coupled together by a bus **32** which is also operatively coupled to at least one input **34** of the memory controller **14**. In certain other embodiments, the at least one first output **12** of the first memory module **10** is operatively coupled to a first input **34** of the memory controller **14** and the at least one second output **24** of the second memory module **26** is operatively coupled to a second input (not shown) of the memory controller **14**.

FIG. **5** shows another example method **200** of using at least one memory module **10** in accordance with certain embodiments described herein. At block **202**, the method **200** may include providing a memory module **10** comprising at least one output **12** operatively coupled to a memory controller **14** of a host computer system **16**. The memory module **10** may be configured to operate in at least two modes comprising an initialization mode, during which the memory module **10** executes at least one initialization sequence, and an operational mode.

The method **200** can further include causing the memory module **10** to enter the initialization mode at block **204**. At block **206**, the method **200** can include receiving a notification signal from the at least one output **12** of the memory module **10**. The notification signal may indicate that the memory module **10** has completed the initialization sequence, for example. In certain embodiments, the method **200** further comprises executing an interrupt routine by the memory controller **14** in response to the notification signal.

Terminology/Alternative Embodiments

Embodiments have been described in connection with the accompanying drawings. However, it should be understood that the figures are not drawn to scale. Distances, angles, etc. are merely illustrative and do not necessarily bear an exact relationship to actual dimensions and layout of the devices illustrated. In addition, the foregoing embodiments have

US 10,474,595 B2

13

been described at a level of detail to allow one of ordinary skill in the art to make and use the devices, systems, etc. described herein. A wide variety of variation is possible. Components, elements, and/or steps can be altered, added, removed, or rearranged. While certain embodiments have been explicitly described, other embodiments will become apparent to those of ordinary skill in the art based on this disclosure.

Conditional language used herein, such as, among others, "can," "could," "might," "may," "e.g.," and the like, unless specifically stated otherwise, or otherwise understood within the context as used, is generally intended to convey that certain embodiments include, while other embodiments do not include, certain features, elements and/or states. Thus, such conditional language is not generally intended to imply that features, elements and/or states are in any way required for one or more embodiments or that one or more embodiments necessarily include logic for deciding, with or without author input or prompting, whether these features, elements and/or states are included or are to be performed in any particular embodiment.

Depending on the embodiment, certain acts, events, or functions of any of the methods described herein can be performed in a different sequence, can be added, merged, or left out all together (e.g., not all described acts or events are necessary for the practice of the method). Moreover, in certain embodiments, acts or events can be performed concurrently, e.g., through multi-threaded processing, interrupt processing, or multiple processors or processor cores, rather than sequentially.

The various illustrative logical blocks, modules, circuits, and algorithm steps described in connection with the embodiments disclosed herein can be implemented as electronic hardware, computer software, or combinations of both. To clearly illustrate this interchangeability of hardware and software, various illustrative components, blocks, modules, circuits, and steps have been described above generally in terms of their functionality. Whether such functionality is implemented as hardware or software depends upon the particular application and design constraints imposed on the overall system. The described functionality can be implemented in varying ways for each particular application, but such implementation decisions should not be interpreted as causing a departure from the scope of the disclosure.

The various illustrative logical blocks, modules, and circuits described in connection with the embodiments disclosed herein can be implemented or performed with a general purpose processor, a digital signal processor (DSP), an application specific integrated circuit (ASIC), a field programmable gate array (FPGA) or other programmable logic device, discrete gate or transistor logic, discrete hardware components, or any combination thereof designed to perform the functions described herein. A general purpose processor can be a microprocessor, but in the alternative, the processor can be any conventional processor, controller, microcontroller, or state machine. A processor can also be implemented as a combination of computing devices, e.g., a combination of a DSP and a microprocessor, a plurality of microprocessors, one or more microprocessors in conjunction with a DSP core, or any other such configuration.

The blocks of the methods and algorithms described in connection with the embodiments disclosed herein can be embodied directly in hardware, in a software module executed by a processor, or in a combination of the two. A software module can reside in RAM memory, flash memory, ROM memory, EPROM memory, EEPROM memory, registers, a hard disk, a removable disk, a CD-ROM, or any

14

other form of computer-readable storage medium known in the art. An exemplary storage medium is coupled to a processor such that the processor can read information from, and write information to, the storage medium. In the alternative, the storage medium can be integral to the processor. The processor and the storage medium can reside in an ASIC. The ASIC can reside in a user terminal. In the alternative, the processor and the storage medium can reside as discrete components in a user terminal.

Certain embodiments described herein are compatible with a memory system including memory devices with various attributes (see, e.g., FIGS. 2 and 3). For example, the memory system of certain embodiments may include various data slice sizes (e.g., two, four, eight, or 16 bit data slices) and corresponding memories (e.g., memories having two, four, eight, or 16 bit data widths).

Although certain embodiments and examples are discussed above, it is understood that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. It is intended that the scope of the inventions disclosed herein should not be limited by the particular disclosed embodiments. Thus, for example, in any method or process disclosed herein, the acts or operations making up the method/process may be performed in any suitable sequence and are not necessarily limited to any particular disclosed sequence.

Various aspects and advantages of the embodiments have been described where appropriate. It is to be understood that not necessarily all such aspects or advantages may be achieved in accordance with any particular embodiment. Thus, for example, it should be recognized that the various embodiments may be carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other aspects or advantages as may be taught or suggested herein.

What is claimed is:

1. A memory module operable with a memory controller of a host system, comprising:

a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge connection in addition to the first edge connections and the second edge connections;

dynamic random access memory elements on the printed circuit board;

a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection; and

wherein the memory module is configurable to operate in any of at least a first mode and a second mode;

wherein the memory module in the first mode is configurable to perform one or more normal memory read or write operations by communicating data signals via the first edge connections in response to address and control signals received via the second edge connections, wherein the memory module in the second mode is not accessed by the memory controller for normal memory read or write operations, and wherein the memory module in the second mode is configurable to perform operations related to one or more training sequences;

US 10,474,595 B2

15

wherein the module controller is configurable to receive via the second edge connections the address and control signals associated with the one or more normal memory read or write operations, wherein the dynamic random access memory elements are configurable to communicate data signals with the memory controller via the first edge connections in accordance with the address and control signals, and wherein the module controller is further configurable to output via the open drain output and the error edge connection a signal indicating a parity error having occurred while the memory module is in the first mode;

wherein the module controller in the second mode is further configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection to a first state or to a second state, one of the first state and the second state being a low logic level and the other one of the first state and the second state being a high impedance state.

2. The memory module of claim 1, wherein the module controller comprises an integrated circuit.

3. The memory module of claim 1, wherein the module controller includes a notification circuit comprising a transistor having an open drain coupled to the open drain output and source coupled to the ground.

4. The memory module of claim 3, wherein the module controller is configurable to drive a gate of the transistor high so as to drive open drain output and the error edge connection to ground, or to drive the gate of the transistor low so as to drive the open drain output and the error edge connection to the high impedance state.

5. The memory module of claim 4, wherein the module controller is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and the ground.

6. The memory module of claim 3, wherein the notification circuit further includes a multiplexor or a logic circuit having an output coupled to a gate of the transistor and configurable to drive the gate of the transistor with either a first signal related to the parity error or a second signal related to the one or more training sequences.

7. The memory module of claim 3, wherein the module controller is configurable to provide the information related to the one or more training sequences by driving a gate of the transistor with the second signal so as to drive the open drain output from the high impedance state to ground or from ground to the high impedance state.

8. The memory module of claim 1, wherein the second edge connections include one or more pins that are not active while the memory module is in the second mode.

9. The memory module of claim 1, wherein the memory module in the second mode is configurable to perform the operations related to the one or more training sequences without communicating data signals via the first edge connections while the memory module is in the second mode.

10. A memory module operable with a memory controller of a host system, comprising:

a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals,

16

and an error edge connection in addition to the first edge connections and the second edge connections;

dynamic random access memory elements on the printed circuit board;

a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller having an open drain output coupled to the error edge connection and configurable to drive the open drain output from a first state to a second state and from the second state to the first state, one of the first state and the second state being a low logic level, and the other one of the first state and the second state being a high impedance state; and

wherein the memory module is operable in at least a first mode in which the memory module is configurable to perform one or more memory read or write operations by communicating data signals via the first edge connections in response to address and control signals received via the second edge connections, and a second mode in which the memory module is not accessed by the memory controller for memory read or write operations, and wherein the memory module in the second mode is configurable to perform operations related to one or more training sequences without communicating data signals via the first edge connections;

wherein the module controller in the first mode is configurable to receive via the second edge connections the address and control signals associated with the one or more memory read or write operations, wherein the dynamic random access memory elements are configurable to communicate data signals with the memory controller via the first edge connections in accordance with the address and control signals, and wherein the module controller in the first mode is further configurable to output via the open drain output and the error edge connection a signal indicating a parity error having occurred in the memory module while the memory module is in the first mode;

wherein the module controller in the second mode is further configurable to output to the memory controller open-drain signals related to the one or more training sequences via the open drain output and the error edge connection while the memory module is in the second mode.

11. The memory module of claim 10, wherein the module controller comprises an integrated circuit.

12. The memory module of claim 10, wherein the module controller includes a notification circuit having a transistor with an open drain coupled to the open drain output and a source coupled to the ground, wherein the module controller is configurable to output to the memory controller the open-drain signals related to the one or more training sequences by driving a gate of the transistor high so as to drive the open drain output and the error edge connection to ground, and by driving the gate of the transistor low so as to drive the open drain output and the error edge connection to the high impedance state, and wherein the notification circuit is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and ground.

13. The memory module of claim 12, wherein the notification circuit further includes a multiplexor or a logic circuit having an output coupled to the gate of the transistor and configurable to drive the transistor with either a first signal related to the parity error or a second signal related to the one or more training sequences.

US 10,474,595 B2

17

**14**. The memory module of claim **10**, wherein the module controller is configurable to output the open-drain signals related to the one or more training sequences by driving the open drain output from the high impedance state to the low logic level or from the low logic level to the high impedance state.

**15**. The memory module of claim **10**, wherein the second edge connections include one or more pins that are not active while the memory module is in the second mode.

**16**. The memory module of claim **10**, wherein the second edge connections include one or more high-order address pins that are not active while the memory module is in the second mode.

**17**. A method, comprising:

at a memory module coupled with a memory controller of a host system, the memory module including a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections via which the memory module receives or outputs data signals, second edge connections via which the memory module receives address and control signals, and an error edge connection in addition to the first edge connections and the second edge connections, the memory module further including dynamic random access memory elements on the printed circuit board;

receiving via the second edge connections address and control signals associated with one or more memory read or write operations;

controlling the dynamic random access memory elements to communicate data signals corresponding to the one or more memory read or write operations via the first edge connections in response to the address and control signals;

outputting via an open drain output coupled to the error edge connection a signal indicating a parity error having occurred in the memory module while the memory module is being accessed by the memory controller for a memory read or write operation;

performing operations related to one or more training sequences while the memory module is not accessed by the memory controller for memory read or write operations; and

outputting to the memory controller via the open drain output and the error edge connection open-drain signals related to the one or more training sequences and unrelated to any memory read or write operation.

**18**. The method of claim **17**, wherein the second edge connections include one or more pins that are not active while the memory module is trained with the one or more training sequences.

**19**. The method of claim **18**, wherein the second edge connections include one or more high-order address pins that are not active while the memory module is trained with the one or more training sequences.

**20**. The method of claim **17**, wherein the memory module includes a notification circuit having a transistor with an open drain coupled to the open drain output and a source coupled to ground, wherein outputting via an open drain output coupled to the error edge connection a signal indicating a parity error having occurred in the memory module comprises driving a gate of the transistor high to provide a low impedance path between the open drain output and ground, and wherein outputting the open-drain signals related to the one or more training sequences and unrelated to any memory read or write operation comprises driving the

18

gate of the transistor to drive the open drain output from a high impedance state to ground and from ground to the high impedance state.

**21**. A memory module operable with a memory controller of a host system, comprising:

a printed circuit board having edge connections that fit into a corresponding slot of the host system so as to be in electrical communication with the memory controller, the edge connections including first edge connections, second edge connections, and an error edge connection in addition to the first edge connections and the second edge connections;

dynamic random access memory elements on the printed circuit board; and

a module controller on the printed circuit board and coupled to the dynamic random access memory elements, the module controller including a transistor having a gate and an open drain output coupled to the error edge connection;

wherein the module controller is configurable to drive the gate of the transistor so as to drive the open drain output to a first state or a second state, the first state being a low logic level and the second state being a high impedance state;

wherein the module controller is configurable to receive via the second edge connections memory commands associated with normal memory read or write operations and to output a set of address and control signals for each of the normal memory read or write operations;

wherein the dynamic random access memory elements are configurable to communicate one or more N-bit-wide data signals with the memory controller via the first edge connections in response to the set of address and control signals, where N is at least 32;

wherein the module controller is further configurable to output via the open drain output and the error edge connection a signal indicating a parity error occurred during any of the memory read or write operations by driving the open drain output and the error edge connection to the first state;

wherein the memory module is configurable to perform operations related to one or more training sequences while the memory module is not accessed by the memory controller for memory read or write operations; and

wherein the module controller is configurable to provide information related to the one or more training sequences by driving the open drain output and the error edge connection from one of the first state and the second state to the other one of the first state and the second state.

**22**. The memory module of claim **21**, wherein the module controller further includes a multiplexor or a logic circuit having an output coupled to the gate of the transistor, and wherein the module controller is configurable to drive the gate of the transistor with either a first signal related to the parity error or a second signal related to the one or more training sequences.

**23**. The memory module of claim **22**, wherein the transistor has a source coupled to ground, wherein the module controller is configurable to output the signal indicating a parity error having occurred by driving the gate of the transistor high to provide a low impedance path between the open drain output and ground, and wherein the module controller is configurable to provide the information related to the one or more training sequences by driving the open

US 10,474,595 B2

**19**

**20**

drain output from a high impedance state to ground or from ground to the high impedance state.

**24**. The memory module of claim **21**, wherein the memory module is configurable to perform the operations related to the one or more training sequences while the memory module is not communicating signals via the first edge connections.

\* \* \* \* \*

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 5

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/088,115 | 04/01/2016 | Hyun Lee | NETL.062C2 | 7163 |

79141          7590          05/20/2016
Jamie J. Zheng, Ph.D Esq.
P.O. Box 60573
Palo Alto, CA 94306

| EXAMINER |
|---|
| CHERY, MARDOCHEE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2133 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/20/2016 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

jz@jzpatent.com
eofficeaction@appcoll.com
infohub.j@gmail.com

PTOL-90A (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 15/088,115 | LEE, HYUN |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | Mardochee CHERY | 2133 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>4/1/16</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL.**    2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) <u>1-20</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>1-20</u> is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☒ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on <u>4/1/16</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All    b)☐ Some**  c)☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

Application/Control Number: 15/088,115                                    Page 2
Art Unit: 2133

## DETAILED ACTION

1.      The present application is being examined under the pre-AIA first to invent
provisions.

### *Specification*

2.      The title of the invention is not descriptive.  A new title is required that is clearly
indicative of the invention to which the claims are directed.

### *Double Patenting*

3.      The nonstatutory double patenting rejection is based on a judicially created
doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the
unjustified or improper timewise extension of the "right to exclude" granted by a patent
and to prevent possible harassment by multiple assignees.  A nonstatutory double
patenting rejection is appropriate where the claims at issue are not identical, but at least
one examined application claim is not patentably distinct from the reference claim(s)
because the examined application claim is either anticipated by, or would have been
obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d
1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir.
1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*,
686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619
(CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

        A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d)
may be used to overcome an actual or provisional rejection based on a nonstatutory
double patenting ground provided the reference application or patent either is shown to

Application/Control Number: 15/088,115                                          Page 3
Art Unit: 2133

be commonly owned with this application, or claims an invention made as a result of

activities undertaken within the scope of a joint research agreement. A terminal

disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO internet Web site contains terminal disclaimer forms which may be

used. Please visit http://www.uspto.gov/forms/. The filing date of the application will

determine what form should be used. **A web-based eTerminal Disclaimer may be**

**filled out completely online using web-screens. An eTerminal Disclaimer that**

**meets all requirements is auto-processed and approved immediately upon**

**submission. For more information about eTerminal Disclaimers, refer to**

**http://www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.**

4.    Claims 1-20 are rejected on the ground of nonstatutory double patenting as being

unpatentable over claims 1-20 of U.S. Patent No. 9311116 and 1-18 of **U.S. Patent**

**#8489837**. Although the claims at issue are not identical, they are not patentably distinct

from each other because claims 1-20 of U.S. Patent No. 9311116 and 1-18 of **U.S.**

**Patent #8489837** anticipate and/or make obvious claims 1-20 of the current application.

5.    "A later patent claim is not patentably distinct from an earlier patent claim if the

later claim is obvious over, or **anticipated by**, the earlier claim. In re Longi, 759 F.2d at

896, 225 USPQ at 651 (affirming a holding of obviousness-type double patenting

because the claims at issue were obvious over claims in four prior art patents); In re

Berg, 140 F.3d at 1437, 46 USPQ2d at 1233 (Fed. Cir. 1998) (affirming a holding of

obviousness-type double patenting where a patent application claim to a genus is

anticipated by a patent claim to a species within that genus). " ELI LILLY AND

Application/Control Number: 15/088,115                                    Page 4
Art Unit: 2133

COMPANY v BARR LABORATORIES, INC., United States Court of Appeals for the

Federal Circuit, ON PETITION FOR REHEARING EN BANC (DECIDED:  May 30,

2001).

### Claim Rejections - 35 USC § 103

6.        In the event the determination of the status of the application as subject to AIA 35

U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any

correction of the statutory basis for the rejection will not be considered a new ground of

rejection if the prior art relied upon, and the rationale supporting the rejection, would be

the same under either status.

        The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

        The factual inquiries set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148

USPQ 459 (1966), that are applied for establishing a background for determining

obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

        1. Determining the scope and contents of the prior art.

        2. Ascertaining the differences between the prior art and the claims at issue.

        3. Resolving the level of ordinary skill in the pertinent art.

        4. Considering objective evidence present in the application indicating

obviousness or nonobviousness.

Application/Control Number: 15/088,115                                                    Page 5
Art Unit: 2133

7.      Claims 1-21 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable

over Tanguay et al. (US 2010/0042778) and Roohparvar (2003/0115427).

        As per claim 1, Tanguay discloses a method performed by a memory module

coupled to a memory controller of a host computer system via an interface, the interface

including data, address and control signal pins and an output pin in addition to the data,

address and control signal pins [*Fig. 2: DDR2 SDRAM array 260 connected to SDRAM controller

116 through connectors 140 pins BA [1:0], ADDR [13:0], RAS#, CAS#, WE#, etc...*], the method

comprising: receiving a first command from the memory controller via the address and

control signal pins [*Fig. 2: first command is sent to array 260 ADDR 14 and RAS#, CAS# 4 pins*];

entering a first mode in response to the first command, wherein the memory module in

the first mode responds to at least one initialization sequence [*¶0026, 0028: before

accessing the memory device, initializing the memory device*]; sending a first output signal via the

output pin to indicate a status of the at least one initialization sequence to the memory

controller [*¶0024, 0025: perform initialization procedure appropriate for the type of memory and

initializing the mode registers*]; entering a second mode in which the memory module

performs memory operations including memory read/write operations according to an

industry standard, wherein, during the read/write operations, the memory module

communicates data with the memory controller via the data signal pins in response to

second memory commands received via the address and control signal pins [*¶0016,

0024: initializing the DIMM as specified by the JEDEC DDR standard and then access the DIMM*]; and

outputting a second output signal related to the read/write operations via the output pin

[*¶0016, 0025: accessing the DIMM by performing read and write commands*].

Application/Control Number: 15/088,115                                    Page 6
Art Unit: 2133

Tanguay does explicitly detail what is the status of the initialization sequence. Roohparvar, however, at paragraph ¶0030 discloses a notification circuit configured to drive at least one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller indicating at least one status of the at least initialization sequence.

At the time of invention, it would have been obvious to one of ordinary skill in the art, to have circuitry determining the status of a notification signal in order to provide a memory that is able to initialize itself without requiring the memory controller to wait unnecessarily for the initialization to be performed (Roohparvar @ ¶0028-0030).

As per claim 2, Roohparvar discloses the method of claim 1, wherein the signal indicating a status of the at least one initialization sequence causes the memory controller to execute an interrupt routine [¶0030].

As per claim 3, Roohparvar discloses the method of claim 1, further comprising receiving a second command from the memory controller, the second command causing the memory module to exit the first mode [¶0012, 24, 27].

As per claim 4, Roohparvar discloses the method of claim 1, wherein the second output signal indicates an error having occurred in the memory module [¶0031].

As per claim 5, the cited art discloses the method of claim 1, wherein the memory module comprises a transistor having a drain terminal coupled to the output pin, and wherein the first output signal is an open-drain signal [Roohparvar @ ¶0027-28].

Application/Control Number: 15/088,115                                    Page 7
Art Unit: 2133

As per claim 6, Roohparvar discloses the method of claim 5, wherein sending the

first output signal comprises driving the output pin to a high impedance state, and

wherein the output pin is kept at a low-impedance state before the memory module

completes the internal procedure in the first mode [¶0023-0024].

As per claims 7-20, the rationale in the rejection of claims 1-6 is herein

incorporated.

**Conclusion**

8.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Mardochee CHERY whose telephone number is

(571)272-4246.  The examiner can normally be reached on 8:30A-5:00P.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jared Ian Rutz can be reached on (571)272-5535.  The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 15/088,115                                        Page 8
Art Unit: 2133

  Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

May 16, 2016

/Mardochee CHERY/
Primary Examiner, Art Unit 2133

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 6

| | |
|---|---|
| **Doc Code: DIST.E.FILE**<br>**Document Description: Electronic Terminal Disclaimer - Filed** | PTO/SB/26<br>U.S. Patent and Trademark Office<br>Department of Commerce |

| | |
|---|---|
| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
| Application Number | 15088115 |
| Filing Date | 01-Apr-2016 |
| First Named Inventor | Hyun Lee |
| Attorney Docket Number | NETL.062C2 |
| Title of Invention | SYSTEMS AND METHODS FOR HANDSHAKING WITH A MEMORY MODULE |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| Netlist, Inc. | 100% |

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

8489837

9311116

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

⊙ Terminal disclaimer fee under 37 CFR 1.20(d) is included with Electronic Terminal Disclaimer request.

○ I certify, in accordance with 37 CFR 1.4(d)(4), that the terminal disclaimer fee under 37 CFR 1.20(d)
  required for this terminal disclaimer has already been paid in the above-identified application.

Applicant claims the following fee status:

○ Small Entity

○ Micro Entity

⊙ Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

I certify, in accordance with 37 CFR 1.4(d)(4) that I am:

⊙ An attorney or agent registered to practice before the Patent and Trademark Office who is of record in
  this application

    Registration Number  51167

○ A sole inventor

○ A joint inventor; I certify that I am authorized to sign this submission on behalf of all of the inventors as evidenced by the
  power of attorney in the application

○ A joint inventor; all of whom are signing this request

| Signature | /Jamie J. Zheng/ |
|-----------|------------------|
| Name | Jamie J. Zheng |

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 7



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/857,553 | 12/28/2017 | Hyun Lee | 129980-5066US | 5811 |

79141          7590          08/28/2018
Morgan Lewis Bockius LLP / Jamie Zheng Ph.D.
1400 Page Mill Road
Palo Alto, CA 94304

| EXAMINER |
|---|
| CHERY, MARDOCHEE |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2133 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/28/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

padocketingdepartment@morganlewis.com
vskliba@morganlewis.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 15/857,553 | Applicant(s) Lee, Hyun | |
|---|---|---|---|
| | Examiner MARDOCHEE CHERY | Art Unit 2133 | AIA Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

## Period for Reply

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

## Status

1) ☑ Responsive to communication(s) filed on <u>12/28/17</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a) ☐ This action is **FINAL.**    2b) ☑ This action is non-final.
3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

## Disposition of Claims*

5) ☑ Claim(s) <u>1-7</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>1-7</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

## Application Papers

10) ☐ The specification is objected to by the Examiner.
11) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or  b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

## Priority under 35 U.S.C. § 119

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☐ All    b) ☐ Some**    c) ☐ None of the:
       1. ☐ Certified copies of the priority documents have been received.
       2. ☐ Certified copies of the priority documents have been received in Application No. _____.
       3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    ** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

### DETAILED ACTION

#### Notice of Pre-AIA or AIA Status

1.        The present application is being examined under the pre-AIA first to invent provisions.

#### Double Patenting

2.        The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

         A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159.  See MPEP §§ 706.02(l)(1) - 706.02(l)(3) for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

         The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed

determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A

web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal

Disclaimer that meets all requirements is auto-processed and approved immediately upon submission.

For more information about eTerminal Disclaimers, refer to

www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

3.      Claims 1-7 are rejected on the ground of nonstatutory double patenting as being unpatentable

over claims 1-18 of U.S. Patent No. 8489837; claims 1-20 of U.S. Patent No. 9311116; and claims 1-22 of

U.S. Patent No. 9858218. Although the claims at issue are not identical, they are not patentably distinct

from each other because the pending claims make obvious the claims of the issued patents and vice

versa.

4.      "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is

obvious over, or **anticipated by**, the earlier claim.  In re Longi, 759 F.2d at 896, 225 USPQ at 651

(affirming a holding of obviousness-type double patenting because the claims at issue were obvious over

claims in four prior art patents); In re Berg, 140 F.3d at 1437, 46 USPQ2d at 1233 (Fed. Cir. 1998)

(affirming a holding of obviousness-type double patenting where a patent application claim to a genus is

anticipated by a patent claim to a species within that genus). "  ELI LILLY AND COMPANY v BARR

LABORATORIES, INC., United States Court of Appeals for the Federal Circuit, ON PETITION FOR

REHEARING EN BANC (DECIDED:  May 30, 2001).

### *Conclusion*

5.      Any inquiry concerning this communication or earlier communications from the examiner

should be directed to MARDOCHEE CHERY whose telephone number is (571)272-4246.  The examiner

can normally be reached on 900-500.

Application/Control Number: 15/857,553                                                        Page 4
Art Unit: 2133

Examiner interviews are available via telephone, in-person, and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use

the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor,

**Jared RUtz** can be reached at **(571)272-5535**.  The fax phone number for the organization where

this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system.  Status information for published applications may be obtained

from either Private PAIR or Public PAIR.  Status information for unpublished applications is available

through Private PAIR only.  For more information about the PAIR system, see http://pair-

direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer

Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR

CANADA) or 571-272-1000.

August 22, 2018

/MARDOCHEE CHERY/
Primary Examiner, Art Unit 2133

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 8

Electronically filed November 28, 2018

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Application of: | Hyun Lee | Confirmation No.: | 5811 |
| Serial No.: | 15/857,553 | Art Unit: | 2133 |
| Filed: | December 28, 2017 | Examiner: | CHERY, MARDOCHEE |
| For: | MEMORY MODULE CONFIGURABLE TO HANDSHAKE WITH A MEMORY CONTROLLER | Attorney Docket No.: | 129980-5066-US |

## TERMINAL DISCLAIMER

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450
Sir:

Applicant, **Netlist, Inc.**, is the assignee of the entire **100%** right, title and interest in and to the above identified application by virtue of assignments recorded on November 15, 2017 at reel/frame 044140 / 0019.

Applicant hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the above identified application which would extend beyond the expiration date of the full statutory term of U.S. Patent No. 8,489,837, (the "prior patent"), which issued on July 16, 2013, U.S. Patent No. 9,311,116, (the "prior patent"), which issued on April 12, 2016, and, U.S. Patent No. 9,858,218, (the "prior patent"), which issued on January 2, 2018 as the term of said prior patents are presently shortened by any terminal disclaimer. Applicant hereby agrees that any patent so granted on the above identified application shall be enforceable only for and during such period that it and the prior patent are commonly owned.

Applicant further agrees that this agreement is to run with any patent granted on the above identified application and is to be binding upon the grantee, its successors, or assigns.

Applicant does not disclaim any terminal part of the term of any patent granted on the

above identified application that would extend to the expiration date of the full statutory term of said prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later expires for failure to pay a maintenance fee, is held unenforceable, is found invalid by a court of competent jurisdiction, is statutorily disclaimed in whole or terminally disclaimed under 37 C.F.R. 1.321, has all claims canceled by a reexamination certificate, is reissued, or is otherwise terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

The undersigned is empowered to act on behalf of and as a representative of **Netlist, Inc..** The undersigned is an attorney of record.

I hereby acknowledge that any willful false statements made are punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

The fee under 37 CFR 1.20(d) is $160. The Commissioner is authorized to charge any required fees or credit any overpayments to our Deposit Account No. 50-0310 (order no. 129980-5066-US).

Signed this _28_ day of _November, 2018_

By: _____

Jamie J. Zheng   (Reg. No. 51,167)
Attorney of Record for Assignee, Netlist, Inc.
Telephone Number:  650-843-4000

2

Terminal Disclaimer

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 9

| | |
|---|---|
| **Doc Code: DIST.E.FILE**<br>**Document Description: Electronic Terminal Disclaimer - Filed** | PTO/SB/25<br>PTO/SB/26<br>U.S. Patent and Trademark Office<br>Department of Commerce |

| | |
|---|---|
| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A PROVISIONAL DOUBLE PATENTING REJECTION OVER A PENDING "REFERENCE" APPLICATION**<br>**AND TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
| Application Number | 15169745 |
| Filing Date | 01-Jun-2016 |
| First Named Inventor | Hyun Lee |
| Attorney Docket Number | NETL.062C3 |
| Title of Invention | MEMORY MODULE CAPABLE OF HANDSHAKING WITH A MEMORY CONTROLLER OF A HOST SYSTEM |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| Netlist, Inc. | 100 % |

The owner(s) of percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of any patent granted on pending reference Application Number(s)

15088115   filed on  04/01/2016

as the term of any patent granted on said reference application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending reference application. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and any patent granted on the reference application are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of any patent granted on the instant application that would extend to the expiration date of the full statutory term of any patent granted on said reference application, "as the term of any patent granted on said reference application may be shortened by any terminal disclaimer filed prior to the grant of any patent on the pending reference application," in the event that any such patent granted on the pending reference application: expires for failure to pay a maintenance fee, is held unenforceable, is found invalid by a court of competent jurisdiction, is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321, has all claims canceled by a reexamination certificate, is reissued, or is in any manner terminated prior to the expiration of its full statutory term as shortened by any terminal disclaimer filed prior to its grant.

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

9311116

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

◉ Terminal disclaimer fee under 37 CFR 1.20(d) is included with Electronic Terminal Disclaimer request.

○ I certify, in accordance with 37 CFR 1.4(d)(4), that the terminal disclaimer fee under 37 CFR 1.20(d) required for this terminal disclaimer has already been paid in the above-identified application.

Applicants claims the following fee status:

○ Small Entity

○ Micro Entity

◉ Regular Undiscounted

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

I certify, in accordance with 37 CFR 1.4(d)(4) that I am:

◉ An attorney or agent registered to practice before the Patent and Trademark Office who is of record in this application

    Registration Number  51167

○ A sole inventor

○ A joint inventor; I certify that I am authorized to sign this submission on behalf of all of the inventors as evidenced by the power of attorney in the application

○ A joint inventor; all of whom are signing this request

| Signature | /Jamie J. Zheng/ |
| --- | --- |
| Name | Jamie J. Zheng |

Case 6:20-cv-00194-ADA   Document 26-12   Filed 05/04/20   Page 4 of 4

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 10

1   SEAN C. CUNNINGHAM, Bar No. 174931
    sean.cunningham@dlapiper.com
2   ERIN P. GIBSON, Bar No. 229305
    erin.gibson@dlapiper.com
3   TIFFANY C. MILLER, Bar No. 246987
    tiffany.miller.dlapiper.com
4   JACOB D. ANDERSON, Bar No. 265768
    jacob.anderson@dlapiper.com
5   DLA PIPER LLP (US)
    401 B Street, Suite 1700
6   San Diego, CA 92101-4297
    Tel: 619.699.2700
7   Fax: 619.699.2701

8   MARK D. FOWLER, Bar No. 124235
    DLA Piper LLP (US)
9   2000 University Avenue
    East Palo Alto, CA 94303-2215
10  Tel: 650.833.1559
    Fax: 650.833.2001

11
    JAMES HEINTZ, to be admitted *pro hac vice*
12  DLA Piper LLP (US)
    11911 Freedom Drive, #300
13  Reston, VA 20190
    Tel: 703.773.4000
14  Fax: 703.773.5000

15  Attorneys for Plaintiff
    NETLIST, INC.
16

17              UNITED STATES DISTRICT COURT

18             CENTRAL DISTRICT OF CALIFORNIA

19                  SANTA ANA DIVISION

20

21  NETLIST, INC.,                          CASE NO. 8:16-cv.-01605

            Plaintiff,                       **COMPLAINT FOR PATENT
22                                           INFRINGEMENT; DEMAND
            v.                               FOR JURY TRIAL**
23
    SK HYNIX INC., SK HYNIX
24  AMERICA INC., and SK HYNIX
    MEMORY SOLUTIONS INC.,
25
            Defendants.
26

27

28

DLA PIPER LLP (US)
   SAN DIEGO
                    WEST\270270507                    -1-
                                              COMPLAINT FOR PATENT INFRINGEMENT
                                                        8:16-CV-01605

1    Plaintiff Netlist, Inc. ("Netlist") brings this action for patent infringement
2    against Defendants SK hynix Inc., SK hynix America Inc. and SK hynix memory
3    solutions Inc. (collectively "Hynix" or "Defendants") and alleges as follows:

**NATURE OF THE ACTION**

5    1.    This is a civil action for patent infringement under the patent laws of
6    the United States relating to patents, including 35 U.S.C. § 281.

**THE PARTIES**

8    2.    Plaintiff Netlist is a corporation organized and existing under the laws
9    of the State of Delaware, having a principal place of business at 175 Technology
10    Drive, Suite 150, Irvine, California 92618.

11    3.    On information and belief, Defendant SK hynix Inc. is a corporation
12    organized and existing under the laws of the Republic of Korea ("Korea"), having a
13    principal place of business at 2091, Gyeongchung-daero, Bubal-eub, Icheon-si,
14    Gyeonggi-do, Korea.  On information and belief, SK hynix Inc. is the worldwide
15    parent corporation for Defendants SK hynix America Inc. and SK hynix memory
16    solutions Inc., and is responsible either directly or indirectly through subsidiaries
17    for their infringing activities.

18    4.    On information and belief, Defendant SK hynix America Inc. is a
19    corporation organized and existing under the laws of California, having a principal
20    place of business at 3101 North 1st Street, San Jose, CA 95134, United States.  On
21    information and belief, Defendant SK hynix America Inc. is a wholly owned
22    subsidiary of SK hynix Inc. and is a United States operating company for SK hynix
23    Inc.  On information and belief, Defendant SK hynix America Inc. provides support
24    for sales, technical, and customer/client relationship operations.

25    5.    On information and belief, Defendant SK hynix memory solutions Inc.
26    is a corporation organized and existing under the laws of California, having a
27    principal place of business at 3103 North 1st Street, San Jose, CA 95134.  On
28    information and belief, Defendant SK hynix memory solutions Inc. is a wholly

1   owned subsidiary of SK hynix Inc. and is a United States operating company for

2   SK hynix Inc.  On information and belief, Defendant SK hynix memory solutions

3   Inc. provides to its customers controller hardware and flash management systems

4   and firmware for devices.

5   **JURISDICTION AND VENUE**

6       6.   This court has jurisdiction over this action pursuant to 28 U.S.C.

7   §§ 1331 and 1338(a) and pursuant to the patent laws of the United States of

8   America, 35 U.S.C. § 101, *et seq.*

9       7.   This Court has personal jurisdiction over Defendants because, on

10   information and belief, they have regularly and systematically transacted business

11   within the State of California and this District.  In addition, this Court has personal

12   jurisdiction over Defendants because, on information and belief, this lawsuit arises

13   out of Defendants' infringing activities, including without limitation their making,

14   using, selling and/or offering to sell infringing products within the State of

15   California and this District.  This Court also has personal jurisdiction over

16   Defendants because, on information and belief, Defendants have made, used, sold

17   and/or offered for sale their infringing products and placed such infringing products

18   in the stream of interstate commerce with the expectation that such infringing

19   products would be made, used, sold and/or offered for sale within the State of

20   California and this District.  Finally, this Court has personal jurisdiction over

21   Defendants SK hynix America Inc. and SK hynix memory solutions Inc. because

22   they are corporations duly incorporated under the laws of California and have

23   offices in California.

24       8.   Venue is proper in the Central District of California pursuant to the

25   provisions of 28 U.S.C. §§ 1391(b), (c), and (d) and 1400(b).  On information and

26   belief, Defendants conduct substantial business directly and/or through third parties

27   or agents in this judicial district by selling and/or offering to sell the infringing

28   products, and/or by conducting other business in this judicial district.  Furthermore,

Case: 21-114    Document: 2    Page: 260    Filed: 02/08/2021

Case 6:20-cv-00194-ADA  Document 26-3 1/  Filed 05/04/20  Page 5 of 21
Case 8:16-cv-01605-D Document  Filed 08/31/16  Page 4 of 20  Page ID #:4

1    Netlist is headquartered and has its principal place of business in this District, sells

2    products in this District, and has been harmed by Defendants' conduct, business

3    transactions and sales in this District.

4                          **FACTUAL BACKGROUND**

5         9.    Since its founding in 2000, Netlist has been a leading innovator in

6    high-performance memory module technologies.  Netlist designs and manufactures

7    a wide variety of high-performance products for the cloud computing, virtualization

8    and high-performance computing (HPC) markets.  Netlist's technology enables

9    users to derive useful information from vast amounts of data in a shorter period of

10   time.  These capabilities will become increasingly valuable as the volume of data

11   continues to dramatically increase.

12        10.    The technologies disclosed and claimed in the asserted patents relate

13   generally to memory modules.  Generally speaking, a memory module is a circuit

14   board that contains DRAM integrated circuits that is installed into a memory slot on

15   a computer motherboard.  United States Patent Nos. 8,756,364 ("the '364 patent")

16   and 8,516,185 ("the '185 patent") relate to memory modules of a computer system,

17   and more specifically to devices and methods for improving the performance, the

18   memory capacity, or both, of memory modules such as DIMMs.  United States

19   Patent Nos. 8,001,434 ("the '434 patent"), 8,359,501 ("the '501 patent"), and

20   8,689,064 ("the '064 patent") relate to self-testing electronic memory modules.

21   United States Patent No. 8,489,837 ("the '837 patent") relates to memory modules

22   that perform handshaking during or upon completion of initialization.

23        11.    Server memory modules historically have been standardized by the

24   standard-setting body for the microelectronics industry, JEDEC (Joint Electron

25   Device Engineering Council).  RDIMM is a JEDEC-standard memory module,

26   which was first standardized in the mid-1990s.  RDIMM accounted for more than

27   95 percent of all server memory modules shipped worldwide in 2011.  Despite its

28   longevity and prevalence, standard RDIMM has become increasingly unable to

-4-

DLA PIPER LLP (US)
SAN DIEGO

WEST\270270507

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

1    keep pace with the higher performance requirements of high-end servers.

2    LRDIMM is a different type of memory module also based on a JEDEC standard.

3    JEDEC has not yet approved a final version of the DDR4 LRDIMM standard,

4    though DDR4 products are widely available on the market today that are compliant

5    with draft versions of the standards being considered by JEDEC.

6        12.    Netlist has in all respects acted in a manner consistent with the JEDEC

7    Patent Policy, as set forth in the JEDEC Manual of Organization and Procedure,

8    which states in relevant part that "[a] license will be offered, to applicants desiring

9    to utilize the license for the purpose of implementing the JEDEC Standard under

10    reasonable terms and conditions that are free of any unfair discrimination… ."

11    Netlist contacted Hynix last year regarding its need for a license to Netlist's patent

12    portfolio and has since been negotiating in good faith to reach a resolution.  In the

13    course of these negotiations, Netlist offered to license the asserted patents to Hynix

14    under reasonable terms and conditions that are free of any unfair discrimination

15    months before bringing this action.  Hynix, however, has from the beginning taken

16    unreasonable positions and refused to attribute any meaningful value to Netlist's

17    fundamental patent portfolio.  As a result, the parties have made no progress

18    towards resolution despite multiple substantive exchanges, months of negotiation,

19    and Netlist's offer to license.

20        13.    In June 2016, consistent with its obligations to JEDEC, Netlist sent

21    Hynix a formal letter outlining Netlist's offer to license Netlist's patent portfolio for

22    DDR4 RDIMMs and LRDIMMs on reasonable terms and conditions that are free of

23    any unfair discrimination.  Netlist again identified the asserted patents, and

24    informed Hynix that Hynix DDR4 RDIMMs and LRDIMMs practice the asserted

25    patents.  Hynix did not accept Netlist's reasonable, good-faith offer.

26        14.    Each of the Defendants has been aware of the asserted patents since at

27    least January 2016 when Netlist presented to the Defendants detailed claim charts

28    related to each of the asserted patents.

-5-

DLA Piper LLP (US)
San Diego

WEST\270270507

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

Case: 21-114     Document: 2     Page: 262     Filed: 02/08/2021

Case: 5:20-cv-00194-ADA     Document 2:16/31/File-05/04/20     Page 7 of 21
Case 8:16-cv-01605-DOC-Document     Filed 08/31/16     Page 6 of 20     Page ID #:6

## COUNT ONE

## Infringement of United States Patent No. 8,756,364

15.     Netlist incorporates by reference the preceding allegations of its Complaint.

16.     The '364 patent, entitled "Multirank DDR Memory Modual With Load Reduction," issued on June 17, 2014 to inventors Jeffrey C. Solomon and Jayesh R. Bhakta.  The '364 patent issued from United States Patent Application No. 13/287,042 filed on November 1, 2011.  Netlist owns by assignment the entire right, title and interest in and to the '364 patent.  Attached hereto as Exhibit 1 is a true and correct copy of the '364 patent.

17.     On information and belief, Defendants directly infringed and are currently infringing at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and 23 of the '364 patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, Hynix DDR4 LRDIMMs (Load-Reduced Dual In-Line Memory Modules), including but not limited to the exemplary Hynix DDR4 LRDIMM modules identified in the Hynix Q3 2016 Databook attached as Exhibit 2 (the "accused LRDIMM products").  An exemplary claim chart comparing the asserted independent claims of the '364 patent to an exemplary one of the accused LRDIMM products (part number HMA84GL7AMR4N-TF TE AB) is attached as Exhibit 3.

18.     On information and belief, each of the Defendants has been aware of the '364 patent since at least January 2016.

19.     On information and belief, users making routine use of the accused LRDIMM products infringe at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and 23 of the '364 patent.  On information and belief, each of the Defendants was aware that the accused LRDIMM products infringe at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and

DLA Piper LLP (US)
San Diego

WEST\270270507

-6-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0201

Case: 21-114    Document: 2    Page: 263    Filed: 02/08/2021

Case: 6:20-cv-00694-ADA  Document 26:31/Filed 05/04/20 Page 8 of 21
Case 8:16-cv-01605  Document  Filed 08/31/16 Page 4 of 20  Page ID #:7

1    23 of the '364 patent, and was aware that users making routine use of the accused

2    LRDIMM products infringe those claims.

3        20.   On information and belief, each of the Defendants specifically

4    intended that users of the accused LRDIMM products infringe at least claims 1, 2,

5    3, 4, 6, 7, 10, 13, 17 and 23 of the '364 patent, and took actions while the '364

6    patent was in force intending to cause the infringing acts, including the infringing

7    routine use of the accused LRDIMM products by users.  For example, on

8    information and belief, Defendants provide specifications, datasheets, instruction

9    manuals, and/or other materials that encourage and facilitate infringing use of the

10   accused LRDIMM products by users with the intent of inducing infringement.

11       21.   On information and belief, each of the Defendants contributes to the

12   direct infringement of at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and 23 of the '364

13   patent, including the infringing routine use of the accused LRDIMM products by

14   users.  On information and belief, Defendants have sold, offered for sale and/or

15   imported within the United States the accused LRDIMM products for use in a

16   product or process that practices those claims, while the '364 patent was in force.

17   On information and belief, the accused LRDIMM products have no substantial

18   noninfringing use, and constitute a material part of the patented invention.  On

19   information and belief, each of the Defendants is aware that the product or process

20   that includes the accused LRDIMM products may be covered by a claim of the '364

21   patent or may satisfy a claim of the '364 patent under the doctrine of equivalents.

22   On information and belief, the use of the product or process that includes the

23   accused LRDIMM products infringes at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and

24   23 of the '364 patent.

25       22.   Defendants have committed these acts of direct and indirect

26   infringement with knowledge of at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and 23 of

27   the '364 patent and thus have acted recklessly and willfully with regard to Netlist's

28   rights in the '364 patent.

DLA Piper LLP (US)
San Diego

WEST\270270507

-7-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0202

23.   As a result of Defendants' direct, indirect and willful infringement of at least claims 1, 2, 3, 4, 6, 7, 10, 13, 17 and 23 of the '364 patent, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

24.   Netlist has been irreparably harmed by Defendants' acts of infringement, and will continue to be harmed unless and until Defendants' acts of infringement are enjoined and restrained by order of this Court.  Netlist has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Defendants and the accused LRDIMM products.

## COUNT TWO

### Infringement of United States Patent No. 8,516,185

25.   Netlist incorporates by reference the preceding allegations of its Complaint.

26.   The '185 patent, entitled "System and method utilizing distributed byte-wise buffers on a memory module," issued to inventors Dr. Hyun Lee and Jayesh R. Bhakta on August 20, 2013.  The '185 patent issued from Application No. 12/761,179, filed on April 15, 2010.  Netlist owns by assignment the entire right, title and interest in and to the '185 patent.  Attached hereto as Exhibit 4 is a true and correct copy of the '185 patent.

27.   On information and belief, Defendants directly infringed and are currently infringing at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185 patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused LRDIMM products.  An exemplary claim chart comparing the asserted independent claim of the '185 patent to an exemplary one of the accused LRDIMM products (part number HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)) is attached as Exhibit 5.

Case: 21-114   Document: 2   Page: 265   Filed: 02/08/2021

Case 8:20-cv-00984-ABA   Document 26-13   Filed 05/04/20   Page 10 of 21
Case 8:16-cv-02038-Document 1   Filed 08/31/16   Page 4 of 20   Page ID #9

1    28.    On information and belief, each of the Defendants has been aware of

2    the '185 patent since at least January 2016.

3    29.    On information and belief, users making routine use of the accused

4    LRDIMM products infringe at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185

5    patent.  On information and belief, each of the Defendants was aware that the

6    accused LRDIMM products infringe at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of

7    the '185 patent, and was aware that users making routine use of the accused

8    LRDIMM products infringe those claims.  On information and belief, each of the

9    Defendants specifically intended that users of the accused LRDIMM products

10   infringe at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185 patent, and took

11   actions while the '185 patent was in force intending to cause the infringing acts,

12   including the infringing routine use of the accused LRDIMM products by users.

13   For example, on information and belief, Defendants provide specifications,

14   datasheets, instruction manuals, and/or other materials that encourage and facilitate

15   infringing use of the accused LRDIMM products by users with the intent of

16   inducing infringement.

17   30.    On information and belief, each of the Defendants contributes to the

18   direct infringement of at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185 patent

19   by users making routine use of the accused LRDIMM products.  On information

20   and belief, Defendants have sold, offered for sale and/or imported within the United

21   States the accused LRDIMM products for use in a product or process that practices

22   those claims, while the '185 patent was in force.  On information and belief, the

23   accused LRDIMM products have no substantial noninfringing use, and constitute a

24   material part of the patented invention.  On information and belief, each of the

25   Defendants is aware that the product or process that includes the accused LRDIMM

26   products may be covered by a claim of the '185 patent or may satisfy a claim of the

27   '185 patent under the doctrine of equivalents.  On information and belief, the use of

28

DLA Piper LLP (US)
San Diego

WEST\270270507

-9-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0204

Case: 21-114    Document: 2    Page: 266    Filed: 02/08/2021

Case 3:20-cv-00194-ADA  Document 26-13  Filed 05/04/20  Page 11 of 21
Case 3:16-cv-01605  Document 1  Filed 06/31/16  Page 10 of 20  Page ID#:10

1    the product or process that includes the accused LRDIMM products infringes at

2    least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185 patent.

3         31.    Defendants have committed these acts of direct and indirect

4    infringement with knowledge of at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the

5    '185 patent and thus have acted recklessly and willfully with regard to Netlist's

6    rights in the '185 patent.

7         32.    As a result of Defendants' direct, indirect and willful infringement of

8    at least claims 1, 2, 3, 7, 8, 10, 11 and 12 of the '185 patent, Netlist has suffered and

9    is continuing to suffer monetary damages and is entitled to a monetary judgment in

10   an amount adequate to compensate for Defendants' past infringement, together with

11   enhanced damages, attorneys' fees, interest, and costs.

12        33.    Netlist has been irreparably harmed by Defendants' acts of

13   infringement, and will continue to be harmed unless and until Defendants' acts of

14   infringement are enjoined and restrained by order of this Court.  Netlist has no

15   adequate remedy at law and is entitled to a preliminary and permanent injunction

16   against Defendants and the accused LRDIMM products.

17                              **COUNT THREE**

18            **Infringement of United States Patent No. 8,001,434**

19        34.    Netlist incorporates by reference the preceding allegations of its

20   Complaint.

21        35.    The '434 patent, entitled "Memory board with self-testing capability,"

22   issued to inventors Dr. Hyun Lee, Jayesh R. Bhakta and Soonju Choi on August 16,

23   2011.  The '434 patent issued from Application No. 12/422,925, filed on April 13,

24   2009.  Netlist owns by assignment the entire right, title and interest in and to the

25   '434 patent.  Attached hereto as Exhibit 6 is a true and correct copy of the '434

26   patent.

27        36.    On information and belief, Defendants directly infringed and are

28   currently infringing at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent by, among

-10-

DLA Piper LLP (US)
San Diego

WEST\270270507

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0205

1     other things, making, using, selling, offering to sell, and/or importing within this

2     District and elsewhere in the United States, without authority, the accused

3     LRDIMM products. An exemplary claim chart comparing the asserted claims of

4     the '434 patent to an exemplary one of the accused LRDIMM products (part

5     number HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)) is attached as

6     Exhibit 7.

7         37.    On information and belief, each of the Defendants has been aware of

8     the '434 patent since at least January 2016.

9         38.    On information and belief, users making routine use of the accused

10    LRDIMM products infringe at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent. On

11    information and belief, each of the Defendants was aware that the accused

12    LRDIMM products infringe at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent, and

13    was aware that users making routine use of the accused LRDIMM products infringe

14    those claims. On information and belief, each of the Defendants specifically

15    intended that users of the accused LRDIMM products infringe at least claims 2, 3,

16    4, 5, 6 and 7 of the '434 patent, and took actions while the '434 patent was in force

17    intending to cause the infringing acts, including the infringing routine use of the

18    accused LRDIMM products by users. For example, on information and belief,

19    Defendants provide specifications, datasheets, instruction manuals, and/or other

20    materials that encourage and facilitate infringing use of the accused LRDIMM

21    products by users with the intent of inducing infringement.

22         39.    On information and belief, each of the Defendants contributes to the

23    direct infringement of at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent, including

24    the infringing routine use of the accused LRDIMM products by users. On

25    information and belief, Defendants have sold, offered for sale and/or imported

26    within the United States the accused LRDIMM products for use in a product or

27    process that practices those claims, while the '434 patent was in force. On

28    information and belief, the accused LRDIMM products have no substantial

1   noninfringing use, and constitute a material part of the patented invention.  On

2   information and belief, each of the Defendants is aware that the product or process

3   that includes the accused LRDIMM products may be covered by a claim of the '434

4   patent or may satisfy a claim of the '434 patent under the doctrine of equivalents.

5   On information and belief, the use of the product or process that includes the

6   accused LRDIMM products infringes at least claims 2, 3, 4, 5, 6 and 7 of the '434

7   patent.

8        40.   Defendants have committed these acts of direct and indirect

9   infringement with knowledge of at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent

10  and thus have acted recklessly and willfully with regard to Netlist's rights in the

11  '434 patent.

12       41.   As a result of Defendants' direct, indirect and willful infringement of

13  at least claims 2, 3, 4, 5, 6 and 7 of the '434 patent, Netlist has suffered and is

14  continuing to suffer monetary damages and is entitled to a monetary judgment in an

15  amount adequate to compensate for Defendants' past infringement, together with

16  enhanced damages, attorneys' fees, interest, and costs.

17       42.   Netlist has been irreparably harmed by Defendants' acts of

18  infringement, and will continue to be harmed unless and until Defendants' acts of

19  infringement are enjoined and restrained by order of this Court.  Netlist has no

20  adequate remedy at law and is entitled to a preliminary and permanent injunction

21  against Defendants and the accused LRDIMM products.

22                          **COUNT FOUR**

23        **Infringement of United States Patent No. 8,359,501**

24       43.   Netlist incorporates by reference the preceding allegations of its

25  Complaint.

26       44.   The '501 patent, entitled "Memory board with self-testing capability,"

27  issued to inventors Dr. Hyun Lee, Jayesh R. Bhakta and Soonju Choi on January

28  22, 2013.  The '501 patent issued from Application No. 13/183,253, filed on July

-12-

14, 2011, which claims priority as a continuation of Application No. 12/422,925, which issued as the '434 patent.  Netlist owns by assignment the entire right, title and interest in and to the '501 patent.  Attached hereto as Exhibit 8 is a true and correct copy of the '501 patent.

45.    On information and belief, Defendants directly infringed and are currently infringing at least claim 4 of the '501 patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused LRDIMM products.  An exemplary claim chart comparing the asserted claim of the '501 patent to an exemplary one of the accused LRDIMM products (part number HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)) is attached as Exhibit 9.

46.    On information and belief, each of the Defendants has been aware of the '501 patent since at least January 2016.

47.    On information and belief, users making routine use of the accused LRDIMM products infringe at least claim 4 of the '501 patent.  On information and belief, each of the Defendants was aware that the accused LRDIMM products infringe at least claim 4 of the '501 patent, and was aware that users making routine use of the accused LRDIMM products infringe that claim.  On information and belief, each of the Defendants specifically intended that users of the accused LRDIMM products infringe at least claim 4 of the '501 patent, and took actions while the '501 patent was in force intending to cause the infringing acts, including the infringing routine use of the accused LRDIMM products by users.  For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM products by users with the intent of inducing infringement.

/////

48.     On information and belief, each of the Defendants contributes to the direct infringement of at least claim 4 of the '501 patent, including the infringing routine use of the accused LRDIMM products by users. On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM products for use in a product or process that practices that claim, while the '501 patent was in force. On information and belief, the accused LRDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, each of the Defendants is aware that the product or process that includes the accused LRDIMM products may be covered by a claim of the '501 patent or may satisfy a claim of the '501 patent under the doctrine of equivalents. On information and belief, the use of the product or process that includes the accused LRDIMM products infringes at least claim 4 of the '501 patent.

49.     Defendants have committed these acts of direct and indirect infringement with knowledge of at least claim 4 of the '501 patent and thus have acted recklessly and willfully with regard to Netlist's rights in the '501 patent.

50.     As a result of Defendants' direct, indirect and willful infringement of at least claim 4 of the '501 patent, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

51.     Netlist has been irreparably harmed by Defendants' acts of infringement, and will continue to be harmed unless and until Defendants' acts of infringement are enjoined and restrained by order of this Court. Netlist has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Defendants and the accused LRDIMM products.

/////

/////

APPX0209

Case: 21-114    Document: 2    Page: 271    Filed: 02/08/2021

Case 8:16-cv-01605-JLS-JCG Document 26-13 Filed 05/04/20 Page 16 of 21
Case 8:16-cv-01605-JLS-JCG Document 1 Filed 08/31/16 Page 15 of 20 Page ID #:15

<u>**COUNT FIVE**</u>

<u>**Infringement of United States Patent No. 8,689,064**</u>

52.    Netlist incorporates by reference the preceding allegations of its Complaint.

53.    The '064 patent, entitled "Apparatus and method for self-test in a multi-rank memory module," issued to inventors Dr. Hyun Lee, Jayesh R. Bhakta and Soonju Choi on April 1, 2014.  The '064 patent issued from Application No. 13/745,790, filed on January 19, 2013, which claims priority as a continuation of Application No. 13/183,253, which issued as the '501 patent, which claims priority as a continuation of Application No. 12/422,925, which issued as the '434 patent. Netlist owns by assignment the entire right, title and interest in and to the '064 patent.  Attached hereto as Exhibit 10 is a true and correct copy of the '064 patent.

54.    On information and belief, Defendants directly infringed and are currently infringing at least claim 16 of the '064 patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the accused LRDIMM products. An exemplary claim chart comparing the asserted independent claim of the '064 patent to an exemplary one of the accused LRDIMM products (part number HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)) is attached as Exhibit 11.

55.    On information and belief, each of the Defendants has been aware of the '064 patent since at least January 2016.

56.    Additionally, on information and belief, users making routine use of the accused LRDIMM products infringe at least claim 16 of the '064 patent.  On information and belief, each of the Defendants was aware that the accused LRDIMM products infringe at least claim 16 of the '064 patent, and was aware that users making routine use of the accused LRDIMM products infringe that claim.  On information and belief, each of the Defendants specifically intended that users of

DLA PIPER LLP (US)
SAN DIEGO

WEST\270270507

-15-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0210

1   the accused LRDIMM products infringe at least claim 16 of the '064 patent, and

2   took actions while the '064 patent was in force intending to cause the infringing

3   acts, including the infringing routine use of the accused LRDIMM products by

4   users.  For example, on information and belief, Defendants provide specifications,

5   datasheets, instruction manuals, and/or other materials that encourage and facilitate

6   infringing use of the accused LRDIMM products by users with the intent of

7   inducing infringement.

8          57.    On information and belief, each of the Defendants contributes to the

9   direct infringement of at least claim 16 of the '064 patent, including the infringing

10  routine use of the accused LRDIMM products by users.  On information and belief,

11  Defendants have sold, offered for sale and/or imported within the United States the

12  accused LRDIMM products for use in a product or process that practices that claim,

13  while the '064 patent was in force.  On information and belief, the accused

14  LRDIMM products have no substantial noninfringing use, and constitute a material

15  part of the patented invention.  On information and belief, each of the Defendants is

16  aware that the product or process that includes the accused LRDIMM products may

17  be covered by a claim of the '064 patent or may satisfy a claim of the '064 patent

18  under the doctrine of equivalents.  On information and belief, the use of the product

19  or process that includes the accused LRDIMM products infringes at least claim 16

20  of the '064 patent.

21         58.    Defendants have committed these acts of direct and indirect

22  infringement with knowledge of at least claim 16 of the '064 patent and thus have

23  acted recklessly and willfully with regard to Netlist's rights in the '064 patent.

24         59.    As a result of Defendants' direct, indirect and willful infringement of

25  at least claim 16 of the '064 patent, Netlist has suffered and is continuing to suffer

26  monetary damages and is entitled to a monetary judgment in an amount adequate to

27  compensate for Defendants' past infringement, together with enhanced damages,

28  attorneys' fees, interest, and costs.

-16-

DLA PIPER LLP (US)
SAN DIEGO

WEST\270270507

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

1    60.    Netlist has been irreparably harmed by Defendants' acts of

2    infringement, and will continue to be harmed unless and until Defendants' acts of

3    infringement are enjoined and restrained by order of this Court.  Netlist has no

4    adequate remedy at law and is entitled to a preliminary and permanent injunction

5    against Defendants and the accused LRDIMM products.

6                            **<u>COUNT SIX</u>**

7              **<u>Infringement of United States Patent No. 8,489,837</u>**

8    61.    Netlist incorporates by reference the preceding allegations of its

9    Complaint.

10   62.    The '837 patent, entitled "Systems and methods for handshaking with

11   a memory module," issued to inventor Dr. Hyun Lee on July 16, 2013.  The '837

12   patent issued from Application No. 12/815,339, filed on June 14, 2010.  Netlist

13   owns by assignment the entire right, title and interest in and to the '837 patent.

14   Attached hereto as Exhibit 12 is a true and correct copy of the '837 patent.

15   63.    On information and belief, Defendants directly infringed and are

16   currently infringing at least claims 1, 2, 3, 5 and 6 of the '837 patent by, among

17   other things, making, using, selling, offering to sell, and/or importing within this

18   District and elsewhere in the United States, without authority, the accused

19   LRDIMM products and Hynix DDR4 RDIMMs (Registered Dual In-Line Memory

20   Modules), including but not limited to the exemplary Hynix DDR4 RDIMM

21   modules identified in the Hynix Q3 2016 Databook attached as Exhibit 2 (the

22   "accused RDIMM products") (collectively the "accused products" or the "accused

23   LRDIMM and RDIMM products").  An exemplary claim chart comparing the

24   asserted independent claim of the '837 patent to exemplary accused LRDIMM and

25   RDIMM products (part number HMA84GL7AMR4N-TF TE AB (32GB DDR4

26   LRDIMM) and part number HMA84GR7MFR4N-TF TD BA (32GB DDR4

27   RDIMM)) is attached as Exhibit 13.

28   /////

DLA PIPER LLP (US)
SAN DIEGO

WEST\270270507

-17-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0212

Case: 21-114    Document: 2    Page: 274    Filed: 02/08/2021

Case 8:16-cv-01605-ADA   Document 28-13   Filed 05/04/20   Page 19 of 21
Case 8:16-cv-01605   Document 1   Filed 08/31/16   Page 18 of 20   Page ID #:18

64.     On information and belief, each of the Defendants has been aware of the '837 patent since at least January 2016.

65.     On information and belief, users making routine use of the accused LRDIMM and RDIMM products infringe at least claims 1, 2, 3, 5 and 6 of the '837 patent.  On information and belief, each of the Defendants was aware that the accused LRDIMM and RDIMM products infringe at least claims 1, 2, 3, 5 and 6 of the '837 patent, and was aware that users making routine use of the accused LRDIMM and RDIMM products infringe those claims.  On information and belief, each of the Defendants specifically intended that users of the accused LRDIMM and RDIMM products infringe at least claims 1, 2, 3, 5 and 6 of the '837 patent, and took actions while the '837 patent was in force intending to cause the infringing acts, including the infringing routine use of the accused LRDIMM and RDIMM products by users.  For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM and RDIMM products by users with the intent of inducing infringement.

66.     On information and belief, each of the Defendants contributes to the direct infringement of at least claims 1, 2, 3, 5 and 6 of the '837 patent, including the infringing routine use of the accused LRDIMM and RDIMM products by users.  On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM and RDIMM products for use in a product or process that practices those claims, while the '837 patent was in force.  On information and belief, the accused LRDIMM and RDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention.  On information and belief, each of the Defendants is aware that the product or process that includes the accused LRDIMM and RDIMM products may be covered by a claim of the '837 patent or may satisfy a claim of the '837 patent under the doctrine of equivalents.  On information and belief, the use of the product

-18-

DLA PIPER LLP (US)
SAN DIEGO

WEST\270270507

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0213

1   or process that includes the accused LRDIMM and RDIMM products infringes at

2   least claims 1, 2, 3, 5 and 6 of the '837 patent.

3        67.   Defendants have committed these acts of direct and indirect

4   infringement with knowledge of at least claims 1, 2, 3, 5 and 6 of the '837 patent

5   and thus have acted recklessly and willfully with regard to Netlist's rights in the

6   '837 patent.

7        68.   As a result of Defendants' direct, indirect and willful infringement of

8   at least claims 1, 2, 3, 5 and 6 of the '837 patent, Netlist has suffered and is

9   continuing to suffer monetary damages and is entitled to a monetary judgment in an

10   amount adequate to compensate for Defendants' past infringement, together with

11   enhanced damages, attorneys' fees, interest, and costs.

12        69.   Netlist has been irreparably harmed by Defendants' acts of

13   infringement, and will continue to be harmed unless and until Defendants' acts of

14   infringement are enjoined and restrained by order of this Court.  Netlist has no

15   adequate remedy at law and is entitled to a preliminary and permanent injunction

16   against Defendants and the accused LRDIMM and RDIMM products.

17                       **PRAYER FOR RELIEF**

18      **WHEREFORE**, Netlist respectfully requests that judgment be entered:

19      A.   Declaring that Defendants have infringed and are infringing, directly

20   and indirectly, the claims of the asserted patents;

21      B.   Compensating Netlist for all damages caused by Defendants'

22   infringement of the asserted patents;

23      C.   Enhancing Netlist's damages up to three times their amount under 35

24   U.S.C. § 284;

25      D.   Granting Netlist pre- and post-judgment interests, together with all

26   costs and expenses;

27      E.   Granting Netlist its reasonable attorneys' fees under 35 U.S.C. § 285;

28   /////

Case: 21-114    Document: 2    Page: 276    Filed: 02/08/2021

Case 6:20-cv-00194-ADA   Document 26-13   Filed 05/04/20   Page 21 of 21
Case 8:16-cv-01605   Document 1   Filed 08/31/16   Page 20 of 20   Page ID #:20

1      F.     Granting a permanent injunction enjoining and restraining Defendants

2  and their agents, servants, employees, affiliates, divisions, and subsidiaries, and

3  those in association with Defendants, from making, using, offering to sell, selling,

4  and importing into the United States any product, or using, offering to sell, or

5  selling any service, that falls within the scope of any claim of the asserted patents;

6  and

7      G.     Awarding such other relief as this Court may deem just and proper.

8                     **<u>DEMAND FOR JURY TRIAL</u>**

9     Netlist respectfully requests a trial by jury on all claims so triable.

10

11  Dated:  August 31, 2016

12                            DLA PIPER LLP (US)

13

14                          By: */s/ Sean C. Cunningham*
                               SEAN C. CUNNINGHAM

15                        ERIN P. GIBSON
                        TIFFANY C. MILLER

16                        JACOB D. ANDERSON
                        DLA PIPER LLP (US)

17                        401 B Street, Suite 1700
                        San Diego, CA  92101

18                        Tel:  619.699.2700
                        Fax:  619.699.2701

19

20                        MARK D. FOWLER
                        DLA PIPER LLP (US)

21                        2000 University Avenue
                        East Palo Alto, CA  94303-2215

22                        Tel:  650.833.2000
                        Fax:  650.833.2001

23                        JAMES HEINTZ

24                        DLA PIPER LLP (US)
                        11911 Freedom Drive, #300

25                        Reston, VA  20190
                        Tel:  703.773.4000
                        Fax:  703.773.5000

26                        Attorneys for Plaintiff
                        NETLIST, INC.

27

28

DLA PIPER LLP (US)
San Diego

WEST\270270507

-20-

COMPLAINT FOR PATENT INFRINGEMENT
8:16-CV-01605

APPX0215

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 11

# EXHIBIT 13

Infringement Claim Chart for U.S. Patent No. 8,489,837 – SK Hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| 8,489,837 Claim | SK Hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| 1. A memory module comprising: | The SK Hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) ("SK Hynix LRDIMM") was assembled outside of the United States (Korea) and imported for sale in the United States.  The SK Hynix LRDIMM is a memory module.<br><br><br><br>To the extent this preamble is found to be a limitation, the SK Hynix LRDIMM is a memory module.<br><br><br><br>**Description**<br><br>SK hynix Load Reduced DDR4 SDRAM DIMMs are low power, high-speed operation memory modules that use DDR4 SDRAM devices. These Load Reduced DIMMs are intended for use as main memory when installed in systems such as servers and workstations.<br><br>**Features**<br><br>• 288 pin Load Reduced DDR4 DRAM Dual In-LIne Memory Modules<br>• Buffer performance by LRDIMM presenting less load to system |

EXHIBIT 13, PAGE 375

Case 8:16-cv-02026-CJC-AFM Document 364-1 Filed 04/20/18 Page 142 of 199 Page ID #:407

Infringement Claim Chart for U.S. Patent No. 8,489,837 – SK Hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| **8,489,837 Claim** | SK Hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller indicating at least one status of the at least one initialization sequence; and | memory controller indicating at least one status of the at least one initialization sequence.

For example, the IDT 4RCD0124K Register Clock Driver (RCD) in the SK Hynix LRDIMM includes such a notification circuit, while the SK Hynix LRDIMM is performing the CA Bus training, outputs at least one notification signal (ALERT_n) to the memory controller indicating at least one status of the at least one initialization sequence.

 

A zoomed-in portion of the Second group of training sequences shows the SK Hynix LRDIMM's output "Alert_n" signal being driven indicating at least one status of the at least one initialization sequence. This Second group of training sequences include a plurality of training sequences that are |

13

APPX0219

EXHIBIT 13, PAGE 387

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 12





DOCKET
NUMBER

3173

Office of the
Secretary
Int'l Trade Commission

**DLA Piper** LLP (US)
401 B Street, Suite 1700
San Diego, California  92101-4297
www.dlapiper.com

Sean C. Cunningham
sean.cunningham@dlapiper.com
T  619.699.2900
F  619.764.6600

September 1, 2016

*VIA HAND DELIVERY & EDIS*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C.  20436

Re:    *Certain Memory Modules And Components Thereof, And Products Containing Same*
         ITC Investigation No. 337-TA-___

Dear Secretary Barton:

I enclose for filing on behalf Complainant Netlist, Inc. ("Netlist") the following documents in support of Netlist's request that the Commission commence an investigation pursuant to the provisions of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. §1337.  Please note that Confidential Exhibits 29C, 30C, 31C, 32C, 33C, 34C, 35C, 36C, 37C, 38C, 39C, 40C to the Complaint contain Confidential Business Information and pursuant to the Commission's Rules of Practice and Procedure, a request for confidential treatment of the information in those exhibits accompanies this filing.

Accordingly, Netlist submits the following documents for filing:

1.    One (1) original and eight (8) paper copies of Complainant's verified Complaint and the Public Interest Statement (originals unbound); one copy of the Non-Confidential Exhibits in electronic form (on a CD); and one copy of Confidential Exhibits 29C, 30C, 31C, 32C, 33C, 34C, 35C, 36C, 37C, 38C, 39C, 40C in electronic form (on a separate CD) (Commission Rules 19 C.F.R. §§ 201.6(c), 210.4(f)(2), 210.8(a)(1)(i), 210.8(a)(1)(ii) and 210.8(b));

2.    Three (3) additional paper copies of the verified Complaint and the Public Interest Statement; three copies of the Non-Confidential Exhibits in electronic form (on a CD); and three copies of Confidential Exhibits 29C, 30C, 31C, 32C, 33C, 34C, 35C, 36C, 37C, 38C, 39C, 40C in electronic form (on a separate CD), for service upon the following proposed Respondents:  SK hynix Inc., SK hynix America Inc. and SK hynix memory solutions Inc. (Commission Rules 19 C.F.R. §§ 201.6(c), 210.4(f)(2), 210.8(a)(1)(iii) and 201.8(b));

3.    One (1) additional paper copy of the verified Complaint for service upon the embassy of Korea (Commission Rules 19 C.F.R. §§ 210.8(a)(1)(iv) and 210.11(a));

4.    One (1) certified copy of each of the following asserted United States Patents:  U.S. Patent Nos. 8,756,364; 8,516,185; 8,001,434; 8,359,501; 8,689,064; and 8,489,837, included with the Complaint as Exhibits 1-6, respectively (Commission Rule 19 C.F.R. § 210.12(a)(9)(i));

5.    One (1) certified copy and three (3) additional copies, on CDs, of the U.S. Patent and Trademark Office prosecution histories for each of the asserted United States Patents: U.S. Patent Nos. 8,756,364; 8,516,185; 8,001,434; 8,359,501; 8,689,064; and 8,489,837,

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MEMORY MODULES AND COMPONENTS THEREOF, AND PRODUCTS CONTAINING SAME** | **Investigation No. 337-TA-_____** |

## COMPLAINANT NETLIST, INC.'S
## STATEMENT ON THE PUBLIC INTEREST

Pursuant to International Trade Commission Rule 210.8(b), Complainant Netlist, Inc. ("Netlist") respectfully submits this statement of public interest regarding the remedial orders it seeks against proposed respondents SK hynix Inc., SK hynix America Inc. and SK hynix memory solutions Inc. (collectively "Respondents"). The public interest does not warrant any departure from the standard practice of excluding all articles found to infringe under section 337. In fact, the public interest heavily favors protecting Netlist's intellectual property rights and domestic industry from further infringement by Hynix. Thus, this Investigation does not present an instance where the Commission, the parties and the public should be required to undergo the time and expense of a recommended determination by the ALJ on the public interest.

Netlist seeks a limited exclusion order directed to certain memory modules, components thereof and products containing same, including Hynix DDR4 RDIMMs and LRDIMMs (collectively "the accused products"), that infringe one or more claims of United States Patent Nos. 8,756,364, 8,516,185, 8,001,434, 8,359,501, 8,689,064 and 8,489,837 (collectively "the asserted patents"). Netlist also seeks a cease and desist order prohibiting Respondents from engaging in the unlawful importation, sale, offer for sale, soliciting of the sale, advertising,

B.    **Netlist's Investments In The Domestic Industry.**

114.    Netlist has an existing economic domestic industry as to HyperCloud and

Netlist's exploitation of the asserted patents and the patented technology incorporated into

HyperCloud. Netlist also has a domestic industry that exists or is in the process of being

established as to its new product HybriDIMM, Netlist's latest breakthrough product that Netlist

introduced to the market for the first time last month, and Netlist's exploitation of each of the

asserted patents and the patented technology incorporated into HybriDIMM.

115.    Netlist makes extensive use of the inventions claimed in the asserted patents in its

HyperCloud and HybriDIMM products. HyperCloud and HybriDIMM were built upon Netlist's

patented technology. Netlist engineers working in Irvine, California, invented the technology of

the asserted patents and worked to implement the patented inventions into Netlist's HyperCloud

and HybriDIMM products, which were designed and developed in the United States. As set

forth in greater detail above, HyperCloud and HybriDIMM practice the asserted patent claims

and thus are Netlist domestic industry products.

116.    Netlist engineers working in Irvine, California, started to design and develop

HyperCloud in 2007. Netlist introduced HyperCloud in 2009 based upon Netlist's patented rank

multiplication and load reduction technology, along with the most efficient distributed buffer

architecture and the other patented inventions at issue in this Investigation. IBM and HP are

among the companies that qualified HyperCloud for use in their products and purchased

HyperCloud. Exhibit 41 (Netlist 10K) at 13.

117.    Netlist engineers working in Irvine, California, started to design and develop

HybriDIMM in 2013, building upon HyperCloud's then-existing design and the technology of

the asserted patents. Netlist's new HybriDIMM technology is designed to be compatible with

the JEDEC DDR4 LRDIMM interface. HybriDIMM is an evolved architecture that combines the proven semiconductor raw materials of DRAM and NAND into a single persistent memory space. It has the same Load / Store model as DRAM, and runs at near DRAM speed, but with capacities usually associated with traditional storage. HybriDIMM can do all of this at a greatly reduced cost compared to DRAM and without system modification. Netlist expects to start shipping HybriDIMM to select customers later this year.

118.    On November 12, 2015, Netlist entered into a JDLA with Samsung, pursuant to which Netlist and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of Netlist's new technology. Exhibit 41 (Netlist 10K) at 34. Netlist received $8 million of non-recurring engineering fees (NRE) from Samsung for the joint development. Exhibit 41 (Netlist 10K) at 34. Netlist and Samsung, along with a group of industry ecosystem partners, will work to bring the compelling benefits of this new technology to a large group of customers in cloud computing, big data, and server and storage markets. By using a hybrid storage solution that appears to the system as a standard LRDIMM, customers will be able to efficiently extract intelligence from large amounts of data in storage systems.

119.    Netlist has made significant and substantial investments in the United States directly related to HyperCloud and HybriDIMM, the inventions claimed in the asserted patents, and developing HyperCloud and HybriDIMM to implement Netlist's patented technology. Public information regarding Netlist's investments is set forth below. Detailed confidential information about Netlist's significant and substantial investments is set forth in Confidential Exhibit 40C, the Declaration of Gail Sasaski, who is Netlist's Chief Financial Officer. *See* Confidential Exhibit 40C, Sasaki Declaration.

120.    Netlist has made significant domestic investments in labor and capital with respect to HyperCloud and HybriDIMM, the technology of the asserted patents, and developing HyperCloud and HybriDIMM to implement Netlist's patented technology.  As of January 2, 2016, Netlist had approximately 45 regular U.S. employees.  Exhibit 41 (Netlist 10K) at 9. Approximately half of these employees are Netlist engineers working in Irvine, California on research and development, design, engineering, and testing of HybriDIMM.  Since 2007, substantially all of the research and development, design, engineering and testing of HyperCloud and HybriDIMM was done by Netlist engineers working in Irvine, California.  Other employees working in jobs other than sales and marketing support Netlist's activities with respect to research and development, design, engineering, testing and production of HyperCloud and HybriDIMM.

121.    Netlist has made significant domestic investments in facilities and equipment with respect to HyperCloud and HybriDIMM, the technology of the asserted patents, and developing HyperCloud and HybriDIMM to implement Netlist's patented technology.  Netlist's headquarters facility is located in approximately 8,203 square feet of space in Irvine, California. Exhibit 41 (Netlist 10K) at 31.  Netlist's total lease expenses were $526,000 in fiscal year 2015 (ended January 2, 2016), most of which relate to lease payments for Netlist's Irvine, California, headquarters facility.  Exhibit 41 (Netlist 10K) at F-24.  Netlist's Irvine, California headquarters are used for research and development, product design, engineering, testing, production support and other corporate functions.  As of the end of fiscal year 2015 (January 2, 2016), Netlist held almost $14 million in property and equipment (not including the value of leased facilities). Exhibit 41 (Netlist 10K) at F-16.

(f)    Grant such other and further relief as the Commission deems just and

proper based on the facts determined by the investigation and the authority of the Commission.

Dated:  September 1, 2016                              Respectfully Submitted,

Sean C. Cunningham
Erin P. Gibson
Tiffany C. Miller
Jacob D. Anderson
**DLA Piper LLP (US)**
401 B Street, Suite 1700
San Diego, CA. 92101
Telephone: 619-699-2700
Fax: 619-699-2701

Mark D. Fowler
**DLA Piper LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2215

James Heintz
**DLA Piper LLP (US)**
11911 Freedom Drive, #300
Reston, VA 20190

APPX0226

## VERIFICATION OF COMPLAINT

I, Noel Whitley, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.    I am currently Netlist, Inc.'s VP Intellectual Property and Licensing.  I am duly authorized by Netlist, Inc. to verify the foregoing Complaint.

2.    To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the allegations and other factual contentions of the Complaint have evidentiary support, or, where specifically identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

3.    To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the claims and other legal contentions set forth in the Complaint are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or by the establishment of new law; and

4.    To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the Complaint is not being filed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Executed this 31st day of August 2016

Noel Whitley

WEST\270754689. 1

APPX0227

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 14

Chad S. Hummel (SBN 139005)
*chummel@sidley.com*
Theodore W. Chandler (SBN 219456)
*tchandler@sidley.com*
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Phone: (213) 896-6000
Fax: (213) 896-6600

[*Full list of counsel included in signature block*]

Attorneys for SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| NETLIST, INC., | Case No.: 8:16-cv-01605-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant,* | Assigned to:  Judge Josephine L. Staton |
| v. | **DEFENDANT SK HYNIX INC.'S COUNTERCLAIMS** |
| SK HYNIX INC., | |
| *Defendant and Counterclaim-Plaintiff,* | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| and | |
| SK HYNIX AMERICA INC., and SK HYNIX MEMORY SOLUTIONS INC., | |
| *Defendants.* | |

DEFENDANT SK HYNIX'S COUNTERCLAIMS

SK hynix Inc. ("SK hynix") asserts the following counterclaims against Netlist, Inc. ("Netlist") over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and/or 1367. SK hynix reserves the right to assert additional counterclaims as warranted by the facts revealed through discovery.

## **NATURE OF ACTION**

1.      SK hynix brings the following counterclaims to address Netlist's ongoing refusal to abide by its binding contractual commitments to grant to SK hynix a license to patents that Netlist claims must be practiced to implement key industry standards relating to semiconductor memory products promulgated by a standard-setting organization called JEDEC on reasonable and non-discriminatory ("RAND") terms and conditions. SK hynix has, at all relevant times, been willing and able to take a license to those patents that Netlist claims are essential or potentially essential to the implementation of the relevant industry standards (i.e., Netlist's "standard essential patents" or "SEPs"). However, in contravention of the licensing commitments that Netlist made in order to have technology over which it claims to have patents incorporated into the relevant standards, Netlist has adopted a "hold-up" strategy of making outrageous license demands followed by litigation seeking coercive injunctive relief preventing the importation or sale of SK hynix's standard-compliant products in order to extract unreasonable and discriminatory royalties.

2.      In order to remedy the ongoing and irreparable harm to SK hynix's business resulting from Netlist's failure to provide it a license to Netlist's claimed SEPs on RAND terms, SK hynix seeks: (a) a finding that Netlist has breached its contractual obligation to offer to SK hynix a license on such terms; (b) a declaration of the RAND terms and conditions on which Netlist is obligated to make a license available to SK hynix; and (c) a declaration that Netlist is not entitled to obtain injunctive or exclusionary relief in any forum against SK hynix for the alleged infringement of Netlist's SEPs in light of SK hynix's willingness to

1    take a license on RAND terms and to accept a judicially determined rate.

2                    **THE COUNTERCLAIM PARTIES**

3            3.      SK hynix is a South Korean corporation with a principal place of

4    business at 2091, Gyeongchung-daero, Bubal-eub, Icheon-si, Gyeonggi-do,

5    Republic of Korea.  SK hynix designs, manufactures, and sells semiconductor

6    memory chips and modules for computer, electronic, and mobile devices

7    ("memory products").

8            4.      Defendant Netlist is a Delaware corporation with a principal place of

9    business at 175 Technology Drive, Suite 150, Irvine, California 92618.  Netlist

10   holds patents that it asserts are relevant to memory products, including patents that

11   it claims are essential to the implementation of various JEDEC standards.  Netlist

12   has stated to investors that it is focused on monetizing its patent portfolio and that

13   it intends to pursue an intellectual property-based licensing business in which it

14   will generate licensing revenue by selling or licensing its technology.

15                    **JURISDICTION AND VENUE**

16           5.      This is a civil action for breach of contract and declaratory relief

17   under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

18           6.      This Court has subject matter jurisdiction over the breach of contract

19   claim pursuant to 28 U.S.C. §§ 1332 and/or 1367.  The matter in controversy

20   exceeds the sum or value of $75,000, exclusive of interest and costs, and is

21   between a citizen or subject of a foreign state and a citizen of Delaware and

22   California.  The breach of contract claim forms part of the same case or

23   controversy as the claims for patent infringement asserted by Netlist in this action.

24           7.      This Court has subject matter jurisdiction over the declaratory

25   judgment claim pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and/or 1367.  An

26   actual case or controversy exists between the parties regarding what constitutes

27   RAND terms and conditions for a license to Netlist's patents essential to JEDEC

28   standards.  The dispute is definite and concrete and touches the legal relations of

the parties, who have adverse legal interests.  The matter in dispute exceeds the

sum or value of $75,000, exclusive of interest and costs, and is between citizens of

different states.

       8.     This Court has personal jurisdiction over Netlist for at least the

following reasons:  (1) Netlist has a principal place of business in California; (2)

Netlist regularly solicits and conducts business in California and has minimum

contacts in California; and (3) Netlist has submitted to the jurisdiction of the Court

by having commenced a patent infringement action in this Court.

       9.     Venue is proper in the Central District of California pursuant to 28

U.S.C. §§ 1391(b), (d).

## FACTUAL BACKGROUND

**A.    SK Hynix**

       10.    Founded in 1983 in the Republic of Korea, SK hynix has become one

of the largest providers of computer memory solutions in the global industry.  SK

hynix began its successful business developing and fabricating random-access

memory (RAM) products for major computer manufacturers.  The company

continued expanding its partnerships and operations and currently has

manufacturing facilities in South Korea and China, and over 27,000 employees.

SK hynix has also developed a continuous record of innovation and varied

semiconductor product offerings sold across the globe.  It is one of the leaders in

the market for various types of Dual In-Line Memory Module ("DIMM") products,

widely used in the latest generations of computer and electronic devices.

       11.    SK hynix has historically invested heavily in R&D, consistently

spending more than 8% of its annual revenue in R&D activities.  In 2015 alone, SK

hynix invested approximately $1.5 billion in R&D.  It holds more than 11,000

issued patents worldwide, including approximately 7,800 patents issued by the

United States Patent & Trademark Office.

///

**B.     Netlist**

12.     Netlist was founded in 2000 and became a publicly-traded company in 2006.  Netlist is headquartered in California and offers various computer memory products.  Netlist's net product sales totaled approximately $6.9 million for the fiscal year ending January 2, 2016, a decline of approximately 64% relative to the prior year.  It currently has just over 100 employees.

13.     Upon information and belief, Netlist has a portfolio of approximately 62 patents issued in the United States.  According to its most recent annual report, Netlist spent approximately $6 million (USD) on R&D in the fiscal year ending January 2, 2016.

**C.     JEDEC and Semiconductor Memory Standards**

14.     JEDEC (formerly known as the "Joint Electron Device Engineering Council") is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States.  Over 300 companies in the computer and electronics industries are currently members of JEDEC, including SK hynix and Netlist.

15.     JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products.  As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by SK hynix's products.

16.     JEDEC's semiconductor memory standards enable interoperability, i.e., the ability of memory products made by different manufacturers to work together and with computer and electronic devices made by others.  JEDEC standards are widely implemented and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

17.     Member companies participate in JEDEC's standard-setting process

1  through over 50 committees and subcommittees that address various technological

2  areas.  Through a collaborative process, members contribute and vote on technical

3  proposals for incorporation into JEDEC standards.  Upon committee and Board

4  approval, new standards are promulgated and made available to the public for free.

5      18.    In some cases, JEDEC members own patents covering the technology

6  they or others seek to have included in a JEDEC standard.  A patent that includes a

7  claim or claims that would necessarily be infringed by the use, sale, offer for sale,

8  or disposition of a portion of a product in order to be compliant with an industry

9  standard is referred to as a "standard essential patent" or an "SEP."

10     19.    Each owner of an SEP can, unless restrained, demand and obtain

11 exorbitant royalties for the use of its patent, far in excess of the value, if any, that

12 the patented technology would command had it not been incorporated into a

13 standard.  If unwilling to pay such excessive royalties, firms wishing to implement

14 the standard face the risk of being foreclosed from using any portion of the

15 standard, including even unpatented and public domain technologies.  This threat

16 of foreclosure, if left unchecked, puts a manufacturer's huge investment in

17 developing standard-compliant products at risk and, in effect, permits the

18 possibility that the SEP holder may capture up to the value of the standard as a

19 whole for each unique implementer, rather than the true value of its specific

20 contribution to the standard.  The exploitation of SEPs to extract unreasonable or

21 discriminatory royalties is referred to as patent "hold-up."

22     20.    The problem of "hold-up" is exacerbated in the context of standards,

23 like those at issue here, as to which there are large numbers of SEPs and many

24 different firms that claim to hold SEPs.  The problem is likewise compounded

25 when the products at issue, also like those here, may be required to implement

26 multiple standards.  The resulting problem of excessive aggregate royalties is

27 referred as "royalty stacking".

28     21.    In order to mitigate these risks, JEDEC—like many other standard-

setting organizations—has adopted a Patent Policy that seeks to ensure that any

patents that would necessarily be practiced to implement a JEDEC standard will be

available for manufacturers of standard-compliant products to license on RAND

terms and conditions.  Every firm that is a member of a JEDEC committee or a

participant in a JEDEC committee meeting, including Netlist, agrees to abide by

the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership or*
> *committee Participation, agree to abide by JEDEC rules and*
> *procedures, including this JEDEC patent policy ("Patent Policy").*

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.2.1.

22.    Pursuant to the JEDEC Patent Policy, as a condition of committee

membership or participation, all JEDEC committee members agree to disclose

"Potentially Essential Patents" relevant to the work of the committee, and to

license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership*
> *and participation, agree to Disclose Potentially Essential Patents, as*
> *set forth more fully in 8.2.3, and to offer to license their Essential*
> *Patent Claims to all Potential Licensees on RAND terms and*
> *conditions, if and as consistent with 8.2.3 and 8.2.4.*

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.2.1.

23.    The JEDEC Patent Policy defines "Potentially Essential Patent" as a

patent that is reasonably believed to contain one or more Essential Patent Claims.

Exhibit 1 (JEDEC Manual No. 21R) § 8.2.1.  "Essential Patent Claim" is further

defined as those patent claims the use of which would necessarily be infringed by

the use, sale, offer for sale or other disposition of a portion of a product in order to

be compliant with the required portions of a final approved JEDEC standard.  *Id.*

24.    Member companies who disclose and agree to license on RAND

terms their patents typically submit a "License Assurance/Disclosure Form" (also

known as a "Letter of Assurance" or "LOA") identifying the relevant JEDEC

standard(s) and making one of the two following commitments specified by the

JEDEC Patent Policy:

>  *For any Essential Patent Claims held or controlled by the entity,*
>  *pending or anticipated to be filed, the entity states:*
>  *___ (i) A license will be offered, without compensation, under*
>  *reasonable terms and conditions that are demonstrably free of any*
>  *unfair discrimination to applicants desiring to utilize the license for*
>  *the purpose of implementing the JEDEC Standard; or*
>  *___ (ii) A license will be offered, with compensation, to applicants*
>  *desiring to utilize the license for the purpose of implementing the*
>  *JEDEC Standard under reasonable terms and conditions that are*
>  *demonstrably free of any unfair discrimination.*

Exhibit 1 (JEDEC Manual No. 21R) at A.3; *see also id.* § 8.2.5.

25.    According to JEDEC's Patent Policy, disclosures and commitments

with respect to one patent are deemed to include all patents claiming priority to the

same filing.  Exhibit 1 (JEDEC Manual No. 21R) § 8.2.1.

26.    If a committee member who owns or controls patents essential or

potentially essential to JEDEC standards does not disclose and agree to license

them before the ballot closes, or notify the committee of an intention not to license

through a so-called "Notice of Refusal", it is still obligated to offer licenses on

RAND terms:

>  *If a Committee Member, at its discretion, elects not to submit a*
>  *License Assurance/Disclosure Form (see Annex A.3) at or before the*
>  *time the ballot closes and does not otherwise provide notice of an*
>  *unwillingness to license in accordance with 8.2.3.1, the Committee*
>  *Member and its Affiliates will be deemed to have agreed to offer to*
>  *grant licenses on RAND terms and conditions for all of its Essential*

1    *Patent Claims of the balloted Standard, if and as consistent with*
2    *8.2.4.*
3    Exhibit 1 (JEDEC Manual No. 21R) § 8.2.5.
4        27.    Although JEDEC does not specifically set forth what terms and
5    conditions are RAND in a given context, certain generally accepted principles have
6    been recognized by participants in the industry, regulators, and the courts,
7    including:
8        (a)    RAND royalties should be set at levels consistent with the goal of
9               promoting widespread adoption of the standard(s) in question;
10       (b)    Reasonable royalties for RAND-encumbered SEPs should be at levels
11              consistent with a reasonable aggregate royalty burden for the
12              standard-compliant product(s);
13       (c)    An SEP owner should be limited to a reasonable royalty that reflects
14              the economic value of its specific patented technology to the
15              standard(s) and product(s) in question and not any additional value
16              conferred by incorporation of that technology in the standard;
17       (d)    An SEP owner cannot discriminate among similarly situated
18              licensees; and
19       (e)    Having agreed to accept a reasonable royalty for use of its patented
20              technology to implement the standard(s) in question, the holder of an
21              SEP has relinquished any right it has to obtain injunctive relief at least
22              against any firm that is willing and able to take a license on RAND
23              terms.
24       28.    The JEDEC Patent Policy is to be interpreted and governed under the
25    laws of the State of New York.  Exhibit 1 (JEDEC Manual No. 21R) § 8.2.10.
26   **D.    Netlist's RAND Commitments**
27       29.    Upon information and belief, Netlist currently owns 62 U.S. patents
28    and 12 U.S. patent applications related to technologies used in various types of

1 DIMM products, including Load-Reduced ("LRDIMM"), Registered ("RDIMM"),

2 and Non-Volatile ("NVDIMM") memory products.

3      30.    Netlist is also a member of JEDEC and has participated in a number

4 of JEDEC technical committees over time.  Upon information and belief, Netlist

5 representatives currently participate in the following committees:  JC-11.10

6 (Microelectronic Ceramic Packages), JC-11.11 (Microelectronic Plastic Packages),

7 JC-16 (Interface Technology), JC-63 (Multiple Chip Packages), and JC-64

8 (Embedded Memory Storage & Removable Memory Cards).  Upon information

9 and belief, at the time that the standards relating to RDIMM and LRDIMM

10 technology were developed by JEDEC, Netlist was a member or attended the

11 meetings of the committees that developed those standards.

12      31.    To date, Netlist has disclosed that 38 of its patents and 2 of its patent

13 applications are essential or potentially essential to JEDEC standards as shown in

14 Exhibit 2 (List of Netlist Disclosed Patents).

15      32.    Netlist has notified JEDEC that it will not offer licenses on RAND

16 terms for several of its patents or applications it has disclosed as essential or

17 potentially essential to JEDEC standards by submitting a "Notices of Refusal" (or

18 "NORs").  As shown in Exhibit 2, Netlist has withdrawn some of its NORs over

19 time and agreed to license those patents on RAND terms.  Upon information and

20 belief, Netlist currently refuses to license on RAND terms 13 of the patents or

21 applications it has disclosed as essential or potentially essential to JEDEC

22 standards.  *See* Exhibit 2 (List of Netlist Disclosed Patents).

23      33.    For the remaining 27 patents or applications Netlist has disclosed as

24 essential or potentially essential to JEDEC standards—which include each of the

25 six patents asserted by Netlist against SK hynix in the underlying patent

26 infringement litigation—Netlist has made binding commitments to offer licenses

27 on RAND terms by virtue of submitting the Letters of Assurance listed on Exhibit

28 3 and attached herein as Exhibits 4-44.

34.   The commitments that Netlist has made to license its SEPs on RAND terms constitute binding contractual obligations that may be enforced by firms seeking to implement the JEDEC standards such as SK hynix.

**E.   Netlist's Failure to Comply with its RAND Obligations**

35.   Although it accepted the benefits of its membership in JEDEC and voluntarily undertook the obligation to license its SEPs on RAND terms in order to induce JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC standards, Netlist has failed and refused over many years to abide by these obligations.  Netlist has engaged in a pattern of conduct indicating a general disregard of its RAND obligations, and the specific licensing demands that it has made on SK hynix have been both unreasonable and, upon information and belief, discriminatory.

36.   Emblematic of Netlist's intent to withhold access to its SEPs in a strategic fashion, at the outset of the relevant period, in 2010, Netlist sought to limit its RAND commitments to allow itself the freedom to refuse to license its patents to certain memory buffer firms that it regarded as more direct competitors, while purporting to commit to license the same patents on RAND terms to the makers of other memory products.  Only after JEDEC officials intervened and warned that such conditional RAND commitments were not permitted did Netlist extend its RAND commitments to the activities of the JC-40 committee that was focused on memory buffer technology.

37.   Netlist's disregard of its RAND obligations has been reflected in the dealings between it and SK hynix over several years.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



38.

39.    In November 2015, Netlist entered into a Joint Development &
License Agreement with Samsung Electronics Co., Ltd. ("Samsung") to jointly
develop certain semiconductor memory products and cross-license their respective
patent portfolios (the "JDLA").  Public disclosures indicate that Netlist received $8
million in cash and $15 million in the form of a note that is convertible into equity
and which is secured by Netlist's patents.

40.

Case: 21-114   Document: 2   Page: 302   Filed: 02/08/2021

Case 8:16-cv-09605-JLS-JCG ADA Document 26-17 Filed 05/04/20 Page 14 of 22
Case 8:16-cv-01605-JLS-JCG Document 58 Filed 11/07/16 Page 13 of 21 Page ID #:1296

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮ which was many

6 multiples of: (a) what the publicly-available information indicated that Samsung

7 had paid for a license to Netlist's portfolio under the JDLA; (b) the $20 million

8 that Netlist claims it had offered just a year earlier for a license in connection the

9 parties' negotiations of a potential NVDIMM-P joint development arrangement;

10 and (c) any reasonable royalty for a license to Netlist's patents.

11     41.   ▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮    In fact, LRDIMM products reflect the standardized and non-

14 standardized contributions of many firms, including SK hynix. There were many

15 contributors to the development of the LRDIMM standards. Nine firms, in addition

16 to Netlist, disclosed their ownership of patents potentially essential to the

17 LRDIMM standard. If the other contributing firms sought royalties equivalent to

18 the ▮▮▮▮▮▮ unit royalty that Netlist demanded from SK hynix, the

19 aggregate royalty for just the LRDIMM-specific technology in the relevant

20 products (which incorporate a host of other technologies and standards) would be

21 grossly excessive and significantly increase the cost of the products.

22     42.   ▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮



43.     In the following months, the parties continued discussing the terms of a license and the technical merits of their respective patent portfolios.

44.     For its part, SK hynix has at all times been willing to license Netlist's patents essential to JEDEC standards on RAND terms and has negotiated (on its behalf and that of its affiliates) in good faith.

45.

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ███████████████

5          46.     In sum, Netlist has failed to offer RAND license terms to SK hynix

6  and has breached its RAND obligations regarding its essential patents.  Upon

7  information and belief, Netlist has unfairly discriminated against SK hynix by

8  refusing to offer similar license terms as those enjoyed by SK hynix's chief

9  competitor, Samsung.

10 **F.     Netlist's Litigation Against SK Hynix**

11         47.     On August 31, 2016, Netlist initiated a patent infringement action

12 against SK hynix and two of its affiliates in the U.S. District Court for the Central

13 District of California, Civil Action No. 8:16-cv-01605-JLS-JCG.  In addition to

14 damages, Netlist sought a permanent injunction against SK hynix's sale of the

15 accused standard-compliant products.

16         48.     The following day, Netlist initiated an investigation against SK hynix

17 at the U.S. International Trade Commission ("ITC") alleging infringement of the

18 same patents asserted in the California action.  In its ITC action, Netlist sought an

19 exclusion order barring the importation of SK hynix's accused standard-compliant

20 products, as well as a cease and desist order directed to inventory in the U.S.  The

21 only relevant forms of relief that the ITC can grant are exclusionary in nature.

22         49.     The patents asserted in the California and ITC actions are U.S. Patent

23 Nos. 8,756,364; 8,516,185; 8,001,434; 8,359,501; 8,689,064; and 8,489,837

24 (collectively, the "Asserted Patents").  In its pleadings, Netlist describes the '364

25 and '185 patents as relating to improvements in performance or memory capacity

26 for memory modules.  Netlist describes the '434, '501, and '064 patents as relating

27 to self-testing electronic memory modules.  Netlist describes the '837 patent as

28 relating to memory modules that perform handshaking during or upon completion

Case: 21-114    Document: 2    Page: 305    Filed: 02/08/2021

Case 8:16-cv-01605-JLS-JCG-ABA    Document 26-17    Filed 05/04/20    Page 17 of 22
Case 8:16-cv-01605-JLS-JCG    Document 38    Filed 11/07/16    Page 16 of 21    Page ID #:1299

1  of initialization.

2      50.    Netlist's litigation campaign against SK hynix (and its affiliates)

3  further confirms its intent to avoid its RAND obligations.  Netlist has singled out

4  SK hynix in an attempt to extract supra-competitive royalties and leverage the

5  threat of injunctions to exclude SK hynix from using Netlist's patented technology.

6  But in promising to offer to license any of its patents essential or potentially

7  essential to JEDEC standards on RAND terms and conditions, Netlist surrendered

8  any right to pick and choose which standard implementers could receive licenses

9  and exclude implementers—like SK hynix—who are able and willing to license on

10 RAND terms.

### FIRST CAUSE OF ACTION

#### Breach of Contract

13     51.    SK hynix realleges and incorporates by reference the allegations set

14 forth in the foregoing paragraphs 1-50.

15     52.    Subject to the terms and conditions of the JEDEC Patent Policy,

16 Netlist has made a contractual commitment and is obligated to offer to

17 implementers of JEDEC standards, including SK hynix and its affiliates, licenses

18 to its essential patents on RAND terms and conditions.  In each of its Letters of

19 Assurance, Netlist promised to make available to implementers of the identified

20 JEDEC standards a license "under reasonable terms and conditions that are

21 demonstrably free of any unfair discrimination."  Exhibits 4-44.

22     53.    Netlist has claimed in its negotiations with SK hynix that the patents

23 and patent applications subject to Netlist's letters of assurance are essential to (i.e.,

24 would necessarily be infringed by complying with) JEDEC standards.

25     54.    Netlist has also represented to SK hynix that it owns additional

26 patents that are, in fact, essential to JEDEC standards.  To the extent that any of

27 Netlist's patents or applications that Netlist claims are essential were not disclosed

28 to JEDEC and to the extent that Netlist has not otherwise provided to JEDEC a

Notice of Refusal with respect to such patents, JEDEC's Patent Policy obligates Netlist to license them on RAND terms.

55.   SK hynix and its affiliates are third-party beneficiaries to Netlist's RAND obligations.  SK hynix has at all times been willing to take a license (on its behalf and that of its affiliates) to Netlist's essential patents on RAND terms and conditions.

56.   Netlist has nonetheless failed to offer a license to its essential patents on RAND terms and conditions, and has rejected the RAND offers made by SK hynix.  Netlist instead has made royalty demands that are wholly disproportionate to the royalties that its patents should command under a reasonable calculation and, upon information and belief, discriminatory in comparison to what SK hynix's similarly-situated competitor, Samsung, has paid for a license.

57.   Netlist has further sued SK hynix and its affiliates for alleged infringement of patents it claims are essential to JEDEC standards, seeking injunctive relief to bar SK hynix's products from the U.S. market notwithstanding the fact that SK hynix is, and at all times relevant hereto has been, willing, able, and entitled to take a license to Netlist's patents on RAND terms.

58.   Netlist has therefore breached its contractual obligations to license its essential patents to SK hynix and its affiliates on RAND terms and conditions.

59.   As a result of Netlist's contractual breach, SK hynix has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEPs on RAND terms, a license which can only be obtained from Netlist. SK hynix's inability to obtain a license to Netlist's SEPs on RAND terms, coupled with Netlist's litigation campaign against SK hynix, threaten SK hynix with the imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

60.   SK hynix has suffered and will continue to suffer irreparable injury by

1    reason of Netlist's acts, practices, and conduct alleged above unless the Court

2    enjoins such acts, practices, and conduct.

3                     **SECOND CAUSE OF ACTION**

4    **Declaratory Judgment of RAND Terms for a License to Netlist's Patents**

5                 **Essential to JEDEC Standards**

6         61.      SK hynix realleges and incorporates by reference the allegations set

7    forth in the foregoing paragraphs 1-60.

8         62.      SK hynix (on its behalf and that of its affiliates) has expressed its

9    willingness to take a license to Netlist's patents essential to JEDEC standards.

10   Netlist has an obligation to offer SK hynix a license to those patents on RAND

11   terms and conditions.

12        63.      However, there is a definite and concrete dispute between SK hynix

13   and Netlist regarding what constitutes RAND royalties for a license to Netlist's

14   patents essential to JEDEC standards.

15        64.      Unless and until RAND royalties for a license to Netlist's patents

16   essential to JEDEC standards are determined, SK hynix will continue to be harmed

17   by the potential disruption of its business, ongoing litigation and threat of potential

18   litigation, threat of injunctions against SK hynix's products, imminent loss of

19   profits, loss of customers and potential customers, and loss of goodwill and

20   product image.

21        65.      SK hynix is therefore entitled to a declaratory judgment setting forth

22   the RAND terms and conditions for a license to Netlist's patents essential to

23   JEDEC standards, including the applicable royalty rate, to which it is entitled.

24        66.      SK hynix is further entitled to a declaratory judgment that it has a

25   right to obtain a license to Netlist's patents essential to JEDEC standards under the

26   RAND terms and conditions to be determined by the Court.

27        67.      SK hynix is willing to be bound and take a license to Netlist's patents

28   essential to JEDEC standards on the RAND terms and conditions to be determined

by the Court (subject to any applicable right of appeal).

**THIRD CAUSE OF ACTION**

**Declaratory Judgment that Netlist is Barred from Seeking and/or Enforcing Injunctive Relief Against SK hynix Based on Patents Essential to JEDEC Standards**

68.    SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-67.

69.    Netlist represented to JEDEC and has claimed in its negotiations with SK hynix that it owns patents and patent applications that are essential or potentially essential to (i.e., would necessarily be infringed by complying with) JEDEC standards, including the Asserted Patents.

70.    Subject to the terms and conditions of the JEDEC Patent Policy, Netlist has made a contractual commitment and/or is otherwise obligated by the JEDEC Patent Policy to grant implementers of JEDEC standards, including SK hynix and its affiliates, licenses to its essential patent on RAND terms and conditions.

71.    Inherent in Netlist's RAND commitments is an admission that monetary compensation in the form of a RAND royalty is adequate to compensate Netlist for use of its SEPs in the implementation of JEDEC standards.

72.    SK hynix (on its behalf and that of its affiliates) has expressed its willingness to take a license to Netlist's patents essential to JEDEC standards.  At all relevant times, SK hynix has negotiated with Netlist in good faith and has been willing to take a license to Netlist's patents essential to JEDEC standards on RAND terms and conditions, including making a RAND offer for a license to Netlist's patents.  SK hynix is willing to be bound and take a license to Netlist's patents essential to JEDEC standards on the RAND terms and conditions to be determined by the Court (subject to any applicable right of appeal).

73.    There is a definite and concrete dispute between SK hynix and Netlist

-18-

regarding whether, alone or in combination with the negotiation history between the parties, Netlist's RAND obligations bar Netlist from seeking and/or enforcing injunctive relief against SK hynix for alleged infringement of patents essential to JEDEC standards, including the Asserted Patents.

74.    Netlist has in fact sought injunctive relief against SK hynix for alleged infringement of the Asserted Patents before this Court and in the ITC.

75.    As a result of the threat of injunctive relief, SK hynix has been harmed and will continue to be harmed by the potential disruption of its business, imminent loss of profits, loss of customers and potential customers, loss of sales, and loss of goodwill and product image, and litigation costs.  If injunctive relief were granted, SK hynix would be irreparably harmed by the disruption of its business, loss of profits, loss of customers and loss of potential customers, loss of sales and goodwill and product image.

76.    SK hynix is therefore entitled to a declaratory judgment that Netlist is barred by its RAND obligations from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards.

## **PRAYER FOR RELIEF**

WHEREAS, Plaintiff SK hynix prays that this Court enter judgment against Defendant Netlist as follows:

A.    Adjudge and decree that Netlist is liable for breach of contract;

B.    Grant injunctive relief requiring Netlist to offer a license to the patents it asserts are essential or potentially essential to the JEDEC standards—including the Asserted Patents—on reasonable terms and conditions that are demonstrably free of unfair discrimination;

C.    Declare the RAND terms and conditions, including royalties, for a license to Netlist's patents essential or potentially essential to JEDEC standards;

Case: 21-114   Document: 2   Page: 310   Filed: 02/08/2021

Case 8:16-cv-01605-JLS-JCG-ADA Document 26-17 Filed 05/04/20 Page 22 of 22
Case 6:20-cv-80196-ADA Document 38 Filed 11/07/16 Page 21 of 21 Page ID #:1304

D.     Declare that SK hynix and its affiliates have a right to obtain a license to Netlist's patent essential to JEDEC standards under the terms and conditions to be determined by the Court;

E.     Enjoin Netlist from further demanding excessive, non-RAND royalties from SK hynix;

F.     Declare that Netlist is barred from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards;

G.     Enjoin Netlist from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards; and

H.     Such other equitable relief as this Court deems just and proper.

Date: November 7, 2016                    Respectfully submitted,

                                          /s/Brian R. Nester
David T. Pritikin (*pro hac vice*)        Chad S. Hummell (SBN 139005)
dpritikin@sidley.com                      chummell@sidley.com
Richard A. Cederoth (*pro hac vice*)      Theodore W. Chandler (SBN 219456)
rcederoth@sidley.com                      tchandler@sidley.com
David Giardina (*pro hac vice*)           SIDLEY AUSTIN LLP
dgiardina@sidley.com                      555 West Fifth Street
SIDLEY AUSTIN LLP                         Los Angeles, CA 90013
1 S. Dearborn Street                      Phone: (213) 896-6000
Chicago, IL 60603                         Fax: (213) 896-6600
Phone: (312) 853-7000
Fax: (312) 853-7036                       Brian R. Nester (*pro hac vice*)
                                          bnester@sidley.com
Kenneth L. Nissly (SBN 77589)             Wonjoo Suh
knissly@nisslylaw.com                     wsuh@sidley.com
LAW OFFICES OF KENNETH L.                 SIDLEY AUSTIN LLP
NISSLY                                    1501 K Street, NW
P.O. Box 3448                             Washington, DC 20005
Saratoga, CA 95070-1448                   Phone: (202) 736-8000
Phone: (408) 398-7043                     Fax: (202) 736-8711

                                          Attorneys for
                                          SK hynix Inc., SK hynix America Inc.,
                                          and SK hynix memory solutions Inc.

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 16

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCGx                    Date:  December 5, 2016
Title:  Netlist, Inc. v. SK hynix Inc. et al.

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  Ivette Gomez                                                       N/A    
Deputy Clerk                                                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:   ATTORNEYS PRESENT FOR DEFENDANT:

Not Present                                                        Not Present

**PROCEEDINGS:   (IN CHAMBERS) ORDER GRANTING DEFENDANTS'
MOTION TO DISQUALIFY (Doc. 29)
(ISSUED UNDER SEAL)**

Before the Court is a Motion to Disqualify DLA Piper as counsel for Plaintiff
Netlist, Inc. filed by Defendants SK hynix Inc., SK hynix America Inc., and SK hynix
memory solutions Inc. (collectively, "SK hynix"). (Mot., Doc. 29; Mem., Doc. 48.) DLA
Piper submitted an Opposition, which Plaintiff Netlist joined, and Defendants replied.
(Opp'n, Doc. 64; Joinder, Doc. 51; Reply, Doc. 62.) For the following reasons, the Court
GRANTS Defendants' Motion to Disqualify.

## I.    BACKGROUND

On August 31, 2016, Netlist filed this suit, alleging that SK hynix's products
infringe six patents that the private standard-setting organization JEDEC has incorporated
into two memory module standards. (Compl. ¶¶ 11, 15-69, Doc. 1.) A day later, Netlist
launched a parallel action before the International Trade Commission (ITC) involving the
same six patents. In both proceedings, Netlist is represented by DLA Piper, which has
provided extensive legal services to SK hynix as well. (Chung Decl. ¶ 9, Exh. M, Doc.
48-13.)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCGx                         Date:  December 5, 2016
Title:  Netlist, Inc. v. SK hynix Inc. et al.

### iii.  SK hynix Has Not Engaged in Unfair Forum Shopping

Finally, DLA Piper contends that SK hynix's motion "should be denied as a tactical and abusive exercise in forum shopping." (Opp'n at 24-25.) This argument is wholly unpersuasive. After all, Netlist selected to file suit in this District as well as with the International Trade Commission. Having chosen to file suit in a jurisdiction with a strict automatic disqualification rule (and fully aware that a disqualification motion was looming), Netlist cannot rightfully protest SK hynix's exercise of its remedies under California law. Besides, if—as DLA Piper insists—this patent dispute will be resolved almost exclusively in ITC proceedings (*id.* at 25), this Court's disqualification decision will hardly prejudice Netlist.

### iv.  Conclusion

As is evident from the record before the Court, DLA Piper sought to unwind its relationship with SK hynix as quickly as possible so that the firm could represent Netlist in potentially lucrative patent litigation against SK hynix. If DLA Piper had not performed any additional work for SK hynix, the strategy—though a bit crass—may have succeeded. But no one informed DLA Piper's German office of the firm's intentions, so the office continued to perform work for SK hynix in May and June 2016. Because California law mandates automatic disqualification for concurrent client conflicts of interest, the Court must disqualify DLA Piper from representing Netlist in this suit.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Disqualification is GRANTED.

Initials of Preparer:   ig for tg

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 17

Case: 21-114     Document: 2     Page: 315     Filed: 02/08/2021

Case 8:16-cv-01605-JLS-JCG Document 26-20 Filed 05/04/20 Page 2 of 27
Case 8:16-cv-01605-JLS-JCG Document 98 Filed 12/23/16 Page 1 of 32 Page ID #:2352

1  [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc., | No. 8:16-cv-01605-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant,* | **JOINT RULE 26(F) REPORT** |
| vs. | Judge:      Hon. Josephine L. Staton |
| SK hynix Inc., | Hr'g Date:  Friday, Jan. 6, 2017 |
| *Defendant and Counterclaim-Plaintiff,* | Hr'g Time:  1:30 p.m. |
| and | Place:      Courtroom 10A |
| SK hynix America Inc. and SK hynix memory solutions Inc., | |
| *Defendants.* | |

1   hynix admits that "Netlist contends" that the Asserted Patents are essential to JEDEC

2   standards, it is very careful to never expressly agree, acknowledge or admit that the

3   Asserted Patents actually *are* essential to such standards. In this way, SK hynix seeks

4   to take serial shots at avoiding paying Netlist for infringing its patented technology—

5   including through multiple trials on the merits, and likely multiple appeals. Notably,

6   in the Zenith-Spectre dispute, Judge Kronstadt also recognized that

7        [t]he resolution of any of the core issues presented in this action could
8        simplify it as to those that remain. However, if the bifurcation proposed
     by either side were adopted, and all claims were ultimately adjudicated,
9        the amount of time that would be required to complete the entire action
     would double. This approach would disserve judicial and party
10       efficiency.

11  *Id*. at 2. Taken to its absurd result, SK hynix's argument could be applied to any other

12  "potentially dispositive" issues in play in this case. For example, all disputes between

13  the parties in this litigation could potentially be resolved by adjudicating SK hynix's

14  validity defenses in a first trial, but adjudicating this issue separately would clearly

15  disserve judicial and party efficiency.

16       Here, bifurcation would effectively subjugate judicial efficiency to SK hynix's

17  strategic ambitions, but it will *not* resolve all disputes between the parties. Under its

18  proposal, SK hynix retains complete optionality to override this Court's determination

19  of a RAND rate through appeal to a higher court if it is dissatisfied with the result of

20  its proposed first trial in this case. Moreover, the RAND rate that SK hynix seeks this

21  Court to impose will only inform whether the monetary portion of Netlist's offer to

22  SK hynix complied with the JEDEC RAND obligations. But SK hynix does not say

23  whether this Court should impose all terms of a license offer, just a dollar amount, or

24  something in between. In any event, even if SK hynix seeks this Court to draft an

25  entire, executable RAND license offer (which is unclear), the question whether SK

26  hynix will forgo all of its defenses and appeals and actually execute a license is left to

27  guesswork.

28

1    Finally, even if first addressing the RAND counterclaims to the exclusion of all

2    other issues could resolve all disputes between the parties (and, for the reasons

3    discussed, it will not), SK hynix's suggested schedule—requiring complete fact and

4    expert discovery, dispositive motion practice, pretrial motions, and trial within six

5    months—is simply impracticable. *Contrast, e.g., TCL Commc'n Tech. Holdings, Ltd.*

6    *v. Telefonaktiebolaget LM Ericsson*, No. 14-cv-00341 (C.D. Cal.) (trial on RAND

7    claims in February of 2017 where complaint was filed in March 2014).

8    For at least these reasons, this case should not be bifurcated. The case should

9    proceed to a trial on the merits of all claims, counterclaims, and defenses to be held

10   within two years from the filing of the complaint—a timeline that is still accelerated in

11   comparison to the average time to trial in patent infringement actions.

12

13   <u>SK hynix's Statement</u>[2]

14   This case presents a number of unusual substantive and procedural issues.  In

15   particular, this action differs from most patent disputes because the asserted patents

16   have been declared by Netlist as standard essential patents ("SEPs") and are

17   encumbered by a binding commitment by Netlist to license them to SK hynix on

18   RAND terms. Plaintiff Netlist acknowledges that it is obligated to offer a RAND

19   license, and for its part, SK hynix has confirmed its willingness to take a RAND

20   license. The central and dispositive issues in the case revolve around Netlist's

21   compliance with its RAND obligation and the determination of a RAND rate.

22   Resolution of the RAND issues here will resolve both this action and the parallel ITC

23   investigation because the outcome will be a license for SK hynix on the asserted

24   patents, mooting Netlist's infringement claims.  For that reason, in other cases where

25

---

26   [2] The statements by Netlist in footnote 1 suggesting it was surprised by these arguments are without merit.  SK hynix discussed the issue of bifurcation with Netlist

27   at the Rule 26(f) conference, and both Rule 16(c)(2)(M) and the Court's order provide that bifurcation is one of the topics properly addressed in this report and at the Case Management Conference.

28

1   SEPs have been asserted, numerous courts have bifurcated and prioritized the RAND

2   issues, recognizing that early resolution of the RAND issues will be dispositive of the

3   entire case.

4          As explained further below, SK hynix requests that the Court bifurcate the

5   RAND claims in this case and set a schedule that will allow resolution of those claims

6   in the same time frame as the parallel and related ITC Investigation brought by

7   Netlist. There are three primary reasons for proceeding in this manner. First, early

8   resolution of the RAND issues would result in a patent license that moots the rest of

9   the case. Second, the statute governing ITC proceedings specifically provides that

10  counterclaims filed in the ITC must be removed to district court, as happened here,

11  and resolved in district court rather than in the ITC. The RAND counterclaims are

12  thus an integral part of the ITC proceedings and should be litigated on the same

13  expedited timetable as those proceedings. Third, absent expedited resolution, Netlist

14  effectively will escape its RAND obligation not by legal right but by procedural

15  gamesmanship; given the ITC's expedited procedure and its lack of jurisdiction to set

16  RAND terms, the potential threat that an exclusion order could be imposed before SK

17  hynix's counterclaims can be resolved will provide Netlist undue licensing leverage.

18          1.    **Background**

19         JEDEC is an independent, non-profit semiconductor engineering trade

20  association and a standard setting organization. ECF No. 1, ¶ 11 (Netlist Complaint);

21  ECF No. 72, ¶ 14 (SK hynix Counterclaims). JEDEC develops standards that allow

22  the accused memory modules (LRDIMM and RDIMM) to work together with other

23  computer components, particularly servers. ECF No. 72, ¶16; ECF No. 80 ¶ 16

24  (Netlist Answer to Counterclaims).

25         Because JEDEC members may own patents covering the technology that they

26  or others seek to have included in a JEDEC standard creates the risk of opportunism.

27  As the Ninth Circuit has recognized in a related context,

28

1
2
3
4
5
6
7

> Once a standard becomes widely adopted, SEP holders
> obtain substantial leverage over new product developers,
> who have little choice but to incorporate SEP technologies
> in their products. Using that standard-development leverage,
> the SEP holders are in a position to demand more for a
> license than the patented technology, had it not been adopted
> by the [standard setting organization], would be worth. The
> tactic of withholding a license unless and until a
> manufacturer agrees to pay an unduly high royalty rate for
> an SEP is referred to as "hold-up."

8   *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d. 1024, 1030-31 (9th Cir. 2015).

9   In order to mitigate this risk, JEDEC has adopted a Patent Policy that seeks to

10   ensure that any patents that would necessarily need to be practiced in order to

11   implement a JEDEC standard will be available for manufacturers of standard-

12   compliant products to license on RAND terms and conditions. ECF No. 72, ¶ 21.[3]

13   Member companies, such as Netlist, who disclose and agree to license on

14   RAND terms their patents typically submit a "License Assurance/Disclosure Form"

15   committing, "[f]or any Essential Patent Claims held or controlled by the entity,

16   pending or anticipated to be filed," that "a license will be offered," either with or

17   without compensation, "under reasonable terms and conditions that are demonstrably

18   free of any unfair discrimination to applicants desiring to utilize the license for the

19   purpose implementing the JEDEC Standard." ECF No. 72C, ¶ 24 (quoting JEDEC

20   Manual No. 21R at A.3); ECF No. 80, ¶ 24.

21   In accordance with the JEDEC Patent Policy, Netlist has disclosed and made

22   binding RAND commitments with respect to 27 patents or applications, including

23   each of the six patents asserted by Netlist against SK hynix in the underlying patent

24   infringement litigation. *See* ECF No. 72, ¶ 33 and Exs. 2–44 thereto (identifying

25   disclosures covering each of Netlist's asserted patents).

26
27
28

---

[3] A copy of the JEDEC Patent Policy, which is contained in the JEDEC Manual of Organization and Procedure, is attached as Exhibit 1 to SK hynix's Counterclaims. *See* ECF No. 72-1, at 26.

-11-

| | |
|---|---|
| 1 | By: /s/ Andrew H. DeVoogd |
| 2 | Nada I. Shamonki (Bar No. 205359) |
| | <nshamonki@mintz.com> |
| 3 | MINTZ LEVIN COHN FERRIS GLOVSKY |
| 4 | & POPEO PC |
| | 2029 Century Park East, Suite 1370 |
| 5 | Los Angeles, California 90067 |
| | Telephone: (310) 586-3200 |
| 6 | Facsimile: (310) 586-3202 |

By: /s/ Andrew H. DeVoogd

Nada I. Shamonki (Bar No. 205359)
  <nshamonki@mintz.com>
MINTZ LEVIN COHN FERRIS GLOVSKY
& POPEO PC
2029 Century Park East, Suite 1370
Los Angeles, California 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

Andrew H. DeVoogd (*pro hac vice*)
  <dhdevoogd@mintz.com>
James M. Wodarski (*pro hac vice*)
  <jwodarski@mintz.com>
Michael C. Newman (*pro hac vice*)
  <mcnewman@mintz.com>
Kristina R. Cary (*pro hac vice*)
  <krcary@mintz.com>
MINTZ LEVIN COHN FERRIS GLOVSKY
& POPEO PC
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241

*Attorneys for Plaintiff and
Counterclaim-Defendant
Netlist, Inc.*

By: /s/ Brian R. Nester

Chad S. Hummel (Bar No. 139055)
  <chummel@sidley.com>
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Telephone: (650) 595-9500
Facsimile: (650) 595-9501

Theodore W. Chandler (Bar No. 219456)
  <tchandler@sidley.com>
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

David T. Pritikin (*pro hac vice*)
  <dpritikin@sidley.com>
Richard A. Cederoth (*pro hac vice*)
  <rcederoth@sidley.com>
David Giardina (*pro hac vice*)
  <dgiardina@sidley.com>
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Brian R. Nester (*pro hac vice*)
  <bnester@sidley.com>
Wonjoo Suh (Cal. Bar No. 269500)
  <wsuh@sidley.com>
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Kenneth L. Nissly (Bar No. 77589)
  <knissly@nisslylaw.com>
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3448
Saratoga, California 95070
Telephone: (408) 398-7043

*Attorneys for Defendant and
Counterclaim-Plaintiff SK hynix Inc.
and Defendants SK hynix America
Inc. and SK hynix memory solutions
Inc.*

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filing party hereby attests that all
signatories listed concur in this filing's content and have authorized this filing.

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 19

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| Netlist, Inc., | ) | No. 8:16-cv-01605-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant*, | ) ) ) | |
| vs. | ) ) | |
| SK hynix Inc., | ) | **PROTECTIVE ORDER** |
| *Defendant and Counterclaim-Plaintiff*, | ) ) ) ) | |
| and | ) | |
| SK hynix America Inc. and SK hynix memory solutions Inc., | ) ) ) | |
| *Defendants*. | ) ) | |

1    **PROTECTIVE ORDER**

2        WHEREAS, documents and information may be sought, produced or exhibited

3    by and among the parties to the above captioned proceeding, which materials relate to

4    trade secrets or other confidential research, development or commercial information,

5    pursuant to Federal Rule of Civil Procedure 26(c)(1)(G);

6        IT IS HEREBY ORDERED THAT:

7        1.    Confidential business information is information which concerns or

8    relates to the trade secrets, processes, operations, style of work, or apparatus, or to the

9    production, sales, shipments, purchases, transfers, identification of customers,

10   inventories, amount or source of any income, profits, losses, or expenditures of any

11   person, firm, partnership, corporation, or other organization, or other information of

12   commercial value, the disclosure of which is likely to have the effect of either (i)

13   impairing the Court's ability to obtain such information as is necessary to adjudicate

14   the claims and defenses in this action; or (ii) causing substantial harm to the

15   competitive position of the person, firm, partnership, corporation, or other

16   organization from which the information was obtained, unless the Court is required

17   by law to disclose such information.

18       2(a).   Any information submitted in pre-hearing discovery or in a pleading,

19   motion, or response to a motion either voluntarily or pursuant to order, in this case,

20   which is asserted by a supplier to contain or constitute confidential business

21   information shall be so designated by such supplier in writing, or orally at a

22   deposition, conference or hearing, and shall be segregated from other information

23   being submitted.  Documents shall be clearly and prominently marked on their face

24   with the legend:  "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO

25   PROTECTIVE ORDER," or a comparable notice.  Such information, whether

26   submitted in writing or in oral testimony, shall be treated in accordance with the

27   terms of this protective order.

28

1    (b).    The Court may determine that information alleged to be confidential is

2    not confidential, or that its disclosure is necessary for the proper disposition of the

3    proceeding, before, during or after the close of a hearing herein.    If such a

4    determination is made by the  Court, opportunity shall be provided to the supplier of

5    such information to argue its confidentiality prior to the time of such ruling.

6    3.    In the absence of written permission from the supplier or an order by the

7    Court, any confidential documents or business information submitted in accordance

8    with the provisions of paragraph 2 above shall not be disclosed to any person other

9    than:  (i) outside counsel for parties to this case, including necessary secretarial and

10   support personnel assisting such counsel; (ii) qualified persons taking testimony

11   involving such documents or information and necessary stenographic and clerical

12   personnel thereof; (iii) technical experts and their staff who are employed for the

13   purposes of this litigation (unless they are otherwise employed by, consultants to, or

14   otherwise affiliated with a non-governmental party, or are employees of any domestic

15   or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or

16   component parts which are the subject of this case); (iv) the Court and the Court's

17   staff; (v) employees and contract personnel of the U.S. District Court for the Central

18   District of California (a) for developing or maintaining the records of this case or

19   related proceedings, or (b) in internal investigations, audits, reviews, evaluations

20   relating to the programs, personnel, and operations of the Court; and (vi) U.S.

21   government employees and contract personnel, solely for cybersecurity purposes.

22   4.    Confidential business information submitted in accordance with the

23   provisions of paragraph 2 above shall not be made available to any person designated

24   in paragraph 3(i)[1] and (iii) unless he or she shall have first read this order and shall

25   have agreed, by letter served on the supplier:  (i) to be bound by the terms thereof; (ii)

26

_____

27   [1] Necessary secretarial and support personnel assisting counsel need not sign onto the
     protective order themselves because they are covered by counsel's signing onto the
28   protective order.

1   not to reveal such confidential business information to anyone other than another
2   person designated in paragraph 3; and (iii) to utilize such confidential business
3   information solely for purposes of this case.  The letter shall also include the
4   following acknowledgement:

5           I, the undersigned, on behalf of _____, acknowledge that
        information submitted for purposes of this case may be disclosed to
6           and used:

7           (i) by the Court, its employees, and contract personnel (a) for
        developing or maintaining the records of this or a related proceeding,
8           or (b) in internal investigations, audits, reviews, and evaluations
        relating to the programs, personnel, and operations of the Court; or
9
10          (ii) by U.S. government employees and contract personnel, solely for
        cybersecurity purposes.  I understand that all contract personnel will
11          sign appropriate nondisclosure agreements.

12          5.      If the Court orders, or if the supplier and all parties to the case agree,
13  that access to, or dissemination of information submitted as, confidential business
14  information shall be made to persons not included in paragraph 3 above, such matter
15  shall only be accessible to, or disseminated to, such persons based upon the
16  conditions pertaining to, and obligations arising from this order, and such persons
17  shall be considered subject to it, unless the Court finds that the information is not
18  confidential business information as defined in paragraph 1 thereof.

19          6(a). Any confidential business information submitted to the Court in
20  connection with a motion or other proceeding within the purview of this case shall be
21  submitted under seal pursuant to paragraph 2 above and C.D. Cal. Civil L.R. 79-5.
22  Any portion of a transcript in connection with this case containing any confidential
23  business information submitted pursuant to paragraph 2 above shall be bound
24  separately and filed under seal.  When any confidential business information
25  submitted in accordance with paragraph 2 above is included in an authorized
26  transcript of a deposition or exhibits thereto, arrangements shall be made with the
27  court reporter taking the deposition to bind such confidential portions and separately
28  label them "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
    PROTECTIVE ORDER."  Before a court reporter or translator receives any such

1   information, he or she shall have first read this order and shall have agreed in writing

2   to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement

3   included as Attachment A hereto.  Copies of each such signed agreement shall be

4   provided to the supplier of such confidential business information.

5   (b).    Submitters[2] are strongly encouraged to encrypt nonpublic documents

6   that are electronically transmitted to the Court to protect sensitive information from

7   unauthorized disclosure.

8   7.    The restrictions upon, and obligations accruing to, persons who become

9   subject to this order shall not apply to any information submitted in accordance with

10  paragraph 2 above to which the person asserting the confidential status thereof agrees

11  in writing, or the Court rules, after an opportunity for hearing, was publicly known at

12  the time it was supplied to the receiving party or has since become publicly known

13  through no fault of the receiving party.

14  8.    The Court acknowledges that any document or information submitted as

15  confidential business information pursuant to paragraph 2 above and C.D. Cal. Civil

16  L.R. 79-5 is to be treated as such, subject to a contrary ruling, after hearing, by the

17  Court.  The party offering the confidential business information must, upon request or

18  as required by C.D. Cal. Civil L.R. 79-5, provide a statement as to the claimed basis

19  for its confidentiality.

20  9.    Unless a designation of confidentiality has been withdrawn, or a

21  determination has been made by the Court that information designated as

22  confidential, is no longer confidential, the Court shall take all necessary and proper

23  steps to preserve the confidentiality of, and to protect each supplier's rights with

24  respect to, any confidential business information designated by the supplier in

25  accordance with paragraph 2 above, including, without limitation:  (a) notifying the

26  supplier promptly of any proposal to redesignate or make public any such

27  ─────────────────────────
28  [2] "Submitters" of confidential business information are the same as "suppliers" of
    confidential business information as that term is used in the context of this Order.

1  confidential business information; and (b) providing the supplier at least seven days

2  after receipt of such inquiry or request within which to take action before the Court,

3  or otherwise to preserve the confidentiality of and to protect its rights in, and to, such

4  confidential business information.

5      10.    If while a case is before the Court, a party to this order who is to be a

6  recipient of any business information designated as confidential and submitted in

7  accordance with paragraph 2 disagrees with respect to such a designation, in full or in

8  part, it shall notify the supplier in writing, and they will thereupon confer as to the

9  status of the subject information proffered within the context of this order.  If prior to,

10  or at the time of such a conference, the supplier withdraws its designation of such

11  information as being subject to this order, but nonetheless submits such information

12  for purposes of the case; such supplier shall express the withdrawal, in writing, and

13  serve such withdrawal upon all parties and the Court.  If the recipient and supplier are

14  unable to concur upon the status of the subject information submitted as confidential

15  business information within ten days from the date of notification of such

16  disagreement, any party to this order may raise the issue of the designation of such a

17  status to the Court which will rule upon the matter.  The Court may *sua sponte*

18  question the designation of the confidential status of any information and, after

19  opportunity for hearing, may remove the confidentiality designation.

20      11.    No less than 10 days (or any other period of time designated by the

21  Court) prior to the initial disclosure to a proposed expert of any confidential

22  information submitted in accordance with paragraph 2, the party proposing to use

23  such expert shall submit in writing the name of such proposed expert and his or her

24  educational and detailed employment history to the supplier.  If the supplier objects

25  to the disclosure of such confidential business information to such proposed expert as

26  inconsistent with the language or intent of this order or on other grounds, it shall

27  notify the recipient in writing of its objection and the grounds therefore prior to the

28  initial disclosure.  If the dispute is not resolved on an informal basis within ten days

-5-

PROTECTIVE ORDER — No. 8:16-cv-01605-JLS-JCG

1   of receipt of such notice of objections, the supplier shall submit immediately each

2   objection to the Court for a ruling.  The submission of such confidential business

3   information to such proposed expert shall be withheld pending the ruling of the

4   Court.

5       12.    If confidential business information submitted in accordance with

6   paragraph 2 is disclosed to any person other than in the manner authorized by this

7   protective order, the party responsible for the disclosure must immediately bring all

8   pertinent facts relating to such disclosure to the attention of the supplier and, without

9   prejudice to other rights and remedies of the supplier, make every effort to prevent

10   further disclosure by it or by the person who was the recipient of such information.

11      13.    [Intentionally omitted]

12      14.    Upon final resolution of this case, each recipient of confidential business

13   information that is subject to this order shall assemble and return to the supplier all

14   items containing such information submitted in accordance with paragraph 2 above,

15   including all copies of such matter which may have been made.  Alternatively, the

16   parties subject to this order may, with the written consent of the supplier, destroy all

17   items containing confidential business information and certify to the supplier (or his

18   counsel) that such destruction has taken place.  This paragraph shall not apply to the

19   Court to the extent it must retain such material pursuant to statutory requirements and

20   for other recordkeeping purposes.  Nothing in this paragraph shall preclude the

21   destruction of those additional copies in the Court's possession which it regards as

22   surplusage.

23      15.    If any confidential business information which is supplied in accordance

24   with paragraph 2 above is supplied by a nonparty to this case, such a nonparty shall

25   be considered a "supplier" as that term is used in the context of this order.

26      16.    Each nonparty supplier shall be provided a copy of this order by the

27   party seeking information from said supplier.

28      17.    [Intentionally omitted]

18.  **Source Code.**  A supplier may designate documents, information, or things as "CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY INFORMATION," which shall mean litigation material of a supplier (a supplier may be (i) a party producing its information or the information of a third-party in its possession or (ii) a third-party producing its information) that constitutes or contains non-public Source Code.

A.    "Source Code" means computer code, scripts, assembly, object code, source code listings and descriptions of source code, object code listings and descriptions of object code, or other electronic files used in network operations, comments for source code or network operation files, or revision histories, as well as Register Transfer Level, Hardware Description Language, VHDL, Verilog, or digital signal processor (DSP) programming files.  For clarity, Source Code filenames and directory structures are not Source Code within the meaning of this definition, but shall be treated as CONFIDENTIAL BUSINESS INFORMATION – SUBJECT TO PROTECTIVE ORDER. The inclusion of protective provisions for source code does not represent a requirement that source code be produced and adds no obligation of production on the Parties or third-parties beyond that already imposed by the Federal Rules.

B.    Materials designated as "CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY INFORMATION," shall only be reviewable by SOURCE CODE QUALIFIED PERSONS.  SOURCE CODE QUALIFIED PERSONS include the following: (1) outside litigation counsel as necessarily incident to the litigation of this case; (2) staff employed by such outside litigation counsel who are necessarily incident to the litigation of this case, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff; (3) outside vendors retained for the purpose of preparing graphics or presentations for use as a demonstrative in a brief or other form of submission or proceeding incident to this case; (4) personnel at interpretation/translation service

1    establishments retained by, but not regularly employed by, outside litigation counsel

2    as necessarily incident to the litigation of this case, including without limitation oral

3    interpreters and document translators; (5) the Court, Court personnel and contract

4    personnel who are acting in the capacity of Court employees as indicated in paragraph

5    3 of this Protective Order; (6) court reporters, stenographers and videographers

6    transcribing or recording testimony at depositions, hearings or trial in this case; and

7    (7) qualified consultants and/or qualified experts in this case (under paragraph 11 of

8    the Protective Order in this case).  Qualified consultants and/or qualified experts may

9    only review CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY

10   INFORMATION after being expressly identified to the supplier as seeking access to

11   CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY INFORMATION.

12   If the receiving party wishes an already identified qualified consultant or qualified

13   expert to receive CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY

14   INFORMATION, it must re-comply with the provisions of paragraph 11 of this

15   Protective Order in this case, including allowing the supplier an opportunity to object

16   to this qualified consultant or qualified expert receiving CONFIDENTIAL SOURCE

17   CODE-ATTORNEYS' EYES ONLY INFORMATION, and identifying the proposed

18   qualified consultant or qualified expert as seeking access to CONFIDENTIAL

19   SOURCE CODE-ATTORNEYS' EYES ONLY INFORMATION.

20       C.    To the extent a supplier makes Source Code available for inspection, it

21   shall be made available for inspection in electronic format in, at the supplier's sole

22   election, the offices of its outside litigation counsel, its facilities where the Source

23   Code is maintained or a facility in the city where either its outside litigation counsel is

24   located or its facilities where the Source Code is maintained is located, provided that

25   any such location is within the continental United States (hereinafter "the Designated

26   Location").

27       D.    To the extent a supplier makes Source Code available for inspection, that

28   supplier's Source Code shall be made available for inspection in electronic format,

Case 8:16-cv-01605-JLS-JCG Document 186-22 Filed 05/04/20 Page 11 of 16 Page ID
#:2491

1    following written notice from the party requesting to inspect the Source Code at least

2    eight (8) business days prior to the first inspection and two business days prior to

3    subsequent inspections, at the Designated Location, between the hours of 9 a.m. and 5

4    p.m. on business days (i.e., weekdays that are not Federal holidays). Nothing in this

5    paragraph shall preclude the supplier and the receiving party from agreeing to

6    (1) shorten the notice periods prior to subsequent inspections, and (2) extend the hours

7    of inspection on business days.

8         E.     To the extent a supplier makes Source Code that is designated

9    "CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY

10   INFORMATION" available for inspection and review, said inspection and review

11   shall be subject to the following provisions, unless otherwise agreed by the supplier:

12             a.     All Source Code shall be made available by the supplier to the

13        reviewing party's outside counsel and/or experts in a secure room on a

14        standalone computer without Internet access or network access to other

15        computers, as necessary and appropriate to prevent and protect against any

16        unauthorized copying, transmission, removal or other transfer of any Source

17        Code outside or away from the computer on which the Source Code is provided

18        for inspection (the "Source Code Computer" in the "Source Code Review

19        Room"). The supplier shall install tools that are sufficient for viewing and

20        searching the code produced, on the platform produced, if such tools exist and

21        are presently used in the ordinary course of the supplier's business. The

22        receiving party's outside counsel and/or experts may request that additional

23        commercially available software tools for viewing and searching Source Code

24        be installed on the computer, provided, however, that: (a) the receiving party or

25        the supplier possesses an appropriate license to such software tools; (b) the

26        supplier approves such software tools, and the supplier's consent will not be

27        unreasonably withheld; and (c) such other software tools are reasonably

28        necessary for the receiving party to perform its review of the Source Code

PROTECTIVE ORDER — No. 8:16-cv-01605-JLS-JCG

1    consistent with all of the protections herein. The receiving party must provide

2    the supplier with the CD or DVD containing such licensed software tool(s) or

3    an appropriate license for downloadable tools at least seven (7) days in advance

4    of the date upon which the receiving party wishes to conduct its first inspection

5    of the Source Code Computer. The receiving party cannot request any

6    additional viewing tools after its first inspection of the Source Code Computer

7    unless such additional tools are reasonably necessary to complete the inspection

8    of the Source Code Computer.

9            b.    Other than those devices provided by the protective order, no other

10    recording devices or recordable media will be permitted inside the source code

11    review room, including without limitation: sound recorders; computers; cellular

12    phones; peripheral equipment; cameras; CDs; DVDs; floppy drives, zip drives,

13    thumb drives, or external drives of any kind; USB memory sticks; portable hard

14    drives; Ethernet or other cables that could be used to transfer data off of a

15    Source Code Computer; Dictaphones; telephone jacks; or smartphones of any

16    kind (including but not limited to BlackBerry, iPhone, or Android devices). Nor

17    shall any non-electronic devices capable of similar functionality be permitted

18    inside the Source Code Review Room.

19            c.    The receiving party's outside counsel and/or experts shall be

20    entitled to take handwritten notes relating to the Source Code. The receiving

21    party's outside counsel and/or experts may not copy portions of the Source

22    Code (e.g., entire source code files or entire functions or methods where such

23    functions or methods are longer than a few lines) into the notes and may not

24    take such notes electronically on the Source Code Computer itself or on any

25    computer that is connected to any network.

26            d.    No copies of all or any portion of the Source Code may leave the

27    room in which the Source Code is inspected except as otherwise provided

28    herein. No written or electronic record of the Source Code is permitted except

-10-

PROTECTIVE ORDER — No. 8:16-cv-01605-JLS-JCG

as otherwise provided herein. The supplier shall provide to the receiving party
one (1) copy on Bates-numbered paper, labeled "CONFIDENTIAL SOURCE
CODE-ATTORNEYS' EYES ONLY INFORMATION," within three (3) days
of the receiving party's designation of the portions of the Source Code to be
printed. The receiving party shall not designate Source Code to be printed in
order to review blocks of Source Code in the first instance, i.e., as an alternative
to reviewing that Source Code electronically on the Source Code Computer.
The receiving party may print only those portions of the Source Code that are
reasonably necessary to prepare court filings, pleadings, contentions, expert
reports or other papers.  The supplier may object to any request to deliver
copies of printed Source Code as excessive and/or not done for a permitted
purpose. If such objection cannot be resolved by mutual agreement within five
(5) business days it shall be submitted to the Court for resolution. The burden
shall be on the receiving party to demonstrate that such printed portion of the
Source Code was no more than is reasonably necessary for a permitted purpose
and not merely printed for the purpose of review and analysis elsewhere. In the
event the request is more than 20 continuous pages, and the parties are unable to
resolve the supplier's objection via meeting and conferring, then at the
supplier's discretion, no portion of the printed Source Code in question need be
delivered to counsel for the receiving party until the issue is resolved by the
Court.  In the event the objection to print 20 continuous pages or less is
sustained by the Court, the pages that were subject to the objections shall be
returned to the supplier within two (2) business days.

      e.     The receiving party agrees to avoid including copies or portions of
the supplier's Source Code in any Court filing, pleading, or other paper, except
as otherwise provided in this Protective Order.

      f.     The receiving party will not copy, remove, or otherwise transfer
any Source Code from the Source Code Computer including, without limitation,

1   copying, photographing, removing, or transferring the Source Code onto any

2   recordable media or recordable device.

3           g.      All persons viewing Source Code shall sign a log on each day they

4   view Source Code that will include the names of persons who enter the locked

5   room to view the Source Code and when they enter and depart. The log shall

6   remain at the Source Code review location.

7           h.      The receiving party's outside counsel of record may make no more

8   than five (5) paper copies of any printed portions of the Source Code from a

9   supplier, not including copies attached to court filings, expert reports,

10  infringement contentions, or exhibits used at depositions or at trial, and shall

11  maintain a log of all paper copies of the Source Code. The log shall include the

12  names of the reviewers and/or recipients of paper copies and locations where

13  the paper copies are stored. The supplier shall be entitled to review the log after

14  the case has ended or by Court order upon a showing of good cause.

15          i.      The receiving party's outside counsel of record and any person

16  receiving a copy of any Source Code shall maintain and store any paper copies

17  of the Source Code at their offices in a manner that reasonably prevents

18  duplication of or unauthorized access to the Source Code, including, without

19  limitation, storing the Source Code in a locked room or cabinet at all times

20  when it is not in use. Any paper copies of such Source Code shall be designated

21  "CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY

22  INFORMATION."

23          j.      Copies of Source Code that are marked as deposition exhibits may

24  be provided to the court reporter or attached to deposition transcripts, subject to

25  the Protective Order. All paper copies of Source Code brought to a deposition

26  but not marked as a deposition exhibit shall be securely destroyed in a timely

27  manner following the deposition.

28

1          k.      Except as provided in this Order, absent express written permission

2    from the supplier, the receiving party may not create electronic images, or any

3    other images, or make electronic copies, of the Source Code from any paper

4    copy of Source Code for use in any manner (including by way of example only,

5    the receiving party may not scan the Source Code to a PDF or photograph the

6    code).  Images or copies of Source Code shall not be included in

7    correspondence between the parties (references to production numbers shall be

8    used instead), and shall be omitted from pleadings and other papers whenever

9    possible.

10         l.      A party may make electronic copies of and include portions of

11   Source Code in filings with the Court, in presentations at any hearing or trial,

12   and in its experts' reports, provided that all filings containing Source Code must

13   be filed under Seal, and all such electronic copies must be labeled

14   "CONFIDENTIAL SOURCE CODE-ATTORNEYS' EYES ONLY

15   INFORMATION" as provided for in this Order. In addition, before displaying

16   Source Code in open court at any hearing or trial, the receiving party will

17   provide notice to the supplier to give the supplier an opportunity to seek

18   appropriate measures from the Court to protect the confidentiality of the Source

19   Code.

20

21

22         IT IS SO ORDERED.

23

24   Dated:  _____January 12_____, 2017      _____

25                                                    J_____. GANDHI

26                                                    United States Magistrate Judge

27

28

-13-
PROTECTIVE ORDER — No. 8:16-cv-01605-JLS-JCG

**Attachment A**

**NONDISCLOSURE AGREEMENT FOR**

**REPORTER/STENOGRAPHER/TRANSLATOR**

I, _____, do solemnly swear or affirm that I will not divulge any information communicated to me in any confidential portion of the case *Netlist, Inc. v. SK hynix Inc. et al.*, No. 8:16-cv-01605-JLS-JCG (C.D. Cal. filed Aug. 31, 2016), except as permitted in the protective order issued in this case.  I will not directly or indirectly use, or allow the use of such information for any purpose other than that directly associated with my official duties in this case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any person reveal the nature or content of any information communicated during any confidential portion of the case or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the participants in said case.

I am aware that the unauthorized use or conveyance of information as specified above is a violation of the Federal Criminal Code and punishable by a fine of up to $10,000, imprisonment of up to ten (10) years, or both.

Signed    _____

Dated    _____

Firm or affiliation    _____

-14-

PROTECTIVE ORDER — No. 8:16-cv-01605-JLS-JCG

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 20

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc., | No. 8:16-cv-01605-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant,* | **DISCOVERY ORDER** |
| vs. | |
| SK hynix Inc., | |
| *Defendant and Counterclaim-Plaintiff,* | |
| and | |
| SK hynix America Inc. and SK hynix memory solutions Inc., | |
| *Defendants.* | |

**DISCOVERY ORDER**

1

2       By agreement of Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") and SK hynix

3   Inc., SK hynix America Inc. and SK hynix memory solutions Inc. (collectively

4   "Defendants" or "SK hynix"), IT IS HEREBY ORDERED THAT:

5                    **1.    Electronic Service and Delivery of Documents**

6       The parties consent to service by electronic means.  *See* Fed. R. Civ. P.

7   5(b)(2)(E).  The parties agree that e-mail service shall be the official form of service in

8   this case for papers that:  (1) need to be filed with the Court and submitted to the Judge

9   (e.g., pleadings, motions, etc.); (2) have a due date set forth in the procedural schedule

10  (e.g., privilege logs, expert reports, etc.); or (3) relate to discovery (e.g., discovery

11  requests and responses, etc.).  Documents and pleadings shall be transmitted as a .pdf

12  file attached to the service e-mail.  In the event the documents are too large for

13  delivery by electronic mail, it is acceptable to:  (1) send the documents via an FTP site,

14  along with a cover e- mail providing instructions on how to access such FTP site and

15  retrieve the documents; or (2) send the documents in smaller portions deliverable by

16  electronic mail, and in multiple e-mail transmissions.  Copies of all discovery requests

17  will be provided in both .pdf format and an identical version in .doc or .docx format to

18  avoid the need to re-type the requests in preparing responses.

19                              **2.    Time for Service**

20      For all discovery requests propounded by any party, service by 7 p.m. Eastern

21  Time constitutes timely service.  Service after 7 p.m. Eastern Time will be considered

22  served the next business day at the option of the receiving party.  For documents not

23  required to be filed with the Court or submitted to the Judge, such as discovery

24  responses, service by midnight Eastern Time constitutes timely service.

25                    **3.    Electronic Mailing Lists for Service**

26      The parties designate the following e-mail addresses to receive formal e-mail

27  service pursuant to Parts 1-2 above:

28

| Party | Designated Email Address |
|-------|--------------------------|
| Netlist | Netlist-CDCA@mintz.com |
| SK hynix | SKhynixNetlistSidleyTeam@sidley.com; knissly@nisslylaw.com |

**4.    Production of Protected Documents – Claw-Back Provision**

The parties agree under Rule 502(d) & (e) that, if documents or things subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity are inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity.   The parties agree that Rule 26(b)(5)(B) shall govern the claw-back of produced documents or things that are subject to a claim of privilege or of protection as attorney work product.

**5.    Failure to Designate Confidential Business Information**

The failure by a party to designate material with one of the designations provided for under the Protective Order, or any amendments thereto, shall not waive any such designation, provided that the party who fails to designate information as confidential, upon learning of the failure to designate, promptly notifies the other parties that such information should have been designated confidential and should be treated as confidential going forward. The designating party shall provide replacement copies of such materials bearing the appropriate confidentiality designation within seven (7) days upon its notification to the other parties.  Upon being notified that the information was not designated as confidential, the receiving parties shall take reasonable steps to retrieve the information from any recipients of such information who previously had been provided the confidential information and who are not authorized to access such confidential information under the Protective Order.  Upon receiving the material with the correct confidentiality designation, the receiving parties shall return or securely destroy, at the producing party's option, all material that was

1  not designated properly.  If the receiving party has reason to believe that the

2  information has been disseminated to persons from whom it has not been able to

3  retrieve the information through reasonable steps, it shall inform the producing party

4  of that fact.

5       No party shall argue that another party is in breach of the Protective Order for

6  any use of confidential information during the time that the information was not

7  designated as confidential. Once a receiving party has received notification of the

8  correct confidentiality designation for the information, the receiving party shall treat

9  such information at the appropriately designated level.

10  ### 6.   **Third-Party Confidentiality**

11       The parties shall take reasonable steps to ensure that the existence of

12  confidentiality or non-disclosure agreements with non-parties ("Non-Party

13  Confidentiality Agreements") do not significantly delay the production of any such

14  documents that a party has agreed to produce.  The parties further agree that those

15  reasonable steps shall include notice from the producing party to any non-parties with

16  whom they have any Non-Party Confidentiality Agreements that provides a copy of

17  the Protective Order entered in this investigation and allows the non-party a period of

18  ten (10) business days, or other time period set forth in a governing agreement, to

19  provide a written objection to the producing party.  The written notice further shall

20  state that the information or documents will be produced if the non-party does not

21  respond in writing within the allocated time period.  If the non-party does not object to

22  the production within ten (10) business days or such other prescribed period, the

23  documents subject to the Non-Party Confidentiality Agreement shall be produced.  The

24  ten (10) business day period may be extended by an additional ten (10) business days

25  if notice is to be sent to a company outside the United States.

26       If a non-party raises a timely objection to production, the producing party

27  objects to the production based on obligations in the Non-Party Confidentiality

28  Agreement that conflict with the preceding paragraph, or the requesting party so

-3-

1   requests, the parties shall meet and confer in good faith regarding the production of the

2   information subject to a Non-Party Confidentiality Agreement.  If the matter reaches

3   an impasse, the party resisting production of the information or the non-party objecting

4   to production or both may seek assistance from the Judge by motion or other

5   permissible manner.

### 7.   Documents Received in Response to a Subpoena

7        Any party who receives documents from a third party pursuant to a subpoena

8   shall re-produce those documents to the other parties within three (3) business days or

9   less.  The parties agree that they shall make best efforts to re-produce such third party

10  materials in fewer than three (3) business days when necessary such as, for example,

11  in the event such documents may be used in a deposition.  Where re-production of the

12  documents within three (3) business days is not feasible, the party who received the

13  documents shall provide prompt notice to the other parties and the issue will be

14  resolved on a case-by-case basis.  Re-production of materials received from a third-

15  party pursuant to a subpoena is not necessary under this paragraph when it is apparent

16  (such as on a production cover letter) that the third party has already produced the

17  materials to the other parties.

### 8.   Non-Confidential Versions of Certain Documents

19       Counsel for a party may request permission to provide a redacted version of a

20  confidential submission from another party to individuals outside the Protective Order.

21  The other parties shall endeavor to respond in a reasonably timely fashion to such

22  requests.  In accordance with the Protective Order, no document designated

23  Confidential Business Information may be shared with anyone outside the Protective

24  Order absent express written authorization from the party that designated the

25  document as Confidential Business Information.  To the extent possible, each

26  confidential submission shall identify in the confidentiality header the party and/or

27  third party supplier(s) that provided Confidential Business Information contained in

28  that submission.

1      **9.**   **Limitations on document preservation (including electronically stored information) and restoration**

2                     **of electronically-stored information**

3      The parties agree to undertake all reasonable efforts to preserve potentially

4  relevant documents, including electronically stored information, to the extent such

5  information was in existence on or before September 1, 2016.  Consistent with Rule

6  26(b)(2)(B), the parties agree that a person need not provide discovery of

7  electronically stored information from sources identified as not reasonably accessible

8  because of undue burden or cost, to the extent such sources are substantially

9  duplicative of data that are more accessible elsewhere. Sources not readily accessible

10  include backup tapes; cell phones; voice mails; text messages; portable storage;

11  temporary files; automatically updated metadata; and server, system, or network logs.

12  To the extent responsive data exists only on legacy systems, the parties agree to

13  discuss whether such data sources are reasonably accessible.  The party seeking the

14  discovery may file a motion to compel discovery pursuant to Rule 37(a).  In response

15  to the motion to compel discovery, or in a motion for protective order filed pursuant to

16  Rule 26(c), the person from whom discovery is sought must show that the information

17  is not reasonably accessible because of undue burden or cost, except to the extent the

18  sources are not readily accessible as stated above.

19      **10.**   **Limitations on discovery of expert-related hearing preparation materials**

20

21      The parties agree that the limitations of Rule 26, Fed. R. Civ. P., including

22  Rules 26(b)(4)(B) and (C), shall govern the discovery and disclosure of expert

   testimony, communications, and materials in this matter.

23      In addition, the parties specifically agree that the following communications and

24  materials shall not be the subject of discovery or inquiry at trial:  (a) drafts or outlines

25  of any expert disclosures (including reports, declarations, affidavits, or any other form

26  of testimony); (b) communications, whether written or oral, between or among any

27  expert and counsel for the party retaining said expert; (c) notes taken by or behalf of

28

-5-

1   any expert; (d) emails, lists, agendas, outlines, memoranda, presentations, and letters,

2   whether in draft or any other form, which were created by counsel for the party

3   retaining said expert that are provided to, or created for counsel or on behalf of any

4   expert; (e) communications between retained experts and their assistants or staff; and

5   (f) any other types of preliminary written work product created by or on behalf of any

6   expert. For avoidance of doubt, herein "expert" includes consultants, testifying

7   experts, and any staff assisting them in this matter.

8       The foregoing exemptions shall not apply to any communications or materials,

9   including those listed above, on which any expert, in any disclosure, expressly relies

10   as a basis for an opinion. Such communications or materials shall be subject to

11   discovery and inquiry at trial. Furthermore, nothing in this agreement is intended to

12   restrict discovery relating to: (a) the compensation paid to an expert; (b) any testing or

13   analysis relied on by an expert and the products, components, systems, networks

14   and/or configurations that the expert tested or analyzed to the extent relied on by an

15   expert; (c) any communications with counsel to the extent relied upon by the expert

16   regarding any testing or analysis relied on by an expert and the products, components,

17   systems, networks and/or configurations that the expert tested or analyzed; (d) the

18   basis of any of the opinions expressed by an expert in his or her report, declaration,

19   affidavit, testimony, or witness statement, including the manner by which such

20   opinions were reached; and (e) any communications with counsel relied on as a basis

21   for any opinions expressed by an expert. Communications and materials exempt from

22   discovery under this provision shall be treated as attorney work product, and need not

23   be listed on any privilege log.

24       For clarification, the parties agree that any retained expert or consultant may not

25   share any confidential business information received under the Protective Order with

26   any other individual, unless that individual has subscribed to the Protective Order. A

27   retained expert's or consultant's non-clerical assistant(s) or non-clerical support staff

28   shall be disclosed under the same provisions of the Protective Order as the retained

1   expert or consultant. In such case, the retained expert or consultant's signature shall

2   be sufficient to subscribe his or her non-clerical assistant(s) or support staff to the

3   Protective Order.

4       The Parties do not anticipate the need for discovery of hearing preparation

5   materials. The Parties expect to discover any information relied upon by any expert in

6   rendering his or her opinion. The Parties do not expect to discover any

7   communications between any expert and counsel, drafts of demonstratives, or drafts of

8   expert reports

9

10      **11.   JOINT ELECTRONIC DISCOVERY**
              **SUBMISSION AND [PROPOSED] ORDER**

11

12   One or more of the parties to this litigation have indicated that they believe that

13   relevant information may exist or be stored in electronic format, and that this content

     is potentially responsive to current and/or anticipated discovery requests. This Joint

14   Submission and [Proposed] Order (and any subsequent orders) shall govern the

     electronic discovery process in this action. The parties and the Court recognize that

15   this Joint Electronic Discovery Submission and [Proposed] Order is based on facts

16   and circumstances as they are currently known to each party, that the electronic

     discovery process is iterative, and that additions and modifications to this

17   Submission may become necessary as more information becomes known to the

18   parties.

19   **I.   Competence.** Counsel certify that they are sufficiently knowledgeable in

20   matters relating to their clients' technological systems to discuss competently issues

     relating to electronic discovery, or have involved someone competent to address

21   these issues on their behalf.

22   **II.   Meet and Confer.** Counsel are required to meet and confer regarding

23   certain matters relating to electronic discovery. Counsel hereby certify that they

     have met and conferred to discuss these issues.

24

25      Date(s) of parties' meet-and-confer conference(s):  October 26, 2016

26   **III.   Unresolved Issues:** After the meet-and-confer conference(s) taking

     place on the aforementioned date(s), the following issues remain outstanding

27   and/or require judicial intervention:

28

**A.    Preservation**

    1.    The parties have discussed the obligation to preserve potentially relevant electronically stored information and agree to the following scope and methods for preservation, including but not limited to: retention of electronic data and implementation of a data preservation plan; identification of potentially relevant data; disclosure of the programs and manner in which the data is maintained; identification of computer system(s) utilized; and identification of the individual(s) responsible for data preservation, etc.

    The parties have been made aware by their respective counsel that the parties are expected to take reasonable steps to hold and preserve potentially relevant documents and data. Furthermore, the parties reserve the right to revisit this issue upon a showing of good cause by the requesting party based upon specific facts that demonstrate a particular need for such discovery.

    2.    State the extent to which the parties have disclosed or have agreed to disclose the dates, contents, and/or recipients of "litigation hold" communications.

    The parties have agreed not to disclose the dates, contents, and/or recipients of "litigation hold" communications for the time being. The parties have been made aware by their respective counsel that the parties are expected to take reasonable steps to hold and preserve potentially relevant documents and data. Furthermore, the parties reserve the right to revisit this issue upon a showing of good cause by the requesting party based upon specific facts that demonstrate a particular need for such discovery.

    3.    The parties anticipate the need for judicial intervention regarding the following issues concerning the duty to preserve, the scope, or the method(s) of preserving potentially relevant electronically stored information.

    The Parties do not presently anticipate the need for judicial intervention regarding the duty to preserve, the scope, or the method(s) of preserving potentially relevant electronically stored information.

**B.    Search and Review**

    1.    The parties have discussed methodologies or protocols for the search and review of electronically stored information, as well

as the disclosure of techniques to be used. Some of the
approaches that may be considered include: the use and
exchange of keyword search lists, "hit reports," and/or
responsiveness rates; concept search; machine learning, or other
advanced analytical tools; limitations on the fields or file types
to be searched; date restrictions; limitations on whether back-up,
archival, legacy, or deleted electronically stored information will
be searched; testing; sampling; etc. To the extent the parties
have reached agreement as to search and review methods,
provide details below.

The parties have discussed the methodologies or protocols for the search and
review of electronically stored information. With the exception of email searches
discussed in Section C.2 below, the parties have agreed not to disclose techniques to
be used, for the time being. The parties reserve the right to revisit this issue and/or
seek discovery concerning search methodologies or protocols upon a showing of
good cause by the requesting party based upon specific facts that demonstrate a
particular need for such discovery.

     2.     The parties anticipate the need for judicial intervention regarding
the following issues concerning the search and review of
electronically stored information.

The Parties do not presently anticipate the need for judicial intervention
regarding the search and review of electronically stored information.

**C.**    **Production**

     1.     **Source(s) of Electronically Stored Information.** The parties
anticipate that discovery may occur from one or more of the
following potential source(s) of electronically stored information
[e.g., email, word processing documents, spreadsheets,
presentations, databases, web sites, etc.]:

The parties anticipate that relevant or responsive information may exist in one
or more of the following sources: email, word processing documents, spreadsheets,
presentations, databases, web sites, technical documents and data, and other
information and documents maintained on servers and shared drives. By so
anticipating and agreeing regarding the possible sources of relevant or responsive
information, the parties do not agree that all such sources must be collected and
searched in order for the parties to fulfill their discovery obligations.

2.    **Limitations on Production.** The parties have discussed factors relating to the scope of production, including but not limited to: (i) number of custodians; (ii) identity of custodians; (iii) date ranges for which potentially relevant data will be drawn; (iv) locations of data; (v) timing of productions; and (vi) electronically stored information in the custody or control of non-parties. To the extent the parties have reached agreements related to any of these factors, describe below:

The parties agree to produce emails in response to email requests served by the other party.  Email production requests shall identify the custodian, search terms, and time frame.  The parties shall cooperate to identify the proper custodians, proper search terms, and proper time frame.  The search terms shall be narrowly tailored to particular issues.  Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.

3.    **Form(s) of Production**:

The parties have reached the following agreements regarding the form(s) of production:

All document production shall be in electronic format unless otherwise agreed to in advance by the parties.

Document Image Format.  Subject to any exceptions discussed below, documents shall be produced in single-page, 300 DPI Group IV compression black-and-white TIFF format.

Native File.  A party that receives a document produced in TIFF format may make a reasonable request to receive the document in its native format, and upon receipt of such a request, the parties shall meet and confer in good faith to determine whether the document should be produced in its native format.

Color.  Documents containing color or grayscale images need not be produced in color or grayscale unless the receiving party makes a reasonable request in writing for such a production in an imaged file format or for the documents to be produced in native format. Color or grayscale images should be delivered as JPGs.

Load File.  Each production shall include an Opticon load file and Concordance .dat file that indicates document breaks to accompany the TIFF images and the metadata identified herein.

File Name.  Each document image file shall be named with the unique Bates number, followed by the extension "TIF" as appropriate.  The Bates number should be electronically "burned" into the image at a place on the document that does not obscure, conceal, or interfere with any information originally appearing on the document.  File names may not be more than fifteen characters long and may not contain spaces.  Each native file shall be named with its unique Bates number, any confidentiality designation (abbreviated form is acceptable), and the appropriate file extension in the following format: [Bates number]_[confidentiality].[file extension].  For example, a native Excel file should be produced with the name ABC000001_CBI.xls.

Document Unitization.  If a document is more than one page, the unitization of the document and any attachments and/or affixed notes shall be maintained as they existed in the original document.

Searchable Text.  Each production will include multi-page text files corresponding to the TIFF files described above, where applicable.

Hard Copy Documents.  All documents that are hardcopy or paper files shall be scanned and produced in the same manner as documents existing in electronic format, above.  In scanning hardcopy or paper documents, distinct documents shall not be merged into a single record, and single documents should not be split into multiple records (i.e., hard copy documents should be logically unitized).  The parties will use reasonable efforts to unitize documents correctly.

Production Media.  Unless otherwise agreed, the parties shall provide document productions in the following manner:  The producing party shall provide the production data on CDs, DVDs, external hard drives, or by secure electronic means (e.g., File Transfer Protocol), as appropriate.

The producing party shall encrypt the production data separately from the CD, DVD, external drive or secure electronic means by which the production data is transmitted.  Each piece of production media shall also identify: (1) the producing party's name; (2) the production date; (3) the Bates number range of the materials contained on the production media; and (4) whether the production media contains Confidential Business Information under the Protective Order in this Investigation.

  <u>Metadata.</u> The following metadata shall be provided within the
Concordance .dat file to the extent reasonably accessible and not subject to a
justified and proper claim of privilege:

  For all documents: Page Count; Md5Hash; Confidentiality; Time Zone
Processed; Custodian.[1]

  Additionally, for emails: To; From; CC; BCC; Date Sent; Time Sent;
Email Subject; Parent-child relationships (attachment information); Conversation
Index.

  Additionally, for non-email documents: Filename; File Extension; Last
Modified Date.

  <u>Unique Documents.</u> The parties shall attempt to de-duplicate ESI to avoid
substantially duplicative productions.  No party shall remove through de-
duplication any attachment to any email, regardless of whether the attachment is
duplicative of any other document.  The parties may de-duplicate emails that are
identical.  Custodian metadata for a given document shall reflect any Custodian of
any document removed as a duplicate of that document.

  <u>Original Documents.</u> During the pendency of this Investigation, the
producing parties shall retain native format copies, including associated
metadata, where available, of all ESI produced in this Investigation and original
hard copy documents for all paper discovery produced in this Investigation, to the
extent such original hard copy documents exist.

  <u>Third-Party Software.</u> To the extent that documents produced pursuant to
this Stipulated Order cannot be rendered or viewed without the use of proprietary
third-party software, the parties shall meet and confer to minimize any expense or
burden associated with the production of such documents in an acceptable
viewable format, including issues that arise with respect to obtaining access to any
such software and operating manuals which are the property of a third party.

    a.  Please specify any exceptions to the form(s) of
       production indicated above (e.g., word processing

---

[1] Custodian metadata shall in good faith identify from whom or where each
document was collected for production in this action, e.g., an individual, a document
repository, or a third party. Merely identifying the producing party as the custodian
generally fails to satisfy this requirement.

1   2   documents in TIFF with load files, but spreadsheets in
native form):

3   The parties have agreed that if ESI cannot be converted to TIFF (such as
4   video files, audio files, and Power Point or Key Note presentations with
animation, Microsoft Excel files, and other similar spreadsheet application files,
5   Microsoft Access, and other similar database files, and Microsoft Project) it will
6   be produced in native format. The parties have further agreed that CAD or similar
engineering drawings or schematics and source code or other software, to the
7   extent applicable, will be produced and/or made available for inspection in native
8   format. When producing a file in native format, it shall be accompanied by a
TIFF placeholder image marked with words indicating that a file has been
9   produced natively, and along with the appropriate confidentiality designation (if
10  any) and production (i.e., Bates) number. In the event that a receiving party
requests production of native format ESI, the producing party and the receiving
11  party shall negotiate in good faith about the timing, cost, and method of such
12  production.

13              b.      The parties anticipate the need for judicial intervention
14                      regarding the following issues concerning the form(s) of
                        production:
15
16  The Parties do not presently anticipate the need for judicial intervention
regarding the form(s) of production.

17              4.      **Privileged Material Identification.** The parties have agreed to
18                      the following method(s) for the identification (including the
19                      logging, if any, or alternatively, the disclosure of the number of
                        documents withheld), and the redaction of privileged documents:
20
21  The parties agree to log all documents within the scope of its responses to
requests for production that it withholds or redacts, except that the parties agree the
22  following need not be logged:  attorney-client privileged communications or work
23  product by party (or a party's outside counsel) directly in connection with a
litigation (including without limitation the instant case) or an *inter partes*
24  reexamination, *ex parte* reexamination, or *inter partes* review proceeding.
Additionally, the parties agree to exchange privilege logs 60 days before the date of
25  the fact discovery cut-off.

26              5.      **Cost of Production.** The parties have analyzed their client's data
27                      repositories and have estimated the costs associated with the
28

-13-
DISCOVERY ORDER — No. 8:16-cv-01605-JLS-JCG

production of electronically stored information. The factors and
components underlying these costs are estimated as follows:

        a.    **Costs**

The parties are currently evaluating the cost of production. The factors and
components underlying these costs include the volume of data to be produced, the
format of the data to be produced, and the search methodologies or protocols
utilized.

        b.    **Cost Allocation.** The parties have considered cost-shifting
or cost sharing and have reached the following
agreements, if any:

The parties are willing to discuss cost allocation measures that may be
implemented during the course of this Investigation.

        c.    **Cost Savings.** The parties have considered cost-saving
measures, such as the use of a common electronic
discovery vendor or a shared document repository, and
have reached the following agreements, if any:

The parties are willing to discuss other cost saving measures that may be
implemented during the course of this case.

      6.    The parties anticipate the need for judicial intervention
regarding the following issues concerning the production of
electronically stored information:

The Parties do not presently anticipate the need for judicial intervention
regarding the production of electronically stored information.

D.    **Other Issues:**

The parties do not anticipate any other issues with respect to electronic
discovery.

The preceding constitutes the agreement(s) reached and existing disputes (if
any) between the parties to certain matters concerning electronic discovery as of this
date. To the extent additional agreements are reached, modifications are necessary, or

1  disputes are identified, they will be outlined in subsequent submissions or agreements and promptly
2  presented to the Court for consideration.

3      IT IS SO ORDERED.

4

5  Dated:    January 12, 2017

   JAY C. GANDHI
6  United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPX0292

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 21

Case 8:16-cv-01605-JLS-JCG   Document 133   Filed 06/13/17   Page 1 of 4   Page ID #:4114

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                              Date: June 13, 2017
Title: Netlist, Inc., v. SK hynix Inc. et al.

---

Present:  **HONORABLE JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  Terry Guerrero                                         N/A    
Deputy Clerk                                           Court Reporter

Attorneys Present for Plaintiff:          Attorneys Present for Defendant:

Not Present                                      Not Present

**PROCEEDINGS:   (IN CHAMBERS) ORDER (1) GRANTING IN PART EX PARTE MOTION TO STRIKE NETLIST'S EXPERT DECLARATIONS, (2) CONTINUING THE DEADLINE TO SUBMIT RESPONSIVE CLAIM CONSTRUCTION BRIEFS TO JUNE 30, 2017, AND (3) CONTINUING THE MARKMAN HEARING TO JULY 27, 2017 (Doc. 126)**

    Before the Court is Defendants SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions Inc.'s *Ex Parte* Application to Strike Netlist's Untimely Expert Declarations in Support of Netlist's Claim Construction Brief.  (App., Doc. 126.) Plaintiff filed an Opposition (Opp'n, Doc. 127), Defendants then submitted a Reply (Reply, Doc. 128), and Plaintiff filed an unsolicited Sur-Reply (Sur-Reply, Doc. 129). The Court GRANTS IN PART the Application.

    In utility patent cases, this Court follows the Northern District of California's Patent Rules unless this Court's presumptive schedule differs.  (Order Setting Scheduling Conf. at 4-5, Doc. 61.)  The Northern District's Patent Rule 4-2(b) provides:

    (b)  At the same time the parties exchange their respective "Preliminary Claim Constructions," each party shall also identify all references from the specification or prosecution history that support its proposed construction and designate any supporting extrinsic evidence including, without limitation, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses. Extrinsic evidence shall be

---

APPX0294

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                              Date: June 13, 2017
Title: Netlist, Inc., v. SK hynix Inc. et al.

identified by production number or by producing a copy if not previously produced. *With respect to any supporting witness, percipient or expert, the identifying party shall also provide a description of the substance of that witness' proposed testimony that includes a listing of any opinions to be rendered in connection with claim construction.*

N.D. Cal. Patent R. 4-2(b) (emphasis added).  In its Rule 4-2 disclosures, which were due on April 7, 2017, Netlist failed to disclose the seventy-seven page declaration of Dr. William Mangione-Smith and the sixty-seven page declaration of Dr. R. Jacob Baker. (*See* Mangione-Smith Decl., Doc. 126-4; Baker Decl., Doc. 126-5.)  Netlist relies heavily on these declarations in its opening brief to support its proposed constructions.  (*See* Netlist Opening Brief, Doc. 124.)

By failing to disclose the content of these declarations Netlist plainly violated Local Patent Rule 4-2.  Netlist's boilerplate references to "declarations of Netlist experts" in the draft of the Joint Claim Construction Statement circulated on May 19, 2017—which Netlist later changed to "declarations of Netlist experts in this proceeding and co-pending proceedings"—failed to apprise Defendants of the "the substance of [these] witness[es'] proposed testimony . . . includ[ing] a listing of any opinions to be rendered in connection with claim construction."  N.D. Cal. Patent R. 4-2(b).  While Netlist claims that these declarations are consistent with its experts' constructions in the ITC proceedings, a comparison of its experts' testimony in the ITC trial and in the present declarations shows extensive elaboration and a few entirely new opinions.  For example, in paragraphs 66 to 74 of the Mangione-Smith Declaration, Dr. Mangione-Smith provides a four-page explanation of "generate," while she simply stated at the ITC trial that she agreed with the OUII Staff's proffered definition of the term.  (*Compare* ITC Trans. 426:22-427:18, Doc. 127-1 *with* Mangione-Smith Decl. ¶¶ 66-74, Doc. 126-4.)  That Netlist is unwilling to substitute certain paragraphs of its new declarations with references to the ITC proceedings shows that these declarations do not simply rehash its experts' opinions before the ITC.

Normally, the Court would simply strike these declarations in their entirety for failure to comply with Rule 4-2.  But, because this claim construction proceeding rather

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                                    Date: June 13, 2017
Title: Netlist, Inc., v. SK hynix Inc. et al.

---

unusually comes on the heels of a full-blown trial before the ITC that touched upon the same issues (albeit often cursorily and not through Plaintiff's experts), the prejudice to Defendants is less than in other circumstances.  In its discussions with SK hynix, Netlist was amenable to withdrawing paragraphs 103-107 and 133-163 of the Mangione-Smith Declaration and paragraphs 43 and 74-88 of the Baker Declaration, so the Court STRIKES these paragraphs and GRANTS Netlist leave to file an amended opening brief by **Friday, June 16, 2017** that replaces any references to these paragraphs with citations to the ITC record.  As for paragraphs 66-81, 108-113, and 121-125 of the Mangione-Smith Declaration and paragraphs 42 and 60-61 of the Baker Declaration, the Court STRIKES these paragraphs unless Netlist agrees to pay Defendants' reasonable attorneys' fees—if any—incurred in supplementing their opening claim construction brief to respond to these paragraphs (and only these paragraphs).  If Netlist opts for the latter course, any amended opening brief by Defendants shall be due by **Monday, June 19, 2017.**  This remedy alleviates any prejudice SK hynix may have faced from Netlist's Rule 4-2 violation without causing an unwarranted forfeiture.

The last day to file responsive claim construction briefs is CONTINUED to **June 30, 2017**, and the *Markman* hearing is CONTINUED to **July 27, 2017 at 9:00 a.m.**  The hearing currently scheduled for July 18, 2017 at 9:00 a.m. will remain on calendar only as a technology tutorial.  The Court encourages the parties to avoid further *ex parte* applications through private agreement and strict compliance with the applicable rules.


Initials of Preparer:  tg

---

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 22

Case 8:20-cv-00804-ADA  Document 26-254 Filed 05/04/20  Page 2 of 14
Case 8:17-cv-01030  Document 1  Filed 06/14/17  Page 1 of 13  Page ID #:1

Nada I. Shamonki (SBN 205359)
nshamonki@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 1370
Los Angeles, CA 90067
Telephone:   310-586-3200
Facsimile:    310-586-3202

Attorneys for Plaintiff Netlist, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc., | Case No.  8:17-cv-1030 |
| *Plaintiff,* | |
| vs. | **COMPLAINT FOR PATENT INFRINGEMENT** |
| SK hynix Inc., SK hynix America Inc. and SK hynix memory solutions Inc., | **DEMAND FOR JURY TRIAL** |
| *Defendants.* | |

- 1 -

Plaintiff Netlist, Inc. ("Netlist") brings this action for patent infringement against Defendants SK hynix, Inc., SK hynix America Inc. and SK hynix Memory Solutions, Inc. (collectively "Hynix" or "Defendants") and alleges as follows:

**NATURE OF THE ACTION**

1.     This is a civil action for patent infringement under the patent laws of the United States relating to patents, including 35 U.S.C. § 281.

**THE PARTIES**

2.     Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

3.     On information and belief, Defendant SK hynix Inc. is a corporation organized and existing under the laws of the Republic of Korea ("Korea"), having a principal place of business at 2091, Gyeongchung-daero, Bubal-eub, Icheon-si, Gyeonggi-do, Korea. On information and belief, SK hynix Inc. is the worldwide parent corporation for Defendants SK hynix America Inc. and SK hynix memory solutions Inc., and is responsible either directly or indirectly through subsidiaries for their infringing activities.

4.     On information and belief, Defendant SK hynix America Inc. is a corporation organized and existing under the laws of California, having a principal place of business at 3101 North 1st Street, San Jose, CA 95134, United States. On information and belief, Defendant SK hynix America Inc. is a wholly owned subsidiary of SK hynix Inc. and is a United States operating company for SK hynix Inc. On information and belief, Defendant SK hynix America Inc. provides support for sales, technical, and customer/client relationship operations.

5.     On information and belief, Defendant SK hynix memory solutions Inc. is a corporation organized and existing under the laws of California, having a principal place of business at 3103 North 1st Street, San Jose, CA 95134. On information and

APPX0299

Case: 21-114   Document: 2   Page: 361   Filed: 02/08/2021

Case 6:20-cv-00094-ADA Document 26-25 Filed 05/04/20 Page 4 of 14
Case 8:17-cv-01030-J Document 1 Filed 06/14/17 Page 3 of 13 Page ID #:3

belief, Defendant SK hynix memory solutions Inc. is a wholly owned subsidiary of SK hynix Inc. and is a United States operating company for SK hynix Inc. On information and belief, Defendant SK hynix memory solutions Inc. provides to its customers controller hardware and flash management systems and firmware for devices.

### JURISDICTION AND VENUE

6.   This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and pursuant to the patent laws of the United States of America, 35 U.S.C. § 101, et seq.

7.   This Court has personal jurisdiction over Defendants because, on information and belief, they have regularly and systematically transacted business within the State of California and this District. In addition, this Court has personal jurisdiction over Defendants because, on information and belief, this lawsuit arises out of Defendants' infringing activities, including without limitation their making, using, selling and/or offering to sell infringing products within the State of California and this District. This Court also has personal jurisdiction over Defendants because, on information and belief, Defendants have made, used, sold and/or offered for sale their infringing products and placed such infringing products in the stream of interstate commerce with the expectation that such infringing products would be made, used, sold and/or offered for sale within the State of California and this District. Finally, this Court has personal jurisdiction over Defendants SK hynix America Inc. and SK hynix memory solutions Inc. because they are corporations duly incorporated under the laws of California and have offices in California.

8.   Venue is proper in the Central District of California pursuant to the provisions of 28 U.S.C. § 1400(b). On information and belief, Defendants have regular and established places of business in this District and conduct business in this District directly and/or through third parties or agents. On information and belief,

Defendants have committed acts of infringement in this District by, without limitation, selling and/or offering to sell the infringing products. Furthermore, Netlist is headquartered and has its principal place of business in this District, sells products in this District, and has been harmed by Defendants' conduct, business transactions and sales in this District.

## FACTUAL BACKGROUND

9.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies. Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing (HPC) markets. Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time. These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

10.    The technologies disclosed and claimed in the asserted patents relate generally to memory modules. Generally speaking, a memory module is a circuit board that contains, among other important components, DRAM integrated circuits. A memory module is typically installed into a memory slot on a computer motherboard and serves as memory for that computer system. United States Patent No. 9,606,907 ("the '907 patent") relates to memory modules of a computer system, and more specifically to devices and methods for improving the performance, the memory capacity, or both, of memory modules such as dual in-line memory modules, or DIMMs. United States Patent No. 9,535,623 ("the '623 patent") relates to memory modules that operate in two distinct modes.

11.    Server memory modules historically have been standardized by the standard-setting body for the microelectronics industry, JEDEC (Joint Electron Device Engineering Council). RDIMM is a JEDEC-standard memory module, which was first standardized in the mid-1990s. LRDIMM is a different type of memory

- 4 -

module governed by other JEDEC standards. Specifically, JEDEC approved the
initial versions of the DDR4 LRDIMM standards for the two primary components,
the DDR4 RCD and DDR4 DB, in August of 2016 and November of 2016,
respectively.

12. Netlist has in all respects acted in a manner consistent with the JEDEC
Patent Policy, as set forth in the JEDEC Manual of Organization and Procedure,
which states in relevant part that "[a] license will be offered, to applicants desiring to
utilize the license for the purpose of implementing the JEDEC Standard under
reasonable terms and conditions that are free of any unfair discrimination... ." Netlist
contacted Hynix in 2015 regarding its need for a license to Netlist's patent portfolio
and has since been negotiating in good faith to reach a resolution. In the course of
these negotiations, Netlist offered to license the direct parents of the asserted patents
to Hynix under reasonable terms and conditions that are free of any unfair
discrimination over a year before bringing this action. Hynix, however, has from the
beginning taken unreasonable positions and refused to attribute any meaningful value
to Netlist's fundamental patent portfolio. Hynix has also launched extensive
collateral attacks on Netlist and its intellectual property, filing a dozen IPRs on a
number of Netlist's patents. As a result, the parties have made no progress towards
resolution despite multiple substantive exchanges, over a year of negotiation, and
Netlist's multiple offers to license.

13. In June 2016, consistent with its obligations to JEDEC, Netlist sent
Hynix a formal letter outlining Netlist's offer to license Netlist's patent portfolio for
DDR4 RDIMMs and LRDIMMs on reasonable terms and conditions that are free of
any unfair discrimination. Netlist again identified the direct parents of the asserted
patents, and informed Hynix that Hynix DDR4 RDIMMs and LRDIMMs practice
these patents and additional SEP assets, which are owned by Netlist but practiced

Case: 21-114   Document: 2   Page: 364   Filed: 02/08/2021

Case 6:20-cv-00394-ADA   Document 26-25   Filed 05/04/20   Page 7 of 14
Case 8:17-cv-01030-JVS-JCG   Document 1   Filed 06/14/17   Page 6 of 13   Page ID #:6

1    without authorization by Hynix. Hynix did not accept Netlist's reasonable, good-faith
2    offers.

3        14.   On August 31, 2016, Netlist filed suit against Defendants in the Central
4    District of California, alleging infringement of U.S. Patent Nos. 8,756,364,
5    8,516,185, 8,001,434, 8,359,501, 8,689,064, and 8,489,837. *Netlist, Inc. v. SK hynix
6    Inc. et al.,* Case No. 8:16-cv-1605 Dkt. No. 1, Compl. (C.D. Cal. Aug. 31, 2016).
7    U.S. Patent No. 8,516,185 is related to and shares a specification with U.S. Patent
8    No. 9,606,907. U.S. Patent No. 8,489,837 is related to and shares a specification with
9    U.S. Patent No. 9,535,623.

10       15.   On September 1, 2016 Netlist filed a Complaint at the International Trade
11   Commission, alleging a violation of Section 337 of the Tariff act of 1930, as
12   amended, 19 U.S.C. § 1337, by Defendants related to the infringement of U.S. Patent
13   Nos. 8,756,364, 8,516,185, 8,001,434, 8,359,501, 8,689,064, and 8,489,837. On
14   September 30, 2016, the International Trade Commission instituted an investigation
15   as to all six patents as Investigation No. 337-TA-1023, *Certain Memory Modules and
16   Components thereof, and Products Containing Same*. Two of subject patents of the
17   Inv. No. 337-TA-1023, U.S. Patent No. 8,516,185 and U.S. Patent No. 8,489,837, are
18   the direct parents of the two patents asserted in this Complaint: U.S. Patent No.
19   9,606,907 and U.S. Patent No. 9,535,623, respectively.

20       16.   Each of the Defendants has been aware of the parents of the asserted
21   patents since at least January 2016 when Netlist presented to the Defendants detailed
22   claim charts related to the parents of each of the asserted patents.

23                              **COUNT ONE**
24   **INFRINGEMENT OF UNITED STATES PATENT NO. 9,606,907**

25       17.   Netlist incorporates by reference the preceding allegations of its
26   Complaint.

27

28

Case: 21-114     Document: 2     Page: 365     Filed: 02/08/2021

Case 6:20-cv-00194-ADA   Document 26-25   Filed 05/04/20   Page 8 of 14
Case 8:17-cv-01030   Document 1   Filed 06/14/17   Page 7 of 13   Page ID #:7

1      18.    The '907 patent, entitled "Memory module with distributed data buffers
2  and method of operation," issued on March 28, 2017 to inventors Hyun Lee and
3  Jayesh R. Bhakta. The '907 patent issued from United States Patent Application No.
4  13/970,606 filed on August 20, 2013. The '907 Patent is a child of Patent No.
5  8,516,185 ("the '185 patent"). Netlist owns by assignment the entire right, title and
6  interest in and to the '907 patent as well as the '185 patent. Attached hereto as
7  Exhibit 1 is a true and correct copy of the '907 patent.

8      19.    On information and belief, Defendants directly infringed and are
9  currently infringing at least the independent and dependent claims of the '907 patent
10 identified in the chart below ("the '907 Asserted Claims") by, among other things,
11 making, using, selling, offering to sell, and/or importing within this District and
12 elsewhere in the United States, without authority, Hynix DDR4 LRDIMMs (Load-
13 Reduced Dual In-Line Memory Modules), including but not limited to the exemplary
14 Hynix DDR4 LRDIMM modules identified in the Hynix Q1 2017 Databook attached
15 as Exhibit 2 (the "accused LRDIMM products").

| '907 Independent Claims | '907 Dependent Claims |
|---|---|
| 1 | 2, 3, 4, 5, 6, 7, 8, 10, 12, 14, and 15 |
| 16 | 17, 18, 19, 20, 21, 22, 24, 25, 27, and 29 |
| 30 | 31, 32, 33, 34, 35, 38, and 42 |
| 43 | 44, 45, 47, 48, 50, and 52 |
| 58 | N/A |

23     20.    An exemplary claim chart comparing the asserted independent claims of
24 the '907 patent to an exemplary one of the accused LRDIMM products (part number
25 HMA84GL7AMR4N-TF TE AB) is attached as Exhibit 3.

APPX0304

Case: 21-114     Document: 2     Page: 366     Filed: 02/08/2021

Case 6:20-cv-00984-ADA   Document 26-25   Filed 05/04/20   Page 9 of 14
Case 8:17-cv-01030-DOC-KES   Document 1   Filed 06/14/17   Page 8 of 13   Page ID #:8

21.   On information and belief, each of Defendants has been aware of the '185 patent, the parent of the '907 patent, and the patents' identical disclosures, since at least January 2016.

22.   On information and belief, users making routine use of the accused LRDIMM products infringe at least the '907 Asserted Claims. On information and belief, each of Defendants was aware that the accused LRDIMM products infringe at least the '907 Asserted Claims, and was aware that users making routine use of the accused LRDIMM products infringe those claims.

23.   On information and belief, each of Defendants specifically intended that users of the accused LRDIMM products infringe at least the '907 Asserted Claims, and took actions while the '907 patent was in force intending to cause the infringing acts, including the infringing routine use of the accused LRDIMM products by users. For example, on information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing use of the accused LRDIMM products by users with the intent of inducing infringement.

24.   On information and belief, each of Defendants contributes to the direct infringement of at least the '907 Asserted Claims, including the infringing routine use of the accused LRDIMM products by users. On information and belief, Defendants have sold, offered for sale and/or imported within the United States the accused LRDIMM products for use in a product or process that practices those claims, while the '907 patent was in force. On information and belief, the accused LRDIMM products have no substantial noninfringing use, and constitute a material part of the patented invention. On information and belief, each of Defendants is aware that the product or process that includes the accused LRDIMM products may be covered by a claim of the '907 patent or may satisfy a claim of the '907 patent under the doctrine of equivalents. On information and belief, the use of the product or process that includes the accused LRDIMM products infringes at least the '907 Asserted Claims.

- 8 -

Case: 21-114   Document: 2   Page: 367   Filed: 02/08/2021

Case 8:20-cv-00104-ADA   Document 25   Filed 05/04/20   Page 10 of 49
Case 8:17-cv-09033-ADA   Document 1   Filed 06/14/17   Page 42 of 13   Page ID #49

25. Defendants have committed these acts of direct and indirect infringement with knowledge of at least the '907 Asserted Claims and thus have acted recklessly and willfully with regard to Netlist's rights in the '907 patent.

26. As a result of Defendants' direct, indirect and willful infringement of at least the '907 Asserted Claims, Netlist has suffered and is continuing to suffer monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendants' past infringement, together with enhanced damages, attorneys' fees, interest, and costs.

27. Netlist has been irreparably harmed by Defendants' acts of infringement, and will continue to be harmed unless and until Defendants' acts of infringement are enjoined and restrained by order of this Court. Netlist has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Defendants and the accused LRDIMM products.

## COUNT TWO

## INFRINGEMENT OF UNITED STATES PATENT NO. 9,535,623

28. Netlist incorporates by reference the preceding allegations of its Complaint.

29. The '623 patent, entitled "Memory module capable of handshaking with a memory controller of a host system," issued to inventor Dr. Hyun Lee on January 3, 2017. The '623 patent issued from Application No. 15/169,745, filed on June 1, 2016. The '623 Patent is the child of Patent No. 8,489,837 ("the '837 patent"). Netlist owns by assignment the entire right, title and interest in and to the '623 patent. Attached hereto as Exhibit 4 is a true and correct copy of the '623 patent.

30. On information and belief, Defendants directly infringed and are currently infringing at least the independent and dependent claims of the '623 patent identified in the chart below ("the '623 Asserted Claims") by, among other things, making, using, selling, offering to sell, and/or importing within this District and

Case: 21-114    Document: 2    Page: 368    Filed: 02/08/2021

Case 1:20-cv-00094-ADA   Document 26-25   Filed 05/04/20   Page 11 of 14
Case 5:17-cv-01095   Document 1   Filed 06/21/17   Page 10 of 13   Page ID #410

1   elsewhere in the United States, without authority, the accused LRDIMM products
2   and Hynix DDR4 RDIMMs (Registered Dual In-Line Memory Modules), including
3   but not limited to the exemplary Hynix DDR4 RDIMM modules identified in the
4   Hynix Q1 2017 Databook attached as Exhibit 2 (the "accused RDIMM products")
5   (collectively the "accused products" or the "accused LRDIMM and RDIMM
6   products").

| '623 Independent Claims | '623 Dependent Claims |
| --- | --- |
| 1 | 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 |
| 12 | 13, 14, 15, 16, 17, 18, 19, and 20 |
| 21 | 22, 23, 24, 25, 26, 27, 28, and 29 |

12       31.    An exemplary claim chart comparing the asserted independent claims of
13   the '623 patent to exemplary accused LRDIMM and RDIMM products (part number
14   HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) and part number
15   HMA84GR7MFR4N-TF TD BA (32GB DDR4 RDIMM)) is attached as Exhibit 5.

16       32.    On information and belief, each of Defendants has been aware of the
17   '837 patent, the parent of the '623 patent, and the patents' identical disclosures, since
18   at least January 2016.

19       33.    On information and belief, users making routine use of the accused
20   LRDIMM and RDIMM products infringe at least the '623 Asserted Claims. On
21   information and belief, each of Defendants was aware that the accused LRDIMM and
22   RDIMM products infringe at least the '623 Asserted Claims, and was aware that
23   users making routine use of the accused LRDIMM and RDIMM products infringe
24   those claims. On information and belief, each of Defendants specifically intended
25   that users of the accused LRDIMM and RDIMM products infringe at least the '623
26   Asserted Claims, and took actions while the '623 patent was in force intending to
27   cause the infringing acts, including the infringing routine use of the accused
28

- 10 -

Case: 21-114    Document: 2    Page: 369    Filed: 02/08/2021

Case 1:20-cv-09194-ADA Document 26-25 Filed 05/04/20 Page 12 of 14
Case 8:17-cv-01030 Document 1 Filed 06/15/17 Page 11 of 13 Page ID #:11

1    LRDIMM and RDIMM products by users. For example, on information and belief,
2    Defendants provide specifications, datasheets, instruction manuals, and/or other
3    materials that encourage and facilitate infringing use of the accused LRDIMM and
4    RDIMM products by users with the intent of inducing infringement.

5        34.    On information and belief, each of Defendants contributes to the direct
6    infringement of at least the '623 Asserted Claims, including the infringing routine use
7    of the accused LRDIMM and RDIMM products by users. On information and belief,
8    Defendants have sold, offered for sale and/or imported within the United States the
9    accused LRDIMM and RDIMM products for use in a product or process that
10   practices those claims, while the '623 patent was in force. On information and belief,
11   the accused LRDIMM and RDIMM products have no substantial noninfringing use,
12   and constitute a material part of the patented invention. On information and belief,
13   each of Defendants is aware that the product or process that includes the accused
14   LRDIMM and RDIMM products may be covered by a claim of the '623 patent or
15   may satisfy a claim of the '623 patent under the doctrine of equivalents. On
16   information and belief, the use of the product or process that includes the accused
17   LRDIMM and RDIMM products infringes at least the '623 Asserted Claims.

18       35.    Defendants have committed these acts of direct and indirect infringement
19   with knowledge of at least the '623 Asserted Claims and thus have acted recklessly
20   and willfully with regard to Netlist's rights in the '623 patent.

21       36.    As a result of Defendants' direct, indirect and willful infringement of at
22   least the '623 Asserted Claims, Netlist has suffered and is continuing to suffer
23   monetary damages and is entitled to a monetary judgment in an amount adequate to
24   compensate for Defendants' past infringement, together with enhanced damages,
25   attorneys' fees, interest, and costs.

26       37.    Netlist has been irreparably harmed by Defendants' acts of infringement,
27   and will continue to be harmed unless and until Defendants' acts of infringement are

28

1  enjoined and restrained by order of this Court. Netlist has no adequate remedy at law

2  and is entitled to a preliminary and permanent injunction against Defendants and the

3  accused LRDIMM and RDIMM products.

4  **PRAYER FOR RELIEF**

5  **WHEREFORE**, Netlist respectfully requests that judgment be entered:

6  A.    Declaring that Defendants have infringed and are infringing, directly and

7  indirectly, the claims of the asserted patents;

8  B.    Compensating Netlist for all damages caused by Defendants'

9  infringement of the asserted patents;

10  C.    Enhancing Netlist's damages up to three times their amount under 35

11  U.S.C. § 284;

12  D.    Granting Netlist pre- and post-judgment interests, together with all costs

13  and expenses;

14  F.    Granting Netlist its reasonable attorneys' fees under 35 U.S.C. § 285;

15  G.    Granting a permanent injunction enjoining and restraining Defendants and

16  their agents, servants, employees, affiliates, divisions, and subsidiaries, and

17  those in association with Defendants, from making, using, offering to sell,

18  selling, and importing into the United States any product, or using, offering to

19  sell, or selling any service, that falls within the scope of any claim of the asserted

20  patents; and

21  H.    Awarding such other relief as this Court may deem just and proper.

22

23  Dated:  June 14, 2017          M ints  L evin  C ohn  F erris  G lovsky
                                    and  P opeo  P.C.

24

25  _____
     Nada I. Shamonki

26

27  *Attorneys for Plaintiff Netlist Inc.*

28

- 12 -

6987523 1v.2

# DEMAND FOR JURY TRIAL

Nellist respectfully requests a trial by jury on all claims so triable.

Dated: June 14, 2017

MINTZ LEVIN COHN FERRIS GLOVSKY
AND POPEO P.C.

*Nada Shamonki*

Nada I. Shamonki

*Attorneys for Plaintiff Nellist Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 1:20-cv-01009-ADA Document 26-25 Filed 05/04/20 Page 14 of 14

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 23

# EXHIBIT 5

Case: Case21-610 120-120 0184 Document Document: 266 264 Filed Page: 05/04/20 2020 Page Page: 04-255

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| **9,535,623 Claim 1** | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| 1. A memory module configured to fit into a corresponding slot of a host system to operate with a memory controller of the host system, the memory module comprising: | To the extent this preamble is found to be a limitation, the SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) ("SK hynix LRDIMM") is a memory module configured to fit into a corresponding slot of a host system to operate with a memory controller of the host system. <br><br> As illustrated in the photo and figure below, the SK hynix LRDIMM includes a printed circuit board (PCB) for communicating signals between (e.g., to/from) the memory module and the memory controller of the host system. <br><br>  <br><br> The PCB is also illustrated in the SK hynix LRDIMM Data Sheet. |

APPX0313

Case: 21-114    Document: 2    Page: 375    Filed: 02/08/2021    Page 14 of 268

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| 9,535,623 Claim 1 | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| [1a_2] wherein the module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system, the module controller generating a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode and outputting the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode; | The SK hynix LRDIMM has a module controller (RCD) that is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system, the module controller generating a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode and outputting the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode.<br><br>The SK hynix LRDIMM is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system. For example, the IDT RCD includes control word state machine and control logic that receives a training control word from the memory controller via pins DA[13:0], decodes it and writes particular bits (e.g., RC0C enabling Clock-to-CA) to an internal register causing the memory module to enter a Clock-to-CA training mode. |

14

APPX0314

Case: 21-114    Document: 2    Page: 376    Filed: 02/08/2021

Case 6:20-cv-00194-ADA   Document 26-26   Filed 05/04/20   Page 17 of 201
Case 8:1?-cv-01030   Document 1-6   Filed 06/14/1?   Page 16 of 208   PageID #:269

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| *9,535,623 Claim 1* | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| |  |
| | *See,* RCD Spec. at p. 53. |

Case: 21-114 Document: 2 Page: 377 Filed: 02/08/2021

Case 6:20-cv-00191-ADA Document 26-26 Filed 05/04/20 Page 18 of 201
Case 8:17-cv-01030 Document 13 Filed 06/14/17 Page 17 of 208 PageID #:270

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| *9,535,623 Claim 1* | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| | **2.18.2 Control Word Decoding**<br><br>The control words are programmed by the host controller using the rank 0 DRAM MRS function with DBG1, DBG0, DBA1, DBA0 = 0111. The DDR4RCD01 forwards the MRS command to the DRAM. The DRAM is required to ignore the content of this word.<br><br>The control word is clocked in when DCS0_n is LOW, DACT_n is HIGH and DA16/RAS_n, DA15/CAS_n, DA14/WE_n are LOW. In Encoded QuadCS mode, DC0 also has to be LOW for a valid control word access. Both the address of the control word and the settings are transmitted over DA[12:0].<br><br>The reset default state of all control words (except vendor specific ones) is '0'. Every time the device is reset, its default state is restored. Stopping the clocks (CK_t=CK_c=LOW) to put the device in low-power mode will not alter the control word settings.<br><br>*Id.* at 57. |

Case: 21-114   Document: 2   Page: 378   Filed: 02/08/2021
Case 6:20-cv-00191-ADA   Document 26-26   Filed 05/04/20   Page 19 of 201
Case 8:17-cv-01030   Document 218   Filed 06/14/17   Page 48 of 208 PageID #:271

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| 9,535,623 Claim 1 | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|

**Table 22 — Control Word Decoding**

| Control word | 12[1] | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 | Meaning |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RC00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | setting[3:0] | | | | | Global Features Control Word |
| RC01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | setting[3:0] | | | | | Clock Driver Enable Control Word |
| RC02 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | setting[3:0] | | | | | Timing and IBT Control Word |
| RC03 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | setting[3:0] | | | | | CA and CS Signals Driver Characteristics Control Word |
| RC04 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | setting[3:0] | | | | | ODT and CKE Signals Driver Characteristics Control Word |
| RC05 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | setting[3:0] | | | | | Clock Driver Characteristics Control Word |
| RC06 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | command[3:0] | | | | | Command Space Control Word |
| RC07 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | setting[3:0] | | | | | Reserved for future use |
| RC08 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | setting[3:0] | | | | | Input/Output Configuration Control Word |
| RC09 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | setting[3:0] | | | | | Power Saving Settings Control Word |
| RC0A | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | setting[3:0] | | | | | RDIMM Operating Speed |
| RC0B | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | setting[3:0] | | | | | Operating Voltage VDD and VREF Source Control Word |
| RC0C | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | setting[3:0] | | | | | Training Control Word |
| RC0D | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | setting[3:0] | | | | | DIMM Configuration Control Word |
| RC0E | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | setting[3:0] | | | | | Parity Control Word |
| RC0F | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | setting[3:0] | | | | | Command Latency Adder Control Word |
| RC1x | 0 | 0 | 0 | 1 | 0 | setting[7:0] | | | | | | | | Internal Vref Control Word |
| RC2x | 0 | 0 | 0 | 1 | 0 | setting[7:0] | | | | | | | | I²C Bus Control Word |
| RC3x | 0 | 0 | 0 | 1 | 1 | setting[7:0] | | | | | | | | Fine Granularity RDIMM Operating Speed |
| RC4x | 0 | 0 | 1 | 0 | 0 | setting[7:0] | | | | | | | | CW Source Selection Control Word |
| RC5x | 0 | 0 | 1 | 0 | 1 | setting[7:0] | | | | | | | | CW Destination Selection Control Word |
| RC6x | 0 | 0 | 1 | 1 | 0 | setting[7:0] | | | | | | | | CW Data Control Word |
| RC7x | 0 | 0 | 1 | 1 | 1 | setting[7:0] | | | | | | | | IBT Control Word |
| RC8x | 0 | 1 | 0 | 0 | 0 | setting[7:0] | | | | | | | | ODT Control Word |
| RC9x | 0 | 1 | 0 | 0 | 1 | setting[7:0] | | | | | | | | QxODT[1:0] Write Pattern Control Word |
| RCAx | 0 | 1 | 0 | 1 | 0 | setting[7:0] | | | | | | | | QxODT[1:0] Read Pattern Control Word |
| RCBx | 0 | 1 | 0 | 1 | 1 | setting[7:0] | | | | | | | | IBT and MRS Snoop Control Word |
| RCCx.. RCFx | 0 | 1 | 1 | x | x | setting[7:0] | | | | | | | | Error Log Register |

1. Address bit 12 must be 0 for RCW accesses. Must be 1 for accesses to Data Buffer (DB) Control Words. If A12 = 1 for a CW write and the LRDIMM disable bit in RC0D is '0' (LRDIMM enabled), the RCD will generate a BCW Write command on the buffer control bus with the function space bits set to '000'. If a 'CW Write' command is executed via RC06 write and if A12 = 1 in the CW Source Selection control word, the RCD will generate a BCW Write command on the buffer control bus with the function space bits from the CW Source Selection control word.

*Id.* at 57.

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| 9,535,623 Claim 1 | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| | **2.18.14 RC0C - Training Control Word**

**Table 35 — RC0C: Training Control Word**

| Setting (DA[3:0]) | | | | Definition | Encoding |
|---|---|---|---|---|---|
| x | 0 | 0 | 0 | Training mode selection | Normal operating mode |
| x | 0 | 0 | 1 | | Clock-to-CA training mode[1] |
| x | 0 | 1 | 0 | | DCS0_n loopback mode[1] |
| x | 0 | 1 | 1 | | DCS1_n loopback mode[1] |
| x | 1 | 0 | 0 | | DCKE0 loopback mode[1] |
| x | 1 | 0 | 1 | | DCKE1 loopback mode[1] |
| x | 1 | 1 | 0 | | DODT0 loopback mode[1] |
| x | 1 | 1 | 1 | | DODT1 loopback mode[1] |
| 0 | x | x | x | Reserved | Reserved |
| 1 | x | x | x | | Reserved |

1. In these training modes the DDR4RCD01 samples the affected inputs every other clock cycle (to accommodate the host sending alternating '0' and '1' pattern on these signals).

*Id.* at 62.

The memory module does not decode any commands while the RC0C Clock-to-CA training mode is enabled, and the DRAM devices are protected by the RCD driving control outputs at inactive levels. As such, the memory module has entered a second mode.

The DRAM is protected by driving the RCD control outputs at inactive levels. The RCD may either force all outputs than can be chip selects (including QxC0/CS2_n and QxC1/CS3_n) HIGH and all QxCKE and QxODT outputs LOW OR hold the previous values on QxCA/QxCS/QxCKE/QxODT before entering any of the CA training modes. The data buffer is protected by driving the buffer control interface signals at inactive levels. The RCD may either drive BODT and BCKE outputs LOW and BCOM[3:0] to '1010' (NOP command) OR the RCD may hold the previous values on BODT/BCKE/BCOM before entering any of the CA training modes.

The RCD does not decode commands while any RC0C training mode is enabled. It is thus necessary for the register to correspondingly disable and ignore unused inputs in each training mode. The following two methods to change or exit CA training modes are supported:

(a) Write access to RC0C through I²C Bus and

(b) DRST_n Reset event.

*Id.* at 45. |

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| 9,535,623 Claim 1 | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| | The module controller generates a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode.  For example, while in Clock-to-CA training mode, the IDT RCD asserts the ALERT_n signal to indicate a status of one or more training sequences.<br><br>**2.12  CA Bus Training Modes**<br><br>The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word") in order to assist the memory controller in aligning the incoming command/address and control signals optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero latency adder has been selected.<br><br>In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle together and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their previous values and parity checking is disabled.<br><br>The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all '0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three cycles after the last command. This position indicates the end position of a cumulative CA bus "eye opening". The memory controller can now position either the clock phase or the Dn input timing so that the clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative to the clock edge.<br><br>Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions at the LOW time, the transition time or the HIGH time of the inputs, respectively.<br><br>The memory controller can use the DCS0_n, DCS1_n, DCKE0, DCKE1, DODT0 and DODT0 loop back modes in similar fashion. In each of these modes a single input signal is looped back to the ALERT_n output and the memory controller can determine the optimal clock position for each of the control signals that are used for a particular DIMM. Once the optimal clock position for all CMD/ADDR and control inputs has been established, the memory controller can determine the best clock position for the whole set of input signals or potentially move the timing of individual control signals around to increase either setup or hold margins relative to the clock edge.<br><br>*Id.* at 44 (emphasis added). |

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| ***9,535,623 Claim 1*** | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| |  **Figure 22 — Clock-to-CA Training Mode Examples** *Id.* at 45. The module controller outputs the notification signal to the memory controller of the host system via the open drain output while the memory module is in the second mode.  For example, during Clock-to-CA training, the IDT RCD outputs the Alert_n signal to the memory controller via open drain output. |

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| *9,535,623 Claim 1* | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| | Output driver characteristics are separately controlled for outputs that are often loaded with twice as many DRAMs as the other outputs. Outputs are grouped as follows:<br><br>• CA Signals = QxA0..QxA17, QxBA0..QxBA1, QxBG0..QxBG1, QxACT_n, QxC2, QxPAR<br>• Control Signals = QxCKE0/1, QxODT0/1, QxC2, QxCS[1:0]_n for Dual CS mode, QxCS[3:0]<br>• CK = Yn_t - Yn_c<br><br><br><br>**Figure 72 — Voltage waveforms, tALERT_HL Measurement**<br><br>*Id.* at 134. *See also id.* at 9, 26, 33, |

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

| *9,535,623 Claim 1* | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| | **Table 16 — Terminal functions** |
| |  |
| | *Id.* at 50. |

Infringement Claim Chart for U.S. Patent No. 9,535,623 – SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM)

Case: 21-114    Document: 2    Page: 384    Filed: 02/08/2021

| ***9,535,623 Claim 1*** | SK hynix HMA84GL7AMR4N-TF TE AB (32GB DDR4 LRDIMM) |
|---|---|
| |  **IDT DDR4-RegisterClockDriver-4RCD0124 Block-Diagram** *See,* IDT RCD0124K Product Data Sheet, available at, https://www.idt.com/products/memory-logic/memory-interface-products/ddr4-solutions/4rcd0124k-ddr4-register-clock-driver-rcd. |
| [1b] a printed circuit board having a first set of edge connections for communicating address and control signals from the | The SK hynix LRDIMM includes a printed circuit board having a first set of edge connections for communicating address and control signals from the memory controller of the host system, a second set of edge connections for communicating data signals between the memory module and the memory controller of the host system while the memory module operates in the first mode, and an error edge connection coupled to the open drain output of the module controller, the memory module |

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 24

1  [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                         SOUTHERN DIVISION

11  _____     No. 8:16-cv-01605-JLS-JCG
                                    )
12  Netlist, Inc.,                  )
                                    )
13      *Plaintiff and*             )    **OPPOSITION TO DEFENDANTS'**
        *Counterclaim-Defendant*,   )    ***EX PARTE* APPLICATION FOR AN**
14                                  )    **ORDER STAYING ONLY**
        vs.                         )    **NETLIST'S INFRINGEMENT**
15                                  )    **CLAIMS PENDING COMPLETION**
    SK hynix Inc.,                  )    **OF *INTER PARTES* REVIEW**
16                                  )
        *Defendant and*             )    District Judge:    Hon. Josephine Staton
        *Counterclaim-Plaintiff*,   )
17                                  )
        and                         )
18                                  )
    SK hynix America Inc. and SK hynix )
19  memory solutions Inc.,          )
                                    )
20      *Defendants*.               )
    _____)

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3   I.      INTRODUCTION ...............................................................................1

4   II.     RELEVANT BACKGROUND ...........................................................1

5   III.    ARGUMENT .....................................................................................4

6           A.   Legal Standard ........................................................................4

7           B.   None of the Relevant Factors Favors a Stay of the Action,
                 Particularly Where the Request is Limited to Only Certain Aspects
8                of the Litigation and is Sought Only as a Second Attempt to Seek
                 an Unfair Advantage through Bifurcation ................................5

9
                 1.   As a result of the ITC proceedings, the parties have already
10                    completed and exchanged the lion's share of fact and expert
                      discovery, and the Markman hearing is imminent. ....................5

11
                 2.   A request for a partial stay does nothing to simplify the
12                    issues here as infringement, validity, and RAND issues are
                      necessarily linked and must be adjudicated together. .................7

13
                 3.   By seeking only a partial stay, it is apparent that Defendants'
14                    intention is to gain an unfair advantage..................................10

15  IV.     CONCLUSION ................................................................................11

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF AUTHORITIES**

**Page(s)**

3    **Cases**

4
5    *Adaptix, Inc. v. HTC Corp.*,
     2015 U.S. Dist. LEXIS 103503 (N.D. Cal. Aug. 5, 2015) ........................................7

6
7    *Aten International Co. Ltd. v. Emine Technology Co., Ltd.*,
     2010 U.S. Dist. LEXIS 46226 (C.D. Cal. April 12, 2010)..................................4, 7

8
9    *In re EMC Corp.*,
     677 F.3d 1351 (Fed. Cir. 2012) ...............................................................................9

10
11   *Fontem Ventures, B.V., et al. v. NJOY, Inc., et al.*,
     Civ. No. 2:14-cv-01645, Dkt. No. 211 (C.D. Cal. June 29, 2015)...........................5

12   *Humanscale Corp. v Compx International Inc.*,
     2009 U.S. Dist. LEXIS 43267 (E.D. Va. May 21, 2009) ..........................................5

13
14   *Kilopass Tech., Inc. v. Sidense Corp.*,
     2011 U.S. Dist. LEXIS 157267 (N.D. Cal. Feb. 8, 2011) ........................................8

15
16   *Landis v. N. Am., Co.*,
     299 U.S. 248 (1936)..............................................................................................3, 4

17
18   *Linksmart Wireless Technology, LLC v. T-Mobile USA, Inc., et al.*
     Civ. No. 8:12-cv-00522, Dkt. No. 130 (C.D. Cal. March 14, 2013)...................6, 7

19
20   *Perez-Funez v. Dist. Dir., I.N.S.*,
     611 F. Supp. 990 (C.D. Cal. 1984) ..........................................................................9

21   *Polaris Industries, Inc. v. BRP U.S. Inc.*,
     2012 U.S. Dist. LEXIS 154479 (D. Minn., Oct. 29, 2012) ......................................4

22
23   *SZ DJI Tech. Co. v. Yuneec Int'l Co.*,
     2016 U.S. Dist. LEXIS 187770 (C.D. Cal. Dec. 5, 2016).........................................9

24
25   *Tokuyama Corp. v. Vision Dynamics, LLC*,
     2008 U.S. Dist. LEXIS 82732 (N.D. Cal. Oct. 2, 2008) ..........................................4

26
27   *Universal Electronics Inc. v. Universal Remote Control, Inc.*,
     943 F. Supp. 2d 1028 (C.D. Cal. 2013).............................................................*passim*

28

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
  2014 U.S. Dist. LEXIS 4025 (N.D. Cal. Jan 13, 2014).............................................. 6

*Zenith Elecs., LLC v. Spectre, Inc.*,
  2015 U.S. Dist. LEXIS 33560 (C.D. Cal. Feb. 5, 2015) ......................................... 8


**Rules**

Fed. R. Civ. P. 42(a) .............................................................................................. 9

## I. INTRODUCTION

Plaintiff Netlist, Inc. ("Netlist") opposes Defendants' *ex parte* application for a partial stay of this case. While Defendants have styled the present application as a request for a stay, the requested relief, if granted, would result in bifurcation of the issues for trial. In asking the Court yet again to stay only a portion of the parties' claims, Defendants again seek to burden this Court, the parties, third parties, and witnesses with two trials. For this reason alone, the application should be denied as a repackaged second request for bifurcation in contravention of the Court's express instruction that no additional motions should be filed seeking bifurcation. Beyond this, the Court should also deny the application because the balance of the relevant factors in assessing whether a stay is appropriate here tips strongly against Defendants. They have not shown—and cannot show—that the proposed bifurcation and partial stay is warranted in this case.

## II. RELEVANT BACKGROUND

Netlist filed this action on August 31, 2016, asserting that Defendants' LRDIMM and RDIMM memory module products infringe six U.S. patents owned by Netlist. Separately, on September 1, 2016, Netlist filed a complaint before the International Trade Commission seeking to institute a Section 337 unfair importation investigation against the Defendants based on their infringement of the same patents by the same imported products. Defendants later filed an answer to the Complaint in the ITC and brought counterclaims, including Defendants' RAND counterclaims. Defendants then removed the RAND-based counterclaims here.

On December 23, 2016, the parties submitted their Joint Rule 26(f) report. In that report, Defendants extensively briefed their request to bifurcate their counterclaims for all purposes and expedite adjudication of those claims. Dkt. No. 98 (Joint Rule 26(f) Report) at 3-17; Dkt. No. 101 (Minute Order Setting Case Schedule). This Court denied Defendants' request for a bifurcation, ruling that

1
2
3
4

> Defendant's willingness to take a license on RAND terms and conditions
> determined by the Court is expressly subject to its right of appeal, and for
> this and other reasons, bifurcation falls short of having the potential to
> resolve all issues in the case and will not inevitably lead to judicial
> efficiency.

5   Dkt. No. 101 (Minute Order Setting Case Schedule).  The Court also emphasized that

6   it had finally resolved the bifurcation issue, and "Defendant is advised no further

7   motion regarding this issue is to be filed."  Dkt. No. 101 (emphasis added).

8       This case differs dramatically from an ordinary patent infringement action due

9   to the co-pending ITC investigation, in which a full evidentiary hearing has already

10  occurred, and in which the parties agreed to extensive discovery cross-use for

11  purposes of this case.  In the ITC investigation, the parties conducted extensive fact

12  and expert discovery directed to the same patents, the same asserted claims, the same

13  accused products, and the same infringement theories.  This discovery included the

14  exchange of scores of contention interrogatories directed to, among other things,

15  infringement, validity, and RAND, and the parties also exchanged thousands of pages

16  of expert reports, took and defended over two dozen fact and expert depositions, and

17  participated fully in a four-day evidentiary hearing before Administrative Law Judge

18  Theodore Essex in early May 2017.

19      Understanding and expressly acknowledging that this extensive fact and expert

20  discovery would go forward in the ITC investigation, and mutually intending to create

21  efficiencies wherever possible for both parties and for this Court, the parties agreed to

22  a sweeping discovery cross-use agreement.  *See* Dkt. No. 98 at 19 ("The parties agree

23  that discovery taken from each other in the parallel ITC action may be used in this

24  action, and the parties will not oppose the use of third-party discovery from the

25  parallel ITC action being used in this action.").  Accordingly, for purposes of this

26  case, the parties have already served and responded to over 200 combined

27  interrogatories and over 220 combined document request, the parties have already

28  exchanged over 2,400,000 pages of document production, the parties have already

OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION TO STAY PLAINTIFF'S CLAIMS
Case No. 8:16-cv-01605-JLS-JCG
2

1  served over 11,400 pages of expert reports, and the parties have already taken and

2  defended 25 days of fact and expert depositions.  In addition, over 1,000 pages of

3  transcript reflect the four days of live trial testimony at the evidentiary hearing in

4  May.

5      The parties were also recently engaged in detailed discussions regarding the

6  potential consolidation of this case with the recently filed Case No. 8:17-cv-01030-

7  JLS-JCG, also pending before this Court.  Netlist alleges in that case that Defendants'

8  same RDIMM and LRDIMM products infringe two new patents, each of which issued

9  in 2017.  The first, U.S. Patent No. 9,606,907 (the "'907 Patent") is a "child" of the

10  '185 Patent asserted in the present action, meaning that the specification of each of the

11  '907 Patent and its parent the '185 Patent is identical.  The second, U.S. Patent No.

12  9,535,623 (the "'623 Patent"), is a child of the '837 Patent asserted in the present

13  action.  Likewise, the specification of each of the '623 Patent and its parent the '837

14  Patent is identical.  The new case was initially assigned to Judge Andrew J. Guilford

15  and Magistrate Judge Karen E. Scott.  On June 19, 2017, however, in apparent

16  recognition of the significant overlap between the cases, the Second Action was

17  transferred to Judge Josephine L. Staton and Magistrate Judge Jay C. Gandhi for all

18  further proceedings pursuant to General Order 16-05.

19      During the meet and confer process on this *ex parte* application, Defendants did

20  not offer any alternatives to using this emergency mechanism, such as an expedited

21  briefing schedule.  Further, contrary to Defendants' assertion that there could not be

22  any hearing on such a regularly noticed motion before the end of August, the parties

23  have two hearing dates currently scheduled in the month of July before this Court,

24  during which such a motion could have been heard.

25

26

27

28

Dated: July 12, 2017

By:  /s/ Andrew H. DeVoogd

Nada I. Shamonki (Bar No. 205359)
    <nshamonki@mintz.com>
MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO PC
2029 Century Park East, Suite
1370
Los Angeles, California  90067
Telephone: (310) 586-3200
Facsimile:  (310) 586-3202

James M. Wodarski (*pro hac vice*)
    <jwodarski@mintz.com>
Andrew H. DeVoogd (*pro hac vice*)
    <dhdevoogd@mintz.com>
Michael C. Newman (*pro hac vice*)
    <mcnewman@mintz.com>
Kristina R. Cary (*pro hac vice*)
    <krcary@mintz.com>
Daniel B. Weinger (*pro hac vice*)
    <dbweinger@mintz.com>
MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO PC
One Financial Center
Boston, Massachusetts  02111
Telephone: (617) 542-6000
Facsimile:  (617) 542-2241

*Attorneys for Plaintiff and
Counterclaim-Defendant
Netlist, Inc.*

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 25

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                              Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

═══════════════════════════════════════════════════════════════════

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  Terry Guerrero                                                  N/A
  Deputy Clerk                                             Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:    ATTORNEYS PRESENT FOR DEFENDANT:

         Not Present                                        Not Present

**PROCEEDINGS:    (IN CHAMBERS)  ORDER GRANTING IN PART
                  DEFENDANTS' APPLICATION FOR AN ORDER STAYING
                  NETLIST'S INFRINGEMENT CLAIMS PENDING
                  COMPLETION OF INTER PARTES REVIEW (Doc. 150)**

   Before the Court is an *Ex Parte* Application for an Order Staying Netlist's
infringement claims pending completion of inter partes review filed by SK hynix Inc., SK
hynix America Inc., and SK hynix memory solutions Inc. (collectively, "SK hynix").
(App., Doc. 150.)  Plaintiff Netlist, Inc. opposed, and SK hynix replied.  (Opp'n, Doc.
151; Reply, Doc. 152.)  For the reasons discussed below, the Court GRANTS IN PART
Defendants' Application to Stay Netlist's infringement claims.

**I.    Background**

   Netlist and SK hynix are currently waging this patent infringement dispute across
three separate tribunals.  On August 31, 2016, Netlist filed this suit against SK hynix,
alleging that Defendants are infringing six patents: (1) United States Patent No.
8,756,364 ("the '364 patent"); (2) United States Patent No. 8,516,185 ("the '185 patent");
(3) United States Patent No. 8,001,434 ("the '434 patent"); (4) United States Patent No.
8,359,501 ("the '501 patent"); (5) United States Patent No. 8,689,064 ("the '064 patent");
(6) United States Patent No. 8,489,837 ("the '837 patent").  (Compl., Doc. 1.)  One day
later, Netlist requested an International Trade Commission investigation into SK hynix's
alleged infringement of the same six patents, which the ITC granted on October 3, 2016.

_____

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                                Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

*In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Institution of Investigation, Inv. No. 337-TA-1023 (Oct. 3, 2016).  On November 7, 2016, SK hynix filed three counterclaims in the ITC action, which it removed to this Court in accordance with the applicable statute and regulation.  (Notice of Removal, Doc. 59.)  *See* 19 U.S.C. § 1337(c); 19 C.F.R. § 210.14(e).  The ITC counterclaims all involve allegations that Netlist breached its contractual obligations to license its standard essential patents on reasonable and non-discriminatory ("RAND") terms.  (*See* Counterclaims, Doc. 67-2.)  In its ITC counterclaims, SK hynix seeks a declaratory judgment establishing a reasonable royalty rate and barring Netlist from seeking or enforcing the ITC order because SK hynix has committed to accepting a license on RAND terms.  (*See id.*)  In May 2017, an ALJ held a four-day hearing in the ITC investigation and, by October 10, 2017, will issue a "final initial determination."  (ITC Scheduling Order at 1, Exh. 1, Doc. 150-1.)

Separately, SK hynix sought inter partes review of all six patents at issue in this suit, which the Patent Trial and Appellate Board has now granted.  Specifically, on May 15, 2017, the PTAB granted inter partes review on the '837, '364, and '064 patents and on July 7, 2017, granted review on the '501, '434, and '185 patents.  ('837 Petition Grant, Exh. A, Doc. 148-1; '364 Petition Grant, Exh. B, Doc. 148-2; '064 IPR Petition Grant, Exh. C, Doc. 148-3; '501 Petition Grant, Exh. E, Doc. 148-5; '434 Petition Grant, Exh. G, Doc. 148-7; '185 Petition Grant, Exh. I, Doc. 148-9.)  Thus, the final written decision on the first three patents is due by May 15, 2018, while the final decision on the latter three patents is due by July 9, 2018.  *See* 35 U.S.C. § 316(a)(11); 37 C.F.R. § 42.100(c).  Four days after the PTAB granted inter partes review on the latter three patents, SK hynix requested a stay of Netlist's infringement claims pending the outcome of the administrative proceedings.  (App.)

## II.     Legal Standard

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

---

APPX0335

Case 8:16-cv-01605-JLS-JCG  Document 154  Filed 07/17/17  Page 3 of 9  Page ID

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                              Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

This inherent authority includes the discretion to stay judicial proceedings pending reexamination of a patent.  *See Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988).  Courts consider three factors in determining whether to grant a stay pending reexamination: "(1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party."  *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1111 (N.D. Cal. 2006).  There is a "liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination or reissuance proceedings."  *ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994).

## III.    Discussion

Resolving this *Ex Parte* Application requires a careful examination of each proceeding's status and the requested relief in each forum.  As in many cases, no option is ideal or elegant, but the Court concludes that the best solution here is to grant a temporary stay of Netlist's infringement claims pending the ITC's initial determination.

### a.  Stage of Litigation

While the parties have fully briefed their claim construction positions and the technology tutorial and *Markman* hearing are scheduled to occur within the next two weeks, "there is more work ahead of the parties and the Court than behind the parties and the Court."  *Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, No. SACV 12-21-JST JPRX, 2012 WL 7170593, at *2 (C.D. Cal. Dec. 19, 2012) (quoting *Tierravision, Inc. v. Google, Inc.*, No. 11-cv-2170 DMS (BGS), 2012 WL 559993, at *2 (S.D. Cal. Feb. 21, 2012)).  Fact discovery does not end for another six months, expert reports have not yet been exchanged, and the scheduled trial is a year away (after the PTAB will reach a final written decision).  (*See* Scheduling Order at 3, Doc. 101.)  As for the conservation of judicial resources, district courts view stay requests more favorably before the issuance of a claim construction order.  *See, e.g.*, *Wonderland Nursery Goods Co. v. Baby Trend,*

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                           Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

*Inc.*, No. EDCV 14-01153-VAP, 2015 WL 1809309, at *3 (C.D. Cal. Apr. 20, 2015)
(staying case where the parties had submitted claim construction briefs, but no *Markman*
hearing had been held yet); *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 943
F. Supp. 2d 1028, 1031 (C.D. Cal. 2013) (denying stay pending inter partes review that
was requested after claim construction); *Interwoven, Inc. v. Vertical Computer Sys., Inc.*,
No. C 10–04645 RS, 2012 WL 761692, at *4 (N.D.Cal. Mar. 8, 2012) (same).  Although
the parties have fully briefed claim construction, adjudicating claim construction and
other disputes on patents that may be invalidated or amended before the scheduled trial
date would needlessly consume judicial resources.

       Netlist makes much of the significant discovery conducted in the ITC proceedings,
which, under the parties' cross-use agreement, can be used in this case.  (Opp'n at 5–6.)
The ITC investigation, however, does not allow for the award of damages, so the parties
will have to conduct discovery into SK hynix's potential monetary liability.  There also
remains at least some question about whether the parties will have to conduct
supplementary discovery related to claim construction in this case.  (*See* Reply at 6.)
Thus, because a stay will conserve both the parties' and judicial resources, the stage of
the litigation militates in favor of granting a stay.

       **b.  Simplification of Issues**

       "[W]hen a claim is cancelled, the patentee loses any cause of action based on that
claim, and any pending litigation in which the claims are asserted becomes moot."
*Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013).  Thus,
"[g]ranting a stay pending IPR is 'particularly' likely to simplify the case 'when a party
has obtained PTO review of each of the asserted claims in the patents-in-suit.'"  *Finjan,
Inc. v. Symantec Corp.*, 139 F. Supp. 3d 1032, 1036 (N.D. Cal. 2015) (quoting
*Evolutionary Intelligence, LLC v. Facebook, Inc.*, No. C 13-4202 SI, 2014 WL 261837,
at *2 (N.D. Cal. Jan. 23, 2014)).  Even if all the claims are not declared invalid, a
substantive amendment to them in inter partes review would bar the patentee from
obtaining damages up to the reissuance of the patent.  *Seattle Box Co. v. Industrial
Crating & Packing, Inc.*, 731 F.2d 818, 827–28 (Fed.Cir.1984); *Visto Corp. v. Sproqit*

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No.  8:16-cv-01605-JLS-JCG | Date:  July 17, 2017 |
| Title: Netlist, Inc. v. SK hynix Inc. et al. | |

*Techs., Inc.*, 413 F. Supp. 2d 1073, 1089 (N.D. Cal. 2006).  Because a petitioner in inter partes review is estopped from later raising "any ground that [it raised] or reasonably could have raised during [the] inter partes review," 35 U.S.C. § 315(e)(2), the administrative proceedings are more likely to simplify a case where all defendants are petitioners in the inter partes review.  *Software Rights Archive, LLC v. Facebook, Inc.*, No. C-12-3970 RMW, 2013 WL 5225522, at *4 (N.D. Cal. Sept. 17, 2013) (observing that the America Invents Act's estoppel provision "heavily tips the scale in favor of granting the stay" if all the defendants are parties to the inter partes review); *Semiconductor Energy Lab. Co.*, 2012 WL 7170593, at *2.  Besides narrowing or eliminating the issues presented in a case, inter partes review "facilitate[s] trial by providing the court with [the] expert opinion of the PTO and clarifying the scope of the claims." *Target Therapeutics, Inc. v. SciMed Life Sys., Inc.*, 33 U.S.P.Q.2d 2022, 2023 (N.D. Cal. 1995).

Here, the inter partes review will do much to streamline a trial in this case: The PTAB has granted inter partes review on every claim at issue in this suit and all the SK hynix Defendants are parties to the inter partes review, so they will be estopped from relitigating any invalidity defenses that reasonably could have been brought in that proceeding once the PTAB reaches a final written decision.  Even if the PTAB does not invalidate all the patents at issue in this suit, inter partes review likely will substantially narrow and clarify the issues that must be resolved by the Court or a jury.

### c.  Undue Prejudice or Clear Tactical Disadvantage

"If a stay would result in prejudice or a clear tactical disadvantage to the nonmoving party, courts have generally denied the motion to stay." *Biomet Biologics, LLC v. Bio Rich Medical, Inc.*, No. SACV 10-1582 (PJWx), 2011 WL 4448972, at *2 (C.D. Cal. Sept. 26, 2011).  In determining whether the patentee would incur undue prejudice or a substantial tactical disadvantage, courts consider (1) the petitioner's diligence in seeking both inter partes review and a stay once the PTAB granted review, (2) any specific impairment the patentee would face in litigating the case if the Court were to grant a stay, and (3) the relationship between the patentee and the alleged

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                                     Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

---

infringer.  *See E.Digital Corp. v. Dropcam, Inc.*, No. 14-CV-04922-JST, 2016 WL
658033, at *4 (N.D. Cal. Feb. 18, 2016).[1]

SK hynix sought inter partes review within four months of service of process and
filed this *Ex Parte* Application four days after the PTAB granted inter partes review on
the '501, '434, and '185 patents.  (Notice of IPR, Doc. 148; App.)  The PTAB's final
written order will likely issue before the trial scheduled in this matter.  Although Netlist
reasons that the case should proceed to trial "while extensive body of discovery . . . is
current and fresh on the parties' minds[,]" it identifies no specific impairment the
company would face in prosecuting this case if the Court were to grant a stay.  (*See*
Opp'n at 5–6.)  *See Longitude Licensing Ltd. v. Apple Inc.*, No. 14-CV-04275-EDL, 2015
WL 12778777, at *8 (N.D. Cal. Oct. 29, 2015) (noting that a patentee must proffer "a . . .
particularized showing" of how its case will suffer as a result of a stay, instead of the
relying on the general risk present in every case that documents or testimony may be
lost).  Thus, because SK hynix's actions do not reflect a last-minute attempt to derail this
case and Netlist has identified no specific loss of evidence that will occur during the
PTAB proceedings, the first two considerations indicate that Netlist would not suffer
undue prejudice or a clear tactical disadvantage.

As for the relationship between the parties, "[c]ourts are more likely to find undue
prejudice when the parties are direct competitors."  *Inogen, Inc. v. Inova Labs, Inc.*, No.
SACV 11-1692-JST (ANx), 2012 WL 4748803, at *4 (C.D. Cal. Mar. 20, 2012).  But,
even if the parties offer directly competing products, the inference of undue prejudice
may be rebutted if the patentee has unreasonably delayed filing suit, prosecuting the
action, or seeking a preliminary injunction.  *See Autoalert, Inc. v. Dominion Dealer Sols.,
LLC*, No. SACV 12-1661-JST, 2013 WL 8014977, at *3 (C.D. Cal. May 22, 2013).
Here, Netlist acknowledges that it does not offer the LRDIMM and RDIMM standard-
compliant products at issue in this suit.  (App. at 10.)  Further, as part of the standard-

---

[1] *E.Digital Corp.* and other cases describe the second factor as the "status of the IPR
proceedings," but this description seems confusing as courts generally consider under this factor
any "specific evidence or testimony" that may be lost or degraded while the inter partes review is
ongoing.  *See* 2016 WL 658033, at *4; *TeleSign Corp. v. Twilio, Inc.*, No. CV 15-3240 PSG
(SSX), 2016 WL 6821111, at *4 (C.D. Cal. Mar. 9, 2016).

---

**CIVIL MINUTES – GENERAL**                                                            **6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                              Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

setting process, Netlist agreed to license its standard-essential patents on RAND terms,
which limits its ability to seek an injunction because SK hynix has agreed to accept a
RAND license.  *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1332 (Fed. Cir. 2014),
*overruled on other grounds by Williamson v. Citrix Online*, LLC, 792 F.3d 1339 (Fed.
Cir. 2015) (holding that—although there is no *per se* rule against issuing injunctions in
standard-essential patent suits—the patentee's "FRAND commitments . . . strongly
suggest that money damages are adequate to fully compensate [it] for any infringement").
Indeed, Netlist has not sought a preliminary injunction in the ten months since filing suit.

  In sum, Netlist will not face undue prejudice or a tactical disadvantage if the Court
grants a stay, because SK hynix diligently sought inter partes review and a stay once the
PTAB granted its petitions, Netlist has identified no specific impairment it will suffer in
litigating this suit if the Court were to grant a stay, and Netlist and SK hynix do not
directly compete on the products at issue in this suit.

  **d.  Additional Considerations**

  While the three standard factors all favor a stay, there are two added complications
in this case: First, SK hynix seeks a stay only of Netlist's infringement claims and avers
that it "would withdraw its application" should the Court determine that a stay of its ITC
counterclaims is required.[2]  (App. at 2.)  SK hynix's ITC counterclaims, which were
removed to this Court, seek declaratory relief preventing Netlist from enforcing any order
obtained from the ITC due to Netlist's alleged breach of its RAND commitments.  (*See*
Counterclaims.)  Because the ITC refuses to stay its investigation pending inter partes
review, SK hynix asserts, it would be prejudiced if it could not continue to litigate its
counterclaims in this Court.  (*See* App. at 11–14.)

  Second, Netlist recently filed a separate infringement suit against SK hynix,
alleging infringement of two additional patents.  *Netlist, Inc. v. SK hynix Inc.*, Complaint,
Doc. 1, Case No. 8:17-cv-01030-JLS-JCG (June 14, 2017).  SK hynix has until mid-

---

  [2] Of course, SK hynix's position that, unless the Court grants its Application in its
entirety, it "would withdraw" the Application has no effect on this Court's determination of the
appropriate resolution based on the applicable legal factors.

**CIVIL MINUTES – GENERAL**                                                    7

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                               Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

October to respond to that suit, *see Netlist, Inc. v. SK hynix Inc.*, Joint Stip., Doc. 24, Case No. 8:17-cv-01030-JLS-JCG (July 14, 2017), and the parties are contemplating consolidation of the two actions (Opp'n at 9–10).

Despite these additional complications, a stay of Netlist's infringement claims is warranted.  As to the first issue, Netlist claims that SK hynix's request for a partial stay demonstrates that it has brought this *Ex Parte* Application to gain an unfair tactical advantage.  (Opp'n at 10–11.)  But SK hynix's partial stay request simply reflects Netlist's choice to litigate in two forums, including one that consistently declines to stay cases pending inter partes review.  *See, e.g.*, *In the Matter of Certain Laser-Driven Light Sources, Subsystems Containing Laser-Driven Light Sources, and Products Containing Same*, Order No. 4, Inv. No. 337-TA-983 (March 3, 2016).  As for Netlist's recently filed patent infringement suit, the Court cannot determine at this juncture whether consolidation would be warranted and whether the patents at issue in that suit will be affected by current or future PTAB proceedings.  There would also be little difference between a stay and consolidation in the short term because the Scheduling Order dates in this case would have to be pushed back to accommodate the new claims.

Yet the Court believes that this stay should be revisited as these multiple proceedings progress.  For instance, the continuing ITC investigation is the only persuasive reason for not staying SK hynix's counterclaims.  Accordingly, the Court will stay Netlist's infringement claims but ORDERS the parties to submit a joint status report two weeks after the ITC's "final initial determination."  The parties should apprise the Court of the ITC's decision, whether either side intends to appeal, and the parties' positions regarding a continued stay of Netlist's infringement claims and SK hynix's counterclaims.

**IV.     Conclusion**

For the foregoing reasons, the Court GRANTS IN PART Defendants' Application to Stay Netlist's infringement claims.  Netlist's infringement claims are STAYED pending further order of the Court.  The parties shall file a joint status report within fourteen (14) days of the ITC's "final initial determination," informing the Court of the

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:16-cv-01605-JLS-JCG                    Date:  July 17, 2017
Title: Netlist, Inc. v. SK hynix Inc. et al.

ITC's decision, whether either side intends to appeal, and the parties' positions regarding a continued stay of Netlist's infringement claims as well as SK hynix's counterclaims. At that time, the Court will decide whether to lift, continue, or modify the stay (including potentially staying SK hynix's counterclaims).

Initials of Preparer:  tg

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 26

Case 8:17-cv-01030-JLS-JCG   Document 26-29   Filed 05/04/20   Page 1 of 34   Page ID #:771

1   Chad S. Hummel (SBN 139005)
    *chummel@sidley.com*
2   Theodore W. Chandler (SBN 219456)
    *tchandler@sidley.com*
3   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
4   Los Angeles, CA 90013
    Phone: (213) 896-6000
5   Fax: (213) 896-6600
6
    [*Full list of counsel included in*
7   *signature block*]
8
    Attorneys for SK hynix Inc., SK hynix
9   America Inc., and SK hynix memory
    solutions Inc.
10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                  SANTA ANA DIVISION

14   NETLIST, INC.,

15        *Plaintiff and Counterclaim-*          Case No.: 8:17-cv-01030-JLS-JCG
          *Defendant,*
16                                               Assigned to:  Judge Josephine L. Staton

17        v.                                     **DEFENDANTS' ANSWER,**
                                                 **AFFIRMATIVE DEFENSES, AND**
18   SK HYNIX INC.,                              **SK HYNIX INC.'S**
                                                 **COUNTERCLAIMS**
19        *Defendant and Counterclaim-*
          *Plaintiff,*
20

21        and

22   SK HYNIX AMERICA INC., and SK

23   HYNIX MEMORY SOLUTIONS

24   INC.,

25        *Defendants.*

26

27

28

1   improvements in performance or memory capacity for memory modules.  Netlist
2   alleges the DE 20 2010 018 501 Ul and the ZL201080039043.0 patents derive
3   from the same patent family as the '185 and '907 patents.  Netlist describes the
4   '434, '501, and '064 patents as relating to self-testing electronic memory modules.
5   Netlist describes the '837 and '623 patents as relating to memory modules that
6   perform handshaking during or upon completion of initialization.

7      54.    Netlist's litigation campaign against SK hynix (and its affiliates and
8   customers) further confirms its intent to avoid its RAND obligations.  Netlist has
9   singled out SK hynix in an attempt to extract supra-competitive royalties and
10  leverage the threat of injunctions to exclude SK hynix from using Netlist's
11  patented technology.  But in promising to offer to take a license any of its patents
12  essential or potentially essential to JEDEC standards on RAND terms and
13  conditions, Netlist surrendered any right to pick and choose which standard
14  implementers could receive licenses and exclude implementers—like SK hynix—
15  who are able and willing to license on RAND terms.

16     55.    As in the 1605 Central District Action, SK hynix asserts the following
17  counterclaims:

18                     **FIRST CAUSE OF ACTION**
19                         **Breach of Contract**

20     56.    SK hynix realleges and incorporates by reference the allegations set
21  forth in the foregoing paragraphs 1-55.

22     57.    Subject to the terms and conditions of the JEDEC Patent Policy,
23  Netlist has made a contractual commitment and is obligated to offer to
24  implementers of JEDEC standards, including SK hynix and its affiliates, licenses
25  to its essential patents on RAND terms and conditions.  In each of its Letters of
26  Assurance, Netlist promised to make available to implementers of the identified
27  JEDEC standards a license "under reasonable terms and conditions that are
28  demonstrably free of any unfair discrimination."  Exhibits 4-44.

Case: 21-114    Document: 2    Page: 407    Filed: 02/08/2021

Case 8:17-cv-01030-VLS-JCG Document 29-29 Filed 05/04/20 Page 29 of 34
Case 8:17-cv-01030-VLS-JCG Document 29 Filed 10/09/19 Page 28 of 33 Page ID #:798

1    58.    Netlist has claimed in its negotiations with SK hynix that the patents

2    and patent applications subject to Netlist's letters of assurance are essential to (i.e.,

3    would necessarily be infringed by complying with) JEDEC standards.

4    59.    Netlist has also represented to SK hynix that it owns additional

5    patents that are, in fact, essential to JEDEC standards.  To the extent that any of

6    Netlist's patents or applications that Netlist claims are essential were not disclosed

7    to JEDEC and to the extent that Netlist has not otherwise provided to JEDEC a

8    Notice of Refusal with respect to such patents, JEDEC's Patent Policy obligates

9    Netlist to license them on RAND terms.

10    60.    SK hynix and its affiliates are third-party beneficiaries to Netlist's

11    RAND obligations.  SK hynix has at all times been willing to take a license (on its

12    behalf and that of its affiliates) to Netlist's essential patents on RAND terms and

13    conditions.

14    61.    Netlist has nonetheless failed to offer a license to its essential patents

15    on RAND terms and conditions, and has rejected the RAND offers made by SK

16    hynix.  Netlist instead has made royalty demands that are wholly disproportionate

17    to the royalties that its patents should command under a reasonable calculation and,

18    upon information and belief, discriminatory in comparison to what SK hynix's

19    similarly-situated competitor, Samsung, has paid for a license.

20    62.    Netlist has further sued SK hynix, its affiliates and its customers for

21    alleged infringement of patents it claims are essential to JEDEC standards, seeking

22    injunctive relief to bar SK hynix's products from the U.S., Chinese and German

23    markets notwithstanding the fact that SK hynix is, and at all times relevant hereto

24    has been, willing, able, and entitled to take a license to Netlist's patents on RAND

25    terms.

26    63.    Netlist has therefore breached its contractual obligations to license its

27    essential patents to SK hynix and its affiliates on RAND terms and conditions.

28    64.    As a result of Netlist's contractual breach, SK hynix has been injured

APPX0346

1  in its business or property because it has been denied access to a license to Netlist's

2  claimed SEPs on RAND terms, a license which can only be obtained from Netlist.

3  SK hynix's inability to obtain a license to Netlist's SEPs on RAND terms, coupled

4  with Netlist's litigation campaign against SK hynix, threaten SK hynix with the

5  imminent loss of customers and potential customers, loss of goodwill and product

6  image, loss of sales, litigation costs, uncertainty in business planning, and

7  uncertainty among customers and potential customers.

8      65.    SK hynix has suffered and will continue to suffer irreparable injury by

9  reason of Netlist's acts, practices, and conduct alleged above unless the Court

10  enjoins such acts, practices, and conduct.

11                      **SECOND CAUSE OF ACTION**

12  **Declaratory Judgment of RAND Terms for a License to Netlist's Patents**

13                  **Essential to JEDEC Standards**

14      66.    SK hynix realleges and incorporates by reference the allegations set

15  forth in the foregoing paragraphs 1-65.

16      67.    SK hynix (on its behalf and that of its affiliates) has expressed its

17  willingness to take a license to Netlist's patents essential to JEDEC standards.

18  Netlist has an obligation to offer SK hynix to license all Netlist patents essential to

19  JEDEC standards on RAND terms and conditions.

20      68.    However, there is a definite and concrete dispute between SK hynix

21  and Netlist regarding what constitutes RAND royalties for a license to Netlist's

22  patents essential to JEDEC standards.

23      69.    Unless and until RAND royalties for a license to Netlist's patents

24  essential to JEDEC standards are determined, SK hynix will continue to be harmed

25  by the potential disruption of its business, ongoing litigation and threat of potential

26  litigation, threat of injunctions against SK hynix's products, imminent loss of

27  profits, loss of customers and potential customers, and loss of goodwill and

28  product image.

-28-

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

70.    SK hynix is therefore entitled to a declaratory judgment setting forth the RAND terms and conditions for a license to Netlist's patents essential to JEDEC standards, including the applicable royalty rate, to which Netlist is entitled.

71.    SK hynix is further entitled to a declaratory judgment that it has a right to obtain a license to Netlist's patents essential to JEDEC standards under the RAND terms and conditions to be determined by the Court.

72.    SK hynix is willing to be bound and take a license to Netlist's patents essential to JEDEC standards on the RAND terms and conditions as determined by the Court (subject to any applicable right of appeal).

### THIRD CAUSE OF ACTION

**Declaratory Judgment that Netlist is Barred from Seeking and/or Enforcing Injunctive Relief against SK hynix Based on Patents Essential to JEDEC Standards**

73.    SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-72.

74.    Netlist represented to JEDEC and has claimed in its negotiations with SK hynix that it owns patents and patent applications that are essential or potentially essential to (i.e., would necessarily be infringed by complying with) JEDEC standards, including the patents to which the Asserted Patents claim priority.  Netlist's Complaint accuses Defendants of infringement by compliance with JEDEC standards.

75.    Subject to the terms and conditions of the JEDEC Patent Policy, Netlist has made a contractual commitment and/or is otherwise obligated by the JEDEC Patent Policy to grant implementers of JEDEC standards, including SK hynix and its affiliates, licenses to its essential patents on RAND terms and conditions.

76.    Inherent in Netlist's RAND commitments is an admission that monetary compensation in the form of a RAND royalty is adequate to compensate

1  Netlist for use of its SEPs in the implementation of JEDEC standards.

2      77.    SK hynix (on its behalf and that of its affiliates) has expressed its

3  willingness to take a license to Netlist's patents essential to JEDEC standards.  At

4  all relevant times, SK hynix has negotiated with Netlist in good faith and has been

5  willing to take a license to Netlist's patents essential to JEDEC standards on

6  RAND terms and conditions, including making a RAND offer for a license to

7  Netlist's patents.  SK hynix is willing to be bound and take a license to Netlist's

8  patents essential to JEDEC standards on the RAND terms and conditions to be

9  determined by the Court (subject to any applicable right of appeal).

10      78.    There is a definite and concrete dispute between SK hynix and Netlist

11  regarding whether, alone or in combination with the negotiation history between

12  the parties, Netlist's RAND obligations bar Netlist from seeking and/or enforcing

13  injunctive relief against SK hynix for alleged infringement of patents essential to

14  JEDEC standards, including the Asserted Patents.

15      79.    Netlist has in fact sought injunctive relief against SK hynix for alleged

16  infringement of the Asserted Patents and sought injunctive relief against SK hynix,

17  and its direct or indirect customers, in the U.S., China and/or Germany.

18      80.    As a result of the threat of injunctive relief, SK hynix has been

19  harmed and will continue to be harmed by the potential disruption of its business,

20  imminent loss of profits, loss of customers and potential customers, loss of sales,

21  and loss of goodwill and product image, and litigation costs.  If injunctive relief

22  were granted, SK hynix would be irreparably harmed by the disruption of its

23  business, loss of profits, loss of customers and loss of potential customers, loss of

24  sales and goodwill and product image.

25      81.    SK hynix is therefore entitled to a declaratory judgment that Netlist is

26  barred by its RAND obligations from seeking and/or enforcing injunctive relief

27  against SK hynix (including its affiliates) products in any jurisdiction with respect

28  to any alleged infringement of any patent essential to JEDEC standards.

-30-

ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

## PRAYER FOR RELIEF

WHEREAS, Plaintiff SK hynix prays that this Court enter judgment against Defendant Netlist as follows:

A.    Adjudge and decree that Netlist is liable for breach of contract;

B.    Grant injunctive relief requiring Netlist to offer a license to the patents it asserts are essential or potentially essential to the JEDEC standards—including the Asserted Patents—on reasonable terms and conditions that are demonstrably free of unfair discrimination;

C.    Declare the RAND terms and conditions, including royalties, for a license to Netlist's patents essential or potentially essential to JEDEC standards;

D.    Declare that SK hynix and its affiliates have a right to obtain a license to Netlist's patents essential to JEDEC standards under the terms and conditions to be determined by the Court;

E.    Enjoin Netlist from further demanding excessive, non-RAND royalties from SK hynix;

F.    Declare that Netlist is barred from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) or its direct or indirect customers in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards;

G.    Enjoin Netlist from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) or its direct or indirect customers in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards; and

H.    Such other equitable relief as this Court deems just and proper.

Date: <u>October 9, 2017</u>                    Respectfully submitted,

                                              <u>/s/Chad S. Hummel</u>
David T. Pritikin                             Chad S. Hummel (SBN 139005)
*dpritikin@sidley.com*                        *chummell@sidley.com*
Richard A. Cederoth                           Theodore W. Chandler (SBN 219456)
*rcederoth@sidley.com*                        *tchandler@sidley.com*
David Giardina                                SIDLEY AUSTIN LLP
*dgiardina@sidley.com*                        555 West Fifth Street, Suite 4000
SIDLEY AUSTIN LLP                             Los Angeles, CA 90013
1 S. Dearborn Street                          Phone: (213) 896-6000
Chicago, IL 60603                             Fax: (213) 896-6600
Phone: (312) 853-7000
Fax: (312) 853-7036                           Brian R. Nester
                                              *bnester@sidley.com*
Kenneth L. Nissly (SBN 77589)                 Wonjoo Suh
*knissly@nisslylaw.com*                       *wsuh@sidley.com*
LAW OFFICES OF KENNETH L.                     SIDLEY AUSTIN LLP
NISSLY                                        1501 K Street, NW
P.O. Box 3448                                 Washington, DC 20005
Saratoga, CA  95070-1448                      Phone: (202) 736-8000
Phone:  (408) 398-7043                        Fax: (202) 736-8711

                                              Attorneys for
                                              SK hynix Inc., SK hynix America Inc.,
                                              and SK hynix memory solutions Inc.

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 27

# MINTZ LEVIN

Andrew H. DeVoogd | 617 348 1611 | ahdevoogd@mintz.com

One Financial Center
Boston, MA 02111
617-542-6000
617-542-2241 fax
www.mintz.com

October 31, 2017

**VIA HAND DELIVERY & EDIS**

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street SW
Washington, D.C. 20436

```
┌─────────────────────────┐
│         DOCKET          │
│         NUMBER          │
│                         │
│        3278             │
│                         │
│ ....................... │
│       Office of the     │
│        Secretary        │
│   Int'l Trade Commission│
└─────────────────────────┘
```

Re:   *Certain Memory Modules and Components Thereof*
       Inv. No 337-TA-__

Dear Secretary Barton:

I enclose for filing on behalf of Netlist, Inc. ( "Netlist" or "Complainant") the following documents in support of Netlist's request that the Commission commence an investigation pursuant to the provisions of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. §1337.  Please note that Confidential Exhibits 20C, 21C, and 22C to the Verified Complaint contain Confidential Business Information and pursuant to the Commission's Rules of Practice and Procedure, a request for confidential treatment of the information in those exhibits accompanies this filing.  Accordingly, Netlist submits the following:

1. One (1) original and eight (8) copies of Complainant's Verified Complaint and the Public Interest Statement (originals unbound); one (1) CD of the Non-Confidential Exhibits and one (1) CD of the Confidential Exhibits (Commission Rules 201.6(c), 210.4(f)(2) and 210.8 (a)(1)(i)) and 210.8(b));

2. Three (3) additional copies of the Complaint, the Public Interest Statement and three (3) CDs of the non-confidential and confidential exhibits (each set of exhibits on separate CDs), for service upon the following Respondents: SK hynix Inc., SK hynix America Inc., and SK hynix memory solutions, Inc.  (Commission Rules 201.6(c), 210.4(f)(2), 210.8(a)(1)(i) and 201.8(b));

3. One (1) additional copy of the Complaint for service upon the embassy of South Korea (Commission Rules 210.8(a)(1)(iii) and 210.11(a));

4. One (1) certified copy of each of the following asserted United States Patents: U.S. Patent No. 9,606,907 and U.S. Patent No. 9,535,623, included with the Complaint as Exhibits 1 and 2 (Commission Rule 210.12(a)(9)(i));

5. One (1) certified copy and four (4) additional copies, on CDs, of the U.S. Patent and Trademark Office prosecution histories for each of the asserted United States Patents: U.S. Patent No. 9,606,907 and U.S. Patent No. 9,535,623, included with the Complaint as Appendices A and B, respectively (Commission Rule 210.12(c)(1));

6. One (1) certified copy of the Assignment Records for asserted United States Patents: U.S. Patent No. 9,606,907 and U.S. Patent No. 9,535,623, included with the Complaint as Exhibits 3 and 4 (Commission Rule 210.12(a)(9)(ii));

**Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.**

BOSTON | LONDON | LOS ANGELES | NEW YORK | SAN DIEGO | SAN FRANCISCO | STAMFORD | WASHINGTON

77.     The '623 patent is practiced by Netlist's memory module products, including the HybriDIMM products. A claim chart comparing Netlist's HybriDIMM product to exemplary claim 1 of the '623 patent is attached as Confidential Exhibit 21C.

B.     **Netlist's Significant and Substantial Domestic Industry Investments.**

78.     Netlist has a domestic industry that exists, or is in the process of being established, as to its next-generation product HybriDIMM, Netlist's latest breakthrough product that is currently out for customer evaluation, and Netlist's exploitation of each of the asserted patents and the patented technology incorporated into HybriDIMM.[8]

79.     Netlist makes extensive use of the inventions claimed in the asserted patents in its HybriDIMM products. HybriDIMM was built upon Netlist's patented technology, much of which was initially patented during the development of Netlist's prior generation HyperCloud product. HybriDIMM is the evolutionary next step in Netlist's long commitment to innovation. Netlist engineers working in Irvine, California, invented the technology of the asserted patents and worked to implement the patented inventions into Netlist's HybriDIMM products, which were designed and developed in the United States. As set forth in greater detail above, HybriDIMM products practice the asserted patent claims and thus are Netlist domestic industry products.

80.     Netlist engineers working in Irvine, California, started to design and develop the prior generation product, HyperCloud, in 2007. Netlist introduced HyperCloud in 2009 based upon Netlist's patented technology, along with an innovative distributed buffer architecture and other patented inventions at issue in this Investigation. IBM and HP are among the companies that qualified HyperCloud for use in their products and purchased HyperCloud.

---

[8] Netlist has provided an exemplary HybriDIMM memory module as a physical exhibit to this Complaint (see Physical Exhibit 3).

81.     Netlist engineers working in Irvine, California, started to design and develop HybriDIMM in 2013, building upon HyperCloud's then-existing design and the technology of the asserted patents.  Netlist's next-generation HybriDIMM technology is designed to be compatible with the JEDEC DDR4 LRDIMM interface.  HybriDIMM is an evolved architecture that combines the proven semiconductor raw materials of DRAM and NAND into a single persistent memory space.  It has the same Load / Store model as DRAM, and runs at near DRAM speed, but with capacities usually associated with traditional storage.  HybriDIMM can do all of this at a greatly reduced cost compared to DRAM and without system modification.  Netlist recently began shipping HybriDIMM evaluation systems to select customers.

82.     On November 12, 2015, Netlist entered into a JDLA with Samsung, pursuant to which Netlist and Samsung agreed to work together to jointly develop a standardized product interface for NVDIMM-P memory modules in order to facilitate broad industry adoption of Netlist's new technology.  Exhibit 22C (Sasaki Decl.) at ¶ 9.  Netlist received $8 million of non-recurring engineering fees (NRE) from Samsung for the joint development.  *Id.*  Since executing the JDLA, Netlist and Samsung worked to bring the compelling benefits of this new technology to a large group of customers in cloud computing, big data, and server and storage markets.  By using a hybrid storage solution that appears to the system as a standard LRDIMM, customers will be able to efficiently extract intelligence from large amounts of data in storage systems.  Having completed Phase One of this development project, Netlist has recently begun the next stage in its efforts to bring this first-of-its-kind technology to market, including by providing full HybriDIMM evaluation systems to select customers and by initiating discussions with Samsung for a next-phase partnership.

26

83.     Netlist has made significant and substantial investments in the United States directly related to HybriDIMM, the inventions claimed in the asserted patents, and developing HybriDIMM to implement Netlist's patented technology. Public information regarding Netlist's investments is set forth below. Detailed confidential information about Netlist's significant and substantial investments is set forth in Confidential Exhibit 22C, the Declaration of Gail Sasaki, who is Netlist's Chief Financial Officer. *See* Confidential Exhibit 22C, Sasaki Declaration.

84.     Netlist has made significant domestic investments in labor and capital with respect to HybriDIMM, the technology of the asserted patents, and developing HybriDIMM to implement Netlist's patented technology. As of September 30, 2017, Netlist had 31 regular U.S. employees. Exhibit 22C (Sasaki Decl.) at ¶ 15. Approximately half of these employees are Netlist engineers working in Irvine, California on research and development, design, engineering, and testing of HybriDIMM. Since 2013, substantially all of the research and development, design, engineering and testing of HybriDIMM was done by Netlist engineers working in Irvine, California. Other employees working in jobs other than sales and marketing support Netlist's activities with respect to research and development, design, engineering, testing and production of HybriDIMM.

85.     Netlist has made significant domestic investments in facilities and equipment with respect to HybriDIMM, the technology of the asserted patents, and developing HybriDIMM to implement Netlist's patented technology. Netlist's headquarters facility is located in approximately 8,200 square feet of space in Irvine, California. Exhibit 22C-1 (Netlist 10K) at 34. Netlist's total lease expenses were $482,000 in fiscal year 2016 (ended December 31, 2016), most of which relate to lease payments for Netlist's Irvine, California, headquarters facility. Exhibit 22C-1 (Netlist 10K) at F-25. Netlist's Irvine, California headquarters are used for

27

research and development, product design, engineering, testing, production support and other corporate functions. As of the end of fiscal year 2016 (December 31, 2016), Netlist held over $14 million in property and equipment (not including the value of leased facilities). Exhibit 22C-1 (Netlist 10K) at F-17.

86.    Netlist has made substantial investments in engineering, research, and development related to exploitation of the asserted patents, including investments made to invent the technology claimed in the asserted patents and develop HybriDIMM to implement Netlist's patented technology. Netlist's total expenditures for research and development were approximately $6.3 million and $6.0 million for 2016 and 2015, respectively. Exhibit 22C-1 (Netlist 2016 10K) at 11. As reflected in confidential Exhibit 22C, Netlist's R&D efforts with respect to the technologies of the asserted patents and their incorporation into HybriDIMM began in 2013.

87.    Additional confidential business information regarding Netlist's investments in plant, equipment, labor, capital, research and development, and engineering related to HybriDIMM, the technology of the asserted patents, and development of HybriDIMM to implement Netlist's patented technology, is set forth in Confidential Exhibit 22C and in the additional confidential exhibits thereto.

88.    As reflected in Confidential Exhibit 22C and in the additional confidential exhibits thereto, Netlist's domestic industry investments are significant, substantial, and ongoing.

## X.    RELIEF REQUESTED

89.    WHEREFORE, by reason of the foregoing, Netlist respectfully requests that the United States International Trade Commission:

(a)    Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(a)(1)(B)(i) and (b)(1), with respect to violations of

28

Section 337 based on the importation, sale for importation, and sale after importation, into the United States of Respondents' memory modules and components thereof, including the accused LRDIMM and RDIMM products made by or on behalf of Respondents, that infringe one or more asserted claims of the '907 patent and the '623 patent;

(b)    Schedule and conduct a hearing on said unlawful acts and, following said hearing, determine whether there has been a violation of Section 337;

(c)    Issue a limited exclusion order, pursuant to 19 U.S.C. § 1337(d), excluding from entry into the United States articles, including the accused LRDIMM and RDIMM products made by or on behalf of Respondents, that infringe one or more asserted claims of the '907 patent and the '623 patent;

(d)    Issue a permanent cease and desist order, pursuant to 19 U.S.C. § 1337(f), prohibiting Respondents, and others acting on their behalf, from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, distributing, offering for sale, selling, licensing, using, or transferring outside the United States for sale in the United States any memory module products and components thereof, including the accused LRDIMM and RDIMM products made by or on behalf of Respondents, that infringe one or more asserted claims of the '907 patent and the '623 patent;

(e)    Impose a bond during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(e)(1) and (f)(1) to prevent further injury to Netlist's domestic industry relating to each of the asserted patents; and

(f)    Grant such other and further relief as the Commission deems just and proper based on the facts determined by the investigation and the authority of the Commission.

29

Dated: October 31, 2017

Respectfully Submitted,

James M. Wodarski
Michael T. Renaud
Andrew H. DeVoogd
Kristina R. Cary
Matthew S. Galica
Tiffany Knapp
MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO P.C.
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
www.mintz.com

Aarti Shah
MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO P.C.
701 Pennsylvania Avenue NW
Suite 900
Washington, DC 20004
Tel: 202-434-7300
Fax: 202-434-7400
      www.mintz.com

*Counsel for Complainant*

30

APPX0359

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 28

Case: 21-114     Document: 2     Page: 422     Filed: 02/08/2021

Case 8:17-cv-01030-JLS-JCG   Document 26-31   Filed 05/04/20   Page 2 of 5
Case 8:17-cv-01030-JLS-JCG   Document 37   Filed 11/30/17   Page 1 of 5   Page ID #:1325

1    [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                         SOUTHERN DIVISION

11                                              No. 8:17-cv-01030-JLS-JCG
     Netlist, Inc.,
12                                              **JOINT STIPULATION FOR**
          *Plaintiff and*                       **AUTOMATIC STAY OF**
13        *Counterclaim-Defendant*,             **PLAINTIFF'S CLAIMS;**
                                                **CONSOLIDATION OF**
14        vs.                                   **COUNTERCLAIMS WITH NO.**
                                                **8:16-CV-01605; AND REQUEST TO**
15   SK hynix Inc.,                             **VACATE SCHEDULING**
                                                **CONFERENCE ON DECEMBER 8,**
16        *Defendant and*                       **2017**
          *Counterclaim-Plaintiff*,
17
          and
18
     SK hynix America Inc. and SK hynix
19   memory solutions Inc.,

20        *Defendants*.

21

22

23

24

25

26

27

28
                                    -1-

1                   **JOINT STIPULATION**

2      Defendants SK hynix Inc., SK hynix America Inc., and SK hynix memory

3 solutions Inc. (collectively, "SK hynix" or "Defendants") and Plaintiff Netlist, Inc.

4 ("Netlist"), by their respective counsel of record, hereby stipulate as follows:

5      WHEREAS Plaintiff filed a complaint at the International Trade Commission

6 ("ITC") on October 31, 2017 ("ITC 3272 Complaint"), which alleges infringement of

7 the same U.S. Patent Nos. 9,606,907 and 9,535,623 asserted in this action;

8      WHEREAS, upon institution of the ITC 3272 Complaint, SK hynix has the

9 statutory right to an automatic stay of the patent infringement claims in this action

10 under 28 U.S.C. § 1659(a);

11      WHEREAS the Parties previously agreed to file, upon institution of the ITC

12 3272 Complaint, a joint stipulation and proposed order asking that the Court: (1)

13 invoke SK hynix's statutory right to a stay of Netlist's patent infringement claims; and

14 (2) consolidate the remaining active claims — SK hynix's RAND counterclaims —

15 with the RAND counterclaims in *Netlist, Inc. v. SK hynix Inc. et al*, Case No. 8:16-cv-

16 01605 ("the '1605 CDCA Case"), and proceed with the consolidated RAND

17 counterclaims on the current schedule in the '1605 CDCA Case, with trial currently

18 set to begin July 10, 2018, *see* ECF No. 36 at 5:21–6:20;

19      WHEREAS the ITC instituted on November 28, 2017, an investigation based

20 on the ITC 3272 Complaint, *see Certain Memory Modules And Components Thereof*,

21 Inv. No. 337-TA-1089;

22      NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and

23 between the undersigned counsel, subject to the Court's approval, that:

24      (1) Netlist's patent infringement claims in this action shall be stayed until the

25 determination of the ITC in Inv. No. 337-TA-1089 becomes final;

26      (2) the remaining active claims in this action (*i.e.*, SK hynix's RAND

27 counterclaims) should be consolidated with the RAND counterclaims in *Netlist, Inc. v.*

28

1     *SK hynix Inc. et al*, Case No. 8:16-cv-01605, and should proceed on the current

2     schedule in the '1605 CDCA Case; and

3         (3) in light of the existing scheduling order in the '1605 CDCA Case that would

4     apply to the consolidated counterclaims, the scheduling conference in this action

5     currently scheduled for December 8, 2017, at 1:30p.m. is unnecessary and may be

6     vacated.

7         A Proposed Order in accordance with this stipulation is attached.

8

9         IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

10

11     DATED: November 30, 2017

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | By: /s/ Andrew H. DeVoogd |
| 2 | Nada I. Shamonki (Bar No. 205359)<br><nshamonki@mintz.com> |
| 3 | MINTZ LEVIN COHN FERRIS GLOVSKY<br>& POPEO PC |
| 4 | 2029 Century Park East, Suite 1370 |
| 5 | Los Angeles, California 90067<br>Telephone: (310) 586-3200 |
| 6 | Facsimile: (310) 586-3202 |

By: /s/ Andrew H. DeVoogd

    Nada I. Shamonki (Bar No. 205359)
      <nshamonki@mintz.com>
    MINTZ LEVIN COHN FERRIS GLOVSKY
    & POPEO PC
    2029 Century Park East, Suite 1370
    Los Angeles, California 90067
    Telephone: (310) 586-3200
    Facsimile: (310) 586-3202

    James M. Wodarski (*pro hac vice*)
      <jwodarski@mintz.com>
    Andrew H. DeVoogd (*pro hac vice*)
      <dhdevoogd@mintz.com>
    Kristina R. Cary (*pro hac vice*)
      <krcary@mintz.com>
    Matthew S. Galica (*pro hac vice*)
      <msgalica@mintz.com>
    MINTZ LEVIN COHN FERRIS GLOVSKY
    & POPEO PC
    One Financial Center
    Boston, Massachusetts 02111
    Telephone: (617) 542-6000
    Facsimile: (617) 542-2241

    *Attorneys for Plaintiff and*
    *Counterclaim-Defendant*
    *Netlist, Inc.*

By: /s/ Theodore W. Chandler

    Chad S. Hummel (Bar No. 139055)
      <chummel@sidley.com>
    Theodore W. Chandler (Bar No. 219456)
      <tchandler@sidley.com>
    SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
    Los Angeles, California 90013
    Telephone: (213) 896-6000
    Facsimile: (213) 896-6600

    David T. Pritikin
      <dpritikin@sidley.com>
    Richard A. Cederoth
      <rcederoth@sidley.com>
    David Giardina
      <dgiardina@sidley.com>
    SIDLEY AUSTIN LLP
    One South Dearborn
    Chicago, Illinois 60603
    Telephone: (312) 853-7000
    Facsimile: (312) 853-7036

    Brian R. Nester
      <bnester@sidley.com>
    Wonjoo Suh (Cal. Bar No. 269500)
      <wsuh@sidley.com>
    SIDLEY AUSTIN LLP
    1501 K Street, NW
    Washington, DC 20005
    Telephone: (202) 736-8000
    Facsimile: (202) 736-8711

    Michael D. Hatcher
      <mhatcher@sidley.com>
    SIDLEY AUSTIN LLP
    2021 McKinney Avenue, Suite 2000
    Dallas, Texas 75201
    Telephone: (214) 981-3300
    Facsimile: (214) 981-3400

    Kenneth L. Nissly (Bar No. 77589)
      <knissly@nisslylaw.com>
    LAW OFFICES OF KENNETH L. NISSLY
    P.O. Box 3448
    Saratoga, California 95070
    Telephone: (408) 398-7043

    *Attorneys for Defendant and*
    *Counterclaim-Plaintiff SK hynix Inc.*
    *and Defendants SK hynix America*
    *Inc. and SK hynix memory solutions*
    *Inc.*

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filing party hereby attests that all signatories listed concur in this filing's content and have authorized this filing.

-4-

STIPULATION TO STAY AND CONSOLIDATE
No. 8:17-cv-01030-JLS-JCG

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 29

Case: 21-114    Document: 2    Page: 427    Filed: 02/08/2021

Case 8:17-cv-01030-JLS-JCG  Document 36-32  Filed 05/04/20  Page 2 of 3
Case 8:17-cv-01030-JLS-JCG  Document 38  Filed 12/06/17  Page 1 of 2  Page ID #:1331

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                        SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc., | No. 8:17-cv-01030-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant*, | **ORDER STAYING PLAINTIFF'S CLAIMS;** |
| vs. | **ORDER CONSOLIDATING COUNTERCLAIMS WITH NO. 8:16-CV-01605;** |
| SK hynix Inc., | **ORDER VACATING SCHEDULING CONFERENCE ON DECEMBER 8, 2017** |
| *Defendant and Counterclaim-Plaintiff*, | |
| and | |
| SK hynix America Inc. and SK hynix memory solutions Inc., | |
| *Defendants*. | |

21

22

23

24

25

26

27

28

-1-

1    This matter is before the Court on the parties' Joint Stipulation for Automatic

2    Stay of Plaintiff's Claims; Consolidation of Counterclaims with No. 8:16 cv-01605;

3    and Request to Vacate Scheduling Conference on December 8, 2017.  The Court,

4    having considered the parties' Stipulation, finds good cause in support thereof.

5    Accordingly, IT IS HEREBY ORDERED that:

6    1.    Netlist's patent infringement claims in this action shall be stayed until the

7    determination of the ITC in Inv. No. 337-TA-1089 becomes final.

8    2.    SK hynix Inc.'s counterclaims in this action are hereby consolidated with

9    the counterclaims in *Netlist, Inc. v. SK hynix Inc. et al.*, No. 8:16-cv-01605-JLS-JCG.

10   The scheduling order in Case No. 8:16-cv-01605 shall apply to the consolidated

11   counterclaims.

12   3.    Within seven days of the entry of this Order, SK hynix Inc. shall file (in

13   Case No. 8:16-cv-01605) a document that sets forth the consolidated counterclaims in

14   a single document titled "Consolidated Counterclaims."  Leave is granted solely for

15   the purpose of combining the counterclaims into a single document; leave is not

16   granted to make any amendments to the counterclaims.  Both a properly redacted

17   version (superseding Doc. 56) and a sealed version (superseding Doc. 72) must be

18   filed.  The sealed version may be filed without further leave of Court.

19   4.    Thereafter, Netlist shall have seven days in which to file a Consolidated

20   Answer to the Consolidated Counterclaims.

21   5.    The scheduling conference in his action currently scheduled for

22   December 8, 2017, at 1:30 p.m. is hereby VACATED.

23   **IT IS SO ORDERED.**

24

25   Dated:  December 06, 2017    _____

26                                 JOSEPHINE L. STATON
                                   United States District Judge
27

28

-2-

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 30

Chad S. Hummel (SBN 139005)
chummel@sidley.com
Theodore W. Chandler (SBN 219456)
tchandler@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Phone: (213) 896-6000
Fax: (213) 896-6600

[*Full list of counsel included in
signature block*]

Attorneys for SK hynix Inc., SK hynix
America Inc., and SK hynix memory
solutions Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| NETLIST, INC., | |
| *Plaintiff and Counterclaim-Defendant,* | Case No.: 8:16-cv-01605-JLS-JCG |
| v. | Assigned to: Judge Josephine L. Staton |
| SK HYNIX INC., | **DEFENDANT SK HYNIX INC.'S NOTICE OF CONSOLIDATION** |
| *Defendant and Counterclaim-Plaintiff,* | |
| and | |
| SK HYNIX AMERICA INC., and SK HYNIX MEMORY SOLUTIONS INC., | |
| *Defendants.* | |

Case: 21-114    Document: 2    Page: 431    Filed: 02/08/2021

Case 8:16-cv-01605-JLS-JCG   Document 26-33   Filed 05/04/20   Page 2 of 6
Case 8:17-cv-01030-JLS-JCG   Document 100   Filed 12/07/17   Page 2 of 6   Page ID #:14758

1    Defendant SK hynix Inc. ("SK hynix") respectfully files this Notice of

2 Consolidation that the counterclaims in *Netlist, Inc. v. SK hynix Inc. et al.*, No. 8:17-

3 cv-01030-JLS-JCG have been consolidated into this action, according to this

4 Court's December 6, 2017 Order in Case No. 8:17-cv-01030-JLS-JCG, attached

5 hereto as Exhibit A.

6

7

8

9    Date: December 7, 2017                Respectfully submitted,

                                           */s/Brian R. Nester*
10
    David T. Pritikin (*pro hac vice*)     Chad S. Hummell (SBN 139005)
11  *dpritikin@sidley.com*                 *chummell@sidley.com*
    Richard A. Cederoth (*pro hac vice*)   Theodore W. Chandler (SBN 219456)
12  *rcederoth@sidley.com*                 *tchandler@sidley.com*
    David Giardina (*pro hac vice*)        SIDLEY AUSTIN LLP
13  *dgiardina@sidley.com*                 555 West Fifth Street
    SIDLEY AUSTIN LLP                      Los Angeles, CA 90013
14  1 S. Dearborn Street                   Phone: (213) 896-6000
15  Chicago, IL 60603                      Fax: (213) 896-6600
    Phone: (312) 853-7000
16  Fax: (312) 853-7036                    Brian R. Nester (*pro hac vice*)
                                           *bnester@sidley.com*
17  Kenneth L. Nissly (SBN 77589)          Wonjoo Suh
18  *knissly@nisslylaw.com*                *wsuh@sidley.com*
    LAW OFFICES OF KENNETH L.              SIDLEY AUSTIN LLP
19  NISSLY                                 1501 K Street, NW
    P.O. Box 3448                          Washington, DC 20005
20  Saratoga, CA  95070-1448               Phone: (202) 736-8000
    Phone:  (408) 398-7043                 Fax: (202) 736-8711
21
22                                         Attorneys for
                                           Attorneys for SK hynix Inc., SK hynix
23                                         America Inc., and SK hynix memory
                                           solutions Inc.
24

25

26

27

28

-1-

# EXHIBIT A

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11
                                        )   No. 8:17-cv-01030-JLS-JCG
12   Netlist, Inc.,                     )
                                        )   **ORDER STAYING PLAINTIFF'S**
13        *Plaintiff and*               )   **CLAIMS;**
          *Counterclaim-Defendant*,     )
14                                      )   **ORDER CONSOLIDATING**
     vs.                                )   **COUNTERCLAIMS WITH NO.**
15                                      )   **8:16-CV-01605;**
     SK hynix Inc.,                     )
16                                      )   **ORDER VACATING SCHEDULING**
          *Defendant and*              )   **CONFERENCE ON DECEMBER 8,**
17        *Counterclaim-Plaintiff*,    )   **2017**
                                        )
18        and                           )
                                        )
19   SK hynix America Inc. and SK hynix )
     memory solutions Inc.,             )
20                                      )
          *Defendants*.                 )
21                                      )

22

23

24

25

26

27

28

                                   -1-

1    This matter is before the Court on the parties' Joint Stipulation for Automatic
2  Stay of Plaintiff's Claims; Consolidation of Counterclaims with No. 8:16 cv-01605;
3  and Request to Vacate Scheduling Conference on December 8, 2017. The Court,
4  having considered the parties' Stipulation, finds good cause in support thereof.
5    Accordingly, IT IS HEREBY ORDERED that:
6    1.    Netlist's patent infringement claims in this action shall be stayed until the
7  determination of the ITC in Inv. No. 337-TA-1089 becomes final.
8    2.    SK hynix Inc.'s counterclaims in this action are hereby consolidated with
9  the counterclaims in *Netlist, Inc. v. SK hynix Inc. et al.*, No. 8:16-cv-01605-JLS-JCG.
10  The scheduling order in Case No. 8:16-cv-01605 shall apply to the consolidated
11  counterclaims.
12    3.    Within seven days of the entry of this Order, SK hynix Inc. shall file (in
13  Case No. 8:16-cv-01605) a document that sets forth the consolidated counterclaims in
14  a single document titled "Consolidated Counterclaims." Leave is granted solely for
15  the purpose of combining the counterclaims into a single document; leave is not
16  granted to make any amendments to the counterclaims. Both a properly redacted
17  version (superseding Doc. 56) and a sealed version (superseding Doc. 72) must be
18  filed. The sealed version may be filed without further leave of Court.
19    4.    Thereafter, Netlist shall have seven days in which to file a Consolidated
20  Answer to the Consolidated Counterclaims.
21    5.    The scheduling conference in his action currently scheduled for
22  December 8, 2017, at 1:30 p.m. is hereby VACATED.
23
24    **IT IS SO ORDERED.**
25  Dated: December 06, 2017
    _____
26                    JOSEPHINE L. STATON
                      United States District Judge
27
28

-2-

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 32

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MEMORY MODULES AND COMPONENTS THEROF, AND PRODUCTS CONTAINING SAME** | **Investigation No. 337-TA-1023** |

**NOTICE OF A COMMISSION DETERMINATION TO REVIEW-IN-PART AN INITIAL DETERMINATION FINDING NO VIOLATION OF SECTION 337; ON REVIEW, TO TAKE NO POSITION ON ONE ISSUE; AFFIRMATION OF THE FINDING OF NO VIOLATION AND TERMINATION OF THE INVESTIGATION**

**AGENCY**:   U.S. International Trade Commission.

**ACTION**:   Notice.

**SUMMARY**:   Notice is hereby given that the U.S. International Trade Commission has determined to review-in-part a final initial determination ("ID") of the presiding administrative law judge ("ALJ") finding no violation of section 337.   On review, the Commission has determined to take no position on the issue under review.   The Commission has also determined to affirm the ID's finding of no violation of section 337 and has terminated the investigation.

**FOR FURTHER INFORMATION CONTACT**:   Clint Gerdine, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, SW., Washington, D.C. 20436, telephone (202) 708-2310.   Copies of non-confidential documents filed in connection with this investigation are or will be available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street, SW., Washington, D.C. 20436, telephone (202) 205-2000.   General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*.   The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*.   Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION**:   The Commission instituted this investigation on October 7, 2016, based on a complaint filed on behalf of Netlist, Inc. of Irvine, California.   81 FR 69853-54.   The complaint, as supplemented, alleged violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, by reason of infringement of certain claims of the following U.S. Patent Nos.:   8,756,364 ("the '364 patent"); 8,689,064; 8,516,185; 8,001,434 ("the '434 patent"); 8,359,501 ("the '501 patent"); and 8,489,837.   The Commission's notice of investigation named SK Hynix Inc. of Gyeoonggi-do, Republic of Korea; and SK Hynix America

Inc. and SK Hynix Memory Solutions Inc., both of San Jose, California, as respondents. The Office of Unfair Import Investigations ("OUII") is also a party to the investigation. *Id.*

On May 31, 2017, the Commission issued notice of its determination not to review the ALJ's ID (Order No. 21) terminating the investigation as to the '364 patent based on partial withdrawal of the complaint.

On November 14, 2017, the ALJ issued his final ID and recommended determination (RD) on remedy and bonding in one document. The ID finds, *inter alia*, that none of respondents' accused products infringe any of the remaining asserted patents. The ID also finds that claims 1-3 and 5-7 of the '434 patent and claim 1 of the '501 patent are not invalid as anticipated in view of U.S. Patent Publication No. 2005/0257109 A1 ("Averbuj").

On November 27, 2017, complainant and respondents petitioned for review of the final ID. On December 5, 2017, complainant, respondents, and OUII each filed a response in opposition to the opposing petition for review. On December 5, 2017, the Chairman granted respondents' motion for leave to refile its petition for review out of time.

Having examined the record of this investigation, including the ID, the parties' petitions for review, and the responses thereto, the Commission has determined to review-in-part the final ID. Specifically, the Commission has determined to review the ID's finding that claims 1-3 and 5-7 of the '434 patent and claim 1 of the '501 patent are not anticipated by Averbuj. The Commission has determined not to review the remainder of the final ID.

On review, the Commission determines to take no position on the ID's finding that claims 1-3 and 5-7 of the '434 patent and claim 1 of the '501 patent are not invalid as anticipated in view of Averbuj. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421 (Fed. Cir. 1984). The Commission therefore affirms the ID's finding of no violation of section 337 and terminates the investigation.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in part 210 of the Commission's Rules of Practice and Procedure, 19 CFR part 210.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:  January 16, 2018

2

CERTAIN MEMORY MODULES AND COMPONENTS                    Inv. No. 337-TA-1023
THEREOF, AND PRODUCTS CONTAINING SAME

### PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **NOTICE** has been served by hand upon the Commission Investigative Attorney, Vu Bui, Esq., and the following parties as indicated, on **January 16, 2018**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Netlist, Inc.:**

James M. Wodarski, Esq.                            ☐ Via Hand Delivery
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO**      ☐ Via Express Delivery
One Financial Center                               ☒ Via First Class Mail
Boston, MA 02111                                   ☐ Other:_____

**On Behalf of Respondents SK hynix Inc., SK hynix America
Inc., and SK hynix memory solutions Inc.:**

Michael R. Franzinger, Esq.                        ☐ Via Hand Delivery
**SIDLEY AUSTIN LLP**                               ☐ Via Express Delivery
1501 K Street NW                                   ☒ Via First Class Mail
Washington, DC 20005                               ☐ Other:_____

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 33

1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                 SOUTHERN DIVISION

11

Netlist, Inc.,

12

    *Plaintiff and*
13     *Counterclaim-Defendant,*

14   vs.

15 SK hynix Inc.,

16     *Defendant and*
    *Counterclaim-Plaintiff,*
17

  and
18

SK hynix America Inc. and SK hynix
19 memory solutions Inc.,

20     *Defendants.*

21

)  No. 8:16-cv-01605-JLS-JCG
)  No. 8:17-cv-01030-JLS-JCG
)
)  **ORDER STAYING SK HYNIX**
)  **INC.'S RAND COUNTERCLAIMS**
)

22
23
24
25
26
27
28

-1-

1
2
3

**<u>ORDER</u>**

4      The Court having read and considered the Joint Report filed by the parties
5   pursuant to ECF Nos. 154 and 157, and the Court having read and considered the
6   parties' Joint Stipulation to Stay SK hynix Inc.'s RAND Counterclaims, and good
7   cause appearing, IT IS HEREBY ORDERED that:
8      1.      SK hynix Inc.'s RAND counterclaims, *see* ECF Nos. 161–62, are hereby
9   stayed until further order of the Court.
10     2.      The scheduling order, *see* ECF No. 101, is hereby vacated.
11     3.      Every three months, starting on May 1, 2018, the parties shall file a joint
12  report on the status of all related litigation between the parties, including in the ITC,
13  the Patent Office, any appeals to the Federal Circuit, and in foreign countries, and in
14  that report the parties shall present their view(s) on whether the stay of SK hynix
15  Inc.'s RAND counterclaims should be continued, lifted, or modified.
16     4.      In addition, at any time, any party may file a motion, after meeting and
17  conferring with the other parties, seeking to lift or modify the stay of SK hynix Inc.'s
18  RAND counterclaims.
19
20     **IT IS SO ORDERED.**
21
      Dated:  February 02, 2018
22
23                                                           _____
24                                                           Hon. JOSEPHINE L. STATON
                                                             United States District Judge
25
26
27
28

-2-

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 35

Trials@uspto.gov                                    Paper No: 25
Tel: 571-272-7822                              Entered: May 3, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SK HYNIX INC., SK HYNIX AMERICA INC., and SK HYNIX MEMORY
SOLUTIONS INC.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

————————

Case IPR2017-00548
Patent 8,489,837 B1

————————

Before STEPHEN C. SIU, MATTHEW R. CLEMENTS, and
SHEILA F. McSHANE, *Administrative Patent Judges*.

SIU, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-00548
Patent 8,489,837 B1

SK Hynix Inc. ("Petitioner") requested *inter partes* review of claims 1–3, 5 and 6 of U.S. Patent No. 8,489,837 B1 ("the '837 patent," Ex. 1001). Paper 1 ("Pet."). On May 15, 2017, we issued a Decision to Institute an *inter partes* review (Paper 7, "Inst. Dec.") of the '837 patent on the following grounds:

1)    Claims 1–3 and 6 under 35 U.S.C. § 103(a) as unpatentable over LeClerg[1] and Lee.[2]

2)    Claims 1–3, 5, and 6 under 35 U.S.C. § 103(a) as unpatentable over LeClerg, Lee, and Kim.[3]

Inst. Dec. 3, 15.

After institution of trial, Netlist, Inc. ("Patent Owner") filed a Patent Owner's Response (Paper 11, "PO Resp."), to which Petitioner replied (Paper 14, "Pet. Reply"). Oral argument was conducted on February 14, 2018. A transcript of that argument has been made of record. Paper 24.

We have jurisdiction under 35 U.S.C. § 318(a). After considering the evidence and arguments of both parties, and for the reasons set forth below, we determine that Petitioner met its burden of showing, by a preponderance of the evidence, that claims 1–3, 5, and 6 of the '837 patent are unpatentable.

RELATED MATTERS

The '837 patent is the subject of the following: *Netlist, Inc. v. SK Hynix Inc.*, Case No. 8:16-cv-01605 (C.D. Cal.) and *In the Matter of Certain Memory Modules and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-1023 (International Trade Commission). *See* Pet. 3.

---

[1] US Patent Publication 2005/0071580 A1, published March 31, 2005 ("LeClerg," Ex. 1005).
[2] US Patent Publication 2005/0193161 A1, published September 1, 2005 ("Lee," Ex. 1007).
[3] US 8,359,521 B2, issued January 22, 2013 ("Kim," Ex. 1008).

APPX0383

IPR2017-00548
Patent 8,489,837 B1

ORDER

After due consideration of the record before us, it is:

ORDERED that claims 1–3, 5, and 6 of the '837 patent are held

unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude with respect to

Exhibits 2001–2008 is dismissed; and

FURTHER ORDERED that, because this is a Final Written Decision, the
parties to the proceeding seeking judicial review of the decision must comply with
the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00548
Patent 8,489,837 B1

PETITIONER:

Joseph A. Micallef
SIDLEY AUSTIN LLP
jmicallef@sidley.com
sidley-skh-ipr@sidley.com


PATENT OWNER:

Mehran Arjomand
David Kim
MORRISON & FOERSTER LLP
marjomand@mofo.com
dkim@mofo.com

William A. Meunier
MINTZ LEVIN COHN FERRRIS
GLOVSKY AND POPEO PC
wameunier@mintz.com

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 36

Trials@uspto.gov                                                                          Paper 42
571-272-7822                                                          Entered: March 21, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SK HYNIX INC., SK HYNIX AMERICA INC., and SK HYNIX
MEMORY SOLUTIONS INC.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

————————

Case IPR2018-00303
Patent 9,535,623 B1

————————

Before STEPHEN C. SIU, BRYAN F. MOORE, and
SHEILA F. MCSHANE, *Administrative Patent Judges*.

SIU, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*

IPR2018-00303
Patent 9,535,623 B1

## I.  INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–29 ("the challenged claims") of U.S. Patent No. 9,535,623 B1 (Ex. 1001, "the '623 patent") are unpatentable.

## BACKGROUND

SK Hynix Inc., SK Hynix America Inc., and SK Hynix Memory Solutions Inc. (collectively, "Petitioner") filed a Petition (Paper 1), with the supporting Declaration of Dr. Donald Alpert (Ex. 1003).  Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7), with the supporting Declaration of Robert J. Murphy (Ex. 2001).  We instituted an *inter partes* review of all challenged claims (claims 1–29) of the '623 patent. Paper 8.  Patent Owner filed a Patent Owner Response (Paper 14, "PO Resp."), with the Supplemental Declaration of Robert J. Murphy (Ex. 2005). Petitioner filed a Petitioner Reply (Paper 23, "Pet. Reply").

Patent Owner filed a Motion to Exclude (Paper 30), Petitioner filed an Opposition to Patent Owner's Motion to Exclude (Paper 33), and Patent Owner filed a Reply to Petitioner's Opposition (Paper 36).

Petitioner filed a Motion to Exclude (Paper 25), Patent Owner filed an Opposition (Paper 34), and Petitioner filed a Reply to Patent Owner's Opposition (Paper 35).

An oral hearing was held on February 6, 2019.  A transcript of the hearing is included in the record.  Paper 41.

IPR2018-00303
Patent 9,535,623 B1

cited portions of Exhibit 2001.  Therefore, Petitioner's motion to exclude is dismissed as moot.


## PATENT OWNER'S MOTION TO EXCLUDE

Patent Owner moves to exclude Exhibits 1034 and 1036.  We did not rely on Exhibits 1034 or 1036.  Therefore, Patent Owner's motion to exclude is dismissed as moot.


## IV. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1–29 of the '623 patent are unpatentable.  Specifically, Petitioner has demonstrated by a preponderance of the evidence that claims 1–29 are unpatentable under 35 U.S.C. § 103(a) over Hazelzet and any one of Buchmann or Talbot; claims 8, 9, 19, 20, 25, and 26 are unpatentable under 35 U.S.C. § 103(a) over Hazelzet, Hokenmaier and any one of Buchmann or Talbot; and claims 10, 15, and 27 are unpatentable under 35 U.S.C. § 103(a) over Hazelzet, Kim, and any one of Buchmann or Talbot.


## ORDER

ORDERED that claims 1–29 of U.S. Patent No. 9,535,623 B1 are unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is DISMISSED;

FURTHER ORDERED that Patent Owner's Motion to Exclude is DISMISSED; and

APPX0389

IPR2018-00303
Patent 9,535,623 B1

    FURTHER ORDERED, that because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2018-00303
Patent 9,535,623 B1


FOR PETITIONER:

Joseph A. Micallef
Wonjoo Suh
SIDLEY AUSTIN LLP
jmicallef@sidley.com
wsuh@sidley.com

FOR PATENT OWNER:

Mehran Arjomand
David Kim
Jonathan Statman
MORRISON & FOERSTER LLP
marjomand@mofo.com
dkim@mofo.com
jstatman@mofo.com

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 37

*PUBLIC VERSION*

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| In the Matter of | |
|---|---|
| **CERTAIN MEMORY MODULES AND COMPONENTS THEREOF** | Inv. No. 337-TA-1089 |

## INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Chief Administrative Law Judge Charles E. Bullock

(October 21, 2019)

**Appearances:**

*For the Complainant Netlist, Inc.:*

James M. Wodarski, Esq., Michael T. Renaud, Esq., Andrew H. DeVoogd, Esq., Kristina R. Cary, Esq., Matthew S. Galica, Esq., Tiffany M. Knapp of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC of Boston, MA.

Aarti Shah, Esq. of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC of Washington, DC.

Stephen J. Akerley, Esq. of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC of San Francisco, CA.

*For the Respondents SK hynix Inc., SK hynix America Inc. and SK hynix memory solutions Inc.:*

Brian R. Nester, Esq., Michael R. Franzinger, Esq., Wonjoo Suh, Esq. of Sidley Austin LLP of Washington, DC.

Ryuk Park, Esq. of Sidley Austin LLP of Palo Alto, CA.

David T. Pritikin, Esq., Richard A. Cederoth, Esq., David C. Giardina, Esq. of Sidley Austin LLP of Chicago, IL.

Theodore W. Chandler, Esq. of Sidley Austin LLP of Los Angeles, CA.

Michael D. Hatcher, Esq. of Sidley Austin LLP of Dallas, TX.

*PUBLIC VERSION*

difficult to view "a notification signal indicating at least one status of one or more training

sequences" as presenting a fresh question once it has been determined there is no "notification

signal . . . indicating at least one status of the at least one initialization sequence" in any accused

product.

Netlist's observation that the two are "not coterminous" (CIB at 93) does not disturb this

outcome.   Again, the test is not exact identity but rather "[i]f the differences between the

unadjudicated patent claims and adjudicated patent claims do not materially alter the question of

invalidity [or infringement], collateral estoppel applies." *Ohio Willow Wood*, 735 F.3d at 1342.

That court explained:

> As reflected in the claim language above, these patents use slightly
> different language to describe substantially the same invention. For
> example, where the '237 patent recites a "tube sock-shaped
> covering," an "amputation stump being a residual limb," and "fabric
> in the shape of a tube sock," the '182 patent analogously recites the
> same claim scope in the form of a "cushion liner for enclosing an
> amputation stump, said liner comprising a fabric covering having an
> open end for introduction of said stump and a closed end opposite
> said open end." Thus, the mere use of different words in these
> portions of the claims does not create a new issue of invalidity.

*Id.* at 1342-43.   Indeed, much like the patentee in *Ohio Willow Wood*, Netlist's argument is

deficiently limited to declaring "initialization" and "training" as different because "initialization

can include one or more training sequences, but the training sequences are not themselves

initialization" (CRB at 67) without explaining why this is significant:

> It is undisputed that the adjudicated claims of the '182 patent only
> require a "polymeric" gel whereas the unadjudicated claims of the
> '237 patent specifically require a "block copolymer" gel. OWW
> argues that this difference in claim scope precludes summary
> judgment. But OWW has not adequately supported this contention
> because it has not provided any explanation regarding *how* the
> "block copolymer" limitation is patentably significant in view of the
> obviousness determination regarding the claims of the '182 patent.

35

*PUBLIC VERSION*

> Since OWW failed to explain how the "block copolymer" limitation
> changes the invalidity analysis, OWW has not met its burden of
> opposing summary judgment based on this distinction.

735 F.3d at 1343. In fact, the terms "polymeric" and "block copolymer" in *Ohio Willow Wood*

have the same relationship as "initialization sequence" and "training sequence," wherein the latter

is a subset of the former.

Additionally, it is important to address Netlist's claim that the 1023 ID actually

"highlighted the material difference in scope between these terms." (CRB at 67-68.) To be clear,

Netlist states:

> In fact, as already discussed, the 1023 ID highlighted the material
> difference in scope between these terms by analogizing the training
> sequences to "the ingredients (*i.e.*, 'eye opening' communications
> from the 'ALERT_n signal') of a cake," which are component parts
> of—but not themselves—the cake (*i.e.*, the initialization sequence).
> JX-2031C at JX-2031C.0105; RX-3548C at RX-3548C.00027-
> .00028.

(*Id.*) First and foremost, this is a mischaracterization of the 1023 ID. In the 1023 ID, the

undersigned explained how the "notification signal" was not a "status" with the following analogy:

> By way of analogy, placing all of the ingredients (*i.e.*, 'eye opening'
> communications from the 'ALERT_n signal') of a cake in a
> shopping bag (*i.e.*, the memory module) at the grocery store does
> not transform them into a cake; that only occurs when they are
> blended and transferred into the oven and baked (*i.e.*, the memory
> controller).

(1023 ID at 96.) Clearly, in this analogy it is the ALERT_n signals which are the ingredients and

do not become a status (cake) until they are received and processed (baked) by the external system

memory controller (oven)—and not training sequences as the ingredients of an initialization

sequence.

36

PUBLIC VERSION

Second, even if the 1023 ID had analogized "training sequences" to be an ingredient of "initialization sequences," this only serves to repeat that principle which the shared specification already discloses—an initialization sequence can comprise one or more training sequences. ('837 patent at 5:64-67, 6:4-7; '623 patent at 7:4-7, 7:11-14.) This is not an explanation of why a switch from "initialization sequence" to "training sequence" materially alters the question of infringement.

Lastly, even if "initialization sequence" and "training sequence" had radically different meanings (*e.g.*, non-overlapping), replacing the former with the latter has only a minimal effect on the claimed invention. The technical character of these sequences does not have any bearing on any other recited feature. For example, "initialization sequence" is recited in claim 1 of the '837 patent as something the memory module performs and to which the notification signal corresponds, with no other feature or component affected:

1. A memory module comprising:

> at least one output configured to be operatively coupled to a memory controller of a host computer system, the memory module configured to operate in at least two modes comprising an initialization mode during which the memory module *executes at least one initialization sequence* and an operational mode;
>
> a controller circuit configured to cause the memory module to enter the initialization mode; and
>
> a notification circuit configured to drive the at least one output while the memory module is in the initialization mode to provide at least one notification signal to the memory controller *indicating at least one status of the at least one initialization sequence*; and
>
> wherein the at least one notification signal triggers the memory controller to execute an interrupt routine.

37

*PUBLIC VERSION*

('837 patent at cl. 1 (emphasis added).)  Claims 2, 3, 6, 7, 10, 14, and 17 all use "initialization

sequence" in the same isolated way.

The '623 patent claims likewise use "training sequences" as a process the memory module

must perform but the substance of that process does not affect any other feature:

> 1. A memory module configured to fit into a corresponding slot of a
> host system to operate with a memory controller of the host system,
> the memory module comprising:
>
> a module controller having an open drain output, the module
> controller generating a parity error signal and driving the parity error
> signal to the memory controller of the host system via the open drain
> output while the memory module operates in a first mode, the parity
> error signal indicating a parity error having occurred in the memory
> module while the memory module operates in the first mode,
> wherein the module controller is configured to cause the memory
> module to enter a second mode in response to a command from the
> memory controller of the host system, the module controller
> generating *a notification signal indicating at least one status of one*
> *or more training sequences* while the memory module is in the
> second mode and outputting the notification signal to the memory
> controller of the host system via the open drain output while the
> memory module is in the second mode; and
>
> a printed circuit board having a first set of edge connections for
> communicating address and control signals from the memory
> controller of the host system, a second set of edge connections for
> communicating data signals between the memory module and the
> memory controller of the host system while the memory module
> operates in the first mode, and an error edge connection coupled to
> the open drain output of the module controller, the memory module
> communicating to the memory controller of the host system via the
> error edge connection the parity error signal while the memory
> module operates in the first mode and the notification signal while
> the memory module is in the second mode.

('623 patent at cl. 1 (emphasis added).)  Claims 3, 5, 11-13, 21, 23, and 29, again, all use "training

sequence" without regard to what that sequence actually entails.

38

*PUBLIC VERSION*

This finding is buttressed by Order No. 17 which analyzed how "initialization" and "training" are used across the '837 and '623 patents and concluded they are effectively interchangeable as far as the invention was concerned. The Order stated:

> For this limitation, I find an overall lack of intrinsic evidence to explain the meaning of "training sequences." Neither it nor "initialization sequence" are given any technical definition in the '623 patent specification apart from referring to "initialization sequence (*e.g.*, comprising one or more training sequences)" ('623 patent at 6:55-57), or "initialization sequence (*e.g.*, one or more training sequences)" (*id.* at 7:7-8). This is acknowledged by all parties. (CIMB at 59; RIMB at 9-10; SRMB at 43.)
>
> The '623 patent also introduces a "training *mode*" in its claims to characterize the second mode of the memory module which is not the normal operational mode. ('623 patent at cls. 4, 14, 22.) This is interesting because the specification never uses this term, opting instead for "initialization mode," which it uses twenty-four times to refer to the same mode—that which is not the normal operational mode. ('623 patent at 5:13-26, 6:50-65, 7:34-47, 8:30-33, 8:46-53, 8:54-9:16, 9:55-61, 10:7-11, 12:6-23, 12:33-37, 12:41-43, 12:57-63, 12:66-13:5, 13:30-36.) No prior family members use "training mode" in their specifications or claims either. (*See generally* '837 patent; '116 patent.) I find this sudden and complete switch suggests interchangeability between "initialization" and "training" as far as the invention of the '623 patent is concerned. In total, the intrinsic evidence communicates that "training" and "initialization" are, broadly, those processes and operations the memory module undergoes when it is not in normal operational mode to prepare for operational mode.

(Order No. 17 at 132.)

The undersigned agrees with these observations of Order No. 17 and hereby determines that the meanings of "initialization sequence" and "training sequence" simply have minimal importance to the inventions of the '837 and '623 patents and minimal impact on the infringement analyses associated therewith such that the test under *Ohio Willow Wood* is satisfied. As there is no dispute as to the other three factors (actually litigated, essential to prior judgment, full and fair

*PUBLIC VERSION*

opportunity) (*see* CIB at 93; CRB at 66-68), the undersigned finds issue preclusion prevents reconsideration of infringement of this limitation such that there can be no infringement by the Accused Products of claim 1 of the '623 patent or any other asserted claim of that patent (all of which depend therefrom).

## 2.    Independent Claim 1

Should the Commission not agree issue preclusion applies, the merits of Netlist's claim of infringement under the '623 patent are discussed below, and the undersigned finds that the Accused Products do not literally infringe claim 1 of the '623 patent.

### a)    *Undisputed Limitations*

To facilitate the infringement discussion, Netlist has assigned identifiers to each limitation of independent claim 1 of the '623 patent. (*See* CIB at xxii-xxiii.) With reference to these identifiers, Netlist contends that there is no dispute over the infringement of limitations 1a, 1b, and 1d by the Accused Products. (CIB at 79, 80, 92.) Netlist cites to the written testimony of its expert, Dr. Mangione-Smith, to fulfill its obligation in establishing the Accused Products include these limitations. (CIB at 79 (citing CX-2004C at Q/A 256-285, 705-771, 847, 849-859, 926), 80 (citing CX-2004C at Q/A 286-297, 705-765, 772-778, 847, 849-855, 860-865, 926), 92 (citing CX-2004C at Q/A 344-360).) Respondents and Staff do not appear to dispute this evidence or Netlist's contention. (RIB at 60-75; RRB at 37-53; SIB at 87-93; SRB at 22-26.) The undersigned notes here that, again, Netlist omits discussion of limitation 1e of the '623 patent, but appears to treat it alongside limitation 1d through citation to expert testimony which covers both limitations.

40

*PUBLIC VERSION*

(*Compare* CIB at xxi *with* CIB at 92; CX-2004C at Q/A 344-360 (covering limitations 1d and

1e).)[5]

In view of the testimony of Dr. Mangione-Smith that the Accused Products include these

limitations, and there being no clear disagreement by Respondents and Staff as to that fact, the

undersigned finds that the Accused Products include these features of independent claim 1.  (*See* CX-

2004C at Q/A 256-285, 705-771, 847, 849-859, 926, 286-297, 705-765, 772-778, 847, 849-855,

860-865, 926, 344-360.)

Infringement of limitation 1c is disputed in-part.  This limitation reads:

> wherein the module controller is configured to cause the memory
> module to enter a second mode in response to a command from the
> memory controller of the host system, the module controller
> generating a notification signal indicating at least one status of one
> or more training sequences while the memory module is in the
> second mode and outputting the notification signal to the memory
> controller of the host system via the open drain output while the
> memory module is in the second mode;

('907 patent at cl. 1.)  Within this limitation, Netlist identifies only "the module controller is

configured to cause the memory module to enter a second mode in response to a command from

the memory controller of the host system" and "the module controller generating a notification

signal indicating at least one status of one or more training sequences while the memory module

is in the second mode" as in dispute between the parties.  (*See* CIB at 80, 83.)  Accordingly, these

portions are discussed further below.  With respect to the remaining portion, Netlist cites to the

written testimony of Dr. Mangione-Smith to fulfill its obligation in establishing it is present in the

Accused Products.  (CIB at 92 (citing CX-2004C at Q/A 298-347).)  Respondents and Staff do not

---

[5]       The undersigned notes that the numbering of Q344-347 is used twice in CX-2004C.  The
noted citation refers to the second usage of Q344-347.

*PUBLIC VERSION*

appear to dispute this evidence or Netlist's contention. (RIB at 59-75; RRB at 37-53; SIB at 87-93; SRB at 22-26.)

In view of the testimony of Dr. Mangione-Smith that the Accused Products include these portions, and there being no clear disagreement by Respondents and Staff as to that fact, the undersigned finds that the Accused Products include these features of independent claim 1. (*See* CX-2004C at Q/A 298-347.)

### b)    *Disputed Limitations*

As noted above, there is a dispute as to whether the Accused Products meet two portions of limitation 1c of independent claim 1 of the '623 patent. As discussed below in more detail, the undersigned finds that the Accused Products do not include "wherein the module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system" or "the module controller generating a notification signal indicating at least one status of one or more training sequences while the memory module is in the second mode."

> (1)    "wherein the module controller is configured to cause the memory module to enter a second mode in response to a command from the memory controller of the host system"

For the "cause the memory module to enter a second mode" limitation, Netlist claims "[t]he JEDEC-compliant RCDs in the Accused Products include an RC0C training control word register, the value of which determines the operating mode of the memory module (*e.g.*, Clock-to-CA Training Mode)." (CIB at 80 (citing CX-2004C at Q/A 302).) Netlist continues:

> For the memory module to enter Clock-to-CA Training Mode (the claimed "second mode"), the RCD first receives a 13-bit "control word" from the memory controller (the claimed "command"). *Id.* at Q/A 303-304; Tr. (Wedig) at 609:24-610:1. This 13-bit control word is an instruction to the RCD, which the RCD decodes using its

42

> own internal logic. *Id.* at Q/A 305; Tr. (Mangione-Smith) at 360:25-
> 361:9; Tr. (Wedig) at 610:1-611:19. Then, using its own internal
> logic, the RCD writes 4-bits to its RC0C register. CX-2004C
> (Mangione-Smith) at Q/A 306-307; Tr. (Mangione-Smith) at
> 361:10-16; Tr. (Wedig) at 610:1-611:19. Writing x000 places the
> module in a normal operating mode; writing x001 places the module
> in the Clock-to-Ca Training Mode. CX-2004C (Mangione-Smith) at
> Q/A 302.

(*Id.* at 80-81.) Netlist adds, "the mode of operation of the memory module does not, and cannot,

change until the RCD receives the 13-bit control word—an instruction or command—from the

memory controller, decodes that word suing its own internal logic, and then write the 4-bit training

control word into its internal RC0C register." (*Id.* at 81 (citing CX-2004C at Q/A 307-311;

Mangione-Smith, Tr. at 361:17-20, 362:20-363:2; Wedig, Tr. at 612:1-22).) Netlist states clearly,

"the memory controller cannot and does not program the RC0C register; instead, the RCD on the

Accused Products does this" and "[t]he mode of operation of the memory module does not, and

cannot, change until the RCD receives the 13-bit control word—an instruction or command—from

the memory controller, decodes that word using its own internal logic, and then writes the 4-bit

training control word into its internal RC0C register." (CRB at 58-59 (citations omitted).)

Netlist asserts that Respondents' opposition to this "cause" limitation is rooted in "a

mistaken belief that the unconstrued claim term 'cause' can only mean 'original cause,' 'deciding

factor,' or 'decide.'" (CIB at 82 (citing Wedig, Tr. at 605:20-606:7; CX-2004C at Q/A 317-320;

969-974); CRB at 57-58.)   Netlist cites several dictionaries to show this is an incorrect

interpretation of the plain and ordinary meaning (CIB at 82 (citations omitted)), and views

Respondents' expert, Dr. Wedig, as "admit[ting] the Accused Products, not the memory controller,

'choose' (*i.e.*, decide) to operate in Clock-to-CA Training Mode" (*id.* (citing Wedig, Tr. at 581:11-

14)). Netlist then suggests that "cause" in the '837 patent from the 1023 Investigation should be

read differently than "cause" in the '623 patent, because the relevant limitation in the '623 patent

*PUBLIC VERSION*

includes the following additional underlined language—"the module controller is configured to

cause the memory module to enter a second mode in response to a command from the memory

controller of the host system." (*See id.* at 82-83 (citing '623 patent at cl. 1; Mangione-Smith, Tr.

at 359:13-23; Wedig, Tr. at 605:4-12; 597:10-598:20); CRB at 56-57.) On this point in particular,

Netlist argues "[i]n the '623 Patent, the module controller cannot 'cause' until it receives the

command to do so. . . . In the '837 Patent, there was no such predicate action required, and thus

the module controller had to 'cause' on its own." (CRB at 60.)

In opposition, and as discussed above, Respondents view the 1023 Investigation as

conclusively establishing that the module controller does not "cause" itself to enter CA Bus

training mode, as it is actually the memory controller which causes this. (RIB at 60; *see id.* at 65-

66 (citing JX-2031C at *99; RX-1587C at Q/A 20[]4-20[]5); RRB at 45-46.) Apart from the 1023

Investigation, and on the nature of Alert_n's use in the system, Respondents explain:

> The host's memory controller causes itself to enter the CA Bus
> training and the JEDEC standard provides the memory controller
> can then cause the RCD to participate in the memory controller's
> training when the memory controller programs the control word into
> the "RC0C" register in the module's RCD. CX-0417 (or RX-2148)
> at Table 22; CX-2220 (or RX-0320) at Table 27; RX-3870C at Q/A
> 217. The memory controller first enters CA Bus training and then
> causes the memory module to both enter, and exit, the CA Bus
> training mode. *Id.* In particular, once the memory controller is in its
> CA Bus training mode, the memory controller takes control over the
> memory module by setting the control word to x001 and
> transmitting it to the RCD. *Id.*; *see also* CX-0417 (or RX-2148) at
> Table 35; CX-2220 (or RX-0320) at Table 44. If the memory
> controller did not send this control word for CA Bus training, the
> memory module would not enter the CA Bus training mode.

(*Id.* at 66.) Respondents emphasize how Dr. Mangione-Smith in the 1023 Investigation testified

it is this control word which causes the memory module to enter the initialization (*i.e.*, training or

second) mode. (*Id.* (citing CX-0005 at Q/A 1334; Mangione-Smith, Tr. at 308:15; JX-2031C at

*99).) Respondents add that, to the extent it is attempted, Netlist has waived any argument that

44

*PUBLIC VERSION*

"cause" should receive different meanings between the '837 and '623 patents (RIB at 67-68; RRB at 47-48) and that such argument is otherwise contrary to law and the intrinsic evidence (*id.* at 68-70 (citing, *inter alia, Aventis Pharma.*, 675 F.3d at 1330; RX-3870C at Q/A 221-232); RRB at 48-49). In their reply brief, Respondents dispute that Dr. Wedig "admitted the accused products satisfy the cause limitation because they can choose to operate in the accused mode." (RRB at 49 (citing CIB at 82; Wedig, Tr. at 581:11-14).) Respondents claim this testimony was simply an observation that "the accused products can be configured/chose [sic] to implement CA Bus training or not to do it all." (*Id.* (citing CX-0890 at *9).) The Staff appears to agree with Respondents' position on this limitation. (*See* SIB at 88-90.)

Here, and apart from the identity of issue between this limitation and "a controller circuit configured to cause the memory module to enter the initialization mode" of the '837 patent resulting in issue preclusion as discussed and determined above, it is notable that the Commission has itself determined, through its non-review of the relevant portions of the 1023 ID, that it is the memory controller of the Accused Products which "causes" the memory module to enter the "second mode." (1023 ID at 92; *Two-Way* Radio, Inv. No. 337-TA-1053, Comm'n Op. at 8 n.4; 19 C.F.R. § 210.42(h)(2).) More specifically, the Commission determined "the 'memory controller' controls when to enter/exist the accused 'initialization mode' with control words and sets the registers in the memory module." (1023 ID at 92.) In doing so, the Commission rejected Netlist's position that it is the memory module's RCD which causes entrance to the initialization mode. (*Id.* at 91.)

The present record confirms this is the operation of the Accused Products. The parties agree that to initiate Clock-to-CA training (*i.e.*, CA Bus training), the memory controller sends a 13-bit training control word to the RCD, which is decoded by the RCD, and using its own logic

45

*PUBLIC VERSION*

writes a 4-bit training word into its RC0C register; wherein that 4-bit training word is what triggers

Clock-to-CA training by the module.  (CRB at 58-59; RIB at 57, 66.)

The evidence would show, however, that that 4-bit control word is nothing more than the

final 4 bits of the 13-bit control word coming from system memory controller.  This is shown in

the JEDEC specification (CX-0417) by the following tables' identification of "DA[3:0]":

**Table 22 — Control Word Decoding**

| Control word | Address Bit | | | | | | | | | | | | | Meaning |
| | 12 | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 | 0 | |
| RC00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | setting[3:0] | | | | Global Features Control Word |
| RC01 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | setting[3:0] | | | | Clock Driver Enable Control Word |
| RC02 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | setting[3:0] | | | | Timing and IBT Control Word |
| RC03 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | setting[3:0] | | | | CA and CS Signals Driver Characteristics Control Word |
| RC04 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | setting[3:0] | | | | ODT and CKE Signals Driver Characteristics Control Word |
| RC05 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | setting[3:0] | | | | Clock Driver Characteristics Control Word |
| RC06 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | command[3:0] | | | | Command Space Control Word |
| RC07 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | setting[3:0] | | | | Reserved for future use |
| RC08 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | setting[3:0] | | | | Input/Output Configuration Control Word |
| RC09 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | setting[3:0] | | | | Power Saving Settings Control Word |
| RC0A | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | setting[3:0] | | | | RDIMM Operating Speed |
| RC0B | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | setting[3:0] | | | | Operating Voltage VDD and VREF Source Control Word |
| RC0C | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | setting[3:0] | | | | Training Control Word |
| RC0D | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | setting[3:0] | | | | DIMM Configuration Control Word |
| RC0E | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | setting[3:0] | | | | Parity Control Word |
| RC0F | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | setting[3:0] | | | | Command Latency Adder Control Word |
| RC1x | 0 | 0 | 0 | 0 | 1 | setting[7:0] | | | | | | | | Internal Vref Control Word |
| RC2x | 0 | 0 | 0 | 1 | 0 | setting[7:0] | | | | | | | | I²C Bus Control Word |

**Table 35 — RC0C: Training Control Word**

| Setting (DA[3:0]) | | | | Definition | Encoding |
| X | 0 | 0 | 0 | Training mode selection | Normal operating mode |
| X | 0 | 0 | 1 | | Clock-to-CA training mode[1] |
| X | 0 | 1 | 0 | | DCS0_n loopback mode[1] |
| X | 0 | 1 | 1 | | DCS1_n loopback mode[1] |
| X | 1 | 0 | 0 | | DCKE0 loopback mode[1] |
| X | 1 | 0 | 1 | | DCKE1 loopback mode[1] |
| X | 1 | 1 | 0 | | DODT0 loopback mode[1] |
| X | 1 | 1 | 1 | | DODT1 loopback mode[1] |
| 0 | X | X | X | Reserved | Reserved |
| 1 | X | X | X | | Reserved |

1. In these training modes the DDR4RCD01 samples the affected inputs every other clock cycle (to accommodate the host sending alternating '0' and '1' pattern on these signals).

(CX-0417 at -68347, Table 22 (excerpted and annotated), -68352, Table 35 (annotated).)  If the

memory controller's DA[3:0] bits are x000, the memory module will be in "normal operating

46

*PUBLIC VERSION*

mode" (in which read/write operations occur); and if those bits are x001, the memory module be

in "Clock-to-CA training mode" (the "second mode"). (*Id.* at -68352, Table 35.) Thus, the

memory controller has direct control over, and thus causes, when the memory module enters the

second mode.

This is interpretation of "cause" is supported by the '623 patent's teaching of embodiments

where the memory controller controls when the memory module enters or exits modes:

> The initialization sequence (e.g., comprising one or more training
> sequences) may be initiated by the system memory controller 14.

('623 patent at 6:55-58);

> In one embodiment, for example, the execution of the interrupt
> routine causes the system memory controller 14 to initiate a
> subsequent training sequence for the memory module 10 or on
> another memory module connected to the host system 16.

(*id.* at 8:25-29);

> [E]xecution of the interrupt routine causes the system memory
> controller 14 to cause the memory module 10 to exit the
> initialization mode and to enter the operational mode.

(*id.* at 8:46-49).

Again, there is no dispute that the memory controller determines when the Accused

Products enter the "second mode." Accordingly, the undersigned finds Netlist has not shown the

Accused Products include this limitation of independent claim 1.

> (2)    "the module controller generating a notification signal
> indicating at least one status of one or more training sequences while
> the memory module is in the second mode"

For the "a notification signal indicating at least one status of one or more training

sequences" limitation, Netlist argues "the function of the RCD's ALERT_n signal and pin during

a single training sequence within the larger Clock-to-CA Training Mode satisfies this element.

47

*PUBLIC VERSION*

(CIB at 83 (citing CX-2004C at Q/A 322).)  Netlist explains "the entire Clock-to-CA Training

Mode assists the memory controller to align its incoming command, address, and control signals

optimally to the clock signal to ensure reliability when reading data from and writing data to

memory modules."  (*Id.* (citing CX-2004C at Q/A 323).)  Netlist further explains how this is

accomplished through communication of series of ones zeros and a clock signal from the memory

controller to the RCD circuit, wherein the RCD samples the series according to the clock signal,

and "logically 'ORs' the sampled signals" to generate a single-bit output of zero or one.  (*Id.* at 84

(citations omitted).)  Netlist describes this as an "eye opening operation" and how that single-bit

output is communicated back to the memory controller "via the open drain output ALERT_n."

(*Id.* (citing (CX-2004C at Q/A 288, 330-331, 345).)  Importantly, Netlist describes the foregoing

as "the claimed training sequence."  (*Id.* (citing CX-2004C at Q/A 332, 344).)

Returning to that single-bit ALERT_n output, Netlist argues its value "indicates to the

memory controller whether (1) the memory module was able to successfully sample or read all of

the enabled Dn inputs as zero (*i.e.*, ALERT_n = low or 0), or (2) the memory module failed to

correctly sample or read all of the enabled Dn inputs as zero (*i.e.*, ALERT_n = high or 1)."  (*Id.*

(citing CX-2004C at Q/A 331, 333, 344; CX-047 at *54-55); *see* CRB at 61.)  According to Netlist,

if the ALERT_n = 0 that is an "indication" that the memory controller and RCD circuit are

"synchronized," whereas ALERT_n = 1 "indicates" they are "unsynchronized."  (CIB at 84-85

(citing CX-2004C at Q/A 331, 333, 344).)

Netlist views Respondents' opposition to this limitation as consisting of four arguments

that have no merit.  First, Netlist contends there is no requirement in the claim for "handshaking,

handing off control, or executing independent operations" as part of the "notification signal"; and

even if there were, "the memory controller passes off the 'eye opening' operations (the training

*PUBLIC VERSION*

sequences) to the memory module." (*Id.* at 85-86 (citing CX-2004C at Q/A 939-946; CX-0417 at
\*54-55); *see* CRB at 63.)   Second, Netlist argues the ALERT_n signal is not a "polled" signal
(which would not fall under the claim according to Order No. 17), a finding otherwise conclusively
established by the 1023 ID (CIB at 87 (citing CX-2366C at \*102-103); CRB at 63-64), but also
because "[t]here [is] no request or query from the memory controller to the memory module during
an eye opening operation" (CIB at 88 (citing CX-2004C at Q/A 951-956; RX-3870C at Q/A 158;
Wedig, Tr. at 591:8-20, 613:9-614:12)).

Third, Netlist disputes that the RCD needs to "know" what the status is in order to indicate
it.   (CIB at 88 (citing CX-2004C at Q/A 957-962); *see* CRB at 63.)   Netlist views "[t]he relevant
inquiry [as] whether the memory controller knows what status the RCD is going to send.   The
answer is 'no.'"   (CIB at 88 (citing Wedig, Tr. at 617:5-9).)   Relatedly, Netlist disputes that
ALERT_n is a mere "loop back of the signal sent of the single, enabled Dn line" and argues it can
be sent in reference to multiple Dn signals at the same time.   (*Id.* at 89 (citing CX-0417 at \*54-55;
RX-3870C at Q/A 115; Wedig, Tr. at 613:10-19).)   Netlist further contends Respondents' expert,
Dr. Wedig, misrepresents the JEDEC standards under which the Accused Products operate as
allowing for initiation of the training sequence via a series of all zeros as opposed to all ones.   (*Id.*
(citing RX-3870C at Q/A 125-129, 179-196; CX-0417 at \*54-55; Wedig, Tr. at 619:5-14).)   Netlist
explains how, in its view, Respondents' improper interpretation of the standard would defeat the
entire purpose of Clock-to-CA training.   (*Id.* at 89-90 (citing, *inter alia*, CX-2004C at Q/A 336-
343; Wedig, Tr. at 616:7-23; Mangione-Smith, Tr. at 365:3-15).)

Fourth, Netlist argues the Clock-to-CA Training Mode is indeed a "training sequence" as
the term was construed by Order No. 17—"synchronization of a receiver circuit to an incoming
data signal."   (*Id.* at 91 (citing CX-2004C at Q/A 963-966; CX-0417 at \*54-55; Wedig, Tr. at

*PUBLIC VERSION*

595:13-596:11).)  Netlist disputes that the mode does not somehow involve data signals or receivers, as the series of ones and zeros on the Dn lines are "bits of data" (*id.* (citing Wedig, Tr. at 613:8-614:12)) and the memory module is a "receiving component[]" (*id.*; CRB at 64).

In its reply brief, Netlist repeats its position discussed above that the 1023 Investigation "did not find that the Accused Products are incapable of indicating a 'status' of <u>anything</u>.  Instead the ALERT_n signal provides information related to discrete eye opening(s)—<u>the one or more training sequences</u> in this Investigation—but not information relating to the entirety of Clock-to-CA Training Mode, *i.e.*, an 'initialization sequence.'"  (CRB at 60 (citing JX-2031C at *102).)  Similarly, Netlist claims "training sequence" and "initialization sequence" are "two very different things."  (*Id.*)

Netlist also contends any argument that ALERT_n = 0 may nonetheless result in system failure if the Dn samplings were taken in non-optimal eye opening regions is untimely under Ground Rule 9.2 (CRB at 61) and technically incorrect as well (*id.* at 62).  On this, Netlist argues:

> But Netlist does not allege, and the JEDEC specification certainly does not state, that the training stops after a single eye opening sequence that results in successful communication as Respondents argument would require to be accurate. *Id.*; CX-0417 at CX-0417.00054-55.Instead, each individual training sequence provides the status (success or failure) for that specific sampling of Dn inputs and clock position. *Id.* As the CALJ found in the 1023 ID, for the purposes of the entire initialization sequence, the memory controller then takes the result of many of these individual training sequences to determine where the eye opening starts and ends. JX-2031C at JX-2031C.0102-03. In the case of a zero returned in a "metastable region," the zero still indicates that the particular clock position resulted in successful read of the Dn inputs (*see* CIPHB at 82-85). The fact that the metastable is not an ideal location for normal operation is beside the point.

(CRB at 62.)

In opposition, Respondents describe the CA Bus training mode (*i.e.* Clock-to-CA training) as something the memory controller controls on its own—"it controls its own training of its own

*PUBLIC VERSION*

signals and clock rather than handing off training to the memory module." (RIB at 59 (citing RX-3870C at Q/A 39-42, 145-148).)    Again, as discussed above, Respondents view the 1023 Investigation as conclusively establishing that Alert_n "is incapable of indicating status of the training; it simply provides information that the memory controller, along with the other information only the controller possesses, uses to determine status." (*Id.* at 60; *see id.* at 60-61 (citing JX-2031 at *102-103; RX-3870C at Q/A 165-166, 286-287; Wedig, Tr. at 627:2-18, 633:20, 631:5-362:12 [sic]); RRB at 38-39 ("the Commission already ruled Alert_n does not provide the status of the 'eye-opening' operations, whether they are equated to initialization or training sequences.").)    Apart from the 1023 Investigation, and on the nature of Alert_n's use in the system, Respondents explain their view that:

> To determine status, the memory controller must (along with other actions): (1) compare the returned ALERT_n pin value with the Dn values that the memory controller sent, (2) use this comparison along with previous comparisons and any phase shifts of the memory controller's Dn signals to determine the position of the beginning, middle or endpoint of an eye opening, and (3) use this information along with any prior identification of the other endpoint of an "eye opening" to determine whether a sampled signal is the start or the end of an "eye opening." RX-3870C at Q/A 170-172, 197-198. In doing so, the memory controller keeps track of the Dn values sent by the memory controller along with the phase difference between the Dn and the clock at each iteration. *Id.* All of this information is known only to the memory controller and only the memory controller is able to determine whether the RCD's sample, the Alert_n value, is within or outside the eye, in the metastable region, and ultimately whether the clock and Dn signals are successfully synchronized such that the sampling was done correctly. *See id.*; CX-0417 (RX-2148), JEDEC RCD01 Specification at SKH_JEDEC_0068334-35; CX-2220 (RX-0320), JEDEC RCD02 Specification at SKH_JEDEC_0068144-46; RX-1587C at Q/A 102-130, 235-249.

(*Id.* at 61-62.) Respondents proffer that all experts agree a 1 or 0 value for Alert_n "does not indicate whether the RCD sampled the Dn signals successfully inside or outside the eye such that the clock and Dn signals are synchronized." (*Id.* at 62-63 (citations omitted); *see generally id.* at

51

*PUBLIC VERSION*

63-65; RRB at 39-45.) Respondents also discuss how the RCD standard can call for the training

of an individual Dn signals, as opposed to several collectively, and this shows the memory module

"is merely a slave that samples and returns back the incoming Dn signal(s)." (RRB at 42 (citing

RX-3870C at Q/A 194-195; Mangione-Smith, Tr. at 329:1-24); *see generally* RIB at 58 (citing

CX-0417 at 44; CX-2220 at 45; RX-3870C at Q/A 112, 115, 116; RX-4089C through RX-4100C).)

Respondents further argue there is no "notification signal" either, as this is "a specific type

of handshaking signal [and] the Accused Products do not handoff training and thus do not require

any handshake signal, just like the prior art the 623 patent disparages." (RIB at 60; *see id.* at 70-

71 (citing RX-3870C at Q/A 140-141, 152, 282-285; Wedig, Tr. at 621:14-25); RRB at 50-51.)

Respondents also look to the '623 patent specification as supporting a distinction between

handshaking and complete control by a system memory controller. (RIB at 71 (citing '623 patent

at 3:55-67; RX-3870C at Q/A 39-40, 42-43, 145-148; RX-1587C at Q/A 141; JX-0029C at 328:19-

332:10).) In sum, Respondents claim:

> The memory controller has full control over CA Bus training
> because it effectively provides, schedules, and knows exactly when
> it will receive the feedback signals (Alert_n) from the memory
> module, *i.e.*, three clock cycles after sending the Dn signals, and
> makes all phase shift adjustments between the clock and Dn signals.
> CX-0417 (or RX-2148) at 44; CX-2220 (or RX-0320) at 44; RX-
> 3870C at Q/A 282-285. In fact, the memory controller's clock signal
> instructs the memory module when to read (*i.e.*, samples) the
> memory controller's Dn signals (*i.e.*, the rising edge of the clock
> signal) being trained. CX-0417 (or RX-2148) at 44-45
> (SKH_JEDEC_0068334-35); CX-2220 (or RX-0320) at 44-46
> (SKH_JEDEC_0068144-46). IDT, who manufactures the accused
> RCD, testified that the RCD is merely a slave that does not execute
> any training. *See, e.g.*, JX-2022C at 69-70, 72. The CA Bus training
> is performed primarily, if not entirely, by the memory controller.
> RX-3870C at Q/A 147. That is because the memory controller is
> intimately conducting the training. *See* JX-2033C at 401:12-402:20
> (Mangione-Smith); RX-3870C at Q/A 149-154.

*PUBLIC VERSION*

(*Id.* at 71-72.)  Nonetheless, Respondents continue, if Alert_n is viewed as handshaking, it is "at best a polled, not a notification, signal" which is not covered by the limitation as construed by Order No. 17.  (*Id.* at 60; *see id.* at 72-74 (citing, *inter alia*, RX-3870C at Q/A 156-164, 280-290; RX-2460 at 64:22-65:2; Wedig, Tr. at 625:23-626:12; Mangione-Smith, Tr. at 347:4-6; CX-0417 at 44; CX-2220 at 44); RRB at 51-53.)    The Staff appears to agree with this assessment.  (*See* SIB at 87-88.)

Lastly, Respondents challenge the notion that CA Bus training meets "synchronization of a receiver circuit to an incoming data signal" (Order No. 17's construction of "training sequence") because "CA Bus training trains control, command and address signals, not data signals."  (*Id.* at 60; *see id.* at 74-75 (citing, *inter alia*, CX-2004C at Q/A 55-57, 323; RX-3870C at Q/A 212; CX-0417 at 44; CX-2220 at 44; RX-1587C at Q/A 226; JX-2033C at 405:13-20, 407:4-13); RRB at 53.)

Here, and apart from the identity of issue between this limitation and "notification signal indicating . . . at least one status of the at least one initialization sequence" of the '837 patent resulting in issue preclusion, the Commission has already determined, through non-review of the 1023 ID, that the ALERT_n signal contained in the Accused Products "does not indicate a status of the 'Clock-to-CA' training mode[] and, instead, that only the memory controller provides status information regarding the initialization sequence [(*i.e.* the 'second mode')]."  (1023 ID at 95.) More specifically, the Commission determined "the information provided by the 'ALERT_n signal' [] is aggregated data points (*i.e.*, 'LOW' or 'HIGH') that are feedback signals that (i) initiate with the memory controller, (ii) merely pass through memory module and (iii) return to the memory controller which then utilizes that information to determine a status of the initialization sequence."  (*Id.* at 95-96.)  In doing so, the Commission refuted Netlist's theory "that 'ALERT_n

*PUBLIC VERSION*

signal' of the accused products 'indicates to the memory controller (1) when the 'eye opening' has

started, (2) when Clock-to-CA training is seeking the ending boundary of the 'eye opening,' and

(3) when the ending boundary of the 'eye opening' has been found.'" (*Id.* at 94.)

The present record confirms this is the nature of the ALERT_n signal in the Accused

Products and supports the same finding that ALERT_n is not a "status" of a "training sequence."

The JEDEC specification Netlist relies on to show the operation of the Accused Products details

the manner in which ALERT_n is generated and then used by the system memory controller. (CX-

0417 at *54-55; *see* CX-0417 at -68334-68335.) For the avoidance of any confusion, the relevant

portion of the specification is reproduced below:

**2.12    CA Bus Training Modes**

The DDR4RCD01 supports several training modes (selected in Table 35, "RC0C: Training Control Word")
in order to assist the memory controller in aligning the incoming command/address and control signals
optimally to the input clock signal CK_t/CK_t. These training modes are only available if a non-zero
latency adder has been selected.

In Clock-to-CA training mode the DDR4RCD01 ORs all enabled Dn inputs[1] every other cycle  together
and loops back the result to the ALERT_n output pin. In this mode, the DPAR input is sampled at the same
time as the other Dn inputs. The ALERT_n latency relative to the DQn inputs is the same 3 cycles as in the
normal parity mode. During any of the CA bus training modes, QCA/QxCKEn and QxODTn hold their
previous values and parity checking is disabled.

The memory controller can use the Clock-to-CA training mode and feedback from the DDR4RCD01 to
adjust the CK_t-CK_c to Dn relationship analogous to the write leveling sequence which adjusts the DQS-
DQS_n to CK_t-CK_c relationship. The memory controller writes consecutive sequences of all '1's and all
'0's on the CA bus and pulls in the Dn timing until the DDR4RCD01 samples all Dn inputs as 0, which is
indicated with the LOW assertion of ALERT_n. This position indicates the start position of a cumulative
CA bus "eye opening". The memory controller advances the clock position or pulls in the Dn timing until
the DDR4RCD01 samples at least one input as '1', which is indicated by ALERT_n remaining high three
cycles after the last command. This position indicates the end position of a cumulative CA bus "eye
opening". The memory controller can now position either the clock phase or the Dn input timing so that the
clock edge is in the middle of this "eye opening" to achieve equal amounts of setup and hold time relative
to the clock edge.

Figure 22 shows three sampling phase positions where the loopback ALERT_n pin transmits either a
consistent 0 output, a randomly toggling 1/0 output or a consistent 1 output, indicating sampling positions
at the LOW time, the transition time or the HIGH time of the inputs, respectively.

54

### 2.12    CA Bus Training Modes (cont'd)



(CX-0417 at -68334-68335.)

As described and shown, the Clock-to-CA training involves several steps. At all points in the process, the memory controller writes consecutive 1s and 0s to the sampled Dn input line (*i.e.*, alternating 1 and 0 to align with sampling at every other clock cycle (*see* CX-0417 at -68352, Table 35 ("1. In these training modes, the DDR4RCD01 samples the affected inputs every other clock cycle (to accommodate the host sending alternating '0' and '1' pattern on these signals)."))). The inputs are sampled by the memory module (read as 1 or 0) and fed into a OR function whose output

*PUBLIC VERSION*

is ALERT_n. If all samples are read as 0, then ALERT_n is LOW (*i.e.*, 0). If at least one sample is read as a 1, then ALERT_n is HIGH (*i.e.*, 1).

The process begins with the phase of the clock signal (or the inputs) being "pull[ed]" or shifted by the memory controller until ALERT_n registers LOW (*i.e.*, every sample is read as a 0). This moment is used as a "start position" or starting point for determination of the eye opening location, in that the start position is considered a first boundary of that eye opening. (CX-0417 at Section 2.12, first waveform image.) The process is continued by the memory controller further pulling or shifting the phase of the clock signal (or the inputs) until ALERT_n registers HIGH (*i.e.*, at least one sample is read as a 1) *for a continuous three alternating clock cycles*. This moment is used as the "end position" or ending point of the eye opening, in that the end position is considered the opposite boundary of that eye opening. (CX-0417 at Section 2.12, third waveform image.) Then, importantly, the memory controller makes a final pull or shift so as to place the clock cycle edge in between the two boundaries—ideally centered between the two so as "to achieve equal amounts of setup and hold time relative to the clock edge" (*i.e.*, to provide the cleanest, most reliable, eye opening reading). Notably, the middle waveform image presented above displays the moment where ALERT_n has begun returning a HIGH value to the memory controller but that HIGH value is not maintained long enough (*i.e.*, three alternating clock cycles) so as to mean the end boundary of the eye opening has been located.

In this way, it is clear that the HIGH or LOW values for ALERT_n, generated by the memory module and transmitted back to the memory controller, do not represent anything more than an indication of whether or not *all* input signals were sampled as 0. The signal is, as the 1023 ID determined (1023 ID at 95-96), a type of feedback signal that reflects the content of the signals it received. It does not reflect the state (*i.e.*, "status") of Clock-to-CA training.

APPX0415

*PUBLIC VERSION*

The undersigned acknowledges, however, that Netlist's theory of infringement is not that

ALERT_n indicates a status of the entire Clock-to-CA training process.   Rather, that theory

specifically alleges the claimed "training sequence" is just one, as characterized by Netlist, "eye

opening operation."  (CIB at 84.)  Further, Netlist identifies two specific "statuses" indicated by

ALERT_n, where its LOW value (*i.e.* 0) would indicate a "status" of synchronization between the

memory controller and module controller, and its HIGH value (*i.e.*, 1) indicates a "status" of non-

synchronization.  (*Id.*)  To be clear, Netlist contends:

> Focusing on the behavior of just one "eye opening" operation (the
> accused training sequence), the memory controller first sends, over
> the course of two clock cycles, a set of ones, then a set of zeros, over
> the enabled Dn inputs to the RCD. CX-0417, at CX-0417.00054-
> 00055; CX-2004C (Mangione-Smith) at Q/A 327-328. With each
> set of signals the RCD also receives a clock signal. *Id.* The RCD
> then samples the enabled Dn inputs every other clock cycle
> according to the clock signal received from the memory controller.
> CX-0417, at CX-0417.00054-00055; CX-2004C (Mangione-Smith)
> at Q/A 329, 344. The RCD then logically "ORs" the sampled
> signals, and generates a single-bit output of zero or a one. CX-2004C
> (Mangione-Smith) at Q/A 330, 344. The single bit result of the
> logical OR operation is sent to the memory controller via the open
> drain output ALERT_n. CX-2004C (Mangione-Smith) at Q/A 288,
> 330-331, 345. This process is visually depicted in CDX-2004C.052,
> and is called a single "eye opening operation." This is the claimed
> training sequence. CX-2004C (Mangione-Smith) at Q/A 332, 344.
>
> . . . .
>
> The resultant value of ALERT_n after a single "eye opening"
> operation (the claimed training sequence) indicates to the memory
> controller whether (1) the memory module was able to successfully
> sample or read all of the enabled Dn inputs as zero (*i.e.*, ALERT_n
> = low or 0), or (2) the memory module failed to correctly sample or
> read all of the enabled Dn inputs as zero (*i.e.*, ALERT_n = high or
> 1). CX-0417.00054-00055; CX-2004C (Mangione-Smith) at Q/A
> 331, 333, 344. *Successful sampling (Alert_n = 0) is an indication of
> the memory module and memory controller being "synchronized."*
> CX-2004C (Mangione-Smith) at Q/A 331, 333, 344. *On the other
> hand, unsuccessful sampling (Alert_n = 1) indicates that the
> memory module and memory controller are "unsynchronized." Id.*
> Thus, the module controller of the Accused Products (the RCD)

*PUBLIC VERSION*

> generates (via a logical OR operation of multiple sampled Dn
> signals) a notification signal (the ALERT_n signal) indicating a
> status (success or failure) of the one or more one or more training
> sequences (one or more eye opening operations) to the memory
> controller. This claim element is infringed.

(CIB at 84-85 (emphasis added).)

The record does not support Netlist's contention. If ALERT_n = 0 is "an indication of the memory module and memory controller being 'synchronized,'" then upon receiving a LOW ALERT_n value, Clock-to-CA training would cease and the memory module could switch to normal operating mode. The training does not cease, however. As described in the JEDEC specification, after receiving a LOW ALERT_n value, the memory controller continues to pull or shift the phase of either the Dn signals or the clock signal for some amount of time until ALERT_n maintains a HIGH value for "three cycles after the last command." (CX-0417 at -68334.) Necessarily, at points during this transition the ALERT_n signal is continuing to return LOW values to the memory controller; and even then, synchronization between the memory module and memory controller is only achieved after the full Clock-to-CA process is performed. Then, after that, the memory controller pulls or shifts the clock signal (or Dn signal) a final time so as to place the clock cycle edge (the moment Dn samples are taken) between the two eye opening boundaries—a technique used to maximize the reliability of the memory module's readings of incoming data signals. It is necessarily true that ALERT_n returns LOW values during this shift as well. After the clock edge is so placed, this would be the moment the memory module and memory controller would be considered synchronized. Thus, the evidence does not support Netlist's claim that ALERT_n = 0 indicates a "status" of synchronization between memory module and memory controller.

Further, even if ALERT_n indicated synchronization between those two components, that synchronization is not so much a "status" of the "training sequence" as opposed to the status which

*PUBLIC VERSION*

the training is invoked to achieve. (*See* CX-0417 at -68334 ("The DDR4RCD01 supports several

training modes . . . in order to assist the memory controller in aligning the incoming

command/address and control signals optimally to the input clock signal . . . .").)

Additionally, the undersigned finds Netlist's decision to include ALERT_n as both part of

its defined "training sequence" (*see* CIB 84 ("[t]he single bit result of the logical OR operation is

sent to the memory controller via the open drain output ALERT_n. . . . This process . . . is called

a single 'eye opening operation.'")) and also as the "notification signal" meant to indicate a

"status" of that training sequence (*id.* at 84-85 ("Successful sampling (Alert_n = 0) is an indication

of the memory module and memory controller being 'synchronized.'")) to be generally

inconsistent with the spirit of the invention of the '623 patent which treats these signals as separate.

For example, the principle aim of the '623 patent is fairly summarized as:

> Alternatively, the notifying method is an advantageous handshaking
> method between the MCH and the memory subsystem controller.
> According to a notifying method, the memory subsystem controller
> sends a signal to the MCH when the memory subsystem controller
> completes the required or requested operation. This method allows
> the MCH to execute one or more independent commands while it is
> waiting for a notification signal from the memory sub system
> controller.

('623 patent at 4:48-56; *see* '623 patent at 7:41-47 ("notification circuit 20 can be configured to

drive the at least one output 12, while the memory module 10 is in the initialization mode or after

the memory module 10 completes one or more initialization sequences . . . .").) Without reading

this feature into the claims, it is nonetheless difficult to see how a notification signal could signal

completion after training has ended if it was itself part of that training as ALERT_n is. As to the

actual claim language at issue, "the module controller generating a notification signal indicating

at least one status of one or more training sequences while the memory module is in the second

mode" ('623 patent at cl. 1), this too suggests a division between the notification signal and the

59

*PUBLIC VERSION*

signals which actually achieve that initialization or training. Indeed, there is no embodiment in the '623 patent where a signal that is part of the training or initialization sequence also serves to indicate a status of that sequence. (*See generally id.*)

Accordingly, the undersigned finds Netlist has not shown the Accused Products include this limitation of independent claim 1.

### 3.    Dependent claims 2-5 and 7-11

With respect to dependent claims 2-5 and 7-11, Netlist contends that there is no dispute over the infringement of these claims by the Accused Products, apart from their dependence on independent claim 1. (CIB at 92.) Netlist cites to the written testimony of Dr. Mangione-Smith to fulfill its obligation in establishing the Accused Products infringe these claims. (CIB at 92 (citing CX-2004C at Q/A 357-421, 705-765, 790-847, 849-855, 880-926).)

It appears Respondents indeed do not contest infringement of claims 2, 3, 5, and 7-11 apart from their dependence on claim 1, but do contest infringement of claim 4 on independent grounds. (RIB at 75-76; RRB at 53.) Claim 4 recites, "[t]he memory module of claim 1, wherein the first mode is an operational mode of the memory module, and the second mode is a training mode of the memory module." ('623 patent at cl. 4.) Specifically, Respondents argue the CA Bus training mode within the Accused Products is properly characterized as a training mode of the system controller, not the memory module, in light of the memory controller "adjust[ing] the memory controller's clock phase to the memory controller's Dn input timing to adjust timing on the memory controller's command and address signals on the memory controller's bus." (*Id.* at 75 (citing CX-0417 at 44; RX-2148 at 44; CX-2220 at 44; RX-0320 at 44).) Thus, according to Respondents, "nothing in the memory module is trained, and no internal clocks to the memory module are modified as a result of CA Bus training." (*Id.* (citing *inter alia* RX-3870C at Q/A 237-

60

*PUBLIC VERSION*

by hard copy and must include a copy of this Initial Determination with red brackets indicating

any portion asserted to contain confidential business information to be deleted from the public

version. [23]  The parties' submission shall include an index identifying the pages of this document

where proposed redactions are located.  The parties' submission concerning the public version of

this document need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock

Chief Administrative Law Judge

---

[23]    If the parties submit excessive redactions, they may be required to provide an additional written statement, supported by declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in Commission Rule 201.6(a). 19 C.F.R. § 201.6(a).

183

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 38

1 | [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | SOUTHERN DIVISION

11 |

Netlist, Inc.,

12 |     *Plaintiff and*

13 |     *Counterclaim-Defendant,*

14 | vs.

15 | SK hynix Inc.,

16 |     *Defendant and*
        *Counterclaim-Plaintiff,*

17 |

18 | and

19 | SK hynix America Inc. and SK hynix memory solutions Inc.,

20 |     *Defendants.*

No. 8:16-cv-01605-JLS-JCG

**SEVENTH JOINT REPORT PER FEB. 2, 2018 ORDER [ECF NO. 172] REGARDING STATUS OF ALL LITIGATION AND REQUEST TO CONTINUE STAY OF SK HYNIX'S RAND COUNTERCLAIMS**

Judge:     Hon. Josephine L. Staton

21

22

23

24

25

26

27

28

- 1 -

JOINT STATUS REPORT — No. 8:16-cv-01605-JLS-JCG

Pursuant to the Court's February 2, 2018 Order [ECF No. 172], the parties submit the following seventh joint status report.  That Order stayed SK hynix's RAND counterclaims, the only then active portion of the case, at the joint request of the parties, and further ordered:

> Every three months, starting on May 1, 2018, the parties shall file a joint report on the status of all related litigation between the parties, including in the ITC, the Patent Office, any appeals to the Federal Circuit, and in foreign countries, and in that report the parties shall present their view(s) on whether the stay of SK hynix Inc.'s RAND counterclaims should be continued, lifted, or modified.

ECF No. 172 at 2.

The parties' first, second, third, fourth, fifth and sixth joint status reports submitted May 1, 2018 [ECF No. 174], August 1, 2018 [ECF No. 175], November 1, 2018 [ECF No. 176], February 1, 2019 [ECF No. 177], May 1, 2019 [ECF No. 178], and August 1, 2019 [ECF No. 178] jointly requested that the Court continue the stay of SK hynix's RAND counterclaims that was entered by the Court on February 2, 2018.  In light of the current status of the parties' litigations throughout the world (set forth below), the parties continue to jointly request that the Court continue the stay of SK hynix's RAND counterclaims.  There are no proceedings in which the potential issuance of an injunction may occur before the deadline to file the next joint status report.

## I.     STATUS OF U.S. ITC AND DISTRICT COURT LITIGATION

### A.     The First ITC and District Court Actions

On August 31, 2016, Netlist filed this case (No. 8:16-cv-01605-JLS-JCG ("the '1605 case")) alleging that SK hynix's DDR4 LRDIMM and RDIMM memory modules infringed six Netlist patents that Netlist has declared as essential to JEDEC standards for memory modules: U.S. Patent No. 8,756,364, U.S. Patent No. 8,516,185, U.S. Patent No. 8,001,434, U.S. Patent No. 8,359,501, U.S. Patent No. 8,689,064, and U.S. Patent No. 8,489,837 (collectively, the "asserted patents"). ECF No. 1, ¶¶ 16-69.

1    The parties are currently drafting petitions to the ITC Commissioners seeking

2    review of the 1089 ID, and the Commission is scheduled to issue its final decision on

3    February 21, 2020.

4    As described in more detail below, SK hynix has also filed IPR petitions in the

5    U.S. Patent Office seeking review of all claims of both the '907 and '623 patents, and

6    the Patent Office has instituted IPRs on all claims of both patents.

7    **II.    STATUS OF FOREIGN LITIGATION**

8    In addition to the U.S. actions, Netlist has filed three actions in China and

9    Germany against SK hynix and its customers.  Those suits too were filed after the ITC

10   hearing in the 1023 Investigation, and the asserted patents all relate to the patents

11   asserted in this case:

12            On July 11, 2017, Netlist filed a patent infringement suit in the Beijing

13            Intellectual Property Court.  In that suit, Netlist again sought an injunction

14            against SK hynix to enjoin sales of SK hynix DDR4 LRDIMMs.  Netlist also

15            sought to enjoin SK hynix customers that purchase DDR4 LRDIMMs designed

16            by SK hynix Inc.  The Beijing Intellectual Property Court dismissed Netlist's

17            case because, as described more fully below, the Chinese Patent Reexamination

18            Board found the asserted patent invalid.

19            Also on July 11, 2017, Netlist filed a patent infringement action in the

20            District Court of Munich.  In Germany, Netlist Luxembourg S.à r.l accuses SK

21            hynix Inc. and Hewlett-Packard GmbH, who allegedly purchases DDR4

22            LRDIMMs designed by SK hynix Inc., of patent infringement.  After briefing

23            and a hearing, the District Court of Munich issued an opinion on January 31,

24            2019, finding that the accused SK hynix DDR4 LRDIMMs do not infringe the

25            asserted patent, and dismissed Netlist's case.  The case is now final.

26            On August 11, 2017, Netlist filed another Chinese patent infringement

27            action in the Beijing Intellectual Property Court, this time against SK hynix's

28            alleged customers.  In this suit, Netlist also sought an injunction.  Netlist sought

- 7 -

JOINT STATUS REPORT — No. 8:16-cv-01605-JLS-JCG

1    to enjoin alleged customers that purchased DDR4 LRDIMMs designed by SK

2    hynix Inc.  The Beijing Intellectual Property Court dismissed Netlist's case

3    because, as described more fully below, the Chinese Patent Reexamination

4    Board found the asserted patent invalid.

5           On November 10, 2017, SK hynix filed a cancelation request with the

6    Chinese Patent Reexamination Board ("PRB") seeking to invalidate the patent

7    Netlist asserted in Beijing Intellectual Property Court against SK hynix and its

8    customers.  The PRB held a hearing in March 2018 and issued its ruling on

9    May 30, 2018 declaring the patent invalid in its entirety, which is now a final

10   non-appealable decision.

11          On December 5, 2017, SK hynix filed a cancellation request with the

12   German Patent and Trademark Office ("GPTO"), requesting that the patent

13   Netlist asserted in the District Court of Munich be invalidated.  Netlist has filed

14   its grounds for opposition.  On July 23, 2019, the GPTO issued a final opinion

15   concluding that the asserted patent was invalid in its entirety.

16          The parties do not anticipate any injunctive relief being issued in the next three

17   months.

18   **III.   STATUS OF PTAB PROCEEDINGS**

19          SK hynix has filed a total of seventeen (17) IPR petitions against thirteen (13)

20   Netlist patents, including all of the patents asserted against SK hynix in this case, the

21   '1030 case and the 1023 and 1089 investigations.  The table below summaries their

22   filing dates, the patents-at-issue and their current status:

| Proceeding | Patent | Filed | Institution Decision | Final Written Decision (FWD) | Appeal Status |
|---|---|---|---|---|---|
| IPR2017-00548 | 8,489,837 | 12/30/2016 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted | Time to appeal has expired. |

| Proceeding | Patent | Filed | Institution Decision | Final Written Decision (FWD) | Appeal Status |
|------------|--------|-------|---------------------|------------------------------|---------------|
| | | | | claims | |
| IPR2017-00549 | 8,756,364 | 12/30/2016 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted claims | Time to appeal has expired. |
| IPR2017-00560 | 8,689,064 | 1/3/2017 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted claims | Notice of appeal filed 6/29/18[1] |
| IPR2017-00562 | 8,359,501 | 1/3/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | Notice of appeal filed 9/6/18[2] |
| IPR2017-00561 | 8,001,434 | 1/5/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | Notice of appeal filed 9/6/18[3] |
| IPR2017-00577 | 8,516,185 | 1/5/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | Time to appeal has expired |
| IPR2017-00587 | 8,671,243 | 1/6/2017 | 6/22/2017 | FWD issued | Time to appeal has |

[1] This IPR appeal has been assigned to the same panel of Federal Circuit judges handling the appeal of the 1023 Investigation.

[2] This IPR appeal has been assigned to the same panel of Federal Circuit judges handling the appeal of the 1023 Investigation.

[3] This IPR appeal has been assigned to the same panel of Federal Circuit judges handling the appeal of the 1023 Investigation.

1    DATED: November 1, 2019

2    By: /s/ Andrew H. DeVoogd          By: /s/ Brian R. Nester

3    Nada I. Shamonki (Bar No. 205359)          Chad S. Hummel (Bar No. 139055)
         <nshamonki@mintz.com>                      <chummel@sidley.com>
4    MINTZ LEVIN COHN FERRIS GLOVSKY       Theodore W. Chandler (Bar No. 219456)
                                                      <tchandler@sidley.com>
5    & POPEO PC                            SIDLEY AUSTIN LLP
     2029 Century Park East, Suite 1370    555 West Fifth Street, Suite 4000
6    Los Angeles, California  90067        Los Angeles, California  90013
     Telephone: (310) 586-3200             Telephone: (213) 896-6000
7    Facsimile:  (310) 586-3202            Facsimile:  (213) 896-6600

8    James M. Wodarski (*pro hac vice*)    David T. Pritikin
         <jwodarski@mintz.com>                 <dpritikin@sidley.com>
9    Andrew H. DeVoogd (*pro hac vice*)    Richard A. Cederoth
         <dhdevoogd@mintz.com>                 <rcederoth@sidley.com>
10   Kristina R. Cary (*pro hac vice*)     David Giardina
         <krcary@mintz.com>                    <dgiardina@sidley.com>
11   Matthew S. Galica (*pro hac vice*)    SIDLEY AUSTIN LLP
         <msgalica@mintz.com>              One South Dearborn
12   MINTZ LEVIN COHN FERRIS GLOVSKY       Chicago, Illinois  60603
                                           Telephone: (312) 853-7000
13   & POPEO PC                            Facsimile:  (312) 853-7036
     One Financial Center
14   Boston, Massachusetts  02111          Brian R. Nester
     Telephone: (617) 542-6000                 <bnester@sidley.com>
15   Facsimile:  (617) 542-2241           Wonjoo Suh (Cal. Bar No. 269500)
                                              <wsuh@sidley.com>
16   *Attorneys for Plaintiff and*         SIDLEY AUSTIN LLP
     *Counterclaim-Defendant*              1501 K Street, NW
17   *Netlist, Inc.*                       Washington, DC  20005
                                           Telephone: (202) 736-8000
18                                         Facsimile:  (202) 736-8711

19                                         Michael D. Hatcher
                                               <mhatcher@sidley.com>
20                                         SIDLEY AUSTIN LLP
                                           2021 McKinney Avenue, Suite 2000
21                                         Dallas, Texas  75201
                                           Telephone: (214) 981-3300
22                                         Facsimile:  (214) 981-3400

23                                         Kenneth L. Nissly (Bar No. 77589)
                                               <knissly@nisslylaw.com>
24                                         LAW OFFICES OF KENNETH L. NISSLY
                                           P.O. Box 3448
25                                         Saratoga, California  95070
                                           Telephone: (408) 398-7043

26                                         *Attorneys for Defendant and*
                                           *Counterclaim-Plaintiff SK hynix Inc.*
27                                         *and Defendants SK hynix America*
                                           *Inc. and SK hynix memory solutions*
28                                         *Inc.*

1    Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filing party hereby attests that all
2    signatories listed concur in this filing's content and have authorized this filing.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 39

No. 19-1920

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

NETLIST, INC.,

*Appellant*,

v.

SK HYNIX INC., SK HYNIX AMERICA INC., SK HYNIX MEMORY SOLUTIONS INC.,

*Appellees.*

Appeal from the United States Patent and Trademark Office,
Case No. IPR2018-00303

## BRIEF FOR APPELLANT NETLIST, INC.

MEHRAN ARJOMAND
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

SETH W. LLOYD
BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C.  20006
Telephone:  202.887.6946
SLloyd@mofo.com

*Counsel for Netlist, Inc.*

JANUARY 3, 2020

# CERTIFICATE OF INTEREST

Counsel for appellant Netlist, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

Netlist, Inc.

2.      The name of the Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are the following (some of whom are no longer with their respective firms):

MORRISON & FOERSTER LLP:  David S. Kim; Jonathan Statman.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

Dated:  January 3, 2020                          /s/ Seth W. Lloyd

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES .................................................. iv

JURISDICTIONAL STATEMENT ....................................................... iv

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUE..............................................................1

STATEMENT OF THE CASE................................................................1

SUMMARY OF ARGUMENT ..............................................................2

STANDARD OF REVIEW ....................................................................3

ARGUMENT ..........................................................................................3

    A.    Because The America Invents Act Makes APJs Principal
        Officers, Their Appointment By The Secretary Violates The
        Constitution ................................................................................3

    B.    The Appropriate Remedy Is Dismissal Of The Review Because
        There Is No Permissible Saving Interpretation Of The Statute ...........5

CONCLUSION......................................................................................7

# TABLE OF AUTHORITIES

## Cases

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
  941 F.3d 1320 (Fed. Cir. 2019) ..................................................1, 2, 3, 4, 5, 6, 7, 8

*Bedgear, LLC v. Fredman Bros. Furniture Co.*,
  783 F. App'x 1029 (Fed. Cir. 2019) ...................................................................7

*Customedia Techs., LLC v. Dish Network Corp.*,
  941 F.3d 1174 (Fed. Cir. 2019) ..........................................................................7

*Edmond v. United States*,
  520 U.S. 651 (1997)..........................................................................................5, 6

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  812 F.3d 1284 (Fed. Cir. 2015) ...........................................................................3

*Uniloc 2017 LLC v. Facebook, Inc.*,
  783 F. App'x 1020 (Fed. Cir. 2019) ...................................................................7

## Statutes

5 U.S.C. § 7513(a) ................................................................................................2, 4

28 U.S.C. § 1295(a)(4)(A) ........................................................................................v

35 U.S.C. § 6(a) ...................................................................................................2, 4

35 U.S.C. § 6(b)(4)....................................................................................................v

35 U.S.C. § 141(c) ....................................................................................................v

35 U.S.C. § 311 .........................................................................................................v

35 U.S.C. § 319 .........................................................................................................v

## Other Authorities

U.S. Const. art. II, § 2, cl. 2 ..................................................................................1, 4

## STATEMENT OF RELATED CASES

This is an appeal from a final written decision of the Patent Trial and Appeal Board ("Board") of a petition for *inter partes* review filed by petitioners-appellees SK hynix Inc., SK hynix America Inc., and SK hynix Memory Solutions, Inc. (collectively "hynix").  hynix challenged the patentability of claims of U.S. Patent No. 9,535,623 ("'623 patent") owned by appellant Netlist, Inc.  No appeal from this proceeding has previously been before this Court or any other court.

Counsel for Netlist is unaware of any pending case that will affect or be affected directly by the Court's decision.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction over this *inter partes* review under 35 U.S.C. §§ 6(b)(4) and 311.  The Board entered its final decision on March 21, 2019.  Netlist timely appealed on May 22, 2019.  This Court has jurisdiction under 35 U.S.C. §§ 141(c) and 319, and 28 U.S.C. § 1295(a)(4)(A).

**DEFENDANTS' OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO
THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)**

# Exhibit 40

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| |
|---|
| In the Matter of<br><br>**CERTAIN MEMORY MODULES AND**<br>**COMPONENTS THEREOF** |

**Investigation No. 337-TA-1089**

### NOTICE OF COMMISSION DETERMINATION TO REVIEW IN PART A FINAL INITIAL DETERMINATION FINDING A VIOLATION OF SECTION 337; SCHEDULE FOR FILING WRITTEN SUBMISSIONS ON THE ISSUES UNDER REVIEW AND ON REMEDY, THE PUBLIC INTEREST, AND BONDING; EXTENSION OF THE TARGET DATE

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has determined to review in part a final initial determination ("ID") issued by the presiding administrative law judge ("ALJ"), finding a violation of section 337 of the Tariff Act of 1930. The Commission requests briefing from the parties on certain issues under review, as indicated in this notice. The Commission also requests briefing from the parties and interested persons on the issues of remedy, the public interest, and bonding. The Commission has also determined to extend the target date for the completion of the above-captioned investigation to April 7, 2020.

**FOR FURTHER INFORMATION CONTACT:** Robert Needham, Office of the General Counsel, U.S. International Trade Commission, 500 E Street, SW., Washington, D.C. 20436, telephone (202) 708-5468. Copies of non-confidential documents filed in connection with this investigation are or will be available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street, SW., Washington, D.C. 20436, telephone (202) 205-2000. General information concerning the Commission may also be obtained by accessing its Internet server (*http://www.usitc.gov*). The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *http://edis.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION:** The Commission instituted this investigation on December 4, 2017, based on a complaint filed by Netlist, Inc. of Irvine, California ("Netlist"). 82 Fed. Reg. 57290-91. The complaint, as supplemented, alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, in the importation

1

into the United States, the sale for importation, and the sale within the United States after importation of certain memory modules and components thereof that infringe claims 1-8, 10, 12, 14, 16-22, 24, 25, 27, 29-35, 38, 43-45, 47, 48, 50, 52, and 58 of U.S. Patent No. 9,606,907 ("the '907 patent") and claims 1-5, 7-15, 17-25, 27, and 29 of U.S. Patent No. 9,535,623 ("the '623 patent"). *Id.* The Commission's notice of investigation named as respondents SK hynix Inc. of the Republic of Korea; SK hynix America Inc. of San Jose, California; and SK hynix memory solutions Inc. of San Jose, California (together, "SK hynix"). *Id.* at 57291. The Office of Unfair Import Investigations ("OUII") is also participating in this investigation. *Id.*

The Commission subsequently terminated the investigation with respect to claims 16-22, 24, 25, 27, 29-35, 38, 43-45, 47, 48, 50, 52, and 58 of the '907 patent and claims 12-15, 17-25, 27, and 29 of the '623 patent based on Netlist's partial withdrawal of its complaint. *See* Order. No. 12 (Mar. 19, 2018), *not reviewed*, Notice (Apr. 5, 2019); Order. No. 19 (Sept. 25, 2018), *not reviewed*, Notice (Oct. 15, 2018); Order. No. 27 (Dec. 6, 2018), *not reviewed*, Notice (Dec. 21, 2018). Accordingly, at the time of the Final ID, the remaining asserted claims were claims 1-8, 10, 12, 14, and 15 of the '907 patent and claims 1-5 and 7-11 of the '623 patent.

On October 19, 2019, the ALJ issued a final initial determination ("Final ID") finding a violation of section 337 with respect to claims 6 and 12 of the '907 patent. Final ID at 164-65. The ALJ found that Netlist showed that SK hynix infringes claims 1-8, 10, 12, 14, and 15 of the '907 patent, but failed to show that SK hynix infringed any claim of the '623 patent. The ALJ also found that SK hynix showed that claims 1-5, 7, 8, 10, 14, and 15 of the '907 patent are invalid as obvious, but failed to show the invalidity of claims 6 and 12. Finally, the ALJ found that Netlist satisfied the domestic industry requirement with respect to the '907 patent, but did not satisfy the domestic industry requirement with respect to the '623 patent.

On November 4, 2019, SK hynix and OUII petitioned for review of the Final ID with respect to many issues involved in the finding of violation with respect to the '907 patent. Also on November 4, 2019, Netlist contingently petitioned for review of the Final ID with respect to certain issues related to the '907 patent. On November 12, 2019, the parties filed responses to each other's petitions. Because Netlist did not petition for review of the Final ID's finding that SK hynix did not violate section 337 with respect to the '623 patent, the Commission finds that Netlist has abandoned that contention and that there is no violation of section 337 with respect to the '623 patent. *See* 19 CFR 210.43(b)(2) (stating that "[a]ny issue not raised in petition for review will be deemed to have been abandoned by the petitioning party").

Having examined the record of this investigation, including the ALJ's final ID, the petition for review, and the responses thereto, the Commission has determined to review the final ID in part. Specifically, the Commission has determined to review the following issues: (1) the construction of the limitation "receive" in the asserted claims of the '907 patent, as well as related issues of infringement and invalidity; (2) the construction of the limitation "produce first module control signals and second module

control signals in response to the set of input address and control signals" in the asserted claims of the '907 patent, as well as related issues of infringement and invalidity; (3) the domestic industry requirement with respect to both of the '623 and '907 patents; and (4) the findings with respect to both of the '623 and '907 patents regarding whether SK hynix showed that Netlist violated its obligations, if any, to offer a license on reasonable and non-discriminatory (RAND) terms. The Commission has determined not to review any other findings presented in the Final ID.

The Commission has also determined to extend the target date for the completion of the investigation until April 7, 2020.

In connection with its review, the Commission is interested in briefing on certain issues. The Commission is not requesting new argument, so for each response, the parties are to identify where they previously made such an argument in their pre- and post-hearing briefs. The Commission is interested in briefing on the following issues:

1. If the Commission were to view the limitation "set of input address and control signals" as referring to a group of input address and control signals, what evidence is there in the record regarding whether or not the accused products and domestic industry products satisfy the limitation "produce first module control signals and second module control signals in response to the set of input address and control signals"?

2. Please explain, with reference to supporting evidence in the record, whether the '907 and '623 patents are essential to any JEDEC standard.

3. Please explain, with reference to supporting evidence in the record, whether the alleged domestic industry products' compliance with JEDEC standards is sufficient to satisfy each and every limitation of a claim of the '907 patent.

4. Please describe the status of Netlist's activities and investments with respect to the articles protected by the '907 and '623 patents at the time of Netlist's filing of the complaint in this investigation. Additionally, please describe the current status of Netlist's domestic industry investments and activities with respect to the articles protected by the '907 and '623 patents.

The parties are invited to brief only the discrete issues described above, with reference to the applicable law and evidentiary record. The parties are not to brief other issues on review, which are adequately presented in the parties' existing filings.

3

In connection with the final disposition of this investigation, the statute authorizes issuance of (1) an order that could result in the exclusion of the subject articles from entry into the United States, and/or (2) cease and desist orders that could result in the respondents being required to cease and desist from engaging in unfair acts in the importation and sale of such articles. Accordingly, the Commission is interested in receiving written submissions that address the form of remedy, if any, that should be ordered. If a party seeks exclusion of an article from entry into the United States for purposes other than entry for consumption, the party should so indicate and provide information establishing that activities involving other types of entry either are adversely affecting it or likely to do so. For background, see *Certain Devices for Connecting Computers via Telephone Lines*, Inv. No. 337-TA-360, USITC Pub. No. 2843, Comm'n Op. at 7-10 (December 1994).

The statute requires the Commission to consider the effects of that remedy upon the public interest. The public interest factors the Commission will consider include the effect that an exclusion order and/or a cease and desist order would have on (1) the public health and welfare, (2) competitive conditions in the U.S. economy, (3) U.S. production of articles that are like or directly competitive with those that are subject to investigation, and (4) U.S. consumers. The Commission is therefore interested in receiving written submissions that address the aforementioned public interest factors in the context of this investigation. The Commission is particularly interested in briefing on the following issues:

1. Please discuss whether the market demand in the United States for memory modules and components thereof would be satisfied if the Commission issued remedial relief against SK hynix regarding the '907 patent. Please address whether that demand could be satisfied by non-infringing RDIMMs, Netlist licensees, or others.

2. Please discuss the types of U.S. consumers that purchase and use the accused products, and discuss the potential impact on those consumers if the Commission were to issue remedial relief against SK hynix regarding the '907 patent.

3. Please explain whether and to what extent servers require uniform memory modules, so the operator of a server would have to replace the whole server system based on the failure of a single memory module if that specific memory module was no longer available. Please explain whether the issuance of remedial relief against SK hynix regarding the '907 patent would have such an effect, and, if so, the extent of that effect.

If the Commission orders some form of remedy, the U.S. Trade Representative, as delegated by the President, has 60 days to approve, disapprove, or take no action on the Commission's determination. *See* Presidential Memorandum of July 21, 2005, 70 FR 43251 (July 26, 2005). During this period, the subject articles would be entitled to enter the United States under bond, in an amount determined by the Commission and

APPX0439

prescribed by the Secretary of the Treasury. The Commission is therefore interested in receiving submissions concerning the amount of the bond that should be imposed if a remedy is ordered.

**WRITTEN SUBMISSIONS:** The Commission requests that the parties to the investigation file written submissions on the issues identified in this notice. The Commission encourages parties to the investigation, interested government agencies, and any other interested parties to file written submissions on the issues of remedy, the public interest, and bonding. Such initial written submissions should include views on the recommended determination by the ALJ on remedy, the public interest, and bonding, which issued in the same document as the Final ID on October 21, 2019. Netlist and the Commission Investigative Attorney are also requested to identify the form of the remedy sought and to submit proposed remedial orders for the Commission's consideration in their initial written submissions. Netlist is further requested to state the date when the '907 patent expires, provide the HTSUS numbers under which the subject articles are imported, and supply a list of known importers of the subject article. The written submissions, exclusive of any exhibits, must not exceed 50 pages, and must be filed no later than close of business on February 14, 2020. Reply submissions must not exceed 25 pages, and must be filed no later than the close of business on February 21, 2020. No further submissions on these issues will be permitted unless otherwise ordered by the Commission.

Persons filing written submissions must file the original document electronically on or before the deadlines stated above and submit 8 true paper copies to the Office of the Secretary by noon the next day pursuant to section 210.4(f) of the Commission's Rules of Practice and Procedure (19 CFR § 210.4(f)). Submissions should refer to the investigation number ("Inv. No. 337-TA-1089") in a prominent place on the cover page and/or the first page. (*See* Handbook for Electronic Filing Procedures, http://www.usitc.gov/secretary/fed_reg_notices/rules/handbook_on_electronic_filing.pdf). Persons with questions regarding filing should contact the Secretary (202-205-2000).

Any person desiring to submit a document to the Commission in confidence must request confidential treatment. All such requests should be directed to the Secretary to the Commission and must include a full statement of the reasons why the Commission should grant such treatment. *See* 19 C.F.R. § 201.6. Documents for which confidential treatment by the Commission is properly sought will be treated accordingly. All information, including confidential business information and documents for which confidential treatment is properly sought, submitted to the Commission for purposes of this Investigation may be disclosed to and used: (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or (ii) by U.S. government employees and contract personnel[1],

---

[1] All contract personnel will sign appropriate nondisclosure agreements.

solely for cybersecurity purposes.  All nonconfidential written submissions will be available for public inspection at the Office of the Secretary and on EDIS.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued:   January 31, 2020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| NETLIST, INC.<br><br>Plaintiff,<br><br>vs.<br><br>SK HYNIX INC. and SK HYNIX AMERICA INC.<br><br>Defendants. | Civil Action No. 6:20-cv-00194-ADA<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF NETLIST, INC.'S OPPOSITION TO
## DEFENDANTS' MOTION TO TRANSFER VENUE

Dated: May 18, 2020

James M. Wodarski
Andrew H. DeVoogd
Matthew S. Galica
MINTZ LEVIN COHN FERRIS GLOVSKY AND
   POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000

J. Stephen Ravel
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

*Attorneys for Plaintiff Netlist Inc.*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND .............................................................................. 2

III.    ARGUMENT ...................................................................................................... 4

    A.    The First-To-File Rule Does Not Apply Here, Because Netlist Is Asserting
        Different Patents Than Those Asserted In The California Cases ......................... 4

        1.    The California Actions Are Neither Duplicative Nor Substantially
            Similar ...................................................................................................... 5

        2.    The First-To-File Rule Does Not Apply, Because Transfer Would
            Not Serve Judicial Efficiency ................................................................. 7

        3.    Transfer Will Not Result In Any Efficiencies ........................................ 9

    B.    Venue in the Central District of California Is Improper, Because SK hynix
        Has No Regular and Established Place of Business There .................................. 10

    C.    The Central District of California Is Not "Clearly" More Convenient ................. 11

        1.    The Private Interest Factors Do Not Clearly Support Transfer ................ 11

        2.    The Public Interest Factors Do Not Clearly Support Transfer ................. 14

    D.    This Case Should Remain in the Waco Division, Netlist's Choice of
        Forum .................................................................................................................. 15

IV.     CONCLUSION .................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADS Sec. L.P. v. Advanced Detection Sec. Servs.*,
No. A-09-CA-773 LY, 2010 U.S. Dist. LEXIS 27903 (W.D. Tex. Mar. 23,
2010) ...................................................................................................................13

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*,
No. 6:13-cv-364, 2014 WL 12570501 (W.D. Tex. June 10, 2014) ........................................13

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
946 F.2d 622 (9th Cir. 1991) ...................................................................................7

*Cadle Co. v. Whataburger of Alice, Inc.*,
174 F.3d 599 (5th Cir. 1999) ...............................................................................5, 7

*Candela Corp. v. Palomar Med. Techs., Inc.*,
No. 9:06-CV-277, 2007 U.S. Dist. LEXIS 19994 (E.D. Tex. Feb. 22, 2007) ..........................8

*Chapman v. Dell, Inc.*,
No. 09-CV-7, 2009 U.S. Dist. LEXIS 50654 (W.D. Tex. Apr. 15, 2009) ..............................15

*CloudofChange, LLC v. NCR Corp.*,
No. 6-19-cv-00513 (W.D. Tex. Mar. 17, 2020)........................................................12

*Cummins-Allison Corp. v. Glory Ltd.*,
No. 2-03-CV-358, 2004 U.S. Dist. LEXIS 13839 (E.D. Tex. May 26, 2004) ..........................8

*Datamize Inc. v. Fid. Brokerage Servs., LLC*,
No. 2:03-cv-321-DF, 2004 U.S. Dist. LEXIS 29100 (E.D. Tex. Apr. 22, 2004) .................5, 6

*Dataquill, Ltd. v. Apple Inc.*,
No. A-13-CA-706-SS, 2014 U.S. Dist. LEXIS 82410 (W.D. Tex. June 13,
2014) ...................................................................................................................14

*Document Generation Corp. v. Allscripts*,
No. 6:08-CV-479, 2009 U.S. Dist. LEXIS 149038 (E.D. Tex. May 19, 2009)....................4, 6

*EROAD Ltd. v. PerDiemCo LLC*,
No. 6:19-CV-00026-ADA (W.D. Tex. Sept. 19, 2019)........................................................14

*Fintiv, Inc. v. Apple, Inc.*,
No. 6:18-cv-00372-ADA, 2019 U.S. Dist. LEXIS 171102 (W.D. Tex. Sept.
10, 2019) ......................................................................................................12, 13

*Garmin Ltd. v. TomTom, Inc.*,
    No. 2:06-CV-338, 2007 U.S. Dist. LEXIS 15214 (E.D. Tex. Mar. 5, 2007) ..........................8

*Humble Oil & Refinery Co. v. Bell Marine Servs. Inc.*,
    321 F.2d 53 (5th Cir. 1963) ...............................................................11

*Hunter Douglas, Inc. v. Nien Made Enter. Co.*,
    2016 WL 6822310 (C.D. Cal. May 23, 2016) ..............................................7

*In re ASM Int'l, N.V.*,
    774 F. App'x 650, 652 (Fed. Cir. 2019) .................................................8

*In re Genentech, Inc.*,
    566 F.3d 1338 (Fed. Cir. 2009).....................................................12, 14

*In re Hoffman-La Roche Inc.*,
    587 F.3d 1333 (Fed. Cir. 2009) ......................................................14

*In re Telebrands Corp.*,
    824 F.3d 982 (Fed. Cir. 2016).......................................................4, 5

*In re Vistaprint Ltd.*,
    628 F.3d 1342 (Fed. Cir. 2010) ......................................................11

*In re Volkswagen of Am., Inc.*,
    545 F.3d 304 (5th Cir. 2008) ........................................................11

*Integra Techs. Int'l, Inc. v. Durst Image Tech. US LLC*,
    No. A-09-CA-143-SS, 2009 U.S. Dist. LEXIS 135920 (W.D. Tex. Aug. 20,
    2009) ................................................................................6

*j2 Glob. Commun's., Inc. v. Protus IP Sols., Inc.*,
    No. 6:08-CV-211, 2008 U.S. Dist. LEXIS 103609 (E.D. Tex. Dec. 23, 2008).......................9

*MDI, Inc. v. Minh Phan*,
    No. SA-07-CV-251, 2007 U.S. Dist. LEXIS 37112 (W.D. Tex. May 22, 2007) ...................10

*Parus Holdings Inc. v. Apple, Inc., et al.*,
    19-cv-00432-ADA, Doc. 114 (Feb. 27, 2020) (Albright, J.) .................................15

*Sofamor Danek Holdings, Inc. v. U.S. Surgical Corp.*,
    No. 98-2369 GA, 1998 U.S. Dist. LEXIS 21746 (W.D. Tenn. Nov. 16, 1998) .....................10

*TC Heartland LLC v. Kraft Foods Group Brands, LLC*,
    137 S. Ct. 1514 (2017).............................................................1, 10

*Tex. Instruments, Inc. v. Micron Semiconductor, Inc.*,
    815 F. Supp. 994 (E.D. Tex. 1993) ....................................................5

*Tinnus Enters., LLC v. Telebrands Corp.*,
   No. 6:15-cv-00551, 2015 U.S. Dist. LEXIS 178419 (E.D. Tex. Aug. 31, 2015)............6, 9, 13

*TMI Prods. v. Audiovox Corp.*,
   No. CV 09-1437-JFW, 2009 U.S. Dist. LEXIS 138463 (C.D. Cal. Apr. 29,
   2009) ..................................................................................................................................6

*VLSI Tech., LLC v. Intel Corp.*,
   No. 19-cv-000254-ADA, 2019 U.S. Dist. LEXIS 155287 (W.D. Tex. Aug. 6,
   2019) (Albright, J.) ......................................................................................................11, 15

*West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
   751 F.2d 721 (5th Cir. 1985) ...............................................................................................9

*XY, LLC v. Trans Ova Genetics, LC*,
   No. W-16-CA-00447-RP, 2017 U.S. Dist. LEXIS 218449 (W.D. Tex. Apr. 5,
   2017) ................................................................................................................................14

## I.    INTRODUCTION

Transfer of this case is unwarranted for multiple reasons. First, venue is proper in this judicial district because SK hynix has a physical presence here, as required by *TC Heartland*. By contrast, Netlist could not have filed this case in the Central District of California ("CDCA"), as SK hynix has no presence there. SK hynix ignores this threshold issue. The Court should defer to Netlist's choice of this forum without compelling circumstances, which are absent in this case. SK hynix has not demonstrated, and cannot demonstrate, that CDCA is a clearly more convenient forum.  Second, SK hynix's reliance on the "first-to-file" rule is misplaced. This case involves patents that Netlist has never asserted in any previously filed litigation. While the patents asserted here are in the same patent family as earlier cases in California, that fact, standing alone, does not trigger the rule. Tellingly, SK hynix cites no case in which a court has invoked the Fifth Circuit first-to-file rule in a case involving different asserted patents. Nor can it. District courts routinely decline to apply the first-to-file rule to a second-filed case involving different patents—even where those patents are in the same patent family as patents asserted in a first-filed case.

SK hynix attempts to buttress its "first-to-file" argument by incorrectly suggesting that the cases filed in California have been "heavily litigated" before Judge Staton. That is simply not true. Both cases were stayed over two years ago, and the matters never materially progressed beyond a responsive pleading, initial disclosures, and work by the parties in 2017 regarding claim construction. Judge Staton never resolved a discovery dispute, never addressed or decided any substantive issues, and never construed any patent terms. And for more than the last two years, her involvement has been limited to granting the parties' periodic joint requests to continue the stay in favor of litigating elsewhere. Moreover, as the result of PTAB proceedings, it is at best uncertain whether any claims will ever move forward in California. There is no reasonable likelihood for judicial inefficiency or duplication of effort.

APPX0447

In sum, the "first-to-file" rule does not apply here, and no public or private factors suggest, let alone clearly establish, that CDCA would be a more convenient forum. Nor do any facts or circumstances suggest or establish, that the present action will not proceed efficiently and cost-effectively in Waco, without any undue difficulties that could be avoided by litigating elsewhere. The Court should deny the motion, and the case should proceed in Waco.

## II.    FACTUAL BACKGROUND

This is the first time Netlist has asserted United States Patent Nos. 9,858,218 and 10,474,595 (the "Asserted Patents") against SK hynix. Netlist previously asserted <u>different</u> patents against SK hynix in two cases in the Central District of California.[1] But those cases were stayed years ago and the parties did not, in fact, litigate them in any meaningful way. Instead, the parties litigated those different patents in two ITC investigations, No. 337-TA-1023 ("*ITC I*") filed in 2016 and No. 337-TA-1089 ("*ITC II*") filed in 2017. In *ITC I*, Netlist asserted U.S. Patent No. 8,489,837 ("the '837 patent"), which is related to the patents asserted here. Mot. at 2. In *ITC II*, Netlist asserted U.S. Patent No. 9,535,623 ("the '623 patent"), a continuation of the '837 patent, also related to the patents asserted here. Mot. at 4. In February 2018, the California court stayed those cases entirely. Mot. at 5; Mot. Ex. 33. They remain stayed to this day.

Contrary to SK hynix's suggestion, the California cases were not "heavily litigated." Mot. at 3. In the brief period those cases were active, the California court did not construe the claims, did not resolve any discovery disputes, and did not issue summary judgment rulings. *See* Declaration of A. DeVoogd ("DeVoogd Decl.") at ¶ 7. Rather, as SK hynix concedes, the judge in California entered a typical discovery and protective order (Mot. at 3; Mot. Exs. 18-20), and both

---

[1] In 2016, Netlist sued SK hynix in Case No. 8:16-CV-01605 ("*California I*") and, in 2017, Netlist sued SK hynix in Case No. 8:17-CV-01030 ("*California II*") (jointly, the "California Actions").

parties submitted basic infringement and invalidity disclosures relying exclusively on information exchanged in the ITC. *See* DeVoogd Decl. at ¶ 6. The parties exchanged claim construction briefs, but the *California I* case was stayed before the *Markman* hearing after the PTAB instituted trial on SK hynix's IPR petitions.[2] After entering the stay in *California I*, Judge Staton ordered periodic reports on the status of litigation elsewhere. In all such reports, SK hynix has agreed that the parties should not litigate in California, including in the most recent status report, submitted after SK hynix filed this Motion.[3] *See id.*, Ex. 1 (May 8, 2020 Status Report).

Contrary to SK hynix's suggestion (Mot. at 4), the vast bulk of the discovery between the parties occurred in the ITC, not in California. For example, the parties produced a combined 416,871 documents (totaling over 4.2 million pages) in the ITC, compared to just 3,122 documents in California—less than 1% of the documents exchanged in the ITC. *See* DeVoogd Decl. at ¶ 6. The parties exchanged 381 interrogatories in the ITC actions, compared to just 23 interrogatories in California. *See id*. And in response to these few discovery requests in California, the parties simply cross-referenced information exchanged in other proceedings. *See id*. As for depositions, only a handful of the 46 deposed witnesses were noticed for deposition in the California cases, and even these were each captioned as only being part of *ITC II*. *See* DeVoogd Decl., Exs. 2-11.

In its Motion, SK hynix also tries to use a discovery cross-use agreement between the parties to suggest that all the discovery exchanged in the ITC somehow also occurred in California. Mot. at 4. SK hynix cannot have it both ways. If the cross-use agreement means that discovery made in *ITC I* and *II* is relevant to *California I* or *II,* then it will be relevant to this case as well.

---

[2] Judge Staton also issued orders disqualifying Netlist's original counsel and striking extrinsic evidence, neither of which concerned the merits of Netlist's patents. *See* DeVoogd Decl. at ¶ 6.
[3] This report notes that PTAB invalidated the '837 patent, and the Federal Circuit affirmed, so the '837 patent was never litigated in California—and it never will be. It also shows that Netlist is also appealing a PTAB decision invalidating the '623 patent. *See* DeVoogd Decl., Ex. 3.

Moreover, SK hynix incorrectly states that "neither the parties nor the evidence are connected to this District." Mot. at 6-7. That is not true. For example, as alleged in the Complaint, and undisputed by SK hynix, SK hynix employs personnel in this District with training, expertise, and responsibilities relating to the accused products. *See* Dkt. No. 1 at ¶¶ 11-12. SK hynix also has commercial space to house these personnel, and works in this District to maintain close business relationships, including with one of its largest customers in the United States based in this District. *Id*. For its part, Netlist personnel frequently travel to this District to maintain and develop its own business relationships with multiple companies resident here. *See* Declaration of Gail Sasaki at ¶ 5. In the last 12 months, for example, ten Netlist personnel traveled to this District ten different times, staying at least 32 days. *See id.* Further underscoring Netlist's contacts with this District is the portion of Netlist's 2019 sales into this District. *See id*. at ¶¶ 7-8.

## III.   ARGUMENT

On the facts as they are, rather than as SK hynix has mischaracterized them, no basis exists to apply the "first-to-file" rule and transfer the present case to CDCA where venue is not proper. Moreover, under a §1404 analysis, no established private or public factor justifies or supports a conclusion that CDCA is a clearly more convenient forum than Waco.

### A.   The First-To-File Rule Does Not Apply Here, Because Netlist Is Asserting Different Patents Than Those Asserted In The California Cases

Contrary to SK hynix's primary argument, the first-to-file rule does not require transfer to CDCA. The first-to-file rule "stands for the common sense proposition that, when two cases are the same or very similar, efficiency concerns dictate that only one court decide both cases." *In re Telebrands Corp.*, 824 F.3d 982, 984 (Fed. Cir. 2016) (emphasis added). Those circumstances do not exist here. The first-to file rule exists to serve the general principle to avoid duplicative litigation and inconsistent adjudications amongst various district courts. *Document Generation*

*Corp. v. Allscripts*, No. 6:08-CV-479, 2009 U.S. Dist. LEXIS 149038, at *15-20 (E.D. Tex. May 19, 2009). Therefore, "[i]n determining whether to apply the first-to-file rule to an action, [the second court] must resolve two questions: 1) are the two pending actions so duplicative or involve substantially similar issues that one court should decide the subject matter of both actions; and 2) which of the two courts should take the case?" *Tex. Instruments, Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997 (E.D. Tex. 1993) (citation omitted).[4] Only where the overlap between the subject cases is nearly complete, transfer is appropriate. *Telebrands*, 824 F.3d at 984 (citing *West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 730 (5th Cir. 1985).

Where, as here, the cases do not overlap in such a "nearly complete" manner, the second court has considerable discretion and may readily retain the case. *Telebrands*, 824 F.3d at 984 (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997)). This decision is case-specific and based on factors such as: (1) the extent of the overlap; (2) the likelihood of conflicts; and (3) the comparative advantage and interest each forum has in resolving the dispute. *Id.* (citation omitted). These factors encompass the principles of comity and sound judicial administration on which the first-to-file rule rests. *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). All of these factors argue for the Court to retain the present action.

     1.    <u>The California Actions Are Neither Duplicative Nor Substantially Similar</u>

Because the Asserted Patents in this case are not the same as the patents asserted in California, the two cases do not involve "substantially similar" issues requiring transfer. *Datamize*, 2004 U.S. Dist. LEXIS 29100, at *10-11 (under first-to-file rule, moving party must prove that the two pending actions are so duplicative, or involve substantially similar issues that they substantially overlap, such that one court should decide both actions). This fact alone is dispositive.

---

[4] Netlist agrees that this Court should apply the Fifth Circuit's version of the "first-to-file" rule. *See, e.g.*, *In re Telebrands Corp.*, 824 F.3d 982, 984 (Fed. Cir. 2016).

The present case involves different patents with different claims, different claim construction issues, and different infringement and validity issues. And because the California cases are stayed, there is zero overlap in active litigation between the two venues.

SK hynix strains to identify factual similarities between this case and the stayed California cases, but nothing SK hynix points to comes anywhere close to the level of "substantial overlap" required to invoke the first-to-file rule. The Fifth Circuit requires far more than the same parties and same accused products to do so. *See, e.g.*, *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:15-cv-00551, 2015 U.S. Dist. LEXIS 178419, at *11 (E.D. Tex. Aug. 31, 2015) ("Cases involving the same parties and accused products will naturally have some potential for overlap; the question … is whether the overlapping issues are substantial, such that interests of justice would require dismissal or transfer.") (emphasis added) (citations omitted). The fact that asserted patents share a similar specification is not "substantial overlap" either, because the scope of a patent is governed by its claims, not its specification. *See, e.g.*, *Document Generation Corp.*, 2009 U.S. Dist. LEXIS 149038, at *15-20 (rejecting motion to transfer continuation patents with different claims); *Datamize*, 2004 U.S. Dist. LEXIS 29100 at *17-18 (related patents sharing the same specification are nonetheless different patents that merit independent construction). Because the patent claims in this case are different from those in California, the first-to-file rule cannot apply.

The cases SK hynix cites are readily distinguishable. These involve circumstances, for example, where the actions were filed close in time and where duplication was inevitable. In *Integra Techs. Int'l, Inc. v. Durst Image Tech. US LLC*, No. A-09-CA-143-SS, 2009 U.S. Dist. LEXIS 135920, at *3 (W.D. Tex. Aug. 20, 2009), the court transferred a second-filed case filed shortly after the first, finding that discovery questions likely would overlap. Similarly, in *TMI Prods. v. Audiovox Corp.*, No. CV 09-1437-JFW (JCx), 2009 U.S. Dist. LEXIS 138463, at *7-8

(C.D. Cal. Apr. 29, 2009), the district court transferred a case filed just two months after the first case under the Ninth Circuit's more lenient first-to-file rule,[5] to avoid inconsistent rulings due to similar evidentiary and discovery issues. And in *Hunter Douglas, Inc. v. Nien Made Enter. Co.*, 2016 WL 6822310 at *9 (C.D. Cal. May 23, 2016), also applying the more lenient Ninth Circuit analysis, the court transferred the case because the first court was "intimately involved" in similar litigation with similar parties and related patents.

Here, in contrast, Netlist filed this case long after the California cases on different patents were stayed—and it is not clear those cases will ever proceed. Moreover, contrary to SK hynix's struggle to demonstrate otherwise, the court in CDCA has not been "intimately involved" in the technology, relevant discovery, or anything else that could justify transfer. There is no reasonable allegation or possibility that duplication will occur, concerning discovery disputes or otherwise. There is no risk of inconsistent adjudications. This simple fact alone dooms SK hynix's motion.

> 2.    The First-To-File Rule Does Not Apply, Because Transfer Would Not Serve Judicial Efficiency

The first-to-file rule also does not apply here because transfer to California would not serve judicial efficiency. The rule is designed "to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues[.]" *Cadle*, 174 F.3d at 603-604 (quoting *West Gulf*, 751 F.2d at 729). No such concerns exist here. There is no real potential for conflict between the actions, which involve different claims on

---

[5] The Ninth Circuit adheres to a more lenient first-to-file rule, considering just three factors: (1) the chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625-26 (9th Cir. 1991). Even under the Ninth Circuit's more lenient standard, SK hynix still could not show that transfer is warranted, because Judge Staton was not "intimately involved" in the California cases. *Cf. Hunter Douglas, Inc. v. Nien Made Enter. Co.*, 2016 WL 6822310 at *9 (C.D. Cal. May 23, 2016) (applying Ninth Circuit analysis, transferring case because first court was "intimately involved" in similar litigation with similar parties and related patents).

different patents. Courts routinely decline to apply the first-to-file rule if the cases involve different patents, even if those patents are related. *See, e.g.*, *Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2007 U.S. Dist. LEXIS 19994, at *5-6 (E.D. Tex. Feb. 22, 2007) (denying motion to transfer for cases involved related patents); *Cummins-Allison Corp. v. Glory Ltd.*, No. 2-03-CV-358, 2004 U.S. Dist. LEXIS 13839, at *9 (E.D. Tex. May 26, 2004) (same); *see also In re ASM Int'l*, N.V., 774 F. App'x 650, 652 (Fed. Cir. 2019) (denying petition for a writ of *mandamus* requesting transfer based on first-to-file rule as the second-filed case involved different patents and different claims); *Garmin Ltd. v. TomTom, Inc.*, No. 2:06-CV-338, 2007 U.S. Dist. LEXIS 15214, at *6-7 (E.D. Tex. Mar. 5, 2007) (declining to apply the first-filed rule because the two actions involved separate patents and the cases were at different stages of litigation).

Further, contrary to SK hynix's assertion, Judge Staton in California has had very little active involvement in the cases before her. She has not been presented with, let alone decided, any discover matter or substantive issues in the cases before her. This is because, in the United States, the parties have <u>only</u> litigated Netlist's patent infringement claims and SK hynix's FRAND defenses in the ITC. Simply put, Judge Staton has not been required to do anything that could possibly create the risk of inconsistent adjudications or duplication of judicial work. SK hynix therefore cannot credibly argue that the California Actions have been "heavily litigated." To the contrary, SK hynix and Netlist jointly requested that Judge Staton stay the California Actions precisely so that the parties could litigate their dispute in the ITC. *See* Mot. at Ex. 33 (staying case on joint stipulation). Not surprisingly, therefore, the discovery completed to-date was undertaken as part of the ITC investigation, not to further the California Actions. The parties presented all discovery matters and disputes to Administrative Law Judges at the ITC. This discovery is only relevant to the California Actions because the parties entered into a cross-use agreement permitting

the use of ITC discovery in the California Actions—if the stay were ever to be lifted and the matters were to proceed. Even the very few depositions that SK hynix claims were taken in the district court litigation were all captioned as, and directly relevant to, *ITC II*. *See* DeVoogd Decl. at ¶ 5. The simple reality is that the California Actions never meaningfully progressed beyond the responsive pleadings stage and some claim construction work by the parties. They have required virtually none of Judge Staton's time, sitting dormant on her administrative docket for years.

Accordingly, application of the first-to-file rule here would be improper in light of Judge Staton's limited involvement with the case and technology. *See j2 Glob. Commun's., Inc. v. Protus IP Sols., Inc.*, No. 6:08-CV-211, 2008 U.S. Dist. LEXIS 103609, at *21 (E.D. Tex. Dec. 23, 2008) (refusing to transfer when the first court never issued a claim construction order and had limited involvement with the technology). Even by SK hynix's reckoning, Judge Staton's involvement is limited to three early stage events years ago. She disqualified Netlist's original counsel before a responsive pleading was filed. She issued an order striking extrinsic claim construction evidence (prior to a *Markman* hearing that never happened on a patent that can no longer be asserted). And she stayed the case. That is not enough; it demonstrates no involvement in the substantive matters of the case and no immersion in the underlying technology. The asserted claims are different, and no possibility exists for duplication of effort among courts. The Court should deny the Motion.

3.    Transfer Will Not Result In Any Efficiencies

Notably, SK hynix does not ask to consolidate the present case with the California Actions because, apart from those actions involving different patents and claims, there is no certainty that the California Actions will ever be litigated. The first-to-file rule should only apply "where the issues presented can be resolved in an earlier-filed action pending in another district court." *West Gulf*, 751 F.2d, at 729-30. Courts routinely refuse to apply the first-to-file rule if consolidation is not requested, as failing to do so negates the purpose of the rule. *See, e.g.*, *Tinnus Enters., LLC*,

2015 U.S. Dist. LEXIS 178419, at *15-17; *Sofamor Danek Holdings, Inc. v. U.S. Surgical Corp.*, No. 98-2369 GA, 1998 U.S. Dist. LEXIS 21746 (W.D. Tenn. Nov. 16, 1998) (denying motion to transfer to an earlier filed action involving a related patent, with similar parties and technology).

All California litigation has been stayed for over two years. Only ten days ago, the parties submitted their eighth joint request to keep the California Actions stayed. *See* DeVoogd Decl., Ex. 1. No valid or enforceable patent claims remain in *California I*. Moreover, a valid, enforceable patent claim will only exist in *California II* action if Netlist successfully appeals the PTAB's Final Written Decision concerning the '623 patent. That appeal is currently pending, and given the Federal Circuit's recent decision in *Arthrex*, it may not finally resolve for the next 18-24 months. Judge Staton has also had no involvement with SK hynix's RAND counterclaims.

Netlist filed here, where venue is proper, and Netlist's "privilege to choose, or not be ousted from his chosen forum[,] is highly esteemed." *MDI, Inc. v. Minh Phan*, No. SA-07-CV-251, 2007 U.S. Dist. LEXIS 37112, at *11 (W.D. Tex. May 22, 2007) (quotation omitted). The principles required to invoke the first-to-file rule are absent here, and do not justify transfer.

### B.   Venue in the Central District of California Is Improper, Because SK hynix Has No Regular and Established Place of Business There

SK hynix fails to mention that Netlist could not have filed in CDCA under the patent venue rules, which require that a defendant have a regular and established place of business in the subject venue. *TC Heartland LLC v. Kraft Foods Group Brands, LLC*, 137 S. Ct. 1514 (2017). This also guts the motion. To Netlist's knowledge, SK hynix has no presence whatsoever in CDCA. In other words, SK hynix seeks transfer to a venue in which it is otherwise immune from a patent infringement suit under the Supreme Court's *TC Heartland* precedent. This Court should deny the requested relief for this reason alone.

**C.      The Central District of California Is Not "Clearly" More Convenient**

Even if venue were proper in CDCA (it is not), SK hynix has also failed to satisfy its heavy

burden of showing that that District is a "<u>clearly</u> more convenient" venue for this dispute. *See*

*Humble Oil & Refinery Co. v. Bell Marine Servs. Inc.*, 321 F.2d 53, 56 (5th Cir. 1963) (noting that

movant bears the burden to demonstrate good cause for transfer). This burden "reflects the

appropriate deference to which the plaintiff's choice of venue is entitled." *In re Volkswagen of*

*Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). "Thus, when the transferee venue is not <u>clearly</u> more

convenient … the plaintiff's choice should be respected." *Id.* (emphasis added); *see VLSI Tech.,*

*LLC v. Intel Corp.,* No. 19-cv-000254-ADA, 2019 U.S. Dist. LEXIS 155287 (W.D. Tex. Aug. 6,

2019) (Albright, J.) (denying motion to transfer and emphasizing importance of plaintiff's choice

of forum). The Fifth Circuit has adopted the *Gilbert* private and public interest factors to determine

whether transfer is appropriate under § 1404(a).[6] In applying these factors, the court enjoys

considerable discretion and assesses the case "on an 'individualized, case-by-case consideration

of convenience and fairness.'" *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010)

(quotation omitted). SK hynix never even acknowledges the "<u>clearly</u> more convenient"

requirement, and fails to provide a credible analysis of the *Gilbert* factors.

1.      <u>The Private Interest Factors Do Not Clearly Support Transfer</u>

<u>Factor 1</u>: The relative ease of access to sources of proof favor WDTX. As SK hynix

acknowledges, in patent infringement cases, "the bulk of the relevant evidence usually comes from

---

[6] The *Gilbert* private interest factors are: (1) the relative ease of access to source of proof (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The *Gilbert* public interest factors are (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflicts of laws [or in] the application of foreign law.

the defendant," and "the place where the defendant's documents are kept weighs in favor of transfer to that location." ECF No. 26 at 12; *see also In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). Here, SK hynix admits that location is South Korea. Mot. at 12. It may also be SK hynix's office in Austin, where personnel provide extensive testing, certification, and qualification of the accused products for one of its largest American customers. *See* ECF No. 1 at ¶ 12; DeVoogd Decl., Ex. 12 (LinkedIn profiles). It is certainly <u>not</u> the Central District of California, as SK hynix has no presence there. What is more, the parties have already conducted extensive discovery in the ITC actions, and the parties' prior cross-use agreements vastly reduces the weight of this factor. And if any further discovery is necessary, as this Court has recognized, access to documents located on a server can be near instantaneous. *Fintiv, Inc. v. Apple, Inc.*, No. 6:18-cv-00372-ADA, 2019 U.S. Dist. LEXIS 171102, at *12 (W.D. Tex. Sept. 10, 2019).

<u>Factor 2</u>: At best for SK hynix, the availability of compulsory process in this district is neutral. It argues that several non-party witnesses reside in California, but fails to explain how this factor favors transfer and fails to show that any potential witness is unwilling to testify. "When no party has alleged or shown any witness's unwillingness, a court should not attach much weight to the compulsory process factor." *CloudofChange, LLC v. NCR Corp.*, No. 6-19-cv-00513 (W.D. Tex. Mar. 17, 2020) (citation omitted). In fact, Dr. Hyun Lee and Mr. Noel Whitley both voluntarily participated in the ITC actions. SK hynix also points to a patent prosecution attorney and witnesses for suppliers of components of the accused products. However, SK hynix does not argue that these witnesses live within 100 miles of CDCA and merely notes that these witnesses, who may not testify at trial, live in the state of California. Certainly, no such alleged witness availability issues arose in or impaired the ITC proceedings.

Factor 3: The cost of attendance for willing witnesses weighs against transfer. While the convenience of witnesses is an important factor, the convenience of non-party witnesses carries the most weight. *ADS Sec. L.P. v. Advanced Detection Sec. Servs.*, No. A-09-CA-773 LY, 2010 U.S. Dist. LEXIS 27903, at *11 (W.D. Tex. Mar. 23, 2010). In addition, "long lists of potential party and non-party witnesses do not affect the Court's analysis for this factor." *Fintiv*, 2019 U.S. Dist. LEXIS 171102, at *18 ("[T]he Court assumes that no more than a few party witnesses—and even fewer third-party witnesses, if any—will testify live at trial."). In its motion, SK hynix only argues that travel to CDCA would be more convenient for party employees and witnesses. ECF No. 26 at 13-14. SK hynix does not even address the cost of attendance for any non-party witnesses. *Id.* Thus, this factor weighs against transfer, as courts rightly accord little weight to such vague and general statements. *See ADS Sec. L.P.*, 2010 U.S. Dist. LEXIS 27903, at *11-13.

Factor 4: No practical problems for an easy, expeditious, and inexpensive case exist justifying transfer. Again, the California Actions have been stayed for over two years, and never substantively progressed. Judge Staton did not issue any substantive or dispositive rulings. As a result, no practical impediments exist that would make it more difficult for the parties to proceed in this Court expediently, cost-effectively, and without undue complications. The California actions went dormant well in advance of the close of fact discovery, before any claim construction order, and before any other dispositive rulings. "Although judicial economy is not among the list of the enumerated factors, it can be a consideration when determining whether a transfer is in the interest of justice." *Tinnus Enters.*, 2015 U.S. Dist. LEXIS 178419, at *23. Further, the cases SK hynix cites are inapposite. First, the court in *Affinity Labs* transferred the case to NDCA in part because the other case still had pending and <u>active</u> claims involving patents related to the asserted patents. *Affinity Labs of Texas, LLC v. Samsung Elecs. Co.,* No. 6:13-cv-364, 2014 WL 12570501,

at \*3 (W.D. Tex. June 10, 2014). Here, PTAB invalidated all patents asserted in California and, for at least the past two years, the parties have agreed not to litigate there. Second, in *XY*, the earlier lawsuit proceeded through claim construction and a three-week jury trial—and a forum selection clause mandated transfer. *XY, LLC v. Trans Ova Genetics, LC,* No. W-16-CA-00447-RP, 2017 U.S. Dist. LEXIS 218449, at \*2 (W.D. Tex. Apr. 5, 2017). This case is very different, as already demonstrated. SK hynix also baselessly speculates as to this factor that Netlist's intention in filing in this District was to create a "wasteful duplication of efforts" or avoid "adverse rulings." (Mot. at 12). But there is nothing to duplicate, and no ruling in California is relevant to the merits here.

2.    The Public Interest Factors Do Not Clearly Support Transfer

Factor 1: Administrative difficulties do not favor transfer because, at best for SK hynix, CDCA has a similar time to trial. This factor focuses on court congestion, and the relevant inquiry is how quickly the court brings the case to trial and resolves the action. *Genentech*, 566 F.3d at 1347. This Court's default is trial less than 18 months after the CMC, and has set most, if not all, patent cases for trial within ~18 months after filing. *EROAD Ltd. v. PerDiemCo LLC*, No. 6:19-CV-00026-ADA (W.D. Tex. Sept. 19, 2019). As a result, a likely time to trial is 22.5 months or earlier. CDCA's similar time to trial of 22.3 months does nothing to support transfer.

Factor 2: This district's localized interests in the events that gave rise to the suit argue against transfer. *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009). For example, personnel in SK hynix's Austin office provide "extensive testing, certification, and qualification of the accused LRDIMM and RDIMM memory modules for specific use" in the products of one of SK hynix's largest American customers resident in this District. ECF No. 1 at ¶ 12. SK hynix ignores these allegations and does not meaningfully contest them. *See* ECF No. 26 at 14. Again, SK hynix cites inapplicable precedent. In *Dataquill*, the plaintiff unpersuasively argued that sales of iPhones to Austin residents alone created a localized interest. *Dataquill, Ltd. v. Apple Inc.*, No.

A-13-CA-706-SS, 2014 U.S. Dist. LEXIS 82410, at *14-15 (W.D. Tex. June 13, 2014). Here, SK

hynix's connection to the district is much more than merely selling to consumers that live in the

district. Its Austin employees work to optimize the accused products specifically for a massive

technology company resident in this District. *See* DeVoogd Decl., Ex. 12 (LinkedIn profiles). As

a result, the parties' substantial connections to this district render this factor at least neutral.

Factors 3 and 4: The other public interest factors are neutral because federal patent law

governs here. *See VLSI Tech., LLC v. Intel Corp.,* No. 19-cv-000254-ADA, 2019 U.S. Dist. LEXIS

155287, at *29 (W.D. Tex. Aug. 6, 2019). None of the public interest factors favor transfer, and

SK hynix has not come close to showing that CDCA is "clearly" more convenient than WDTX.[7]

### D.    This Case Should Remain in the Waco Division, Netlist's Choice of Forum

It is both proper and appropriate for the present case to remain in the Waco Division. If

venue is proper in WDTX, venue is proper in any division in the district. *Chapman v. Dell, Inc.,*

No. 09-CV-7, 2009 U.S. Dist. LEXIS 50654, at *6-7 (W.D. Tex. Apr. 15, 2009). SK hynix has not

met its burden to prove that the Austin Division is clearly more convenient than Waco. If anything,

SK hynix's willingness to litigate in Austin shows that its motion to transfer to California is

meritless. Regardless, SK hynix's sole argument is that its facility is physically located in Austin.

That fact, standing alone, is not enough.

### IV.    CONCLUSION

For these reasons, Netlist asks that the Court deny SK hynix's Motion in its entirety.

---

[7] Should the Court conclude it needs more information about the nature, extent, and materiality of SK hynix's contacts with this District, Netlist requests leave to conduct limited venue-related discovery. *See Parus Holdings Inc. v. Apple, Inc., et al.*, 19-cv-00432-ADA, Doc. 114 (lead case) (Feb. 27, 2020) (ordering venue discovery) (Albright, J.). This would take the form of up to 10 requests for production of documents and a single 30(b)(6) deposition of a SK hynix representative regarding its significant contacts with the District. That said, because SK hynix is nowhere close to satisfying its burden to justify transfer to California, such discovery should be unnecessary.

Dated: May 18, 2020

/s/ *Andrew H. DeVoogd*
James M. Wodarski
  (*pro hac vice pending*)
  Massachusetts BBO No. 627036
  E-mail: JMWodarski@mintz.com
Andrew H. DeVoogd
  (Admitted to practice in WDTX)
  Massachusetts BBO No. 670203
  E-mail: AHDeVoogd@mintz.com
Matthew S. Galica
  (*pro hac vice pending*)
  Massachusetts BBO No. 696916
  E-mail: MSGalica@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
  POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

J. Stephen Ravel
Texas State Bar No. 16584975
Email: steve.ravel@kellyhart.com
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

*Attorneys for Plaintiff Netlist Inc.*

16

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on May 18, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

/s/ *Andrew DeVoogd*
Andrew DeVoogd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| **NETLIST, INC.,** |  |
| **Plaintiff,** |  |
| **v.** | **Civil Action No. 6:20-cv-00194-ADA** |
| **SK HYNIX INC. and SK HYNIX AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** |  |

## DEFENDANTS' REPLY IN SUPPORT OF OPPOSED MOTION TO TRANSFER VENUE PURSUANT TO THE FIRST-TO-FILE RULE OR, ALTERNATIVELY, 28 U.S.C. § 1404(a)

**Table of Contents**

I.      The Pending Cases in California Satisfy any Threshold Requirement for Transfer........... 1

II.     Transfer Is Warranted Pursuant to the First-To-File Rule .................................................. 2

III.    Transfer is Also Warranted Under Section 1404(a) ........................................................... 4

IV.     In The Alternative, This Case Should Be Transferred to Austin ....................................... 5

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adv. Processor Techs. LLC v. Amtel Corp.*,
    No. 2:12-cv-152, 2013 WL 1279053 (E.D. Tex. Mar. 26, 2013) ............................................5

*In re ASM Int'l, N.V.*,
    774 Fed. App'x 650 (Fed. Cir. 2019) ........................................................................................3

*Aventis Pharms. Inc. v. Teva Pharms. USA Inc.*,
    No. 06-469, 2007 WL 2823296 (E.D. Tex. Sept. 27, 2007) ...................................................2, 3

*Candela Corp. v. Palomar Med. Techs., Inc.*,
    No. 06-277, 2007 U.S. Dist. LEXIS 19994 (E.D. Tex. Feb. 22, 2007) ...............................2, 3

*Cummins-Allison Corp. v. Glory Ltd.*,
    No. 03-358, 2004 U.S. Dist. LEXIS 13839 (E.D. Tex. May 26, 2004) ............................2, 3, 4

*Datamize, Inc. v. Fid. Brokerage Servs., LLC*,
    No. 03-321, 2004 U.S. Dist. LEXIS 29100 (E.D. Tex. Apr. 22, 2004) ....................................3

*Document Generation Corp. v. Allscripts*,
    No. 08-479, 2009 U.S. Dist. LEXIS 149038 (E.D. Tex., May 19, 2009) .................................3

*Garmin Ltd. v. TomTom, Inc.*,
    No. 06-338, 2007 U.S. Dist. LEXIS 15214 (E.D. Tex. Mar. 5, 2007) .....................................3

*j2 Glob. Commun's., Inc. v. Protus IP Sols., Inc.*,
    No. 08-211, 2008 U.S. Dist. LEXIS 103609 (E.D. Tex. Dec. 23, 2008) ..................................3

*Leach v. Day To Day Imports, Inc.*,
    No. 17-7351, ECF No. 50 (C.D. Cal. Nov. 14, 2017) ..............................................................2

*Tinnus Enters., LLC v. Telebrands Corp.*,
    No. 15-551, 2015 U.S. Dist. LEXIS 178419 (E.D. Tex. Aug. 31, 2015) ..................................3

**Statutes and Rules**

28 U.S.C. § 1404(a) .......................................................................................................1, 2, 4, 5

Fed R. Civ. P. 45 ..............................................................................................................................5

Fed. R. Civ. P. 45(c)(1)(B) .............................................................................................................5

Fed. R. Civ. P. 45(c)(1)(B)(ii) ........................................................................................................5

Local Rule CV-5(b) ........................................................................................................1

Netlist's opposition [ECF No. 27] does not dispute that (i) the California actions involve the same parties, accused products, infringement theories, and discovery that would be needed in this action, *see* Mot. [ECF No. 26] at 6, 8–9 & nn.6–7; (ii) the patents asserted here are continuations of the patents asserted in California, with the same specification, inventor, and priority date, *see* Mot. at 5; and (iii) the claims asserted here were found by the Patent Office to be "not patentably distinct" from those asserted in California, *see* Mot. at 5 & n.4. Netlist repeatedly suggests it will no longer litigate the patents in California given the PTAB's Final Written Decisions of invalidity, but at the same time Netlist has refused to dismiss those patents with prejudice and instead has filed an appeal in the Federal Circuit, *see* Ex. 39,[1] which is why both of Netlist's California actions remain pending. And Netlist does not even mention, let alone dispute, that SK hynix's RAND counterclaims in California encompass the two patents asserted here and are likely to moot this case. *See* Mot. at 1–3, 10. Even if Netlist were to dismiss its California claims, the RAND counterclaims would still proceed in California, overlapping with this case with respect to essentiality (i.e., infringement) and the calculation of RAND royalties. *See* Mot. at 10. Tellingly, Netlist itself successfully persuaded Judge Staton in California ***not*** to bifurcate the RAND counterclaims from its patent claims because that would "burden itself, the parties, third parties, and witnesses with two trials." Ex. 17 at 3:20; Ex. 18 at 1 (denying bifurcation). That is precisely why this action should be transferred to Judge Staton under both the "first-to-file" rule and 28 U.S.C. § 1404(a), so that she can resolve all of the claims and counterclaims between the parties in the most efficient manner possible.

I.     **The Pending Cases in California Satisfy any Threshold Requirement for Transfer**

Netlist argues that the "threshold" for transfer is not met because it "could not have filed this case" in C.D. Cal. Opp'n at 1; *see id.* at 10. But no such "threshold" exists for transfer under the first-to-file rule. Having sued SK hynix twice in C.D. Cal. on closely related patents, Netlist "waived [its] right to contest venue" when it brought its "initial action in that [venue]."

---

[1] Unless stated otherwise, cited exhibits are attached to the Hatcher Declaration [ECF No. 26-3].

*Leach v. Day To Day Imports, Inc.*, No. 17-7351, ECF No. 50 at 4 & n.1 (C.D. Cal. Nov. 14, 2017).  And with respect to the threshold requirement for transfer under § 1404(a), the proceedings in C.D. Cal. establish that all parties have "consented" to venue in that district.  *Id.* at 4 n.1; Mot. at 11 (citing Ex. 10, ¶ 8; Ex. 13, ¶ 8; Ex. 22, ¶ 8; Ex. 26, ¶ 8).  Moreover, the claims here "might have been brought" in C.D. Cal. because Netlist could have sought leave to amend its complaint in California to add the patents asserted here.  For at least these reasons, transfer is warranted.  If this case is not transferred, it should be stayed or dismissed, *see* Mot. at 8, not proceed as a duplicative case as Netlist would prefer.

## II.     Transfer Is Warranted Pursuant to the First-To-File Rule

Netlist agrees the "first-to-file" rule is governed by Fifth Circuit law, *see* Opp'n at 5 n.4, which directs that "once the district court [finds] that the issues ***might*** substantially overlap, the proper course of action [is] for the court to transfer,"[2] Mot. at 8.  The overlap between the two cases does ***not*** need to be "nearly complete" as Netlist misleadingly suggests.  *See* Opp'n at 5.[3]

Netlist also incorrectly asserts that there is "no case in which a court has invoked the Fifth Circuit first-to-file rule in a case involving different asserted patents."  Opp'n at 1.  To the contrary, transfer under the first-to-file rule was granted in a case where the "patents [asserted in E.D. Tex.] protect[ed] distinct inventions from those involved in the [first-filed] New Jersey actions."  *Aventis Pharms. Inc. v. Teva Pharms. USA Inc.*, No. 06-469, 2007 WL 2823296, at *2 (E.D. Tex. Sept. 27, 2007).  The Court "reject[ed] the suggestion that the cases will not substantially overlap," finding that the parties, infringement theories, and accused products were the same, *see id.*, just like here, *see* Mot. at 6, 8–9 & nn.6–7.

The cases cited by Netlist are easily distinguished.  *See* Opp'n at 6, 8.  They either

---

[2] Unless stated otherwise, all emphasis in quotes has been added.

[3] The cases cited by Netlist confirm this.  *See, e.g.*, *Candela Corp. v. Palomar Med. Techs., Inc.*, No. 06-277, 2007 U.S. Dist. LEXIS 19994, at *3 (E.D. Tex. Feb. 22, 2007) ("[T]he first-to-file rule applies regardless of whether the suits are identical as long as they overlap on substantive issues."); *Cummins-Allison Corp. v. Glory Ltd.*, No. 03-358, 2004 U.S. Dist. LEXIS 13839, at *6 (E.D. Tex. May 26, 2004) ("The cases need not be identical to be duplicative.").

involved unrelated patents or accused products,[4] unrelated defendants,[5] or a previous decision by the first-filed court that it did not want to proceed with the patents asserted in the second-filed court.[6]  In contrast, the facts here align with previous cases granting transfer under the first-filed rule.  *See* Mot. at 9–10;[7] *Aventis*, 2007 WL 2823296, at \*2.  As explained above, the California actions "substantially overlap" with this action, as they involve the same parties, products, and infringement theories, and SK hynix's RAND counterclaims encompass the patents asserted here

---

[4] *See In re ASM Int'l, N.V.*, 774 Fed. App'x 650, 651–52 (Fed. Cir. 2019) ("[T]he four patents in the Oregon action were directed to different subject matter than the seven patents in the California action. . . . [T]his case involves different asserted patents, claim terms, and technology than are at issue in the Northern California action."); *Tinnus Enters., LLC v. Telebrands Corp.*, No. 15-551, 2015 U.S. Dist. LEXIS 178419, at \*11-12 (E.D. Tex. Aug. 31, 2015) (declining to transfer patent case to earlier suit "invoking separate and distinct legal doctrines" of trademark, copyright, and fraud); *Candela*, 2007 U.S. Dist. LEXIS 19994, at \*4-5 (noting the patents at issue had "different claims and specifications" and the second case involved different products); *Document Generation Corp. v. Allscripts*, No. 08-479, 2009 U.S. Dist. LEXIS 149038, at \*18-20 (E.D. Tex., May 19, 2009) ("it is not clear that the same set of products had been accused" and the patents are merely continuations-in-part that contain "new matter and different claims," which "could have a substantial impact on claim construction and other issues in the case," including "different infringement arguments and different damages theories"); *j2 Glob. Commun's., Inc. v. Protus IP Sols., Inc.*, No. 08-211, 2008 U.S. Dist. LEXIS 103609, at \*21 & n.5 (E.D. Tex. Dec. 23, 2008) ("Defendants have not shown that . . . similar products are at issue. . . . [T]hese cases involve different defendants" and with respect to the one common defendant it "has not shown that the same or similar products will be at issue in both this case and the California case."); *Garmin Ltd. v. TomTom, Inc.*, No. 06-338, 2007 U.S. Dist. LEXIS 15214, at \*5-7 (E.D. Tex. Mar. 5, 2007) ("[T]he '378 patent is not in the same family as the patents in the Wisconsin case.").

[5] *Datamize, Inc. v. Fid. Brokerage Servs., LLC*, No. 03-321, 2004 U.S. Dist. LEXIS 29100 at \*11 (E.D. Tex. Apr. 22, 2004) ("different defendants… different accused products, and a different industry").

[6] *Cummins-Allison*, 2004 U.S. Dist. LEXIS 13839, at \*2-3, \*8-9 (at the urging of the defendants, the first-filed court "refused to allow the additional patents to be added" and instead ruled "they should be the subject of a new cause of action"); *see also Aventis*, 2007 WL 2823296, at \*2 (distinguishing *Cummins-Allison* on this basis).  Here, Netlist never asked SK hynix or Judge Staton about adding these patents to the pending California litigation.

[7] Netlist's attempt to distinguish these cases falls short.  *See* Opp'n at 6–7.  Netlist's suggestion that the "first-to-file" rule should only apply to cases "filed close in time" raises a distinction without a difference: the chronological order of the cases—not the absolute length of time between them—is the relevant consideration under a first-to-file analysis.  Nor is there any merit to Netlist's assertion that the Ninth Circuit applies a "more lenient" articulation of the "first-to-file" rule than the Fifth Circuit.  Opp'n at 6–7 & n.5.  As SK hynix explained, the two circuits apply the same rule, *see* Mot. at 9 n.10, and thus the factually analogous cases SK hynix has identified are persuasive authority to which Netlist offers no meaningful response.

3

and would proceed even if Netlist dismissed its patents in California with prejudice (which it has refused to do).

Netlist incorrectly states "SK hynix has agreed that the parties should not litigate in California, including in the most recent status report." Opp'n at 3.[8] To the contrary, SK hynix has merely consented to Judge Staton's stated preference that the proceedings in C.D. Cal. be held in abeyance pending resolution of related IPR and ITC proceedings; SK hynix never suggested, much less agreed, that the parties should never litigate in California. Moreover, the parties' most recent joint status report to Judge Staton explicitly stated that "the parties intend to submit an interim status report addressing the status of this litigation and the stay after [W.D. Tex.] rules on SK hynix's pending motion to transfer." Dkt. 27-4, Ex. 1 at 2:12–:17. Netlist's complaint that "SK hynix does not ask to consolidate the present case with the California Actions," Opp'n at 9, is equally misplaced because consolidation is an issue for Judge Staton to resolve after transfer, not something to be decided here. *See, e.g.*, *Cummins-Allison*, 2004 U.S. Dist. LEXIS 13839, at *6-7 (once "substantial overlap" is identified, "the 'first-to-file' rule gives the *first-filed* court the responsibility to determine which case should proceed"); Mot. at 7–8.

## III.    Transfer is Also Warranted Under Section 1404(a)

Transfer under § 1404(a) is also warranted. *See* Mot. at 11–15. Netlist does not dispute that the handful of SK hynix employees in Austin are irrelevant to the issues in this case, as

---

[8] Netlist also argues that the California actions have not been "heavily litigated," Opp'n at 1–2, but that is not the test under the first-filed rule, where often the two cases are filed close in time and thus little litigation has taken place in either forum. In any event, Netlist's argument ignores the substantial discovery and motion practice that has occurred in California. *See* Mot. at 2–4. For instance, Judge Staton has issued four opinions totaling dozens of pages that resolved disputed issues, *see* Exs. 16, 18, 21, 25, including one requiring the Judge to conduct "a comparison of [Netlist's] experts' testimony in the ITC trial and in the present declarations [that] show[ed] extensive elaboration and a few entirely new opinions," including regarding the '837 patent, Ex. 21 at 2. Netlist dismisses most of the discovery in C.D. Cal. as irrelevant because it was part of a cross-use agreement between the ITC and C.D. Cal., *see* Opp'n at 3, 8–9, but that cross-use agreement only ***favors*** application of the first-to-file rule because it does not apply to this action. The possibility that this discovery could conceivably (though not necessarily) become available in this case is irrelevant to the first-to-file analysis, as that possibility is true in every case in which the first-to-file rule involves identical parties (which is usually the case).

confirmed by the fact that after years of discovery, dozens of depositions, and two trials involving the same products, theories of infringement, and RAND issues, neither party ever asked any of those employees to testify. *See* Mot. at 7, 14; Kim Decl. ¶¶ 10–11 [ECF No. 26-4]. And California is clearly more convenient to the witnesses, which is why the vast majority of the depositions took place there, and none took place in Texas. *See* Hatcher Decl. ¶¶ 6–11 [ECF No. 26-3]. The fact that Netlist's employees sometimes travel to Texas does not change the fact they all live and work in C.D. Cal. where Netlist is headquartered, and they could not be compelled to testify here.[9] *See also Adv. Processor Techs. LLC v. Amtel Corp.*, No. 2:12-cv-152, 2013 WL 1279053, at *8 (E.D. Tex. Mar. 26, 2013) (discounting where parties "frequently travel" in § 1404(a) analysis). Regarding the ***nine*** third-party witnesses in California, Netlist misleadingly argues that "Dr. Hyun Lee [the sole inventor on the asserted patents] and Mr. Noel Whitley [the key executive relevant to the RAND issue] both voluntarily participated in the ITC actions," Opp'n at 12, but that was ***before*** they left Netlist, and Netlist provides no reason to believe they would volunteer to travel from C.D. Cal. to Texas now. Netlist also ignores that two of the three third-party suppliers of the components accused of infringement produced their witnesses in C.D. Cal., *see* Hatcher Decl. ¶ 9 [ECF No. 26-3] (Rambus and Montage), and that the prosecutor of the patents could be compelled to testify in C.D. Cal. but not here, *see* Fed. R. Civ. P. 45(c)(1)(B)(ii). Netlist does not identify any relevant witnesses in Texas, much less in Waco.

## IV.    In The Alternative, This Case Should Be Transferred to Austin

Netlist does not provide any cogent justification for why, if the Court retains this case, it should not be transferred to the Austin Division. The only connections Netlist identifies to this District are the SK hynix employees in Austin discussed above, nothing in Waco.

---

[9] The 2013 amendments to Rule 45 clarified that only "a party or a party's ***officer***" — not a mere employee, like Netlist points to when it argues its personnel travel to Texas, Opp'n at 4 — can be compelled to testify in a state where he "regularly transacts business in person," Fed. R. Civ. P. 45(c)(1)(B). Thus, none of Netlist's witnesses could be compelled to testify here.

Date:  May 26, 2020                              Respectfully submitted,

                                     By:  /s/ Brian R. Nester

David C. Giardina                           Michael D. Hatcher (*pro hac vice*)
Illinois Bar No. 6225008 (*pro hac vice*)   Texas Bar No. 24027067
SIDLEY AUSTIN LLP                           SIDLEY AUSTIN LLP
One South Dearborn                          2021 McKinney Avenue, Suite 2000
Chicago, IL 60603                           Dallas, TX 75201
Telephone:  (312) 853-7000                  Telephone:  (214) 981-3300
Facsimile:  (312) 853-7036                  Facsimile:  (214) 981-3400
dgiardina@sidley.com                        mhatcher@sidley.com

Theodore W. Chandler                        Barry K. Shelton
California Bar No. 219456 (*pro hac          Texas State Bar No. 24055029
vice*)                                      SHELTON COBURN LLP
SIDLEY AUSTIN LLP                           311 RR 620, Suite 205
555 West Fifth Street                       Austin, TX 78734-4775
Los Angeles, CA 90013                       Telephone: (512) 263-2165
Telephone:  (213) 896-6000                  Facsimile: (512) 263-2166
Facsimile:  (213) 896-6600                  bshelton@sheltoncoburn.com
tchandler@sidley.com
                                            COUNSEL FOR DEFENDANTS
Brian R. Nester                             SK HYNIX INC. AND SK HYNIX AMERICA INC.
DC Bar No. 460225 (*pro hac vice*)
Joseph A. Micallef
DC Bar No. 443679 (*pro hac vice
forthcoming*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 26, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Brian R.Nester*
Brian R. Nester

# Exhibit 42
# (Annotated)

| | |
|---|---|
| **From:** | Hatcher, Michael D. |
| **Sent:** | Friday, June 12, 2020 3:04 PM |
| **To:** | Joshua Yi; Barry Shelton |
| **Cc:** | Nester, Brian; Nissly, Kenneth (EXTERNAL @NISSLYLAW.COM); Micallef, Joseph; AHDeVoogd@mintz.com; jmwodarski@mintz.com; msgalica@mintz.com; Steve Ravel |
| **Subject:** | Submission in Netlist, Inc. v. SK hynix Inc. (6:20-cv-194-ADA) in Response to Oral Order During June 11 Teleconference |

Dear Mr. Yi,

The parties conferred as ordered during the teleconference yesterday, Dkt No. 36, in the case referenced in the subject line.  Netlist has agreed to withdraw its First Amended Complaint adding the '523 patent to this case by Monday, and will file a separate case next week in which it will assert that patent, and that patent only.  SK hynix has agreed to accept service of that new complaint for that new case, and the parties have agreed to extend the period to answer that new complaint to August 21, 2020.

In light of the above, the parties further agreed that SK hynix's motion to transfer in this case is ripe for decision, and that further briefing is not required.

Please let us know if the Court has any questions.

Best,
Mike


**MICHAEL D. HATCHER**

**SIDLEY AUSTIN LLP**
+1 214 981 3428
mhatcher@sidley.com

---

**From:** Joshua Yi <Joshua_Yi@txwd.uscourts.gov>
**Sent:** Wednesday, June 10, 2020 11:20 PM
**To:** Barry Shelton <bshelton@sheltoncoburn.com>
**Cc:** Hatcher, Michael D. <mhatcher@sidley.com>; Nester, Brian <bnester@sidley.com>; Nissly, Kenneth (EXTERNAL @NISSLYLAW.COM) <knissly@nisslylaw.com>; Micallef, Joseph <jmicallef@sidley.com>; AHDeVoogd@mintz.com; jmwodarski@mintz.com; msgalica@mintz.com; Steve Ravel <steve.ravel@kellyhart.com>
**Subject:** RE: Rescheduling CMC in Netlist, Inc. v. SK hynix Inc. (6:20-cv-194-ADA)

Counsel,

The Court will calendar this case for a telephonic scheduling conference for 3PM on Thursday.  Thanks.

-Josh

**From:** Barry Shelton <bshelton@sheltoncoburn.com>
**Sent:** Wednesday, June 10, 2020 5:53 PM
**To:** Joshua Yi <Joshua_Yi@txwd.uscourts.gov>
**Cc:** Hatcher, Michael D. <mhatcher@sidley.com>; Nester, Brian <bnester@sidley.com>; Nissly, Kenneth
(EXTERNAL @NISSLYLAW.COM) <knissly@nisslylaw.com>; Micallef, Joseph <jmicallef@sidley.com>;
AHDeVoogd@mintz.com; jmwodarski@mintz.com; msgalica@mintz.com; Steve Ravel
<steve.ravel@kellyhart.com>
**Subject:** Rescheduling CMC in Netlist, Inc. v. SK hynix Inc. (6:20-cv-194-ADA)

Josh,

You probably recall that the Court recently set the CMC in *Netlist, Inc. v. SK hynix Inc.*, Case 6:20-cv-194-ADA,
after SK hynix filed a motion to transfer such that the CMC was set nearly two months before SK hynix's deadline
to answer the original complaint. Yesterday Netlist filed an amended complaint adding yet another asserted
patent, U.S. Patent No. 10,217,523; this patent issued a year before Netlist filed its original complaint. Given the
addition of this patent – which relates to 3 patents Netlist asserts in the Central District of California (the forum
to which SK hynix has requested transfer) – Defendant requests a conference with the Court to discuss
rescheduling the CMC to avoid the manifest prejudice to SK hynix from having to work on preliminary invalidity
contentions nearly a month and half before answering.

Regards,

Barry

**Barry K. Shelton | Partner**
Shelton Coburn LLP
311 RR 620 S, Suite 205
Austin, Texas 78734-4775
T: (512) 263-2165 **|** F: (512) 263-2166 **|** M: (512) 517-9998
bshelton@sheltoncoburn.com | www.sheltoncoburn.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **NETLIST, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 6:20-cv-00194** |
| **SK HYNIX INC. and SK HYNIX AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## DEFENDANT SK HYNIX'S ANSWER, AFFIRMATIVE DEFENSES, & COUNTERCLAIM

Defendants SK hynix Inc. and SK hynix America Inc. (collectively, "Defendants" or "SK hynix") hereby submit their Answer, Affirmative Defenses, and Counterclaim in response to the First Amended Complaint for Patent Infringement ("Amended Complaint") of Plaintiff Netlist, Inc. ("Netlist"). Each of the paragraphs and headings in the answer below corresponds to the same-numbered paragraph and headings in the Amended Complaint. Footnotes from the Amended Complaint have been omitted. Defendants deny all allegations in the Amended Complaint, whether express or implied, that are not specifically admitted below. The patents identified in the Amended Complaint are referred to collectively as the Asserted Patents in this Answer.[1] Defendants respond as follows:

---

[1] After filing the Amended Complaint, Netlist filed a notice withdrawing its allegations of infringement with respect to U.S. Patent No. 10,217,523. *See* D.I. 37. Hence, U.S. Patent No. 10,217,523 is not considered one of the "Asserted Patents."

and representations to JEDEC.  In violation of such obligations and representations, Netlist has requested excessive license fees for the Asserted Patents.

Netlist's improper attempt to expand the scope of its patent rights by seeking terms that violate Netlist's RAND obligations is barred by the doctrine of patent misuse.

## RESERVATION OF ADDITIONAL DEFENSES

Defendants reserve all defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the patent laws of the United States, and any other defenses, at law or in equity, which may now exist or in the future may be available based on discovery and further factual investigation in this case.

## COUNTERCLAIM

SK hynix Inc. ("SK hynix") asserts the following counterclaim against Netlist, Inc. ("Netlist") over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 2201, 2202, 1332, and/or 1367.  SK hynix reserves the right to assert additional counterclaims as warranted by the facts revealed through discovery.

## NATURE OF THE ACTION

1.      SK hynix brings the following counterclaim to address Netlist's ongoing refusal to abide by its binding contractual commitments to grant to SK hynix a license to patents that Netlist claims must be practiced to implement key industry standards relating to semiconductor memory products promulgated by a standard-setting organization called JEDEC on reasonable and non-discriminatory ("RAND") terms and conditions. SK hynix has, at all relevant times, been willing and able to take a license to those patents that Netlist claims are essential or potentially essential to the implementation of the relevant industry standards (i.e., Netlist's "standard essential patents" or "SEPs").  However, in contravention of the licensing commitments that

Netlist made in order to have technology over which it claims to have patents incorporated into the relevant standards, Netlist has adopted a "hold-up" strategy of making outrageous license demands followed by waves of foreign and domestic litigation seeking coercive injunctive relief preventing the importation or sale of SK hynix's standards-compliant products in order to extract unreasonable and discriminatory royalties.

2.      In order to remedy the ongoing and irreparable harm to SK hynix's business resulting from Netlist's failure to provide it a license to Netlist's claimed SEPs on RAND terms, SK hynix seeks a finding that Netlist has breached its contractual obligation to offer to SK hynix a license on such terms.

## THE COUNTERCLAIM PARTIES

3.      SK hynix is a South Korean corporation with a principal place of business at 2091, Gyeongchung-daero, Bubal-eup, Icheon-si, Gyeonggi-do, Republic of Korea.  SK hynix designs, manufactures, and sells semiconductor memory chips and modules for computer, electronic, and mobile devices ("memory products").

4.      Defendant Netlist is a Delaware corporation with a principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.  Netlist holds patents that it asserts are relevant to memory products, including patents that it claims are essential to the implementation of various JEDEC standards.  Netlist has stated to investors that it is focused on monetizing its patent portfolio and that it intends to pursue an intellectual property-based licensing business in which it will generate licensing revenue by selling or licensing its technology.

## JURISDICTION AND VENUE

5.      This is a civil action for breach of contract.

6.      This Court has subject matter jurisdiction over the breach of contract claim pursuant to 28 U.S.C. §§ 1332 and/or 1367.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen or subject of a foreign state and a citizen of Delaware and California.  The breach of contract claim forms part of the same case or controversy as the claims for patent infringement asserted by Netlist in this action.

7.      This Court has personal jurisdiction over Netlist at least because Netlist has submitted to the jurisdiction of the Court by having commenced a patent infringement action in this Court.

8.      Subject to Defendants' pending motion to transfer venue pursuant to either the first-to-file rule or 28 U.S.C. § 1404(a) (D.I. 26), venue is proper in the Western District of Texas pursuant to 28 U.S.C. §§ 1391(b).

## FACTUAL BACKGROUND

### A.  SK hynix

9.      Founded in 1983 in the Republic of Korea, SK hynix has become one of the largest providers of computer memory solutions in the global industry.  SK hynix began its successful business developing and fabricating random-access memory (RAM) products for major computer manufacturers.  The company continued expanding its partnerships and operations and currently has manufacturing facilities in South Korea and China, and over 27,000 employees.  SK hynix has also developed a continuous record of innovation and varied semiconductor product offerings sold across the globe.  It is one of the leaders in the market for various types of Dual In-Line Memory Module ("DIMM") products, widely used in the latest generation of computer and electronic devices.

10.     SK hynix has historically invested heavily in R&D, consistently spending more than 8% of its annual revenue in R&D activities.  In 2019 alone, SK hynix invested approximately $2.8 billion in R&D.  As of June 2020, it held more than 13,900 issued patents worldwide, including approximately 9,400 patents issued by the United States Patent & Trademark Office.

**B.  Netlist**

11.     Netlist was founded in 2000 and became a publicly-traded company in 2006. Netlist is headquartered in California and offers various computer memory products.  Netlist's net products sales totaled approximately $26.1 million for the fiscal year ending December 28, 2019, a 22% decrease compared to the 2018 fiscal year.  For the fiscal year 2019, resale of component products purchased by Netlist from third parties represented 77% of Netlist's net sales.

12.     Upon information and belief, Netlist has a portfolio of approximately 81 patents issued in the United States.

**C.  JEDEC and Semiconductor Memory Standards**

13.     JEDEC (formerly known as the "Joint Electron Device Engineering Council") is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States.  Over 300 companies in the computer and electronics industries are currently members of JEDEC, including SK hynix and Netlist.

14.     JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products.  As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by SK hynix's products.

15.    JEDEC's semiconductor memory standards enable interoperability, i.e., the ability of memory products made by different manufacturers to work together with computer and electronic devices made by others.  JEDEC standards are widely implemented and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

16.    Member companies participate in JEDEC's standard-setting process through over 50 committees and subcommittees that address various technological areas.  Through a collaborate process, members contribute and vote on technical proposals for incorporation into JEDEC standards.  Upon committee and Board approval, new standards are promulgated and made available to the public for free.

17.    In some cases, JEDEC members own patents covering the technology they or others seeks to have included in a JEDEC standard.  A patent that includes a claim or claims that would necessarily be infringed by the use, sale, offer for sale, or disposition of a portion of a product in order to be compliant with an industry standard is referred to as a "standard essential patent" or an "SEP."

18.    Each owner of an SEP can, unless restrained, demand and obtain exorbitant royalties for the use of its patents, far in excess of the value, if any, that the patented technology would command had it not been incorporated into a standard.  If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any portion of the standard, including even unpatented and public domain technologies.  This threat of foreclosure, if left unchecked, puts a manufacturer's huge investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard as a whole for each unique implementer, rather than the

true value of its specific contribution to the standard, independent of the incorporation of the technology into the standard. The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

19.     The problem of "hold-up" is exacerbated in the context of standards, like those at issue here, as to which there are large numbers of SEPs and many different firms that claim to hold SEPs. The problem is likewise compounded when the products at issue, like those at issue here, may be required to implement multiple standards. The resulting problem of excessive aggregate royalties is referred to as "royalty stacking."

20.     In order to mitigate these risks, JEDEC—like many other standard-setting organizations—has adopted a Patent Policy that seeks to ensure that any patent that would necessarily be practiced by implementing a JEDEC standard will be available for manufacturers of standard-compliant products to license on RAND terms and conditions. Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership*
> *or committee Participation, agree to abide by JEDEC rules and*
> *procedures, including this JEDEC patent policy ("Patent Policy").*

Exhibit 1 (JEDEC Manual No. 21S) § 8.2.2.1.

21.     Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee, and to license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership*
>
> *or committee Participation, agree to Disclose Potentially Essential*
>
> *Patents, as set forth more fully in 8.2.3, and to offer to license their*
>
> *Essential Patent Claims to all Potential Licensees on RAND terms*
>
> *and conditions, if and as consistent with 8.2.3 and 8.2.4.*

Exhibit 1 (JEDEC Manual No. 21S) § 8.2.2.1.

22.　　The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims.  Exhibit 1 (JEDEC Manual No. 21S) § 8.2.1.  "Essential Patent Claim" is further defined as those patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard.  *Id.*

23.　　The JEDEC Patent Policy provides that the disclosure of Potentially Essential Patents "shall be made as early as reasonably possible" and documented by submission to JEDEC of either a "License Assurance/Disclosure Form" or a "Notice of Refusal."  Exhibit 1 (JEDEC Manual 21S) § 8.2.3.  In order to be effective, any such License Assurance/Disclosure Form or Notice of Refusal must be delivered to the JEDEC Legal Department within thirty (30) calendar days of a draft specification's completion.  *Id.*

24.　　Member companies who disclose and agree to license on RAND terms their patents do so via the aforementioned "License Assurance/Disclosure Form" (also known as a "Letter of Assurance" or "LOA") identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> *For any Essential Patent Claims held or controlled by the entity,*
>
> *pending or participated to be filed, which are or may be required*
>
> *to implement a Standard that may result from the JEDEC Standard*
>
> *Activity, the entity hereby makes one of the following*
>
> *commitments:*
>
> *(i)    A license will be offered, without compensation, under*
> *reasonable terms and conditions that are free of any unfair*
> *discrimination to applicants desiring to utilize the license*
> *for the purpose of implementing the JEDEC Standard,*
> *subject to the terms and conditions in 8.2.4; or*
>
> *(ii)    A license will be offered, to applicants desiring to utilize*
> *the license for the purpose of implementing the JEDEC*
> *Standard under reasonable terms and conditions that are*
> *free of any unfair discrimination, subject to the terms and*
> *conditions in 8.2.4..*

Exhibit 1 (JEDEC Manual No. 21S) § 8.2.5.

25.    According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing.  Exhibit 1 (JEDEC Manual No. 21S) § 8.2.1.

*26.*    If a committee member who owns or controls patents essential or potentially essential to JEDEC standards does not disclose and agree to license them before the ballot closes, or notify the committee of an intention not to license through a so-called "Notice of Refusal," it is still obligated to offer licenses on RAND terms:

> *If a Committee Member, at its discretion, elects not to submit a*
>
> *License Assurance/Disclosure Form (see Annex A.3) at or before*
>
> *the time the ballot closes and does not otherwise provide notice of*
>
> *an unwillingness to license in accordance with 8.2.3.1, the*
>
> *Committee Member and its Affiliates will be deemed to have*
>
> *agreed to offer to grant licenses on RAND terms and conditions for*
>
> *all of its Essential Patent Claims of the balloted Standard, if and*
>
> *as consistent with 8.2.4.*

Exhibit 1 (JEDEC Manual No. 21S) § 8.2.5.

27.    Although JEDEC does not specifically set forth what terms and conditions are RAND in a given context, certain generally accepted principles have been recognized by participants in the industry, regulators, and the courts, including:

(a)  RAND royalties should be set at levels consistent with the goal of promoting widespread adoption of the standard(s) in question;

(b) Reasonable royalties for RAND-encumbered SEPs should be at levels consistent with a reasonable aggregate royalty burden for the standard-compliant product(s);

(c) An SEP owner should be limited to a reasonable royalty that reflects the economic value of its specific patented technology to the standard(s) and product(s) in question and not any additional value conferred by incorporation of that technology in the standard;

(d) An SEP owner cannot discriminate among similarly situated licensees; and

(e) Having agreed to accept a reasonable royalty for use of its patented technology to implement the standard(s) in question, the holder of an SEP has relinquished any right

it has to obtain injunctive relief at least against any firm that is willing and able to take a license on RAND terms.

28.    The JEDEC Patent Policy is to be interpreted and governed under the laws of the State of New York.  Exhibit 1 (JEDEC Manual No. 21S) § 8.2.10.  Although the JEDEC Manual 21 has been updated and amended from time to time, upon information and belief, all of the relevant provisions of the JEDEC Patent Policy have been substantively the same at all times relevant hereto.

**D.  Netlist's RAND Commitments**

29.    Upon information and belief, Netlist holds 81 patents issued in the United States, at least some of which Netlist contends are related to technologies used in various types of DIMM products, including Load-Reduced ("LRDIMM"), Registered ("RDIMM"), and Non-Volatile ("NVDIMM") memory products.

30.    Netlist is also a member of JEDEC and has participated in a number of JEDEC technical committees over time.  Upon information and belief, at the time that the relevant standards relating to RDIMM and LRDIMM technology were developed by JEDEC, Netlist was a member or attended the meetings of the committees that developed those standards.

31.    To date, and on information and belief, Netlist has disclosed that 42 of its patents are essential or potentially essential to JEDEC standards as shown in Exhibit 2 (List of Netlist Patents).

32.    Netlist has notified JEDEC that it will not offer licenses on RAND terms for several of its patents or applications it has disclosed as essential or potentially essential to JEDEC standards by submitting a "Notice of Refusal" (or "NORs").  As shown in Exhibit 2, Netlist has withdrawn some of its NORs over time and agreed to license those patents on RAND terms.

APPX0488

Upon information and belief, Netlist currently refuses to license on RAND terms 10 of the patents

or applications it has disclosed as essential or potentially essential to JEDEC standards. *See*

Exhibit 2 (List of Netlist Disclosed Patents).

33.    For the remaining patents or applications Netlist has disclosed as essential or

potentially essential to JEDEC standards—which extend to each of the thirteen patents asserted

by Netlist (including the '218 and '595 patents) against SK hynix in the underlying patent

infringement litigation, another case currently pending in W.D. Texas, two cases pending in the

C.D. Cal., cases previously brought in China and Germany, and investigations previously brought

in the ITC—Netlist has made binding commitments to offer licenses on RAND terms by virtue of

submitting the Letters of Assurance listed on Exhibit 3 and attached herein as Exhibits 4-62.

34.    The commitments that Netlist has made to license its SEPs on RAND terms

constitute binding contractual obligations that may be enforced by firms seeking to implement the

JEDEC standards, such as SK hynix.

**E. Netlist's Failure to Comply with its RAND Obligations**

35.    Although it accepted the benefits of its membership in JEDEC and voluntarily

(albeit untimely) undertook the obligation to license its SEPs on RAND terms in order to induce

JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC

standards, Netlist has failed and refused over many years to abide by these obligations.  Netlist

has engaged in a pattern of conduct indicating a general disregard of its RAND obligations, and

the specific licensing demands that it has made on SK hynix have been both unreasonable and,

upon information and belief, discriminatory.

36.    Emblematic of Netlist's intent to withhold access to its SEPs in a strategic

fashion, at the outset of the relevant period, in 2010, Netlist sought to limit its RAND

commitments to allow itself the freedom to refuse to license its patents to certain memory buffer firms that it regarded as more direct competitors, while purporting to commit to license the same patents on RAND terms to the makers of other memory products. Only after JEDEC officials intervened and warned that such conditional RAND commitments were not permitted did Netlist extend its RAND commitments to the activities of the JC-40 committee that was focused on memory buffer technology.

37.    Over the course of negotiations of various potential business arrangements dating back to 2012, Netlist has evidenced a disregard for its RAND obligations by refusing at times even to consider licensing patents subject to such RAND obligations and at others professing a desire to use its RAND-encumbered patents to favor certain industry players and disadvantage others in a manner inconsistent with its non-discrimination obligations.

38.    In November 2015, Netlist entered into a Joint Development & License Agreement with Samsung Electronics Co., Ltd. ("Samsung"), to allegedly jointly develop certain semiconductor memory products, while cross-licensing their respective patent portfolios (the "JDLA"). Public disclosures indicate that Netlist received $8 million in cash and $15 million in the form of a note that is convertible to equity and which is secured by Netlist's patents.

39.    Shortly after concluding its agreement with Samsung, in December 2015, Netlist asserted for the first time that SK hynix infringed several of its patents that are allegedly essential to JEDEC standards based on SK hynix's LRDIMM products conforming to those JEDEC standards. During subsequent negotiations, Netlist demanded that SK hynix pay hundreds of millions of dollars in royalties for a license to Netlist's portfolio. Netlist has based its demands on the now demonstrably false claim that it "invented" LRDIMMs and that it holds seminal patents that are foundational to the LRDIMM and RDIMM standards.

40.     For its part, SK hynix has at all times been willing to take a license to Netlist's patents essential to JEDEC standards on RAND terms and has negotiated (on its behalf and that of its affiliates) in good faith.  For example, in April 2016, SK hynix offered to pay Netlist a substantial royalty of millions of dollars that was based upon the conservative assumption that all of the $23 million Samsung paid to Netlist in connection with the JDLA was for rights to Netlist's patents, rather than the potential ownership interest in Netlist that Samsung received, or payments for Netlist's non-recurring engineering costs.  SK hynix has reiterated (and at times has increased) this offer in the years since then, emphasizing in its negotiations with Netlist that it was willing to raise its offers if Netlist identified any other elements of consideration that Samsung paid for a license to Netlist's patents.  Netlist has rejected all of SK hynix's offers, and has been unwilling to provide any explanation of the consideration that Samsung paid for a license to Netlist's patents.

41.     In June 2016, Netlist provided SK hynix with a new demand for a license with a term of up to four years.  Given the anticipated volume of sales over the relevant periods, Netlist's demands would again have required SK hynix to pay hundreds of millions of dollars in royalties, far in excess of what publicly-available information indicates Samsung paid for a longer term license covering its sales plus an investment in Netlist, and far in excess of any reasonable royalty based upon what SK hynix has paid other firms in the industry with much larger and more valuable portfolios.  In fact, several of Netlist's demands have asked SK hynix to pay for a license to just a portion of Netlist's patent portfolio substantially more in royalties than Netlist is worth as an enterprise based upon the price of its publicly-traded stock.

42.     Netlist continues to maintain that the terms of its June 2016 offer are consistent with its RAND licensing obligations and has repeatedly reverted to those terms in the course of subsequent negotiations.

43.     In sum, Netlist has failed to offer RAND terms to SK hynix and has breached its RAND obligations regarding its essential patents.  Upon information and belief, Netlist has unfairly discriminated against SK hynix by refusing to offer similar license terms as those enjoyed by SK hynix's chief competitor, Samsung, and, in any event, has demanded royalties from SK hynix that far exceed the incremental value of any essential patents in Netlist's portfolio.

**F.  Netlist's Litigation against SK hynix**

44.     On August 31, 2016, Netlist initiated a patent infringement action against SK hynix and two of its affiliates in the C.D. Cal, Civil Action No. 8:16-cv-01605-JLS-JCG (hereinafter "1605 C.D. Cal. Action").  In addition to damages, Netlist sought a permanent injunction against SK hynix's sales of the accused standard-compliant products.

45.     The following day, Netlist initiated an investigation against SK hynix at the ITC alleging infringement of the same patents asserted in the 1605 C.D. Cal. Action.  In its ITC action, Netlist sought an exclusion order barring the importation of SK hynix's accused standard-compliant products, as well as a cease and desist order directed to inventory in the U.S.  The only relevant forms of relief that the ITC can grant are exclusionary in nature.

46.     On June 14, 2017, before the ITC investigation had even resulted in an initial determination on Netlist's allegations of infringement, Netlist initiated another patent infringement action against SK hynix and two of its affiliates in the C.D. Cal., Civil Action No. 8:17-cv-01030-JLS-JCG (hereinafter "1030 C.D. Cal. Action").  Netlist again sought a permanent

injunction against SK hynix's sales of the accused standard-compliant products in addition to damages.

47.     Shortly thereafter, Netlist initiated another investigation against SK hynix at the ITC alleging infringement of the same patents asserted in the 1030 C.D. Cal. Action.  In its second ITC action, Netlist again sought an exclusion order barring the importation of SK hynix's accused standard-compliant products, as well as a cease and desist order directed to inventory in the U.S.

48.     On July 11, 2017, Netlist filed a fifth patent infringement suit in the Beijing Intellectual Property Court.  In that suit, Netlist again sought an injunction against SK hynix. Netlist also sought to enjoin customers that purchase LRDIMMs designed by SK hynix Inc.

49.     On July 11, 2017, Netlist filed a sixth patent infringement action in the District Court of Munich (*Landgericht München I*).  In Germany, Netlist Luxembourg S.à.r.l accused SK hynix Inc. and Hewlett-Packard GmbH, who allegedly purchases LRDIMMs designed by SK hynix Inc., of infringement of a German utility model patent.

50.     On August 11, 2017, Netlist filed a seventh patent infringement action in the Beijing Intellectual Property Court, this time against SK hynix's alleged customers.  In that suit, Netlist also sought an injunction.  Netlist again sought to enjoin alleged customers that purchase LRDIMMs designed by SK hynix Inc.

51.     All of the above-described actions that have reached a final decision have resulted in findings that all of the asserted claims of Netlist's allegedly essential patents are not infringed, invalid, or both.  In addition, SK hynix has challenged the validity of several of Netlist's declared essential patents through challenges at the relevant patent offices, which have resulted in

invalidations of nearly all of Netlist's asserted claims.  A summary of the Netlist's failures to date

in establishing that it holds even one valid and essential patent is summarized below:

| Asserted Patent | Result |
|---|---|
| US 8,359,501 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1023 Investigation |
| US 8,001,434 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1023 Investigation |
| US 8,516,185 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1023 Investigation |
| US 8,489,837 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1023 Investigation |
| US 8,756,364 | Invalid – IPR Final Written Decision |
| | Withdrawn from 337-TA-1023 Investigation |
| US 8,689,064 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1023 Investigation |
| US 9,606,907 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1089 Investigation |
| US 9,535,623 | Invalid – IPR Final Written Decision |
| | Not Infringed – 337-TA-1089 Investigation |
| CN 201080039043 | Invalid – Chinese Patent Office |
| DE 202010018501 | Invalid – German Patent & Trademark Office |
| | Not Infringed – Final Judgment |

52.    Despite Netlist's uniform failure in establishing that it has even one valid and

essential patent in its portfolio of declared SEPs and the final determinations that patents Netlist

previously asserted to be foundational to the LRDIMM and RDIMM standards were, in fact,

invalid and not essential to the standards (as Netlist had long claimed), Netlist has refused to

adjust its licensing demands meaningfully to reflect the diminished size and value of its

potentially essential portfolio and continues to assert that the value of its portfolio is unchanged.

In so doing, Netlist has demonstrated that its demands have been and continue to be unreasonable,

untethered from any assessment of the incremental value of its patents, and thus in violation of its

RAND licensing obligations.

53.     In connection with the 1605 and 1030 C.D. Cal. Actions, SK hynix filed counterclaims that, among other things, sought a judicial determination of the RAND terms for a portfolio license to all patents that Netlist asserts to be essential.  Before both cases were stayed by agreement of the parties, Netlist resisted all attempts by SK hynix to expedite resolution of the RAND counterclaims, which would have resulted in a license on RAND terms, thereby mooting Netlist's patent infringement allegations.

54.     On March 17, 2020, Netlist filed the current patent infringement action in the Western District of Texas, Netlist's eighth patent infringement action against SK hynix, alleging infringement of two more patents allegedly essential to JEDEC standards.  Netlist's complaint accuses the same RDIMM and LRDIMM products at issue in the prior 7 actions.  Netlist's complaint seeks enhanced damages.  In addition, public statements by Netlist's President and CEO, C.K. Hong, indicate the possibility that Netlist will seek injunctive relief in this proceeding. For example, during a call with investors, Mr. Hong stated that the Western District of Texas action "provides a jury trial and the ability to seek both an injunction and damages, the latter of which was unavailable to [Netlist] at the ITC."

55.     On June 15, 2020, Netlist filed its ninth action against SK hynix in this District (C.A. No. 6:20-cv-00525) asserting infringement of U.S. Patent No. 10,217,523, which is related to the '434, '501, and '064 patents Netlist asserts in the C.D. Cal. and the ITC.

56.     At this stage, Netlist has asserted a total of thirteen patents, in nine different actions, in three different countries against the same SK hynix accused products.  The patents asserted in the 1605 C.D. Cal. Action, 1030 C.D. Cal. Action, and corresponding ITC actions are U.S. Patent Nos. 8,756,364, 8,516,185, 8,001,434, 8,359,501, 8,689,064, 8,489,847, 9,606,907, and 9,535,623; in W.D. Texas are U.S. Patent Nos. 9,858,218, 10,474,595, and U.S. Patent No.

10,217,523; in Germany is DE 20 2010 018 501 U1; and in China is ZL201080039043.0.  In its pleadings, Netlist describes the '364, '185, and '907 patents as relating to improvements in the performance or memory capacity for memory modules.  Netlist alleges the DE 20 2010 018 501 U1 and the ZL201080039043.0 patents derive from the same patent family as the '185 and '907 patents.  Netlist describes the '523, '434, '501, and '064 patents as relating to self-testing electronic memory modules.  Netlist describes the '837, '623, '218, and '595 patents as relating to memory modules that perform handshaking during or upon completion of initialization.

57.    Netlist's litigation campaign against SK hynix (and its affiliates and customers) further confirms its intent to avoid its RAND obligations.  Netlist has singled out SK hynix in an attempt to extract supra-competitive royalties and leverage the threat of injunctions to avoid its RAND obligations.  But in promising to offer a license to any of its patents essential or potentially essential to JEDEC standards on RAND terms and conditions, Netlist surrendered any rights to pick and choose which standard implementers could receive licenses and exclude implementers—like SK hynix—who are able and willing to license on RAND terms.

## FIRST CAUSE OF ACTION

### Breach of Contract

58.    SK hynix realleges and incorporates by reference the allegations set forth in the foregoing paragraphs 1-57.

59.    Subject to the terms and conditions of the JEDEC Patent Policy, Netlist has made a contractual commitment and is obligated to offer to implementers of JEDEC standards, including SK hynix and its affiliates, licenses to its essential patents on RAND terms and conditions.  In each of its Letters of Assurance, Netlist promised to make available to

implementers of the identified JEDEC standards a license "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Exhibits 4-62.

60.    Netlist claims that the patents and patent applications subject to Netlist's letters of assurance are essential to (i.e., would necessarily be infringed by complying with) JEDEC standards.

61.    Netlist has also represented to SK hynix that it owns additional patents that are, in fact, essential to JEDEC standards. To the extent that any of Netlist's patents or applications that Netlist claims are essential were not disclosed to JEDEC and to the extent that Netlist has not otherwise timely provided to JEDEC a Notice of Refusal with respect to such patents, JEDEC's Patent Policy obligates Netlist to license them on RAND terms.

62.    SK hynix and its affiliates are third-party beneficiaries to Netlist's RAND obligations. SK hynix has at all times been willing to take a license (on its behalf and that of its affiliates) to Netlist's essential patents on RAND terms and conditions.

63.    Netlist has nonetheless failed to offer a license to its essential patents on RAND terms and conditions, and has rejected the RAND offers made by SK hynix. Netlist instead has made royalty demands that are wholly disproportionate to the royalties that its patents should command under a reasonable calculation and, upon information and belief, discriminatory in comparison to what SK hynix's similarly-situated chief competitor, Samsung, has paid for a license to Netlist's SEPs.

64.    Netlist has further sued SK hynix, and its affiliates and customers, for alleged infringement of patents it claims are essential to JEDEC standards, seeking injunctive relief to bar SK hynix's products from the U.S., Chinese, and German markets notwithstanding the fact that

SK hynix is, and at all times relevant hereto has been, willing, able, and entitled to take a license to Netlist's patents on RAND terms.

65.    Netlist has further refused to adjust its royalty demands in light of its repeated and consistent failures to establish that it holds any valid and essential patents that read on SK hynix's JEDEC-compliant RDIMM and LRDIMMs.

66.    Netlist has therefore breached its contractual obligations to license its essential patents to SK hynix and its affiliates on RAND terms and conditions.

67.    As a result of Netlist's contractual breach, SK hynix has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEPs on RAND terms, a license which can only be obtained from Netlist.  SK hynix's inability to obtain a license to Netlist's SEPs on RAND terms, coupled with Netlist's campaign of baseless litigation against SK hynix, has and continues to threaten SK hynix with imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

68.    SK hynix has suffered and will continue to suffer irreparable injury by reason of Netlist's acts, practices, and conduct alleged above unless the Court enjoins such acts, practices, and conduct.

## **PRAYER FOR RELIEF**

WHEREAS, Counterclaim Plaintiff SK hynix prays that this Court enter judgment against Counterclaim Defendant Netlist as follows:

A.    Adjudge and decree that Netlist is liable for breach of contract;

B.    Grant injunctive relief requiring Netlist to offer a license to the patents it asserts are essential or potentially essential to the JEDEC standards—including the

Asserted Patents—on reasonable terms and conditions that are demonstrably free of any unfair discrimination;

C.    Enjoining Netlist from further demanding excessive, non-RAND royalties from SK hynix;

D.    Declare that Netlist is barred from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) or its direct or indirect customers in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards;

E.    Enjoining Netlist from seeking and/or enforcing injunctive relief against SK hynix (including its affiliates) or its direct or indirect customers in any jurisdiction with respect to any alleged infringement of any patent essential to JEDEC standards;

F.    Compensate SK hynix for all damages caused by Netlist's breach of its RAND obligations;

G.    Award SK hynix its attorneys' fees;

H.    Grant SK hynix its costs and expenses;

I.    Such other equitable relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

SK hynix demands a jury trial for all issues deemed to be triable by a jury.

Date:  July 21, 2020                    Respectfully submitted,

                                        By:  */s/ Brian R. Nester*                    

David C. Giardina                       Michael D. Hatcher (*pro hac vice*)
Illinois Bar No. 6225008 (*pro hac vice*)   Texas Bar No. 24027067

66

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
dgiardina@sidley.com

Theodore W. Chandler
California Bar No. 219456 (*pro hac vice*)
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
tchandler@sidley.com

Brian R. Nester
DC Bar No. 460225 (*pro hac vice*)
Joseph A. Micallef
DC Bar No. 443679 (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

Kenneth L Nissly
California Bar No. 77589 (*pro hac vice*)
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3462
Saratoga, California  95070
Telephone: (408) 398-7043
knissly@nisslylaw.com

SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400
mhatcher@sidley.com

Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620, Suite 205
Austin, TX 78734-4775
Telephone: (512) 263-2165
Facsimile: (512) 263-2166
bshelton@sheltoncoburn.com

COUNSEL FOR DEFENDANTS
SK HYNIX INC. AND SK HYNIX AMERICA INC.

## **CERTIFICATE OF SERVICE**

The foregoing document was filed under the Court's CM/ECF system, automatically effecting service on counsel of record for all other parties who have appeared in this action on the date of such service.

*/s/ Barry K. Shelton*
Barry K. Shelton

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                            WACO DIVISION

 3   NETLIST, INC.                *    June 19, 2020
                                  *
 4   VS.                          *  CIVIL ACTION NO. W-20-CV-194
                                  *
 5   SK HYNIX, INC, ET AL         *

 6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                TELEPHONIC SCHEDULING CONFERENCE
 7
     APPEARANCES:
 8
     For the Plaintiff:      Andrew H. DeVoogd, Esq.
 9                           James M. Wodarski, Esq.
                             Matthew Galica, Esq.
10                           Mintz, Levin, Cohn, Ferris, Glovsky
                                and Popeo P.C.
11                           One Financial Center
                             Boston, MA 02111
12
                             J. Stephen Ravel, Esq.
13                           Kelly Hart & Hallman LLP
                             303 Colorado Street, Suite 2000
14                           Austin, TX 78701

15   For the Defendant:      Barry K. Shelton, Esq.
                             Shelton Coburn LLP
16                           311 RR 620 S, Suite 205
                             Austin, TX 78734-4775
17
                             Brian Ralph Nester, Esq.
18                           Sidley Austin - Washington
                             1501 K St NW
19                           Washington, DC 20005

20                           Michael D. Hatcher, Esq.
                             Sidley Austin LLP
21                           2021 McKinney Avenue, Suite 2000
                             Dallas, TX 75201
22
                             Kenneth L. Nissly, Esq.
23                           Law Offices of Kenneth L. Nissly
                             P.O. Box 3462
24                           Saratoga, CA 95070-1462

25
```

2

```
1   Court Reporter:            Kristie M. Davis, CRR, RMR
                               PO Box 20994
2                              Waco, Texas 76702-0994
                               (254) 340-6114
3

4        Proceedings recorded by mechanical stenography, transcript

5   produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (June 19, 2020, 3:47 p.m.)

2        MS. MILES:  Telephonic scheduling conference in Civil

3    Action 6:20-CV-194, styled Netlist, Incorporated versus SK

4    hynix Incorporated, SK hynix America Incorporated.

5        THE COURT:  If I could hear from counsel for each side.

6        MR. RAVEL:  Your Honor, for the plaintiff Netlist it's

7    Steve Ravel.  Along with me are three lawyers from the Mintz

8    firm Jim Wodarski who will be speaking primarily, Drew Devoogd

9    and Matt Galica.  Our CFO Gail Sasaki is on the phone, and our

10   chief licensing officer Marc Frechette is also on the phone.

11       THE COURT:  Very good.  If I could hear from counsel for

12   the defendant.

13       MR. SHELTON:  Good afternoon, Your Honor.  This is Barry

14   Shelton of Shelton Coburn LLP.  Today from Sidley Austin we

15   have Brian Nester and Mike Hatcher and also Ken Nissly from the

16   Nissly Law Firm.

17       THE COURT:  Very nice.

18       Mr. Nester, I think this is the first time I've had the

19   honor of having you in my court, isn't it?

20       MR. NESTER:  It's nice to be before you, Your Honor.

21       THE COURT:  And so it's wonderful to hear from you again.

22   It's been probably a decade since I last got to chat with you.

23   So I'm glad you're involved in this case.  I have to -- and

24   you're now at Sidley?

25       MR. NESTER:  That's correct, Your Honor.

4

1      THE COURT:  Okay.  Well, they're lucky to get you.

2      So let me see.  After a Markman and six other conferences,

3  my brain only has so much I would say RAM left, but then Barry

4  Shelton would make fun of me at some point for not knowing what

5  I meant.

6      So let me see.  I have down that we can do a Markman for

7  you all on November 20th.  Is that -- from the plaintiff does

8  that work for you all?

9      MR. WODARSKI:  Yes.  This is Jim Wodarski, Your Honor.  We

10  saw the e-mail this morning that said November 19th, but

11  November 19th or November 20th is available.  And we would

12  agree to that.

13      THE COURT:  Okay.  Mr. Nester?

14      MR. NESTER:  Your Honor, we would request that the Markman

15  be extended into January because of an overlapping schedule.

16  Just to give you the background there, between September and

17  November, which is where the Markman process is now in this

18  Court, we also have an ITC litigation during which we'll do

19  both claim construction briefing, the hearing, all fact

20  discovery needs to be completed, and we'll also get deep into

21  expert discovery during that same period.  So if we could move

22  to a later date, it would -- we would prefer it.  We would

23  request it for that reason.

24      THE COURT:  Okay.  Let me go back for a second.  My clerk

25  just said he meant to tell me the 19th.  So I'm about to

1  address what Mr. Nester said, but for -- just for -- it's clear

2  for everyone, the date we're talking about is the 19th and not

3  the 20th.

4      Let me hear from counsel for plaintiff why I would not

5  delay this case if there isn't -- are the same patents in the

6  ITC case?

7      MR. NESTER:  Your Honor, it's a separate matter

8  altogether.  It's not Netlist.

9      THE COURT:  I'm sorry.  Okay.  So it's not -- it's not

10 that it's duplicative.  It's just that you might need more

11 bandwidth -- there's only so much time in the day and you might

12 need more time because you have an ITC case and, as Mr. Shelton

13 knows, I've at least sat there for those.  So...

14     (Laughter.)

15     THE COURT:  So I've attended them.  And so the problem is

16 you all would like some more time.  Let me do this.  Give me

17 one second.  If you all would hold on just a second, I'm going

18 to be chatting with my law clerk to see what we want to do

19 about possibly changing the date.  So I will be -- I will be

20 right back.

21     MR. NESTER:  Thank you, Your Honor.

22     THE COURT:  Mr. Shelton, can you hear me?

23     MR. SHELTON:  Yes, sir.

24     THE COURT:  Okay.  Very good.

25     So here's what we're going to do in the case.  We are

1  going to set the Markman hearing for December 10th and we're

2  going to set the case for trial on October 26th of 2021.  A

3  formal order will be coming out setting the trial date.

4      So that being said, is there anything else that we need to

5  take up with respect to anything that will happen prior to the

6  Markman?  I'll start with the plaintiff.

7      MR. WODARSKI:  Your Honor, this is Jim Wodarski.  Thank

8  you for that.  I don't believe we have any other issues we

9  would need to raise for events prior to the Markman.

10      THE COURT:  Okay.  And my understanding is that there's a

11  motion to transfer venue to the Central District of California.

12  It is now ripe.  You all can anticipate that motion being

13  resolved no later than by the end of July and hopefully sooner

14  than the end of July.

15      Counsel for hynix, is there anything else we need to take

16  up with respect to either the Markman hearing or anything else?

17      MR. NESTER:  Your Honor, this is Brian Nester again.  So

18  if Your Honor would entertain argument, we are obviously

19  prepared to do that on the motion to transfer.  There -- we

20  have seen your --

21      THE COURT:  We'll have argument.  Not today.  Neither of

22  you want what's left of my brain power today.  But fortunately

23  for you all every trial I had set in July was -- had to be

24  pushed back and so I have plenty of time between now and the

25  end of July to read the motion and I will set it for a hearing

1  that will probably take place by Zoom.  And so if -- in fact,

2  as soon as -- it may be as quickly as next week I hope.  In

3  fact, it should be as quickly as next week that I have an

4  opportunity to read everything, and so I would anticipate

5  having a hearing by Zoom with -- it's hard to say because

6  there's a 4th of July coming up, but if it's at all possible,

7  I'll have a hearing on that motion within the next two weeks.

8  Failing that, it will be the week after July 4th.

9        MR. NESTER:  Very good, Your Honor.  Thank you.

10       THE COURT:  Anything else?

11       MR. NESTER:  Not from SK hynix, Your Honor.

12       THE COURT:  Okie dokie.  Well, as I've said a thousand

13 times, I have the best job on the planet because the lawyers

14 who come in front of me are the best lawyers that could

15 possibly handle litigation.  I appreciate each one of you, and

16 I hope that you be safe out there and have a great weekend.

17 Take care.

18       (Hearing adjourned at 4:00 p.m.)

19

20

21

22

23

24

25

8

```
 1   UNITED STATES DISTRICT COURT )

 2   WESTERN DISTRICT OF TEXAS     )

 3

 4        I, Kristie M. Davis, Official Court Reporter for the

 5   United States District Court, Western District of Texas, do

 6   certify that the foregoing is a correct transcript from the

 7   record of proceedings in the above-entitled matter.

 8        I certify that the transcript fees and format comply with

 9   those prescribed by the Court and Judicial Conference of the

10   United States.

11        Certified to by me this 26th day of August 2020.

12
                                    /s/ Kristie M. Davis
13                                  KRISTIE M. DAVIS
                                    Official Court Reporter
14                                  800 Franklin Avenue
                                    Waco, Texas 76701
15                                  (254) 340-6114
                                    kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| NETLIST, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>SK HYNIX INC. and<br>SK HYNIX AMERICA INC.<br><br>    Defendants. | Civil Action No. 6:20-cv-00525-ADA<br><br>**JURY TRIAL DEMANDED** |
| NETLIST, INC.<br><br>    Plaintiff,<br><br>vs.<br><br>SK HYNIX INC. and<br>SK HYNIX AMERICA INC.<br><br>    Defendants. | Civil Action No. 6:20-cv-00194-ADA<br><br>**JURY TRIAL DEMANDED** |

### AMENDED SCHEDULING ORDER GOVERNING THE '525 AND '194 CASES

The Court **ORDERS** that the following schedule will govern deadlines in Civil Action Nos. 6:20-cv-00525-ADA and 6:20-cv-00194-ADA, consolidated as Civil Action No. 6:20-cv-00194-ADA.

| Date/Deadline | Item |
|---|---|
| October 16, 2020 | Fact Discovery opens. |

| Date/Deadline | Item |
| --- | --- |
| November 6, 2020 | 194[2] - Parties file Reply claim construction briefs. |
| November 20, 2020 | Deadline to serve Initial Disclosures per Rule 26(a). |
| December 4, 2020 | 525[3] - Defendant serves preliminary invalidity contentions in the form of (1) a chart setting forth where in the prior art references each element of the asserted claim(s) are found, (2) an identification of any limitations the Defendant contends are indefinite or lack written description under section 112, and (3) an identification of any claims the Defendant contends are directed to ineligible subject matter under section 101. Defendant shall also produce (1) all prior art referenced in the invalidity contentions, (2) technical documents, including software where applicable, sufficient to show the operation of the accused product(s), and (3) summary, annual sales information for the accused product(s) for the two years preceding the filing of the Complaint, unless the parties agree to some other timeframe. |
| December 18, 2020 | 525 - Parties exchange claim terms for construction. |
| January 8, 2021 | 525 - Parties exchange proposed claim constructions. |
| January 12, 2021 | 525 - Parties disclose extrinsic evidence. The parties shall disclose any extrinsic evidence, including the identity of any expert witness they may rely upon with respect to claim construction or indefiniteness. With respect to any expert identified, the parties shall identify the scope of the topics for the witness's expected testimony.[4] With respect to items of extrinsic evidence, the parties |

[2] Deadlines that only apply to Civil Action No. 6:20-cv-00194-ADA are identified by a "194" prefix. Schedule items without a numeric prefix apply to both cases.
[3] Deadlines that only apply to Civil Action No. 6:20-cv-00525-ADA are identified by a "525" prefix. Schedule items without a numeric prefix apply to both cases.
[4] Any party may utilize a rebuttal expert in response to a brief where expert testimony is relied upon by the other party.

| Date/Deadline | Item |
|---|---|
| | shall identify each such item by production number or produce a copy of any such item if not previously produced. |
| January 13, 2021 | 525 - Deadline to meet and confer to narrow terms in dispute and exchange revised list of terms/constructions. |
| January 20, 2021 | 525 - Plaintiff files Opening claim construction brief, including any arguments that any claim terms are indefinite. |
| February 10, 2021 | 525 - Defendant files Responsive claim construction brief. |
| February 24, 2021 | 525 - Plaintiff files Reply claim construction brief. |
| March 10, 2021 | 525 - Defendant files a Sur-Reply claim construction brief. |
| March 12, 2021 | Parties submit Joint Claim Construction Statement.<br><br>See General Issues Note #8 regarding providing copies of the briefing to the Court and the technical adviser (if appointed). |
| March 12, 2021 | Parties submit optional technical tutorials to the Court and technical adviser (if appointed).[5] |
| March 19, 2021 | Markman Hearing at 1:30 p.m. |
| April 9, 2021 | Deadline to add parties. |
| April 16, 2021 | Deadline to serve Final Infringement and Invalidity Contentions. After this date, leave of Court is required for any amendment to Infringement or Invalidity contentions. This deadline does not relieve the Parties of their |

[5] The parties should contact the law clerk to request a Box link so that the party can directly upload the file to the Court's Box account.

| Date/Deadline | Item |
| --- | --- |
| | obligation to seasonably amend if new information is identified after initial contentions. |
| June 11, 2021 | Deadline to amend pleadings. A motion is not required unless the amendment adds patents or patent claims. (Note: This includes amendments in response to a 12(c) motion.) |
| June 25, 2021 | Deadline for the first of two meet and confers to discuss significantly narrowing the number of claims asserted and prior art references at issue. Unless the parties agree to the narrowing, they are ordered to contact the Court's Law Clerk to arrange a teleconference with the Court to resolve the disputed issues. |
| July 23, 2021 | Close of Fact Discovery. |
| July 30, 2021 | Opening Expert Reports. |
| August 27, 2021 | Rebuttal Expert Reports. |
| September 24. 2021 | Close of Expert Discovery. |
| September 29, 2021 | Deadline for the second of two meet and confer to discuss narrowing the number of claims asserted and prior art references at issue to triable limits. To the extent it helps the parties determine these limits, the parties are encouraged to contact the Court's Law Clerk for an estimate of the amount of trial time anticipated per side. The parties shall file a Joint Report within 5 business days regarding the results of the meet and confer. |
| October 1, 2021 | Dispositive motion deadline and Daubert motion deadline. See General Issues Note #8 regarding providing copies of the briefing to the Court and the technical adviser (if appointed). |
| October 15, 2021 | Serve Pretrial Disclosures (jury instructions, exhibits lists, witness lists, discovery and deposition designations). |

| Date/Deadline | Item |
|---|---|
| October 29, 2021 | Serve objections to pretrial disclosures/rebuttal disclosures. |
| November 5, 2021 | Serve objections to rebuttal disclosures and File Motions in limine. |
| November 12, 2021 | File Joint Pretrial Order and Pretrial Submissions (jury instructions, exhibits lists, witness lists, discovery and deposition designations); file oppositions to motions in limine |
| November 19, 2021 | File Notice of Request for Daily Transcript or Real Time Reporting. If a daily transcript or real time reporting of court proceedings is requested for trial, the party or parties making said request shall file a notice with the Court and e-mail the Court Reporter, Kristie Davis at kmdaviscsr@yahoo.com

Deadline to meet and confer regarding remaining objections and disputes on motions in limine. |
| November 22, 2021 | File joint notice identifying remaining objections to pretrial disclosures and disputes on motions in limine. |
| November 29, 2021 | Final Pretrial Conference. The Court expects to set this date at the conclusion of the Markman Hearing. |
| December 6, 2021 | Jury Selection/Trial. |

SIGNED this _____18th_____ day of _____November_____, 2020.

_____
**ALAN D ALBRIGHT**
**UNITED STATES DISTRICT JUDGE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **NETLIST, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action Nos. 6:20-cv-00194-ADA and 6:20-cv-00525-ADA** |
| **SK HYNIX INC. and SK HYNIX AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## <u>DEFENDANTS' OPPOSED MOTION TO STAY PENDING TRANSFER</u>

**Table of Contents**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

III.    ALL CASE ACTIVITY UNRELATED TO TRANSFER SHOULD BE STAYED
        PENDING RESOLUTION OF SK HYNIX'S MOTION TO TRANSFER .................... 2

    A.  The Court has inherent authority to issue a stay pending a ruling on SK hynix's motion to
        transfer ........................................................................................................... 2

    B.  All relevant factors favor a stay pending a decision on the transfer motion...................... 3

        1.  A stay will not prejudice Netlist ...................................................................... 3

        2.  SK hynix will suffer hardship absent a stay..................................................... 6

        3.  A stay will conserve judicial resources........................................................... 6

IV.     CONCLUSION................................................................................................... 7

Defendants SK hynix Inc. and SK hynix America Inc. (collectively "SK hynix") respectfully move for a stay of all case activity unrelated to SK hynix's pending motion to transfer Civil Action No. 20-cv-00194-ADA ("the '194 Case") and Civil Action No. 20-cv-00525-ADA ("the '525 Case") (hereinafter "Western District Action") to the United States District Court for the Central District of California ("C.D. Cal."). *See* '194 ECF No. 26; '525 ECF No. 24.[1]  Counsel for SK hynix have conferred with counsel for Netlist, Inc. ("Netlist"), and Netlist opposes the relief requested herein.

## I.     INTRODUCTION

Stay of all activity in this case apart from the pending motion to transfer is appropriate to save the Court and the parties unnecessary effort and expense while the Court considers transfer. SK hynix filed its motion to transfer over seven months ago.  Given the likelihood of success with the motion to transfer to C.D. Cal., where both Netlist and SK hynix's overlapping, first-filed actions now pend, and the Federal Circuit's guidance that "a trial court must first address whether it is a proper and convenient venue before addressing any substantive portion of the case," *In re Nintendo Co.*, 544 F. App'x 934, 941 (Fed. Cir. 2013), a stay is appropriate here. The *Markman* hearing in this case is fast approaching and the parties will soon begin claim construction briefing.  A modest delay imposed by a stay will impose little prejudice, if any, while the Court resolves the transfer motion.  Fifth Circuit and the Federal Circuit caselaw establishes that transfer motions are a "top priority," and are to be addressed before other substantive issues such as claim construction.

## II.     BACKGROUND[2]

On May 4, 2020, SK hynix filed a motion to transfer to C.D. Cal. pursuant to the first-to-file rule or, alternatively, 28 U.S.C. § 1404(a).  *See* '194 ECF No. 26.  The motion has been fully

---

[1] Pursuant to the Court's Scheduling Order Governing the '525 and '194 Cases, the parties have been ordered to make filings only in the '194 Case.  *See* '194 ECF No. 65.

[2] A detailed account of the litigation history between SK hynix and Netlist is set forth in the briefing in support of SK hynix's pending motion to transfer.  *See* '194 ECF No. 26, at 2–7.

briefed.  *See* '194 ECF Nos. 26, 27, 29, 31, 40, 42.  On June 12, 2020, the parties agreed that the "motion to transfer in this case is ripe for decision."  '194 ECF No. 42-1.  The parties later stipulated that the ruling on the motion to transfer in the '194 Case "shall be binding upon and have the same effect" in the '525 Case.[3]  '525 Case, ECF No. 24.

Exchange of *Markman* materials in the '525 Case—including the exchange of claim term constructions and briefs—will begin on January 8, 2021.  '194 ECF No. 65.  A combined *Markman* hearing for the two cases scheduled for March 19, 2021.  *Id.*

The parties met and conferred, but Netlist opposes a temporary stay for the Court to decide the transfer motion.

## III.    ALL CASE ACTIVITY UNRELATED TO TRANSFER SHOULD BE STAYED PENDING RESOLUTION OF THE MOTION TO TRANSFER

### A.    The Court has inherent authority to issue a stay pending a ruling on SK hynix's motion to transfer

Both the Federal Circuit and the Fifth Circuit hold that transfer motions should be prioritized and resolved before addressing other substantive issues.  *See, e.g.*, *In re Apple Inc.*, 979 F.3d 1332, 1339 (Fed. Cir. 2020) ("Although district courts have discretion as to how to handle their dockets, once a party files a transfer motion, disposing of that motion should unquestionably take priority.") (applying Fifth Circuit law); *In re Nintendo Co.*, 544 F. App'x at 941 (applying Fifth Circuit law in holding that "a trial court must first address whether it is a proper and convenient venue before addressing any substantive portion of the case").

Accordingly, courts often stay cases pending decisions on transfer.  *See, e.g.*, *Secure Axcess, LLC v. Nintendo of Am., Inc.*, No. 2:13-cv-0032, ECF No. 133 (E.D. Tex. Feb. 10, 2014) ("[T]he Court is persuaded that a short stay pending resolution of the severance and transfer issues is likely to simplify the issues in this case."); *DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 6:13-cv-919, ECF No. 83 (E.D. Tex. Oct. 28, 2014) ("The Court hereby STAYS all proceedings

---

[3] The Court initially informed the parties to anticipate resolution of the transfer motion by the end of July 2020.  *See* '194 ECF No. 52, at 6:10–14.  In October, the Court indicated that it would resolve the motion by the end of 2020.  '525 ECF No. 23.

… while it considers Defendant's Motion to Transfer Venue") (emphasis omitted); *Anza Tech., Inc. v. Xilinx, Inc.*, No. 17-cv-687, 2017 WL 10379350, at *1 (D. Col. Oct. 16, 2017) ("[T]he Court acknowledges the efficiency and fairness of delaying the proceedings pending resolution of a motion to transfer that could resolve this Court's involvement in this matter.").  A stay would uphold 28 U.S.C. § 1404(a)'s intent to "prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense' … when defendants are forced to expend resources litigating substantive matters in an inconvenient venue while a motion to transfer lingers unnecessarily on the docket." *In re Google Inc.*, No. 15-138, 2015 WL 5294800, at *1 (Fed. Cir. July 16, 2015) (internal citation omitted) (ordering stay of proceedings pending resolution of transfer motion); *see also In re Fusion-IO, Inc.*, 489 F. App'x 465, 466 (Fed. Cir. 2012) ("We fully expect, however, for Fusion-IO to promptly request transfer in the lead case along with a motion to stay proceedings pending disposition of the transfer motion, and for the district court to act on those motions before proceeding to any motion on the merits of the action.").

**B.    All relevant factors favor a stay pending a decision on the transfer motion**

This District considers three factors in determining whether to stay:  (1) any potential prejudice to the non-moving party; (2) the hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources saved by avoiding duplicative litigation.  *See, e.g.*, *Yeti Coolers, LLC v. Home Depot U.S.A., Inc.*, No. 1:17-cv-342, 2018 WL 2122868, at *1 (W.D. Tex. Jan. 8, 2018); *B & D Produce Sales, LLC v. Packman1, Inc.*, No. 16-cv-99, 2016 WL 4435275, at *1 (W.D. Tex. Aug. 19, 2016).  Each of three factors favor a stay here.

**1.    A stay will not prejudice Netlist**

Netlist will not suffer any prejudice as a result of a stay pending a decision on SK hynix's motion to transfer. The stay sought by SK hynix should be of a very limited duration and would be narrowly tailored to ensure the transfer issues are decided before other substantive issues (such as claim construction).  As discussed above, *supra* n.3, the Court previously indicated that

a decision is expected well before the *Markman* hearing, meaning the stay should be of a limited duration.

There is no discernible prejudice to Netlist from such a short stay, particularly as the present action represents the third and fourth suits Netlist brought against SK hynix on closely-related patents, which undeniably overlap with those asserted in the first two suits in C.D. Cal. *See, e.g.*, *Secure Axcess*, No. 2:13-cv-0032, ECF No. 133 ("As this case is in its early stages and claim construction briefing has just begun, a short stay of limited duration [while the Court decides a motion to transfer] will not unduly prejudice or present a clear tactical disadvantage to the Plaintiff."). Indeed, Netlist agreed to stay the C.D. Cal. actions, indicating stay presents little prejudice in a case such as this where Netlist offers no products competing with the accused.

Moreover, SK hynix motion is likely to succeed, undermining any claim of prejudice. Netlist never disputes that SK hynix's breach of contract claims in the first-filed action substantially overlap with the same breach claims here. Further, Netlist never truly disputes that its asserted infringement claims in the first-filed action substantially overlap with those asserted here, and instead, wrongly contends the claims must be identical. *In re Nitro Fluids L.L.C.*, 978 F.3d 1308, 1312 (Fed. Cir. 2020) (cases were "substantially overlapping" for purposes of the first-to-file analysis where, as here, plaintiff had accused the same products of infringing patents from the same family with the same inventor in earlier filed litigation elsewhere). Moreover, Netlist does not even argue that the § 1404(a) factors compel litigation in this District, but instead applies the wrong standard, arguing that those factors do not balance in favor of transfer to C.D. Cal. *See, e.g.*, '194 ECF No. 27, at 11 ("The Central District of California Is Not 'Clearly' More Convenient").

Further, several recent Federal Circuit cases strongly support SK hynix's motion to transfer pursuant to either the first-to-file rule or, alternatively, the traditional § 1404(a) factors, further confirming there would be no prejudice to Netlist from a short stay. *In re Nitro Fluids L.L.C.*, applying Fifth Circuit precedent, holds that "transfer pursuant to the first-to-file rule would be proper in this case absent the existence of compelling circumstances," and "[u]nless the

4

balance of transfer factors favors **_keeping_** the case in the second-filed court [i.e., this Court],

there are no compelling circumstances to justify" keeping the case.  2020 WL 6301719, at *2

(emphasis added); *see also id.* at *3 ("[T]he first-to-file rule places a premium on the importance

of allowing one court to resolve substantially overlapping cases.").  Netlist incorrectly assumed

the burden with respect to the convenience factors was on SK hynix, rather than on Netlist.  *See,*

*e.g.*, '194 ECF No. 27, at 11 (arguing that SK hynix has "failed to satisfy its heavy burden of

showing that [C.D. Cal.] is a '<u>clearly</u> more convenient' venue for this dispute").

 Even without the first-to-file rule, recent Federal Circuit cases confirm that the traditional

§ 1404(a) factors strongly favor transfer here.  In *Apple*, for example, the Federal Circuit directed

transfer from this District to N.D. Cal. for reasons similar to those raised in SK hynix's motion to

transfer.  *See Apple*, 2020 WL 6554063, at *4–8; '194 ECF No. 26 at 6–7, 11–14; '194 ECF No.

31 at 5.  As in *Apple*, SK hynix's only presence within this District is minimal and unrelated to

the events that gave rise to the suit, as SK hynix's nine Austin-based employees merely provide

sales and high-level technical assistance to customers in the area, whereas Netlist is

headquartered in C.D. Cal. (and has no presence in this District).  SK hynix America is likewise

headquartered in California,[4] and the cases call into question the work and reputation of

individuals—such as, for example, Netlist's alleged inventors and licensing professionals (some

now former-employee third parties) —residing in C.D. Cal.  *Apple*, 2020 WL 6554063, at *9;

'194 ECF No. 26 at 6–7, 13–15; ECF No. 31 at 4–5.  Similarly, in *Adobe*, the Federal Circuit

directed transfer from this District to the Northern District of California where, as here, the

defendant's offices in Austin, Texas had "nothing to do with the design, development, or

operation of the Accused Products" at issue in the case, and the inventor of the asserted patents

and his company were located in the transferee forum, a factor that tipped "significantly" in

---

 [4] SK hynix America is headquartered in San Jose, within the Northern District of California, which is much closer to C.D. Cal. than traveling to the Western District of Texas.  *See DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 13-cv-919, 2014 WL 6847569, *3 n.1 (E.D. Tex. Nov. 7, 2014) (noting, in granting motion to transfer, that "[t]he Central District of California is much closer to the NDCAL than requiring travel to the Eastern District of Texas.").

favor of transfer.  *In re Adobe Inc.*, 823 Fed. App'x. 929, 930–31 (Fed. Cir. July 28, 2020).

Thus, given that any stay should be short and the merits strongly favor transfer, this factor favors

a stay.

### 2.    SK hynix will suffer hardship absent a stay

Allowing this case to progress through additional discovery and *Markman* proceedings

while awaiting a decision on SK hynix's transfer motion is likely to result in significant hardship

to SK hynix.  Courts resolve transfer motions prior to addressing substantive matters to "prevent

the waste 'of time, energy, and money' and protect litigants, witnesses and the public against

unnecessary inconvenience and expense … when defendants are forced to expend resources

litigating substantive matters in an inconvenient venue while a motion to transfer lingers

unnecessarily on the docket."  *See In re EMC Corp*, 501 Fed. App'x. 973, 975–76 (Fed. Cir. Jan

29, 2013).  Absent a stay, SK hynix must prepare claim construction briefing in the '525 Case,

prepare for a combined *Markman* hearing for both cases, and also take and respond to discovery

in both cases.  The strength of the pending transfer motion further emphasizes the prejudice here.

Thus, this factor also favors issuance of a stay.

### 3.    A stay will conserve judicial resources

A stay pending a decision on transfer would also conserve significant judicial resources.

A stay likely would avoid a needless *Markman* hearing in two cases, eliminate the risk that

*Markman* briefing and hearings would be conducted twice in two different courts, and obviate

the need for this Court to resolve any discovery disputes between the parties should they arise

between now and whenever the transfer motion is decided.  *See In re Apple*, 2020 WL 6554063

at *3 ("[A] *Markman* hearing and claim construction order are two of the most important and

time-intensive tasks a district court undertakes in a patent case."); *McDonnell Douglas Corp. v.

Polin*, 429 F.2d 30, 30 (3d Cir. 1970) ("Judicial economy requires that another district court

should not burden itself with the merits of the action until it is decided that a transfer should be

effected.").  Thus, this factor likewise favors a stay.

## IV.    CONCLUSION

For the foregoing reasons, the Court should stay all case activity unrelated to transfer until a decision on SK hynix's transfer motion has been rendered.

Date:  December 15, 2020                    Respectfully submitted,

                                           By:  */s/ Brian R. Nester*

David C. Giardina                          Michael D. Hatcher (*pro hac vice*)
Illinois Bar No. 6225008 (*pro hac vice*)  Texas Bar No. 24027067
SIDLEY AUSTIN LLP                          SIDLEY AUSTIN LLP
One South Dearborn                         2021 McKinney Avenue, Suite 2000
Chicago, IL 60603                          Dallas, TX 75201
Telephone:  (312) 853-7000                 Telephone:  (214) 981-3300
Facsimile:  (312) 853-7036                 Facsimile:  (214) 981-3400
dgiardina@sidley.com                       mhatcher@sidley.com

Theodore W. Chandler                       Kenneth L. Nissly
California Bar No. 219456 (*pro hac*       California Bar No. 77589 (*pro hac vice*)
*vice*)                                    Law Offices of Kenneth L. Nissly
SIDLEY AUSTIN LLP                          P.O. Box 3462
555 West Fifth Street                      Saratoga, California 95070-1462
Los Angeles, CA 90013                      Telephone:  (402) 398-7043
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600                 Barry K. Shelton
tchandler@sidley.com                       Texas State Bar No. 24055029
                                           SHELTON COBURN LLP
Brian R. Nester                            311 RR 620, Suite 205
DC Bar No. 460225 (*pro hac vice*)         Austin, TX 78734-4775
Joseph A. Micallef                         Telephone: (512) 263-2165
DC Bar No. 443679 (*pro hac vice*          Facsimile: (512) 263-2166
*forthcoming*)                             bshelton@sheltoncoburn.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.                        **COUNSEL FOR DEFENDANTS**
Washington, D.C. 20005                     **SK HYNIX INC. AND SK HYNIX AMERICA INC.**
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 15, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Brian R.Nester*
Brian R. Nester

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| NETLIST, INC. | Civil Action No. 6:20-cv-00194-ADA |
| Plaintiff, | |
| vs. | Civil Action No. 6:20-cv-00525-ADA |
| SK HYNIX INC. and SK HYNIX AMERICA INC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## PLAINTIFF NETLIST, INC.'S OPPOSITION TO
## DEFENDANTS' MOTION TO STAY PENDING TRANSFER

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   LEGAL STANDARD........................................................................................... 2

III.  ARGUMENT ........................................................................................................ 3

    A.    Factor One: A Stay Will Prejudice Netlist's Right to Protect Its Patents
        and Obtain Expeditious Resolution of Its Claims .................................... 3

    B.    Factor Two: SK hynix's Vague and Speculative Allegations of "Hardship"
        Do Not Support a Stay ............................................................................... 6

    C.    Factor Three: A Stay Is Unlikely to Conserve Judicial Resources ........... 7

IV.   CONCLUSION..................................................................................................... 7

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adobe Inc.*,
   823 Fed. App'x. 929 (Fed. Cir. July 28, 2020)........................................................4, 5

*In re Apple Inc.*,
   818 F. App'x 1001 (Fed. Cir. 2020) .............................................................................5

*In re Apple Inc.*,
   979 F.3d 1332 (Fed. Cir. 2020)....................................................................................5

*In re: Cinemark Holdings Inc., et al.*,
   No. 2020-103, 2020 WL 7393227 (Fed. Cir. Dec. 17, 2020)......................................4

*In re Nitro Fluids L.L.C.*,
   978 F.3d 1308 (Fed. Cir. 2020)................................................................................4, 5

*Kahn v. GMC*,
   889 F.2d 1078 (Fed. Cir. 1989)....................................................................................3

*MiMedx Grp., Inc. v. Tissue Transplant Tech. Ltd.*,
   2015 WL 11573771 (W.D. Tex. Jan. 5, 2015) .............................................................3

*Neodron, Ltd. v. Dell Technologies, Inc., et al.*,
   Case No. 1-19-CV-00819-ADA, Order Denying Motion to Stay (Dec. 16, 2019) ...........1, 2, 3

*Sierra Club v. Fed. Emergency Mgmt. Agency*,
   2008 U.S. Dist. LEXIS 47405 (S.D. Tex. June 11, 2008) ...........................................2

*Yeti Coolers, LLC v. Home Depot U.S.A., Inc.*,
   No. 1:17-CV-342-RP, 2018 WL 2122868 (W.D. Tex. Jan. 8, 2018) ..........................2

## I.     INTRODUCTION

Defendants SK hynix Inc.'s and SK hynix America, Inc.'s (collectively "SK hynix" or "Defendants") motion to stay ("Stay Motion") is a transparent attempt to re-brief its motion to transfer ("Transfer Motion") for the fourth time.[1] But an improper fourth bite at the apple does not change the underlying dispositive facts that demonstrate that these cases are properly before this Court and should remain here. Much of Defendants' submission attempts to direct the Court to recent decisions from the Federal Circuit, which differ factually from the present dispute. To the extent that the Federal Circuit guidance in those written decisions is relevant to the transfer request here, it further supports denial of the motion to transfer.

Defendants' only argument in support of the requested stay is that because they believe the case will ultimately be transferred, it should be stayed. However, Defendants made no effort to argue any clear hardship or inequity to support the stay request, as was required under this Court's precedent. *See Neodron, Ltd. v. Dell Technologies, Inc., et al.*, Case No. 1-19-CV-00819-ADA, Order Denying Motion to Stay at 2-3 (Dec. 16, 2019) (Albright, J.) ("*Neodron*") (movant has a heavy burden of "mak[ing] out a <u>clear case</u> of hardship or inequity in being required to go forward"). Accordingly, a stay is neither warranted nor justified here.

Ultimately, only Netlist, and not Defendants, would be prejudiced if the cases were stayed. Underscoring the lack of prejudice towards Defendants is the fact that Defendants waited seven months after filing the Transfer Motion before filing this Stay Motion. Had Defendants truly believed litigating this case would prejudice them, they would not have continued to actively and extensively litigate this case for months before requesting a stay. As for the only true prejudice

---

[1] *See Netlist, Inc. v. SK hynix Inc. et al*, Civ. No. 20-cv-00194-ADA, ECF No. 26 (SK hynix's Mot. to Transfer), ECF No. 31 (SK hynix's Reply ISO Mot. to Transfer), ECF No. 42 (SK hynix's Contingent Resp. to Netlist's Supp. Submission Re Mot. to Transfer).

suffered by either party, imposing a stay now would deprive Netlist from expeditious resolution of this litigation and the ability to enforce its patent rights. The Court should deny the Stay Motion.

## II.   LEGAL STANDARD

Whether to stay a case falls within the Court's inherent discretional authority. *Neodron* at 2-3 (citing *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) ("The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation, which includes authority to control the scope and pace of discovery.") (citations omitted); *Clinton v. Jones*, 520 U.S. 681, 706 (1997)). Determining whether to issue a stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id.* at 3 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

The proponent has the heavy burden to "make out a clear case of hardship or inequity in being required to go forward if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Id.* (quoting *In re Davis*, 730 F.2d 176, 178 (5th Cir. 1984)) (in turn quoting *Landis*, 299 U.S. at 255). *See also Sierra Club v. Fed. Emergency Mgmt. Agency*, 2008 U.S. Dist. LEXIS 47405 at *19-20 (S.D. Tex. June 11, 2008) (stating that the moving party bears the "*heavy burden* to show why a stay should be granted" and why it is "supported by a *genuine necessity*") (emphasis added).

In determining whether a stay is proper, a district court should consider, among other factors: (1) the potential prejudice to the non-moving party; (2) the hardship and inequity to the moving party if the action is not stayed; and (3) judicial resources. *Yeti Coolers, LLC v. Home Depot U.S.A., Inc.*, No. 1:17-CV-342-RP, 2018 WL 2122868 (W.D. Tex. Jan. 8, 2018) (denying motion to stay for granting it would both work prejudice against the plaintiff and compromise judicial economy, while defendant would suffer no such hardship were its motion denied).

## III.     ARGUMENT

Defendants make no effort to establish any clear harm or inequity that would result if the litigation is not stayed. The request for a stay should therefore be denied. Each of the three established factors that this Court must assess in deciding Defendants' request for a stay tips against Defendants or is, at best for them, neutral. Defendants speculatively argue that, because their Transfer Motion will be granted, a stay is warranted. The opposite is true. On the merits, the Transfer Motion should be denied, especially under recent Federal Circuit guidance. The dispositive facts have not changed. It is still the undisputed fact that Netlist could not have filed these actions in the CDCA, and no infringement claims remain pending there. Defendants' meaningful presence in this district has not changed and, by contrast, the Defendants have no connection to the CDCA. This Court therefore maintains its strong local interest in resolving the dispute, unlike the facts involved in other recent cases addressed by the Federal Circuit.

Accordingly, Defendants' requests for a transfer and a stay should both fail.

### A.     Factor One: A Stay Will Prejudice Netlist's Right to Protect Its Patents and Obtain Expeditious Resolution of Its Claims

The Federal Circuit has long recognized a "strong public policy favoring expeditious resolutions of litigation." *Kahn v. GMC*, 889 F.2d 1078, 1080 (Fed. Cir. 1989). Similarly, the Fifth Circuit has consistently found that "[a] patent holder has 'an interest in the timely enforcement of its patent right.'" *MiMedx Grp., Inc. v. Tissue Transplant Tech. Ltd.*, 2015 WL 11573771, at *2 (W.D. Tex. Jan. 5, 2015) (quoting *Lennon Image Techs., LLC v. Macy's Retail Holdings, Inc.*, 2014 WL 4652117, at *2 (E.D. Tex. Sept. 18, 2014)). A stay would deprive Netlist of a speedy resolution of its claims, especially in light of the fact that a transfer is unlikely to occur. *See, e.g.*, *Neodron* at 4 (concluding that the delay as a result of the requested stay would likely prejudice the plaintiff's "interests in protecting its patents and an expeditious resolution to the litigation").

3

Notwithstanding, Defendants urge that Netlist will not suffer prejudice solely based on argument that these cases will be transferred to another court. That argument is not relevant to the Fifth Circuit's test for assessing a stay request, and, regardless, does not serve to outweigh or mitigate the legitimate prejudice Netlist would suffer by not being able to timely enforce its patent rights.

Further, nothing in the present motion provides a new fact or legal argument that would change the transfer arguments that are already before the Court. As the Federal Circuit reiterated just days ago, transfer is not appropriate where—as here—no Defendant is headquartered in the proposed transferee venue. *In re: Cinemark Holdings Inc., et al.*, No. 2020-103, 2020 WL 7393227, at *2 (Fed. Cir. Dec. 17, 2020) ("where no defendant is headquartered in the proposed transferee venue, this court has not previously granted mandamus, and we see no reason to grant such extraordinary relief here"). Defendants have no documents or relevant witnesses in the CDCA, and make no argument otherwise. In the litigation between the parties to-date, all of Defendants' witness testimony has come from individuals who live and work in South Korea. The vast majority of the documents produced have also come from repositories in South Korea. Most of the depositions of Defendants witnesses have also taken place in South Korea.

It is curious and disingenuous for Defendants to now suggest that inconvenience of travel from northern California to Texas, rather than to central California, is a relevant consideration concerning the transfer motion. Brief at 5, n. 4. Defendants' only possible motivation for the argument now is to posit facts that they know are not accurate in an effort to make the underlying posture of this dispute look more like the inapposite circumstances of other recent cases addressed by the Federal Circuit. To that end, unlike the facts here, all of the Defendants in *Nitro Fluids, Apple I,* and *Adobe* were headquartered in the transferee forum, where the accused instrumentalities were designed, developed, and tested. *See, e.g., In re Nitro Fluids L.L.C.*, 978

F.3d 1308 (Fed. Cir. 2020) ("*Nitro Fluids*") (explaining that plaintiff and defendant were located in transferee forum where relevant evidence was also located); *In re Apple Inc.*, 979 F.3d 1332 (Fed. Cir. 2020) ("*In re Apple I*") (same); *In re Adobe Inc.*, 823 Fed. App'x. 929 (Fed. Cir. July 28, 2020) ("*Adobe*") (same).

In its present motion, Defendants ignore the fact that Defendant SK hynix America has offices in Houston, Texas and in Austin, Texas, within this judicial district. Defendants' operations in Texas establish both a superior local interest and potential for local sources of proof in this district. Notably, in a decision that Defendants elected not to address where circumstances like these were present, the Federal Circuit refused to conclude that this Court clearly abused its discretion in transferring the case to the Austin Division, instead of the Northern District of California. *In re Apple Inc.*, 818 F. App'x 1001, 1004 (Fed. Cir. 2020) ("*Apple II*").

Concerning Defendants' first-to-file argument, the simple reality remains that, under *TC Heartland*, Netlist could not have filed these cases in the CDCA, as no Defendant has any presence there. Moreover, the purpose of the first-to-file rule is to avoid potential interference in the affairs of another court. *Nitro Fluids* at 1312. Here, the CDCA cases were consolidated and comprehensively stayed years ago, without meaningful activity or a *Markman* hearing occurring prior to the stay. As Defendants are aware, there are no actionable infringement claims in the CDCA cases, only Defendants' RAND counterclaims. *See* ECF No. 40 (Supp. Declaration of A. DeVoogd ISO Netlist's Opp. to Def. Motion to Transfer); ECF No. 42 (SK hynix's Contingent Resp. to Netlist's Supp. Submission Re Mot. to Transfer). Simply put, the two stayed CDCA cases, which involve different patents, are unlikely to move forward, and cannot and will not "substantially overlap" with the cases that were filed here. Yet, Defendants incorrectly state that Netlist does not dispute that the patent claims asserted in the CDCA actions substantially overlap

with the patent claims asserted in this Court. *Id*. To the contrary, Netlist has always maintained that no substantial overlap exists. *See, e.g.*, ECF No. 27 at 6 ("nothing SK hynix points to comes anywhere close to the level of 'substantial overlap' required to invoke the first-to-file rule.").

Defendants claim that because Netlist agreed to stay the two CDCA cases, the present request for a stay "presents little prejudice." Brief at 4. Defendants well know the only reason that the parties agreed to stay the two CDCA cases: so that the parties could litigate those claims expeditiously elsewhere, in the International Trade Commission and before the Patent Trial and Appeal Board, which is exactly what happened.

### B.    Factor Two: SK hynix's Vague and Speculative Allegations of "Hardship" Do Not Support a Stay

Defendants have not identified any meaningful prejudice it would suffer if these cases proceed—nor can they. In a single paragraph of attorney argument on this point, Defendants claim that they will suffer hardship by following the agreed-to schedule, including preparing claim construction briefing for one Asserted Patent, as well as preparing for a combined *Markman* hearing for all Asserted Patents. Brief at 6. But Defendants' obligation to navigate through claim construction and prepare for a *Markman* hearing exists regardless of venue. The normal course of litigating a patent infringement case is not a hardship, and certainly something that cannot be avoided or mitigated by staying the case.

Moreover, before requesting the present stay, Defendants already took part in three rounds of claim construction briefings for two Asserted Patents, totaling 116 pages with 82 exhibits. The parties also exchanged initial disclosures and discovery, consisting of 42 interrogatories and 136 requests for production. And, most recently, Defendants served an outlandish package of purported invalidity contentions for the '523 Patent, totaling 6,102 pages advancing 55 prior art combinations

thrown at the wall. This is in addition to Defendants' previously-served invalidity contentions for the '218 and '525 Patents, which consisted of 12,203 pages with 128 total combinations.

In this context, Defendants' suggestion they would be prejudiced by completing the claim construction briefing process for the third asserted patent in this case lacks any merit. This factor also clearly weighs against granting a stay.

### C.    Factor Three: A Stay Is Unlikely to Conserve Judicial Resources

Claim Construction briefing for two of the Asserted Patents is complete, while the third is underway. The *Markman* hearing is more than two months away. And again, with no substantial overlap of claims and no infringement claims remaining before the CDCA, no reasonable possibility exists for any duplication of effort or interference in matters actively before that court. This Court is a more appropriate and convenient forum for the present actions, and there is no reasonable need for a court in CDCA to expend judicial resources on these cases—nor do any of the parties reasonably expect that to occur. Therefore, it is not a waste of party or court resources to proceed on the current path. The motivation behind the Defendants transfer and stay request is forum-shopping, and not the conservation of resources.

This factor also weighs in favor of denying the request for a stay.

### IV.    CONCLUSION

For these reasons, this Court should deny the motion for a stay.

Dated: December 22, 2020

/s/ *Andrew H. DeVoogd*
James M. Wodarski
  (*pro hac vice pending*)
  Massachusetts BBO No. 627036
  E-mail: JMWodarski@mintz.com
Andrew H. DeVoogd
  (Admitted to practice in WDTX)
  Massachusetts BBO No. 670203
  E-mail: AHDeVoogd@mintz.com
Matthew S. Galica
  (*pro hac vice pending*)
  Massachusetts BBO No. 696916
  E-mail: MSGalica@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
  POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

J. Stephen Ravel
  Texas State Bar No. 16584975
  Email: steve.ravel@kellyhart.com
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

*Attorneys for Plaintiff Netlist Inc.*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on December 22, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

/s/ *Andrew H. DeVoogd*
Andrew H. DeVoogd

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **NETLIST, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 6:20-cv-00194-ADA and**<br>**Civil Action No. 6:20-cv-00525-ADA** |
| **SK HYNIX INC. and SK HYNIX**<br>**AMERICA INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR OPPOSED MOTION TO STAY**
**PENDING TRANSFER**

**Table of Contents**

I.      SK HYNIX WILL SUFFER HARDSHIP ABSENT A STAY ........................................... 1

II.     A STAY IMPOSES NO COGNIZABLE PREJUDICE ON NETLIST ............................ 2

III.    A STAY WILL CONSERVE JUDICIAL RESOURCES .................................................. 3

IV.     THE LIKELIHOOD OF TRANSFER PROVIDES ADDITIONAL SUPPORT FOR A
        SHORT STAY ...................................................................................................... 3

V.      CONCLUSION ................................................................................................... 5

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Inc.*,
   818 F. App'x 1001 (Fed. Cir. 2020) ........................................................................5

*In re Apple Inc.*,
   979 F.3d 1332 (Fed. Cir. 2020).......................................................................1, 2, 3

*In re Cinemark Holdings Inc.*,
   No. 2020-103, 2020 WL 7393227 (Fed. Cir. Dec. 17, 2020)...................................4

*DSS Tech. Mgmt., Inc. v. Apple, Inc.*,
   No. 6:13-cv-919, ECF No. 83 (E.D. Tex. Oct. 28, 2014)........................................2

*Dynaenergetics Europe GMBH v. Hunting Titan*,
   Civ. A. 6:20-cv-00069, 2020 WL 3259807 (W.D. Tex. June, 16 2020) ..................4

*In re Horseshoe Ent.*,
   337 F.3d 429 (5th Cir. 2003) ..................................................................................3

*In re EMC Corp.*,
   501 Fed. App'x. 973 (Fed. Cir. 2013)......................................................................1

*In re Google Inc.*,
   No. 15-138, 2015 WL 5294800 (Fed. Cir. July 16, 2015)....................................1, 2

*Kahn v. GMC*
   889 F.2d 1078 (Fed. Cir. 1989)...............................................................................3

*Leach v. Day To Day Imports, Inc.*,
   No. 17-7351, ECF No. 50 (C.D. Cal. Nov. 14, 2017) .............................................4

*McDonnell Douglas Corp. v. Polin*,
   429 F.2d 30 (3d Cir. 1970).......................................................................................3

*MiMedx Grp., Inc. v. Tissue Transplant Tech. Ltd.*,
   2015 WL 11573771 (W.D. Tex. Jan. 5, 2015) .........................................................3

*Neodron, Ltd. v. Dell Techs, Inc., et al.*,
   Case No. 1-19-CV-00819, ECF No. 44 (W.D. Tex. Dec. 16, 2019) ........................3

*In re Nintendo Co.*,
   544 F. App'x 934 (Fed. Cir. 2013) ..........................................................................1

*Secure Axcess, LLC v. Nintendo of Am., Inc.*,
  No. 2:13-cv-0032, ECF No. 133 (E.D. Tex. Feb. 10, 2014)......................................................2

**Statutes**

28 U.S.C. § 1404(a) ................................................................................................................3

Defendants SK hynix Inc. and SK hynix America Inc. (collectively "SK hynix") respectfully submit this Reply in support of their motion to stay all case activity unrelated to SK hynix's pending motion to transfer until resolution of the motion to transfer. The Court should grant stay to conserve judicial resources, and prevent further hardship to SK hynix, particularly where a short stay is unlikely to invoke cognizable prejudice on Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") and transfer is likely.

## I.    SK HYNIX WILL SUFFER HARDSHIP ABSENT A STAY

Netlist's contention that SK hynix has "not identified any meaningful prejudice it would suffer if these cases proceed – nor can they," NL Opp'n at 6, ignores Federal Circuit precedent. The Federal Circuit has held that courts should resolve transfer motions before addressing substantive matters specifically to "'prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense' when defendants are forced to expend resources litigating substantive matters in an inconvenient venue while a motion to transfer lingers unnecessarily on the docket." *In re Google Inc.*, No. 15-138, 2015 WL 5294800, at *1 (Fed. Cir. July 16, 2015) (internal citation omitted); *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020) ("… once a party files a transfer motion, disposing of that motion should unquestionably take priority") (applying Fifth Circuit law); *In re Nintendo Co.*, 544 F. App'x 934, 941 (Fed. Cir. 2013) (applying Fifth Circuit law in holding that "a trial court must first address whether it is a proper and convenient venue before addressing any substantive portion of the case"); *In re EMC Corp.*, 501 Fed. App'x. 973, 975–76 (Fed. Cir. 2013). In *Google*, the Federal Circuit recognized the prejudice resulting from being forced to engage in claim construction briefing and discovery—both of which are either imminent or underway in this case—while a motion to transfer is pending. *In re Google Inc.*, 2015 WL 5294800, at *1-2; *see also In re Apple Inc.,* 979 F.3d at 1338 (("[A] *Markman* hearing and claim construction order are two of the most important and time-intensive substantive tasks a district court undertakes in a patent case.").

While Netlist faults SK hynix for not seeking a stay sooner, SK hynix filed its motion to transfer promptly, well before the Case Management Conference.   And the Court has previously suggested that a ruling would be forthcoming.[1]  SK hynix certainly cannot be faulted for abiding by the Court's schedule or for now seeking what presumably will be a shorter stay than if it had moved earlier.  The substantive and imminent *Markman* process scheduled the next few months now warrants a stay, as detailed above.  *In re Apple Inc.*, 979 F.3d at 1342-43.

## II.    A STAY IMPOSES NO COGNIZABLE PREJUDICE ON NETLIST

Netlist's contention that a short stay "Will Prejudice Netlist's Right to Protect Its Patents and Obtain Expeditious Resolution of Its Claims," NL Opp'n at 3, is overstated at this stage of the parties' dispute.  First, it bears noting that Netlist has had its "day in court" twice now; taking two ITC investigations, involving multiple patents related to those at issue here, to final decision, including all available appeals.

Further, and as set out above, while a party such as Netlist has a right to have its claims resolved, that right does not supersede 28 U.S.C. § 1404(a)'s intent to limit expenditures of time, money and resources while a transfer motion is pending.  *In re Google Inc.*, 2015 WL 5294800, at *1 (ordering stay of proceedings pending resolution of transfer motion).  For this very reason, courts routinely temporarily stay proceedings pending resolution of a transfer motion.  *See, e.g.*, *Secure Axcess, LLC v. Nintendo of Am., Inc.*, No. 2:13-cv-0032, ECF No. 133 (E.D. Tex. Feb. 10, 2014) ("[T]he Court is persuaded that a short stay pending resolution of the severance and transfer issues is likely to simplify the issues in this case."); *DSS Tech. Mgmt., Inc. v. Apple, Inc.*, No. 6:13-cv-919, ECF No. 83 (E.D. Tex. Oct. 28, 2014) ("The Court hereby **STAYS** all proceedings … while it considers Defendant's Motion to Transfer Venue").

The cases Netlist cites are inapposite.  None sought a short stay pending resolution of a

---

[1]  The Court initially informed the parties on June 19, 2020, that they could anticipate resolution of the transfer motion "no later than by the end of July [2020] and hopefully sooner." '194 ECF No. 52, at 6:10–14.  In October 2020, with the motion still pending, the Court further provided that it "will work on the motion to transfer [so that] it is done by the end of the year well before the Markmans [in March 2021]."  '525 ECF No. 23.

transfer motion, which both the Federal Circuit and Fifth Circuit have repeatedly recognized should "take top priority in the case." *In re Apple Inc.*, 979 F.3d at 1343 (citing *In re Horseshoe Ent.*, 337 F.3d 429, 433 (5th Cir. 2003)). Thus, for instance, in *Neodron*, cited by Netlist, the defendants sought a stay pending resolution of an ITC investigation, not a motion to transfer; and rather than the short stay sought here, the *Neodron* defendants sought a stay likely to extend three years, when accounting for appeals. *Neodron, Ltd. v. Dell Techs, Inc., et al.*, Case No. 1-19-CV-00819, ECF No. 44, Order Denying Motion to Stay, at 2, 4 (Dec. 16, 2019 (Albright, J.)) ("*Neodron*"). The other decisions cited by Netlist likewise did not involve a stay pending resolution of a motion to transfer. Opp. at 3 (citing *Kahn v. GMC,* 889 F.2d 1078 (Fed. Cir. 1989); *MiMedx Grp., Inc. v. Tissue Transplant Tech. Ltd*., 2015 WL 11573771 (W.D. Tex. Jan. 5, 2015)).

## III.     A STAY WILL CONSERVE JUDICIAL RESOURCES

Netlist cannot legitimately dispute that a short stay pending resolution of the transfer motion will conserve judicial resources. As the Federal Circuit recently emphasized in the context of transfer motions, "[a] *Markman* hearing and claim construction order are two of the most important and time-intensive tasks a district court undertakes in a patent case." *In re Apple Inc.*, 979 F.3d at 1338. And "[j]udicial economy requires that another district court should not burden itself with the merits of the action until it is decided that a transfer should be effected." *McDonnell Douglas Corp. v. Polin*, 429 F.2d 30, 30 (3d Cir. 1970).

## IV.     THE LIKELIHOOD OF TRANSFER PROVIDES ADDITIONAL SUPPORT FOR A SHORT STAY

SK hynix submits that the likelihood of success on the motion to transfer provides additional support for a short stay. SK hynix's transfer motion briefing fully addresses the reasons the Court should grant transfer, but Netlist presents a number of arguments in its opposition that warrant a response.

First, Netlist's opposition confirms there is no significant dispute that the issues here in in the California cases substantially overlap, and that is all that is required under the first to file

rule.[2]  As an initial matter, Netlist again does not dispute that Defendants' breach of contract

claims in the first-filed action substantially overlap with the claims here, or that the first-filed

breach claims encompass the patents asserted in this District.  NL Opp'n at 6; NL Opp'n

Transfer at 4-10.  Moreover, and as to the asserted infringement claims in both forums, Netlist

never truly disputes that its patents asserted in the first-filed action substantially overlap with

those asserted here, and instead wrongly contends the patent claims must be *identical*.  NL

Opp'n Transfer at 4-10.  Remarkably, Netlist now represents to this Court that "no infringement

claims remain pending" in the first-filed action.  NL Opp'n at 3.  That is simply not true.

Netlist's infringement claims *remain* pending in the California cases, and Netlist has never

moved to dismiss them.

      Next, Netlist suggests that the stay in the California cases somehow counsels against

transfer.  But both parties on November 9, 2020 requested the continued stay of the California

case *until this Court resolves the pending motion to transfer*.  Ex. 1, Nov. 9, 2020 Jt. Status Rpt.

at 2.  After this Court rules on the transfer motion, the parties will submit an interim report in the

California cases to allow that court to decide how to proceed.  *Id.*  In any event, this Court has

held that where both parties jointly seek a stay of the first-filed action, that stay does *not* weigh

against transfer to the stayed forum, particularly when analyzing judicial economy.

*Dynaenergetics Europe GMBH v. Hunting Titan*, Civ. A. 6:20-cv-00069, 2020 WL 3259807 at

*5 (W.D. Tex. June, 16 2020) (holding that, where both parties agree to stay, "transferring this

particular case for potential consolidation with a stayed case will not negatively impact judicial

economy.").

      Finally, Netlist's reliance on *In re Cinemark Holdings Inc.*, and the *Apple II* case, is

---

[2] Netlist continues to cite *no* support for its argument that whether "Netlist could have filed these cases in the CDCA" is a relevant consideration under the first-to-file rule.  Opp. at 5.  It is not relevant, and, regardless, Netlist is properly considered to have waived any objection to jurisdiction and venue in CDCA, and all parties properly considered to have consented to such, for purposes of the claims currently at issue in these cases.  *Leach v. Day To Day Imports, Inc.*, No. 17-7351, ECF No. 50 at 4 & n.1 (C.D. Cal. Nov. 14, 2017).

perplexing.  The Federal Circuit in *Cinemark* denied mandamus under the first-to-file rule because the parties in the two suits were different, the cases involved different accused functionality, the cases involved different accused products, and, as a result, the earlier-filed suit lacked substantial overlap.  No. 2020-103, 2020 WL 7393227, at *1-2 (Fed. Cir. Dec. 17, 2020).  The opposite is true here, where the parties, the accused products, and the relevant functionality are identical in both jurisdictions, and the first-filed breach of contract claims would resolve Netlist's claims in this District, as detailed in SK hynix's transfer motion briefing.

As for Netlist's criticism of SK hynix for allegedly ignoring *In re Apple Inc.*, 818 F. App'x 1001, 1004 (Fed. Cir. 2020) ("*Apple II*"), Opp'n at 5, that case is inapposite.  In *Apple II*, the district court denied transfer from Texas to California because it was likely that a "significant source of proof"—the promulgator of the WiFi standards at issue—was headquartered in the Western District of Texas, Apple engineers within the district likely had relevant knowledge of the 802.11ac standards at issue, and one of the accused products was even made within the Western District of Texas.  818 F. App'x at 1002.  Here, however, after four years of litigation on related patents, Netlist now concedes that SK hynix's relevant witnesses and documents have no connection to this District, admitting that "[i]n the litigation between the parties to-date, *all of the Defendants' witness testimony has come from individuals who live and work in South Korea*," and "[t]he *vast majority* of the documents produced have also come from repositories in South Korea."  NL Opp'n at 4 (emphases added).  No party has identified a single "significant source of proof" in this District after extensive litigation in the California cases and in other forums since 2016.

V.    **CONCLUSION**

For the foregoing reasons, the Court should stay all case activity unrelated to transfer until a decision on SK hynix's transfer motion has been rendered.

Date:  December 29, 2020                    Respectfully submitted,

                                            By:  */s/ Brian R. Nester*

David C. Giardina
Illinois Bar No. 6225008 (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
dgiardina@sidley.com


Brian R. Nester
DC Bar No. 460225 (*pro hac vice*)
Joseph A. Micallef
DC Bar No. 443679 (*pro hac vice)*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

Michael D. Hatcher (*pro hac vice*)
Texas Bar No. 24027067
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400
mhatcher@sidley.com


Kenneth L. Nissly
California Bar No. 77589 (*pro hac vice*)
Law Offices of Kenneth L. Nissly
P.O. Box 3462
Saratoga, CA 95070-1462
Telephone: (402) 398-7043
knissly@nisslylaw.com


Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620, Suite 205
Austin, TX 78734-4775
Telephone: (512) 263-2165
Facsimile: (512) 263-2166
bshelton@sheltoncoburn.com

**COUNSEL FOR DEFENDANTS
SK HYNIX INC. AND SK HYNIX AMERICA INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 29, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(b).

*/s/ Brian R.Nester* _____
Brian R. Nester

**DEFENDANTS' REPLY IN SUPPORT OF THEIR OPPOSED MOTION TO STAY
PENDING TRANSFER**

# EXHIBIT 1

1    [COUNSEL LISTED ON SIGNATURE PAGE]

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10               SOUTHERN DIVISION

| | |
|---|---|
| Netlist, Inc., | No. 8:16-cv-01605-JLS-JCG |
| *Plaintiff and Counterclaim-Defendant*, | **NINTH JOINT REPORT PER FEB. 2, 2018 ORDER [ECF NO. 172] REGARDING STATUS OF ALL LITIGATION AND REQUEST TO CONTINUE STAY OF SK HYNIX'S RAND COUNTERCLAIMS** |
| vs. | |
| SK hynix Inc., | Judge:     Hon. Josephine L. Staton |
| *Defendant and Counterclaim-Plaintiff*, | |
| and | |
| SK hynix America Inc. and SK hynix memory solutions Inc., | |
| *Defendants*. | |

- 1 -

JOINT STATUS REPORT — No. 8:16-cv-01605-JLS-JCG

APPX0549

Pursuant to the Court's February 2, 2018 Order [ECF No. 172], the parties submit the following ninth joint status report.  That Order stayed SK hynix's RAND counterclaims, the only then active portion of the case, at the joint request of the parties, and further ordered:

> Every three months, starting on May 1, 2018, the parties shall file a joint report on the status of all related litigation between the parties, including in the ITC, the Patent Office, any appeals to the Federal Circuit, and in foreign countries, and in that report the parties shall present their view(s) on whether the stay of SK hynix Inc.'s RAND counterclaims should be continued, lifted, or modified.

ECF No. 172 at 2.  Subsequently, the Court modified its order, requiring joint status reports in six month intervals, beginning May 8, 2020.  ECF No. 182 at 1.  As with the parties' first eight reports,[1] the parties again jointly request that the Court continue the stay of SK hynix's RAND counterclaims at this time, but the parties intend to submit an interim status report addressing the status of this litigation and the stay after the U.S. District Court for the Western District of Texas rules on SK hynix's pending motion to transfer to this Court two now-consolidated cases filed by Netlist on related patents, as described below.  There are no proceedings in which the potential issuance of an injunction may occur before the deadline to file the next regularly scheduled joint status report.

As explained in more detail below, since the parties' last status report, there have been two primary developments.  First, Netlist filed a second, new patent infringement action against SK hynix in the United States District Court for the Western District of Texas.  Netlist asserts one additional patent, related to patents asserted in the '1605 case in this District.  Netlist alleges the newly asserted patent is essential to certain JEDEC standards, and accuses the same JEDEC standard

---

[1] The parties' first, second, third, fourth, fifth, sixth, seventh and eighth joint status reports were submitted May 1, 2018 [ECF No. 174], August 1, 2018 [ECF No. 175], November 1, 2018 [ECF No. 176], February 1, 2019 [ECF No. 177], May 1, 2019 [ECF No. 178], August 1, 2019 [ECF No. 179], November 1, 2019 [ECF No. 181], and May 8, 2020 [ECF No. 185].

compliant memory modules that are at issue in the '1605 and '1030 cases in this
District.  This new Western District of Texas case has been consolidated with Netlist's
first Western District of Texas case, and Netlist and SK hynix have stipulated that the
court's ruling on SK hynix's motion to transfer the first Western District of Texas case
to this District pursuant to the "first to file" rule and/or 28 U.S.C. § 1404(a) will
govern the second case as well.  Netlist opposes that motion, briefing is complete, and
the parties are awaiting a decision as the cases progress.

Second, SK hynix has now filed petitions in the U.S. Patent Office for *Inter
Partes* Review ("IPR") of all asserted claims of all three patents now asserted in the
Western District of Texas cases.

## I.   STATUS OF U.S. ITC AND DISTRICT COURT LITIGATION

### A.   The First ITC and District Court Actions

On August 31, 2016, Netlist filed this case (No. 8:16-cv-01605-JLS-JCG ("the
'1605 case")) alleging that SK hynix's DDR4 LRDIMM and RDIMM memory
modules infringed six Netlist patents that Netlist has declared as essential to JEDEC
standards for memory modules: U.S. Patent No. 8,756,364, U.S. Patent No. 8,516,185,
U.S. Patent No. 8,001,434, U.S. Patent No. 8,359,501, U.S. Patent No. 8,689,064, and
U.S. Patent No. 8,489,837 (collectively, the "asserted patents"). ECF No. 1, ¶¶ 16-69.

The following day, Netlist filed a parallel Complaint (Inv. No. 337-TA-1023
("the 1023 investigation")) alleging infringement of the same six patents in the U.S.
International Trade Commission ("ITC").  In the ITC, Netlist sought an exclusion
order prohibiting importation of SK hynix DDR4 LRDIMM and RDIMM products;
monetary remedies are not available in the ITC.

On November 7, 2016, SK hynix filed counterclaims relating to Netlist's
obligations to offer to license the asserted patents on reasonable and non-
discriminatory ("RAND") terms in the ITC which, by law, were removed to this Court
for resolution and consolidated into this case. *See* 19 C.F.R. § 210.14(e).  Netlist

declared the asserted patents to be potentially standard essential patents ("SEPs"), committing to offer to license them on RAND terms. Among other things, the RAND counterclaims ask the Court to set the RAND royalty rate for Netlist's essential patents.

As described in more detail below, SK hynix thereafter filed petitions in the U.S. Patent Office for *Inter Partes* Review ("IPR") of all asserted claims of all six patents asserted in this case. On July 7, 2017, the Patent Office instituted IPRs on all asserted claims of all six asserted patents. *See* 35 U.S.C. § 314(a); 37 C.F.R. § 42.108. SK hynix promptly filed an *Ex Parte* Application to Stay Netlist's Infringement Claims in light of the instituted IPRs, while allowing SK hynix's RAND counterclaims to continue progressing towards trial, then scheduled to start July 10, 2018.

By Order dated July 17, 2017, the Court granted in part that application, holding that "Netlist's infringement claims are STAYED pending further order of the Court," and that SK hynix's RAND counterclaims were not stayed. ECF No. 154 at 8.

The ALJ assigned to the 1023 investigation thereafter issued his "Final Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bonding" (hereinafter "1023 ID") on November 14, 2017, finding (1) no infringement of any asserted patent, (2) no showing by SK hynix that any of the asserted patents are invalid, and (3) were the Commission to find a violation of Section 337, an exclusion order should issue against the accused products, and that RAND considerations did not override the public interest in exclusion. On January 16, 2018, the ITC Commissioners issued the ITC's final determination in the 1023 investigation that SK hynix does not infringe any of Netlist's asserted patents, the same patents Netlist asserts in the '1605 case. The 1023 investigation is thus terminated.

On February 2, 2018, at the parties' joint request, this Court stayed SK hynix's RAND counterclaims, the only then still active portion of this case, in view of the 1023 investigation being terminated in SK hynix's favor.

On March 12, 2018, Netlist filed a notice of appeal, appealing the final determination in the 1023 investigation to the Court of Appeals for the Federal Circuit (Case No. 18-1676). SK hynix intervened in that appeal. Netlist only appealed as to U.S. Patent Nos. 8,001,434, 8,359,501, and 8,689,064 ("self-test patents"). On December 12, 2019, the Federal Circuit dismissed the appeal as moot, after affirming that same day the Patent Trial and Appeals Board's final written decisions finding all asserted claims of all three self-test patents invalid, decisions that Netlist had also appealed to the Federal Circuit. The mandate has since issued and the time for filing a petition for certiorari has passed. The 1023 investigation is thus finally concluded.

### B.     The Second ITC and District Court Actions

After the parties' hearing in the 1023 investigation, Netlist filed, on June 14, 2017, a second complaint in this Court against SK hynix resulting in Case No. 8:17-cv-01030-JLS-JCG ("the '1030 case"), alleging infringement of two additional Netlist patents (U.S. Patent No. 9,606,907 ("the '907 patent"), and U.S. Patent No. 9,535,623 ("the '623 patent")) by SK hynix's DDR4 LRDIMM and RDIMM products. The patents asserted in the '1030 case are from the same families as the six asserted patents in the first '1605 case. On October 9, 2017, SK hynix filed RAND counterclaims against Netlist in that case. The counterclaims are essentially identical to the RAND counterclaims that SK hynix filed against Netlist in this '1605 case.

On October 31, 2017, Netlist filed a second ITC complaint against SK hynix alleging infringement of the same two patents asserted in the '1030 case against SK hynix, which was instituted as the 1089 investigation. In the ITC, Netlist again seeks an exclusion order prohibiting importation of SK hynix DDR4 LRDIMM and RDIMM products (the same products at issue in the 1023 investigation and both the

1  '1605 and '1030 cases).  The 1089 investigation was initially scheduled to conclude

2  by a "target date" of July 3, 2019.  The target date is the earliest possible date that an

3  exclusion order resulting from that investigation could go into effect.

4       The parties jointly stipulated to stay the '1030 case based on SK hynix's

5  automatic right to stay in light of the parallel 1089 investigation; the parties also

6  agreed to consolidate the RAND counterclaims in the '1030 case into this '1605 case.

7  '1030 ECF No. 37; '1030 ECF No. 38; ECF No. 160.  The RAND counterclaims

8  corresponding to both the 1023 Investigation and the 1089 Investigation are thus all in

9  this '1605 case.  *See* ECF Nos. 161–62.

10       On February 20, 2018, SK hynix filed a motion for summary determination of

11  non-infringement in the 1089 investigation.  SK hynix argued that Netlist's assertion

12  of the parent patents to the '907 and '623 patents in the 1023 investigation, and the

13  final determination of non-infringement of those parent patents, precluded Netlist's

14  '907 and '623 patent infringement claims under both claim preclusion and issue

15  preclusion doctrines.

16       The ALJ assigned to the 1089 investigation issued his "Initial Determination

17  Granting Respondents' Motion for Summary Determination of Non-Infringement"

18  (hereinafter "1089 Preclusion ID") on April 12, 2018, finding that the doctrine of

19  issue preclusion (but not claim preclusion) bars Netlist's assertion of the '907 and

20  '623 patents against SK hynix.  The 1089 Preclusion ID thus terminated the

21  investigation.

22       On April 23, 2018, Netlist filed a petition for review with the ITC

23  Commissioners seeking review of the 1089 Preclusion ID's issue preclusion holding,

24  and SK hynix filed a contingent petition for review seeking review of the 1089

25  Preclusion ID's claim preclusion holding if the Commission reviewed the issue

26  preclusion holding.

27       On May 29, 2018, the Commission issued its decision on the 1089 Preclusion

28  ID, vacating the ID and remanding for "the ALJ to (1) consider the parties' claim

- 6 -

1  construction arguments and make appropriate findings resolving their claim
2  construction disputes, and (2) continue the investigation." The ALJ thereafter
3  extended the "target date" for the investigation to August 5, 2019 and set a new
4  procedural schedule for the investigation. On August 30, 2018, the ALJ issued his
5  claim construction order. The investigation was later reassigned to the Chief
6  Administrative Law Judge ("CALJ"). The hearing in the investigation was scheduled
7  for January 15-22, 2019, but was postponed as a result of the Federal government
8  shutdown. The hearing was thereafter rescheduled to March 11-15, 2019. The CALJ,
9  however, had a family medical issue develop the first day of the hearing, leading to
10 the hearing's postponement. The hearing was thus rescheduled to July 15-19, 2019,
11 and the "target date" for the ITC's completion of the investigation has been reset to
12 February 21, 2020.

13         The CALJ issued his "Final Initial Determination on Violation of Section 337
14 and Recommended Determination on Remedy and Bonding" (hereinafter "1089 ID")
15 on October 21, 2019, finding (1) no infringement of the 623 patent, and that SK hynix
16 was estopped from challenging its validity, and (2) infringement of all asserted claims
17 of the 907 patent, and that all but two of the asserted claims were invalid. The 1089 ID
18 recommends that, in view of the violation of Section 337, the Commission should
19 issue an exclusion order against the accused products, and also concluded that RAND
20 considerations did not override the public interest in exclusion of the accused
21 products.

22         The parties each petitioned the ITC Commissioners seeking review of the 1089
23 ID, and the Commission issued a notice on January 31, 2020 of its determination to
24 review the 1089 ID. Netlist did not petition for review of the finding of no
25 infringement of the '623 patent, so only the '907 patent and defenses thereto were at
26 issue. On April 7, 2020, the ITC Commissioners issued the ITC's final determination
27 in the 1089 investigation finding no violation of section 337. The Commission
28 concluded that SK hynix does not infringe the '907 patent under its construction of

1   two claim terms/phrases, that all but two of the asserted claims are invalid, that neither
2   the '907 or '623 are essential to the JEDEC standards at issue, and that the JEDEC
3   Patent Policy is not unenforceable.  The 1089 investigation is thus terminated.

4          On April 29, 2020, Netlist filed a notice of appeal, appealing the final
5   determination in the 1089 investigation to the Court of Appeals for the Federal
6   Circuit.  However, Netlist has since withdrawn its appeal and the 1089 investigation is
7   thus finally concluded.

8          As described in more detail below, SK hynix has also filed IPR petitions in the
9   U.S. Patent Office seeking review of all claims of both the '907 and '623 patents, the
10  Patent Office has instituted IPRs on all claims of both patents, and has issued final
11  written decisions finding all asserted claims invalid.

12         **C.     The Third and Fourth District Court Actions**

13         On March 17, 2020, Netlist filed a complaint in the Western District of Texas,
14  Waco Division against SK hynix resulting in Case No. 6:20-cv-00194-ADA ("the
15  '194 W.D. Texas case"), alleging infringement of two additional Netlist patents (U.S.
16  Patent No. 9,858,218 ("the '218 patent") and U.S. Patent No. 10,474,595 ("the '595
17  patent")) by SK hynix's DDR4 LRDIMM and RDIMM products.  The patents
18  asserted in the '194 W.D. Texas case are from the same family as U.S. Patent No.
19  8,489,837 in the '1605 case and the '623 patent in the '1030 case.  On May 4, 2020,
20  SK hynix filed a motion to transfer the '194 W.D. Texas case to this Court, pursuant
21  to the "first-to-file" rule and/or 28 U.S.C. § 1404(a), which Netlist opposed.  That
22  motion is now fully briefed and awaiting decision.  In the meantime, SK hynix filed
23  RAND counterclaims against Netlist in the '194 W.D. Texas case, the parties have
24  begun fact discovery, completed three rounds of claim construction briefing, and are
25  proceeding towards a *Markman* hearing currently set for March 2021.

26         On June 15, 2020, Netlist filed another complaint in the Western District of
27  Texas, Waco Division against SK hynix resulting in Case No. 6:20-cv-00525-ADA
28

- 8 -

1   ("the '525 W.D. Texas case"), alleging infringement of one additional Netlist patent
2   (U.S. Patent No. 10,217,523 ("the '523 patent")) by SK hynix's DDR4 LRDIMM
3   products.  The patent asserted in the '525 W.D. Texas case is from the same family as
4   U.S. Patent Nos. 8,001,434, 8,359,501 and 8,689,064 in the '1605 case. As with the
5   '194 case, fact discovery has begun, and the parties are proceeding towards a
6   *Markman* hearing in March 2021.

7   The judge, Judge Albright, in the '194 W.D. Texas case and '525 W.D. Texas
8   has since consolidated them, and the parties have filed a stipulation that the court's
9   ruling on the motion to transfer the '194 W.D. Texas case will apply to the '525 W.D.
10  Texas case too.

11  As described in more detail below, SK hynix has also filed IPR petitions in the
12  U.S. Patent Office seeking review of all claims of the '218, '595, and '523 patents,
13  and each of those petitions is awaiting an institution decision from the Patent Office.

14  **II.   STATUS OF FOREIGN LITIGATION**

15  In addition to the U.S. actions, Netlist has filed three actions in China and
16  Germany against SK hynix and its customers.  Those suits too were filed after the ITC
17  hearing in the 1023 Investigation, and the asserted patents all relate to the patents
18  asserted in this case:

19  On July 11, 2017, Netlist filed a patent infringement suit in the Beijing
20  Intellectual Property Court.  In that suit, Netlist again sought an injunction
21  against SK hynix to enjoin sales of SK hynix DDR4 LRDIMMs.  Netlist also
22  sought to enjoin SK hynix customers that purchase DDR4 LRDIMMs designed
23  by SK hynix Inc.  The Beijing Intellectual Property Court dismissed Netlist's
24  case because, as described more fully below, the Chinese Patent Reexamination
25  Board found the asserted patent invalid.

26  Also on July 11, 2017, Netlist filed a patent infringement action in the
27  District Court of Munich.  In Germany, Netlist Luxembourg S.à r.l accuses SK
28  hynix Inc. and Hewlett-Packard GmbH, who allegedly purchases DDR4

1    LRDIMMs designed by SK hynix Inc., of patent infringement.  After briefing

2    and a hearing, the District Court of Munich issued an opinion on January 31,

3    2019, finding that the accused SK hynix DDR4 LRDIMMs do not infringe the

4    asserted patent, and dismissed Netlist's case.  The case is now final.

5         On August 11, 2017, Netlist filed another Chinese patent infringement

6    action in the Beijing Intellectual Property Court, this time against SK hynix's

7    alleged customers.  In this suit, Netlist also sought an injunction.  Netlist sought

8    to enjoin alleged customers that purchased DDR4 LRDIMMs designed by SK

9    hynix Inc.  The Beijing Intellectual Property Court dismissed Netlist's case

10   because, as described more fully below, the Chinese Patent Reexamination

11   Board found the asserted patent invalid.

12        On November 10, 2017, SK hynix filed a cancelation request with the

13   Chinese Patent Reexamination Board ("PRB") seeking to invalidate the patent

14   Netlist asserted in Beijing Intellectual Property Court against SK hynix and its

15   customers.  The PRB held a hearing in March 2018 and issued its ruling on

16   May 30, 2018 declaring the patent invalid in its entirety, which is now a final

17   non-appealable decision.

18        On December 5, 2017, SK hynix filed a cancellation request with the

19   German Patent and Trademark Office ("GPTO"), requesting that the patent

20   Netlist asserted in the District Court of Munich be invalidated.  Netlist has filed

21   its grounds for opposition.  On July 23, 2019, the GPTO issued a final opinion

22   concluding that the asserted patent was invalid in its entirety.

23        The parties do not anticipate any injunctive relief being issued in any of these

24   foreign cases as all have been finally concluded against Netlist.

25   **III.    STATUS OF PTAB PROCEEDINGS**

26        SK hynix has filed a total of twenty (20) IPR petitions against sixteen (16)

27   Netlist patents, including all of the patents asserted against SK hynix in this case,

28   the '1030 case, the 1023 and 1089 investigations, and the '194 and '525 W.D. Texas

- 10 -

cases. The table below summaries their filing dates, the patents-at-issue and their
current status:

| Proceeding | Patent | Filed | Institution Decision | Final Written Decision (FWD) | Appeal Status |
|---|---|---|---|---|---|
| IPR2017-00548 | 8,489,837 | 12/30/2016 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted claims | Time to appeal has expired. |
| IPR2017-00549 | 8,756,364 | 12/30/2016 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted claims | Time to appeal has expired. |
| IPR2017-00560 | 8,689,064 | 1/3/2017 | 5/15/2017 | FWD issued 5/3/2018 invalidating all asserted claims | FWD affirmed in full 12/12/20. |
| IPR2017-00562 | 8,359,501 | 1/3/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | FWD affirmed in full 12/12/20. |
| IPR2017-00561 | 8,001,434 | 1/5/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | FWD affirmed in full 12/12/20. |
| IPR2017-00577 | 8,516,185 | 1/5/2017 | 7/7/2017 | FWD issued 7/5/2018 invalidating all asserted claims | Time to appeal has expired |
| IPR2017-00587 | 8,671,243 | 1/6/2017 | 6/22/2017 | FWD issued | Time to appeal has |

| Proceeding | Patent | Filed | Institution Decision | Final Written Decision (FWD) | Appeal Status |
|---|---|---|---|---|---|
| | | | | 6/20/2018 invalidating all claims | expired. |
| IPR2017-00649 | 8,301,833 | 1/13/2017 | Denied | n/a | n/a |
| IPR2017-00667 | 7,532,537 | 1/13/2017 | 7/21/2017 | FWD issued 7/18/2018 invalidating all claims | Time to appeal has expired. |
| IPR2017-00668 | 7,532,537 | 1/13/2017 | 7/21/2017 | FWD issued 7/18/2018 invalidating all claims | Time to appeal has expired. |
| IPR2017-00692 | 8,874,831 | 1/17/2017 | 7/21/2017 | FWD issued 7/5/2018 invalidating all claims | Time to appeal has expired. |
| IPR2017-00730 | 9,128,632 | 1/20/2017 | Denied | n/a | n/a |
| IPR2018-00303 | 9,535,623 | 12/14/2017 | 5/24/18 | FWD issued 3/21/2019 invalidating all claims | Notice of appeal filed 5/22/19, but appeal thereafter withdrawn |
| IPR2018-00362 | 9,606,907 | 12/22/2017 | 6/29/18 | FWD issued 6/27/2019 invalidating all asserted claims | Notice of appeal filed 8/27/19 |
| IPR2018-00363 | 9,606,907 | 12/22/2017 | 6/29/18 | FWD issued 6/27/2019 invalidating all asserted claims | Notice of appeal filed 8/27/19 |

- 12 -

JOINT STATUS REPORT — No. 8:16-cv-01605-JLS-JCG

| Proceeding | Patent | Filed | Institution Decision | Final Written Decision (FWD) | Appeal Status |
|---|---|---|---|---|---|
| IPR2018-00364 | 9,606,907 | 12/27/2017 | 8/6/18 | FWD issued 8/5/19 finding SK hynix estopped and terminating IPR | Notice of appeal filed 10/1/19 |
| IPR2018-00365 | 9,606,907 | 12/27/2017 | 8/6/18 | FWD issued 8/5/19 finding SK hynix estopped and terminating IPR | Notice of appeal filed 10/1/19 |
| IPR2020-01042 | 10,474,595 | 6/9/2020 | Awaiting decision | n/a | n/a |
| IPR2020-01044 | 9,858,218 | 6/9/2020 | Awaiting decision | n/a | n/a |
| IPR2020-01421 | 10,217,523 | 8/21/2020 | Awaiting decision | n/a | n/a |

- 13 -

1  DATED: November 9, 2020

2  By: /s/ Andrew H. DeVoogd          By: /s/ Brian R. Nester

3     Nada I. Shamonki (Bar No. 205359)        Chad S. Hummel (Bar No. 139055)
         <nshamonki@mintz.com>                    <chummel@sidley.com>
4      MINTZ LEVIN COHN FERRIS GLOVSKY         Theodore W. Chandler (Bar No. 219456)
                                                  <tchandler@sidley.com>
5      & POPEO PC                              SIDLEY AUSTIN LLP
       2029 Century Park East, Suite 1370     555 West Fifth Street, Suite 4000
6      Los Angeles, California  90067         Los Angeles, California  90013
       Telephone: (310) 586-3200              Telephone: (213) 896-6000
7      Facsimile:  (310) 586-3202             Facsimile:  (213) 896-6600

8      James M. Wodarski (*pro hac vice*)      Richard A. Cederoth
         <jwodarski@mintz.com>                    <rcederoth@sidley.com>
9      Andrew H. DeVoogd (*pro hac vice*)      David Giardina
         <dhdevoogd@mintz.com>                    <dgiardina@sidley.com>
10     Matthew S. Galica (*pro hac vice*)      SIDLEY AUSTIN LLP
         <msgalica@mintz.com>                  One South Dearborn
11     MINTZ LEVIN COHN FERRIS GLOVSKY         Chicago, Illinois  60603
                                               Telephone: (312) 853-7000
12     & POPEO PC                              Facsimile:  (312) 853-7036
       One Financial Center
13     Boston, Massachusetts  02111            Brian R. Nester
       Telephone: (617) 542-6000                 <bnester@sidley.com>
14     Facsimile:  (617) 542-2241             SIDLEY AUSTIN LLP
                                               1501 K Street, NW
15     *Attorneys for Plaintiff and*          Washington, DC  20005
       *Counterclaim-Defendant*               Telephone: (202) 736-8000
16     *Netlist, Inc.*                         Facsimile:  (202) 736-8711

17                                             Michael D. Hatcher
                                                  <mhatcher@sidley.com>
18                                             SIDLEY AUSTIN LLP
                                               2021 McKinney Avenue, Suite 2000
19                                             Dallas, Texas  75201
                                               Telephone: (214) 981-3300
20                                             Facsimile:  (214) 981-3400

21                                             Kenneth L. Nissly (Bar No. 77589)
                                                  <knissly@nisslylaw.com>
22                                             LAW OFFICES OF KENNETH L. NISSLY
                                               P.O. Box 3448
23                                             Saratoga, California  95070
                                               Telephone: (408) 398-7043

24                                             *Attorneys for Defendant and*
                                               *Counterclaim-Plaintiff SK hynix Inc.*
25                                             *and Defendants SK hynix America*
                                               *Inc. and SK hynix memory solutions*
26                                             *Inc.*

27  Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filing party hereby attests that all
    signatories listed concur in this filing's content and have authorized this filing.
28

- 14 -
JOINT STATUS REPORT — No. 8:16-cv-01605-JLS-JCG

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## U.S. District Court [LIVE]

### Western District of Texas

**Notice of Electronic Filing**

The following transaction was entered on 10/16/2020 at 2:32 PM CDT and filed on 10/16/2020

| | |
|---|---|
| **Case Name:** | Netlist, Inc. v. SK hynix America Inc. et al |
| **Case Number:** | 6:20-cv-00525-ADA |
| **Filer:** | |
| **Document Number:** | 23 |

**Docket Text:**
Minute Entry for proceedings held before Judge Alan D Albright. Telephone Conference held on 10/16/2020. Case called for telephonic scheduling conference. At issue is whether the two cases will proceed at the same time for hearings or be separated. Plaintiff would like to combine both cases together while the defendant prefers that have 1 Markman Hearing on the track with the second case which is later. There is also a pending motion to transfer case to California. The Court decided that set the Markman Hearings in March and set all trials in both matter in December 2021. Discovery is open immediately, The Court will work on the motion to transfer and it is done by the end of the year well before the Markmans. (Minute entry documents are not available electronically.) (Court Reporter Kristie Davis).(bw)

**6:20-cv-00525-ADA Notice has been electronically mailed to:**

Andrew H. DeVoogd     AHDeVoogd@mintz.com, CMChirillo@mintz.com, sasantos@mintz.com

Barry K. Shelton     bshelton@sheltoncoburn.com, 6471047420@filings.docketbird.com

Brian Ralph Nester     bnester@sidley.com, brian-nester-7968@ecf.pacerpro.com, dcefilingnotice@sidley.com

David C. Giardina     dgiardina@sidley.com, david-giardina-6990@ecf.pacerpro.com, efilingnotice@sidley.com

J. Stephen Ravel     steve.ravel@khh.com, janet.atwood@kellyhart.com, ofelia.williamson@kellyhart.com

Joseph A. Micallef     jmicallef@sidley.com, sturner@sidley.com

Kenneth L. Nissly     knissly@nisslylaw.com

Michael D. Hatcher     mhatcher@sidley.com, txefilingnotice@sidley.com, wbullock@sidley.com

Michael R. Franzinger     mfranzinger@sidley.com, efilingnotice@sidley.com

Theodore W. Chandler     tchandler@sidley.com, hhirano@sidley.com, theodore-chandler-1829@ecf.pacerpro.com

**6:20-cv-00525-ADA Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| NETLIST, INC., | |
| Plaintiff. | |
| v. | Civil Action No. 6:20-cv-00525-ADA |
| SK HYNIX INC. and SK HYNIX AMERICA INC., | |
| Defendants. | |

<u>**JOINT STIPULATION ON MOTION TO TRANSFER VENUE**</u>

WHEREAS, the above-captioned action was filed by Plaintiff Netlist, Inc. ("Netlist") against Defendants SK hynix Inc. and SK hynix America Inc. (collectively "SK hynix") in the United States District Court for the District of Texas, Waco Division on June 15, 2020;

WHEREAS, Netlist filed an earlier action, C.A. No. 6:20-cv-00194-ADA, against SK hynix in this Court on March 17, 2020, and SK hynix filed an opposed Motion to Transfer Case Pursuant to the First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a) ("Motion to Transfer") on May 4, 2020, which is fully briefed and ripe for decision by the Court;

WHEREAS, Netlist and SK hynix agree that the Court's resolution of the Motion to Transfer in C.A. No. 6:20-cv-00194-ADA shall be binding upon and have the same effect in the present case as if filed and decided herein;

NOW, THEREFORE, Netlist and SK hynix, through each party's respective counsel, hereby jointly stipulate to the entry of an Order making the Court's decision of the Motion to Transfer in C.A. No. 6:20-cv-00194-ADA binding upon the parties in this case.

Date:  October 21, 2020

Respectfully submitted,

By:  */s/ Brian R. Nester*
Michael D. Hatcher (*pro hac vice*)
Texas Bar No. 24027067
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone:  (214) 981-3300
Facsimile:  (214) 981-3400
mhatcher@sidley.com

David C. Giardina
Illinois Bar No. 6225008 (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
dgiardina@sidley.com

Theodore W. Chandler
California Bar No. 219456 (*pro hac vice*)
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
tchandler@sidley.com

Brian R. Nester
DC Bar No. 460225 (*pro hac vice*)
Joseph A. Micallef
DC Bar No. 443679 (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711
bnester@sidley.com
jmicallef@sidley.com

Kenneth L Nissly
California Bar No. 77589 (*pro hac vice*)
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3462

Saratoga, California  95070
Telephone: (408) 398-7043
knissly@nisslylaw.com

Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620, Suite 205
Austin, TX 78734-4775
Telephone: (512) 263-2165
Facsimile: (512) 263-2166
bshelton@sheltoncoburn.com

*Attorneys for Defendants*
*SK hynix Inc. and SK hynix America Inc.*

/s/ *Andrew H. DeVoogd*
James M. Wodarski
(*Admitted pro hac vice*)
Massachusetts BBO No. 627036
E-mail: JWodarski@mintz.com
Andrew H. DeVoogd
(Admitted to practice in WDTX)
Massachusetts BBO No. 670203
E-mail: AHDeVoogd@mintz.com
Matthew S. Galica
(*Admitted pro hac vice*)
Massachusetts BBO No. 696916
E-mail: MSGalica@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
POPEO P.C.
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241

J. Stephen Ravel
Texas State Bar No. 16584975
Email: steve.ravel@kellyhart.com
KELLY HART & HALLMAN LLP
303 Colorado, Suite 2000
Austin, Texas 78701
Tel: (512) 495-6429

*Attorneys for Plaintiff Netlist Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on October 21, 2020, all counsel of record who are deemed

to have consented to electronic service are being served with a copy of this document through the

Court's CM/ECF system under Local Rule CV-5(b)(1).

*/s/ Barry K. Shelton*
Barry K. Shelton

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| NETLIST, INC., | |
| Plaintiff. | |
| v. | Civil Action No. 6:20-cv-00525-ADA |
| SK HYNIX INC. and SK HYNIX AMERICA INC., | |
| Defendants. | |

**[PROPOSED] ORDER**

The Court, having reviewed and considered the Joint Stipulation on Motion to Transfer Venue, does hereby ORDER that the Court's decision on Defendants' Motion to Transfer Case Pursuant to the First-to-File Rule or, Alternatively, 28 U.S.C. § 1404(a) ("Motion to Transfer") in C.A. No. 6:20-cv-00194-ADA shall be binding on the parties in this case.

SIGNED this _____ day of _____, 2020.

_____
HONORABLE ALAN D ALBRIGHT
UNITED STATES DISTRICT COURT JUDGE

| | |
|---|---|
| **From:** | Hannah Santasawatkul |
| **To:** | Barry Shelton |
| **Cc:** | Nester, Brian; Giardina, David C.; Micallef, Joseph; Nissly, Kenneth (EXTERNAL @NISSLYLAW.COM); Hatcher, Michael D.; Franzinger, Michael; Chandler, Theodore W.; steve.ravel@khh.com; AHDeVoogd@mintz.com |
| **Subject:** | RE: Netlist v. SK Hynix (6:20-cv-525 and 6:20-cv-194): Request for conference regarding motion to stay |
| **Date:** | Wednesday, January 6, 2021 6:26:15 PM |



Good evening Counsel,

Happy New Year to you as well—hope this first week has you off to a great start!

Thank you for informing me that briefing has closed. I assure you that we are working diligently to resolve the Motion to Transfer. However, the Court's policy is to proceed with all deadlines while the Court resolves the jurisdictional issues in parallel, which the Court will try to do as far in advance of the Markman hearing as possible. Please let me know if you have any other questions, and have a great rest of your week!

Best,
Hannah

---

**From:** Barry Shelton <bshelton@sheltoncoburn.com>
**Sent:** Tuesday, January 5, 2021 5:11 PM
**To:** Hannah Santasawatkul <Hannah_Santasawatkul@txwd.uscourts.gov>
**Cc:** Nester, Brian <bnester@sidley.com>; Giardina, David C. <dgiardina@sidley.com>; Micallef, Joseph <jmicallef@sidley.com>; Nissly, Kenneth (EXTERNAL @NISSLYLAW.COM) <knissly@nisslylaw.com>; Hatcher, Michael D. <mhatcher@sidley.com>; Franzinger, Michael <mfranzinger@sidley.com>; Chandler, Theodore W. <tchandler@sidley.com>; steve.ravel@khh.com; AHDeVoogd@mintz.com
**Subject:** Netlist v. SK Hynix (6:20-cv-525 and 6:20-cv-194): Request for conference regarding motion to stay

==**CAUTION - EXTERNAL:**==

Hannah,

Happy New Year to you!

SK hynix requests a teleconference with the Court to address its fully-briefed Motion to Stay that was filed December 15, 2020. That motion seeks a short stay, until the Court decides SK hynix's fully-briefed Motion to Transfer, which has been pending over eight months, since May 4, 2020.

Currently, the *Markman* hearing in these consolidated cases is scheduled for March 19, 2020. A stay is needed at this juncture to avoid unnecessary additional claim construction briefing and *Markman* hearing preparation, particularly since the first to file rule and 1404(a) factors make transfer appropriate, as explained in SK hynix's Motion to Transfer. Proceeding with the *Markman*

hearing under these circumstances would impose undue hardship on SK hynix, requiring litigation of substantive matters before venue is settled. *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020). Further, as any stay should be short, Netlist identifies no cognizable prejudice to stay, particularly given it filed suit in this forum knowing that transfer – to the forum (C.D. Cal.) in which it is headquartered and in which it filed its first two district court cases against SK hynix, asserting patents in the same families as the patents asserted in this case, against the same accused products – was likely.

Regards,

Barry

**Barry K. Shelton | Partner**
Shelton Coburn LLP
311 RR 620 S, Suite 205
Austin, Texas 78734-4775
T: (512) 263-2165 **|** F: (512) 263-2166 **|** M: (512) 517-9998
bshelton@sheltoncoburn.com | www.sheltoncoburn.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

Misc. Docket No. _____

# United States Court of Appeals
# for the Federal Circuit

---

IN RE SK HYNIX INC., SK HYNIX AMERICA INC.,

*Petitioner.*

---

On Petition for a Writ of Mandamus to the
U.S. District Court for the Western District of Texas in
Case No. 6:20-cv-194-ADA, District Judge Alan Albright

---

## PETITION FOR A WRIT OF MANDAMUS WITH APPENDIX IN SUPPORT

---

KENNETH L. NISSLY
LAW OFFICES OF KENNETH L.
  NISSLY
P.O Box 3462
Saratoga, CA 95070-1462
Telephone: (408) 398-7043

CARTER G. PHILLIPS
RYAN C. MORRIS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

*Counsel for SK hynix Inc., SK hynix America Inc.*

January 21, 2021

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**FORM 9. Certificate of Interest**

## CERTIFICATE OF INTEREST

**Case Number**

**Short Case Caption**  In re SK hynix

**Filing Party/Entity**  SK hynix Inc. and SK hynix America Inc.

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/21/2021

Signature:  /s/ Carter G. Phillips

Name:  Carter G. Phillips

APPX0573

FORM 9. Certificate of Interest

Form 9 (p. 2)
July 2020

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| SK hynix Inc. | | SK Telecom Co., Ltd. |
| SK hynix America Inc. | | SK hynix Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
July 2020

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable   ☐ Additional pages attached

| | | |
|---|---|---|
| David C. Giardina, Sidley Austin LLP, Chicago, IL | Theodore W. Chandler, formerly of Sidley Austin LLP, Los Angeles, CA | Michael D. Hatcher, Sidley Austin LLP, Dallas, TX |
| Brian R. Nester, Joseph A. Micallef, Michael R. Franzinger, Sidley Austin LLP, Washington, DC | Christopher S. Ross, Alice A. Wang, Sidley Austin LLP, Washington, DC | Wonjoo Suh, formerly of Sidley Austin LLP, Washington, DC |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable   ☐ Additional pages attached

| | | |
|---|---|---|
| Netlist, Inc. v. SK hynix Inc., Case No. 8:16-CV-01605 (C.D. Cal.) | Netlist, Inc. v. SK hynix Inc., Case No. 8:17-CV-01030 (C.D. Cal.) | Netlist, Inc. v. SK hynix Inc., Civil Action No. 6:20-cv-00525 (W.D. Tex.) |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable   ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................i

INTRODUCTION ...................................................................1

RELIEF SOUGHT ..................................................................2

ISSUES PRESENTED ..............................................................3

JURISDICTIONAL STATEMENT ..............................................3

STATEMENT OF FACTS ........................................................4

    A.    Background on Parties and Patent Family ...............................4

    B.    Background of Related Litigation ..............................................7

    C.    Background of This Litigation ...................................................12

REASONS WHY THE WRIT SHOULD ISSUE ....................................15

I.    The First-to-File Rule and Traditional Transfer Factors
    Warrant Issuance of the Writ. ........................................................17

    A.    The First-to-File Rule Compels Transfer. ................................17

    B.    Transfer Is Warranted Under Section 1404(a) .........................23

        1.    "Access to sources of evidence" weighs in favor of transfer. 25

        2.    The "availability of compulsory process" strongly favors
            transfer. ....................................................................................26

        3.    "Witness convenience" overwhelmingly favors transfer. ......29

        4.    No "practical problems" weigh against transfer...................31

        5.    The "local interest" factor favors transfer............................32

        6.    The "familiarity of the forum with the governing law"
            favors transfer. ........................................................................33

II.    At a Minimum, Mandamus Is Proper Because the District
    Court Has Failed To Timely Address the Transfer Motion. .........34

CONCLUSION ........................................................................37

CERTIFICATE OF COMPLIANCE ................................................... xxxix

APPENDIX

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acer Am. Corp.*,
  626 F.3d 1252 (Fed. Cir. 2010) ..................................................... 26, 32

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*,
  No. 6:13-CV-364, 2014 WL 12570501 (W.D. Tex. June 11,
  2014) ....................................................................................... 31, 32

*In re Amerijet Int'l, Inc.*,
  785 F.3d 967 (5th Cir. 2015) ................................................................ 21

*In re Apple Inc.*,
  979 F.3d 1332 (Fed. Cir. 2020) ..................................... 1, 16, 24, 31, 34

*Cadle Co. v. Whataburger of Alice, Inc.*,
  174 F.3d 599 (5th Cir. 1999) ............................................................... 18

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*,
  542 U.S. 367 (2004) ............................................................................ 16

*Dataquill, Ltd. v. Apple Inc.*,
  Case No. 13-CA-706, 2014 WL 2722201 (W.D. Tex. June
  13, 2014) ............................................................................................. 33

*In re Echostar Corp.*,
  388 F. App'x. 994 (Fed. Cir. 2010) ...................................................... 35

*In re EMC Corp.*,
  501 F. App'x 973 (Fed. Cir. 2013) ....................................................... 20

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................... 21

*In re Genentech, Inc.*,
  566 F.3d 1338 (Fed. Cir. 2009) ................................................. 25, 28, 29

*In re Google*,
  2015 WL 5294800 (Fed. Cir. Jul. 16, 2015) ............................... *passim*

*Hoffman v. Blaski*,
  363 U.S. 335 (1960) ................................................................... 20

*In re Hoffmann-LaRoche Inc.*,
  587 F.3d 1333 (Fed. Cir. 2009) ................................................ 32

*Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*,
  665 F.3d 671 (5th Cir. 2011) .................................................... 19

*Leach v. Day To Day Imports, Inc.*,
  No. 17-7351, ECF No. 50 (C.D. Cal. Nov. 14, 2017) ........................ 23

*In re Morgan Stanley*,
  417 F. App'x 947 (Fed. Cir. 2011) ............................................ 30

*In re Nintendo Co.*,
  589 F.3d 1194 (Fed. Cir. 2009) ................................. 17, 24, 25

*In re Nintendo*,
  544 F. App'x 934 (Fed. Cir. 2013) ........................... 15, 34, 36

*In re Nitro Fluids, Inc.*,
  978 F.3d 1308 (Fed. Cir. 2020) ................................................ 19

*PersonalWeb Techs., LLC v. NEC Corp. of Am. Inc.*,
  No. 6:11-cv-655, 2013 U.S. Dist. LEXIS 46296 (E.D. Tex.
  Mar. 21, 2013) ........................................................................ 28

*Save Power Ltd. v. Syntek Fin. Corp.*,
  121 F.3d 947 (5th Cir. 1997) .............................................. 17, 19

*Sutter Corp. v. P & P Indus., Inc.*,
  125 F.3d 914 (5th Cir. 1997) .................................................... 18

*In re TOA Tech.*,
  543 F. App'x 1006 (Fed. Cir. 2013) .......................................... 30

*In re TS Tech. United States Corp.*,
  551 F.3d 1315 (Fed. Cir. 2008) ............................................. 3, 35

*Van Dusen v. Barrack*,
  376 U.S. 612, 616 (1964) ....................................................... 35

*In re Vistaprint Ltd.*,
  628 F.3d 1342 (Fed. Cir. 2010) .......................................... 32

*In re Volkswagen AG*,
  371 F.3d 201 (5th Cir. 2004).................................... 24, 29, 30

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008) (en banc).............................. 16

*West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*,
  751 F.2d 721 (5th Cir. 1985)............................................... 18

*XY, LLC v. Trans Ova Genetics, LC*,
  No. W-16-CA-00447-RP, 2017 WL 5505340 (W.D. Tex.
  Apr. 5, 2017) ....................................................................... 23

## Statutes

28 U.S.C. § 1295................................................................................. 3

28 U.S.C. § 1404(a) ..................................................................... *passim*

28 U.S.C. § 1404............................................................................... 35

## Other Authorities

Fed. R. Civ. P. 45(c) ..................................................................... 27

# INTRODUCTION

Petitioners SK hynix Inc. and SK hynix America Inc. (together "SK hynix") respectfully ask this Court to issue a writ of mandamus to the United States District Court for the Western District of Texas ("WDTX") requiring that court to transfer this case. SK hynix moved to transfer the underlying action over eight-and-a-half months ago, but the district court has yet to rule upon the motion and is instead driving the substantive proceedings in this case forward. This Court's precedent is clear: "once a party files a transfer motion, disposing of that motion should unquestionably take priority." *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020). District courts certainly have some degree of "discretion as to how to handle their dockets," *id.*, but the district court's delay here has far surpassed any reasonable amount of discretion the court has.

The district court's inaction is all the more egregious because this is a prototypical case for transfer. SK hynix sought to transfer this case to the United States District Court for the Central District of California ("CDCA") where two related cases are currently pending. Those cases involve the same family of patents, the same accused products, and

even the same accused functionality as this case. Plaintiff Netlist has

declared that each of the patents involved in the CDCA cases and the

patents asserted here are essential to the same industry standards for

computer memory modules. And in each case, SK hynix has asserted

counterclaims against Netlist for its failure to license these supposedly

standard-essential patents on reasonable and non-discriminatory

("RAND") terms and conditions. These counterclaims encompass the

patents Netlist asserts in the underlying action here. Thus, transfer is

warranted as a matter of judicial economy under both the first-to-file

rule and 28 U.S.C. § 1404(a). Because the basis for transfer is so clear,

the Court should issue a writ of mandamus compelling WDTX to

transfer this case to CDCA. At a minimum, however, mandamus is

warranted to compel the district court to decide the pending motion to

transfer before proceeding with the substantive proceedings in this

case.

## RELIEF SOUGHT

SK hynix respectfully requests a writ of mandamus compelling the

United States District Court for the Western District of Texas to

transfer this case to the United States District Court for the Central

District of California, or, in the alternative, staying the Western

District of Texas case and directing the district court to rule on SK

hynix's motion to transfer.

## ISSUES PRESENTED

Whether this case should be transferred to the Central District of

California, because substantially similar cases were filed there first,

and because the private and public factors compel transfer to that court.

Whether the district court here clearly abused its discretion by

failing to rule on SK hynix's motion to transfer for over eight-and-a-half

months, where related cases are pending in the Central District of

California and the evidence clearly demonstrates that is a far more

convenient venue for the parties and witnesses.

## JURISDICTIONAL STATEMENT

The Federal Circuit has jurisdiction over this petition because the

underlying case in the Western District of Texas is a patent case. *See* 28

U.S.C. § 1295; *id.* §§ 1331, 1338(a). Mandamus is available "to correct a

clear abuse of discretion or usurpation of judicial power." *See In re TS

Tech. United States Corp.*, 551 F.3d 1315, 1318 (Fed. Cir. 2008). Failure

to timely rule on a motion to transfer warrants mandamus. *See In re Google*, 2015 WL 5294800, at *1 (Fed. Cir. Jul. 16, 2015).

## STATEMENT OF FACTS

### A.    Background on Parties and Patent Family

In the underlying action here, Netlist accuses SK hynix's memory module products of infringing U.S. Patent No. 9,858,218 ("the '218 patent") and U.S. Patent No. 10,474,595 ("the '595 patent"), which Netlist contends are essential to certain Joint Electron Device Engineering Council ("JEDEC") standards for memory modules, where JEDEC is the established standards-setting organization for the industry.

SK hynix Inc. is a Korean company with its principal place of business in Korea. APPX0095. SK hynix America Inc. is a California corporation headquartered in San Jose, California. APPX0095-0096. SK hynix America Inc. is a subsidiary of SK hynix Inc. in the United States, providing support for sales, technical, and customer or client relationship operations. *Id.* California has been the base of SK hynix's operations in the United States for over 30 years, and it has over 200 employees in that State. APPX0096. The documents related to the

research and development, operation, and function of the accused

products, as well as related marketing, sales, and licensing information,

are maintained in Korea. APPX0097. SK hynix America does have a

small office in Austin, Texas, but the nine employees working in that

office have never been relevant to this case. APPX0097-0098. Nor are

they involved in the research, design, development, or manufacture of

any accused products. APPX0098. Rather, those employees provide

commercial sales and high-level technical assistance to customers in the

Austin area, referring more detailed technical questions from customers

to engineers in Korea. *Id.*

As Netlist has explained in related litigation, "Netlist is

headquartered and has its principal place of business in [CDCA], sells

products in [CDCA], and has been harmed by Defendants' conduct,

business transactions and sales in [CDCA]." APPX0198-0199,

APPX0300-0301. Netlist has also asserted that "Netlist engineers

working in Irvine, California, invented the technology of the asserted

patents and worked to implement the patented inventions into

Netlist's … products …." APPX0223, APPX0354. "Since 2007,

substantially all of the research and development, design, engineering

and testing of [the products] was done by Netlist engineers working in Irvine, California." APPX0225, APPX0356. Netlist does not allege in this case that it has a presence in Texas, and, as far as SK hynix is aware, it has no facilities or employees there.

Netlist has declared that many of its patents are essential to JEDEC industry standards for memory modules. APPX0199-0200, APPX0218, APPX0301-0302, APPX0313. These allegedly standard-essential patents include U.S. Patent No. 8,489,837 ("the '837 patent") and U.S. Patent No. 9,535,623 ("the '623 patent"), as well as the '218 patent and the '595 patent. APPX0109-0120 ('837 patent), APPX0122-0135 ('623 patent), APPX0137-0150 ('218 patent), APPX0152-0168 ('595 patent). The '623, '218, and '595 patents all claim to be continuations, through intervening applications, of the '837 patent. APPX0122, APPX0138, APPX0153.

As discussed in more detail below, long before bringing the present case in WDTX asserting the '218 and '595 patents, Netlist asserted the '837 and '623 patent against SK hynix in the pending CDCA cases, accusing the same products and functionality accused in this case.

## B.    Background of Related Litigation

Netlist has filed seven prior cases accusing SK hynix's memory modules of infringing Netlist's alleged standard-essential patents—two in district court, two in the ITC, and three before foreign tribunals. Across these proceedings, Netlist and SK hynix have taken dozens of depositions, conducted two trials in the ITC, and engaged in litigation in two CDCA cases, as detailed below. None of these cases was brought in Texas, and none of the fact witnesses who have been deposed or appeared at a hearing or trial resides in Texas.

In the two California cases—just like this one—Netlist has accused SK hynix's standard-compliant DDR4 LRDIMM and RDIMM memory modules of infringing standard essential patents. *Compare* APPX0035, APPX0039 *with* APPX0212, APPX0306-0307. More specifically, Netlist asserts, both in California and in Texas, that SK hynix's products infringe based on their incorporation of "Clock-to-CA training mode" functionality called for by JEDEC standards. APPX0045-0051, APPX0054-0060, APPX0219, APPX0319-0323.

In 2016, Netlist first sued SK hynix in CDCA (No. 8:16-CV-01605) ("*California I*") and the U.S. International Trade Commission (No. 337-

TA-1023) ("*ITC I*"). APPX0196, APPX0218, APPX0222. Netlist asserted that SK hynix infringed standard-essential patents, including the '837 patent. SK hynix filed counterclaims in *California I* asserting that Netlist had violated contractual obligations to license its standard-essential patents to SK hynix on reasonable and non-discriminatory ("RAND") terms. APPX0244-0245. The counterclaims seek a determination of the RAND terms to license those patents that Netlist asserts to be standard-essential, as well as an order barring Netlist from enforcing any injunctive relief it might receive from a court or the ITC on the basis of infringement of any standard-essential patent. APPX0246, APPX0248.

SK hynix's counterclaims encompass both the '218 patent and '595 patent that Netlist asserts in the underlying case here. APPX0079-0080. Indeed, Netlist acknowledged before the court below that it "committed" to offer to license the relevant patents on RAND terms under the JEDEC Patent Policy. APPX0032-0033.

The parties advanced both the claims and the counterclaims in *California I*, including through negotiations over discovery and protective orders, APPX0261-0275, APPX0277-0292, exchange of

discovery including infringement and invalidity contentions, APPX0100, and full briefing of all claim construction issues. *Id*. Judge Staton also held a hearing and granted a motion to disqualify Netlist's initial counsel, APPX0252, and granted a motion to strike portions of expert claim-construction declarations Netlist had filed improperly, APPX0294. Judge Staton eventually stayed Netlist's claims—though not SK hynix's counterclaims—pending the resolution of *inter partes* review proceedings on all claims of the relevant patents. APPX0340-0342. The counterclaims were not stayed because *ITC I* proceeded apace, putting SK hynix at risk of an exclusion order in what it alleged was a violation of Netlist's RAND obligations. APPX0341. As a result, discovery continued in *California I* as to SK hynix's RAND counterclaims.

In January 2018, the ITC issued a Final Determination of non-infringement of all six asserted patents in *ITC I*, including the '837 patent. APPX0376. Shortly thereafter, the Patent Trial and Appeal Board ("PTAB") issued final written decisions that found invalid each of the asserted claims of the patents at issue in both *California I* and *ITC I*, including the '837 patent. APPX0383. Judge Staton then stayed SK

9

hynix's RAND counterclaims in *California I* based on an agreement between the parties. APPX0380. Judge Staton continues to manage the case and requires regular joint reports from the parties on whether the stay should be lifted. *Id.* The parties have agreed to immediately update Judge Staton once the WDTX rules on the pending transfer motion, and provide her with their proposals for how *California I* should thereafter proceed. APPX0550. During the course of that case, Netlist has maintained, and the CDCA ordered, that the infringement and RAND claims should be litigated together rather than bifurcated. APPX0256. And, under a cross-use discovery agreement for *California I* and *ITC I*, the parties have served and responded to hundreds of interrogatories, requests for admission, and requests for production; exchanged over 2.4 million pages of document production; served over 11,000 pages of expert reports; and taken over 25 days of depositions of fact and expert witnesses. APPX0330-0331, APPX0100.

Prior to the ITC's determination in *ITC I* (and the ensuing district court stay), in June 2017, Netlist filed a second case against SK hynix in CDCA (No. 8:17-CV-01030) ("*California II*"), and then a second case

in the ITC in October 2017 (No. 337-TA-1089) ("*ITC II*").[1] APPX0298,

APPX0313, APPX0353. In these cases, Netlist asserted claims of the

'623 patent, which is a continuation of the '837 patent. APPX0301-0302.

In *California II*, SK hynix reiterated the RAND counterclaims it

asserted in *California I*. APPX0345-0346, APPX0348-0349. Judge

Staton ultimately consolidated and stayed both CDCA cases.

APPX0367.

　　　ITC II resulted in a finding that *ITC I*'s non-infringement finding

with respect to the '837 patent collaterally estopped Netlist from

asserting the '623 patent. APPX0394-0399. It separately concluded that

the accused products did not infringe the '623 patent. APPX0399-0419.

These findings became final after Netlist declined to seek review.

APPX0437.

　　　Finally, while *California II* and *ITC II* were pending, SK hynix

filed an IPR against the '623 patent, which resulted in a final written

---

[1] Netlist also sued SK hynix twice in China and once in Germany. In
each, Netlist alleged that SK hynix infringed Netlist's allegedly
standard-essential patents, which were all members of the same patent
families Netlist has asserted in the U.S. litigation. Netlist lost all of its
foreign cases, which resulted in final decisions that the patents were
not infringed, invalid, or both. APPX0424-0425.

decision invalidating all asserted claims. APPX0388-0389. Netlist initially appealed that decision, and that appeal was pending at the time Netlist filed the complaint in this case; Netlist has since abandoned that appeal. APPX0434.

## C.    Background of This Litigation

Netlist filed the underlying action asserting the '218 patent and '595 patent on March 17, 2020. APPX0027. Its complaint alleges that the same SK hynix products at issue in the California cases infringe based on their incorporation of the same "Clock-to-CA training mode" functionality accused in California. APPX0035, APPX0045-0051, APPX0039, APPX0054-0060.

As noted, both of the '218 and '595 patents, and the '623 patent, are continuations of the '837 patent that was asserted in *California I*. All four patents share the same specification, inventor, and claimed priority dates. APPX0109-0120, APPX0122-0135, APPX0137-0150, APPX0152-0168. Indeed, the examiner for the '218 and '595 patents initially rejected all of the then-pending claims "on the ground of nonstatutory double patenting as being unpatentable over claims 1-18" of the '837 patent, finding that:

> Although the claims at issue are not identical, they are not
> patentably distinct from each other because the pending
> claims make obvious the claims of the issued patents and
> vice versa.

APPX0173; *see also* APPX0185. Netlist overcame this rejection only by filing terminal disclaimers tying the expiration of the '218 and '595 patents to the expiration of the '837 patent. APPX0183, APPX0189, APPX0192.

In short, in the WDTX case at issue here, Netlist is asserting the same infringement theories it has asserted in *California I* and *California II*. Likewise, SK hynix is asserting nearly identical RAND counterclaims and defenses.

Because this case substantially overlaps with *California I* and *California II*, SK hynix moved to transfer this case to CDCA on May 4, 2020, under the first-to-file rule and 28 U.S.C. § 1404(a). *See* APPX0074-0094. The motion was fully briefed by May 26, 2020. *See* APPX0442 (Netlist Opposition Br.), APPX0464 (SK hynix Reply Br.). As early as June 12, 2020, Netlist and SK hynix agreed that the "motion to transfer in this case is ripe for decision." APPX0476.[2]

---

[2] Shortly after briefing on the transfer motion in this case concluded, Netlist filed another action asserting U.S. Patent No. 10,217,523 ("the

In June 2020, the district court assured the parties that it would rule on the motion to transfer "by the end of July" 2020. APPX0507. In the meantime, the court required the parties to proceed with the case. A few months later, SK hynix once again raised its outstanding transfer motion in a case-management conference in the related 525 action. APPX0563. In response, the district court indicated that it would rule "by the end of the year well before the Markmans." *Id.* The end of the year, of course, came and went.

Accordingly, after the transfer motion had been pending for seven months, SK hynix once again asked the court to rule on its transfer motion and moved for a stay of the case in order to "prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'" while it is "forced to expend resources litigating substantive matters in an inconvenient venue while a motion to transfer lingers unnecessarily on the docket." *In re Google*, 2015 WL 5294800, at *1; *see also* APPX0515-

---

'523 patent") on June 15, 2020. *See Netlist, Inc. v. SK hynix Inc.*, Civil Action No. 6:20-cv-00525 (W.D. Tex.) ("525 action"). APPX0061. The parties have stipulated that the ruling on the motion to transfer in this case "shall be binding upon and have the same effect" in this more recent case. APPX00565.

0525. On January 6, 2021, SK hynix was informed that its stay request would be denied. APPX0570. In addition, the district court's law clerk informed SK hynix that the court would proceed with the substantive deadlines "in parallel" with "jurisdictional issues," which includes the transfer motion. APPX0570. The law clerk also provided the vague assertion that the court would decide the motion "as far in advance of the Markman hearing as possible." APPX0570.

Despite this Court's admonition that a pending transfer motion should be addressed "before … any substantive portion of the case," *In re Nintendo*, 544 F. App'x 934, 941 (Fed. Cir. 2013), the district court has scheduled a *Markman* hearing for March 19, 2021, and it ordered briefing for that hearing to commence several weeks ago. APPX0510-0514.

## REASONS WHY THE WRIT SHOULD ISSUE

Mandamus relief is appropriate where a petitioner (1) has a "clear and indisputable" right, (2) has "no other adequate means to attain the relief [it] desires," and (3) demonstrates that "the writ is appropriate under the circumstances." *In re Apple, Inc.*, 979 F.3d 1332, 1336 (Fed. Cir. 2020); *see also Cheney v. U.S. Dist. Court for the Dist. of Columbia*,

542 U.S. 367, 381 (2004). In the transfer context, the first factor is the linchpin, as an erroneous transfer decision cannot be remedied in a future appeal. *See id.*

Under this Court's precedent, district courts must prioritize the resolution of transfer motions, and failure to do so in a timely fashion warrants mandamus relief. *In re Google*, 2015 WL 5294800, at *1.

Separately, under Fifth Circuit precedent, a district court should grant a transfer motion if the movant shows that the transferee venue is clearly more convenient than the transferor venue. *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc).[3] In making this determination, district courts must assess and balance a number of private and public interest factors. *See id.*

Issuing a writ of mandamus is appropriate here in light of both the district court's delays and SK hynix's showing that the case should be transferred. Indeed, related, first-filed litigation involving substantially overlapping issues is already occurring between Netlist and SK hynix in CDCA. Under the first-to-file rule and the traditional

---

[3] This Court applies the law of the regional circuit when considering transfer motions. *See, e.g.*, *In re Echostar Corp.*, 388 F. App'x. 994, 995 (Fed. Cir. 2010).

transfer analysis under 28 U.S.C. § 1404(a), the case should be transferred to CDCA, and the Court should issue a writ compelling the district court to effect this transfer.

## I.    The First-to-File Rule and Traditional Transfer Factors Warrant Issuance of the Writ.

The Court should issue a writ of mandamus compelling the district court to transfer this case to CDCA. SK hynix's transfer motion demonstrated that this case should be heard in CDCA—not WDTX— because of the "stark contrast in relevance, convenience, and fairness between the two venues." *In re Nintendo Co.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009). As explained below, the district court erred by failing to rule on that motion. This is especially so because the factors governing transfer establish that SK hynix has an indisputable right to transfer of this case to CDCA, and the Court should so order. Both the first-to-file rule and the traditional private and public factors mandate transfer.

### A.    The First-to-File Rule Compels Transfer.

As a "general rule," "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). Even where the

overlapping cases are filed in different district courts, "[t]he concern

manifestly is to avoid the waste of duplication, to avoid rulings which

may trench upon the authority of sister courts, and to avoid piecemeal

resolution of issues that call for a uniform result." *West Gulf Maritime*

*Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985).

Under the Fifth Circuit's formulation of the first-to-file rule, the

rule "not only determines which court may decide the merits of

substantially similar issues, but also establishes which court may

decide whether the second suit filed must be dismissed, stayed or

transferred and consolidated." *Cadle Co. v. Whataburger of Alice, Inc.*,

174 F.3d 599, 606 (5th Cir. 1999) (quoting *Sutter Corp. v. P & P Indus.,*

*Inc.*, 125 F.3d 914, 920 (5th Cir. 1997)). That is, "once the district court

[finds] that the issues *might* substantially overlap, the proper course of

action [is] for the court to transfer the case to the [first-filed] court to

determine which case should, in the interests of sound judicial

administration and judicial economy, proceed." *Id.*[4] Here, this means

---

[4] The court may also "dismiss an action" or "stay it" if the issues "can be resolved in an earlier-filed action pending in another district court." *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 & n.1 (5th Cir. 1985).

that Judge Staton in CDCA should determine how Netlist's various cases should proceed, all of which involve the same family of patents and the same allegations of infringement.

The overlap between this case and *California I* and *II* is obvious and substantial. The Fifth Circuit evaluates substantial overlap by looking to such factors as whether "the core issue … was the same" or whether "much of the proof adduced … would likely be identical." *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011). "The rule does not, however, require that cases be identical." *Save Power*, 121 F.3d at 950; *cf. In re Nitro Fluids, Inc.*, 978 F.3d 1308,1309-10 (Fed. Cir. 2020) (granting mandamus where second-filed suit "alleg[ed] that the same accused products infringe two … other related patents"). Even if the "overlap between two suits is less than complete, the judgment is made … based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Int'l Fid. Ins.*, 665 F.3d at 678.

Substantial overlap exists between the case Netlist filed in WDTX and the earlier cases it filed in CDCA. The '218 and '595 patents

descend directly from the '837 patent, which is asserted in California. Indeed, the '218 and '595 patents share an identical specification with the earlier-asserted patents and include claims that the Patent Office found to be "not patentably distinct from" those of the earlier-asserted patents. *See supra* at 12. The accused products in all cases are the same. And Netlist's infringement theories are the same. Hence, the claim construction, infringement, and validity analyses and the discovery that goes into these issues will be nearly identical across all three cases.[5]

Similarly, the RAND royalty issues over the '218 and '595 patents substantially overlap with the RAND issues pending in *California I* and *II*. As in the *California* cases, SK hynix has asserted a counterclaim here seeking RAND terms on all allegedly standard-essential patents.

---

[5] The fact that the PTO has found the claims invalid or that Netlist has abandoned its appeals of the PTO's decisions is irrelevant. Transfer motions are "decided based on 'the situation which existed when suit was instituted.'" *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013) (quoting *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)). When Netlist filed this case in May 2020, Netlist was still appealing the PTAB decisions invalidating the claims being asserted in CDCA. Moreover, Netlist has not sought to dismiss the CDCA infringement claims, which remain pending. In any case, Netlist has not denied the substantial overlap of the RAND counterclaims—which SK hynix would now be forced to litigate in WDTX.

APPX0479. But the CDCA counterclaims seeking a determination of the RAND terms for a license to *any* Netlist standard-essential patent (which SK hynix has committed to take) *already include* the '218 and '595 patents asserted here.[6] Any damages award arising from these claims must take into account Netlist's RAND licensing obligations, *see, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1235 (Fed. Cir. 2014), so allowing this case to proceed in WDTX risks inconsistent determinations and a significant waste of judicial resources when the same issues are proceeding in California, where substantial discovery has already taken place. *See supra* at 10. The Fifth Circuit has held that transfer is warranted in such circumstances. *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 976-77 (5th Cir. 2015), as revised (May 15, 2015) (finding "substantial overlap" where there was "a substantial risk that rulings in Florida—or Texas—would 'trench upon the authority' of the other court and lead to 'piecemeal resolution of issues that call for a uniform result'").

---

[6] A finding on these RAND terms could moot Netlist's infringement claims on these patents.

The first-to-file rule exists to prevent wasteful parallel actions. Because SK hynix's counterclaims in the CDCA cases encompass the patents Netlist has asserted in the underlying action here, CDCA will necessarily decide the essentiality of Netlist's patents, whether practice of the claimed standard necessarily infringes, and the scope of Netlist's RAND obligations. Absent a transfer, WDTX will have to duplicate this analysis, leading to the risk of inconsistent determinations. Even if both courts reach the same result, the substantial factual overlap between the underlying action and the California cases will result in a wasteful expenditure of judicial and party resources.

Accordingly, under Fifth Circuit precedent, WDTX should have ordered the transfer of this case to CDCA, and its failure to do so for eight-and-a-half months warrants issuance of a writ of mandamus by this Court.[7]

---

[7] In briefing on the transfer motion in the district court, Netlist argued that venue would not have been appropriate in CDCA, despite having filed two infringement cases against SK hynix in that district. APPX0456. In any event, this assertion is irrelevant in the first-to-file analysis, and Netlist has cited no authority holding otherwise.

### B.     Transfer Is Warranted Under Section 1404(a)

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

As a threshold matter, the previous cases in California establish that this case "might have been brought" in CDCA, where all parties have consented to venue. *See XY, LLC v. Trans Ova Genetics, LC*, No. W-16-CA-00447-RP, 2017 WL 5505340, at *11 (W.D. Tex. Apr. 5, 2017) (finding forum appropriate where parties have "extensively litigat[ed]" already). Having sued SK hynix twice in CDCA on closely related patents, Netlist "waived [its] right to contest venue" when it brought its "initial action in that [venue]." Order Transferring Action, *Leach v. Day To Day Imports, Inc.*, No. 2:17-07351, ECF No. 50 at 4 & n.1 (C.D. Cal. Nov. 14, 2017). Moreover, the claims here "might have been brought" in CDCA because Netlist could have sought leave to amend its complaint in CDCA to add the patents asserted here.

In the Fifth Circuit, the district court must evaluate a number of private and public interest factors in making this determination. The private interest factors include: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Apple*, 979 F.3d at 1338-39. The public factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004).

This case "features a stark contrast in relevance, convenience, and fairness between the two venues." *In re Nintendo Co.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009). Both Netlist and SK hynix America are headquartered in California, where the events giving rise to this case occurred and where related litigation has been occurring. WDTX, Netlist's new chosen forum, has little connection to this case, and

Netlist's vague assertions regarding SK hynix's small Austin office are belied by the fact that not a single Texas employee has been identified or deposed in the four years that the parties have litigated the California and ITC cases. Thus, the private factors strongly favor transferring this case to CDCA—access to sources of evidence, the availability of compulsory process, and the convenience of witnesses all weigh significantly in favor of CDCA. The public factors also weigh in favor of transfer or are neutral. Under such circumstances, the district court must grant transfer. *See Nintendo Co.*, 589 F.3d at 1198 ("[I]n a case featuring most witnesses and evidence closer to the transferee venue with few or no convenience factors favoring the venue chosen by the plaintiff, the trial court should grant a motion to transfer.").

### 1. "Access to sources of evidence" weighs in favor of transfer.

It is well recognized that "[i]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer," and therefore, "the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). SK hynix's documents will be the primary sources of evidence relevant to Netlist's claims, and those documents

are in California or South Korea, where SK hynix America and SK

hynix are based. Moreover, given that Netlist's claims here mirror those

in the *California* and *ITC* actions, those sources of proof have already

been produced in California. APPX0100.

Moreover, there is no reason to believe that any evidence relevant

to this litigation is in Texas. SK hynix America's small Austin office is

not involved in the research, design, development, or manufacture of

any of the accused products, and instead focuses on sales and technical

assistance to customers in the area. APPX0105. Netlist's principal place

of business is in CDCA, and it has no footprint in WDTX whatsoever.

Thus, the "access to sources of evidence" factor strongly favors transfer.

*See In re Acer Am. Corp.*, 626 F.3d 1252, 1254-55 (Fed. Cir. 2010) ("Our

prior orders in venue transfer cases make clear that the combination of

multiple parties being headquartered in or near the transferee venue

and no party or witness in the plaintiffs chosen forum is an important

consideration.").

### 2. The "availability of compulsory process" strongly favors transfer.

The availability of compulsory process over key witnesses in

CDCA also significantly counsels in favor of transfer. Both Netlist and

SK hynix America are headquartered in California, and many witnesses will be within the 100-mile subpoena radius of CDCA; no witnesses have been identified in WDTX. *See* Fed. R. Civ. P. 45(c).

California is home to several important third-party witnesses that are outside WDTX's subpoena power but may be compelled by CDCA. For example, Dr. Hyun Lee is the lone inventor of the '837, '623, '218 and '595 patents, and SK hynix expects to take and submit Dr. Lee's testimony regarding any alleged invention claimed in the '218 and '595 patents. APPX0104-0105. Dr. Lee is no longer employed by Netlist, so he is a third-party witness; however, SK hynix understands that he still lives near Netlist's headquarters in CDCA. APPX0104. Mr. Noel Whitney is Netlist's former chief licensing officer who led Netlist's efforts to license SK hynix under Netlist's alleged standard essential patent portfolio, and thus his testimony is highly relevant to the RAND issues applicable to the patents at issue here. APPX0103-0104. Mr. Whitley has similarly left Netlist but apparently still resides near Netlist's headquarters in CDCA. In addition, the patent prosecutor for all four patents, and witnesses for the suppliers of components for the accused products, are located in California. APPX0104.

Netlist has argued that there is no indication witnesses would be unwilling to testify in WDTX given their participation in the ITC proceeding, but their participation occurred *before* they left Netlist, and only Mr. Whitley actually traveled to attend the trial in the ITC live. APPX0458, APPX0471. In any case, courts have recognized that whether third-party witnesses might be willing to voluntarily travel and testify should not factor into the court's analysis. *PersonalWeb Techs., LLC v. NEC Corp. of Am. Inc.*, No. 6:11-cv-655, 2013 U.S. Dist. LEXIS 46296, at \*33 n.14 (E.D. Tex. Mar. 21, 2013) (declining to take into account witness declarations that they are willing to testify). Because such speculation about whether witnesses are willing to voluntarily participate is unnecessary in CDCA, that district is clearly more convenient. *See In re Genentech, Inc.*, 566 F.3d at 1345.

In contrast to California, Texas offers nothing to aid in compulsory process. Netlist's complaint does not identify or implicate any third parties located in WDTX that are likely to be deposed or to testify. Though Netlist has vaguely speculated that there may be witnesses in WDTX, this speculation is belied by the fact that in over four years of

litigation involving the same products, no third-party witnesses have been identified or deposed in Texas. APPX0104-0105.

The availability of compulsory process in California strongly favors transfer.

### 3. "Witness convenience" overwhelmingly favors transfer.

Convenience to witnesses is commonly acknowledged as "'the single most important factor in transfer analysis,'" *Genentech*, 566 F.3d at 1343. The Fifth Circuit applies a "100-mile rule" to this factor: "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen AG*, 371 F.3d at 204-05. Here, many witnesses reside in California, no identified witnesses are in Texas, and other witnesses reside in locations—e.g., South Korea—for which California is significantly more convenient. Thus, this factor strongly weighs in favor of transfer.

None of SK hynix's potential witnesses resides in WDTX, and in over four years of prior litigation involving the same products, patent family, and RAND issues, Netlist has never identified or deposed any

SK hynix employees in WDTX. APPX0102. CDCA, on the other hand, is

a much shorter average travel distance for SK hynix's potential

witnesses, including those in California and Korea. APPX0096. Travel

to WDTX by witnesses at SK hynix's U.S. headquarters in California

would require repeated costly, indirect flights. *Id.*

Transfer is particularly favored here where a substantial number

of witnesses reside in the transferee venue and none resides within

WDTX. *See In re TOA Tech.*, 543 F. App'x 1006, 1009 (Fed. Cir. 2013)

(even where some party employees resided in Texas, "the potential for

inconvenience to witnesses still favor[ed] transfer, because none of

those witnesses reside[d] within 100 miles of the Eastern District of

Texas and the majority of witnesses would find the [transferee district]

less inconvenient and costly to travel for trial"); *see also In re Morgan

Stanley*, 417 F. App'x 947, 948-49 (Fed. Cir. 2011) (transfer favored

where "the inventors" and "the defendants' employees with unique

knowledge regarding the accused products reside in or near the

transferee venue," while "no party is headquartered within a hundred

miles of the [Western] District of Texas").

### 4. No "practical problems" weigh against transfer.

Not only do these private factors weigh in favor of transfer, but there are no practical problems that weigh against transfer. In fact, transfer to CDCA where the related cases are pending will make trial easy, expeditious, and inexpensive compared to allowing the cases to proceed in parallel in WDTX and CDCA. "At the end of the day, 'judicial economy plays a paramount role in trying to maintain an orderly, effective, administration of justice.'" *Affinity Labs of Texas, LLC v. Samsung Elecs. Co.*, No. 6:13-CV-364, 2014 WL 12570501, at *7 (W.D. Tex. June 11, 2014) (quoting *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010)). Here, where "there are pending cases in [CD]CA with 'some overlapping issues,'" this Court has recognized that the "judicial economy benefits" weigh in favor of transfer. *In re Apple Inc.*, 979 F.3d 1332, 1344 (Fed. Cir. 2020).

As explained above, this case involves the same accused functionality of the same accused products at issue in cases currently pending in CDCA. Given that the CDCA court has already expended significant resources and become familiar with the parties, this patent family, and the RAND issues here, transfer to CDCA is the only way to

avoid wasteful duplication of effort. *See In re Vistaprint Ltd.*, 628 F.3d at 1346 (finding "the fact there is co-pending litigation … involving the same patent and underlying technology" provides "substantial justification" for a venue).

### 5. The "local interest" factor favors transfer.

As to the public factors, CDCA has a substantial local interest in this case, which favors transfer. Netlist is headquartered there, and individuals who are involved in this case live and work in or near that district. *In re Hoffmann-LaRoche Inc.*, 587 F.3d 1333, 1336 (Fed. Cir. 2009) (local interests are strong where a "cause of action calls into question the work and reputation of several individuals residing in or near that district and who presumably conduct business in that community"); *Affinity Labs*, 2014 WL 12570501, at *3 ("The district where a party has its principal place of business typically has a stronger local interest in the adjudication of the case."). As mentioned, key witnesses, including inventor Dr. Lee, also reside in CDCA. *See In re Acer Am. Corp.*, 626 F.3d at 1256 (finding local interest where "the inventor and patent prosecuting attorney whose work may be questioned" are residents of the district).

In contrast, as noted, WDTX has no material connection to the events in this litigation. The limited personnel at SK hynix's Austin office are of little significance given that in the course of four years, neither Netlist nor SK hynix deposed or even identified any Austin employee as a witness in litigation involving the same products, patent family, and RAND issues. That sales and other customer-facing activities take place in Austin, or that the product and a customer, Dell, are in Austin do not constitute a meaningful local interest. *Dataquill, Ltd. v. Apple Inc.*¸ Case No. 13-CA-706, 2014 WL 2722201, at 4 (W.D. Tex. June 13, 2014) ("The fact [accused products] are sold to Austin residents is largely irrelevant, as the mere presence of accused products in a district does not create a local interest.").

### 6. The "familiarity of the forum with the governing law" favors transfer.

CDCA's familiarity with the governing law favors transfer. As discussed, *supra*, given the two pending cases in California, CDCA and Judge Staton have greater familiarity with the technology relevant to

this patent family and the RAND counterclaims that will be relevant here.[8]

*    *    *

For all of the reasons above, the private and public factors all favor transferring this case to CDCA.

## II. At a Minimum, Mandamus Is Proper Because the District Court Has Failed To Timely Address the Transfer Motion.

Even though the Court should compel the district court to transfer this case to CDCA, mandamus is warranted, at a bare minimum, to compel the district court to address SK hynix's transfer motion.

The Court has emphasized that a district court should prioritize and resolve a party's transfer motion before it addresses other substantive issues in a case. *See, e.g.*, *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020) ("Although district courts have discretion as to how to handle their dockets, once a party files a transfer motion, disposing of that motion should unquestionably take top priority.") (applying Fifth Circuit law); *In re Nintendo Co.*, 544 F. App'x at 941

---

[8] The other two public interest factors are neutral. The parties agree that the relative congestion of the courts is about the same. *See* APPX0460. The avoidance of unnecessary problems for conflict of laws in the application of foreign law is not at issue here. *See* APPX0461.

(applying Fifth Circuit law in holding that "a trial court must first address whether it is a proper and convenient venue before addressing any substantive portion of the case").

This is because "[a]t times, a lengthy delay in ruling on a request for relief can amount to a denial of the right to have that request meaningfully considered." *In re Google, Inc.*, No. 2015-138, 2015 WL 5294800, at *1 (Fed. Cir. July 16, 2015). And the Court has recognized that such a constructive denial "[i]n the context of transfer of venue motions" can "frustrate 28 U.S.C. § 1404's intent … when defendants are forced to expend resources litigating substantive matters in an inconvenient venue while a motion to transfer lingers unnecessarily on the docket." *Id.* (citing *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964)). Accordingly, in *Google*, the Court granted mandamus where a district court had let a transfer motion linger for eight months and where Google "made a compelling case" that the trial court "arbitrarily refused to consider the merits of its transfer motion." *Id.* at *2; *see also In re TS Tech*, 551 F.3d at 1318 ("The writ of mandamus is available in extraordinary situations to correct a clear abuse of discretion or usurpation of judicial power.").

The Court's decision in *Google* controls here. SK hynix filed its transfer motion on May 4, 2020, and briefing was completed by May 26, 2020. After seven months with no decision from the district court, SK hynix moved to stay the case to ensure that WDTX did not needlessly hold a claim construction hearing scheduled for March 19, 2021. Even after the stay motion, however, the district court has not acted on the transfer motion for nearly eight-and-a-half months. Instead of prioritizing the transfer motion, the district court is considering it in "parallel" with other substantive matters. APPX0570. The district court's extreme delay and its refusal to heed the instruction to resolve transfer motions before proceeding to other substantive aspects of the case warrant the sort of "supervisory" intervention that justifies the writ of mandamus. *See In re Nintendo Co.*, 544 F. App'x at 936. Thus, as in *Google*, mandamus is warranted, and the Court, at a minimum, should order WDTX to issue a timely ruling on SK hynix's transfer motion.

## CONCLUSION

For the foregoing reasons, the Court should issue a writ of mandamus requiring the district court to grant SK hynix's motion to transfer this case to the CDCA. Alternatively, the Court should issue a writ of mandamus staying this case and requiring the district court to rule on SK hynix's transfer motion within 30 days.

Date: January 21, 2021                     Respectfully submitted,

                                           /s/ Carter G. Phillips

Kenneth L. Nissly                          Carter G. Phillips
Law Offices of Kenneth L.                  Ryan C. Morris
    Nissly                                 Sidley Austin LLP
P.O Box 3462                               1501 K Street, N.W.
Saratoga, CA 95070-1462                    Washington, D.C. 20005
Telephone: (408) 398-7043                  Telephone: (202) 736-8000

*Counsel for SK hynix Inc., SK hynix America Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 7,070 words (as determined by the Microsoft Word word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in 14-point Century Schoolbook font.

/s/ Carter G. Phillips
Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, D.C. 20005
(202) 736-8000

*Counsel for SK hynix Inc.,*
*SK hynix America Inc.*

NOTE: This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

--------------------------

**In re:  SK HYNIX INC., SK HYNIX AMERICA INC.,**
*Petitioners*

--------------------------

2021-113

--------------------------

On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas in No. 6:20-cv-194-ADA, Judge Alan D. Albright.

--------------------------

## ON PETITION

--------------------------

## O R D E R

SK hynix Inc. and SK hynix America Inc. (collectively, "SK hynix") submit a petition for a writ of mandamus directing the United States District Court for the Western District of Texas to transfer the underlying case to the United States District Court for the Central District of California, or alternatively, directing the Western District of Texas to stay the proceedings and to rule on SK hynix's motion to transfer.

Upon consideration of,

IT IS ORDERED THAT:

2                                             IN RE: SK HYNIX INC.

Netlist Inc. is directed to respond to the petition no later than February 1, 2021 at 12:00 noon.

FOR THE COURT

January 27, 2021          /s/ Peter R. Marksteiner
Date                      Peter R. Marksteiner
                          Clerk of Court

s29

**2021-0113**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

IN RE SK HYNIX INC., SK HYNIX AMERICA INC.

*Petitioner.*

*On Petition for a Writ of Mandamus to the*
*U.S. District Court for the Western District of Texas in*
*Case No. 6:20-cv-0194-ADA, District Judge Alan D. Albright*

## REPLY BRIEF FOR RESPONDENT NETLIST, INC.

James M. Wodarski
jwodarski@mintz.com
Andrew H. DeVoogd
dhdevoogd@mintz.com
MINTZ LEVIN COHN FERRIS
  GLOVSKY AND POPEO PC
One Financial Center
Boston, MA  02111
Tel. (617) 542.6000
Fax (617) 542.2241

*Counsel for Respondent Netlist, Inc.*

February 1, 2021

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. iii

INTRODUCTION ......................................................................................1

COUNTERSTATEMENT OF THE ISSUES PRESENTED...................................3

COUNTERSTATEMENT OF FACTS ...............................................................3

REASONS WHY THIS WRIT SHOULD NOT ISSUE .........................................4

    A.    Petitioners' Request that This Court Compel the District Court to Adjudicate the Pending Transfer Motion Is Moot ................................4

    B.    It Would Be Improper for this Court to Assume Control over the Adjudication of a Transfer Motion in the First Instance......................5

CONCLUSION .........................................................................................7

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Inc.*,
  979 F.3d 1332 (Fed. Cir. 2020) ........................................................3, 5

*In re Fusion-IO, Inc.*,
  489 F. App'x 465 (Fed. Cir. 2012) ....................................................7

*In re Google*,
  2015 WL 5294800 (Fed. Cir. July 16, 2015).....................................2

*In re Intel Corp.*,
  No. 2021-111, 2021 U.S. App. LEXIS 1691
  (Fed. Cir. Jan. 21, 2021) ..................................................................2

*In re Oracle Corp.*,
  No. 2010-M935, 2010 WL 2076987 (Fed. Cir. May 19, 2010).....................7, 8

*In re Remy Cointreau USA, Inc.*,
  541 F. App'x 985 (Fed. Cir. 2013) ................................................7, 8

**Statutes and Rules**

28 U.S.C. § 1404(a) ................................................................................7

**STATEMENT OF RELATED CASES**

1. *Netlist, Inc. v. SK hynix Inc.*, Civil Action No. 6:20-cv-00525 (W.D. Tex.)

2. *Netlist, Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605 (C.D. Cal.)

3. *Netlist, Inc. v. SK hynix Inc.*, Case No. 8:17-cv-01030 (C.D. Cal.)

## CERTIFICATE OF INTEREST

Counsel for Respondent, Andrew H. DeVoogd, certifies the following:

1.      The full name of every party or amicus represented by me is:

Netlist, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Netlist, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.      The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Matthew Galica, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

Eric Hansen, McKool Smith

John Garvish, McKool Smith

5.      Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

*Netlist, Inc. v. SK hynix Inc.*, Civil Action No. 6:20-cv-00525 (W.D. Tex.)

*Netlist, Inc. v. SK hynix Inc.*, Case No. 8:16-cv-01605 (C.D. Cal.)

*Netlist, Inc. v. SK hynix Inc.*, Case No. 8:17-cv-01030 (C.D. Cal.)

6.     All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

     None.

Dated: February 1, 2021         Respectfully submitted,

                    /s/ *Andrew H. DeVoogd*
                    Andrew H. DeVoogd
                    *Attorney for Respondent Netlist, Inc.*

Pursuant to the Court's Order, dated January 27. 2021, Respondent Netlist, Inc. submits this Reply in response to petitioners SK Hynix Inc. and SK Hynix America Inc.'s ("SK hynix" or "Petitioners") petition for writ of mandamus, dated January 21, 2021.

## INTRODUCTION

A writ of mandamus must be reserved for truly extraordinary circumstances, and this Court should exercise its mandamus authority with prudence and restraint. *In re Intel Corp*., No. 2021-111, slip op. at 5, 2021 U.S. App. LEXIS 1691, at *5 (Fed. Cir. Jan. 21, 2021) (quoting *Ex parte Fahey*, 332 U.S. 258, 259-60 (1947)). The Petition here arises from SK hynix's concern that its pending motion to transfer has not been decided by the lower court. The district court has now noticed a hearing on the motion for this Tuesday, February 2, 2021. A decision and order should therefore issue promptly. Accordingly, there is no need to compel the lower court to address and decide the pending motion. To the extent this Court desires to impose certainty on when the decision and order will issue, it may command the lower court to issue its decision within thirty days, as the Petition requests. *See, e.g.*, *In re Google*, 2015 WL 5294800, at *2 (Fed. Cir. July 16, 2015) (unpublished) (granting writ of mandamus and ordering magistrate judge below to issue a decision on motion to transfer within 30 days). That, however, should be the limit of this Court's response to the Petition. Nothing more is needed or justifiable.

The Petition, however, goes beyond a request to have the lower court promptly adjudicate the motion to transfer, and asks that this Court, itself, decide the motion. No precedent exists for the request. It would be an extreme and imprudent use of the Court's mandamus authority in any circumstances. It is plainly not warranted here, where the district court will hear the motion tomorrow. The transfer motion is properly left in the first instance to the discretion of the district court, and it would be improper for this Court to "exercise *de novo* dominion" over the motion and deprive the lower court of its rightful role in the administration of the case. *See generally In re Apple Inc.*, 979 F.3d 1332 (Fed. Cir. Nov. 9. 2020) (Moore, J., dissenting) (citing *In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010) and 28 U.S.C. § 1404(a)) (noting that an appellate court exercising "de novo dominion" over a matter committed "to the sound discretion of the trial court" is improper). In fact, Congress has committed the decision on motions to transfer "to the sound discretion of the trial court," and this Court has properly been reluctant to interfere with that role. *Id*.

This Court should dismiss the Petition as moot. Alternatively, the Court should, at most, command that the lower to issue a decision and order on the motion to transfer within thirty days.

APPX0628

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

Whether the procedural relief requested by Petitioners—that this Court order the lower court to hold a hearing and decide the pending transfer motion—is moot, because the lower court is holding a hearing on the motion the day after the filing of this brief.

Whether it is appropriate for this Court, as Petitioners' request, to improperly step into the shoes of the lower court, which has not yet made necessary factual findings relating to the transfer analysis, and usurp the reasoned discretion of the district court regarding transfer.

## COUNTERSTATEMENT OF FACTS[1]

On January 28, 2021, Western District of Texas Judge Alan D. Albright issued an order setting a motion hearing on Petitioners' motion to transfer for February 2, 2021, at 9:30 AM. *See* 2021-0113, Dkt. No. 7 at Exhibit A. Prior communication from the lower court stated that it will resolve "the jurisdictional issues … as far in advance of the Markman hearing as possible." APPX0570. Thus, Petitioners' transfer motion will be heard on February 2, 2021, and decided forthwith following that hearing (if not during the hearing).

---

[1] Respondent disagrees with Petitioners' Statement of Facts insofar as it mischaracterizes the record before the lower court. But the majority of that Statement is not germane to the only issue properly before this Court—whether the Writ is moot in view of the lower court's setting of a hearing on the subject motion to transfer.

## REASONS WHY THIS WRIT SHOULD NOT ISSUE

In light of the district court noticing a hearing on the transfer motion, the Petition is moot. The district court addressed Petitioners' concern. Mandamus relief is only appropriate where a petitioner (1) has a "clear and indisputable" right, (2) has "no other adequate means to attain the relief [it] desires," and (3) demonstrates that "the writ is appropriate under the circumstances." *In re Apple, Inc.*, 979 F.3d at 1336. Under that standard, certain of the requested relief is no longer necessary, and the more extreme request for relief should be denied.

Under the second of those three elements, only the Petition's request that this Court "compel the district court to address SK hynix's transfer motion," is arguably appropriate under the circumstances. Pet. at 34. Petitioners' other request for relief, that this Court "should compel the district court to transfer this case to California," Pet. at 34, is both unprecedented and unwarranted. Petitioners improperly ask this Court to usurp the lower court's clear fact-finding role in making a determination universally left to its measured discretion. No authority that Petitioners advance supports, let alone compels, such an extreme intervention.

### A.    Petitioners' Request that This Court Compel the District Court to Adjudicate the Pending Transfer Motion Is Moot

Petitioners ask for a writ of mandamus "compel[ling] the district court to rule on SK hynix's transfer motion" within 30 days. Pet. at 37. Given the fact that the district court set a hearing on the transfer motion to convene the day after the filing

of this brief, Petitioners appear to already have the relief they request. *See* 2021-0113, Dkt. No. 7 at Exhibit A (Order setting hearing date). This is because the lower court will undoubtedly rule on the transfer motion expeditiously, either during, or shortly after, the imminent oral hearing.[2] In any event, this Court can compel a decision by a date certain.

Thus, no need exists for a stay of case deadlines, which would only prejudice Respondent. Netlist has already served its opening *Markman* brief regarding one of the three asserted patents. Petitioners' responsive brief is due on February 10, 2021. Under a stay commencing before that date, Respondents would receive the unfair advantage of additional time to assess and respond to Netlist's claim construction positions. An exchange of claim construction briefs must occur regardless of whether the parties are litigating in Texas or in California. The claim that Petitioners would somehow be prejudiced by serving a responsive claim construction brief on the present schedule is misplaced.

**B.    It Would Be Improper for this Court to Assume Control over the Adjudication of a Transfer Motion in the First Instance**

Petitioners provide no support for their extraordinary request that this Court bypass the lower court and, in fact, relevant precedent requires the opposite. This

---

[2] Judge Albright has ruled on transfer motions from the bench immediately following an oral hearing. *See, e.g.*, Exhibit B, Minute Entry, *Uniloc 2017 LLC v. Apple Inc.*, No. 6:19-cv-00532-ADA (W.D. Tex. Nov. 16, 2020), ECF No. 109.

Court has consistently rejected petitioners' requests that the Court "*bypass* the district court and direct it to transfer the case based on our assessment of the relevant factors." *See, e.g., In re Remy Cointreau USA, Inc.*, 541 F. App'x 985, 987 (Fed. Cir. 2013) (emphasis added) ("*Remy Cointreau*") (rejecting request that Federal Circuit order transfer prior to the district court's decision on the motion pending below); *In re Fusion-IO, Inc.*, 489 F. App'x 465, 465–66 (Fed. Cir. 2012) (same); *In re Oracle Corp.*, No. 2010-M935, 2010 WL 2076987, at *1 (Fed. Cir. May 19, 2010) (same).

The *Remy Cointreau* case is instructive, in which the panel noted that section 1404(a)

> assigns *to the district court* the primary responsibility for determining whether the convenience of the parties and witnesses, and the proper administration of justice, call for transfer. When questions arise as to whether a case should be transferred, ***it is our practice to allow the trial court to act on the motion in the first instance***, *and for us to review that decision only under a highly deferential standard of review.* [Petitioner], of course, may seek mandamus if . . . the district court denies the motion.

541 F. App'x at 987 (emphasis added). This Court reached the same conclusion in *In re Fusion-IO, Inc.*, 489 F. App'x 465, 465–66 (Fed. Cir. 2012), in which petitioner sought a writ of mandamus ordering transfer to a different venue before the district court had weighed in on the merits of the transfer motion. This Court summarily denied the petition, and declined the petitioner's invitation "to bypass the district court's weighing of the facts and considerations relevant to its transfer motion." *Id*.

And in *In re Oracle Corp.*, No. 2010-M935, 2010 WL 2076987, at *1 (Fed. Cir. May 19, 2010), this Court denied a writ of mandamus petition seeking transfer where the transfer motion had been denied by a magistrate, but the district court was still assessing a reconsideration request. The panel noted that "[i]t would be inappropriate for this court to consider the [transfer motion] while it remains pending before the district court." *Id*.

As noted in *Remy Cointreau*, Petitioners may properly seek mandamus if the district court denies the transfer motion to address any plausible claim that the lower court's decision was an abuse of its discretion. 541 F. App'x at 987. The only prudent course now is to let the district court issue its decision.

## CONCLUSION

For these reasons, the Court should dismiss the Petition as moot. Alternatively, the Court should command the district court to issue a decision and order on the pending motion to transfer within thirty days, and dismiss all other relief requested in the Petition.

Dated: February 1, 2021        Respectfully submitted,


/s/ Andrew H. DeVoogd
James M. Wodarski
Andrew H. DeVoogd
  MINTZ, LEVIN, COHN, FERRIS,
   GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111

*Attorneys for Respondent Netlist, Inc.*

## CERTIFICATE OF SERVICE

I, Svetlana Santos, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **February 1, 2021** Appellant electronically filed the foregoing **RESPONSE BRIEF FOR RESPONDENT, NETLIST, INC.** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users, including the following principal counsel for the other parties.

Carter G. Philips
Ryan C. Morris
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005

Kenneth L. Nissly
LAW OFFICES OF KENNETH L. NISSLY
P.O. Box 3462
Saratoga, CA 95070

Paper Copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

Dated: February 1, 2021

/s/ Svetlana Santos
Mintz Levin

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e)

 X    The brief contains 1,674 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6)

 X    The brief has been prepared in a proportionally spaced typeface using MS Word 2016 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

Date: February 1, 2021                    /s/ Andrew H. DeVoogd_____
                                          Andrew H. DeVoogd
                                          MINTZ, LEVIN, COHN, FERRIS,
                                          GLOVSKY, AND POPEO, P.C.
                                          *Attorneys for Respondent Netlist, Inc.*

# EXHIBIT B

# U.S. District Court [LIVE]
## Western District of Texas (Waco)
## CIVIL DOCKET FOR CASE #: 6:19-cv-00532-ADA

Uniloc 2017 LLC v. Apple Inc.                            Date Filed: 09/10/2019
Assigned to: Judge Alan D Albright                      Jury Demand: Both
Case in other court: United States Court of Appeals for the    Nature of Suit: 830 Patent
                 Federal Cir, 20-00135    Jurisdiction: Federal Question
Cause: 35:271 Patent Infringement

**Plaintiff**

**Uniloc 2017 LLC**                    represented by    **William E. Davis , III**
                                                                            The Davis Firm, PC
213 N. Fredonia Street, Suite 230
Longview, TX 75601
903-230-9090
Email: bdavis@davisfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian John Hurt**
The Davis Firm PC
213 N. Fredonia Street
Suite 230
Longview, TX 75601
903-230-9090
Fax: 903-230-9661
Email: churt@bdavisfirm.com
*ATTORNEY TO BE NOTICED*

**Debra Coleman**
Coleman and Coleman PC
PO Box 161957
Austin, TX 78716
512-327-8933
Fax: 512-328-6269
Email: deb@coleman-coleman.com
*ATTORNEY TO BE NOTICED*

**Edward K. Chin**
Edward Chin, Esq.
680 N. Carroll Ave., Suite 110
Southlake, TX 76092
817-697-4525
Email: echin@davisfirm.com
*ATTORNEY TO BE NOTICED*

**Rudolph Fink , IV**
Davis Firm P.C.
213 N. Fredonia Street, Suite 230
Longview, TX 75601

(903) 230-9090
Email: rfink@davisfirm.com
*ATTORNEY TO BE NOTICED*

**Ty Wilson**
The Davis Firm, P.C.
213 N. Fredonia Street, Suoite 230
Longview, TX 75601
903-230-9090
Fax: 903-230-9661
Email: twilson@davisfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Apple Inc.**                    represented by  **Brian K. Erickson**
DLA Piper LLP (US)
401 Congress
Suite 2500
Austin, TX 78701
(512) 457-7059
Fax: (512) 721-2263
Email: brian.erickson@dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Catherine Huang**
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
619- 699-2700
Fax: 619- 699-2701
Email: catherine.huang@dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine K. Corbett**
DLA Piper LLP (US)
2000 University Ave.
East Palo Alto, CA 94303-2241
650-833-2000
Fax: 650-833-2001
Email: christine.corbett@dlapiper.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Erik R. Fuehrer**
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214
650- 833-2000

APPX0639

Fax: 650- 833-2001
Email: erik.fuehrer@dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey T. Quilici**
Orrick, Herrington & Sutcliffe LLP
300 W. 6th St., Suite 1850
Austin, TX 78701
512.582.6916
Email: jquilici@orrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Michael Guaragna**
DLA Piper LLP (US)
401 Congress
Suite 2500
Austin, TX 78701
(512) 457-7125
Fax: 512/457-7001
Email: john.guaragna@dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Larissa Bifano**
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
617-406-6000
Fax: 617-406-6100
Email: larissa.bifano@dlapiper.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark D. Fowler**
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214
(650) 833-2000
Fax: (650) 833-2001
Email: mark.fowler@us.dlapiper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Van Handel**
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
617-406-6000
Fax: 617-406-6100
Email:
michael.vanhandel@us.dlapiper.com

APPX0640

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Summer Torrez**
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2241
650-833-2000
Fax: 650-833-2001
Email: summer.torrez@dlapiper.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anand Mohan**
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
202-799-4000
Fax: 202-799-5000
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christian Chessman**
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214
(650) 833-2000
Fax: (650) 833-2001
Email: christian.chessman@dlapiper.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Pieja**
Goldman Ismail Tomaselli Brennan &
Baum LLP
200 South Wacker Drive, 22nd Floor
Chicago, IL 60606
312-681-6000
Fax: 312-881-5191
Email: mpieja@goldmanismail.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/10/2020 | 110 | SUPPLEMENT *Courtesy Copy of Uniloc 2017 LLC's Petition For Rehearing En Banc in Misc. No. 2020-135 in the United States Court of Appeals for the Federal Circuit* by Uniloc 2017 LLC. (Hurt, Christian) (Entered: 12/10/2020) |
| 11/16/2020 | 109 | Minute Entry for proceedings held before Judge Alan D Albright: Telephone Conference held on 11/16/2020. Case called for a telephonic hearing. The Court heard parties discussion on the Order Transferring Case and how it should be handled. After |

hearing argument, the Court determined that it will not transfer the case since the Order to Transfer is being reviewed. The Case is currently stayed with no activity until it is determined whether it will be transferred or not. The Plaintiff's Counsel was asked to let the Court know when there is a ruling regarding the transfer. (Minute entry documents are not available electronically.). (Court Reporter Kristie Davis.)(am) (Entered: 11/16/2020)

APPX0642

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**In re: SK HYNIX INC., SK HYNIX AMERICA INC.,**
*Petitioners*

_____

2021-113

_____

On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas in No. 6:20-cv-194-ADA, Judge Alan D. Albright.

_____

**ON PETITION**

_____

Before NEWMAN, MOORE, and STOLL, *Circuit Judges.*

MOORE, *Circuit Judge.*

### O R D E R

SK hynix Inc. and SK hynix America Inc. (collectively, "SK hynix") petition for a writ of mandamus directing the United States District Court for the Western District of Texas to transfer the underlying case to the United States District Court for the Central District of California, or alternatively, directing the Western District of Texas to stay the proceedings and to rule on SK hynix's pending motion to transfer. Netlist, Inc. opposes the petition.

Netlist filed this patent infringement suit against SK hynix in March 2020. On May 4, 2020, SK hynix moved to

2                                    IN RE: SK HYNIX INC.

transfer the case. The district court received Netlist's response on May 18, 2020 and SK hynix's reply on May 26, 2020 but has yet to rule. Meanwhile, the trial judge has ordered the parties to engage in extensive discovery and has scheduled a Markman hearing for March 19, 2021. On December 15, 2020, SK hynix moved to stay proceedings pending disposition of its transfer motion, but, on January 6, 2021, the court informed the parties of its policy "to proceed with all deadlines while [it] resolves the jurisdictional issues in parallel." Appx0570. SK hynix then filed this petition. On January 27, 2021, this court directed Netlist to respond by February 1, 2021. On January 28, 2021, the district court issued an order setting a hearing on the transfer motion for the morning of February 2, 2021.

Applying the law of the United States Court of Appeals for the Fifth Circuit in cases arising from district courts in that circuit, this court has held that mandamus may be used to correct a patently erroneous denial of transfer or an arbitrary refusal to act on such request. *See, e.g., In re Microsoft Corp.*, 630 F.3d 1361, 1363 (Fed. Cir. 2011); *In re Nintendo, Ltd.*, 589 F.3d 1194, 1201 (Fed. Cir. 2009); *In re Genentech Inc.*, 566 F.3d 1338, 1348 (Fed. Cir. 2009); *In re Google*, No. 2015-138, 2015 WL 5294800 (Fed. Cir. Jul. 16, 2015). That standard is an exacting one, requiring the petitioner to establish that (1) it has a clear and indisputable legal right to relief; (2) does not have any other method of obtaining the relief requested; and (3) that the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004).

We agree with SK hynix that the district court's handling of the transfer motion up until this point in the case has amounted to egregious delay and blatant disregard for precedent. As we recently reiterated, "[a]lthough district courts have discretion as to how to handle their dockets, once a party files a transfer motion, disposing of that motion should unquestionably take top priority." *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020) (citations

omitted); *see also In re Horseshoe Entm't*, 337 F.3d 429, 433 (5th Cir. 2003) ("[I]n our view disposition of that [transfer] motion should have taken a top priority in the handling of this case by the . . . District Court."). No such priority was given to the motion here, as it simply lingered unnecessarily on the docket while the district court required the parties to proceed ahead with the merits.

In light of the fact that the district court has now scheduled a hearing on the motion and is presumably proceeding toward a resolution of the transfer issue, we are not prepared to say that a writ of mandamus to compel the court to act on the motion would be necessary or appropriate at this juncture. Nor can we say that SK hynix has no alternative avenue to obtain meaningful relief on its request to transfer the case, as we fully expect that the district court will expeditiously rule on its motion. However, given the lengthy delay and upcoming Markman hearing, we find it appropriate to grant the petition to the extent that the district court must stay all proceedings concerning the substantive issues of the case and all discovery until such time that it has issued a ruling on the motion capable of providing meaningful appellate review of the reasons for its decision. *See In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 290 (5th Cir. 2015). Precedent compels entitlement to such relief and the district court's continued refusal to give priority to deciding the transfer issues demonstrates that SK hynix has no alternative means by which to obtain it.

Accordingly,

IT IS ORDERED THAT:

The petition is granted to the extent that the district court must stay all proceedings concerning the substantive issues in the case until such time that it has issued a ruling on the transfer motion capable of providing meaningful appellate review of the reasons for its decision. The parties shall inform the court when the district court has issued such an opinion.

4                                                          IN RE: SK HYNIX INC.

FOR THE COURT

February 01, 2021            /s/ Peter R. Marksteiner
Date                        Peter R. Marksteiner
                            Clerk of Court

s29

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**



|  |  |  |
|---|---|---|
| NETLIST, INC., | § | |
| *Plaintiff* | § | |
| | § | **6:20-CV-00194-ADA** |
| **-vs-** | § | |
| | § | |
| SK HYNIX INC.,  SK HYNIX AMERICA INC., | § | |
| *Defendants* | § | |

|  |  |  |
|---|---|---|
| NETLIST, INC., | § | |
| *Plaintiff* | § | |
| | § | **6:20-CV-00525-ADA** |
| **-vs-** | § | |
| | § | |
| SK HYNIX INC.,  SK HYNIX AMERICA INC., | § | |
| *Defendants* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants SK hynix Inc. and SK hynix America Inc.' ("Hynix" or "Defendants") Motion to Transfer Venue to the Central District of California ("CDCA") or alternatively to the Austin Division of the Western District of Texas (the "Motion to Transfer").[1] ECF #26.  Having considered the parties' briefing, the relevant facts and law, and the parties' oral arguments at the hearing conducted on February 2, 2021, the Court is of the opinion that the Motion to Transfer should be **DENIED**.

## BACKGROUND FACTS

On March 17, 2020, Plaintiff Netlist, Inc. ("Netlist" or "Plaintiff") filed a first suit in this Court (No. 6:20-CV-00194) ("the -194 action") accusing Hynix of infringing U.S. Patent Nos.

---

[1] Hynix's Motion to Transfer was filed under Case No. 6:20-CV-00194, but after Case No. 6:20-CV-00525 was filed and consolidated with the -194 action, the parties subsequently stipulated that the Motion to Transfer should apply to both the -194 and -525 actions. As such, this Order also applies to both actions.

APPX0647

9,858,218 ("the '218 patent") and 10,474,595 ("the '595 patent"). ECF #1.  The '595 patent is a continuation of the '218 patent.  Almost two months later, Hynix filed the Motion to Transfer venue to CDCA under the first-to-file rule or alternatively under 28 U.S. Code § 1404(a), or alternatively transfer the -194 action to the Austin Division of this District. ECF #26.

Hynix's transfer request under the first-to-file rule was based on two cases Netlist had previously filed in California. In 2016, Netlist sued Hynix in CDCA (No. 8:16-CV-01605, before Judge Staton) ("California I") and the U.S. International Trade Commission (No. 337-TA-1023) ("ITC I"), asserting, among others, U.S. Patent No. 8,489,837 ("the '837 patent"). *Id*.  Both the '218 and '595 patents are continuations from the '837 patent.  Netlist sued Hynix a second time in June 2017 in CDCA (No. 8:17-CV-01030) ("California II") and then a second time in the ITC in October 2017 (No. 337-TA-1089) ("ITC II"), asserting, among others, U.S. Patent No. 9,535,623 ("the '623 patent"). *Id*.  The '623 patent is also a continuation of the '837 patent. Several months later, in February 2018, Judge Staton stayed both California I and II actions, which remain stayed until today.  Before the two California actions were stayed, they were largely on auto-pilot: the parties negotiated discovery and protective orders, exchanged infringement and invalidity contentions, and exchanged claim construction briefs. ECF #26, 27. The California court's only involvement in those two cases includes holding a hearing to disqualify Netlist's initial counsel, granting a motion to strike portions of expert declarations in support of opening claim construction brief, and requesting the parties to file periodic status reports after the stay. *Id*.

Both the '837 and '623 patents in the California I and II actions have been invalidated by the Patent Trial and Appeal Board ("PTAB") through *inter partes* review ("IPR") proceedings. The PTAB instituted IPR review of the '837 patent in May 2017 and entered a final written

decision in May 2018 invalidating all challenged claims. *See* IPR2017-00548. Netlist did not appeal the PTAB's decision invalidating the '837 patent. Similarly, the PTAB instituted IPR review of the '623 patent in May 2018 and entered a final written decision in March 2019 invalidating all challenged claims. *See* IPR2018-00303. On May 22, 2019, Netlist filed a notice of appeal of the PTAB's decision regarding the '623 patent, which is still pending.

In the -194 action in this District, the Court held an initial case management conference on June 11, 2020. ECF #36. Shortly afterwards, on June 15, 2020, Netlist sued Hynix a second time in this Court (No. 6:20-cv-00525-ADA) ("the -525 action"), asserting U.S. Patent No. 10,217,523 ("the '523 patent"). The '523 patent is not related to the '218 or '595 patents previously asserted by Netlist in the -194 action, or any of the patents asserted in the California I and II actions. Four days later, on June 19, 2020, this Court held a second scheduling conference, and subsequently entered a scheduling order on July 8, 2020, setting Markman hearing for the -194 action for December 8, 2020 and trial date for October 16, 2021. ECF #39, 46. Based on the scheduling order, the parties completed their claim construction briefing for the -194 action in November 2020. ECF #53, 58, 61, 63, 66, 71.

Meanwhile, in the -525 action, the Court held a case management conference on October 16, 2020, where the Court consolidated the -194 action and -525 action upon Hynix's request. -525 action, ECF #23. Also upon Hynix's request, the Court agreed to delay the Markman hearing for four months in the consolidated case, re-setting it from December 8, 2020 to March 19, 2021, and re-setting the trial date for the consolidated case to December 6, 2021. -525 action, ECF #23, 28; -194 action, ECF #65, 73. Fact discovery for the consolidated case opened immediately after the conference, starting on October 16, 2020. Several days later, the parties

stipulated on October 21, 2020 that Hynix's Motion to Transfer shall apply to both the -194 and -525 actions. -525 action, ECF #24.

# DISCUSSION

## I.    First-To-File Rule

### A.    Standards

The first-to-file rule "stands for the common sense proposition that, when two cases are the same or very similar, efficiency concerns dictate that only one court decide both cases." *In re Telebrands Corp.*, 773 F. App'x 600, 602 (Fed. Cir. 2016) (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir.1985); *Save Power*, 121 F.3d at 950. "Where the overlap is complete or nearly complete, the usual rule is for the court of first jurisdiction to resolve the issues." *In re Telebrands*, 773 F. App'x at 602 (citing *West Gulf*, 751 F.2d at 730).

However, where the overlap between the two cases is not "complete or nearly complete," the "second district court has considerably more discretion." *Id.*; *see also In re ASM Int'l, N.V.*, 774 F. App'x 650, 652 (Fed. Cir. 2019). Indeed, "[t]he most basic aspect of the first-to-file rule is that it is discretionary; 'an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts.'" *Alltrade, Inc., v. Uniweld Products, Inc.*, 946 F.2d 622, 625, 628 (9th Cir. 1991) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183-84 (1952)). In such cases, the second district court's "judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Save Power*, 121 F.3d at 951; *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011). "The crucial

inquiry is one of 'substantial overlap.'" *Save Power*, 121 F.3d at 950 (citations omitted); *Sweet Little Mexico*, 665 F.3d at 678.

### B.    Analysis

The overlap between the present WDTX cases and the CDCA cases is far from "complete or nearly complete" to require a transfer under the first-to-file rule.[2] Although the '218 and '595 patents asserted in the -194 action are from the same family as the '837 and '623 patents asserted in the California cases, the present case involves different asserted claims from different patents, and therefore different claim construction issues and different infringement and validity issues. In addition, the -525 action, which is consolidated with the -194 action, involves a patent that is unrelated to any of those asserted in the California cases. Without a "complete or nearly complete" overlap between the WDTX cases and the CDCA cases, the Court thus exercises its discretion and analyzes the relevant factors in determining whether the first-to-file rule applies.

### 1.    "extent of overlap"

Hynix contends that the first-to-file rule applies here because the patents asserted in the present actions are from the same family as those asserted in the California actions and as a result, the claim construction, infringement, and invalidity analysis across all these actions are likely to be nearly identical. ECF #26 at 7-9. However, this alone does not justify a transfer under the first-to file rule. The -194 action involves different claims from different patents than the two California actions, which therefore requires different claim constructions and different

---

[2] Hynix contends that the Court should transfer the cases to CDCA pursuant to the first-to-file rule or alternatively pursuant to 28 US.C. 1404(a). However, Hynix does not contend that it does not have any presence in CDCA, and the present actions could not have been originally brought in CDCA under the *TC Heartland* patent venue rule. Hynix essentially contends that the first-to-file rule trumps the venue requirements described in Section 1400(b) and *TC Heartland*. Hynix, however, does not provide any legal authority for that proposition, nor has the Court been able to find one. In the absence of such legal authority, the Court will not extend the first-to-file rule to trump the venue requirements that the Supreme Court clearly set forth in *TC Heartland*. But to provide a complete record of this Court's analysis, the Court provides its first-to-file analysis.

infringement and validity contentions.  Transfer under the first-to-file rule requires far more than patents from the same family, same parties, and same accused products. *See, e.g., Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 6:15-cv-00551, 2015 WL 11090494, at *4 (E.D. Tex. Aug. 31, 2015), report and recommendation adopted, 2015 WL 11089478 (E.D. Tex. Dec. 2, 2015) ("Cases involving the same parties and accused products will naturally have some potential for overlap; the question … is whether the overlapping issues are substantial, such that interests of justice would require dismissal or transfer."); *Document Generation Corp. v. Allscripts,* No. 6:08-CV-479, 2009 U.S. Dist. LEXIS 149038 at *15-20 (E.D. Tex. May 19, 2009) (rejecting motion to transfer continuation patents with different claims); *Datamize Inc. v. Fid. Brokerage Servs., LLC*, No. 2:03-cv-321-DF, 2004 U.S. Dist. LEXIS 29100 at *17-18 (E.D. Tex. Apr. 22, 2004) (related patents sharing the same specification are nonetheless different patents that merit independent construction). Moreover, the '523 patent asserted in the -525 action, to which action the Motion to Transfer also applies, is totally unrelated to any patent asserted the California actions.

Hynix further contends that the RAND royalty issues in the present actions would also "substantially overlap" with its RAND royalty counterclaims pending in California I and II. ECF #26 at 10.   However, there are no viable RAND claims pending in the California cases concerning the '837 or '623 patent – Hynix is fully aware that the PTAB has already invalidated both patents through IPR proceedings. ECF #26 at 3, 5. By representing that its RAND royalty claims are still pending in the California cases, Hynix seems to suggest that it is willing to take licenses for invalidated patents. The Court is not in a place to judge Hynix's business acumen, but it appears to the Court that Hynix keeps its RAND claims in the California cases solely to gain certain tactical advantages.

In view of the above, the Court finds no "substantial overlap" between the WDTX cases and the CDCA cases.

### 2.      "likelihood of conflict"

There is no real likelihood of conflict or risk of inconsistent adjudications between the WDTX actions and the CDCA actions.  As discussed above, both the '837 and '633 patents in the CDCA actions have been invalidated by the PTAB, and Netlist did not appeal the PTAB's decision invalidating the '837 patent. Thus, a valid, enforceable patent claim will only exist in the California actions if Netlist successfully appeals the PTAB's decision concerning the '623 patent.  However, even if the '623 patent is eventually determined to be valid, the WDTX actions involve different claims from different patent than the CDCA actions: the asserted patent in the -525 action is not related to any of the asserted patents in the CDcA actions, and the asserted patents in the -194 action involves different claims than the '623 patent, although they are from the same family.  Therefore, any likelihood of conflict or risk of inconsistent adjudications would be attenuated, to say the least.

### 3.      "comparative advantage and the interest of each forum in resolving the dispute"

This factor also disfavors transfer under the first-to-file rule.  The CDCA actions have been stayed since February 2018 and they remain stayed today.   The parties have not meaningfully litigated the CDCA actions.   As the parties indicated in their briefing, the California court's only involvement in those two cases includes holding a hearing to disqualify Netlist's initial counsel, granting a motion to strike portions of expert declarations in support of opening claim construction brief, and requesting the parties to file periodic status reports after the stay.  The California court has not been presented with, let alone decided, any discover

matter or substantive issues in the cases. No Markman hearing has been scheduled and no trial date has been set for the California cases. Indeed, there is no indication when the stay will be lifted and Hynix has presented no evidence showing that the California court will not also stay the present actions if they were transferred to CDCA. The California actions were stayed at least partly due to the PTAB's institution of Hynix's IPR petitions. ECF #27 at 3. However, as Netlist pointed out, the Federal Circuit may not finally resolve its appeal of the PTAB's decision concerning the '623 patent for the next 18-24 months. And Hynix has not indicated that it intends to request the stay be lifted before the final resolution of the appeal concerning the '623 patent.

By contrast, the present case has been actively and substantively litigated in this Court. This Court has held three case management conferences and issued three scheduling orders for this case so far. The parties completed claim construction briefing for the two asserted patents in the -194 action and have already begun claim construction briefing for the -525 action. A consolidated Markman hearing has been set for March 19, 2021,[3] and trial has been set for December 6, 2021. Therefore, this Court has the "comparative advantage and the interest" in resolving the present case than the CDCA court.

In sum, all three factors weigh against transfer under the first-to-file rule.

## II.    Transfer under 28 U.S.C. 1404(a)

### A.    Standards

In patent cases, motions to transfer under 28 U.S.C. § 1404(a) are governed by the law of the regional circuit. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Under §

---

[3] Markman hearing for the -194 action was originally set for December 8, 2020. The hearing was reset for over four months later to March 19, 2021 only upon the request of Hynix to have a consolidated Markman hearing for the -194 and -525 actions.

1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought or

to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

Section 1404(a)'s threshold inquiry is whether the case could initially have been brought

in the proposed transferee forum. *In re Volkswagen AG*, 371 F.3d 201, 202–03 (5th Cir. 2004)

[*Volkswagen I*]. If that inquiry is satisfied, the Court determines whether transfer is proper by

analyzing and weighing various private and public interest factors. *Humble Oil & Ref. Co. v. Bell

Marine Serv.*, 321 F.2d 53, 56 (5th Cir. 1963); *In re Apple Inc.*, 979 F.3d 1332, 1338 (Fed. Cir.

2020) (applying Fifth Circuit law). The private interest factors are "(1) the relative ease of access

to sources of proof; (2) the availability of compulsory process to secure the attendance of

witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems

that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am., Inc.*, 545

F.3d 304, 315 (5th Cir. 2008) (en banc) [*Volkswagen II*] (quoting *Volkswagen I*, 371 F.3d at

203). The public interest factors are "(1) the administrative difficulties flowing from court

congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity

of the forum with the law that will govern the case; and (4) the avoidance of unnecessary

problems of conflict of laws [or in] the application of foreign law." *Id.* (quoting *Volkswagen I*,

371 F.3d at 203) (alterations in original). The factors are neither exclusive nor exhaustive, and no

one factor is dispositive. *Id.*  In applying these factors, the court enjoys considerable discretion

and assesses the case "on an 'individualized, case-by-case consideration of convenience and

fairness.'" *In re Vistaprint Ltd.,* 628 F.3d 1342, 1346 (Fed. Cir. 2010) (quotation omitted).

The burden to prove that a case should be transferred for convenience falls squarely on

the moving party. *See id.* Although the plaintiff's choice of forum is not a separate factor entitled

to special weight, respect for the plaintiff's choice of forum is encompassed in the movant's elevated burden to "clearly demonstrate" that the proposed transferee forum is "clearly more convenient" than the forum in which the case was filed. *Id.* at 314–15. While "clearly more convenient" is not necessarily equivalent to "clear and convincing," the moving party "must show materially more than a mere preponderance of convenience, lest the standard have no real or practical meaning." *Quest NetTech Corp. v. Apple, Inc.*, No. 2:19-cv-118, 2019 WL 6344267, at *7 (E.D. Tex. Nov. 27, 2019).

### B.    Hynix Has Not Met the Threshold Requirement

Hynix has not met its burden to establish that the present WDTX actions could initially have been brought in CDCA. Hynix does not dispute that it has no presence in CDCA and therefore Netlist could not have filed the -194 and -525 actions in CDCA under the *TC Heartland* patent venue rule, which requires that a defendant have a regular and established place of business in the subject venue.[4] *TC Heartland LLC v. Kraft Foods Group Brands, LLC*, 137 S. Ct. 1514 (2017). ECF #27 at 10, #31 at 1-2. Instead, Hynix only contends that the California I and II actions "establish that all parties have 'consented' to venue in that district." ECF #31 at 1-2. However, there is no evidence showing that the parties have both consented to the CDCA venue the in -194 and -525 actions. The fact that Netlist objects to Hynix's Motion to Transfer itself indicates that Netlist has not consented to the CDCA venue. Further, in its briefing, Hynix has cited no mandatory or persuasive authority to show that by filing suits in CDCA pre-*TC Heartland*, Netlist has automatically consented to venue in that district for any following suits involving different patents. As such, Hynix has not shown that it has met the threshold

---

[4] The California I and II cases were filed before the Supreme Court's *TC Heartland* decision, and were therefore not subject to the *TC Heartland* patent venue rule.

requirement for transfer under Section 1404(a), and its transfer request under Section 1404(a) should be denied for this reason alone.

### C.    *Volkswagen* Interest Factors Also Disfavor Transfer

Assuming arguendo that the WDTX actions "might have been brought" in CDCA, Hynix has not shown that CDCA is "clearly more convenient" than WDTX, by weighing the *Volkswagen* public and private factors.

### 1.    *Volkswagen* Private Interest Factors

#### a.    "Relative ease of access to sources of proof"

The first private factor, ease of access to sources of proof, considers "documents and physical evidence" as opposed to witnesses. *See Volkswagen II*, 545 F.3d at 315. Physical location of such sources of proof remains relevant notwithstanding technological advances in data storage, copying, and transmission. *See Volkswagen II*, 545 F.3d at 316; *In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009).  "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Apple Inc.*, 979 F.3d 1332, 1340 (Fed. Cir. 2020) (citing *In re Genentech*, 566 F.3d at 1345.

SK hynix Inc. is a Korean corporation having a principal place of business in Korea. Hynix admits that the documents related to the research and development, operation, and function (i.e., design documents) of the accused products, as well as marketing, sales and licensing information related thereto, are maintained in Korea. ECF #26 at 6-7.  Sources of proof could also be in this District in Austin, Texas, where SK hynix America has an office or in San Jose, California, where SK hynix America Inc.'s headquarter is located. *Id*.  Hynix does not

contend that any sources of proof is located in CDCA. Therefore, this factor weighs slightly against transfer.

> b.   *"Availability of compulsory process to secure the attendance of witnesses"*

Federal district courts have the absolute power to compel attendance of a trial, hearing, or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Federal district courts have trial subpoena power over a person "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is a party or a party's officer; or . . . [if the person] is commanded to attend a trial and would not incur substantial expense." Fed. R. Civ. P. 45(c)(1)(B). As party witnesses almost invariably attend trial willingly, "[w]hen no party has alleged or shown any witness's unwillingness, a court should not attach much weight to the compulsory process factor." *CloudofChange, LLC v. NCR Corp.*, No. 6-19-cv-00513 (W.D. Tex. Mar. 17, 2020) (citation omitted).

Hynix points out that Dr. Hyun Lee, the lone inventor of the '837, '623, '218 and '595 patents, is no longer employed by Netlist; nor is Mr. Noel Whitley, Netlist's former chief licensing officer, and are therefore both third-party witnesses. ECF #26 at 13.  Both Dr. Lee and Mr. Whitley are allegedly living in Irvine, California.  However, Hynix fails to show that either potential witness, or any other potential witnesses, are unwilling to testify.  In fact, both Dr. Lee and Mr. Whitley voluntarily participated in the related ITC actions, which occurred in Washington, D.C. Thus, this factor is neutral.

### c.   *"Cost of attendance for willing witnesses"*

Courts properly give more weight to the convenience of non-party witnesses than to party witnesses. *See ADS Sec. L.P. v. Advanced Detection Sec. Servs*., No. A-09-CA-773 LY, 2010 U.S. Dist. LEXIS 27903, at *11 (W.D. Tex. Mar. 23, 2010); *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc*., 867 F. Supp. 2d 859, 870–71 (E.D. Tex. 2012).

Hynix has not identified any non-party witnesses, but points out that it is easier for its party witness in Korea travel to CDCA than to WDTX. However, the Court does not find that flying from Korea to the Los Angeles airport and then driving to Santa Ana (where the California cases were filed) costs less than flying from Korea to the Dallas-Fort Worth airport and then driving to Waco. Similarly, the Court does not find that it would cost more for any Hynix's party witnesses to travel from San Jose to Santa Ana than to Waco. If anything, the hotels in Waco are cheaper on average than in Santa Ana. Hynix also contents that Netlists is headquartered in Irvine, California, and thus it would cost less for Netlist's party witnesses to travel to the CDCA court. However, when Netlist filed its actions in this Court, it has already taken consideration of such potential costs. Therefore, the Court finds that this factor is neutral.

### d.   *"all other practical problems that make trial of a case easy, expeditious and inexpensive"*

The Court finds this factor weighs against transfer. As discussed above, both the '837 and '623 patents have been invalidated by the PTAB, and Netlist has only appealed the decision concerning the '623 patent. Thus, it is very likely that those two patents, which are the main basis of Hynix's Motion to Transfer, will not be litigated in CDCA at all.  Further, the parties have not meaningfully and substantively litigated the CDCA actions, where the court's only involvement in those cases was holding a hearing to disqualify counsel, striking portions of expert declarations, and requesting the parties to file status reports after stay. The California

cases have been stayed three years since February 2018, and there is no evidence when the stay will be lifted in the near future.  Further, Hynix has presented no evidence showing that the California court will not also stay the present actions if they were transferred to CDCA.

On the other hand, the parties have been actively litigation the -194 and -525 actions since the first case was filed in March 2020: the claim construction briefing for the -194 action was already completed in November 2021, the claim construction briefing for the -525 action is ongoing, Markman hearing has been scheduling for March 19, 2021, and trial has been scheduled for December 6, 2020.  To transfer the present case to another district would largely obviate all the resources expended by the parties and the Court to prepare this case. Therefore, this factor weighs against transfer.

### 2.    *Volkswagen* **Public Interest Factors**

#### a.    *"Administrative difficulties flowing from court congestion"*

A faster average time to trial means a more efficient and economical resolutions of the claims at issue. Hynix offers no evidence showing that the present case will be tried faster in CDCA than in this district.  On the contrary, the California cases have been stayed three years with no evidence of that stay being lifted and no trial date set. By contrast, the present case is set for trial in this District in December 2021, around 10 months from now. Thus, this factor weighs against transfer.

#### b.    *"Local interest in having localized interests decided at home"*

While Netlist's headquarter is located in C.D. Cal, Hynix maintains an office in Austin and provides support to one of its largest American customers in this District. On the other hand, Hynix does not contend that it has any presence in CDCA. Further, the fact that Hynix is willing to transfer the present actions to the Austin Division of this District indicates that Hynix is aware

of the localized interest of litigating the present actions in this District. On balance, the Court finds that this factor weighs against transfer.

    *c.   "Familiarity of the forum with the law that will govern the case" and "avoidance of unnecessary problems of conflict of laws or in the application of foreign law"*

Noting that this case implicates federal patent law under Title 35 of the United States Code, the Court find that both factors are neutral for the transfer analysis.

    **3.    Hynix Has Failed to Establish That CDCA Would Be Clearly More Convenient**

Having considered the private and public interest factors, Court's conclusions for each factor is summarized in the following table:

| Factor | The Court's Finding |
|---|---|
| Relative ease of access to sources of proof | Weighs slightly against transfer |
| Availability of compulsory process to secure the attendance of witnesses | Neutral |
| Cost of attendance for willing witnesses | Neutral |
| all other practical problems that make trial of a case easy, expeditious and inexpensive | Weighs against transfer |
| Administrative difficulties flowing from court congestion | Weighs against transfer |
| Local interest | Weighs against transfer |
| Familiarity of the forum with law that will govern case | Neutral |
| Problems associated with conflict of law | Neutral |

On balance, the Court is not persuaded that trial in the Central District of California would be clearly more convenient than trial in the Western District of Texas.

## III.    Intra-District Transfer

In the Fifth Circuit, the § 1404(a) factors apply to both inter-district and intra-district transfers. *In re Radmax Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013). It is well-settled that trial courts have even greater discretion in granting intra-district transfers than they do in the case of inter-district transfers. *See, e.g.*, *Sundell v. Cisco Systems Inc.*, 1997 WL 156824, at *1, 111 F.3d 892 (5th Cir. 1997) ("Under 28 U.S.C. § 1404(b), the district court has broad discretion in deciding whether to transfer a civil action from a division in which it is pending to any other division in the same district.").

Other than pointing out that Hynix has a presence in Austin, Hynix has not offered any persuasive showing that litigating the present actions in Austin would be clearly more convenient than in Waco.  On the contrary, the Austin courthouse is closed due to the Covid-19 pandemic and there is no indication that it will be open by this case's scheduled trial date.  Thus, this case can only move forward in the Waco courthouse in the near future.

# CONCLUSION

For the reasons stated above, the Court finds that Hynix has failed to meet its burden to demonstrate that litigating this case in the Central District of California, or in the Austin Division of this District would be clearly more convenient than in Waco. Accordingly, the Hynix's Motion to Transfer is **DENIED**.

The Court *sua sponte* reconsiders its previous decision to delay the Markman hearing and subsequent scheduling and rescinds it. **Accordingly, the Court re-sets the Markman hearings for the consolidated -194 and -525 actions to take place on March 1, 2021, and the case is set for jury trial for July 6, 2021.**[5]

**SIGNED** this 2nd day of February, 2021.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

---

[5] The claim construction briefing for the -194 action has been completed and Plaintiff filed its opening claim construction brief for the -525 action on January 20, 2021. For the -525 action, the Court orders that Defendants file responsive claim construction brief by February 8, 2021, Plaintiff file reply claim construction brief by February 23, 2021, and the parties submit joint claim construction brief by noon, February 24, 2021. The parties are also ordered to submit an amended proposed scheduling order based on these dates by February 5, 2021.